```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2                  CIVIL NO. 13-CV-4507(CCC)

 3

 4    IN RE: DEPOMED PATENT LITIGATION
                                          TRANSCRIPT OF
 5                                          PROCEEDINGS
                                          (P.M. Session)
 6                                           (Public)

 7    - - - - - - - - - - - - - - - -

 8
                                     Newark, New Jersey
 9                                   March 14, 2016

10    B E F O R E:

11           THE HONORABLE CLAIRE C. CECCHI,
             United States District Judge
12

13

14

15

16

17
      _____
18           Pursuant to Section 753 Title 28 United States Code,
      the following transcript is certified to be an accurate record
19    as taken stenographically in the above-entitled proceedings.

20

21               S/Yvonne Davion
                 _____
                 Yvonne Davion, CCR
22               Official Court Reporter

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3        KEITH MILLER, ESQ.
          (Robinson Miller)

 4        MICHAEL SITZMAN, ESQ
          CHRISTINE RANNEY, ESQ.
 5        FRANK P. COLE, ESQ.
          JAYSEN S. CHUNG, ESQ.
 6        DAVID GLANDORF, ESQ.
          (Gibson, Dunn & Crutcher, LLP)
 7        For Depomed and Janssen

 8

 9        MELISSA CHUDEREWICZ, ESQ.
          (Pepper Hamilton, LLP)

10        LINDA A. WADLER, ESQ.
          BASIL J. LEWRIS, ESQ.
11        (Finnegan, Henderson, Farabow, Garrett & Dunner, LLP)
          For Grunenthal

12
          JAMES RICHTER, ESQ.
13        (Winston & Strawn, LLP)

14        SAL PATEL, ESQ.
          IMRON ALY, ESQ.
15        (Schiff Hardin, LLP)
          For Alkem

16
          KENNETH G. SCHULER, ESQ.
17        TERRENCE CONNOLLY, ESQ.
          (Latham & Watkins, LLP)

18
          AMY M. HANDLER, ESQ.
19        (Sills Cummis & Gross)
          For Roxane Laboratories

20
          SHEILA RAFTERY WIGGINS, ESQ.
21        VINCENT CAPUANO, PHD ESQ.
          ANTHONY FITZPATRICK, ESQ.
22        (Duane Morris, LLP)
          For Actavis Elizabeth, LLC and
23        Watson Laboratories, Inc

24

25
```

W I T N E S S E S

Thomas Christoph

Cross examination by Mr. Aly
Redirect examination by Mr. Sitzman
Recross examination by Mr. Schuler
Recross examination by Mr. Aly

Michelle Brown
Direct examination by Mr. Glandorf
Cross examination by Mr. Capuano

1    T H O M A S   C H R I S T O P H, sworn and testifies as follows:

2    CROSS EXAMINATION BY MR. ALY:

3         THE COURT:  We are going to continue with the

4    cross.  And I will remind the witness that he remains under

5    oath.  Thank you.

6         Q.  Good afternoon, Dr. Christoph.

7         A.  Good afternoon.

8         Q.  I would like also to start with timeline demonstrative

9    slide 13 that you had presented.

10        This is the timeline you discussed on direct

11   examination.  Is that right?

12        A.  Yes.

13        Q.  And in that timeline you said that as compared to the

14   tests and trials that you discussed during direct, everything

15   that was on here that you discussed and nothing is missing.

16   Is that right?

17        A.  Yes.

18        Q.  And if we can walk through some of those and I get to

19   my questions here first the Bennett report in November 1994,

20   that related to mononeuropathic pain, correct?

21        A.  That's correct.

22        Q.  And mono and polyneuropathic are two different kinds of

23   pain.  Is that right?

24        A.  Yes.

25        Q.  We have the Chung report here in December 2000 that

1      also related to mononeuropathic only.  Is that right?

2          A.   That's correct.

3          Q.   And then December 18, 2002 you did the STZ experiments

4      and that you said related to polyneuropathic pain. Is that

5      right?

6          A.   That's correct.

7          Q.   And then in between December 18, 2002 and March 12,

8      2007,  you didn't rush to the patent office in that time.   Is

9      that fair to say?

10         A.   I don't recall any interaction with the patent office.

11         Q.   Well, you had submitted a patent application in

12     March 2007, correct?

13         A.   Yes.

14         Q.   And in between 2002 you did the STZ experiments.   And

15     in fact you waited about three years to do the vincristine test

16     that you talked about?

17         A.   It took quite some time to develop the vincristine

18     model.  As I said, this was done by, it was developed by

19     Lillian Maymor (ph) and she came in early 2002.  So we started

20     to think about getting access to polyneuropathic pain models

21     and somewhere in the range of maybe in the range of the Chung

22     report.

23              We were thinking how could be get access to these

24     models.  And then we got the opportunity to bring in Lillian

25     Maymor work to do the post work and she brought us or she had

1   the experience and the know how.  And she developed during her

2   post doc time a vincristine model.  And she did quite some work

3   on this vincristine model comparing it with a number of

4   different other polyneuropathic pain models.

5        And in the end turned out that the vincristine would be

6   the suitable one, robust enough one to make a, test a

7   pharmacological test on it.

8        Q.   So, your testimony is you took sometime to develop even

9   the test to do the vincristine report.

10       Is that what you are saying?

11       A.   We invested a lot of effort in developing the model

12   until we got to the time when the vincristine was available.

13       Q.   And it took you over three years even to come up with

14   that model.  Is that correct?

15       A.   I don't know exactly the times but one might look in

16   the details of the vincristine report and what time this was

17   done.  And I remember that we also, Lillian Maymor she left I

18   think in 2004 and this model was also transferred to a

19   technician who took over then the testing.

20       Q.   And then before 2005 when the results were in about

21   vincristine which you said was a good model, there are no other

22   tests that you discussed between July 2005 and the time you

23   filed the patent in March 2007.  Is that right?

24       A.   I don't know whether we discussed anymore models as I

25   don't recall.

1    Q.   And sir, did you at Grunenthal at this time between

2    1999 and 2007, was Tapentadol the only drug you were working on

3    or were you working on other projects as well?

4    A.   We worked on a number of different projects.

5    Q.   More than five projects at the same time?

6    A.   I don't recall.

7    Q.   Of course there would be days if not weeks where you

8    wouldn't be working at Tapentadol in that window of time.

9         Is that right?  Between 1999 and 2007?

10   A.   Could you repeat the question?

11   Q.   Sure.  There would be days if not weeks of time where

12   you were not actively working on Tapentadol between the time

13   frame of November 1999 and March 2007.   Is that correct?

14   A.   Well, if you look at the pure working time in the lab,

15   that's, I think, correct.   I don't recall how much we

16   discussed internally on these data and what did we,  what the

17   result of these discussions were which led to further

18   experiments.

19   Q.   And so as far as the timing, we've addressed that now.

20   I want to talk about the bottom half of this particular slide

21   where you talk about these changes, references 1, 2 and 3.

22        Do you see that?

23   A.   Yes.

24   Q.   Do you agree that Dr. Tzchentke is not an inventor on

25   the '130 patent?

1    A.    That's correct.

2    Q.    And Dr. Tzchentke was at Grunenthal at the time that

3    you were, correct?

4    A.    Yes, he was.

5    Q.    You are the co-author on a couple of these Tzchentke

6    references, correct?

7    A.    Yes.

8    Q.    Did you tell Dr. Tzchentke, please do not publish the

9    information about Tapentadol, we haven't filed for a patent

10   yet?

11   A.    I don't recall talking to Dr. Tzchentke about the

12   patent invention.   I recall that he was the person responsible

13   for bringing all pharmacological data together.  And he also

14   got the responsibility to write papers on this.

15   Q.    And that's my question.   Not only did you not tell Dr.

16   Tzchentke to not publish, as a matter of fact you gave him all

17   of the information specifically to publish it, right?

18   A.    Well, this was the way the whole department did it

19   because we had lots of, if you look at these different

20   Tzchentke references, there are not only data on neuropathic

21   pain, there are data on visceral pain also from my labs.  There

22   are data on acute nociceptive pain, inflammatory pain.  All of

23   these data came together.

24        And Dr. Tzchentke had the responsibility to somehow to

25   act as a window person and to collect all these data.

1    Q.   And isn't it true sir that Dr. Tzchentke collected that

2    information including from you.  And you knew he was going to

3    make publications with that information,  correct?

4    A.   Well, he received all the information, of all the labs.

5    And he was, his responsibility or his task was to do some

6    publication of this.

7    Q.   And did you know that that was his task at the time, to

8    do some publication?

9    A.   Yes,  I knew this.

10   Q.   Now as far as the materials that was included that Dr.

11   Tzchentke gathered, he also gathered information from people

12   that were not named as inventors on the '130 patent,  right?

13   A.   Yes,  these were all these different data which were

14   generated in the labs of my colleagues like Robert Kugle and

15   Bob Shena (ph),  like Thomas Tzchentke himself.  This was all

16   different data from the whole department.

17   Q.   In all of the tests that you described, and I am

18   talking about all of them that are appearing on demonstrative

19   13, not one of them was a human administrative trial,  correct?

20   A.   Well, since these were all pre Kugle data and Thomas

21   Tzchentke who was also a colleague in the pharmacology, all of

22   these pre-communicative data generated in rats and mice.

23   Q.   Now Dr. Tzchentke's deposition was taken in this case.

24   Do you know him to be someone who tells a falsehood or tells

25   lies about what work people did on the articles he published?

1      A.   Well, I know him as a responsible and truthful

2    colleague.   I don't know what he, what he witnessed.   I have

3    no idea.

4      Q.   And so as far as you're here today if Dr.  Tzchentke

5    said something different than what you said about the materials

6    in the articles, right now you don't have any reason to

7    disagree with anything he said.   Is that right?

8      A.   Well, I wouldn't see what this could be.   Of course it

9    depends on the subject which he was talking about.   But,  this

10   I cannot judge.

11     Q.   Okay.   Let's change then to a third topic with you and

12   that is the declaration that you discussed with Mr. Schuler.

13   And that is at PTX 1600 tab H production number GRTNUC 4045.

14          To make sure what we are looking at Dr. Christoph there

15   was a point in time when the patent office said that we think

16   that the invention you are submitting might be invalid, might

17   be obvious.

18          Do you recognize that?

19     A.   Well, if I remember correctly, there was some

20   discussion on this including statements of these Buschmann

21   reference and the Walken (ph) reference.

22     Q.   And as part of the work that you did, you were asked to

23   submit a declaration to the patent office during the time that

24   the patent was being reviewed, right?

25     A.   Well, I gave all my data to the patent office at that

1       time.

2           Q.   And you were asked to put that in a declaration to the

3       patent office, correct?

4           A.   I don't recall.

5           Q.   And in this declaration let's look at some information

6       on production number, it will be Page 7 of the Document 44051.

7                This is some of the data appearing here Dr. Christoph

8       that you submitted to the patent office, correct?

9           A.   Yes.

10          Q.   And if we can highlight the two graphs.  Zoom in on

11      those.  And what we have in our comparison to the patent

12      office is some tests with Tapentadol on top, correct?

13          A.   That's correct.

14          Q.   And morphine on the bottom, correct?

15          A.   Yes, that's true.

16          Q.   The reason you chose morphine is because it's an

17      opioid, right?

18          A.   The reason why we choose morphine was because it's the

19      standard opiate.  It's the gold standard for treatment of

20      severe chronic pain conditions.  And it's in the same ballpark

21      as Tapentadol.

22          Q.   Now, you knew, though, sir, at this time when you are

23      submitting the declaration, that Grunenthal had Tramadol

24      available, correct?

25          A.   Yes.

1    Q.   Tramadol was commercially available in fact, correct?

2    A.   Sure.

3    Q.   And you didn't submit any comparison of Tapentadol to

4    Tramadol to the patent office, right?

5    A.   But I think there is some comparison to Tramadol in the

6    invention text in the patent.

7    Q.   I'm asking about the data in the declaration.

8         Did you submit any comparison of data between

9    Tapentadol and Tramadol, sir?

10   A.   No.  I mean in this model, as I said, this was a model

11   which we newly developed, the C T analgesia model.  And I don't

12   think we tested Tramadol in this model because it wasn't

13   considered to be the appropriate comparator.

14        It was morphine which we wanted to compare with since

15   morphine has similar potency in acute nociception and morphine

16   shows very different from Tramadol, shows similar abuse

17   liability matters,  abuse liabilities than compared with

18   Tramadol.

19        So, to our understanding morphine was the correct

20   comparator in this study.

21   Q.   At the time you submitted the declaration,  Dr.

22   Christoph,  you knew that Tramadol had two mechanisms of

23   action, an opioid mechanism and a non opioid,  correct?

24   A.   Yes.   We knew that Tramadol had an opiate agonistic

25   activity.   We knew that it had a norepinephrine reuptake of 55

1    HT reuptake and all of these need to be, as I said before, all

2    of these needs to be activated and present and all are located

3    on different entities of the molecule.   So,  it's a very

4    complex mixture.

5       Q.   And, sir, you also agreed on the cross-examination that

6    Mr. Schuler did, that you in fact you yourself had published on

7    Tramadol having the dual action opioid and non opioid before

8    you signed this declaration,  right?

9       A.   This was a publication on Tramadol versus morphine in

10   polyneuropathic pain.   This is not --

11      Q.   I think you answered my question.

12      A.   -- the matter of this field.

13      Q.   And on this particular model here in your declaration

14   you said that morphine had, was not on -- sorry, let me start

15   over.  You said that morphine was a better comparison than

16   Tramadol because Tramadol has different enantiomers that are in

17   the mix?

18      A.   No, this was a Tramadol statement.

19      Q.   Because you know, sir, that morphine is a mixture of

20   enantiomers also, right?

21      A.   Morphine?

22      Q.   Morphine.

23      A.   The activity of morphine is solely, it's a MU receptor

24   agonist.

25      Q.   Do you know if morphine is a combination of enantiomers

1 or not, sir?

2  A. I don't think so.

3  Q. Morphine has five stereo centers doesn't it on the

4 compound?

5  A. Well, I'm not a chemist.

6  Q. So you don't know how many enantiomers there are for

7 morphine?

8  A. I couldn't draw you the chemical structure of morphine,

9 sir.

10  Q. Do you understand then that Morphine has an active

11 metabolite or activity metabolites.  It's not morphine itself

12 but the metabolites that are responsible for the opioid

13 activity.  Did you know that?

14  A. I know that morphine itself shows a strong opioid

15 receptor agonistic activity.

16  Q. When given to man, it's the morphine M6 glucuronide,

17 M6G for short?  That's the most active MU opioid component and

18 that's a metabolite, correct?

19  A. It's not so easy.  It's also complex because M6G, to my

20 recollection, is a strong MU opioid agonist which is, by the

21 way, the same mechanism as the mother compound morphine, as

22 morphine itself.  And it gets, it gets metabolized so it will

23 disappear by time.

24   So you have when giving morphine and it's metabolized

25 to M6G, you will find only the MU opioid receptor activity

1    present in the treated subject.  And that's different from

2    Tramadol because there if you give Tramadol alone and give it

3    to a subject which is not able to metabolize Tramadol, the

4    subject will not receive any MU opioid receptor activity.

5        Q.   Let me see if you can answer my question which is

6    whether or not M6G is a metabolite of morphine or not?

7        A.   M6G yes is a metabolite of morphine.

8        Q.   Now, did you know that Tapentadol development at

9    Grunenthal was part of what they called a Tramadol successor

10    project?  Did you know that?

11        A.   Well, what, I don't know, at what time you think of?

12        Q.   At the time you are submitting this declaration in 2011

13    did you know that at Grunenthal Tapentadol was part of the

14    Tramadol successor project?

15        A.   I knew that we wanted to generate a new analgesic which

16    could overcome some of the problems which Tramadol was facing.

17        Q.   Did you know that the name of the project at Grunenthal

18    was Tramadol successor project?

19        A.   I don't recall this.

20        Q.   As far as the data that you submitted at anytime did

21    you compare to the patent office Tapentadol and Tramadol?  Not

22    just this declaration, but at anytime?

23        A.   Not that I remember.

24        Q.   And the Harati article that you discussed with counsel

25    that's an article you also didn't share with the patent office,

1    correct?

2         A.   Well, to my recollection the data, the research reports

3    were shared with the patent office.   And in the research

4    reports these articles are cited so they should know that this

5    was in the research reports.

6         Q.   So you are saying that you agree that you did not give

7    Harati to the patent office but the patent office should have

8    known by reading the reports, looking at the citation and

9    digging through all of these on their own?   Is that what you're

10   saying?

11             MR. SITZMAN:    Objection, your Honor,

12   mischaracterizes the testimony.

13             THE COURT:    Rephrase that question.

14        Q.   I want ask do you agree that you did not separately

15   submit Harati to the patent office?

16        A.   I don't recall this.

17        Q.   And your testimony is that the patent office should

18   have been aware of Harati because it's cited in one of the

19   technical reports that you also believe you submitted to the

20   patent office.   Is that right?

21        A.   I will say yes.

22        Q.   Thank you.   No further questions.

23             THE COURT:   Thank you.   All right.   Let's turn to

24   the plaintiffs for redirect.

25             I'm sorry, was there anything additional?

1          MR.FITZPATRICK:   Nothing for Actavis your Honor.

2          THE COURT:   Anything else from the defendants'

3    side? No?  Thank you.

4    REDIRECT EXAMINATION BY MR. SITZMAN:

5      Q.   Let me just go over a few, a couple of things.  And

6    actually I want to address one thing that Mr. Aly just

7    addressed.

8          Could I have exhibit DTX 1031, please.   It's column

9    12,  Table 3.

10          Doctor, can I have you look at, it's the '130 patent

11    DTX 1031.   Do you see that?

12      A.   Yes.

13      Q.   Now,  do you see Table 3 here in column 12?

14      A.   Yes,  I do see this.

15      Q.   Mr. Aly asked you a bunch of questions as to whether or

16    not you had told the patent office or supplied the patent

17    office with any information comparing Tapentadol to Tramadol?

18      A.   Uh-huh.

19      Q.   Do you recall those questions?

20      A.   Yes I do recall.

21      Q.   And I just want to look here at Table 3 compound 9 here

22    in table 3.  What's that?

23      A.    This should be Tapentadol.

24      Q.   And the one above it?

25      A.   That's Tramadol.

 1          Q.    Tramadol.  Okay.  And over here by the way just since

 2     we're here, the 100 percent here is it showing a hundred

 3     percent efficacy?

 4          A.    Yes.

 5          Q.    And Tramadol is at 86 percent efficacy when Tapentadol

 6     is a hundred.  Is that correct?

 7          A.    It's correct.

 8          Q.    And you submitted this data to --

 9               MR. SCHULER:    Your Honor, can we have some non

10     leading questions on redirect? It's still direct.  This is

11     leading.

12               MR. SITZMAN:    I'm allowed to respond to the

13     cross-examination.

14               MR. SCHULER:    I'm not saying it's beyond the

15     scope.  I'm asking for non leading questions.

16               THE COURT:    You can try and rephrase the

17     question.

18          Q.    All right.  Can you tell us about the efficacy of

19     Tapentadol here as disclosed in Table 3?

20          A.    Sure.   That means the efficacy, that's what I

21     mentioned also during our previous discussion, that there is

22     full efficacy, a hundred percent efficacy of Tapentadol in this

23     model of polyneuropathic pain.  And that's different from

24     Tramadol which show efficacy of 86 percent.

25          Q.    And that's also different than morphine too?

1      A.   It's different from morphine and it's also different

2   from Gabapentin, yes.

3      Q.   And this data, did you supply this data to the PTO?

4      A.   Well, I mean it's in the patent.

5      Q.   Can I have DTX 2010.

6           Do you remember on cross-examination Mr. Schuler asked

7   you some questions about this article?

8      A.   Yes.

9      Q.   And this is the article you're the lead author on?

10      A.   Correct.

11      Q.   Okay.  Now, Mr. Schuler asked you some questions here

12   about this paragraph that starts with however.  Do you see

13   that?

14      A.   Yes.

15      Q.   Okay.  Sorry.  I don't think he asked you about this.

16           Could you read that sentence if you can into the record

17   there?

18      A.   Which one?

19      Q.   The one that begins however?

20      A.   However, the debate about choice of appropriate

21   treatment for neuropathic pain continues.  And Tramadol amongst

22   others, among others, is seen as one useful compound in this

23   indication.

24      Q.   Okay.  And the debate that is referred to here is that

25   the controversy that you were discussing earlier?

1      A.   Yes.

2      Q.   And so as of this writing your paper here, you didn't

3   believe the debate had been resolved, had you?

4      A.   That's correct.

5      Q.   Do you remember that Mr. Schuler asked you some

6   questions about this article?

7      A.   Yes.

8      Q.   And this is DTX 2009.   Could you read the yellow

9   highlighted sentence here?

10      A.   As is generally the case with neuropathic pain, the

11   treatment of PHN which is postherpetic neuralgia is presently

12   unsatisfactory.   Only tricyclic antidepressants have

13   established efficacy in controlled clinical trials.

14          However, many PHN patients obtain no pain relief with

15   these drugs and only occasionally is complete pain relief

16   achieved.

17      Q.   And then the last sentence on this page?

18      A.   At the present time, there is serious controversy on

19   the issue of whether opioid analgesics are of benefit in

20   painful conditions such as PHN associated with damage to the

21   central or peripheral nervous system.

22          For example, in patients with a wide variety of

23   neuropathic pains, controlled intravenous opioid infusions

24   failed to produce analgesia.

25      Q.   Is that discussion consistent with your knowledge at

1    the time about the treatment of polyneuropathic pain and in

2    particular PHN?

3        A.   Absolutely.  And I mean again if you -- it's again

4    stating intravenous administration which means a high load of

5    opioid which still fails.

6        Q.   And actually that's what you testified to when you were

7    responding to Mr. Schuler's questions.  Is that correct?

8        A.   Yes.

9        Q.   Mr. Schuler also showed you this document which was

10   really large.  Luckily he didn't read it.   The induction of

11   pain.  Do you remember that?

12       A.   Yes,  I do.

13       Q.   Okay.  Do you remember he showed you a table of

14   definitions?

15       A.   Yes.

16       Q.   By the way, that's  DTX 2012.  Do you remember he

17   asked you a little bit, he asked you about the pain definition

18   here?

19       A.   Yes.

20       Q.   Okay.   Let me bring your attention down to Number 8

21   analgesia.   What does it say there?

22       A.   Analgesia anti- nociception, a reduction in spontaneous

23   pain or the pain elicited by a noxious stimulus.

24       Q.   Is the anti-nociception, is that an understanding that

25   you had at the time in terms of what analgesia meant at that

1    time?

2         A.   At which time are you talking about?

3         Q.   At the time of this article which is 1998.

4         A.   1998, yes.  I mean this was, mainly analgesia was

5    mainly in these days referring to established analgesics at

6    that time, which were for chronic and severe pain, was the

7    opiates.

8         Q.   You didn't understand that the analgesias at this time

9    were anti-neuropathic, right?  They were synonymous with

10   antinociception?

11        A.   Yes.

12        Q.   Let's turn quickly to the Buschmann patent DTX 120.

13   Let me have column 23.  There's a table there.

14             Now,  Mr. Schuler asked you some questions about the

15   Buschmann patent and what it disclosed.

16             Do you recall that?

17        A.   Yes.

18        Q.   And it disclosed or used the word "pain".  Do you

19   recall other than this writhing inhibition data, was there

20   anything else in the Buschmann patent showing any efficacy?

21        A.   Not to my knowledge.

22        Q.   And the writhing inhibition, what kind of test is that?

23        A.   That's a kind of acute nociceptive pain elicited by

24   chemical stimulation.

25        Q.   And was there any other indication in this patent,

1    based on your review of it, to suggest that the pain referred

2    to here in this patent referred to anything other than

3    antinociception?

4        A.   No.

5        Q.   Let me also pull up DTX 1030 and let's start on

6    Page 15.   Can you bring up the last paragraph on this page?

7    Can you recall this is the report, the cross tolerance and

8    tolerance report for Tapentadol.   Do you remember that?

9        A.   Yes

10       Q.   Do you remember Mr. Schuler asking you about this

11   paragraph about the old dogma?

12       A.   Yes.

13       Q.   Can we turn to Page 16, something that he didn't show

14   you.   And can you pick up mid-sentence mid-paragraph with

15   these data.   Can you read that sentence that begins with

16   these?

17       A.   These data are far from drawing a complete picture of

18   the clinical situation, but at least they are leading in the

19   same direction as the data of this report.

20       Q.   And is that consistent with your recollection of where

21   things stood when this report was written?

22       A.   Yes.

23            MR. SITZMAN:   I have no further questions your

24   Honor.

25            THE COURT:   Thank you.

1          MR. SCHULER:   Just real briefly.

2   RECROSS EXAMINATION BY MR. SCHULER:

3      Q.   Can you read the last two sentences of that paragraph?

4      A.   If you show it to me, yes.  Drugs with more than a

5   single mechanism of action might be favorable to drugs acting

6   respectively only at one target.   This concept is also seen in

7   the classical W.H.O. leader for the treatment of chronic pain

8   conditions with drug combinations.

9      Q.   It says W.H.O. leader.  That's a typo?

10      A.   That's a typo.  Its means letter.  That's referring to

11   the W.H.O. recommendation for the treatment of I think mainly

12   cancer associated.

13      Q.   And that's multi-modal analgesia, correct?

14      A.   Yes.

15      Q.   What you're saying here is that tapping into with more

16   than one mechanism of action consistent with the W.H.O. Letter,

17   might be better for treating these, excuse me, chronic pain

18   situations, correct?

19      A.   This is comparing the, this is linking the finding to

20   the effect, that's the W.H.O. letter, that the chronic severe

21   cancer pain also recommends kind of a multi-modal pain

22   treatment.

23          MR. SCHULER:   That's it.

24          THE COURT:   Thank you.  Anything else?

25          MR. ALY:   Yes, your Honor.

1            THE COURT:   Okay.

2    RECROSS EXAMINATION BY MR. ALY:

3        Q.   It's that new table we talked about, DTX 1031 at column

4    12 at eight I think on the PDF.   Table 3.

5            Now I just want to make sure we understand the

6    comparison, Dr. Christoph.   Because I think Mr. Sitzman points

7    out these numbers, 86 percent and a hundred percent.

8            Do you remember that?

9        A.   Yes.

10       Q.   The dose that as given for Tapentadol was

11   31.6 milligrams per kilogram, right?

12       A.   Yes.

13       Q.   The dose for Tramadol was two thirds of that, 21.5

14   milligrams per kilogram, correct?

15       A.   Yes.

16       Q.   And in fact surprisingly on the mechanical hyperalgesia

17   the results were about the same between Tramadol and

18   Tapentadol,  right?

19       A.   A little bit better for Tapentadol,  yes.

20       Q.   When you look at overall range, this range over here,

21   they are overlapping, correct?

22       A.   That's correct.

23            MR. ALY:   Nothing further.

24            THE COURT:   Thank you.   Anything else?

25            MR. SITZMAN:   No, thank you, your Honor.

1          THE COURT:   Okay.  Thank you.   We have concluded

2     with this witness.   Thank you, doctor, very much for appearing

3     today.  You are excused at this point.  Thank you.   Your

4     testimony has concluded.   Thank you so much.

5               Are we ready with the next witness?

6               MR. SITZMAN:   Yes, we are your Honor.

7     Plaintiffs would like to call Dr. Michelle Brown to the stage

8     or to the witness stand.

9     M I C H E L L E   B R O W N, sworn and testifies as follows:

10              MR. ALY:   Your Honor, we did discuss an objection

11    to the demonstrative.  I don't know if your Honor would prefer

12    to do it beforehand or during.

13              THE COURT:   I don't believe I received anything

14    yet so why don't I get a set and we can see what we're talking

15    about.

16              MR. SITZMAN:   Yes please distribute those.

17              THE COURT:   Before we get to that, are there any

18    objections to the exhibits themselves or just this one

19    demonstrative?

20              MR. ALY:   From us, not for the exhibits.

21              THE COURT:   Anyone ?

22              MR. CAPUANO:   No objection.

23              MR. CONNOLLY:   No objection.

24              THE COURT:   Mr. Aly, what is the objection and

25    which one is it?

 1           MR. ALY:   I have the larger version.  I don't

 2     know if your Honor we're looking at the same slide 22.

 3           MR. SITZMAN:   Can you pull up slide 22 so we can

 4     see it on the big screen ?

 5           MR. ALY:   Or slide 23.   So your Honor Dr.

 6     Brown's testimony is going to talk about the labels.  All

 7     right.  And as far as the labels are concerned we don't have a

 8     problem.   What we do have a problem with is Dr. Brown

 9     addressing Alkem's intent, the company's intent, somehow

10     reading the mind of the corporation saying Alkem had a specific

11     intent to do X.

12           There's one rule of evidence about which there is

13     much debate in the legal community is that an expert cannot

14     testify about somebody else's intent or state of mind and we're

15     not even --

16           THE COURT:   I don't know what she is going to

17     say.  But, if what if she were to refer to factors and she

18     would to say well, based upon my reading that establishes

19     intent, would she be able to do so?

20           MR. ALY:   No, your Honor.

21           THE COURT:   As opposed to your actual mental

22     intent.  If she looked at certain indicia and pointed to

23     certain indicia, would she be able to do that?

24           MR. ALY:   No, your Honor, that is the ultimate

25     question of intent.  Talking about the label or what people

1    will do with the label or not do is fair game.  But saying

2    specific intention to induce infringement is not fair game.

3                  THE COURT:    Counsel.

4                  MR. SITZMAN:  I've never heard that objection ever

5    before in my life, induced infringement requires intent.

6    Infringement experts are allowed to speak to and address every

7    single element.  This expert did address this element in her

8    report.

9                  The defendant Alkem decided not to respond to it.

10   Defendant Alkem then also had the opportunity to depose this

11   expert on those issues.

12                 The report was issued in June of last year.

13   They've had fair warning of this issue.  She has based her

14   opinion on facts.  She is entitled, as an expert, to render a

15   decision on the ultimate, or opinion on the ultimate issue and

16   that ultimate issue, as you know, includes intent.  All right.

17                 So it sounds like there was a long history.  She

18   disclosed it.  There was certainly a deposition of this

19   particular witness.  Why would it be something that would be

20   objected to at this point, given the opportunity for and full

21   and fair disclosure on this?  It doesn't appear to be surprise.

22   And she is an expert.  Shouldn't she be entitled to opine on

23   these issues?

24                 MR. ALY:   No, your Honor, because that, what Mr.

25   Sitzman is talking about is discovery obligations and having

1    the exchange and notice about the scope of the opinion.  That's

2    a Rule 26 issue, a discovery issue.  We are not talking about

3    Rules of Evidence.

4            And we believe, there are several cases, I have a

5    sheet of cases that I can read into the record that says an

6    expert cannot testify as to state of mind.

7            THE COURT:  Although was that particular line of

8    thought in her expert report presented through her deposition

9    objected to at the time? I mean it certainly wasn't raised

10   before me.

11           MR. SITZMAN:  Correct, your Honor.

12           MR. ALY:  This is the time to do it.  This is the

13   evidence where it's being presented.  It wasn't being presented

14   as evidence before.  We wouldn't have, for example, a legal

15   expert saying in response to Dr. Brown's report, no, you can't

16   have expert testimony on intent.

17           We believe this is the first opportunity to raise

18   that type of an objection as evidence as opposed to a discovery

19   issue.

20           MR. SITZMAN:  Your Honor, there's no rule of

21   evidence that I'm aware of.  I still haven't heard him cite a

22   rule of evidence on this issue.  My suspicion, based on his

23   argument, is that he's reading from a bunch cases where an

24   expert has testified about the emotional state of being of some

25   other person.

1            As she disclosed in her expert report, her

2 conclusion on specific intent is based on her review of the

3 ANDA, the letter, the actions and all of the things that Alkem

4 has done to infringe this patent.  And she is going to testify

5 shortly.  The Court will take that evidence.

6            If Mr. Aly wants to move to strike and he thinks

7 he's got authority for that,  he should file a motion and do

8 that.  But at this point in time I believe there is no rule of

9 evidence that would preclude her from testifying.

10            MR. ALY:   Your Honor, the rules are 701 and 702.

11 A person can only offer expert testimony about the area in

12 which any person can be an expert.

13            THE COURT:  But wouldn't she be competent as an

14 expert to go back in the record and look at specific things

15 that were either done or not done and draw a conclusion based

16 upon her experience?

17            And the question was an apt one by Mr. Sitzman in

18 terms of the cases, do you have them precisely in this context

19 or are they dealing with someone's sort of emotional thoughts

20 at a specific point in time? I mean there is a long or a

21 lengthy continuum in terms of these issues.

22            MR. ALY:   No, they are, in fact I was familiar

23 with one of these.  I happened to be in one of them in the

24 district of Delaware in 2004 and that's another New Jersey case

25 over in the circuit.  This is pretty common.

1          THE COURT:   What's the case?  What's the cite?

2     Do you have a copy of it for the Court?

3          MR. ALY:  I do not have a copy.  I can share with

4     you this excerpt we have.  I would be happy to do that or if

5     you want, your Honor, as Mr. Sitzman said, to brief it later,

6     we are happy to do that too.

7          THE COURT:   I think she sounds like she is

8     competent to enter into this testimony, to provide this

9     testimony.  If she bases it on something that you think is not

10    appropriate, certainly you can raise it as an issue to strike.

11    But, again, if she is going to be testifying, we heard a

12    preview of what she is going to be testifying as to.

13          And if she's going to be testifying as to certain

14    activity, I would think that that would be appropriate in this

15    circumstance.  But, perhaps maybe the best mode is just to see

16    how it unfolds.  And if you still have an objection, you can

17    raise it at that time.  How does that sound?

18          MR. ALY:   We will do so, your Honor.

19          THE COURT:   Is that good for everyone?

20          MR. SITZMAN:  Yes, your Honor.

21          THE COURT:   All right.  Let's proceed.  Also

22    actually before we go forward, what is the citation Counsel is

23    referencing?

24          MR. ALY:   The one I read?

25          THE COURT:   Yes.

```
1                    MR. ALY:   345 F Supp 2d 431 at 443.
2                    THE COURT:    431 at 443.   And what's the name of
3          the case?
4                    MR. ALY:   Oxford Gene Technology versus Mergen.
5                    THE COURT:   Is there an additional case?
6                    MR. ALY:    There are several, your Honor.
7                    THE COURT:  Would you like to list them all off or
8          would you like to give copies to the Court?  You can just list
9          them off now just so we will have them.
10                   MR. ALY:   Bracco Diagnostic, 627 F Supp 2nd 384
11         at 440.   Astra Zeneca versus tap,  444 F Supp 2nd 278 at 293.
12         In re:  Rosuvastatin calcium patent litigation 2009 Westlaw
13         4800702.
14                   THE COURT:   What is what the last one in re:
15         Rosuvastin, I'm sorry R-o-s-u-v-a-s-t-a-t-i-n and Astra Zeneca
16         versus Watson labs.
17                   THE COURT:   I'm sorry for the last one what was
18         the actual cite for it.
19                   MR. ALY:   The in re:  Rosuvastin. The cite is
20         2009,  W.L. 4800702  at eight.
21                   THE COURT:   At eight okay.
22                   MR. ALY: And Astra Zeneca versus Watson labs,
23         2012 W. L. 6043266 at two.
24                   THE COURT:   Okay.
25                   MR. ALY:   Thank you.
```

1          THE COURT:    Thank you.  Let's proceed.

2          MR. SITZMAN:   Thank you, your Honor.

3  M I C H E L L E  B R O W N,  sworn and testifies as follows:

4  DIRECT EXAMINATION BY MR. SITZMAN:

5      Q.   Good afternoon.

6      A.   Good afternoon.

7      Q.   Could you please state your name for the record?

8      A.   Dr. Michelle Brown.

9      Q.   And Dr. Brown could you tell us a little bit about your

10  educational background?

11     A.   Yes, I went to medical school at the university of

12  Florida.   I did an internship in internal medicine at Mount

13  Sinai medical center in Miami.   Following that I returned to

14  the university of Florida and completed a residency in

15  anesthesiology.  This was followed by a special fellowship in

16  pain management at the university of Florida.

17          I stayed at the University of Pennsylvania in 1997 as

18  an assistant professor of anesthesiology and pain management.

19  Following that, I retained a courtesy clinical associate

20  professor appointment at the university of Florida until 2011.

21  However, simultaneously, I was in private practice from 1997

22  until now.

23     Q.   And let's take a look at the next two slides.   Does

24  this reflect your current employment, sorry, this does reflect

25  that employment history that some of which you just touched on

```
 1          ,  correct?

 2          A.   Yes, it does.

 3          Q.   Okay.   And in the slide before that,  could you tell

 4     us what's reflected here on this slide?

 5          A.   Yes.   I currently am employed by Unifour anesthesiology

 6     associates in hickory,  North Carolina.   And I work as a staff

 7     anesthesiologist and pain management physician at about 9 to 10

 8     locations that we staff.   I'm also a member of our executive

 9     committee of our practice.   We manage the entire practice of

10     20 physicians and 70 additional employees.

11          And part of my role on this committee is to supervise

12     all of our medical directors of our clinics, pain clinics.

13     You may see that it says Associate medical director at some of

14     our pain clinics, we assign that name to me at the pain clinics

15     where I staff so that the patients and the staff that work

16     there know that they can come to me specifically with problems

17     at those locations.

18          But overall my duty on the executive committee is to

19     oversee the medical directors.   I work to deal with compliance

20     issues,  quality measures,  managing the staff.   I develop

21     policies and procedures.   And of course I field complaints

22     too.

23          Q.   How long have you worked at Unifour?

24          A.   Since 2001.

25          Q.   Okay.  And generally, if you were to put a label on it,
```

1 what kind of doctor do you describe yourself as?

2  A. I'm an anesthesiologist and I have a sub specialty

3 certification in pain management.

4  Q. How much time do you spend on a weekly basis seeing

5 patients?

6  A. I spend about 30 hours per week face to face with

7 patients seeing them in the pain clinic. Overall my week may

8 vary putting in anywhere from 40 to 80 hours depending on my

9 call duties. But I also work in the operating room

10 anesthetizing patients for surgical procedures. But on average

11 about two-thirds of my time is spent seeing patients at the

12 pain clinic.

13  Q. And how many pain patients would you estimate that you

14 see on a monthly basis?

15  A. About 500.

16  Q. And how many active pain patients do you currently have

17 under your care?

18  A. I would estimate around 3,000.

19  Q. And can you describe for us, you know the typical pain

20 patient that you see in the pain clinic?

21  A. Usually a patient is referred to me because they have

22 pain and their physician is unable to manage that pain be it

23 their primary care physician or surgeon or some other type of

24 specialist.

25  The most common painful syndrome that we will see

1    involves spine pain, it may involve low back pain or neck

2    pain.   Following that we may see other pain conditions like

3    diabetice neuropathy or fibromyalgia.  We may also see joint

4    discomfort as well but there's many things that we see

5    Q.   Were you retained to provide expert testimony in this

6    case?

7    A.   Yes I was.

8    Q.   And by whom?

9    A.   Depomed.

10    Q.   At this phase in the case in terms of where the case is

11    today and trial,  what were you asked to do?

12    A.   I was asked to assess whether the defendants in this

13    case have infringed the method of treatment claims of the '130

14    patent if allowed to market and sell their generic versions of

15    Nucynta ER.

16    Q.   And more specifically were you asked to look at induced

17    infringement for the defendants?

18    A.   I was.

19    Q.   And were you also asked to look at contributory

20    infringement?

21    A.   Yes, I was.

22    Q.   And did you make those assessments?

23    A.   I did.

24    Q.   And at a high level what is, if you can give us summary

25    of those opinions of infringement of the '130 patent?

1      A.   Alkem will infringe claims 1,2 3 of the '130 patent if

2   they are allowed to market their generic drug.   Both Roxane

3   and Actavis will infringe claims 1 and 2 of the '130 patent if

4   they are allowed to market their generic drug.

5      Q.   And generally speaking what do you base these opinions

6   on?

7      A.   On my clinical experience as a pain management

8   physician but also on many of the documents I have reviewed in

9   this case.

10      Q.   And among those things you reviewed the defendant's

11   proposed labels for their generic versions of the Nucynta ER

12   drug?

13      A.   Yes.

14      Q.   And you reviewed other portions of their ANDA

15   applications as well?

16      A.   Yes.

17           MR. SITZMAN:  Your Honor, I would like to offer at

18   this time Dr. Brown as an expert in pain management and

19   treatment, including the management of patients with

20   nociceptive and neuropathic pain.

21           THE COURT:  Any objection?

22           MR. CAPUANO:  No objection.

23           MR. ALY:  No.

24           THE COURT:  She is, in fact, deemed as an expert

25   in these areas.

```
 1                    MR. SITZMAN:    Before I continue forward, I think
 2       I know that but if I get close, will you let me know.
 3                    MR. CAPUANO:    Yes.
 4            Q.   All right.  Let's take a step back for a minute and
 5       talk a little bit more generally about pain.   What is your
 6       definition of pain?
 7            A.   Pain is an unpleasant and emotional sensory experience
 8       that is associated with actual or potential tissue damage or it
 9       can be explained in terms of such damage.
10            Q.   And would you agree then that pain is a symptom?  Is
11       that how you describe that?
12            A.   Yes,  I would.
13            Q.   And a symptom would be distinct from a cause of a pain,
14       correct?
15            A.   Yes,  it is.
16            Q.   What types of pain do you find relevant in this case
17       and in rendering your opinions?
18            A.   Nociceptive versus neuropathic pain.   Acute versus
19       chronic pain.   Intensity of pain described as mild,  moderate,
20       or severe.
21            Q.   Let's briefly chat about nociceptive pain.  What is
22       nociceptive pain?
23            A.   Nociceptive pain is pain involving specialized nerve
24       endings that are called nociceptors.   When nociceptors are
25       activated, this is in response to actual potential tissue
```

1    damage.   A patient will describe this sort of pain as a

2    throbbing or an aching pain much like a toothache or hitting

3    your thumb with a hammer is another example.

4         Typically this is a very distinct pain when a patient

5    is describing it to us.

6         Q.   What about neuropathic pain and can you give us some

7    examples?

8         A.   Neuropathic pain is pain that results from damage to or

9    dysfunction of the nervous system.   A patient will describe

10   this very differently than nociceptive pain.   Typically they

11   will describe it as a burning sensation an electrical or

12   shocking sensation, a pins and needles sensation.

13        Examples of this could include diabetic peripheral

14   neuropathy, postherpetic neuralgia, fibromyalgia.  A lot of

15   people consider that to be an neuropathic pain.

16        Q.   And can certain pain conditions be a combination of

17   both nociceptive and neuropathic?

18        A.   Yes, and we usually call these a mixed pain syndrome.

19        Q.   And do you have an example of a mixed pain syndrome

20   that we can think about?

21        A.   Most common example is chronic low back pain.

22        Q.   And that has elements of both nociceptive and

23   neuropathic?

24        A.   Yes.

25        Q.   What is acute pain?

1      A.   Acute pain is pain that generally will last anywhere

2    from 3 to 6 months.  It's expected to be self limited or that

3    it will heal overtime.

4      Q.   Can you contrast that with chronic pain.  How do you

5    define chronic pain?

6      A.   Chronic pain is pain that generally will last further

7    than six months and is not expected to heal.

8      Q.   Between acute pain and chronic pain,  which one falls

9    within the label of Nucynta ER?

10      A.   Chronic pain.

11      Q.   And why?

12      A.   Because this discusses pain that requires around the

13    clock coverage but for an extended period of time or for a long

14    term and that would indicate chronic pain.

15      Q.   Focusing on chronic pain then and just chronic pain for

16    a minute,  can chronic pain also be nociceptive?

17      A.   Yes,  it can.

18      Q.   And I assume then chronic pain could also be

19    neuropathic?

20      A.   Yes it can and probably most often is.

21      Q.   Most often is neuropathic?

22      A.   Neuropathic,  yes.

23      Q.   What is that, your assessment there, what is that based

24    on, that it's most often neuropathic?

25      A.   I base that on my clinical experience but also when you

1    assess nerves, nerves don't regenerate very well.   They don't

2    grow back like if you were to cut your hand with a knife you

3    expect that's going to heal.   But nerves don't really

4    regenerate very well.

5            And the classic example of this is Christopher Reeve's

6    spinal cord injury.   You don't expect something that is a

7    damage to the nervous system like that to recover very well.

8    That's a clear example of why that turns chronic.

9            Another reason is and I think some of the other

10   experts, medical experts in this case have said this is

11   neuropathic pain is very difficult to treat and you can't seem

12   to get it under control and typically will turn into a chronic

13   pain because of that.

14        Q.   Doctor, what is severe pain?

15        A.   Severe pain really refers to the intensity of pain.

16   And there's many ways that we refer to the intensity of pain.

17   This is just one of them.   And we use a grade like mild,

18   moderate or severe with severe being the worst.

19        Q.   And as I asked with the other symptoms we talked about,

20   can severe pain be nociceptive in nature?

21        A.   Yes.

22        Q.   And can it be neuropathic?

23        A.   Yes.

24        Q.   All right.   Let's take a look at the '130 patent.

25   Can I have the -- there we go.

1          You're aware that the plaintiffs have asserted claims

2     1,  2,  3 and 6 of the '130 patent against Alkem,  correct?

3          A.   Yes.

4          Q.   And that the plaintiffs have also asserted claims 1 and

5     2 against Actavis and Roxane?

6          A.   Yes.

7          Q.   And I think you said this earlier,  you understand that

8     claims 1,  2,  3 and 6 are all method of treatment claims?

9          A.   Yes.

10         Q.   Now,  could you just describe in your own words as you

11    are looking at claim one,  does that cover -- how do you read

12    claim one?

13         A.   It's a method of treating polyneuropathy pain using

14    Tapentadol.

15         Q.   Okay and is claim two different from claim one in your

16    perspective?

17         A.   Only in the sense now that Tapentadol is being

18    described as a salt.

19         Q.   And is claim, sorry, so what type of, just looking at 1

20    and 2 for a second, what type of pain do you believe claims 1

21    and 2 cover?

22         A.   Polyneuropathic pain.

23         Q.   Is claim three different from claims 1 and 2?

24         A.   This claim discusses only diabetic polyneuropathic pain

25    which is a type of polyneuropathic pain.

1    Q.   And claim six, does that also cover diabetic
2    polyneuropathic pain?
3    A.   Yes, I think diabetic polyneuropathy is just worded
4    slightly differently here but again it's still a type of
5    polyneuropathic pain.
6    Q.   Now, doctor, in prescribing a drug to a patient do you
7    read the package insert or label for the drug?
8    A.   I do.  In fact the FDA wants us to.
9    Q.   Have you ever been instructed or were you ever
10   instructed in medical school that you should not read the
11   package insert for a drug before prescribing a drug to a
12   patient?
13   A.   No I was never taught that.
14   Q.   Do you think it's reasonable for a physician to ignore
15   the package insert or label?
16   A.   No, I don't think that's reasonable.
17   Q.   And how many physicians again do you work with in your
18   group that you oversee?
19   A.   We have twenty physicians.
20   Q.   And based on your work with them and your oversight,
21   do your colleagues read the package inserts and labels of the
22   pain medications that they prescribe?
23   A.   They do.  In fact, at some of my locations I work with
24   more than one physician at the same location in a day and I can
25   tell you that we may be standing at the nurse's station looking

1      at a package insert figuring out how to prescribe it for

2      somebody.  And this is a teaching opportunity for the both of

3      us.

4            If there's two of us, for example, and as a supervisor

5      if a physician with whom I work prescribes a medicine in an

6      unsafe manner, I will hear about it.   And if that happens it's

7      certainly brought to my attention.

8      Q.   Now, aside from the package insert and the label, do

9      you also read literature about approved drugs and prescribing

10     them to patients?

11     A.   I do.

12     Q.   And when you have a patient in your office, do you

13     rely on the label or do you rely on the literature when you

14     prescribe a particular drug?

15     A.   Practically speaking I relied on the label.   This is

16     information that's been scientifically vetted by the FDA.   If

17     I have a patient who is sitting in my waiting room and Mrs.

18     Jones is in there waiting for me to write a prescription, it is

19     very impractical for me to go pull the literature on a

20     particular drug and see what it says.

21           And I rely upon the label in those situations to

22     prescribe a medication, I have a license to prescribe

23     effectively the proper doses and make sure that I'm not going

24     to bring harm to that patient.

25     Q.   Let's take a look at the Nucynta ER label starting with

1    its original version.

2             Can I have PTX 1499 ?

3             And do you recognize this document, doctor?

4    A.  Yes.  This is the original label for Nucynta ER when it

5    was FDA approved in 2011.

6    Q.  And Ross can you blow up the indications and usage

7    section on the left column there ?

8             What was Nucynta ER originally approved for in 2011?

9    A.  It was indicated for the management of moderate to

10   severe chronic pain in adults when a continuous, around the

11   clock opioid analgesic is needed for an extended period of

12   time.

13   Q.  Can polyneuropathic pain be moderate to severe chronic

14   pain as described here in this indication?

15   A.  Yes, it can.  I think the other experts in this case

16   have also said the same thing.

17   Q.  Let's take a look at a little deeper into this first

18   label.  Page 273457.  And if you can blow up the first part

19   of the clinical study section there.

20            And you see disclosed there the chronic low back pain

21   study.  Do you see that?

22   A.  Yes.

23   Q.  Okay.  And you understand that this was one of the

24   studies that was submitted in the approval process for Nucynta

25   ER?

1    A.   Yes it was.

2    Q.   Can you describe just on a high level what the results

3    show in terms of Nucynta ER?  You may need the rest of that

4    label.  But in terms of the Nucynta ER in the performance here

5    in this chronic low back pain study.

6    A.   Yes, it showed that patients who on average had severe

7    low back pain were given either Nucynta ER or placebo and

8    showed improved pain relief with Nucynta ER compared to

9    placebo.

10    Q.   I think we talked about this at the outset but it is

11    your belief that chronic low back pain can be polyneuropathic?

12    Is that what you said?

13    A.   Yes, and it often is.

14    Q.   In your experience, in your practice, do you see

15    patients with chronic low back pain who have a polyneuropathic

16    cause?

17    A.   Yes.  Chronic low back pain is probably one of the most

18    common painful syndromes and I see and it frequently does have

19    polyneuropathic pain associated with it, particularly as it

20    gets chronic and severe.

21    Q.   Now,  Dr. Weinberger and Actavis have argued that

22    chronic low back pain consists of neuropathic components.  Do

23    you agree with that?

24    A.   No, I don't.

25    Q.   And what do you rely on for that opinion?

1        A.   My clinical experience but also on some of the

2   literature.

3        Q.   Let's take a look at one of them that was used the

4   other day.   Can I have PTX 872.   This is the Morlion or

5   Morlion, I'm going to get my French down soon,  Morlion

6   reference.

7             Do you recognize that?

8        A.   Yes I do.

9        Q.   You've read this article and this reference before I

10  take it?

11       A.   Yes.

12       Q.   Let's look at Page 870.   Down there in the last

13  paragraph, thanks, Ross.

14            Now, Actavis and Dr. Weinberger argue that this portion

15  of this reference supports their position that chronic low back

16  pain rarely has a neuropathic pain component.

17            Do you agree with that?

18       A.   No I don't.

19       Q.   And can you explain why?

20       A.   This is very difficult to read.   But,  looking at the

21  numbers that are presented here,  such as the first sentence

22  that overall 80 to 90 percent of patients with low back pain

23  are thought to experience pain arising from a nociceptive

24  mechanical cause, while that statement may be true,  this is

25  encompassing acute and chronic low back pain.   There is no

1    mention that this is specifically chronic low back pain.   Go

2    ahead.

3        Q.   And only chronic low back pain would fall within the

4    Nucynta, correct, Nucynta label, correct?

5        A.   Yes.

6        Q.   Is there a mention of low back pain in this section

7    that Actavis is relying on?

8        A.   Although it's difficult to read, the sentence that

9    begins with however towards the bottom does references that.

10       Q.   And what does that say?

11       A.   It says However, note that this percentage is higher in

12   the presence of a neuropathic pain component when chronic low

13   back pain is considered.

14       Q.   All right.   Can we also turn, since we are in this

15   article, can we turn to Page 869?   I believe it's at the bottom

16   of this first column, the part of chronic LBP and we may need

17   the paragraph on the top of the second column.

18            Does this section of Morlion also discuss chronic low

19   back pain?

20       A.   Yes.   This is a little more specific to chronic low

21   back pain here.

22       Q.   And here it references, it looks like at the bottom of

23   the first pull out thus recent studies have demonstrated that

24   approximately 20 to 50 percent of patients with chronic low

25   back pain have a greater than 90 percent likelihood of a

1    neuropathic pain component.

2         Is that consistent with your practice and your

3    understanding?

4    A.   Yes and I think even further the further statement that

5    an additional 28 percent of patients with a neuropathic pain

6    component is suspected.  And then the next sentence is also I

7    think quite relevant, the presence of neuropathic pain

8    component is associated with more severe pain symptoms.

9    Q.   Excellent.  All right.  Despite all of this that we

10   just looked at, are all forms of chronic low back pain

11   neuropathic?

12   A.   No.

13   Q.   Okay.  So they can be, they can have nociceptive

14   components?

15   A.   They can be nociceptive,  mixed or neuropathic.

16   Q.   So, given this,  do you have an opinion as to whether

17   chronic low back pain would fall within indication one of the

18   Nucynta ER label for moderate to severe chronic low back pain?

19   A.   Yes, chronic low back pain would fall into that

20   indication.

21   Q.   Okay.  And do you,  what do you base that opinion on?

22   A.   I base that on literature like this, my clinical

23   experience and also on the label.

24   Q.   In fact, there was a chronic low back pain that was

25   submitted with the label?

1    A.   Yes.

2    Q.   Are there other studies that were submitted with the

3    original Nucynta ER label?

4    A.   Yes.

5    Q.   Can we go back to that?  It's Nucynta 458.  This is the

6    other study that you are referring to?

7    A.   Yes.

8    Q.   What study is this?

9    A.   This is the study looking at the benefits of Nucynta ER

10   in patients who had painful diabetic peripheral neuropathy.

11   And in fact this study at the time was pivotal because with any

12   type of drug that had MU opioid receptor activity, we had never

13   seen a pure neuropathic pain model used in support of FDA

14   approved in any way.  It was the first time.  And this was

15   quite remarkable.

16        And I remember thinking about this that this was

17   something that I have never seen before.

18   Q.   And these results are reported in the label here.   Is

19   that correct?

20   A.   Yes.

21   Q.   And I guess this goes without saying but I just want to

22   confirm, DPN is a type of polyneuropathic pain?

23   A.   Yes, and the studies showed that patients showed

24   improved pain relief with Nucynta ER compared with placebo.

25   Q.   Do you have an opinion as to whether DPN falls within

1 the first indication of the label for moderate to severe

2 chronic pain?

3   A. Yes, it falls within the label and also it appears that

4 the FDA thought that too.

5   Q. Let's go to PTX 1383.  I want to show you, move to the

6 current label of Nucynta ER, and if you could blow up the

7 indications and usage section again.

8   Do you recognize this document?

9   A. Yes, this is the current Nucynta ER label.

10   Q. Okay.  And focusing on these indications and usages,

11 what is Nucynta ER currently indicated for?

12   A. The first indication is pain severe enough to require

13 daily around the clock long term opioid treatment and for which

14 alternative treatment options are inadequate.

15   And the second indication, the neuropathic pain

16 associated with diabetic peripheral neuropathy otherwise known

17 as DPN in adults severe enough to require daily around the

18 clock long term opioid treatment and for which alternative

19 treatment options are inadequate.

20   Q. Can pain severe enough to require daily around the

21 clock long term opioid treatment be polyneuropathic?

22   A. Yes, and it often is.

23   Q. Now are you aware of why there was a wording change

24 from the original label we just looked at to this one in terms

25 of indication one?

1      A.   No, I'm not.

2      Q.   Other than the wording difference, do you view them

3   clinically different in any way, shape or form?

4      A.   No, I don't.

5      Q.    When you look just at indication one for a second, is

6   there any particular cause of the pain symptom that is

7   specified in indication one?

8      A.   No, simply for pain.

9      Q.   So that's the symptom that we talked about earlier?

10      A.   Correct.

11      Q.    Indication two, is that a particular cause associated

12   with the symptoms?

13      A.   Yes, that's specific to diabetic peripheral neuropathy.

14      Q.   And does diabetic peripheral neuropathy fall within

15   indication one?

16      A.   Yes,  it does.

17      Q.    Do other causes fit within indication one?

18      A.   Yes.

19      Q.   And does polyneuropathic pain describe many of those

20   causes?

21      A.   Yes.

22      Q.   All right.   Turning to second 14,  one of the current

23   labels which is Page 9.   Thanks Ross.

24           These are the clinical study section.   It looks like a

25   second study has been added.   Do you see that?

1      A.   Yes.

2      Q.   And what is that additional study?

3      A.   An additional DPN study was added to the current label.

4      Q.   How does this new DPN study affect your opinions in

5      this case.

6      A.   It does not.

7      Q.   And why not?

8      A.   Because it doesn't change clinically how I may

9      prescribe the drug.   There was already a DPN study in the

10     original label.

11     Q.   So if we can go on to the next demonstrative I just

12     want to confirm your understanding.

13          Then that indication one, I'm sorry,  indication one

14     was supported with the first two studies we see here?

15     A.   Yes.

16     Q.   And then indication two was supported with the second

17     DPN study,  correct?

18     A.   Yes.

19     Q.   All right.   And if we can have the next to confirm

20     your understanding then actually go back one I think.   There

21     we go.

22          Indication one, in your opinion, that indication one

23     covers claims 1,  2,  3 and 6 ?

24     A.   Yes.

25     Q.   And indication two, what does that cover?

1    A.   Claims 3 and 6.

2    Q.   Okay.   So I know you're not a lawyer but I would like

3    to go through the different types of infringement you were

4    asked to address in this case and that we talked on very early

5    on in this examination.

6         Can we have, there we go.

7         Do you understand that to find induced infringement

8    there must be direct infringement,  knowledge that the actions

9    would cause infringement and specific intent to induce

10   infringement?

11   A.   Yes.

12   Q.   And to find contributory infringement there must be

13   those same first two elements, direct infringement and

14   knowledge that the actions would cause infringement plus, no

15   substantial noninfringing uses and that the component must be a

16   material part of the invention?

17   A.   Yes.

18   Q.   Did you agree with those elements in this case?

19   A.   Yes,  I did.

20   Q.   Let's take Alkem first.

21        MR. ALY:   Your Honor, this may be a good time as

22   we enter into the information presented by defendant, to have

23   the courtroom sealed.

24        MR. SITZMAN:   That's fine.   I was going to wait

25   until we got to Actavis but that's fine.

1          THE COURT:   Would you like to do that now?

2          MR. ALY:   Sure.

3          THE COURT:   We are going to clear the courtroom

4     so counsel obviously will remain and the clients will remain.

5     Everyone else must wait outside.

6          MR. KANDARA:   John Kandara, a California attorney,

7     member of the public.

8          It appears that during Dr. Weinberger's testimony

9     yesterday there was at least some of that testimony that should

10    have been open to the public and was not.   We have heard some

11    of that discussion today.

12         THE COURT:   I am not certain what you refer to but

13    if someone knows what this gentleman is speaking of, maybe you

14    can enlighten me.   I'm getting nods no.

15         MR. KANDARA:   I will tell you right now.   It

16    appears there was some discussion by Dr. Weinberger about some

17    papers, a paper that he was using to cite to.   Let's see, a

18    paper that he cited to support his opinion.

19         All I'm asking, if I can find, the reference, it

20    was PTX 870 pages 869 and 870, he discussed, the paper

21    discussed whether chronic low back pain did or did not have a

22    polyneuropathic component.

23         What I'm asking is that to the extent that there

24    is any discussion today that would not relate directly to the

25    labels and what the labels say, the parties would police

1    themselves a little bit better than they did yesterday and

2    allow the public back in.

3                    THE COURT:   We are narrowly tailoring this and we

4    have the entirety of the proceedings open to the public with

5    the exception of a very small portion of the testimony.

6                    MR. KANDARA:  I understand that.

7                    THE COURT:   That has been highlighted by counsel

8    and they determine whether it's time that we are going to be

9    discussing something that is subject to sealing at that point.

10                   And we have many documents in the case, obviously

11   that have been sealed previously, not exactly on this date, but

12   previously sealed.  And if we are talking about any areas that

13   go into that, obviously the courtroom needs to be sealed.

14                   If you believe there has been some portion, a

15   small portion that may have been included in the sealing that

16   shouldn't be included in the sealing, I'm not certain exactly

17   as to what that is.  I know you mentioned something today.  I

18   don't know if counsel know anything about that or why it's

19   being brought up.  But obviously we're trying to narrowly

20   tailor that.

21                   MR. KANDARA:  I understand.

22                   THE COURT:   We've asked members of the public be

23   excused.  As we attend to, that there may be testimony that is

24   subject to sealing not for any other reason.

25                   Let me hear from counsel on this if you have any

```
 1          other information that can bear upon this.
 2                    MR. CAPUANO:   Your Honor, in a 10 or 15-minute
 3          exchange, there are going to be a handful of questions, maybe
 4          more, that aren't related to confidential information.  I don't
 5          think it's practical to open and close the door for five
 6          questions and then send people out again and have them ushered
 7          in and out.
 8                    It's just we are trying to do the best we can to
 9          be as narrowly tailored as you to protect our client's
10          information.
11                    THE COURT:   Counsel.
12                    MR. SITZMAN:   I just want to comply with the
13          concerns that everybody has.   It seems to me, though one thing
14          that dawns on me, I guess we'll have to go back to the
15          transcript anyway, we could always, when we have the transcript
16          in front of us --
17                    THE COURT:   We could unseal a portion of it.
18                    MR. SITZMAN:   Unseal the portions, but at this
19          point there's --
20                    THE COURT:   There's nothing being done here to
21          prevent the public from hearing matters aside from those that
22          are actually sealed.
23                    MR. KANDARA:   I understand, your Honor.
24                    THE COURT:   As the Court needs to be very mindful
25          of protecting the record because certainly that is my job here.
```

```
 1              MR. KANDARA:  I was only --

 2              THE COURT:   So, as counsel for Actavis has

 3    mentioned, if he does ask a question that perhaps is not

 4    something that pertains to something to be sealed because he is

 5    following up with before and after with questions that need to

 6    be protected, obviously that has to be covered here.   We could

 7    have at left members of the public go in and out after every

 8    question but we are trying to work it out in as best a way we

 9    can work it on.

10              MR. KANDARA:  I am not asking for every other

11    question, your Honor.  I am asking to the extent that counsel

12    is aware that there is going to be a block of questions that is

13    not related to confidential information,  they inform the Court

14    of that and have the courtroom reopened until such time as

15    there is another block of confidential information.

16              THE COURT:   I totally understand.

17              MR. KANDARA:  That's all I'm asking.

18              THE COURT:   I totally understand.  I believe they

19    have been working in a very cooperative method and way to get

20    that done and to insure that is adhered to but our goal is all

21    the same here.   We have one goal to protect that which needs

22    to be protected.   And beyond that certainly we are interested

23    in providing this as being an open forum for the public.

24              But I do need to make sure that whatever counsel

25    has told me needs to be protected, that certainly we operate on
```

1    that principle.   And if there is anything that has gone by

2    which looks like it has been covered through a section of

3    testimony that has been sealed, we can take a look at that at a

4    future time.

5         As I indicated, our goals are to provide the

6    litigants here, the parties with the protection that they

7    deserve regarding their particular documents and testimony that

8    need to be protected, and balance that against what the public

9    needs.  And we have been doing this in a way that insures that

10   the public can hear you know everything that can be given to

11   the public.  So we are not trying to do anything but that.

12        So, let me take down the pages of the testimony

13   you are looking at and certainly counsel can look at that and

14   see if there's any issue.  You mentioned it was at the

15   beginning but we don't have that before us right now.  So tell

16   me what it is and counsel will take a look at it and get back

17   to me.

18        MR. KANDARA:  Apparently on some discussion

19   yesterday during Dr. Weinberger's testimony of the Morlion

20   article PTX 872 and whether it supported his opinion that

21   chronic low back pain rarely has a polyneuropathic component.

22   Such discussion clearly does not involve one label or another

23   or the language that's included in that label and thus should

24   not be considered confidential.

25        THE COURT:   Okay.  We don't have a transcript

1      right now but when we get that transcript, we will certainly

2      take a look at it and direct counsel to take a look at it.  And

3      if there is any reason that it needs to remain sealed, you will

4      let me know that.

5              If there's any reason that it can be open to the

6      public, you will let me know.  How does that sound?

7              MR. SITZMAN:  We will do.

8              MR. CAPUANO:   We will.

9              THE COURT:  We will all endeavor to work together

10     on this issue so there are no further complications.  Thank

11     you.  At this point we are however to seal the courtroom

12     because I have been informed that the following material is

13     privileged, confidential, highly confidential, needs to be

14     retained.

15             So let me go through and I will do the same.  I

16     will follow the same procedure that I have been following.

17     Let's see all the folks from the plaintiffs.   We have Depomed.

18     Let's see you folks.  Grunenthal.  Actavis.  Roxane.  Alkem.

19     All right.

20             Anyone else?  We have someone in the corner.  You

21     are here with one of the teams.  With Roxane.   All right.

22     Let's go.  Let's seal the courtroom.

23                 (Whereupon the hearing is sealed).

24                 (Whereupon the following takes place in open

25     court)

1              MS. SHARKEY:  We are going to pass out corrected

2      Mogil exhibits.

3              THE COURT:   These are corrected?  These look like

4      demonstratives.

5              MS. SHARKEY:  These are demonstratives corrected

6      in hard copy after the discussion on Friday.

7              MR. CONNOLLY:  You may recall Mr. Schuler and Mr.

8      Sitzman had a discussion about a couple of slides, reached an

9      accommodation, and I think that we promised to get you

10     replacement slides.  Because I think at some point there were

11     either handwritings or blackouts or whatever.  It's just it

12     reflects the agreement among counsel.

13             THE COURT:  I got it.  Okay.  That makes sense.

14     Thank you.

15             MR. CONNOLLY:  I know that there's no reporter

16     here to report on that important development.

17             THE COURT:  We did just unseal the room so.

18             MR. CONNOLLY:  Right.

19             THE COURT:  It is unsealed.  Everyone is free to

20     listen.  In any event, do we have anything else that we need

21     to discuss today before we break?

22             MR. CONNOLLY:  Not from Roxane.  Your Honor.

23             THE COURT:  Anything?

24             MR. ALY: No, your Honor

25             MR.FITZPATRICK:  No.

1              MR. SITZMAN:    Nothing, your Honor.

2              THE COURT:    Excellent.  We will be adjourned for

3      the evening.  I look forward to the continuation of the

4      cross-examination tomorrow morning.  And I think that's it.

5              And again who did we say was going to be on the

6      witness stand for the remainder of the day thereafter?

7              MR. ALY:  Two witnesses, Steed and Wolf.

8              THE COURT:  And they are?

9              MR. ALY:    Steed is a polymorph expert that Alkem

10     is calling.

11             MR. CONNOLLY:    And Dr. Wolf, your Honor, is a

12     stereochemistry expert.  He is going to testify about

13     enablement and written subscription.  And then keeping in the

14     theme of the trial, he is also a German who speaks accented

15     English.

16             THE COURT:    We are getting very used to that.  We

17     will be in good shape.

18             Anything else?  We are going to conclude.  Thank

19     you very much, everyone.  Much appreciated for your time and

20     effort today.  Thank you.

21             (Whereupon the matter was concluded).

22

23

24

25