1

2                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEW JERSEY
3                       CIVIL NO. 13-CV-4507(CCC)

4

5        IN RE: DEPOMED PATENT LITIGATION

                                              TRANSCRIPT OF
6                                               PROCEEDINGS

7

8

9        - - - - - - - - - - - - - - - - -

10                                      Newark, New Jersey
                                        March 17, 2016
11
         B E F O R E:
12
                    THE HONORABLE CLAIRE C. CECCHI,
13                  United States District Judge

14

15

16

17

18

19       _____
                    Pursuant to Section 753 Title 28 United States Code,
20       the following transcript is certified to be an accurate record
         as taken stenographically in the above-entitled proceedings.
21

22                       _S/Yvonne Davion_____
23                       Yvonne Davion, CCR
                         Official Court Reporter
24

25

2

```
 1

 2                         A P P E A R A N C E S

 3

 4        KEITH MILLER, ESQ.
          (Robinson Miller)
 5
          MICHAEL SITZMAN, ESQ
 6        CHRISTINE RANNEY, ESQ.
          FRANK P. COLE, ESQ.
 7        JAYSEN S. CHUNG, ESQ.
          DAVID GLANDORF, ESQ.
 8        (Gibson, Dunn & Crutcher, LLP)
          For Depomed and Janssen
 9

10        MELISSA CHUDEREWICZ, ESQ.
          (Pepper Hamilton, LLP)
11
          LINDA A. WADLER, ESQ.
12        BASIL J. LEWRIS, ESQ.
          (Finnegan, Henderson, Farabow, Garrett & Dunner, LLP)
13        For Grunenthal

14        JAMES RICHTER, ESQ.
          (Winston & Strawn, LLP)
15
          SAL PATEL, ESQ.
16        IMRON ALY, ESQ.
          AHMED RIAZ, ESQ.
17        (Schiff Hardin, LLP)
          For Alkem
18
          KENNETH G. SCHULER, ESQ.
19        TERRENCE CONNOLLY, ESQ.
          (Latham & Watkins, LLP)
20
          AMY M. HANDLER, ESQ.
21        (Sills Cummis & Gross)
          For Roxane Laboratories
22
          SHEILA RAFTERY WIGGINS, ESQ.
23        VINCENT CAPUANO, PHD ESQ.
          ANTHONY FITZPATRICK, ESQ.
24        (Duane Morris, LLP)
          For Actavis Elizabeth, LLC and
25        Watson Laboratories, Inc
```

1

2

3                   W I T N E S S E S

4

5        Stephen Martin

6

7        Direct examination by Mr. Capuano            4

8        Cross examination by Mr. Best               29

9

10       Christian Wolf

11

12       Direct examination by Mr. Sobolski         133

13       Cross examination by Mr. Glandorf          169

14       Redirect examination by Mr. Sobolski       211

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Let's get started.   We're here on In

 2   re:  Depomed.   Let's just get counsel's appearances on the

 3   record and then we can resume with the witness.

 4              (All attorneys are present)

 5              THE COURT:   Let us resume with the testimony.

 6   It's the direct of Professor Martin.

 7              Professor Martin, you may approach the stand and I

 8   remind you you are under oath and that your testimony will

 9   continue.

10              MR.FITZPATRICK:   Just before we start the

11   testimony, if we could note for the record, as I indicated

12   before we went on the record, that defendants will not be

13   calling Dr. Hollingsworth to testify in view of the fact that

14   his testimony will parallel Dr. Steed's testimony.  And Dr.

15   Steed was offered on behalf of all defendants.  So we won't be

16   calling Dr. Hollingsworth.

17              THE COURT:   That is fine.   Thank you.

18   S T E P H E N   M A R T I N, sworn and testifies as follows:

19   DIRECT EXAMINATION BY MR. CAPUANO:

20              MR. CAPUANO:  May I proceed?

21              THE COURT:   Yes.

22              MR. CAPUANO:  Good morning, your Honor.

23              THE COURT:   Good morning.

24   Q.  Just to reorient ourselves to where we left off

25   yesterday, we went through the three stages for how a person of
```

1   ordinary skill in the art would go about designing a new

2   analgesic in the early 1990s.

3         You testified, Professor Martin, do you remember, about

4   what's shown here on the slide, the three stages first being

5   selecting a lead compound by studying the prior art and

6   selecting a lead, identifying the pharmacophore of the lead to

7   determine what should be maintained, and what options were

8   available for modification by studying the prior art structured

9   activity relationships.

10        And then based on that modifying the lead according to

11   the teachings of the prior art to make changes to structure and

12   evaluate biological activities of the new compounds that were

13   prepared.

14        Do you remember that testimony?

15   A.   I do.

16   Q.   Okay.

17   A.   Is this on?

18              THE COURT:   Tap just the top.  Let's see.

19              THE WITNESS:  May I get a pointer?  I am likely to

20   need one.  Thank you.

21   Q.   Okay.  And having gone through those three stages like

22   you did, you ended up here where you identified SS O

23   desmethyltramadol as the most promising lead from the mixture

24   of Tramadol and O desmethyltramadol isomers.

25        And you explained how the prior art motivated the

1        person of ordinary skill in the art to modify the OH group on

2        the bridge carbon to hydrogen and open the ring to make

3        compounds like linear compounds in Nazarov 1 that had central

4        service system activity.  And by doing so with those two

5        changes a person of ordinary skill in the art would have

6        arrived at Tramadol.

7             Is that a fair summary of what happened yesterday, Dr.

8        Martin?

9        A.  Yes, it is.

10       Q.  Dr. Martin, I'm sorry, and result in Tapentadol.  I

11       said Tramadol.

12       A.  Okay.  Yes, Tapentadol as written up there in the

13       slide.

14       Q.  Thank you.  And then we started to get into what Dr.

15       Buschmann had testified about.  And I will just start there.

16            You read Dr. Buschmann's testimony from his time in

17       Court last week?

18       A.  I did.

19       Q.  Okay.  And did you read where he testified about how

20       the psychlohexane ring was necessary in Tramadol and O

21       desmethyltramadol to obtain the correct positioning of the

22       groups in Tramadol and O desmethyltramadol, the relative

23       position of those groups?

24            Do you remember that testimony?

25       A.  He said it was important.  I don't remember the word

1        "necessary" necessarily, but certainly he acknowledged its

2        importance.

3            Q.   Would a person of ordinary skill in the art have

4        believed in 1994 that the only way to get those groups to adopt

5        that preferred orientation was by maintaining them as

6        substituents on a closed cyclohexane ring?

7            A.   No.

8            Q.   And you've prepared a slide showing that preferred

9        orientation.

10               What are you showing here?

11           A.   Okay.   So, I'm showing these Newman projections that

12       we talked about yesterday.   And we sort of introduced what they

13       were.   Because these are, these are at least one way of

14       looking at these kinds of molecules that kind of simplify

15       things in some ways and enable you to analyze confirmational

16       issues which will relate to relative stability of different

17       confirmations and thinking about what is the preferred

18       confirmation and solution.

19               And so if we go over here to the cyclohexane

20       derivative, you will see the orientations of these groups.   And

21       I didn't mention this yesterday but we call these equatorial.

22       It's on this cyclohexane ring.   And they are in the more stable

23       orientation in this configuration on this cyclohexane ring.

24               And then the question is okay, so, can you have an

25       acyclic molecule that still enforces that preferred

1    confirmation.  And the answer is yes, definitely yes.   And I

2    tried to illustrate that here by considering this ring open

3    compound and then looking at the Newman projection for this in

4    exactly the same way I'm viewing the Newman projection for

5    this.

6         So, essentially to just revise, review, we sort of

7    imagine sitting over here and look at this carbon bond.

8         Q.   Do you want to do it there?

9         A.   No, let's just say here.  And this is what we see.  We

10   can run through that stuff again.  But, this is what we see.

11   And what we see is almost exactly what we see over here.  We

12   see the relationships of this group with the nitrogen and the

13   two metals and its relation to the AR.

14        What I didn't say yesterday is this AR is a shorthand

15   notation for this group up here.  AR means aryl.  And so it's,

16   without cluttering the drawing, it's easier to draw that way.

17        And the important thing to note again is in this

18   confirmation here, these groups, the aryl group and this group

19   are oriented in space exactly the same as they oriented over

20   here.   If you look at all the other atoms that are present in

21   both molecules, this atom here corresponds to that atom over

22   there.   This little atom here corresponds to this atom here.

23   And then this atom here is this circle in the back.

24        So, fundamentally what this is telling us is that this

25   acyclic molecule has the same preferred confirmation in

1    solution, let's say, as the cyclohexane, the arrangement, as I

2    said, with the pharmacophore.  The important thing is how these

3    things are arranged.   They are arranged the same way.

4        Q.   And when you say acyclic, is that another way of saying

5    open chain or linear, that terminology you've been using?

6        A.   Yes.  Acyclic, linear, open chain are all equivalent

7    terms.

8        Q.   And then we learned about Newman projections.  We got

9    out our models and we went through these slides showing the two

10   adjacent carbon atoms.   We turned it around as shown on the

11   animation to look at our models with the yellow, blue, red

12   and white substituents and we explained how that is the same as

13   what you'd see in a Newman projection.

14        And we had a little tutorial about Newman projections.

15   Is that fair?

16        A.   Yes, I think so.  I hope it was informative.

17        Q.   Okay.  And then this, in fact, is where we left off

18   when we stopped yesterday afternoon.

19        Professor Martin, can you explain how using this slide,

20   slide Number 49, how using Newman projections a person of

21   ordinary skill in the art can determine which are the preferred

22   orientations and whether those preferred orientations are the

23   same as what you would have in Tramadol?

24        A.   Okay.  So right so we kind of got started on this.  And

25   so this Newman projection is a replication of what we saw

1          previously with some additional notes.  And that is these

2          little red double headed arrows which I referred to as a

3          Gauche, Gauche, people pronounce this differently, interaction

4          and these are unfavorable.

5               Basically they represent steric interactions, repulsive

6          interactions between atoms on this here which was originally

7          the blue ball.  I wish I had labeled these blue, red and so

8          forth as well, but I didn't.

9               But this would be the blue and this of course is the

10         red.  And then there's this interaction over here which is

11         similarly unfavorable again a Gauche interaction.

12         Q.   Why are these unfavorable?

13         A.   Because of the steric repulsion.  And so at the very

14         end I modified my model slightly and I modified your Honor's

15         model.  I didn't modify your model.  I am happy to do so if

16         you wish.  It's just these little plastics things that sort of

17         designate that the substituents you know this nitrogen here and

18         this aryl group are bigger than the other ones.

19                   MR. BEST:   I think we remember enough chemistry

20         to follow.

21         A.   All right.  Thank you.  I did modify it because it is

22         important.  So again if we take that same perspective and if

23         you view down this bond,  if you view down this bond, you see

24         these bigger groups are together.  And if you just kind of

25         rotate these plastic things, you can see how they bump into

1        each other.

2              And so these plastic things actually are a better

3        representation of the space that these atoms occupy.   These

4        little balls aren't really don't represent this actual spatial

5        requirement of these groups.  And so the bigger, you know, the

6        bigger the ball, you know.

7                    THE COURT:   So, is the repulsion just caused by

8        size or are there additional elements to that?

9                    THE WITNESS:  You know, if we leave it at size,

10       this is easy.  We can see electronic repulsions and things like

11       that.  But it's basically the size they are physically bumping

12       into each other.  And so that causes, what that does is it

13       increases the energy of that particular form.

14             And so if we accept, for the moment, and its

15       inarguable, I think, that these Gauche interactions are bad,

16       then all we have to do is look at the various different

17       confirmations I've presented here.

18             And what I've done here is presented the three

19       more stable confirmers that we have here.  And I can go into

20       detail if you wish.  But I think let's keep it simple and just

21       look at these.  And if we just count these Gauche interactions,

22       so wherever this angle here is 60 degrees.  And anytime you see

23       two groups with that angular relationship, that's bad.

24             And so if you can imagine and if you take your

25       model and you rotate 120 degrees, you get a different

1     presentation that has the blue, the blue ball down.

2               So remember the blue is this nitrogen.  So if you

3     kind of keep that, that's a reference point.  I'm just rotating

4     this front atom.  So then the blue goes down and you see that

5     the blue is still interacting with this red.  So that's bad.

6     But if you count these Gauche interactions now, there are 3,

7     one this interaction here,  two, this interaction here,  and

8     three, this interaction here.

9               And then if you take the step again and you hold

10    the model and you rotate by another 120 degrees,  you get that.

11    And now you see the red ball and the blue ball are away from

12    each other.  So that's actually a bit better.   But,  you still

13    have, if you count them, and again you can look down the model

14    and you can count them too, you can see that there's an

15    interaction here between the blue and the white, between the

16    white and the yellow, and between the yellow and the red.

17               Do you see that?

18               THE COURT:    I do.

19               THE WITNESS:   Okay.  And so that's bad too.  So

20    that's this picture over here.  There are three of these

21    interactions.

22               And so the more of these interactions you have,

23    and of course the size of the groups matters too, but to keep

24    it simple, we can just count these interactions.  And so this

25    confirmer,  confirmer A I've labeled here, has only two of

 1    these interactions.  Confirmer B has three.  And confirmer C
 2    has three as well.
 3            And so what that tells the sophomore in organic
 4    chemistry at least at the first pass is that this confirmer is
 5    the more stable,  most stable of these three confirmers and it
 6    is this confirmer, remember, that corresponds to the way the
 7    atoms were arranged on this cyclohexane ring.
 8            And so I think yeah, thank you, so this is the
 9    same thing as confirmer A.  And this is the representation of,
10    in this particular case, this molecule here which was not
11    Tapentadol, by the way.  And if we look at the representation
12    of the cyclohexane ring, it's the same.
13            So, this acyclic form is the more stable form of
14    this molecule.  And the more stable form of this molecule
15    corresponds to the more stable form of that molecule.
16            And so that would tell one of skill in the art
17    that this particular molecule, this one here, would adopt a
18    three dimensional shape with respect to the important parts in
19    terms of biology.  It would maintain the same spatial
20    relationships that this molecule here had.
21            And I think this is really important because it is
22    important, we touched on this a little bit yesterday, but when
23    you think about how you're going to open the ring, as I
24    mentioned, there are many ways.  And we will get to that I
25    think later.  And there are many ways you could do it.

1          But, whatever ways you would pick to do it, you

2     would maintain these stereocenters and the substitution at

3     these stereocenters because that's the only way that you can

4     maintain the relationship in this acyclic form that you need to

5     have that corresponds to the cyclic form.

6          Q.   Thank you, Professor Martin.

7               MR. CAPUANO:  For the record, Professor Martin is

8     pointing to demonstrative Exhibit 48.

9          Q.   Professor Martin, you also brought some bigger models

10    with you, according to the plaintiffs.

11         Can you use those bigger models to show how in the

12    linear open chain configuration of Tapentadol that it adopts or

13    can adopt in its lowest energy form the same orientation of the

14    groups as in the cyclohexane version like Tramadol?

15         A.   Sure.  So what I did throughout my testimony is

16    exemplify things from the RR series, from the RR Tramadol, RR

17    desmethyltramadol.  And the reason for that is that's how I

18    exemplified things throughout my expert report and everything.

19    So I wanted to keep that consistent.  But, the models I've made

20    are different.

21         So, I mentioned a moment ago that this molecule here

22    with R equals H is not Tapentadol.  It's the enantiomer of

23    Tapentadol.  And the models I've created and have distributed

24    to the Court are models actually of Tapentadol.   So that's the

25    mirror image isomers of these two molecules here.  So they

1      are --

2          Q.   Have you done everything with the RR on the slides?

3          A.   Yes.

4          Q.   Does that apply equally to the SS?

5          A.   Oh,  yes,  yes because they are enantiomers.  And I

6      think it's been established in Court that enantiomers have the

7      same physical properties except with respect to the way they

8      rotate the plain and polarized light.

9              They also have different properties when they interact

10     with chiral environments.  But, as far as these molecules and

11     solution, they have the same energetics.  So they are identical

12     essentially.

13         Q.   In terms of presentation, is it the case that you used

14     RS, RR just as simplification or to be consistent and there's

15     no difference between what's going on in RR and what would be

16     going with SS?

17         A.   Not in terms of this analysis, no.  They are identical.

18         Q.   Okay.

19         A.   So this I don't know how much people have played with

20     their models and we will see in a minute.  But, if you pick

21     the model up that has this cyclohexane ring, this closed ring,

22     and you orient it so this six membered ring here, this flat is

23     up on top and this side chain here with the blue atom at the

24     end is on the left.

25              And then you take the molecule that actually has a

1    broken ring which corresponds to the molecule up there on the

2    right, except the mirror image you can sort of lay them right

3    down on top of each other and you can lineup the aromatic ring

4    and you can play around with this a little bit and lineup the

5    rest of the molecule.  So it's exactly the same.   Have you

6    been able to do that?

7             THE COURT:   Let me play around with it a little

8    bit.

9             THE WITNESS:  There it is.  And you can see that

10   they superimpose on each other.  And all those important atoms

11   are arranged in the same places.  And you can actually move

12   them around a little bit.

13   A.   So I mean if you wish you can twist, let me just pick

14   one of them because there are some flexibility, there are some

15   points of flexibility here.  You can turn this.

16        I put sort of restricters on this big ring up here.

17   But, you can turn it and you can turn equally in both of those

18   compounds.  So, you know, these molecules are going to adopt,

19   they are going to change their confirmation from what we are

20   seeing here when they bind.

21        But the important thing is whatever rotations you do

22   with this big ring on the top or this thing with the blue on

23   the end, however you want to do that, you can do it on both

24   molecules.  And then you can sit them down and superimpose them

25   again.

1    So I think that's why it's good to leave them with you

2    and you can play with them and you can actually convince

3    yourself that yes, they sit right on top of each other.

4    Now there's one other difference that I need to alert

5    you to.  On the molecule that has the six membered ring, you

6    see that it's got this little red thing, extra thing there.  Do

7    you see that?  Hopefully it hasn't fallen off.

8    THE COURT:    Which one is that?

9    THE WITNESS:    That little red right there.

10   Exactly.  That's extra.  And that is the hydroxyl group on O

11   desmethyltramadol.

12   Q.    Is that the aliphatic hydroxyl group?

13   A.    Yes, that's that bridge hydroxyl group.  So the two

14   molecules that we are comparing here, actually can you go, we

15   had the slide where we went through the analysis of how we get

16   to Tapentadol from O desmethyltramadol.

17   A.    Right.  This one.  So the molecules you have in your

18   hand are this one and this one.  And so you see this little red

19   box here.  That's that little red atom.  That's an oxygen.  And

20   that thing at the end of it is the hydrogen.

21   So at the end of all of these, wherever you see this

22   painted thing, at the end of that is hydrogen atom.

23   THE COURT:    Okay.

24   A.    So, the models then correspond now to this structure

25   and this structure here.   And as I said, you know, these can

1    adjust and will adjust.  And I've drawn these things in a

2    particular orientation.  But you understand that there can be

3    flexibility.

4                    THE COURT:  Okay.  And just so I'm clear, the

5    difference between the red and the blue is what?

6                    THE WITNESS:  The red is oxygen and the blue is

7    nitrogen.

8                    THE COURT:  Thank you.

9                    THE WITNESS:  Yes, you're welcome.

10                   MR. CAPUANO:  And just for the record also,

11   Professor Martin is pointing to slide Number 43 in his

12   testimony just now.

13   Q.   Professor Martin, do you remember that you see when

14   looking at options to open the cyclohexane ring, one of the

15   options that you listed as possible was the option of what you

16   called scission.  And I'm looking at slide 50.

17        And you pointed out that you could open the ring by

18   cutting or in designing a new molecule that could be envisioned

19   by cutting bonds at either A, B or C?  Do you remember that?

20   A.   I did.

21   Q.   You said you would come back and explain why, although

22   that was a possibility, it wouldn't have been a preferred way

23   of going about it.

24        And using slide 50, can you explain for the Court why a

25   person of skill in the art would not have found scission, the

1    scission option of opening the ring to be a promising option

2    for modifying the cyclohexane region of Tramadol and O

3    desmethyltramadol?

4        A.   I would like to revise it to as promising, not

5    promising all together.  But, there are two references here.

6    First and foremost is the simple one.  This gets really

7    complicated.  But, the simple answer that I think would have

8    directed one of ordinary skill is when they consulted the prior

9    art and looked in the literature for compounds like this one,

10   like this one, or like this one, I don't have identifiers for

11   these.

12       This molecule results from scission A.  This molecule

13   results from scission B.  And this one results from scission,

14   am I --

15       Q.   I just wanted to point out where you were pointing on

16   slide 50.  That's all.  Just to be clear.

17            THE COURT:   You know what, I think it's a good

18   idea to just keep doing it with each reference so we can at

19   least go back and look at it.

20            So when we did A just now scission A I guess was

21   in the middle of the slide at slide 50.  It is the third figure

22   on the right.  Scission B I think was on bottom side on the

23   left.  And C was on the right side on the bottom as well.

24            THE WITNESS:  Right.

25            MR. CAPUANO:  Thank you, your Honor.

1          Q.    Professor Martin, you and I both --

2                THE COURT:  I know it's hard to do but it would

3     make for a more complete transcript.

4                THE WITNESS:  I forget about having records that

5     you all can look back on afterwards.

6                THE COURT:    Thank you.

7          A.    So let me try this again.   So, there are these three

8     scission possibilities.  So if you look at the top structure

9     here on the slide 50, as you showed, there are three

10    possibilities I considered.  And you asked maybe why you didn't

11    consider cleaving other bonds in this figure.

12               And the answer to that question is simple. The answer

13    to that question is that when you cleave other bonds, and I

14    don't need to identify what they are other than A, B and C, you

15    will no longer have the stereocenters that are critical to

16    maintaining confirmational control.

17               So, you no longer have the stereocenter as what Flick

18    referred to as the bridge carbon atom.  And you no longer have

19    this stereocenter to carbon aminomethyl side chain, okay.

20               So, again, these compounds, as far as I could tell, are

21    not precedent in the prior art.  So that's one thing.  But, the

22    other thing which gets more complicated is to look at this one,

23    this is scission A.  So this is in the second line of the

24    slide.  And going across, you can imagine cleaving this bond

25    and then this molecule in the center here would be the

1     resultant molecule where we'd now have two of these methyl

2     groups, these CHC groups in the middle.

3                   And the problem with doing that is that these

4     groups now are really bumping into each other.  They are really

5     close.  And you can get a sense of that if you go back and look

6     at the model and if you, you can actually pull this apart.

7     It's a little hard.  They pop.

8          Q.   Do you want the Judge to pull those apart?

9                   THE COURT:  I'm not going to pull mine apart

10    because just because I like it intact.  I will watch yours.

11                  THE WITNESS:  You may not get it back together.

12    So, I've just pulled it apart.  But, if that's all I do, these

13    atoms are right next to each other.  Remember I told you that

14    bumping into each other is bad when we look at the Newman

15    projections.  So, this is terrible.

16                  I mean these two atoms are within distance where

17    they want to be bonded and connected to each other but they are

18    no longer connected.   So, they are very unhappy and now get

19    out of the way.   And all of a sudden we've got something.

20    But, whatever that is would maintain confirmational preferences

21    here.

22                  But the problem is is that we are not going to

23    maintain relationships of these two carbon atoms, let's say for

24    example as we had over here.  This side chain is now going to

25    do all kinds of things.

1      Q.   You're pointing to the center?

2      A.   Sorry, the central carbon.   This side chair will do

3   all sorts of things to get rid of these interactions.   And one

4   example of that's on the third drawing in the second line,

5   that's one possibility.

6           But the point here is now if you think about where the

7   atoms are, you have less control here.

8      Q.   Professor Martin, when you do the scission at bond B or

9   bond C, do you end up with that same --

10     A.   You have the same problem.

11     Q.   -- bad bumping into relationship that you showed for

12   scission of bond A?

13     A.   Right.   And so in that case the point is is that the

14   atoms that remain, that you have remaining in this structure,

15   once you cleave the bond, the atoms that remain cannot adopt

16   the same positions in space as they did in the starting

17   material.   They have to change dramatically.

18          And so I would say that's less preferred.   It's

19   certainly not something one couldn't do.   One might do it but

20   it would be something that would be secondary, I think, to the

21   other analysis.   And so yeah -- okay, never mind.

22     Q.   And so one of the other options that you said was

23   available for opening the ring was excision.

24          Do you remember that?

25     A.   I do.

1    Q.   And you showed us how by excising what you've labeled

2    here on slide 51 with the blue circle one how excising that

3    guided by Nazarov one prior art would lead to doing that with

4    SS O desmethyltramadol would lead to Tapentadol.

5         But you also said one option would be excising carbon

6    atom labeled two or even excising both carbon atoms one and

7    two.  And can you explain for the Court why it is that a person

8    of ordinary skill in the art would not be motivated to excise

9    carbon two or carbons one and two over the preference for

10   excising carbon one again?

11   A.   Again I would like to characterize it as less

12   motivated.  Again I am looking at preferences of what one with

13   ordinary skill in the art would do and the priorities that they

14   would set forth based on prior art teachings.  And I think it's

15   important to keep that in mind.

16        I don't want to take the position that these are not

17   possible or even maybe as good.  I'm taking the position that

18   they are not guided by prior art.  They are guided more by

19   thoughtful analysis.

20        And so the box we have in red with Nazarov there again

21   I picked that one because of its prior art precedent.  It's not

22   just Nazarov, by the way, it's also Spasoff (ph) which didn't

23   get on this slide but I think we talked about it.

24        So, this on the third line here these two compounds on

25   on the third line are enantiomers again.

1    Q.   We are again talking about slide 51?

2    A.   Yeah.  We are still on slide 51.   The third line.

3  We're talking about enantiomers.  And the third line represents

4  the case where we would remove or excise carbon atom or

5  methylene Number 2, okay.  And these compounds would have the

6  same confirmational preferences as this one.

7    Q.   And this one is the one in the red box?

8    A.   Sorry, the one in the red box.  And then the last pair

9  on the bottom, the fourth line, these compounds, this pair of

10  compounds arises from removing both carbons one and two in the

11  top line of the slide Number 51.  I have to keep saying that, I

12  guess.

13       So, these compounds too would have the same

14  confirmational preferences I think largely certainly with

15  respect to the pharmacophore as compounds in the red box.

16  But, I pick the ones in the red box as being those guided by

17  prior art.  And so that was why we started with those because

18  these, these are the ones explicitly I think precedented in the

19  prior art.

20    Q.   Now, Professor Martin, having arrived at the idea to

21  make Tapentadol hydrochloride -- to make Tapentadol, would a

22  person of ordinary skill in the art know how to actually go

23  about synthesizing it?

24    A.   Oh, yeah.

25    Q.   Okay.  And what would be involved in that synthesis?

1    Not specifically, but --

2         A.   To make Tapentadol?

3         Q.   Yes, sir.

4         A.   Well, I mean there are many references in the

5    literature to making compounds like this.  We have Nazarov, for

6    example, in 1955 who sets forth a very simple way of making

7    these kinds of compounds.  And so Spasoff years later.  I mean

8    it would be a very simple thing to make Tapentadol.

9         Q.   Are you aware of any of plaintiffs' experts who have

10   testified that it would be other than routine to make

11   Tapentadol once having decided to make it?

12        A.   I'm sorry, are you saying do they think it would be

13   difficult to make?

14        Q.   That's another way of saying it, yes.

15        A.   I am aware of no testimony that says it would be

16   difficult to make.

17        Q.   Okay.  And in making Tapentadol and thinking about salt

18   forms of Tapentadol, would a person of ordinary skill in the

19   art be motivated to make the hydrochloride salt of Tapentadol?

20        A.   Well, sure.  I mean we're starting with Tramadol and

21   Tramadol was marketed as a hydrochloride salt.  So, I mean the

22   analogy comes straight through from Tramadol to where we are

23   now.

24        Q.   Okay.  Can I have defendant's Exhibit 176?

25             Professor Martin, do you recognize defendant's

1    Exhibit 176?

2         A.   Yes, I do.  It's a paper by Steven, I'm not sure how he

3    pronounces his name, Bergee published in 1977.  And essentially

4    it's a review article on pharmaceutical salt forms.

5         Q.   Can we have Table 1, the top of the next page?

6              What's presented in Table 1 of this defendant's

7    Exhibit 176?

8         A.   Well, I think if you look at the title of the table it

9    tells you, it says that Table 1 is a table of the FDA-approved

10   commercially marketed salts as of 19, well, the date here would

11   be 1977,  right.  And so we have quite a few.  I don't know how

12   many, forty plus.  I don't know what the exact number is but

13   quite a few.

14        Q.   And these are approved salts and the percentage of

15   approved commercially marketed salts, and it goes through

16   starting with acetate and on down.  Is that right?

17        A.   It does.

18        Q.   And for example acetate 1.26.  This one

19   benzenesulfonate 0.25.

20             Do you see that?

21        A.   Yes, I do.

22        Q.   What's the percentage for hydrochloride salt?

23        A.   Hydrochloride is almost 43 percent.  So the vast,

24   well, certainly the majority, vast majority I guess of

25   plurality, I am not sure is the word, but the greatest fraction

1    of hydrochloride salts, I guess the next closest one, I don't

2    know, is well a chloride and bromide.  So I am not sure what

3    the difference is.

4         Q.   Professor Martin, remember we talked about the claims

5    of the '593 patent?

6         A.   I do.

7         Q.   And we looked at claims 8 and 17.  And you testified

8    that those were method claims.

9              Do you remember that?

10        A.   You mean 117?

11        Q.   I'm sorry, thank you.  Claims 8 and 117.

12        A.   Yes, I said they were obvious.  And why did I think

13   they were obvious?

14        Q.   Thank you.  That's a good question.

15        A.   Sorry.  I got hung up on correcting you.

16             Well, I think they are obvious.  These are method of

17   use claims that relate to using Tapentadol as an analgesic

18   compound.  And we've started with an analgesic compound

19   Tramadol.  And we've modified that compound with the intent of

20   making an analgesic compound.  So, it's pretty obvious to me

21   that it would be an analgesic compound to treat pain.

22        Q.   Okay.  And Professor Martin, finally, have you prepared

23   a slide that summarizes your opinions in this matter?

24        A.   I have.

25        Q.    Could you read that into the record, please?

1      A.   So a POSITA in 1994 would have selected Tramadol O

2    desmethyltramadol and their individual enantiomers as lead

3    compounds for developing new analgesics.  And I think we said

4    that we would preferentially select the minus O

5    desmethyltramadol of all of those.

6           The prior art in 1994 would have motivated a POSITA to

7    modify the lead compounds to arrive to Tapentadol.  The

8    asserted claims of the '593 patent are invalid as obvious in

9    view of the prior art as a whole which would have suggested to

10   a POSITA to make Tapentadol with a reasonable expectation that

11   it would be effective to treat pain.

12     Q.   Thank you.

13          MR. CAPUANO:  I have no further questions, your

14   Honor, at this time.

15          THE COURT:   Thank you.  Let's turn to the cross.

16          MR. BEST:   I believe we have some binders to hand

17   out.

18          THE COURT:   Let's take care of that.  We will

19   find out if there is any issue and then we can move forward.

20          Please, everyone, take a look at the exhibits and

21   let me know if there is any issue.

22          MR. CAPUANO:   We have no objection to the

23   exhibits, your Honor.

24          THE COURT:   Thank you.  Let's proceed.

25

1    CROSS EXAMINATION BY MR. BEST:

2         Q.   Good morning, Dr. Martin.

3         A.   Good morning, Mr. Best.

4         Q.   Now, could we start with PTX 54, the Nazarov reference

5    to which you referred extensively this morning?

6              Now, you testified that this reference would have

7    motivated a person of ordinary skill to remove a carbon atom

8    from a structure like the Tramadol compounds to generate linear

9    compounds.

10             Is that right?

11        A.   That's correct.

12                  THE COURT:   You know, I'm sorry, we are just

13   going to close this.  I'm sorry.  Go right ahead.

14                  MR. BEST:   No problem.

15        Q.   Actually for a moment could we see Dr. Martin's direct

16   demonstrative Number 51?

17             I believe you referred to this demonstrative in some of

18   that testimony.  Is that correct?

19        A.   It is.

20        Q.   You would agree with me that Nazarov only particularly

21   describes one compound in terms of biological activity,

22   correct?

23        A.   That's my recollection.  Well, he said one particular

24   one has really strong activity.

25        Q.   Yeah.  Let's focus on that and perhaps it will help.

1              Could we have PTX 54 once more at Page 4?

2       Q.   Can we highlight the last sentence of the second

3    paragraph?

4              Is this the passage of the Nazarov reference to which

5    you just referred?

6       A.   Right.  He says The most interesting substance turned

7    out to be -- do you want me to read the rest?

8       Q.   No, I think that's sufficient.

9              Now the chemical structure of this compound, and I

10   believe --

11                  THE COURT:   What is your exhibit for this one?

12                  MR. BEST:   It's PTX 54.  I think there's also a

13   DTX number.

14                  THE COURT:   Is it?

15                  MR. BEST:   But I don't know.

16                  THE COURT:   Is it 729?

17                  MR. BEST:   729.

18                  THE COURT:   Okay.  I have it.

19      Q.   I believe this substance is identified as compound 14

20   in this reference.  Is that right?

21      A.   Yes, it is.

22      Q.   Okay.  And I believe the chemical structure of compound

23   14 is referred to in this reference.  Isn't that correct?

24      A.   It is.

25      Q.   And could we see that on the prior page, please?  And

1    would you highlight that structure and the bit to the right of

2    it?

3            And in this case compound 14 is referred to as having

4    an R group of methyl and an R prime group of basically a

5    phenoxy acetic group, correct?

6        A.   That's correct.

7        Q.   And I think that you noted yesterday this is a bit of

8    an awkward structure.  So we've redrawn it to make it a little

9    clearer.

10           Could we have my demonstrative Number 4?

11           Now, on the right would you agree that this is the

12   compound 14 that was described in Nazarov?

13       A.   I believe that's accurate, yes.

14       Q.   And as you can see on the left I have depicted the

15   minus enantiomer of Tramadol the S S O rather it's metabolite,

16   the S S O desmethyltramadol, correct?

17       A.   Yes.

18       Q.   Now, would you agree with me that the Nazarov compound

19   has a phenyl ring attached to what we referred to throughout

20   these proceeding as the bridge head carbon?

21       A.   A phenyl ring, well, it's got more than a phenyl ring.

22   It's got this entire ester.  Is this what you are referring to.

23       Q.   I'm not.  I am referring to the phenyl ring attached to

24   the bridge head carbon directly.

25       A.   Right.  So that's the same as what I had shown before

1    earlier.

2        Q.   Now, so that Nazarov compound is not like Tramadol or

3    as in this respect.  Is that fair?

4        A.   It differs in that respect only by this hydroxyl group.

5    That's correct

6        Q.   By hydroxyl group, you mean the hydroxyl group that

7    would have attached meta to which that phenyl group is attached

8    to the rest of the molecule, correct?

9        A.   Correct.  And in the desmethyltramadol structure, you

10   have in the right that hydroxyl group is present whereas that

11   hydroxyl group is not present on Nazarov.  That's correct.

12       Q.   And this compound was singled out for, I believe you

13   called it its strong biological activity, right?

14       A.   I said these compounds that had this linear framework

15   that would be analogous to those compounds that would derive

16   from taking, in this particular case O desmethyltramadol and

17   removing that one carbon atom which I think we labeled as

18   number 1.

19            I said I was referring to those atoms themselves.   I

20   wasn't referring to the entire pharmacophore of Nazarov.

21   Nazarov doesn't have, clearly it doesn't have this hydroxyl

22   group which we learned yesterday from Flick is so terribly

23   important.

24       Q.   So, thank you for that explanation.  But, I was asking

25   a pretty simple question.

1        You would agree with me that you described this

2    compound, in fact, the paper describes this compound as having

3    a strong biological activity, correct?

4        A.   I did.

5        Q.   So wouldn't you agree that Nazarov teaches a person of

6    ordinary skill to employ a phenyl group of linearized compounds

7    such as this depicted?

8        A.   It shows that a phenyl group there is effective, yes.

9        Q.   Now looking at the bridge head carbon once more, you

10   see that the O H group here, which also appears in the O

11   desmethyltramadol structure, the aliphatic O H has been

12   esterified, correct?

13       A.   I do.

14       Q.   Now and in fact I think we discussed before, the

15   Nazarov compound has a phenoxy acetyl group here, O

16   desmethyltramadol.  It's a free OH, correct?

17       A.   That's correct.

18       Q.   So again the Nazarov compound is unlike either Tramadol

19   or its metabolites in this respect,  correct?

20       A.   Well, this particular Nazarov compound that you've

21   drawn up there, yes.  But the precursor of this Nazarov

22   compound for which I don't have any specific information

23   regarding its biological activity, I don't know whether those

24   compounds were tested.  Nazarov simply tells us that this was

25   the most active compound.

1        The point is is that the precursor to this molecule has

2    that O H on it.  And that molecule very much more resembles the

3    Tramadol structure on the left-hand side of this slide that

4    you've represented.

5        Q.  And just to confirm, you just said that you do not

6    have data regarding the biological activity of the OH precursor

7    of Nazarov compound 14, correct?

8        A.  No, he didn't, he really called out this compound on

9    the right as being the one that was most interesting.  So,

10    obviously others were interesting since this was most.

11        Q.  Well, actually this is the only compound he calls out

12    as having any particular activity, correct?

13        A.  He said it was most interesting.

14        Q.  Now, and wouldn't then this compound have taught a POSA

15    to provide the phenoxy acetyl ester of a linearized compound

16    such as Nazarov compound 14 rather than the free OH in

17    developing a new analgesic?

18        A.  So, well these were anesthetic acts.  I think they are

19    different from analgesics.  I said these compounds DCNS

20    activity.

21        I think what Nazarov teaches is that of the compounds

22    he looked at and the esters he looked at, I guess, and again I

23    don't know what else he looked at, he said this is the most

24    promising.

25        And so I guess yes, if you're going to make that

1      compound, then he's teaching it looks like you should put an

2      ester on this, yeah.

3          Q.   Now, you just made a distinction, I believe, between

4      anesthetic and analgesic activities.  Is that right?

5          A.   Right.

6          Q.   And so is it fair to say that Nazarov only teaches a

7      person of ordinary skill how to create potentially effective

8      anesthetics rather than potentially effective analgesics?

9          A.   No.  He didn't test for analgesic activity so far as I

10     know.  He did teach about anesthetics.  So he teaches the

11     anesthetic part.

12         Q.   So there's no data in Nazarov relating to analgesia,

13     correct?

14         A.   Correct.

15         Q.   None of those compounds were tested for analgesia,

16     correct?

17         A.   I can't answer.  I don't know.

18         Q.   That's fair.  But, the paper reports no compounds as

19     having been tested for analgesia.  Is that fair?

20         A.   It doesn't say that they were not, yeah.

21         Q.   Which means that, yes, it's correct that the paper does

22     not indicate?

23         A.   Okay.  Sure. Sorry.

24         Q.   No problem.  In fact, if we look back at the paper, the

25     Nazarov paper at Page 4 once again and focus in on that same

1      paragraph, the comparison that's made here between compound 14

2      is with a compound called dicaine, correct?

3          A.   Yes.

4          Q.   And dicaine is a local anesthetic, correct?

5          A.   That's my recollection.  It's been a long time since I

6      looked at this particular reference.  I looked the structure up

7      but I have forgotten what it is.

8          Q.   Now, is it fair to say or you agree with me that the

9      Nazarov compound was synthesized a mixture of stereoisomers?

10         A.   It looks like it's a mixture of four different

11     compounds.  I would guess there are two stereocenters that

12     reaction is, I don't know that that reaction generated those

13     stereocenters as particularly stereoselective.

14         So, yeah, I would anticipate a mixture of two different

15     diastereomers and the enantiomers of both of them, so four

16     compounds.

17         Q.   And if I could have my structure again which I think is

18     my demonstrative four.

19         Is it fair to indicate that sort of mixture of

20     stereoisomers with only indicating straight lines rather than

21     the dashed in solid wedges?

22         A.   I don't know.  You kind of have to be careful how you

23     evaluate that.  You don't know necessarily what people are

24     trying to do when they represent things.

25         But, normally, if you look at a structure like that,

1    and of course when they drew the structures they didn't draw

2    them like this, they drew a representation, I would say, that's

3    analogous to this that didn't have any stereochemical

4    descriptors.  And so you would look at that and say yeah, it

5    certainly could be four different compounds.

6        Q.   And when you say that, you mean the structure I've

7    drawn?

8        A.   I'm sorry, yes, the structure from Nazarov on the

9    right.

10        Q.   Thank you.  Now, the composition of -- and so Nazarov,

11    you would agree, teaches a person of ordinary skill to employ a

12    mixture of stereoisomers in developing a new analgesic using

13    Nazarov as a basis?

14        A.   Again right.  So I mean what he teaches is that the

15    mixture is active.  I wouldn't say that he teaches that this is

16    the best thing.  He doesn't go any further than that.  And I

17    don't know what they did subsequent to this.

18            But, if they were truly interested in this, they would

19    have separated the diastereomers.  They would have tested each

20    of the enantiomeric diastereomers and if they found activity,

21    then they would have separated those enantiomers and tested

22    them each individually is what they would have done.  But, they

23    didn't do that here.  So we don't have any information.   I

24    wouldn't say that it teaches this is the thing to do.  It says

25    this works.

1   Q. But, at least it doesn't teach you that you need to

2 separate those stereoisomers?

3   A. No, you don't need to separate them and you still get

4 activity.  So, that's a good thing.

5   Q. Nazarov was published in 1955.  Is that right?

6   A. Yeah, he had several papers.  This one is from A55.

7   Q. The Flick article you have spoken of at length I'm sure

8 we will discuss was published in '78.  Is that right?

9   A. That's correct.

10   Q. You would agree that Flick and his colleagues were not

11 motivated to make linear compound on the basis of Nazarov since

12 it was available in the art for more than 30 years, correct?

13   A. Well, I can't answer that question.  They don't report

14 making any such molecules.  I don't know whether they

15 considered it.  I have no idea what they were thinking.  They

16 didn't report it.  They weren't motivated to report on that in

17 this paper.  But, I don't know anything more.

18   Q. But the Nazarov compound was available in the art to

19 them before they published the Flick paper in '78. Is that

20 right?

21   A. Yes, it certainly was available.  I don't know whether

22 they looked for it.

23   Q. And they didn't make linear compounds as a part of the

24 Flick study, correct?

25   A. That's correct.

1          Q.   Now, you testified that you've read Dr. Buschmann's

2     testimony rendered in this litigation last Thursday,  correct?

3          A.   Yeah, I read through it is how I characterize it.    I

4     hope I don't have to take a test on it.

5          Q.   Fair enough.    I think mostly the answer is no.   But,

6     you've answered a couple of questions on it so I'm going to ask

7     you a couple of more.

8               You should then recall that by 1991 Grunenthal has

9     synthesized at least more than 500 more compounds that were

10    analogs of the Tramadol compounds,  correct?

11         A.   Yeah, I think at the end I remember a number upward or

12    I remember the number 900 somewhere.   I remember a number like

13    870 somewhere.   But yeah a lot of compounds over the course of

14    the project.

15         Q.   And in all the time between, and again having read Dr.

16    Buschmann's transcript, in all the time between 1978,  let's

17    say and 1991,  none of the compounds that Grunenthal reported

18    as having made with linear compounds, correct?

19         A.   I believe that's correct.   I reviewed I think

20    Buschmann was the first.   My understanding is Buschmann was the

21    first to have done that.   I looked at Dr. Buschmann's

22    notebooks, at least some of them.

23              I'm sorry, could you ask the question again.

24         Q.   Sure.  Is it fair to say that, well, I think I'm not

25    actually sure there was a question on the table.   But, let me

1    ask you this, in the time going up to 1991, is it fair to say

2    that the Grunenthal scientists were not motivated by Nazarov to

3    make linear compounds, correct?

4         A.   Well, I believe that's the case.   Because I believe

5    it's the case that Buschmann was the first.

6              As far as my understanding is Buschmann was the first.

7    And in my looking at some of his notebooks, I recall the first

8    of these being the earliest date I remember was '92.  So that's

9    what I know.

10             So from what I know maybe the answer to your question

11   is yes.  But, I don't have access to all the other things that

12   they were doing.

13        Q.   That's fair.   You are aware of no evidence that is

14   contradictory, however, correct?

15        A.   I am aware of no evidence that's contradictory, no.

16        Q.   Now could we look at the Spasoff article which you

17   discussed briefly yesterday DTX 739?  I am sure it's in

18   defendant's binder but not in mine.

19        A.   It's not in mine.

20        Q.   Do you recall testifying about the Spasoff article

21   yesterday?

22        A.   Yes.

23        Q.   Would you agree with me that no compounds discussed in

24   Spasoff were analyzed for their analgesic activity?

25        A.   I don't think so, no.   They were, there's no data in

1    Spasoff.  But, there is a comment in Spasoff where he says

2    certain compounds had better -- did you say analgesic activity?

3        Q.   I did?

4        A.   Okay.   Let me go, there's a sentence in here.

5        Q.   Let's highlight what I'm pointing at.   This may help

6    you.

7             Are you thinking of this last sentence of this

8    paragraph?

9        A.   No, there is another sentence where he talks about the

10   threo compound.   And there's a reference to a footnote nine.

11   Aramova, (ph) I think is the reference.

12       Q.   Right.

13       A.   I don't remember what they tested these compounds for.

14   And again I did focus on CNS activity as being the guide here.

15   I mean CNS is at least CNS and then you have a chance at

16   analgesic if you are interacting with the nervous system.   I

17   could try to find the sentence if you want.

18       Q.   Please do.

19            THE COURT:   That's all the stuff from yesterday,

20   right?

21            THE WITNESS:   Right.

22            THE COURT:   That's DTX 739.

23       Q.   Let's try the second page of the PDF.

24       A.   729 you said?

25            THE COURT:   I think it's 739.

1    Q.   739.   Have you found it?

2    A.   I think so.  The beginning of the last paragraph.

3    Q.   Yes, exactly.  Now again because I'm not sure there was

4    a clear question on the table right now, but you would agree

5    with me that Spasoff does not discuss any of the compounds

6    disclosed therein having been tested for analgesic activity?

7    A.   He does not say that they were tested for analgesic

8    activity.  That's correct.  He says they are tested for central

9    nerve activity and things like that.  I don't, I don't know

10   exactly what it says.

11   Q.   There's a focus on this reference Number 9, right?

12   A.   I beg pardon.

13   Q.   There's a focus in response to I think you are relying

14   on this first sentence of the paragraph beginning the

15   neuropharmacological screening.  Is that right?

16   A.   Yes,  yes.

17   Q.   And he refers to what he has called reference Number 9,

18   correct?

19   A.   That is correct.

20   Q.   And if we look at reference Number 9 in the back, that

21   points to Navramapo (ph) paper, correct?

22   A.   That's correct.  And that does exist somewhere.

23   Q.   In fact, it exists in your binder from yesterday.   If

24   you look at DTX 851.   If we could look at page --

25   A.   DTX 851?

1    Q.   851.  If we could look at the third page of that.

2    A.   Are we going to use models or not?

3    Q.   Maybe.   You can set them aside for now.

4    A.   Okay.  I have the reference.

5    Q.   Now, do you see any reference to a study of any of

6    these compounds that were discussed in Spasoff relating to --

7    withdrawn.

8         Do you see any references here to a test of the Spasoff

9    compounds for their analgesic activities?

10   A.   I will have to read it.  Where?

11   Q.   Start with pharmacological study.

12   A.   Okay.   Okay.  So they test them for toxicity and

13   basically they tested them against reserpine.  I'm not a

14   pharmacologist.  I don't know what that particular thing is.  I

15   don't know.  It may be related to norepinephrine.

16        Because the epinephrine that they mention is, as I

17   remember, is a norepinephrine reuptake compound.   And we

18   talked about the norepinephrine antinociceptive pathways

19   yesterday.   And they are doing some comparisons, it looks

20   like, with epinephrine.

21        If you look at Figure 2, they are certainly, if one

22   connects the norepinephrine analgesic pathway, you can say

23   there's some information here.   But, the tests per se were not

24   for analgesia.

25   Q.   In fact, they were for ptosis, p-t-o-s-i-s and

1    catalepsy and tremors.  Isn't that right?

2        A.   Yeah.   Amongst the things for the reserpine beyond what

3    the toxic effects,  yeah.

4        Q.   Now, Spasoff -- we can go to the front page.  Actually

5    Spasoff was published in 1981, correct?  And I think --

6        A.   I believe.

7        Q.   It may be '77.

8        A.   '77.

9        Q.   Does that look correct?

10       A.   '77, yes.

11       Q.   So, this was available to Grunenthal scientists by

12   1991,  correct?

13       A.   It was.

14       Q.   And Spasoff did not encourage any of them to make

15   linear compounds.   Is that right?

16       A.   I can't answer question.

17       Q.   Well, they didn't make any linear compounds as a

18   consequence of reading Spasoff, did they?

19       A.   Not to my knowledge.   Well, although I don't know.

20   Buschmann may have.  I don't know what motivated, I don't know

21   what exactly prior art he looked at.

22       Q.   Do you have any evidence whatsoever that he looked at

23   Spasoff at any point?

24       A.   Dr. Buschmann?

25       Q.   Correct.

1      A.   I have no evidence,  no.

2      Q.   Now,  you testified previously about how a POSA -- and,

3  by the way, I have used the term a couple of times.  If I use

4  the word "POSA" will you recognize that to be person of

5  ordinary skill in short?

6      A.   It seems like there's two acronyms that people use

7  here.  Some people like one, some people like another.  I will.

8      Q.   Brevity is the soul of wit.  So, I will use the shorter

9  one.

10          You testified previously about how a POSA would have

11  come back starting at a starting point and developing this new

12  analgesic in 1994, right?

13      A.   I did.

14      Q.   You would agree that a person of ordinary skill at the

15  time would have known many analgesics that would have been

16  potential starting points for developing a new analgesic?

17      A.   Yes, I would have been aware of many.

18      Q.   I think you had a slide that indicated opioids would be

19  one such group of compounds, right?

20      A.   That would be.

21      Q.   And cannabinoids would be another group?

22      A.   That was another one that's listed.

23      Q.   And Nsaids, I think you described as being a

24  nonsteroidal antiinflammatory drug.  Is that correct?

25      A.   That's correct.

1    Q.   You also described monoamine uptake inhibitors as being

2    one of those in your study, correct?

3    A.   Yes.

4    Q.   And other options would have included drugs with more

5    than one mechanism of analgesia, right?

6    A.   Right.  Yeah.  When I found Tramadol, I realized that

7    this had a dual mode of action.  I'm not quite sure what your

8    question is.

9    Q.   It's a pretty simple one.  Another option for a person

10   of ordinary skill in 1994 in developing a new analgesic would

11   be drugs with multiple analgesic mode of action.  Is that

12   right?

13   A.   Yeah.  Okay.

14   Q.   You agree it would be reasonable to characterize that

15   family of molecules as a pharmaceutical or having pharmacology?

16   A.   Yes.

17   Q.   For a moment I'd like to focus on opioids.  And I think

18   you talked a little about this yesterday.

19        As of 1994 several different types of opioid receptors

20   were known in the art.  Is that right?

21   A.   That's true.

22   Q.   And these receptors are proteins that are located on

23   the surface of some cells and are relevant to the transmission

24   of pain signals.  Is that right?

25   A.   That's correct.

1     Q.   And the opioid receptors known in 1994 include MU

2     opioid receptors, right?

3     A.   That's correct.

4     Q.   And it also included Kappa opioid receptors, right?

5     A.   That's correct.

6     Q.   And delta opioid receptors, right?

7     A.   That's correct.

8     Q.   And opioids, opioid drugs excerpt analgesia by

9     interacting with those receptors, right?

10    A.   I think primarily it's the MU receptor for most of

11    these things.   But, people were interested at the time of

12    Kappa and delta antagonists to or agonist,  antagonist,

13    agonist but for, they wanted to take care of pain.  So, they

14    were looking for agonist.

15         But, with the idea that they might have fewer of the

16    side effects of morphine.

17    Q.   And the same was true for Kappa opioid?

18    A.   Yeah.

19    Q.   Now, that interaction process of drug interceptors I

20    think you described physically yesterday with your hands as

21    being a complementarity of three dimensional shape.  Is that

22    right?

23    A.   I don't know if I used those words but that's correct.

24    Q.   And people often analogize that to a lock and a key

25    where the lock has given shape to fit a particular key and not

1      other keys,  correct?

2          A.   Yeah.   I think that's a bit simplistic in looking at it

3      because neither the lock nor the key is rigid.   So there's some

4      induced, there's adjustments that occur with a lock and a key.

5          Those are both very rigid and there's no adjustments

6      that can be made.   But, yeah, so I would say there's another

7      model of that that is sort of the induced fit model that

8      describes, it allows for the slight changes in structures of

9      both the receptors and the small molecule.

10         Q.   Now, would you agree that as of July 1994 there were

11     opioid compounds that were known to target more than one type

12     of opioid receptor at once?

13         A.   Right.   I mean we saw yesterday that Tramadol does.   I

14     didn't discuss that.   I sort of whizzed by it.   But, there were

15     data in one of those papers, I think one of the Raffa papers,

16     if I remember, where he pointed they did test binding

17     affinities of those other receptors.

18         Q.   Is it your testimony that binding affinity is

19     predictive of functional analgesic activity?

20         A.   This is definitely not predictive of function.

21         Q.   Now, could we have PTX 139 up which is Raynor and it

22     should be in your cross binder.

23         A.   139?

24         Q.   139.   Now I think that we had not talked about this

25     one before.   You reviewed this article in the course of

1    formulating your opinions in this case,  right?

2        A.   You know,  if I listed it somewhere, I've looked at a

3    lot of references and I may have looked at this one.  This may,

4    I honestly don't remember.

5        Q.   I represent to you, sir, that you cited this report.

6        A.   Okay.

7        Q.   I believe in your July expert report.

8        A.   Okay.

9        Q.   If I could have Page 4 of this document up and can you

10   blow up Table 1.

11           Looking at Table 1 of this document, which is on Page 4

12   of PTX 139, you see here listed several different types of

13   opioid interacting drugs, correct?

14       A.   Right.  Could we have the, I mean these columns

15   represent the different receptors, right, MU, delta, right?

16   Kappa, delta and MU, I guess.  Okay.

17       Q.   Yeah.  And several of these compounds are described as

18   being selective for either the MU, the Kappa or the delta

19   opioid receptors,  correct?

20       A.   Well, I don't know that they are described that way.

21   But if you look at the table, you can see that there are some

22   that are much more selective than others.  Certainly these

23   compounds about halfway through where these numbers are greater

24   than what, a thousand?  So, yes.

25       Q.   In fact, those compounds are described as "MU selective

1      compounds", right?

2          A.   Again described that way, the table suggests that

3      that's the case, yes.

4          Q.   The authors describe them that way?

5          A.   I have to take your word for it because I'm not looking

6      at their wording.

7          Q.   Actually you are looking at their wording, right?   It

8      says, "MU selective compounds".

9          A.   Oh, I'm sorry.  I'm sorry.  I didn't see that part of

10     the table.

11         Q.   That's fair.  So it does, in fact, indicate these are

12     MU selective compounds?

13         A.   I'm sorry, I thought we just had a list of compounds.

14         Q.   No problem.   And in fact other compounds are listed as

15     Kappa selective compounds, right?

16         A.   I see that, yes, now.

17         Q.   And others are delta selective compounds?

18         A.   I see that also.

19         Q.   And then there's a group of compounds called non

20     selective compounds,.

21              Do you see that?

22         A.   I see that.

23         Q.   And do you understand non selective in this respect to

24     mean that these compounds interact with more than one of the MU

25     opioid receptors?

1    A.  That's not really what the table shows because there

2    is, there are several compounds that don't appear to interact

3    with any of them.

4    Q.  Okay.  So, let's pick out one.   Etorphine, would you

5    agree that it interacts with all three of the receptor types?

6    A.  Etorphine I think is the one, not Pentazocine.  But

7    Pentazocine is also the one he highlighted as also interacting

8    with all of them.

9    Q.  In fact, with the exception of let's say three of these

10   compounds where every number is greater than a thousand,  all

11   of the compounds interact with more than one of the opioid

12   receptor types,  correct?

13   A.  Yeah, that's true.  They interact, yeah.

14   Q.  Now, so these compounds that did interact with more

15   than one receptor exhibited multi-analgesic mechanisms of

16   action, right?

17   A.  Well, I'm not sure that's true.  Naloxone is an

18   antagonist.  So, I don't think that exhibits analgesic

19   activity.

20   Q.  Now, but some of these compounds do obviously interact

21   with multiple of the receptors.  And you know them to be

22   analgesics, right?

23   A.  Yes, I think Pentazocine is one and Etorphine is

24   another.   Leu-enkephalin are, to my knowledge, not used as

25   drugs.  But, those are some that I recognize.   Naltrexone may

1    be an antagonist too.  I don't know exactly what all of these

2    things are.

3              But, I do know Pentazocine and Etorphine are

4    analgesics.  I think Etorphine is the compound you use to knock

5    out elephants, if I remember.

6    Q.   You did not -- you said that a person of ordinary skill

7    in 1994 would have been motivated to find compounds with

8    multiple mechanisms of action, right?

9    A.   Yes, polypharmacology.

10   Q.   But you did not start with any of these compounds in

11   your exhibits, correct?

12   A.   I guess what you are trying to get me to say is I am

13   characterizing this as having polypharmacology.  These

14   compounds are interacting.  And all these receptors in my mind,

15   in my view, the polypharmacology of this of having multiple

16   modes of addressing pain would be rather different mechanisms

17   than just opioid.  I can't tell you that.

18             Let's pick any compound that has these multiple

19   activities.  I don't know if Pentazocine is an example since

20   that's the one that's highlighted.  I don't know if there is

21   analgesic activity arising from each of these modes of

22   interaction.

23             So I really don't know if analgesia in these compounds

24   is arising because of interactions at these different

25   receptors.  These compounds could be antagonists so Pentazocine

 1      may be an agonistic MU.  But it may be antagonist to delta and

 2      Kappa.

 3              So in that case in my mind the analgesic activity is

 4      not arising from polypharmacology.  So without knowing all of

 5      that information and whether analgesia is arising from each of

 6      these interactions these compounds have with the different

 7      opioid receptors, I can't say that there's polypharmacology

 8      here that would be beneficial in terms of creating a new

 9      analgesic.

10          Q.   Is it fair to say then that you didn't perform such an

11      analysis?  You did not look at these compounds interacting with

12      more than one opioid receptor to determine whether in fact they

13      exhibited polypharmacologic analgesia, correct?

14          A.   No, I didn't.  No.  I was looking for something a bit

15       -- I was trying to get my mind, you know, the opioid is the

16      classic compound and very good analgesics.  But, they are

17      notorious for having bad side effects.

18              I think I just saw in the paper this morning that

19      doctors are not supposed to just prescribe opioids for chronic

20      pain anymore because of the addiction potential that you have.

21      So, one wants to minimize opioid side effects.

22          Q.   Now, it's fair to say you're not an expert in treating

23      pain,  correct?

24          A.   I think that would be an M.D. that would be an expert

25       in treating pain,  yeah.

1    Q.   So you are not, right?

2    A.   I am not an M.D., no.

3    Q.   And it's your testimony, sir, that FDA has withdrawn

4  approval for the use of opioids to treat chronic pain?

5    A.   I didn't say that.

6    Q.   You said?

7    A.   Well, I said, I just read the headline this morning

8  that doctors are being told not to prescribe it.  I don't think

9  this is from the FDA.  I don't think I said that, did I?  I

10  don't think so.

11    Q.   So, would you consider what the FDA says about the use

12  of such compounds to be influential in determining what a

13  person of ordinary skill would choose as a starting point for

14  creating an analgesic in 1994?

15    A.   The FDA would be one agency.  I mean any, I don't

16  know, approved drugs generally are good.  Not all drugs start

17  off in this space.  Many of them start off in Europe and come

18  here.  I think some start here and go to Europe.

19    Q.   And you know as a matter of fact, don't you, that

20  Tramadol was not FDA approved in 1994, correct?

21    A.   Right.  But it had been approved in Europe for many

22  years.  So clearly it had an established safety efficacy track

23  record.

24    Q.   And that record was insufficient to get FDA approval at

25  least for more than a decade, correct?

1        A.   I have no idea.

2        Q.   Well, how long was Tramadol in use in Europe, since you

3   just testified?

4        A.   I don't know exactly when its use started.   But, it was

5   certainly well before 1994.   Since I have not looked at

6   records or anything, I really don't know whether Grunenthal

7   ever tried to get it approved in the United States.   I have no

8   idea of what was done there.   I mean ultimately it was

9   approved, but, I don't know what the hold up was.

10       Q.   Now, at the beginning of your testimony yesterday you

11  discussed the general idea of structure activity relationship

12  determination or SAR, correct?

13       A.   That's correct.

14       Q.   And you also mentioned having obtained one or more

15  patents, right?

16       A.   Myself personally?

17       Q.   Correct.

18       A.   I'm an inventor.   I'm listed as an inventor on some

19  applications.   I think I said that none of these patents have

20  issued yet.   So, it hasn't gone through the process of the

21  examiner raising questions or addressing the questions.   So

22  none of that process has started on any of the patents that I'm

23  an inventor on in the last couple of years, no.

24       Q.   And those patent applications for all of them you

25  signed an inventor's oath, correct?

1        A.   Yes,  I did.

2        Q.   And that said that you had reviewed the applications

3    and attested to its correctness to the extent of your

4    knowledge,  right?

5        A.   That's correct.

6        Q.   And so you viewed what you had in those applications as

7    patentable,  correct?

8        A.   That's correct.

9        Q.   And were those applications a result, any of them, of

10   SAR studies you performed?

11       A.   Yes, they were definitely the result of some SAR

12   studies, binding studies, yes.

13       Q.   Now, you would agree with me in this case you have not

14   identified a single starting point for the development of a new

15   analgesic in 1994 but rather multiple starting points,  right?

16       A.   I'm sorry, could you repeat the question?

17       Q.   Sure.  You would agree with me, wouldn't you, that in

18   developing your opinion of obviousness in this case, you do not

19   start with a single starting point that a person of ordinary

20   skill would have used in developing a new analgesic in 1994,

21   but rather multiple starting points, right?

22       A.   I think where I ended up was starting with Tramadol.

23       Q.   And Tramadol is composed of multiple molecules,

24   correct?

25       A.   Well, I think it's composed of two enantiomers,  yes.

1      Q.   And I believe you've testified that the metabolite of
2    those enantiomers would also be relevant,  correct?
3      A.   Right.  They were known metabolites.  They were known
4    to be active.
5      Q.   In fact, the same is true about the racemic mixture of
6    the Tramadol enantiomers, right?
7      A.   That what?
8      Q.   Well, you would agree with me that you have testified
9    that in your view a person of ordinary skill would have been
10   motivated to select first off either enantiomer of Tramadol as
11   a starting point in 1994,  right?
12     A.   Yeah.  I think what we did is we went through the
13   analysis where we looked at all of those.   We considered all
14   of those.   And we found good things.   And then all of the
15   prior art ultimately led to a single compound minus O
16   desmethyl.
17     Q.   Sorry.
18     A.   I'm sorry, I interrupted you.
19     Q.   I interrupted you.  So, let's try it again.
20          So, isn't it correct that in your view a person of
21   ordinary skill would have been motivated to select either
22   enantiomer of Tramadol as a starting point in 1994 and
23   developing a new analgesic?
24     A.   They would have been among the ones that were
25   considered,  yes.   I think I testified though that of those

1    two, the RR had the kind of properties that a person of

2    ordinary skill would look for, namely that it had this

3    polypharmacology.

4        Q.  So, is it your testimony, sir, then, that the SS would

5    not have been a good starting point for a person of ordinary

6    skill in developing an analgesic in 1994?

7        A.  No.  I'm just saying I think I said they would all be

8    starting points.  Some were better than others, I think.  But,

9    they would all be ones that I think that one would look at.

10       Q.  When you say they all, are you including each of the

11   enantiomers of Tramadol? Each of the enantiomers of Tramadol's

12   O desmethyl metabolite, as well as the racemic mixtures of both

13   of those enantiomers?

14       A.  I think I made that clear in my opening reports and

15   that's what we discussed.

16       Q.  I just wanted to make clear for purposes of the record

17   because I think that's correct.

18           You would agree with me, and I think that you just

19   testified that, and going through your analyses, you then later

20   honed in on one of the stereoisomers of O desmethyltramadol as

21   one of your more interesting starting points,  right?

22       A.  I honed in on it makes it -- what I think I testified

23   is the prior art led me there.

24       Q.  Okay.  So, and one of the reasons you cited was that

25   in your view some people could not metabolize the Tramadol

1    enantiomers themselves correctly.  Is that right?

2        A.  Yes I think that was documented in the literature

3    several places.

4        Q.  You cited no such literature in your testimony, right?

5        A.  I don't remember whether it got cited or not.  There's

6    something in Parr which was not part of this.  This is

7    something from Sevchek (ph) which discusses this.  So certainly

8    we didn't discuss the par reference at all.  But we did discuss

9    the Sevchek reference.

10        And I don't remember whether we talked about that part

11    of it or not.  But, I think I made the point when I was down

12    there that not all people have, they have a full suite of

13    enzymes to do these metabolic transformations.

14        Q.  Let's talk a little bit about that.  So, you would

15    agree with me, wouldn't you, that O desmethyltramadol was known

16    to occur in man only to a minor extent?

17        A.   That sounds almost like a quote.

18        Q.  In fact it is.

19        A.  Yes, I would agree.

20        Q.  So, let's bring up Sevchek which is DTX 736.   If you

21    would focus on in this paragraph right here, and here, would

22    you agree with me that Sevchek reports on desmethyltramadol

23    is -- well, actually, why don't you just read the first

24    sentence into the record, please.

25        A.   Okay.   Although O desmethyltramadol is the main

1    metabolite of Tramadol in most species, in man there is only a

2    slow biotransformation and Tramadol is excreted mainly

3    unchanged.

4         Q.   Could you also read the next sentence?

5         A.   Sure.  Hence the production of metabolites with strong

6    opioid activity, i.e., O desmethyltramadol occurs in man only

7    to a minor extent.

8         Q.   Now, this phenomenon that O desmethyl Tramadol occurs

9    in man only to a minor extent would have been true both for

10   people having normal metabolites and also this a cytochrome

11   P450 chromosome, correct?

12        A.   I don't know.  It would certainly be true of people

13   that had reduced cytochrome P450 activity.  Whether a

14   cytochrome P450 was important, I don't know if it's generally

15   true of all people though.  I don't know how broadly.  I don't

16   know what population of people they looked at.  I don't know

17   anything about that.

18        But clearly at least sometimes it doesn't get

19   metabolized.  And certainly those people, some of these people

20   would not have the enzyme or have low amounts of it.  I can't

21   speak to the rest of it though.

22        Q.   And the article simply reports that in man in general

23   this transformation O desmethyltramadol is minor, correct?

24        A.   In general it's not there.

25        Q.   Well, in man it's there, correct?

1      A.   In man, it's there.

2      Q.   There's no indication that only people having incorrect

3 cytochrome P450 activity were measured in this study, right?

4      A.   There's no information about that.   Maybe if we go to

5 Lintz we would find that.  I don't know.  But, yeah, that's

6 fair.  That's all the more reason to actually start with the

7 compound that doesn't have the methyl group there.

8           I mean if it is, in fact, true, which you're suggesting

9 is true more generally than I necessarily interpreted this,

10 that clearly motivates a person of ordinary skill to start with

11 the compound without that methyl group because then you

12 wouldn't rely on metabolism as a mode of giving you the more

13 active analgesic activity.

14     Q.   Well, you would agree with me that prior to 1994 there

15 were no studies in man in which only the O desmethyl

16 metabolites or a mixture of the two metabolites was

17 administered to obtain analgesia,  correct?

18     A.   I will say that I'm unaware of any,  yes.

19     Q.   And in fact every study which you are aware of in which

20 some component of Tramadol was administered to patients, was

21 simply the two enantiomers of Tramadol,  correct?

22     A.   Yeah, that's correct.  I don't even know if the

23 individual enantiomers were administered separately.  And so,

24 yeah.

25     Q.   Now, let's talk a little bit about Tramadol.   The two

1    enantiomers, I believe you discussed this in your direct

2    testimony, are, of Tramadol, are mirror images of each other.

3    Is that correct?

4         A.   That's correct.

5         Q.   Could we have my demonstrative Number 1? Are these the

6    two enantiomers of Tramadol?

7         A.   Yes, I believe so.  Yes.

8         Q.   I believe you testified that you're unaware of any

9    clinical studies in man in which only one of the two

10   enantiomers was administered and observed for analgesia,

11   correct?

12        A.   That I'm unaware of any.

13        Q.   Now, by July 1994 therefore a person of ordinary skill

14   understood that the overall antinociceptive activity of

15   Tramadol deprived the complementary and synergistic activity

16   between these two enantiomers, right?

17        A.   I think we may be coming to a Raffa reference.  But,

18   you would certainly know that based on the prior art.  Maybe

19   you should rephrase the question.

20        Could you just rephrase the question before I answer?

21   Sorry.  I may go off on a tangent here.  So, let me get your

22   question again, if I may.

23        Q.   Sure.  So, by July 1994 a person of ordinary skill

24   would have understood that the overall antinociceptive activity

25   of Tramadol was derived from its complementary and synergistic

1          interaction between the two enantiomers?

2               A.   In man?

3               Q.   In man.

4               A.   I'm not sure they would have known that.   There was,

5          there were data in animals that suggest that, certainly.

6               Q.   Right.

7               A.   I don't know that there were any data in man that

8          support that.

9               Q.   And so is it fair to say that if you don't see data in

10         man, in a piece of prior art that you are referencing, that you

11         discount its value as a predictor for a person of ordinary

12         skill in 1994?

13              A.   I didn't say that.   I answered your question which was

14         different.   You asked me basically is the drug that means in

15         man now, then the other references that we have, certainly

16         enlighten us as to possibilities and how these may be working

17         in man.   But, the actual tests for what you are saying, as far

18         as I know, were not done in man.   They were done in animals.

19              Q.   And the tests that you discussed in Driessen, both of

20         the Driessen references and both the Raffa references and the

21         subject reference and so forth, I think you had a slide of a

22         bunch of references?

23              A.   Right.

24              Q.   None of those were done of man, correct?

25              A.   No, they were done in animals.   And they were decent.

1    That's a decent animal model.  But, it doesn't say it works

2    that way in man.

3         Q.   In general you would agree with that?

4         A.   It suggests that this is a mechanism of action in man.

5    That's all the information that you have.   And so I think

6    that's what you would say is that's probably that way in man.

7         Q.   Okay.  Could we have up the Raffa two article which I

8    think in your binder from yesterday is DTX 692.  You may have a

9    copy.

10        A.   I do have a copy in yours.

11        Q.   You are familiar with this because you discussed this

12   yesterday?

13        A.   Yes.

14        Q.   The title is Complementary and Synergistic

15   Antinociceptive Interaction between the Enantiomers of

16   Tramadol, correct?

17        A.   That's correct.

18        Q.   Now, I think yesterday you focused on the abstract of

19   this article.  And I believe Mr. Capuano attempted to focus

20   only on the left side of it.

21             Do you remember that?

22        A.   I remember that's where we focused.

23        Q.   Why don't we look at the whole abstract and have what I

24   think is called Harvey called the rest of the story.

25             You would see here that, in fact, the abstract

1    discusses how the plus and minus enantiomers produced

2    antinociception in a synergistic way, correct?

3        A.   Right.  So probably we should highlight so it's on the

4    right half.

5        Q.   Let's highlight synergy there.

6        A.   It suggests based on this that's what it says,  yeah.

7        Q.   Could we also highlight significantly more potent, etc

8    than the theoretical additive effect of the enantiomers.

9             Now,  would you agree with me that in this paper the

10   authors examined separately the analgesic activity of plus

11   Tramadol and minus Tramadol in your model?

12       A.   I believe that's right.  That's what we said yesterday.

13   Right.  So, that's reflected in Table 1 that we did discuss.

14       Q.   Right.

15       A.   It's also in Table 2.

16       Q.   Okay.  And the authors then prepared a theoretical

17   additive effect which is discussed here in the abstract, right?

18       A.   That's correct.

19       Q.   And what the authors found was racemic Tramadol i.e.

20   Tramadol having both enantiomers was significantly more potent

21   than the theoretical additive effect of each enantiomer, right?

22       A.   Well, I think you have added some words but I think you

23   represented it fairly.  Okay.  Sorry, I was on the wrong line.

24   Okay.  Yes.

25       Q.   I have represented it fairly?  You agree?

1        A.   Yeah.

2        Q.   Now, and in fact there is some P values noted here.  Do

3   you see those?

4        A.   Yes.

5        Q.   And P values are measures of statistical significance,

6   correct?

7        A.   They are.

8        Q.   And as a scientist in general you are familiar with the

9   notion of P values, right?

10       A.   I am.

11       Q.   In general a P value of less than .05 as indicated here

12   means that there's a 95 percent chance that the observed effect

13   was not due to random effects, correct?

14       A.   Right in whatever experiment was conducted.

15       Q.   Now, and in English that means these data showed that

16   the synergy was statistically significant, correct?

17       A.   That's right.  That's what's being presented.

18       Q.   Now, could we go to Page 9 of this document at the

19   lower right hand? And could we blow up the bottom of this

20   column and the top of this column?  You can put them on top of

21   each other because they are a single paragraph.

22            You see this paragraph in summary, correct?

23       A.   I do.

24       Q.   Now, about midway down this paragraph I think on the

25   screen it's here starting with our conclusion, could you read

1     that sentence in the record?

2         A.   Sure.   Our conclusion is that the overall

3     antinociceptive action of Tramadol derives from the combined

4     pharmacologies of the two enantiomers of the racemic drug.

5         Q.   Tramadol apparently results from the fortuitous

6     interaction of the enantiomers, right?

7         A.   That's what this says.

8         Q.   You agree with that conclusion,  correct?

9         A.   Not entirely.

10        Q.   Well, the authors had that conclusion, correct?

11        A.   That's correct.  But if you look at the Table 2 -- are

12    you going to go there?

13        Q.   We can in a moment.

14        A.   Okay.  So, that's what the authors are saying, yes.

15        Q.   Right.  And these are Grunenthal authors, are they not?

16        A.   I believe.  I have to look.  There are some papers

17    which I don't know.  There's an R.W. Johnson so, yeah, so some

18    of the authors were Grunenthal for sure.

19        Q.   And Grunenthal knew, more than anyone in the world,

20    about Tramadol.  Is that fair?

21        A.   I think that's probably fair,  yeah.

22        Q.   Now,  not only does the analgesia result in synergy but

23    the sides effects result in, either it results in no synergy or

24    put differently -- let me clean that up.  Withdrawn.

25             Would you agree with me that the side effect profile of

1    Tramadol was shown to have simply additive or counteractive

2    effects between the two enantiomers versus the racemic mixture?

3        A.   Yeah.   I mean these side effects are the non

4    antinociceptive things and elsewhere in the article in the

5    table it presents that, so, yeah.

6        Q.   And would you read the sentence beginning Hence into

7    the record please?

8        A.   Yeah.   Hence, the clinical profile of Tramadol

9    apparently results from the fortuitous interaction of the

10   enantiomers on the therapeutic endpoint analgesia, but not on

11   side effects.

12       I did emphasize the word "apparently" because there's

13   equivocation there, I think.

14       Q.   Well, you read the author's conclusion, correct?

15       A.   I did read the author's conclusion.

16       Q.   They didn't qualify it in any other way?

17       A.   Other than saying apparently, no.

18       Q.   Aren't the observed reports in any paper apparently

19   what is observed from the experiments reported?

20       A.   I have no opinion on that.

21       Q.   Now,  let's go to, you testified yesterday that a

22   person of ordinary skill would have been attracted to Tramadol

23   as a starting point for developing a new analgesic because it

24   had a dual mechanism of action,  right?

25       A.   I did.

1    Q.   And in your view Tramadol was unique in this respect,

2  correct?

3    A.   I think it was characterized that way in the prior art,

4  yes.

5    Q.   And you would agree with me that every compound is

6  unique, correct?

7    A.   I would agree with that but they are not characterized

8  as such as Tramadol was.

9    Q.   And when you say was characterized in prior art, you

10  are referring to what was known as the Raffa one reference,

11  correct?

12    A.   That's correct.

13    Q.   You have identified no other references that refer to

14  Tramadol as either atypical or unique, correct?

15    A.   That's true.

16    Q.   Now, you would agree with me that you found Tramadol

17  "atypical" because Tramadol had no MU opioid and monoamine

18  reuptake method of action, right?

19    A.   I think that's how the authors of the prior art

20  characterized it, yes.

21    Q.   Do you agree with that assessment?

22    A.   Yes.

23    Q.   Do you agree with me that Tramadol's monoamine reuptake

24  relates to the both serotonin as well as norepinephrine

25  pathways?

1    A.   Is Tramadol as the drug is a mixture of enantiomers?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And Tramadol analgesic activity results from three

5    mechanisms of action, mu opioid agonist, nor reuptake

6    inhibition and serotonin reuptake activity, correct?

7    A.   That's correct.  Yeah, that's the implication.

8    Q.    So, a person of ordinary skill looking at Tramadol's

9    starting point or any of its components, would not have been

10   motivated to eliminate any of these analgesic mechanisms in

11   developing a new analgesic, right?

12   A.   I think I disagree with that.  I think I pointed out

13   yesterday that that serotonin side effects, there are some bad

14   effects associated with binding to serotonin receptors.  There

15   are a number of serotonin receptors.  So they are not all bad,

16   but, some of them are.

17        And if you know they are serotonin activity, then you

18   might want to veer away from that.

19   Q.   Did you cite any evidence whatsoever to indicate that

20   there were bad effects from serotonin inactivity?

21   A.   Well, I cited the example of LSD.  I didn't cite any

22   literature.  It's common knowledge amongst people who deal with

23   serotonin anyway.

24   Q.   There are drugs that act on the serotonin reuptake

25   pathway, correct?

1        A.   There are, yes.   They have selected activity.

2        Q.   And there are drugs in the analgesic space, aside from

3    Tramadol, that interact on the serotonin reuptake pathway,

4    correct?

5        A.   I don't know of any.

6        Q.   Well, you cited serotonin reuptake activity compounds

7    on your opening, one of your opening slides yesterday as places

8    to start developing a new analgesic in 1994, correct?

9        A.   I said monoamine uptake so that would have included.

10   That but I knew of the norepinephrine ones.

11       Q.   I think the transcript will show that you also referred

12   to the serotonin reuptake pathway.

13       A.   As in that slide where I talked about analgesic.

14       Q.   Correct?

15       A.   Okay, I may have mentioned that was one of the -- well,

16   I think I was explaining what monoamine reuptake inhibitors

17   were.   I don't remember the exact context but I think that what

18   I was doing was explaining what monoamine reuptake meant in

19   response to a question.

20       Q.   Now, could we look at the -- well, you would agree that

21   pain perception was modulated by the serotonin pathway,

22   correct?

23       A.   Yeah, that was an element.

24       Q.   Why then do you focus on removal of the serotonin

25   reuptake pathway rather than, for example, the MU opioid

1   pathway from Tramadol and developed a new analgesic? Is it

2   because the resulting compound had looked more like Tapentadol?

3        A.   No, no.

4        Q.   So you recall testifying yesterday about a criticism of

5   your opinions as being that they were driven by hindsight,

6   correct?

7        A.   Yes, I do remember that.

8        Q.   And you testified that that is not correct, right?

9        A.   I testified that way, yes.

10       Q.   You agree with me before rendering your opinions in

11  this case, you reviewed the '593 patent, correct?

12       A.   Before?

13       Q.   Before coming to your opinion of obviousness in this

14  case, you reviewed the '593 patent, correct?

15       A.   I didn't review that in the context of obviousness.  I

16  saw that much later I was asked to think about this without

17  having seen that.

18       Q.   You were asked, so, let me understand your testimony.

19            Were you asked to determine the obviousness of the

20  claims of the '593 patent without having reviewed those claims?

21       A.   Okay.  So, no.  I had to review the claims to have come

22  to that conclusion.

23       Q.   I agree with you.  And some of those claims

24  specifically layout Tapentadol, correct?

25       A.   Yes, some of them do of course.

1      Q.   And prior to formulating your opinions in the case you

2   understood that the case concerned Tapentadol, right?

3      A.   Okay.  Yes.

4      Q.   Now, we've talked a fair amount about polypharmacology.

5           Would you agree with me that polypharmacology, in

6   addition to potentially generating analgesia, also generates

7   side effects?

8      A.   Sure.  I mean every interaction can result in some side

9   effects.  But, the idea here is is if you've got

10   polypharmacology, I think I explained this, at least let's, if

11   we can focus on this particular situation where we're talking

12   about analgesia and pain, the opioid, you know, they are great

13   analgesics, as I said.

14           And the problem with these analgesics is they are

15   highly addictive and they have a lot of these bad side effects.

16   So, if you could administer a lower amount of a compound that's

17   effecting that particular receptor or if the compound you're

18   using has a lower influence, let's say, on that opioid

19   receptor, then you tone down that opioid activity, you

20   presumably tone down the side effect profile, and you still

21   maintain analgesia, the amount of analgesia that you want via

22   this other mechanistic pathway.

23      Q.   Now, you recall -- can we clear the blow ups, please?

24   You recall yesterday focusing on Table 1 of this document.

25           So, could we look at that on Page 4?  Now, this table

1   includes so called KI values for, among other things, racemic

2   Tramadol and plus and minus Tramadol enantiomers, correct?

3       A.   That's correct.

4       Q.   And KI values are measures of the binding affinity that

5   is observed for these measured compounds versus these various

6   receptors, correct?

7       A.   That's correct.

8       Q.   Receptors that are viewed are MU, delta and Kappa

9   opioid receptors, as well as norepinephrine reuptake receptor

10  and serotonin reuptake receptor?

11      A.   That's correct.  Can I see my demonstrative Number 2?

12  Now, again we have the two structures of the plus and minus

13  Tramadol which we discussed earlier.  At the bottom I've carved

14  out just Table 1 and highlighted it.

15           Does it look accurate to you

16      A.   The table is accurate.  You have carved out certain

17  things and it looks, I'm not sure exactly what you're carving

18  out.

19      Q.   For the moment I simply mean the table.

20      A.   Okay.

21      Q.   And these KI values, a smaller number indicates tighter

22  binding to that particular receptor, correct?

23      A.   That's correct.

24      Q.   Now, you see here that plus Tramadol has a tighter

25  binding than minus Tramadol to the MU opioid receptors, right?

```
1          A.   That's correct.

2          Q.   By something in the neighborhood of 15 to 20-fold,

3     right?

4          A.   That's true.

5          Q.   And it also, it being plus Tramadol also has a tighter

6     binding to the serotonin reuptake pathway than does minus

7     Tramadol, correct?

8          A.   Yes, that's true by a five-fold difference.

9          Q.   And conversely minus Tramadol has a tighter binding to

10    the norepinephrine reuptake pathway, correct?

11         A.   Minus Tramadol has a tighter, yeah, okay, it has the

12    tightest binding, yes, of the three.

13         Q.   And again something in the neighborhood of six fold,

14    five to six?

15         A.   Five relative to the plus enantiomer, but to the

16    mixture it's not even a factor of two.

17         Q.   Right.  Relative to the mixture, relative to plus

18    Tramadol minus Tramadol, about a five yield tighter binding,

19    right?

20         A.   Right.

21         Q.   I believe you testified that molecules have particular

22    three dimensional shapes, right?

23         A.   Yes.

24         Q.   And they have some flexibility, I think you mentioned

25    this earlier, they have some flexibility in terms of their
```

1    three dimensional shape, right?

2         A.   That's true.

3         Q.   Different molecules have different amounts of

4    flexibility. Is that fair?

5         A.   Sure.

6         Q.   I believe you testified that the cyclohexane ring

7    brings rigidity to the structure of its component compounds and

8    their metabolites, right?

9         A.   I don't know that I said, I don't know that I said it

10   that way.  The cyclohexane ring itself is also flexible.  This

11   part it pre-organizes.  I think I said these groups.  And

12   there's a preferred orientation that the cyclohexane ring

13   enforces.  But, I didn't characterize the cyclohexane ring as

14   being rigid, I don't believe.

15        Q.   Well, the transcript will answer that question.   But

16   let's use your term pre-organized.  I think that's fair.

17             So,  would you agree with me that plus Tramadol based

18   on the data here in Table 1 is pre-organized, as you put it, in

19   a shape that corresponds to the shape it has when bound to the

20   MU opioid receptor?

21        A.   Well, I mean we don't know exactly what it looks like

22   when it's bound to the MU opioid receptor.  Usually, as we

23   talked earlier, this is this induced fit and so we don't really

24   know exactly how it binds.

25        Q.   Well, is it at least correct that the plus Tramadol

1    enantiomer is pre-organized in a shape that corresponds to its

2    complementary MU opioid receptor more so than minus Tramadol?

3        A.   What I would say is the confirmational space that's

4    available to plus Tramadol, the low energy confirmational

5    space, it's available to it, enables it to better interact with

6    the MU opioid receptor than the confirmational space which is

7    available to the minus isomer.

8             So, the net result is yes, as you say it.  But, I think

9    it's a little more complicated than just the way you put it.

10   The conclusion is the same, yeah, basically.

11       Q.   Okay.  And with regard to norepinephrine, would you

12   agree with me that the minus Tramadol molecule is more closely

13   pre-organized to bind to the norepinephrine receptor than is

14   plus Tramadol?

15       A.   I really don't like the use of the word

16   "pre-organization".

17       Q.   You used it.

18       A.   I have used that word, yes, in the past.

19       Q.   A minute ago.

20       A.   Yeah, I did.  But, I think what's important here is,

21   you know, there is a preferred confirmation and solution.  And

22   we can kind of work from that on.  I think what I would say is

23   that the minus Tramadol molecule for its the pharmacophore and

24   the three dimensional arrangement and the flexibility that's

25   inherent in that is better suited for binding at norepinephrine

1       center than is the plus isomer.

2               I think I pointed out when I played with these

3       molecules, at the end I said there is flexibility here.  And I

4       said, and I said that the flexibility that's inherent in the

5       cyclohexane molecule is the same kind of flexibility that's

6       going to be available to the open chain molecule.

7               So I acknowledge then at least implicitly I think that

8       there is likely to be some flexibility involved in the actual

9       binding of that.

10      Q.   Well, you would agree with me that the cyclohexane

11      molecule Tramadol is less flexible overall than the linear

12      compound that you modeled?

13      A.   I would say that that's fair.

14      Q.   And would you agree with me that pre-organizing these

15      ligands in a manner that corresponds with that biologically

16      active confirmations would generally be thought to lead to

17      higher association constants to their receptors?

18      A.   That's a general thought but it's wrong.

19      Q.   Well, that's the general thought of a person of

20      ordinary skill in the art, correct?

21      A.   I think we had this discussion at my deposition and

22      with that Bartlett article, if you remember.  And we talked a

23      little about intricacy of binding and so forth.  And in the

24      Bartlett papers of that time he notes that there are certain

25      caveats to this and you can't entirely rely on that concept.

1          So, even at that time there were known caveats to

2    saying that.  If you pre-organize a molecule in the wrong way,

3    it's not going to be able to adopt the three dimensional

4    orientations that it needs to adopt.

5          And it may be, and that's part of my what I said is at

6    least in going from the Tramadol with the six membered ring to

7    the more flexible molecule, I suggested that what we might be

8    trying to do here is to optimize interactions at both the

9    opioid and the norepinephrine receptors.

10          And you can gain that ability by endowing the molecule

11    with a little more flexibility.  And we all, I mean I have also

12    provided evidence in this case that showed that the flexible

13    molecules actually bind better.

14          And so the answer is that pre-organizing molecules, and

15    it was known at the time, does not always lead to better

16    binding.

17    Q.   Well, but, it was generally assumed, you would agree,

18    that pre-organizing a flexible molecule in the three

19    dimensional confirmation it adopts and bond to its receptor

20    would provide a derivative having increased binding affinity,

21    would you not?

22    A.   I think that the literature, there's literature that

23    stands in opposition to this.  And I think I provided that in,

24    I don't remember which of the reports it was, but, I did

25    provide that.   There's the DiMaio (ph) reference if I recall

1          correctly and it was with enkephalin.

2                  Like I said, if you get the -- and similarly the whole

3          opioid, the whole as I pointed out yesterday, the whole history

4          of simplifying and making derivatives of morphine, I won't say

5          they always lead to less more flexible molecules, but very

6          oftentimes it leads to more flexible molecules.  So there's

7          nothing, there's no magic about the pre-organization.

8              Q.   Well, thank you for that explanation.  But, I was

9          asking a much simpler question which is was it generally

10         assumed, generally assumed that pre-organizing a flexible

11         molecule in its bound state, in its three dimensional bound

12         state as it would be at its receptor, would increase binding

13         affinity.

14             A.   It was but if you read, there are caveats to that, as I

15         explained.  And at that time there were known caveats that

16         people were aware of.

17             Q.   And the caveat you just described is that if you

18         organize it in a way that you know interacts poorly, that could

19         reduce affinity.  Is that right?

20             A.   I think the caveat more generally is I mean this is a

21         process.  It's not so simple as just focusing on where you go.

22         The process is one of taking a receptor and a small molecule

23         and they are over here and, you know, they are in whatever

24         environment they are in and then putting them together.

25                 It's kind of a process where you form the complex.

1    And the difference, in other words, the KI is determined about

2    the relative energies of these two states, right.  And so the

3    additional caveat that you have to put in here was certainly

4    understood by people who thought about it was that the flexible

5    and the constrained molecules have to interact in the same way

6    not only with the protein, which is to your suggestion, but

7    also with the solvent.

8        So the simple approach that you are taking and the

9    simplified way you're looking at this question is certainly the

10   way that some people looked at it.  But some people understood

11   that that wasn't a reliable way of looking at it even at that

12   time.

13   Q.  Well, it was a general assumption at the time, was it

14   not?

15   A.  It was a general -- I would certainly not argue with

16   you that it was a general, it was a generally applied paradigm

17   in drug discovery.  The other flip side of that, of course, is

18   that, and it's also implicit, that trying to get the dual

19   pharmacology is when you make compounds more rigid.  They can

20   be more selective.

21       And so in that DiMaio reference that I referred you to

22   when we had this discussion at my deposition, in those cases

23   the molecules that were constrained, the enkephalin analogs

24   that were constrained had better selectivity for, I forget

25   which the MU or I forget which ones, but they had better

1    selectivity for the different opioid receptors, but they had

2    lower affinity.

3          So, I mean there's literature, the prior art literature

4    at the time this was done that says pre-organizing things is

5    not necessarily good.   And these cases you don't know what the

6    bound confirmation is so that's the problem.

7      Q.   And so you have to make the compound and actually try

8    the binding experiment to determine whether the compound will

9    in fact have negative interactions,  correct?

10     A.   Well, what you determine is whether it binds as well,

11   yeah.   That's what you determine.   You find it binds either if

12   you're doing a simple receptor binding assay, what you find out

13   is that the change you make, it binds better or worse, and

14   these are nice examples.

15         If you go from plus Tramadol to minus Tramadol, that's

16   a change.   And then you do these binding studies, this is the

17   effect of making that change.

18     Q.   And apriori, you would agree with me that if you, in

19   fact, confine a ligand to its pre-organized state, the state

20   that it will have when it's bound to a receptor, that you would

21   expect that compound to have higher binding affinity than a

22   more flexible compound, correct?

23     A.   Again, I think you have to think of the process you're

24   focusing on, the end result.   And you're focusing only on the

25   ligand.   You are not considering the protein.   You are not

1    considering the interactions that the small molecule has to

2    solvent

3        Q.   I am considering all of those.  I am saying apriori, a

4    person of ordinary skill, would expect that a molecule that is

5    rigidified in its bound confirmation, in a confirmation that

6    will interact well with receptors would be expected to have a

7    higher binding affinity than a more flexible compound.  That's

8    all I'm asking.

9        A.   Okay.  I think if everything worked exactly the way you

10   say it, that's true.  But, again, we don't know the structures

11   of the receptors here.  So, we don't know what that

12   confirmation is.

13       Q.   You only have sort of binding data effectively about

14   those compounds with their receptors, right?

15       A.   That's what we have here, yeah.

16       Q.   Could we go to -- we can either take a break or I can

17   push through.

18                    THE COURT:   You know, actually the court reporter

19   has requested a break so that's perfect.  Thank you.  About 5

20   or 10 minutes.

21                    I will remind the witness you are under oath and

22   you are still testifying.  So you're not going to be speaking

23   to your Counsel about your testimony.

24                    With that, we will be back in about 5 or

25   10 minutes.  Thank you.

```
 1              (Whereupon a short recess was taken.)

 2              (In open court at 11:34 a.m.)

 3              THE COURT:  So, we are back on the record with

 4    Professor Martin and we are engaged in the cross-examination.

 5              MR. BEST:  Can we page forward one?  That's it.

 6    BY MR. BEST:

 7       Q.   Hello again, Dr. Martin.

 8       A.   Hello, Mr. Best.

 9       Q.   Now, yesterday you discussed, and I think maybe even a

10    little bit this morning, this slide which lists certain

11    norepinephrine reuptake inhibitors, correct?

12       A.   Yes.

13       Q.   And you discussed certain structural characteristics

14    that these compounds have, correct?

15       A.   I did.

16       Q.   And you would agree that at least certain of the

17    tramadol components and/or its metabolites have norepinephrine

18    reuptake activity as well, correct?

19       A.   Yes.

20       Q.   Now, would you agree that you provided no data or

21    evidence that tramadol actually binds the norepinephrine

22    receptor at the same location that any of these compounds that

23    you have on your slide bind?

24       A.   I think there's no way of knowing.  Well, I don't know

25    if there's a way of knowing.  I don't know.
```

1      Q.   Now, we've discussed the goal of -- the goals of a

2    person of ordinary skill in 1994 involved in a new analgesic,

3    and we've talked a lot I think about efficacy, so can we talk a

4    little bit about safety.  Regarding safety, would you agree

5    with me that no drug is completely safe?

6      A.   I would agree.  I've heard people characterize drugs as

7    toxic substances with beneficial side effects.

8      Q.   And, in fact, all drugs have side effects, right?

9      A.   I think that's true, yes.

10     Q.   And regarding side effects, you are familiar with the

11   distinction between on-target side effects and off-target side

12   effects?

13     A.   Yes.

14     Q.   And is it fair to characterize on-target effects as the

15   biological responses occurring from interaction with the

16   desired target that yield functional problems?

17     A.   Yeah.  Certainly, yeah, you can have too much.  Yes,

18   yes.

19     Q.   And off-target effects arise from the same compound

20   interacting with targets other than the desired target; is that

21   right?

22     A.   That's correct.

23     Q.   Now, would you agree with me that no compound binds

24   cleanly to one and only one target?

25     A.   I will say I'm not aware of one.

1    Q.   That's fair.  Now, could we go to your -- I'm sorry, my

2    demonstrative number 3.  We discussed this morning this

3    question of if, in fact, one started from O-desmethyltramadol,

4    the idea of making a linear compound out of it; do you recall

5    that testimony?

6    A.   Yes.

7    Q.   And in the context of that testimony, we discussed

8    cleaving certain bonds and removing carbon atoms, correct?

9    A.   We did.

10   Q.   Now, at the lower left you see I've drawn a structure

11   which is the same as the structure up here in the middle, both

12   of which are O-desmethyltramadol, and I've numbered the carbon

13   atoms in the cyclohexane ring; do you see that?

14   A.   Yes, I do.

15   Q.   And the carbon attached to the phenol is labeled carbon

16   1, and then counting clockwise around to 1, 2, 3, 4, 5, 6 where

17   carbon 2 is attached to the dimethylamino methylene moiety.  Do

18   you see that?

19   A.   Yes.

20   Q.   Now, in the context of that, would you agree with me

21   that a person of ordinary skill, if he or she wanted to make a

22   linear compound out of this, had five bonds that could have

23   been cleaved to do so?

24   A.   You mean if we -- well, there are six bonds that you

25   can cleave.  Are you excluding what -- the bond between 1 and

1    2?

2        Q.   Correct, I am.

3        A.   Okay.  Yeah, then there would be five.

4        Q.   Now, effectively cleaving one of these bonds, and I say

5    effectively because you wouldn't necessarily start with this

6    compound on the slide as a starting material, but we can

7    formally call it cleaving the bond.  Do you understand that?

8        A.   Yes, I understand.

9        Q.   So, if one effectively cleaved any one of those five

10   bonds, the bonds between carbons 2 and 3, 3 and 4, 4 and 5, 5

11   and 6, or 1 and 6, would you agree with me that simply cleaving

12   that bond would not yield tapentadol, correct?

13       A.   That's correct, because we have that hydroxyl group at

14   carbon 1.

15       Q.   That's fair.  And let's assume that the hydroxyl group

16   was replaced by hydrogen.  Take that assumption.

17       A.   Okay.

18       Q.   Would it also be the case that were one to cleave any

19   one of those bonds that I indicated, one would not obtain

20   tapentadol?

21       A.   That's true.

22       Q.   Now, in fact, a person of ordinary skill would have to

23   remove a carbon atom to obtain tapentadol, correct?

24       A.   Right, from -- right.

25            MR. BEST:  Now, could we click forward?

1    BY MR. BEST:

2        Q.   Now, one of those options is this bond between carbons

3    1 and 6; do you see that?

4        A.   Right.  This is the -- this is the option in the first

5    line going to the left; is that what you are referring to?

6        Q.   Correct, correct.

7        A.   Yes.

8        Q.   And you might recognize this image, it was in one of

9    Dr. Rausch's reports, more or less.  I have added a couple of

10   flourishes.

11       A.   Okay.  Well, I'm not sure I recall any images from his

12   reports as I sit here, but...

13       Q.   Okay.  Fair enough.  But you reviewed his reports?

14       A.   Yes, I did.

15       Q.   Now, would you agree with me that cleaving the bond

16   that I have indicated as A between carbons 1 and 6, there is no

17   way to obtain tapentadol from cleavage of that bond?

18       A.   That's true.

19             MR. BEST:  Now, could we click forward?

20   BY MR. BEST:

21       Q.   Is it also true that cleaving bond B between carbon 6

22   and 5, again there's no way to obtain tapentadol?

23       A.   That's true.

24       Q.   Now --

25       A.   Just by cleaving, yeah.

1      Q.   Fair enough.  And even if the hydroxyl was a

2  hydrogen --

3      A.   But if I removed a carbon, we could get there

4  ultimately.  Never mind.  Sorry.  I apologize.

5      Q.   Sure.  By that do you mean that you could sort of work

6  backwards and then add some more carbons in; is that the point?

7      A.   No, no, no.  I was anticipating other things.  I'm

8  sorry.

9      Q.   Okay.  Fair enough.  So, you would agree that cleaving

10  bond B would not yield tapentadol, correct?

11      A.   I agree.

12           MR. BEST:  So, let's click forward.

13  BY MR. BEST:

14      Q.   Now, bond C, this one is interesting because once you

15  cleave bond C, I think you have already testified, simply

16  cleaving the bond would not yield tapentadol, but then you

17  would have two options for removing a carbon, either what's

18  been labeled in my diagram as carbon 4 or carbon 5.  Do you

19  agree?

20      A.   Okay.  Now, so we're going to start removing carbons,

21  right?  Okay.

22      Q.   Right.  And if you remove what is in red as carbon

23  number 5, you do not obtain tapentadol, correct?

24      A.   That is true.

25      Q.   It's only if you remove carbon 4 that you can obtain

1       tapentadol through this pathway, right?

2           A.   Right.  Again, you have to remove the hydroxyl group.

3           Q.   Of course.

4               MR. BEST:  Let's do the next one.

5       BY MR. BEST:

6           Q.   And if you cleave the bond that I have indicated as D

7       between carbons 3 and 4, again you have two options.  You could

8       remove -- if you remove carbon, what's been labeled as carbon

9       3, you would not obtain tapentadol, correct?

10          A.   Let me try that.  Carbon 3 is the red one?  Yeah, you

11      would not.

12          Q.   But if you remove carbon 2 -- or rather carbon 4, you

13      could obtain tapentadol through that route, correct?

14          A.   Right.  That's the blue carbon, right?

15              MR. BEST:  And the last one, please.

16      BY MR. BEST:

17          Q.   And if you cleaved carbon bond between -- the bond

18      between carbons 2 and 3 which I have labeled as E, that pathway

19      would also not lead to tapentadol, correct?

20          A.   That's correct.

21          Q.   Now, you provided some testimony this morning as to --

22      suggesting that one of ordinary skill would not cleave either

23      what has been labeled here as bond E between carbons 2 and 3

24      and between -- bond A between carbons 1 and 6.  Do you recall

25      that testimony?

1    A.   Okay.  So, I see that -- I see the bond B.  Am I

2    supposed to look for the other one that's between 1 and 6, or

3    is that not indicated?

4    Q.   It's not indicated in the center, but you would agree

5    with me that you offered testimony this morning that a person

6    of ordinary skill would not have been motivated to cleave

7    either the bond between carbons 2 and 3 or the bond between

8    carbons 1 and 6, correct?

9    A.   Yeah.  I'm having to look over here.  Yes, but that's

10   true.

11   Q.   And your testimony in that respect was that this would,

12   quote, destroy stereo centers that are critical to maintaining

13   stereochemical control, correct?

14   A.   Well, critical to maintaining the three dimensional

15   relationships that are in the cyclohexane ring.

16   Q.   And underlying that analysis, is it fair to say that

17   you are suggesting that a person of ordinary skill would,

18   therefore, expect the resulting compounds to have poor

19   analgesic activity; is that right?

20   A.   Yeah.  I think they, a person would expect them to have

21   worse activity, but it would be a guess, yes.

22   Q.   Okay.  Could we look at the Flick article, which I know

23   we've discussed at some length yesterday and a little bit this

24   morning, which is DTX-715 or DX-108 at your preference.  I

25   guess 108 is the English, so maybe that's better for you.  I

1          think on the screen it's probably better to have DTX-715

2          because the tables are cleaner.

3                    MR. BEST:  Could we go forward one page?

4          BY MR. BEST:

5              Q.   This is the Flick article that you discussed yesterday

6          and this morning, correct?

7              A.   Yes, that's correct.

8                    MR. BEST:  And could we look at Table 4, which is

9          on page -- I'm not sure of the page, maybe 6.  Yeah, could we

10         blow up Table 4, please?  Could we highlight, please, L201?

11         BY MR. BEST:

12             Q.   Now, the compound L201 or composition, rather, is the

13         various stereoisomers of tramadol, correct?

14             A.   That's correct.

15                   MR. BEST:  And could we also highlight E417 and I

16         think it's 418, maybe 419, but it is whatever is below 417?

17         BY MR. BEST:

18             Q.   Now, these two compounds are identical to the tramadol

19         composition except that instead of having an OH group at R2,

20         they have a double bond, and that double bond is either between

21         carbons 1 and 2 or between carbons 1 and 6, correct?

22             A.   That's correct.

23             Q.   And in both instances, you have removed the stereo

24         center.  In fact, in one instance between 1 and 6 you removed

25         one stereo center, namely the bridgehead-carbon that you

1    discussed earlier, and the 1,2 olefin removes both stereo

2    centers, correct?

3        A.   That's correct.

4        Q.   And if you look at the analgesic activity of those two

5    compounds, do you see that, in fact, there are analgesia --

6    let's start with 417 -- is, in fact, better than tramadol?

7        A.   That's correct.

8        Q.   And so you would agree with me that a person of

9    ordinary skill reading Flick would understand that the stereo

10   centers at 1 and 2 in the diagram of Table 4, which I think

11   I've labeled as carbons 1 and 2 in my diagram, were not

12   necessary to obtain analgesia?

13       A.   They're not necessary -- well, they removed them, and

14   so they still had analgesic effect, but they also increased the

15   toxic effects of the molecule.  So, that's a bad thing.

16       Q.   And for 417, that toxicity increase, the toxicity has

17   been increased then for 418 or whatever is below it, correct?

18       A.   Correct, relative to 201.

19       Q.   But the analgesia of 417 is better than L201, correct?

20       A.   That's correct, but it's more toxic.

21       Q.   Right.  And yesterday I believe you discussed the

22   concept of therapeutic index.  Do you recall that?

23       A.   Yes.

24       Q.   And when you discussed it, you discussed therapeutic

25   index as being, quote, very important.  Do you remember that?

1    A.   I certainly said it was important, yes.

2    Q.   And you see here that the therapeutic index of the

3    tramadol composition and the E417 composition are less than

4    twofold different; is that fair?

5    A.   So, in the E417, that particular case, we have a single

6    compound, yeah.  So, it's more toxic, yes.

7    Q.   That's not what I asked you, sir.  What I asked you was

8    with regard to the therapeutic index.  Would you look at that

9    column, please.

10   A.   Okay.

11   Q.   And I asked you, is the therapeutic index of E417 just

12   about twofold, actually a little less than twofold worse than

13   the tramadol composition?

14   A.   Yes.

15   Q.   And do you regard that change in therapeutic index, to

16   be clear, a roughly twofold change in therapeutic index to

17   dissuade a person of ordinary skill from making this change

18   from L201 to E417?

19   A.   No.  I think I've said before that factor of 2 is not

20   necessarily something that one hangs a hat on.  It is certainly

21   something to look at, and if it were twofold better, that would

22   lead you in the direction, you would say, okay, so maybe I can

23   do it a little bit better.  So, it's not a big effect, but it

24   is certainly a noticeable effect.

25   Q.   Now, could we have up -- and I've had a note from my

1      colleagues.  I believe that underneath E417 is labeled E410

2      rather than whatever else I've said today.

3              Could we look at your demonstrative number 49?  Now,

4      you recall testifying this morning about these various

5      conformations, correct?

6      A.   Yes.

7      Q.   And with regard to conformation A, I believe you

8      testified that this is the most stable conformation, right?

9      A.   I said that's the most stable of these three, yes.

10     Q.   And to be clear, when you say it's the most stable,

11     it's not the only confirmation that this molecule that you

12     represented as A would have in solution, correct?

13     A.   You mean if I have conformer A as the way I represented

14     this the only way, or would I have all three of these in

15     solution at the same time?

16     Q.   My question is the latter.  Would -- in solution, you

17     have more than simply conformation A of this molecule that is

18     drawn on your slide?

19     A.   Right, so you would have a mixture of all three.

20     Q.   Now, with regard to conformation A, I believe you

21     indicated there is this Gauche interaction between the methyl

22     group on what is depicted as the front carbon and the -- this

23     methyl group that is -- well, it is an ethyl side chain, but

24     the methyl group of the side chain depicted on the back carbon.

25     Do you see that?

1      A.   Yes.

2      Q.   Now, would you agree with me that if you had the

3 compound in which this carbon, carbon number 5 --

4      A.   Okay.  I'll have to look.  I'm sorry.  I was not

5 looking at the screen.

6      Q.   No problem.  Would you agree with me that if you had

7 the compound where carbon number 5 was removed but carbon

8 number 4 was not removed, that, in fact, you have exactly the

9 same interaction between those side chains?

10      A.   Yes.  When I presented that as these other options for

11 excising, I think I said that the analysis -- maybe I didn't

12 say it, but the analysis would be the same.

13      Q.   And in solution, would you agree with me that this

14 methyl group that's attached to the structure you have drawn as

15 conformation 1 would actually rotate -- it's a little difficult

16 to do this in court -- but would rotate backward into sort of

17 behind the plane of the screen to relieve this interaction?

18      A.   The interaction is actually more with -- yeah, okay.

19 So, there will be some interaction there and it would have to

20 move a little bit somewhere, yeah.

21      Q.   And to be precise, this methyl group would, as drawn,

22 recede behind the plane of the screen; is that right?

23      A.   Right.

24      Q.   And if you had another carbon attached to what has been

25 labeled as carbon number 4 -- or, rather, carbon number 5, if

1    you had another carbon attached to carbon number 5 such that

2    you removed no carbons, had simply cleaved the bond between

3    carbons 4 and 5, would you agree with me that that side chain

4    would also rotate to behind the plane of the screen to relieve

5    this Gauche interaction?

6        A.   All right.  So, now we have yet another carbon atom

7    which is attached there as you are referring to.

8        Q.   Correct.

9        A.   And that is going to, as you say, move with it, and a

10   potential issue here is that when that happens, you may place

11   that particular carbon in a bad place relative to binding to

12   the norepinephrine or, yeah, either receptor, actually.

13       Q.   And you don't know whether that would be true until you

14   actually make the compound and test it with those receptors.

15   Is that fair?

16       A.   That's true, yes.

17       Q.   Now, you have drawn --

18            MR. BEST:  Could we go forward, actually, to slide

19   number -- or backward to slide 32, I believe, of this deck?

20   No, it's not this.  Maybe page forward one.  Let's try one

21   more.  Again.  Again.  That's it.

22   BY MR. BEST:

23       Q.   So, you discussed yesterday this notion of options, in

24   fact, you labeled on the slide three options that a person of

25   ordinary skill would have had starting with what you've drawn

1    here, an enantiomer of tramadol, and you have labeled those

2    options as scission, excision and substitution, correct?

3         A.   Right.

4         Q.   Now, you discussed yesterday the notion of substitution

5    sort of in passing, and I think you clarified that you meant

6    adding something to the ring; is that right?

7         A.   That's correct.

8         Q.   And when you said that, what were some of the possible

9    substitutions you had in mind?

10        A.   Well, I mean, there are many substitutions.  I mean

11   there are many possibilities.  There can be a whole host of

12   things.  But in making those substitutions, if that's the path

13   you would take, you know, I don't know whether you would want

14   big or small.  It kind of depends.  It can be any number of

15   groups.  There would be certain places you would probably not

16   necessarily want to put them because they might change

17   conformations because of bad interactions, but there are quite

18   a few.  I mean, there are a lot of different R groups out

19   there.

20        Q.   That a person of ordinary skill could have chosen to

21   decorate this cyclohexane ring with?

22        A.   Right.  And I think my point was that that wouldn't be

23   the first thing one would do because at least in the theme of

24   looking at, let's say, opioid analgesics, this is an opioid,

25   that the history is simplifying, not complicating, for the most

1    part.

2        Q.   You discussed morphine in that context and the

3    simplifications of the morphine molecule, correct?

4        A.   Right.

5        Q.   Would you agree with me that in addition to simplifying

6    the morphine molecule, one method of SAR for a morphine that

7    chemists have undertaken is to actually make it more

8    complicated, particularly adding more complex groups to the

9    free -- the amino group in morphine?

10       A.   Yes, that's a very common thing, right.

11            MR. BEST:  Now, can we look at Flick once more,

12   and again probably the German for the screen, but -- which is

13   DTX-715, but you may want to look at DX-108 in your binder

14   because that's the English.

15   BY MR. BEST:

16       Q.   Now, you have testified that a person of ordinary skill

17   would have been motivated to convert the aliphatic hydroxyl of

18   tramadol to a hydrogen, correct?

19       A.   Yes, based on the results that are in this table, yes,

20   that there was no significant loss of activity.

21            MR. BEST:  And could we blow up Table 4 once

22   again?  I'm sorry, with the structure in it.  Thank you.  And

23   could we highlight L201, that line?  Can we also highlight

24   E609, that line?

25   BY MR. BEST:

1      Q.   Now, L201 I think you've testified earlier is the

2   tramadol composition, correct?

3      A.   Yes.

4      Q.   And E609 is the composition having a hydrogen at the,

5   what you called the bridgehead position in Table 4 as discussed

6   as R2.  Do you see that?

7      A.   Yes.

8      Q.   And when that substitution was made by Flick and his

9   coworkers, he obtained a lower level of analgesia, correct?

10     A.   Slightly lower, yes.

11     Q.   And he obtained --

12     A.   Again, if you look at the things, I think I pointed

13  this out yesterday, if you look at what's in parentheses,

14  there's overlap in here, but the number 16 is less than 23.6 --

15  or 16.1, actually, is less than 23.6.

16     Q.   And would you agree that they also observed, with

17  regard to toxicity, an increase in toxicity by adding the

18  hydrogen into position R2?

19     A.   That's correct.  But again, it was only small.

20     Q.   And you noted the parentheses with respect to

21  analgesia.  Let's look at the parentheses with respect to

22  toxicity.  There's no overlap between the range reported for

23  E609 and the range reported for L201, correct?

24     A.   That's correct.

25     Q.   And the therapeutic index, which again we've talked

1    about earlier, as a result of the data that Flick obtained,

2    showed a decreased therapeutic index for converting the OH at

3    R2 to hydrogen, correct?

4        A.   That's correct.  But again, I've said the factor of 2

5    or 3 is not huge and wouldn't necessarily dissuade somebody

6    from doing one thing or another.  I mean, there are other

7    changes presumably one would think about making that would --

8    could potentially offset that either way.

9        Q.   Well, it's not persuasive to go toward the H, is it?

10       A.   I'm sorry?

11       Q.   One of ordinary skill would not be persuaded to go to

12   an aliphatic H at R2 rather than an aliphatic OH by these data,

13   would he or she?

14       A.   Well, you would have better analgesic activity, and I

15   think one of the points that I think would have captured, a

16   person of ordinary skill, would have captured their attention,

17   was the acknowledgment by the authors that this was a

18   surprising result, and so this might be a fertile field for

19   further investigation.

20       Q.   Well, thanks for that explanation, but I think you said

21   that there would be an increase in analgesia, but, in fact,

22   there is no increase in analgesia from the tramadol composition

23   to the hydrogen containing composition, correct?

24       A.   No, I think I said -- the way I looked at it yesterday,

25   I said they were comparable, and I think the way the authors of

1    the article characterize it is it had -- I think they said it

2    had significant activity, I forget the exact wording, but I

3    think they said significant activity, and they sort of

4    described how they were a little surprised by that.  They

5    didn't use the word "surprised," I don't think in there, but

6    they said it was unpredicted, unexpected, and so I think lots

7    of times when you find unexpected things that -- when you find

8    unexpected things, that's often a cue to look at that a little

9    bit more.

10       Q.   Now, thank you again for that explanation, but my

11    question was a pretty simple one.  It is correct, and I'm

12    asking it because I think you misspoke about two questions ago

13    in saying that E609 has a higher analgesia than --

14       A.   Oh, I'm sorry.

15       Q.   It does not, correct?

16       A.   No, I did misspeak if I said that.

17          MR. BEST:  Can we go back in your direct

18    demonstratives to number 56?  And I'm sure it is actually going

19    to be like 57.  But -- could we go forward?  Could we go

20    backward then?  We only have two options.  Yeah, that one is

21    good.

22    BY MR. BEST:

23       Q.   We looked at I think actually this one a few moments

24    ago.  Now, again, you discussed --

25       A.   So, that's not --

```
1        Q.   I said a similar one.  It's not quite similar.
2        A.   Yeah, I'm not sure we've looked at that before,
3   actually.
4        Q.   I think you're right.  So, here we have conformations
5   A, B and C once again, but here you are noting the inclusion of
6   an OH at the aliphatic, what we've called the bridge-carbon,
7   correct?
8        A.   That's correct.
9        Q.   And you note that there is an H bond between the OH and
10  the amine, correct?
11       A.   Okay.  So, I mean --
12       Q.   Let's start with, is that correct?
13       A.   Well, that's based on the -- that's based on findings
14  in Spasoff.  That's not based on any information I have, and
15  that's based on analogous compounds, not this particular one,
16  because if you remember, Spasoff also didn't have the OR group
17  on the aromatic ring of the top left-hand structure, and so he
18  was looking at conformational aspects in those compounds
19  closely related to this, but not identical.  And he was the one
20  that said that some conformations, namely the ones I've shown
21  you, conformation A and conformation B, were stabilized, well,
22  he referred to them as being stabilized by a hydrogen bond, and
23  if I recall, he had some spectroscopic evidence that supported
24  that, but I would have to go back and review that to be sure.
25  That's my recollection.  It may have been NMR.  It's hard to
```

1      find the NMR.  I think it was IR, but I don't remember for

2      sure.

3          Q.   Well, let's sort of unpeel that a little bit.  Do you

4      disagree with Spasoff that there would have been a hydrogen

5      bond between this aliphatic OH and the amine?

6          A.   No, that's why I put it there, is because I am assuming

7      he was correct, and that's why I put it there.

8          Q.   Right.  And that H bond would tend to stabilize

9      conformation A, correct?

10         A.   Well, I think a hydrogen bond, it makes it less bad.  I

11     mean, sure, a hydrogen bond we think of as a stabilizing

12     factor, but in this particular case, and this conformation A as

13     well as conformation B, this hydrogen bond actually enables you

14     to -- I think it's a six-membered ring, one, two, three, four,

15     five, six, yeah.  So, basically there are -- this oxygen, the

16     oxygen that we have here and the attached hydrogen, so it's the

17     hydrogen atom that's attached to the hydroxyl group in

18     conformation A, is going to be hydrogen bonding with the

19     nitrogen, and so that actually relieves some of the steric

20     interactions as well.  So, it actually does more than just be a

21     hydrogen bond.  And you have that in both conformation A and B.

22     So, it's really, you know, if you look at it carefully and

23     think about it, I think it's more than just simply the hydrogen

24     bond.

25         Q.   That's fair, but you would agree that the hydrogen bond

```
 1          does stabilize conformation A?

 2               A.   Yeah, right.

 3                         MR. BEST:   Now, can we look at the Frankus paper

 4          that you discussed yesterday, which is DTX-717?  I know there's

 5          an English translation which you marked, but I don't remember

 6          the number.

 7                         MR. CAPUANO:   I think it was 2052.

 8          BY MR. BEST:

 9               Q.   2052.  So, you may want 2052 since it is English, but

10          for the screen, could we have -- yeah, actually that's fine.

11               A.   Is that in your binder?

12               Q.   I think it is in your yesterday bind from defendants.

13                         MR. CAPUANO:   I think it is not.

14                         MR. BEST:   Oh, it is not?  I think it is behind

15          your -- the Frankus.

16                         MR. CAPUANO:   I'll take your word for it.  Let me

17          look.

18          BY MR. BEST:

19               Q.   If you look at the Frankus article, which I think is

20          tabbed at 717, do you actually have two documents there, one of

21          them behind a blue slip sheet?

22               A.   It's DTX-717?

23               Q.   Yes, 717.

24               A.   Yes, it's there.

25                         THE COURT:   I'm sorry, how many are we supposed to
```

1      have behind the blue sheet, just one?

2                    MR. BEST:  There should just be one document.

3                    THE COURT:  Yes, there is.

4                    MR. BEST:  And I think it is the English

5      translation that was marked yesterday as DTX-2052.

6      BY MR. BEST:

7          Q.  So, do you recall testifying about this document

8      yesterday?

9          A.  Yes.

10         Q.  Now, looking at either version of this that you're more

11     comfortable with, would you just confirm for me that the only

12     cis-trans isomeric pair that was separated and evaluated in the

13     context of this paper were the stereoisomers of tramadol?

14         A.  Yeah, that's my recollection, yes.  I think that's

15     what's in the title and -- sorry.  I just want to be sure.

16         Q.  No problem.  Many witnesses have had a lot of time in

17     this case, so you should not be shortchanged.

18         A.  I beg your pardon?

19         Q.  Never mind.

20         A.  Okay.  I was looking through to see if there is

21     anything about the metabolite, and I don't see anything, but so

22     the conformational analysis was done on tramadol, yes, and the

23     cis-trans forms of tramadol, not desmethyl.

24         Q.  Correct.  And none of the compositions discussed in

25     Flick, with the exception of L201, which is the various

1    stereoisomers of tramadol, are discussed in this Frankus

2    article, correct?

3         A.   None of the which?

4         Q.   So, aside from L201, which is discussed both in Flick

5    and in this Frankus article, would you agree with me that none

6    of the other compositions discussed in Flick are in the Frankus

7    article?

8         A.   Let me look at that one table where they --

9         Q.   Sure.

10        A.   He's got some other numbers here, the 280 -- 380.  So,

11   I don't know for sure, but my guess is that these numbers he

12   has are new numbers that are associated with the cis isomer and

13   the trans, optically pure trans minus and trans plus.  So, I

14   think what you said is correct.  I don't think any of these

15   numbers correspond to numbers in Flick.

16        Q.   Other than L201?

17        A.   I'm sorry, yes, other than L201.  L -- E265, I don't

18   think that was in Flick either.

19        Q.   And as a consequence, Frankus only reports data for

20   cyclic backbone compounds, correct?

21        A.   That's correct.

22             MR. BEST:  Now, could we go back to the Flick

23   article at 715 for the screen?

24   BY MR. BEST:

25        Q.   Probably you will want the English which I think has

1    been marked DX-108 in your binder.

2         A.   Yes, it has.

3         Q.   Now, you understand that this paper was published in

4    1978, right?

5         A.   Correct.

6         Q.   Now, would you agree with me that Flick and his

7    colleagues only examined something like 30, maybe 25, maybe 28,

8    but something like 30 different analogues of tramadol?

9         A.   Well, should we count them or -- I mean, there is --

10   that's probably on that order.  I mean, it's, basically I think

11   the compounds in Table 2 probably is all of them, and the

12   number is probably similar to what you are suggesting.  Without

13   counting them, I don't know exactly, but I think that's a fair

14   representation.

15        Q.   Now, nowhere does the Flick article discuss either

16   analgesic or toxicity data for linear compounds; isn't that

17   correct?

18        A.   That's correct.

19             MR. BEST:  And, in fact, if we go to page --

20   actually, Rob, could we have DX-108 in this instance on the

21   screen, the English, not DTX, DX?  It will be page 12, but not

22   DTX, DX.  Maybe I'll just have to put it up if you don't have

23   it.  A pause for reflection.

24             MR. CAPUANO:  I think it is DTX-834 as well.

25             MR. BEST:  Yes, let's try DTX-834.  Maybe it will

1    be good enough to read.  And could we go to page 12?

2    BY MR. BEST:

3        Q.   Now, would you agree with me that the Flick article

4    notes specifically that the basic structure of compounds with

5    analgesic activity must possess a cycloalkane structure?

6        A.   Can we highlight what you are referring to, sir?

7        Q.   Absolutely.

8             MR. BEST:  Could we highlight note 1 and blow it

9    up?

10   BY MR. BEST:

11       Q.   Would you read actually what note 1 says into the

12   record.

13       A.   Right.  "The basic structure of the compounds with

14   analgesic activity must consist of a cyclohexane radical

15   substituted with phenyl in 1 position connected in 2 position

16   to a basic amino group over a methylene bridge."  And I think

17   that -- well, with the sort of Raffa paper before, this one,

18   any paper really, we have to -- the results and conclusions of

19   any paper have to be put in the context of what that particular

20   study was and what it included.  And so this particular study

21   was largely, as you pointed out, studies of cyclohexanols.

22   Right?  There's only one example of I think a five-membered

23   ring and one of a seven-membered ring.

24            So, based on those results, he's saying that in this

25   particular class of compounds, you have to have a six-membered

1    ring, a five-membered ring isn't good and a seven-membered ring

2    isn't good.  So, you have to read this comment within the

3    context of the article.

4        Q.  Well, would you agree with me then that this article

5    does not provide context for making linear analogues of the

6    basic tramadol core structure since no such compounds were

7    evaluated in this article?

8        A.  I've said that several times already, yes, it doesn't

9    provide guidance for that, no.

10       Q.  Now, I just wanted to correct you.  I think you read

11   the word "cyclohexane" when you read this into the record, but

12   would you agree with me that it reads cycloalkane?

13       A.  I'm sorry, cycloalkane, yes.  Oh, okay.  But let me

14   step back, still within the context of this work, yes, I did

15   misread it, but it's cycloalkane, still in the context of this

16   work, it's the cycloalkane radical, so I'm not quite sure what

17   this conclusion means because all of his compounds, I don't

18   know that there's a single structure in that table that diverts

19   from this description.  I'd have to go look, but I think all of

20   them fit this rule.

21       Q.  Well, the author says here, "The basic structure of the

22   compounds with analgesic activity must consist of a cycloalkane

23   radical."  Correct?

24       A.  Right.  Again, based on this study.  He's well aware

25   that morphine has this activity.  So, when we're talking about

1    these cycloalkanols, right, and that's all this paper is about.

2    The title I think was -- did it say?  It says cyclohexanols.

3    So, all we know from this paper is the context of this paper

4    and the conclusion is based on all the studies that are

5    presented in this paper.  So, what I'm saying is that all of

6    his compounds have -- fit this rule number 1.  So, this isn't

7    really an enlightening conclusion.  That's all I'm saying.  It

8    doesn't -- it doesn't tell us anything really.

9        Q.   You've relied on other conclusions in this paper,

10   though, correct?

11       A.   Yeah, some of them make -- are more conclusory than

12   this one is, though.

13       Q.   Could we, while we're here, could we look at --

14   actually, rather than looking, you testified that a person of

15   ordinary skill would have been motivated to remove the phenolic

16   methyl group in developing a new analgesic starting with the

17   new tramadol compounds, correct?

18       A.   Yes.

19       Q.   And you have based that opinion on comparative data

20   shown in the Flick article suggesting that the O-desmethyl

21   composition had higher analgesia than the O-methyl, correct?

22       A.   Well, not solely on Flick.  Hennies also did this, this

23   assay, and as far as I understand with Hennies, he looked at

24   pure compounds, not mixtures of diastereomers, and he also

25   pointed out that O-desmethyl was about threefold more active

1 than tramadol.

2   Q. Now, the Flick article was published in '78, which I

3 think we talked about before, correct?

4   A. Yes.

5   Q. And the Hennies article, which if you want to look at

6 it --

7   A. '81 or something.  I don't remember.

8   Q. I think '88.

9   A. Okay.

10   Q. If you look at DTX-691.  Is that the article to which

11 you have been referring as Hennies?

12   A. You said DTX?

13   Q. 691.

14   A. Okay.  Hang on.  Right.  That says '88.

15   Q. Now, you would agree then that both of --

16   A. Do I need to keep this?

17   Q. No.  I just wanted you to have the date in mind.  Now,

18 you would agree that both the Flick data, 1978, and the Hennies

19 data, 1988, were available to a person of ordinary skill in the

20 art as of their publication dates, right?

21   A. Yes.

22   Q. Now, a person of ordinary skill would also know that

23 Grunenthal did not develop O-desmethyltramadol as an analgesic

24 at any point, correct?

25   A. Well, I don't know what they did with it.  They never

1    got to the market.  So, I don't know what they did about

2    looking into it.  I have no idea.

3                MR. BEST:  Could we look at slide number 53 of

4    your presentation?  Go back one.  I'm sorry.  Forward one

5    maybe.  This is it.

6    BY MR. BEST:

7        Q.   So, when you were talking about this slide earlier, I

8    just want to confirm to you this second bullet point.  And it

9    reads, "It would be obvious to a POSITA to use an improved

10   analgesic to treat pain."  Do you see that?

11       A.   Yes.

12       Q.   Was the improved analgesic you had in mind tapentadol?

13       A.   In this particular instance, yes.  This is what this is

14   all about.

15       Q.   Now, would you agree with me that the effect on

16   bioavailability of converting a meta methoxy group of the

17   tramadol molecules to the O-desmethyl equivalent could not be

18   determined a priori, that is, before running the experiment?

19       A.   Sure.

20       Q.   And would you say the same of the effect on

21   bioavailability of other similar modifications to the tramadol

22   core structure?

23       A.   So, when we're doing bioavailability, let me understand

24   what the experiment is.  The experiment is we dose animals and

25   we look at plasma concentrations and things of this sort?

1        Q.   Sure.

2        A.   So, now, could you repeat your question, please?

3        Q.   Sure.  So, would you agree with me that a person of

4    ordinary skill -- in general, the effect on bioavailability of

5    chemical modifications would have to be measured; it could not

6    be predicted a priori?

7        A.   It is a very difficult thing to predict.

8        Q.   The same is true with toxicity, correct?

9        A.   Yes, these are all things that are very important in

10   drug -- I use that word very important -- in drug discovery,

11   you have to worry about these things, yes.

12             MR. CAPUANO:  Your Honor, let me just object that

13   we're getting into now bioavailability, pharmacology and

14   clinical science.  That is beyond the scope of what Dr. Martin

15   is here for.

16             MR. BEST:  So, I will represent that these

17   questions were asked of Dr. Martin in his deposition and he

18   responded the same as this, and I'm done with that line in any

19   event.

20             MR. CAPUANO:  Okay.

21             MR. BEST:  So, I have a document that I'd like to

22   introduce that I think is not in your binders.

23             May I approach, your Honor?

24             THE COURT:  Yes.

25             MR. BEST:  Now, for identification purposes, we

```
 1        have marked this as PTX-3000.

 2                    MR. SCHULER:  For Roxane Laboratories, we just

 3        note that the pretrial order I think notes that additional

 4        exhibits are for purposes of either impeachment or refreshing

 5        memory, and I don't see a predicate for either right now.

 6                    MR. BEST:  The predicate will become clear upon

 7        the first set of questions, which relates to Dr. Martin's prior

 8        testimony this morning on naloxone.

 9                    THE COURT:  So, is it, in fact, impeachment then?

10                    MR. BEST:  Correct.

11                    THE COURT:  All right.  Any objection to the

12        document?

13                    MR. CAPUANO:  No, happy to have it.

14                    THE COURT:  Happy to have it, okay.

15        (PLAINTIFF EXHIBIT PTX-3000 WAS RECEIVED IN EVIDENCE.)

16                    THE WITNESS:  Do I have a copy of this?

17                    MR. BEST:  Were you handed one?  If not, I can get

18        you one.  You don't have it in the binder.

19                    THE COURT:  Do we have an extra one?

20                    THE WITNESS:  You didn't hand me one.

21                    MR. BEST:  We have an extra one.

22                    THE COURT:  Either way.  Thank you.

23                    THE WITNESS:  Thank you.

24        BY MR. BEST:

25            Q.  I'll give you a moment to look at this, but for
```

1    context, this morning I believe very early on you discussed

2    naloxone, and I think you discussed it as an antagonist and

3    that you thought it did not have analgesic activity.  Do you

4    recall that?

5        A.   I don't know whether I said I didn't think or I wasn't

6    sure, I don't know, but I characterized it as an antagonist,

7    not an agonist, which is normally what you look for.  So, it

8    looks like I was right on the antagonist part, but I think

9    you're going to tell me I'm wrong on the analgesic part.

10       Q.   That's a fair guess.

11       A.   Because I just read the paragraph.  So, I stand

12   corrected, I guess.

13       Q.   No problem.  Would you read the first sentence of this

14   paper into the record, which has been marked PTX-3000.

15       A.   The first sentence?

16       Q.   Please.

17       A.   "In a model of experimental pain in the rat, namely

18   Freund's adjuvant-induced arthritis, we have previously shown

19   that there is a dose-dependent bidirectional effect of systemic

20   injection of the opiate antagonist naloxone:  hyperalgesia is

21   found with a high dose, 100 micrograms per kilogram IV,

22   analgesia with lower doses, 10 to 300 micrograms per kilogram

23   IV.  Under different conditions, other authors have also

24   demonstrated analgesic effects with relatively low doses of

25   naloxone."

1        Q.   So, the article, it's fair to say, discusses the fact

2   that naloxone is, in fact, analgesic, correct?

3        A.   Right.   If I may read the next sentence, it is

4   paradoxical they say.   So, yes, I agree with what you're

5   saying, but it...

6        Q.   And if I could ask you -- we discussed earlier this

7   notion of animal experiments with regard to such compounds.

8                  MR. BEST:   And if you could look -- if we could

9   put up the next to last page of the paper.

10                 THE WITNESS:   The same paper?

11                 MR. BEST:   Same paper, penultimate page.   And

12  could we blow up right here?

13  BY MR. BEST:

14       Q.   Do you see on the right, in fact, the penultimate

15  sentence of the paper, which starts "as described above," do

16  you see that?

17       A.   As described above, yes.

18       Q.   Would you please read that sentence into the record.

19       A.   Sure.   "As described above, an analogous biphasic

20  naloxone effect has been reported in clinical pain in humans."

21       Q.   And so is it fair to say that the authors are reporting

22  that the effect that they saw in this animal model is also

23  observed in humans?

24       A.   Yes, it is.

25       Q.   You can set this aside.

1        A.   I beg your pardon?

2        Q.   You can set this aside.

3        A.   Okay.

4                MR. BEST:   We have one more document to introduce,

5        your Honor, for impeachment.

6                THE COURT:   Okay.

7                MR. BEST:   This one has been marked PTX-3001.

8                THE COURT:   Any issue with this document?

9                MR. CAPUANO:   Not yet, your Honor.   We'll see

10       where he goes.

11               THE COURT:   Okay.

12       BY MR. BEST:

13       Q.   Now, you discussed yesterday your contention that

14       tramadol was unique with respect to certain characteristics.

15       Do you recall that testimony?

16       A.   Yes, I do.

17       Q.   And I think you said that aside from tramadol, there is

18       nothing else out there that had dual activity for analgesia; is

19       that right?

20       A.   I think I said I was not aware of anything.

21       Q.   That's fair.   So, let's look at this article by Foote,

22       et al, published in 1988.   And we can just focus on the

23       summary.

24               MR. BEST:   Blow up the whole summary, but I'd like

25       to highlight the last sentence.

1    BY MR. BEST:

2        Q.   Would you read the last sentence of the summary into it

3    record.

4        A.   Yes.  "The coexistence of D1 dopaminergic and atypical

5    opioid agonist properties represents a unique pharmacodynamic

6    combination which is not shared with any other analgesic, and

7    may provide safe and innovative pain therapy."

8        Q.   So, would you agree that this compound is being

9    described as atypical and is unique?

10       A.   It is.  Is this compound a -- has it been approved as a

11   drug and shown to be safe and efficacious?  I don't know what

12   this compound is.

13       Q.   Well, Dr. Martin, I think you testified this morning

14   that FDA approval was not a requisite for starting material,

15   correct?

16       A.   Oh, I don't think I said that.  I said that -- I said

17   that it was -- I said this was not -- your compound, this

18   compound, tramadol, was not FDA approved at that time.  I did

19   say that, but I said it was also approved in the -- in Europe

20   and had been used and approved for years and shown to be safe

21   and efficacious.  I don't think I ever said or certainly never

22   meant to suggest that FDA approval was a prerequisite, but --

23   and so my question here wasn't -- I don't remember what -- the

24   record can show whether I said FDA, but more generally what I

25   thought I said was is this approved as a drug somewhere and was

1    it shown to be useful and efficacious.

2        Q.   And is it fair to say that it's your point of view that

3    the starting point for developing a new analgesic in 1994 for a

4    person of ordinary skill had to be a drug that had been

5    administered to humans and proven on its own to be safe and

6    efficacious?

7        A.   I think, yes, I think that's a position I've maintained

8    from the very beginning.  We've discussed that in my

9    deposition, and I said certainly -- I mean, one has to have --

10   a person of ordinary skill has to have some way of filtering

11   all of the information that's out there.  And so a good

12   starting point in terms of thinking about possible leads are

13   compounds that have already been shown to be safe and

14   efficacious in whatever -- for whatever indication you are

15   interested in.  This to me doesn't look like -- I mean, again,

16   that's why I asked you the question, is this compound an

17   approved drug anywhere?

18       Q.   I can't answer questions, Dr. Martin.  You have to do

19   that.

20       A.   I'm sorry -- well, but that's my question, and if it

21   isn't, then I would say this may be a unique compound and have

22   unique properties like this in the sense that it acts on the

23   dopaminergic system, which is a different one.

24       Q.   And the opioid system, correct?

25       A.   I'm sorry, and the opioid, and it has certainly been

1       characterized as atypical and unique, and I said I was unaware

2       of this earlier when you asked me the question.  But then

3       again, I would circle back, and I can't ask you the question

4       here, but I would, if I were looking at this, I would have not

5       have considered this, whatever this compound is, and I don't

6       know what it is yet, would not have considered it to be a

7       possible lead.  As I said at the very -- well, I don't remember

8       whether I said it in this testimony or not.  A lot of words

9       have been said.  But I think I made very clear at the beginning

10      that a compound had to be an approved drug that had been shown

11      safe and efficacious.

12          Q.   I think you testified not two minutes ago that the

13      compound did not have to be an approved drug to be a

14      starting -- a reasonable starting point for a person of

15      ordinary skill, correct?

16          A.   I don't remember that testimony.  That it did not have

17      to be an approved drug?

18          Q.   Correct.

19          A.   You know, if you say to me, well, O-desmethyltramadol

20      was not an approved drug and you want to connect those dots, I

21      would have to agree with you, I suppose, but...

22          Q.   I'm doing no dot connecting.  I'm simply reflecting on

23      your testimony.  And going back to that testimony, isn't it

24      fair to say that this compound has been described as both

25      atypical and unique and the authors hypothesize it may provide

1       a safe and effective pain therapy, correct?

2           A.   That's what it says.

3           Q.   And would you agree with me that one of the goals that

4       a person of ordinary skill had in 1994 in developing a new

5       analgesic would be to minimize addiction potential?

6           A.   That would certainly be one goal.

7                   MR. BEST:  Can we go to what internally is marked

8       page 150?  It would probably be the third from the last page in

9       your PDF.  And could we get this part and highlight "we

10      therefore propose," that sentence?

11      BY MR. BEST:

12          Q.   Now, would you agree -- well, first off, would you read

13      this sentence into the record, please.

14          A.   "We therefore propose that since CY 208-243 had no

15      effect on dopamine metabolism, that it may lack the biochemical

16      basis for addiction potential."

17          Q.   Now, would you agree that all else equal, the lack of

18      addiction potential would have motivated a person of ordinary

19      skill to select this compound as a starting point as a new

20      analgesic in 1994?

21          A.   Well, it doesn't fit the other criteria of being an

22      approved drug, but yes, in terms of the addiction potential,

23      that was one of the advantages I discussed I think at the

24      beginning of having this dual pharmacology, is that you are

25      likely to have less addiction potential.  And certainly for

1    tramadol itself, it was well known at the time anyway that it

2    came out, that it had lower addiction potential anyway than a

3    lot of the opioids.  I think it's been changed since then, but

4    certainly at this time it was viewed as being pretty good

5    because it didn't have those addictive properties that the

6    classic opioids did.

7        Q.   Now, would you agree that on the basis of having read

8    this article now --

9        A.   I haven't read the article.

10       Q.   Having skimmed the article.  If you want a little more

11   time to do so, by all means take it.

12            THE COURT:  We can give you time to read it.

13            THE WITNESS:  Let me just respond to your

14   questions and I'll read it as needed.

15   BY MR. BEST:

16       Q.   Sure.  So, would you agree that you were not correct

17   that there were no dual opioid and non-opioid analgesics known

18   to the art in 1984 other than tramadol?

19       A.   I would agree that that wasn't correct, but it was -- I

20   think I'm probably correct and I'm quite sure I'm correct in

21   saying there were no approved drugs other than tramadol that

22   had this dual mode of action.

23       Q.   And, in fact, you would agree that there might be other

24   such compounds that had been known in the art at that time,

25   correct, having these dual --

```
1        A.   Well, you have shown me one.  I wouldn't be surprised

2    if you had another one.  I don't know.

3                 MR. BEST:  I don't have any more questions at this

4    time.

5                 THE COURT:  Thank you very much.  All right.  Do

6    we have redirect?

7                 MR. CAPUANO:  Just very briefly, your Honor.

8                 THE COURT:  Yes.

9                 MR. CAPUANO:  May I have Mr. Best's demonstrative

10   Exhibit Number 4?

11                That's number 3, I think.  Yes.

12   (REDIRECT EXAMINATION OF DR. MARTIN BY MR. CAPUANO:)

13        Q.   Professor Martin, do you remember Mr. Best asking you

14   about Nazarov, one compound XIV that's shown on the right-hand

15   side of this slide?

16        A.   Yes, I do.

17        Q.   And he seemed to suggest -- did he seem to suggest that

18   because this compound has the hydroxyl group on the

19   bridge-carbon esterified, that one might want to do that to

20   (S,S)-O-desmethyltramadol?

21                MR. BEST:  Objection, your Honor.  Leading.

22                THE WITNESS:  Actually, I don't --

23                THE COURT:  Hold on one second.  You can rephrase

24   it, Mr. Capuano.

25   BY MR. CAPUANO:
```

1    Q.   Do you remember Mr. Best suggesting to you that one

2    might want to esterify (S,S)-O-desmethyltramadol?

3    A.   You know, I don't know if -- honestly, I can't tell you

4    whether -- he said that I was certainly expecting that to come.

5    It seemed that if we connect these two things, it seemed -- it

6    was logical for me to assume or think that because this

7    compound on the right has this ester, that we might talk about

8    the compound on the left having an ester.

9              MR. CAPUANO:   Could I have my demonstrative

10   Exhibit Number 27?

11   BY MR. CAPUANO:

12   Q.   Do you remember looking at this in your direct

13   examination, Professor Martin?  This is from Flick Table 4.

14   A.   Yes.

15   Q.   And what does Flick Table 4 tell you about esterifying

16   that hydroxyl position on cycloalkanol analgesics?

17   A.   He clearly teaches away from it.  The data he

18   presents -- what's going on?

19   Q.   I'm sorry.  Stay there.

20   A.   The data he presents for it's L205 and L204 show that

21   these compounds were that bridge hydroxyl group has, in fact,

22   been esterified with at least two different esters, that

23   they're in one case -- well, in one case there was no analgesic

24   activity up to the limit they tested.  In the other case, it

25   looks like there may have been some slight analgesic activity

```
 1        at the maximum dose they tested.

 2        Q.   Exhibit DTX-733.  Do you remember Mr. Best asking you

 3        about this paper from Raffa 2, what we've been calling Raffa 2?

 4        A.   I do.

 5                  MR. CAPUANO:  Can you show the abstract?

 6        BY MR. CAPUANO:

 7        Q.   Do you remember Mr. Best asking you that I only asked

 8        you about the left-hand part of the abstract and he wanted to

 9        tell you about the right-hand side, and he mentioned Paul

10        Harvey telling about the rest of the story; do you remember he

11        wanted to show you the rest of the story?

12        A.   I do.

13        Q.   Do you remember you asking him to show you Table 2?

14        A.   I asked -- I think I asked him are we going to look at

15        Table 2.  I remember saying the word "Table 2."

16        Q.   Did he ever show you Table 2?

17        A.   No, he didn't.

18        Q.   Would you like to see Table 2 and explain --

19        A.   And see the rest of the story?

20        Q.   And tell the rest of the story, yes.

21        A.   Sure.

22                  MR. CAPUANO:  Can you bring up Table 2, please?

23        There it is at the top.

24        BY MR. CAPUANO:

25        Q.   And do you remember Mr. Best asking you about synergy
```

1    among tramadol isomers?

2        A.   Yes, he did, I remember.

3        Q.   What does this table tell you about -- what does the

4    data in this table tell you or tell a person of ordinary skill

5    in the art about whether tramadol is synergistic, and what does

6    it tell you in particular about whether tramadol is synergistic

7    when administered orally?

8        A.   So, yeah, so this is interesting.  So, probably if we

9    look at the table and we look at the first two entries where we

10   have abdominal constriction in the hot plate test -- let me say

11   that I am not a pharmacologist.  I think I said in my

12   deposition I really didn't understand this test that they used.

13   In fact, I looked at the data and I still couldn't quite get my

14   head around what they meant by synergy.  So, I was simply

15   willing to take their conclusion without digging into it.  You

16   know, if I really wanted to be thorough, I would dig into it,

17   but I didn't do that.

18           But the point is if we look at the first two entries

19   and we look to the synergy column, it says there's synergy.

20   So, I'll accept the fact that there's synergy in those two

21   cases.  However, and to your point about the oral activity, and

22   I think if one of ordinary skill is interested in making a

23   drug, oral bioavailability is the key thing.  You want them to

24   be orally available.  And the PO, after that, the mouse in line

25   3 where it's the tail flick test.  So, the first two tests are

1    the two tests for analgesia, the abdominal constriction test

2    and the hot plate test, and then there's another test called

3    the tail flick test, and interestingly, when it is administered

4    orally, it is characterized as having no synergistic effect.

5        Q.   Well, let me just ask you, in the tests that are

6    reported here, how many are reporting no synergy and how many

7    are reporting synergy?

8        A.   Okay.  Let's focus on the ones that have beneficial

9    analgesic effects.  So, that would be all the way down to side

10   effects.  So, if we don't include the side effect count, there

11   are four yeses and five nos.

12       Q.   And in the one test where it was given orally, is

13   synergy reported as yes or no?  Not the last two.

14       A.   No.

15            MR. CAPUANO:  Let's have my demonstrative Exhibit

16   Number 20.

17   BY MR. CAPUANO:

18       Q.   Professor Martin, do you remember Mr. Best asking you

19   whether you, in fact, identified a single compound as a

20   starting point as a lead compound in your analysis?

21       A.   I certainly identified a preferred starting point, yes.

22       Q.   And is your preferred starting point shown on

23   demonstrative Exhibit 20 as (S,S)-O-desmethyltramadol?

24       A.   It is.

25       Q.   Professor Martin, are you aware of any information that

1      compares tapentadol with the same compound lacking the hydroxy

2      group on the aromatic ring?

3          A.  Okay.  Your question is comparing the tapentadol itself

4      with the compound lacking the hydroxy group on the aromatic

5      ring?

6          Q.  Yes.  And I strike the question because it was my

7      fault.

8              Are you aware of any information or data that compares

9      tapentadol with the same compound that also has a hydroxyl on

10     the bridge-carbon?

11         A.  It seems -- I can't remember for sure.  That may have

12     been one of the examples in the '593 patent.  I don't remember.

13     There were some examples in the '593 patent in that -- the

14     bioactivity.  So, I don't know if that's -- I don't remember if

15     that's one of them.  There were several in there that -- I

16     think that compound may have been in there, but I don't

17     remember for sure.

18             MR. CAPUANO:  Okay.  Let's have my demonstrative

19     756 that Mr. Best used.

20             Can we put it up using your PowerPoint?

21             MR. BEST:  Yes, of course.  I think the problem is

22     that our electronic version is not the version you printed off

23     for us.

24             MR. CAPUANO:  Let me show it at the ELMO.  You got

25     it.  Thank you.

```
 1        BY MR. CAPUANO:

 2            Q.   Do you remember Mr. Best asking you about this slide?

 3            A.   I do.

 4            Q.   And does tapentadol have the OH that's at the top of

 5        structures A, B and C?

 6            A.   So, are you asking me does tapentadol have this -- if

 7        we look at this structure here, let's say, an OH here?

 8            Q.   Tapentadol doesn't have this OH --

 9            A.   I'm sorry.  Okay.  I wasn't looking at that.  No, it

10        does not have that OH.

11            Q.   And that's the OH at the top of structures A, B and C?

12            A.   That's correct.

13            Q.   And that's the one he was asking you about, about

14        hydrogen bonding, correct?

15            A.   That's correct.

16            Q.   OH doesn't exist in tapentadol?

17            A.   It does not exist in tapentadol, no.

18                 MR. CAPUANO:  Thank you.  I have no further

19        questions, your Honor.

20                 THE COURT:  Thank you.  Anything further?

21                 MR. BEST:  I have nothing further, nothing.

22                 THE COURT:  Anything from anyone?

23                 MR. CAPUANO:  I might have something.

24                 THE COURT:  Okay.

25                 MR. BEST:  Maybe I will have some.
```

1                    MR. CAPUANO:  No further questions, your Honor.

2                    THE COURT:  All right.  Thank you very much.  You

3       are released as a witness.  Thank you for your testimony today.

4                    THE WITNESS:  Thank you.

5                    THE COURT:  We do appreciate it.  All right.  You

6       may step down.  Just be careful of the step.  Thank you.

7                    (Witness excused.)

8                    THE COURT:  I think this is a good time to break

9       for lunch.  All right?  So, we'll see you back here in 45

10      minutes.  Thank you.

11                   THE DEPUTY COURT CLERK:  All rise.

12                   (Recess at 12:45 p.m.)

13                   (In open court at 1:37 p.m.)

14                   THE DEPUTY COURT CLERK:  All rise.

15                   THE COURT:  Hello, everyone.  Have a seat.  Folks,

16      we are on with the next witness.  Mr. Aly?

17                   MR. ALY:  Your Honor, before we call the next

18      witness, I just wanted to advise your Honor what I advised

19      plaintiffs during the lunch break, that is, because Dr.

20      Martin's testimony was long and covered the subjects that Dr.

21      Prisinzano was going to cover, we'll withdraw Dr. Prisinzano,

22      and that will be offered on behalf of all the defendants, the

23      testimony that Dr. Martin has given.  Bottom line is one more

24      witness for today and this week, which is the next witness, Dr.

25      Wolf.

```
1              THE COURT:  All right.  That sounds fine.  How
2      long do we think this witness will go for?
3                   MR. SOBOLSKI:  Approximately an hour, your Honor.
4                   THE COURT:  An hour?  And then?
5                   MR. GLANDORF:  Half hour, 45 minutes of cross.
6                   THE COURT:  All right.  That's fine.  Sounds good.
7              Then I guess, going back to where we were
8      yesterday, so assuming that, then we would not sit tomorrow and
9      we would resume on Monday, and we would resume on Monday with,
10     who is it at this point?
11                  MR. ALY:  We have a witness, who will be Dr.
12     Buvanendran, on the '130 patent.  Of course, that's weather
13     permitting.
14                  THE COURT:  I just looked at my forecast for home,
15     which is three to six inches, which I don't understand, but
16     we'll see how it goes.  I have a feeling it's going to be less
17     than what is predicted, but if it is actually something, as I
18     indicated, we'll contact Mr. Miller, let him know what's
19     happening with the court, because sometimes they do a delayed
20     opening if the roads are slick.  So, I'll let you know how that
21     works out, because he has everyone's e-mail and we'll be able
22     to contact you.  So, hopefully it's nothing, but in case, you
23     have the whole procedure set up for what happens.  Thank you.
24     Right?
25                  Anything else we have to deal with in terms of our
```

1      schedule?  Anything else?

2                  MR. ALY:  Not that I know of.

3                  THE COURT:  Okay.  So, let's start with the

4      witness.

5                  MR. SOBOLSKI:  The defense calls Dr. Christian

6      Wolf, your Honor.

7                  THE COURT:  Thank you.

8                  MR. SOBOLSKI:  Your Honor, we have a witness

9      binder and demonstratives, if we may approach.

10                 THE COURT:  Certainly.  You may exchange them.

11     We'll have the witness sworn in.

12     (**CHRISTIAN WOLF, Ph.D.,** HAVING BEEN DULY SWORN, TESTIFIED AS

13     FOLLOWS:)

14                 THE DEPUTY COURT CLERK:  You can step up and state

15     your name for the record.

16                 THE WITNESS:  Christian Wolf.

17                 THE COURT:  Thank you.  Good afternoon, sir.  How

18     are you?

19                 THE WITNESS:  Good.  How are you?

20                 THE COURT:  Good.  Thank you.

21                 Let's begin.  Thank you.

22                 MR. SOBOLSKI:  Thank you, your Honor.

23     (DIRECT EXAMINATION OF CHRISTIAN WOLF BY MR. SOBOLSKI:)

24          Q.  Good afternoon, Dr. Wolf.  Please state your name for

25     the record.

1       A.   Christian Wolf.  Good afternoon.

2       Q.   Dr. Wolf, have you prepared demonstratives in

3   connection with your testimony today?

4            THE COURT:  You know what, let me just stop you.

5   I'm sorry.  Was there any issue with respect to the exhibits or

6   the demonstratives?

7            MR. GLANDORF:  No objection.

8            THE COURT:  Thank you.  Go right ahead.

9            MR. SOBOLSKI:  Thank you, your Honor.

10            THE WITNESS:  Yes, I did.

11   BY MR. SOBOLSKI:

12       Q.   And are these the demonstratives you prepared in

13   connection with your testimony today, Dr. Wolf?

14       A.   Yes.  I prepared a few slides with regard to my

15   professional qualifications, the scientific background that I

16   think is important for the discussion of this patent, and a few

17   other opinions about the patent as well.

18       Q.   Thank you, Dr. Wolf.  Let's begin with your

19   professional qualifications.  Please start by telling the Court

20   your current professional affiliation.

21       A.   I am professor of chemistry at Georgetown University.

22   I've been there since 2000.  I run a research group with about

23   seven or eight graduate students, typically sometimes a

24   post-doc and a few undergrad students, and we are interested in

25   developing organic chemical synthesis.  We are working on the

1    making and analysis of chiral compounds, stereochemistry in

2    general.  We are also interested in chiral cognition,

3    chemosensing projects, drug discovery and so on.

4       Q.  And in addition to your laboratory research, Dr. Wolf,

5    do you also teach students at Georgetown?

6       A.  Yes, I typically teach a course each semester in the

7    areas of organic chemistry, stereochemistry, and synthetic

8    methods, both on the undergraduate and graduate levels.

9       Q.  Thank you, Dr. Wolf.  Please tell the Court about your

10   scientific training in the field of organic chemistry and

11   stereochemistry.

12      A.  I obtained a Ph.D. in chemistry from the University of

13   Hamburg in 1995, working on the synthesis and analysis of

14   chiral compounds, and then I was further deepening my expertise

15   in this area as a postdoctoral fellow at the University of

16   Illinois from 1996 to 1997, and I obtained my first job as a

17   scientist at SmithKline Beecham Pharmaceuticals in 1997 and

18   stayed there until 2000, and I was working there at the

19   development of drug candidates and pharmaceutical compounds.

20      Q.  And during your time at SmithKline, Dr. Wolf, were you

21   developing optically active drug candidates?

22      A.  Yes, I did.

23      Q.  Dr. Wolf, has your scientific work in the field of

24   stereochemistry been published?

25      A.  Yes.  I have published over 100 papers, a few book

1    chapters and a textbook on stereochemistry.  Most of these

2    publications deal with the making and analysis of chiral

3    compounds.  I am also frequently working as a peer reviewer for

4    about 20 international journals.  I have several collaborations

5    with the pharmaceutical industry and academic partners as well.

6         Q.   And has your work in the field of stereochemistry been

7    recognized, Dr. Wolf?

8         A.   Yes.  I am an editorial board member of the journal

9    called Chirality, and I have received a few awards I've listed

10   here.

11             MR. SOBOLSKI:  At this time, your Honor,

12   defendants would like to offer Dr. Wolf as an expert in organic

13   chemistry, including stereochemistry and the synthesis,

14   analysis and characterization of optically active compounds.

15             THE COURT:  Thank you.  Any objection?

16             MR. GLANDORF:  No objection.

17             THE COURT:  Thank you.  He is so admitted as an

18   expert in those areas.  Thank you.

19             MR. SOBOLSKI:  Thank you, your Honor.

20   BY MR. SOBOLSKI:

21        Q.   Dr. Wolf, what is organic chemical synthesis?

22        A.   I prepared a slide here that explains the basics of

23   organic chemical synthesis, which is about the making of

24   organic compounds.  So, as scientists, we typically start with

25   an idea to make a compound, and then we select starting

1    materials for this, and think about a reaction, certain

2    reaction conditions, which could be reaction time and reaction

3    temperature, and then one way to characterize reaction and

4    organic synthesis would be, for instance, to look at the yield,

5    and that is defined as the amount of product compared to the

6    theoretical amount that one could make, as shown in this

7    equation, but then the very important question that we have to

8    ask ourselves is obviously did we actually make the compound

9    that we anticipated to make.  So, did we make that hypothetical

10   compound as we thought we would?

11        So, there are a number of steps that we then do.  It

12   starts typically with the product isolation, and so techniques

13   that I use to isolate products are, for instance,

14   chromatography, crystallization and extraction, and then once

15   we have the isolated purified compound, we try to identify the

16   structure.  And techniques that I use to do that is, comprise

17   NMR spectroscopy, mass spectometry, crystallography and

18   combustion analysis.  And then we run some tests to further

19   characterize the product, and those could be including melting

20   point range determinations and optical rotational analysis.

21   Q.   And for the record, this was demonstrative 8.

22        Dr. Wolf, explain for the Court, please, what is an

23   isomer?

24   A.   I show this on this slide here.  Isomers can be either

25   constitutional isomers, which are compounds with the same

1    structural formula, but different atom connectivity.  And then

2    we have another class which are stereoisomers.  These have the

3    same atom connectivity but different spatial orientation of

4    groups and atoms.  And so in this class we have two classes,

5    one is the class of enantiomers, which are defined as

6    non-superimposable mirror images, and all other stereoisomers

7    that are not enantiomers are diastereomers.

8        Q.   Dr. Wolf, you testified about enantiomers.  How are

9    enantiomers described in organic chemical literature?

10       A.   So, I'm showing on this slide, for an example, it's an

11   illustration of two non-superimposable mirror images.  The blue

12   line, the blue vertical line that you see there would be the

13   mirror.  So, these are non-superimposable mirror images.  The

14   one on the left side, we could mention as the R enantiomer, and

15   the one on the left is the S enantiomer.  These are chiral

16   compounds.  They have a chiral center, and the word "chirality"

17   comes from Greek and it basically means handedness.  So, we can

18   kind of think of these hands there, the right hand and the left

19   hand, to refer to the chirality.  So, these labels are very

20   important.  They refer to fundamental aspects of

21   stereoisomerism in chiral compounds.

22        So, even though these two mirror images look like

23   they're almost identical, they are sometimes having very

24   different chemical and biological properties, and that can be

25   like a night and day comparison.

1          One example is, for instance, the example of

2     thalidomide.  Thalidomide was also known or is also known as

3     Contergan.  That is a drug that was used to treat pregnant

4     women in the '60s in some European countries.  We know that the

5     R enantiomer treats nausea and morning sickness whereas the S

6     enantiomer causes severe birth defects.  So, you see how

7     different they can be in terms of their biological activities.

8          And you can think of this as the example of the right

9     hand fits into the right glove and the left hand fits into the

10    left glove.  So, human beings are also made of chiral

11    compounds.  And so some enzymes, some receptors might have just

12    the right glove, so the R enantiomer fits in, has a certain

13    function, the S enantiomer might not fit in or might not fit in

14    as well.  So, you can see they might act at different places in

15    the human body or they might act differently.  And so that's

16    why we get to these, in some cases, night and day differences

17    between enantiomers.

18    Q.  For the record, this is demonstrative 10 citing

19    DTX-1574.  Let's turn to demonstrative 11, Dr. Wolf.  What, if

20    any, are pertinent properties of isomers?

21    A.  So, there's more to the stereo descriptors, as I just

22    mentioned.  For instance, chemists would know, a person of

23    ordinary skill in the art would know that enantiomers have the

24    same melting point ranges and opposite optical rotation that's

25    inherent properties of enantiomers, whereas diastereomers

140

1    typically have different melting point ranges and different

2    optical rotations.

3        Q.   And what is the import of those properties, Dr. Wolf?

4        A.   It tells us a lot.  If you have different melting point

5    ranges, we know we are not looking at enantiomers.

6        Q.   Thank you, Dr. Wolf.  Let's turn to demonstrative 12

7    where you presented your analysis of U.S. patent RE39,593, and

8    let's turn to demonstrative 13.  Is this, in fact, the patent

9    that you have analyzed in connection with your testimony today,

10   Dr. Wolf?

11       A.   Yes.  This is a part from the cover page of the '593

12   patent, which I understand is a reissued patent, so I've also

13   looked at the parent patents.

14       Q.   And which claims have you analyzed in connection with

15   your testimony today, Dr. Wolf?

16       A.   I think that's on the next slide.

17       Q.   And this is demonstrative 14?

18       A.   Yes.

19       Q.   What are those claims, Dr. Wolf?

20       A.   These are the claims I've looked at for my testimony

21   today, which are claim 8, 61, 117 and 147.

22       Q.   Let's turn to demonstrative 15.  Dr. Wolf, do you

23   understand that the Court has construed one of the claim

24   limitations that appears in claim 61 and 117?

25       A.   I'm aware of that.

1    Q.   And did you consider that construction in connection

2    with your testimony?

3    A.   Yes.  I have used this construction for my analysis

4    today.

5    Q.   Let's turn to demonstrative 16 where you have presented

6    a definition of person of ordinary skill in the art.  Why have

7    you done so, Dr. Wolf?

8    A.   Yes.  My understanding is this is the definition of the

9    defendants, and I think it's a very reasonable definition for a

10   POSITA, what myself in industry and academia as a team member

11   in such efforts.

12   Q.   And did you consider this definition of a person of

13   ordinary skill in the art in connection with your testimony

14   today?

15   A.   Yes, I did.

16   Q.   Let's turn to demonstrative 17 where you presented

17   plaintiffs' proposal of a person of ordinary skill in the art.

18   Did you consider this definition, Dr. Wolf?

19   A.   Yes.  I find it to be very similar, and the opinions

20   that I have today are independent of which definition one would

21   choose.

22   Q.   Thank you, Dr. Wolf.  Let's turn to demonstrative 18

23   where you have presented the four asserted claims in the '593

24   patent.  Does this present your conclusions?

25   A.   Yes.  I have some conclusions for claims 8, 61, 117 and

1    147, and I also have some opinions related to some of the

2    aspects that Dr. Mogil testified a few days ago.

3        Q.   And those opinions that you referred to from Dr. Mogil,

4    have you read the transcript of Dr. Mogil's testimony in this

5    case?

6        A.   Yes, I did.

7        Q.   Let's turn to demonstrative 19 where you have indicated

8    your opinions in relation to the lack of utility of claims 8,

9    61, 117 and 147.  In connection with your review of Dr. Mogil's

10   testimony, Dr. Wolf, did you find any further pertinent

11   information?

12       A.   So, I know that Dr. Mogil looked at this table here

13   from the '593 patent, and I agree with him that there is no

14   information on Example 25 in this table.  So, as a chemist, my

15   conclusion is a person of ordinary skill in the art would not

16   know anything about any activity of Example 25.  The fact that

17   there is Example 24, which is the purported enantiomer of 25,

18   also wouldn't tell us anything about the activity of 25.

19       Q.   And why is that, Dr. Wolf?

20       A.   It's the other purported enantiomer and, as I just

21   explained with the example of thalidomide, they can have

22   drastically differently biological activities, so one wouldn't

23   know.

24       Q.   And for the record, this is an excerpt from column 22

25   of the '593 patent on demonstrative 20.  Let's turn to

1      demonstrative 21, Dr. Wolf.  Did you find any other information

2      meaningful in connection with the table of the '593 patent?

3          A.   Yes.  What I have highlighted here in the red rectangle

4      is that there are a number of entries about racemic compounds,

5      and the racemic compound is a mixture of both enantiomers in a

6      1 to 1 ratio.  So, looking at this again, one wouldn't know

7      about the individual activities of enantiomers that were a part

8      of this mixture.

9          Q.   Thank you, Dr. Wolf.  Let's turn now to demonstrative

10     22 in which you have introduced your obviousness analysis in

11     connection with claims 8, 61, 117 and 147.  Let's start on

12     demonstrative 23.  What standard were you asked to apply in

13     connection with your obviousness analysis?

14         A.   I have listed here the factors that I was asked to

15     apply into this analysis, and I also understand that a POSITA

16     must be motivated and must have a reasonable expectation of

17     success to follow that motivation.

18         Q.   Now, on demonstrative 23, Dr. Wolf, you have indicated

19     as one factor the scope and content of the prior art.  What was

20     the date that you used to assess the scope and content of the

21     prior art?

22         A.   Based on Dr. Mogil's opinion that the earliest date for

23     possible utility would have been in 2005, I looked for prior

24     art before 2005 and I found an interesting article there about

25     tapentadol.

1    Q.   Okay.  And let's turn to demonstrative 24.  Is this the

2    prior art about the tapentadol about which you just testified,

3    Dr. Wolf?

4    A.   Yes.  This is a document from the World Health

5    Organization titled World Health Organization Drug Information

6    that was published in 2002, and if you look there at the

7    bottom, it says international nonproprietary names for

8    pharmaceutical substances.  So, this is for pharmaceuticals;

9    it's not just a catalog of chemicals.  It's about

10   pharmaceuticals.  And what we see here is the name and the

11   structure of tapentadol, and it says it's an analgesic.

12   Q.   For the record, this is an excerpt at page 184 of

13   DTX-260.

14        Let's turn to demonstrative 25, Dr. Wolf, starting with

15   your analysis of claim 8 of the '593 patent.

16             MR. SOBOLSKI:  Let's return for a moment to

17   demonstrative 23, please, Mr. Haw.

18   BY MR. SOBOLSKI:

19   Q.   Now, in connection with your analysis of claim 8 of the

20   '593 patent, Dr. Wolf, what, if any, differences between the

21   prior art World Health Organization reference and claim 8 would

22   a person of ordinary skill in the art observe?

23   A.   I don't think there is any difference.

24   Q.   Turn back to demonstrative 25, please.

25   A.   So, I think the person of ordinary skill in the art

1    would find the claim obvious with regard to the document from

2    the World Health Organization.  It is about a method of

3    treating a mammal suffering from pain, and the document from

4    the World Health Organization says this is an analgesic.  So,

5    it discloses tapentadol as an analgesic.

6        Q.   And why would that be -- why would the disclosure of

7    tapentadol as an analgesic be significant to a person of

8    ordinary skill in the art?

9        A.   A person of ordinary skill in the art would understand

10    that the WHO document talks about pharmaceuticals that would be

11    used for the treatment of mammals, in particular humans, so one

12    would be highly motivated to use it for treating mammals

13    suffering from pain.

14        Q.   And in that motivation, would a person of ordinary

15    skill in the art have a reasonable expectation of success in

16    treating that mammal suffering from pain based on the

17    disclosure of the World Health Organization reference?

18        A.   Yes, because it's labeled as an analgesic, and I think

19    I have on another slide testimony from Dr. Friderichs, who is

20    one of the named inventors, who I think basically says the

21    same.

22        Q.   And let's look at that testimony.  Is this the

23    testimony you have presented on demonstrative 26 from page 166

24    of Dr. Friderichs' deposition transcript?

25        A.   Yes.  And so Dr. Friderichs says this will be a

1    compound -- an analgesic would be a compound that alleviates

2    pain.  So, a person who wants to treat pain would have a

3    reasonable expectation of success doing this with an analgesic.

4    Q.  And let's return for a moment to demonstrative 25, Dr.

5    Wolf, where you have presented the language of claim 8.  Do you

6    have an understanding of the compounds encompassed by claim 8,

7    Dr. Wolf?

8    A.  Yes.  And I will discuss this in more detail a little

9    bit later.

10   Q.  And did you consider, Dr. Wolf, whether any of the

11   compounds encompassed by claim 8 other than tapentadol appear

12   in the 2002 World Health Organization reference at DTX-260?

13   A.  Yes, I looked through the whole document and I couldn't

14   find any other compound covered by this claim in this WHO

15   document.  So, tapentadol is the only one.

16   Q.  Thank you, Dr. Wolf.  Let's turn now to demonstrative

17   27 where you have presented further, a further excerpt from the

18   deposition testimony of Dr. Friderichs.  What have you

19   identified here, Dr. Wolf?

20   A.  Yes, so a person of ordinary skill in the art would

21   know that the WHO document teaches to use tapentadol for

22   treating pain.  And so a POSITA could then confirm this with --

23   would be motivated to confirm it, would have a reasonable

24   expectation of success confirming this, and just by doing this

25   with a few animal tests within a few days.

1    Q.    Thank you, Dr. Wolf.  Let's turn to demonstrative 28.

2    Did you analyze obviousness in connection with the limitations

3    of claim 61, 117 and 147?

4    A.    Yes, I did.

5    Q.    And let's begin with the limitations you have

6    identified in claim 61 and 117.  Will you identify for the

7    Court what that limitation is?

8    A.    So, in claim 61 and 117 there is mention of a

9    hydrochloride.

10   Q.    And what is the limitation you have identified in claim

11   147?

12   A.    It's a pharmaceutically acceptable salt.

13   Q.    What, if any, difference between the content of claim

14   61, 117 and 147, would a person of ordinary skill in the art

15   identify in relation to the 2002 World Health Organization

16   reference?

17   A.    I think there is very little difference.

18   Q.    Let's turn to demonstrative 29.  Why do you believe a

19   person of ordinary skill in the art would find very little

20   difference between those three claims and the World Health

21   Organization reference?

22   A.    Because I think a person of ordinary skill in the art

23   would be highly motivated to make a hydrochloride salt, a

24   pharmaceutically acceptable salt of tapentadol.  What I show

25   you here is on the top an excerpt from the Gould publication

1    which is from 1986.  It is called Salt Selection for Basic

2    Drugs, so that's what we do for pharmaceuticals, and it

3    mentions the formulation as hydrochloride have been by far the

4    most frequent choices.  So, it's about 40 percent, which is

5    highlighted here in the green rectangle.

6        Q.   For the record, that's DTX-1575, the Gould reference.

7    Please go on, Dr. Wolf.

8        A.   I also have mentioning here of the Berge reference in

9    the second table.  That's only an excerpt, actually, of that

10   table.  That's from 1977.  And if you go towards the second

11   entry from the bottom, you basically get the same message, the

12   hydrochloride here was 43 percent compared to others.  So, that

13   would be, a person would be motivated to make a salt formation,

14   in particular hydrochloride salt, from tapentadol.

15       Q.   And Berge is DTX-176 at page 2.

16       A.   And finally I have also a reference to Gennaro from

17   2000 which basically echoes the other two references.

18       Q.   And Gennaro is DTX-1580.  Thank you, Dr. Wolf.

19            Let's turn now, Dr. Wolf, to demonstrative 30 in which

20   you have introduced your analysis of the lack of -- a final

21   question in connection with demonstrative 29, Dr. Wolf.  Would

22   a person of ordinary skill in the art have a reasonable

23   expectation of success in obtaining the hydrochloride salt of

24   tapentadol?

25       A.   Based on these references, yes.

1      Q.   And would a person of ordinary skill in the art have a

2      reasonable expectation of success in obtaining a

3      pharmaceutically acceptable salt of tapentadol as disclosed in

4      the World Health Organization reference from 2002?

5      A.   Yes.

6      Q.   Thank you, Dr. Wolf.   Returning to your analysis of

7      lack of written description, what is the legal standard you

8      were asked to apply in connection with that analysis of claims

9      61, 117 and 147?

10     A.   My understanding is that a person of ordinary skill in

11     the art looking into the four corners of the specification

12     would have to see that there is evidence that the inventors,

13     indeed, invented what they claimed they had invented, and this,

14     of course, would be an objective inquiry that would be

15     contextual, and that means in the context of this exam, it

16     would be about the making of a new -- of new chiral compounds.

17     Q.   Thank you, Dr. Wolf.   And let's turn to demonstrative

18     32 where you have excerpted the language of claims 61, 117 and

19     147.   Are these, in fact, the claims you have analyzed?

20     A.   That's correct.   And I know that these are all about

21     the 1R,2R stereoisomer.

22     Q.   Let's turn to demonstrative 33, Dr. Wolf.   You have

23     presented here an excerpt from column 19, lines 11 to 30 of the

24     '593 patent.   What data, if any, what information, if any,

25     would a person of ordinary skill in the art observe in the '593

1    patent in connection with your analysis of those claims?

2      A.  So, this is where a POSITA would find information about

3    Example 25, and the first thing a POSITA would notice is that

4    there aren't any structural data here.

5      Q.  What do you mean by there are no structural data

6    presented in Example 25?

7      A.  So, what you see here is a depiction of a hypothetical

8    structure, and a name, which actually was changed from 1R,2S to

9    1R,2R, and a person of ordinary skill in the art would find

10    information that this is an enantiomer that was obtaining 45

11    percent yield.  And then there is a reference to Example 24, so

12    one would understand there are enantiomers here discussed.  The

13    only data that I found here don't tell us anything about the

14    structure.  There's a melting point range of 168 to 170

15    degrees, and then there's a specific rotation which is -- which

16    was determined as minus 27.5 degrees.

17      Q.  Now, Dr. Wolf, by the mid 1990s, would structural data

18    and structural tests have been known to a person of ordinary

19    skill in the art?

20      A.  Absolutely, and I think I have a slide on that as well.

21      Q.  And let's turn to demonstrative 34.  Is this the

22    demonstrative you are referencing?

23      A.  Yes.  So, what I'm listing here is basically what I've

24    said earlier.  There are several techniques, and I just list a

25    few of those, that were commonly used in the '90s that one

1    could use to elucidate a structure of the compound.  That would

2    be spectroscopy, for example, proton and carbon NMR

3    spectroscopy, or IR, which stands for infrared spectroscopy,

4    also x-ray crystallography, mass spectometry, and combustion

5    analysis.  None of these tests are in the '593 patent.

6        Q.  Now, Dr. Wolf, what did the literature in chemistry say

7    in regard to the use and presentation of structural data?

8        A.  I have a few slides to that effect.

9        Q.  Let's begin with demonstrative 35 where you have

10   presented an excerpt from DTX-222 at page 8A, a 1993 reference.

11       A.  This is from the Journal of Organic Chemistry in 1993.

12   It is from the Guidelines for Authors.  And what it says here

13   is that for the -- in order to prove identity of new compounds,

14   one should be considering proton and carbon NMR spectroscopy,

15   infrared spectroscopy, and mass spectometry.

16       Q.  Now, Dr. Wolf, in the excerpt you selected from DTX-222

17   that you just testified about the use of these data for "all

18   new compounds," what is the significance, if any, of the term

19   "all new compounds?"

20       A.  Well, this is not a high standard that is required

21   here, but if you think about a new compound, there is no

22   reference framework.  So that it is very important to get

23   structural data for new compounds.

24       Q.  Now, Dr. Wolf, DTX-222 is from the Journal of Organic

25   Chemistry.  Did you consider literature outside of the context

1      of academic journals in chemistry?

2          A.   Yes.  I think it's on the -- one of the next slides.

3          Q.   Let's turn to demonstrative 36 where you have excerpted

4      from the Sibilia reference at DTX-1581, page 2.

5          A.   Yes, this is from 1988, and it brings me back to what I

6      said earlier when I discussed organic chemical synthesis.  The

7      important question that we as chemists always ask ourselves

8      when we have run a reaction, did we actually make what we

9      hypothesized we would make?  And so this is actually saying the

10     same.  And so in this case there is a suggestion to run

11     infrared IR spectroscopy or magnetic NMR spectroscopy to

12     identify the structure.  And I like to note that this is also

13     about, if you look in the second line, it's about

14     pharmaceuticals.

15         Q.   Thank you, Dr. Wolf.  Now, you have been testifying

16     about the use of structural data for new compounds.  Did you

17     consider any literature about the use of structural data in

18     connection with known compounds?

19         A.   Yes, I did.  I think that's on the next slide.

20         Q.   And this is demonstrative 37 where you have presented

21     an excerpt from DTX-274.  What is this reference, Dr. Wolf?

22         A.   This is from a textbook that one could use for

23     undergraduate teaching purposes.  It is about the synthesis of

24     aspirin, a known compound.  And even in this situation, a

25     chemist would verify the outcome of the reaction and do some

1    spectroscopy.  So, in this case what is mentioned here is using

2    UV spectroscopy to make sure that the compound that was

3    expected to be formed is made.

4          So, the chemistry is an empirical art and it is not

5    predictive.  Even if you run reactions, there are in the

6    literature where we know the starting materials, the

7    conditions, we always check if the product that we wanted to

8    make has actually been made.  So, even for known compounds, not

9    to mention new compounds.

10   Q.   Thank you, Dr. Wolf.  And did you consider any -- use

11   structural data in the context of patents?

12   A.   I did.  I think that's on the next slide.

13   Q.   And let's turn to that which is demonstrative 38.  And

14   you have an excerpt here from DTX-263, which is U.S. patent

15   number 5,061,398 issued October 29, 1991.  What is this patent,

16   Dr. Wolf?

17   A.   This patent is from 1991, and it's about an optically

18   active compound.  And so what the inventors provide in this

19   patent is structural data in the form of mass spectroscopy and

20   proton NMR.

21   Q.   Thank you, Dr. Wolf.  In your own work, you testified

22   earlier that you have synthesized optically active compounds,

23   correct?

24   A.   Correct.

25   Q.   When did you begin that work, Dr. Wolf?

1      A.   In the 1990s.

2      Q.   And what has your practice been in connection with

3  presenting the results of your synthesis of new organic

4  compounds?

5      A.   So, my practice has been, when we discuss the synthesis

6  of new chiral compounds, to provide structural data for these

7  new compounds.

8      Q.   Thank you, Dr. Wolf.  Let's turn to demonstrative 39.

9  You have included here again the excerpt from the '593 patent

10  containing Example 25.  What data would a person of ordinary

11  skill in the art find disclosed under Example 25?

12      A.   Well, what one does not find, to begin that way, is

13  that there aren't any structural data.  So, instead of data

14  that tell us anything about the structure of Example 25, there

15  is a melting point range and an optical rotation.  These are

16  important to characterize Example 25, but they don't tell us

17  anything about the structure.

18      Q.   And when you say -- and when you testify that these are

19  important to characterize Example 25, what do you mean by that,

20  Dr. Wolf?

21      A.   Because, as I said earlier, we know that enantiomers

22  must have the same melting point range.  So, if they don't, if

23  you have materials and they have different melting point

24  ranges, we know they aren't enantiomers.  So, it is going to be

25  still useful information to have that.

1      Q.   And Example 25 would be understood by a person of

2      ordinary skill in the art to be an enantiomer of what,

3      supposedly?

4      A.   As I said earlier, you see here that enantiomer minus

5      21, in the sentence, was obtained in 45 percent yield under the

6      conditions cited in Example 24.   So, a person of ordinary skill

7      in the art would then looking at that Example 24.

8      Q.   And let's turn to Example 24.   Let's turn to

9      demonstrative 40, Dr. Wolf, in which you have excerpted

10     Examples 24 in part and Example 25 of the '593 patent.   What

11     would a person of ordinary skill in the art conclude based on

12     the information presented in connection with those two

13     examples?

14     A.   A person of ordinary skill in the art would observe a

15     striking discrepancy between the data provided and the

16     labeling, and he or she would not mentally come to the

17     conclusion that these would be enantiomers.   The melting point

18     range provided for Example 24 is 194 to 196 degrees, and the

19     melting point range for Example 25 is totally different.   It's

20     168 to 170 degrees.   The specific rotations are also not the

21     same.   So that the data are very important for a POSITA, and

22     they clearly tell these cannot be enantiomers.

23     Q.   Now, let's take a step back, Dr. Wolf.   In Example 25,

24     the chemical structure that is depicted or drawn under Example

25     25, what is that depicted structure?

1      A.   Just the depicted structure is what we know as of today

2    as tapentadol.

3      Q.   And if that depicted structure under Example 25 is what

4    we know today to be the chemical structure of tapentadol, why

5    would a person of ordinary skill in the art consider the

6    further information provided in Example 25, Dr. Wolf?

7      A.   Well, a person of ordinary skill in the art would never

8    exclude any information that would be provided in the

9    specification, and at the time it was supposedly a new

10   compound.  So, one would always be drawn to look at data.

11     Q.   And when you or a person of ordinary skill in the art

12   considers that data, what is the conclusion reached?

13     A.   The conclusion would be that the inventors had not

14   possessed what they claimed to have invented because the

15   melting points are totally off, there could not have been a

16   mental picture even of two enantiomers.  So, the conclusion

17   would be, as I say on this slide, that they would not be

18   physically or mentally in possession -- the inventors were not

19   in physical or mental possession of the claimed subject matter.

20     Q.   And you said that would be based on the melting point.

21   Would it also be based on specific optical rotation presented?

22     A.   Correct, the specific rotation is also different.

23     Q.   Thank you, Dr. Wolf.  Now, so far in connection with

24   your written description analysis, you have been testifying

25   about the specification of the '593 patent.  Did you consider

1    any further information in connection with that analysis?

2        A.   Yes.  I also looked at the prosecution history, as I

3    understand that plaintiffs have brought that up.

4        Q.   And this is demonstrative 22.

5        A.   Yes.  Even if I, looking at the prosecution history, I

6    have the same conclusion.  The issues that are already

7    discussed remain the same, but it becomes even actually more

8    obscure if one looks at the public record, which is the

9    prosecution history.

10       Q.   Excuse me.  This is demonstrative 42.  Let's turn to

11   demonstrative 43, Dr. Wolf.

12       A.   Yes, what I'm showing here is, this is from the

13   original '737 patent which was filed in 1995 where Example 25

14   is referred to as the 1S,2S stereoisomer.

15       Q.   And for the record, this is DTX-950 at page 30, Example

16   25 in the original '737 parent application.  And why would a

17   person of ordinary skill in the art find the 1S,2S disclosure

18   in that application meaningful, Dr. Wolf?

19       A.   It is meaningful because this is clearly not what is in

20   the claims.  In the claims we have the 1R,2R stereoisomer.

21   Here we have the 1S,2S.

22       Q.   And let's turn to demonstrative 45, Dr. Wolf.  Would a

23   person of ordinary skill in the art in the prosecution history

24   find any further information in connection with the

25   representation in the original parent patent application?

1       A.   Yes, this is a declaration signed by Dr. Buschmann, one

2   of the named inventors, and he signs that he has reviewed and

3   understands the contents of the specification, and he believed

4   everything to be true.  That means a POSITA would look at the

5   data and think that those would be objective, true data.

6       Q.   And for the record, this is the July 17, 1995

7   submission at DTX-1350, page 1.

8            Let's turn to demonstrative 46 now, Dr. Wolf, moving

9   further in time.  Would a person of ordinary skill in the art

10  find any subsequent information meaningful in connection to

11  Example 25?

12      A.   Yes.  This is from 1997 where there was a change from

13  1S,2S to 1R,2S.  So, if you look here at Example 25, now the

14  stereo description was changed from 1S,2S to 1R,2S.

15      Q.   And you provided an excerpt here from DTX-952 at page 2

16  in the middle of demonstrative 46.  Why would this be

17  meaningful?

18      A.   Because it was said these were inconsistencies in the

19  R/S stereo descriptions and support for these amendments was

20  found in the original formulas in Examples 24 and 25.

21      Q.   Thank you, Dr. Wolf.  Let's explore further the

22  November 1997 submissions in connection with the prosecution

23  history.  Let's look at demonstrative 48.  Did the applicants

24  present any further submissions in connection with their

25  amendment or Example 25?

1    A.   Yes.  What we see here was submitted at pretty much the

2    same time, and from this paragraph, several examples are

3    mentioned, but not Example 25.  But if you look at the table

4    that was also part of this declaration, there is an Example 25

5    which at the time was understood to be the 1R,2S stereoisomer.

6    Q.   And how would a person --

7    A.   There is confusion for a POSITA to even understand what

8    the inventors thought they had invented.

9    Q.   Thank you, Dr. Wolf.  Now, as it issued in June 19,

10   2001, what would a person of ordinary skill in the art have

11   concluded about the disclosure of the '737 patent with respect

12   to Example 25?

13   A.   Again, we see here 1R,2S in the issued '737 patent, and

14   that is not what is in the claims that we are discussing, so

15   the conclusion would have been that they were not in possession

16   of the claim subject matter.

17   Q.   And that was demonstrative 51.  Let's turn to

18   demonstrative 52, Dr. Wolf.  Now, in connection with the

19   prosecution of the reissue application starting in July 2003,

20   would a person of ordinary skill in the art have found still

21   further information pertinent to what the inventors possessed?

22   A.   Yes.  This is from the '593 issue application, and if

23   you can go back to that slide, there is an amendment to correct

24   inadvertent errors.

25   Q.   And what was that amendment, Dr. Wolf?

1      A.   The inventors then changed one more time again the

2      stereo description, and so now it was changed from 1R,2S to

3      1R,2R.

4      Q.   And did the inventors make any further statements in

5      connection with that amendment, Dr. Wolf?

6      A.   Yes.  They said that the compounds in examples which

7      includes Example 25 were incorrectly named.

8      Q.   And for the record, this is demonstrative 54 containing

9      an excerpt from PTX-667 at page 1.

10          Now, turning to demonstrative 55, Dr. Wolf, in summary,

11     what would a person of ordinary skill in the art, following the

12     prosecution of the '593 patent, conclude about what the

13     inventors possessed?

14     A.   This is a summary of the public record that I just went

15     through where the description was changed from 1S,2S first to

16     1R,2S, and then finally to 1R,2R.  And a POSITA looking at this

17     would be really confused and think that the inventors were

18     confused about what they really possessed.

19     Q.   Dr. Wolf, are you aware that one of the inventors, Dr.

20     Helmut Buschmann, testified at trial in this case?

21     A.   Yes, I am aware of that.

22     Q.   And have you read the trial testimony of Dr. Buschmann?

23     A.   Yes, I did.

24     Q.   Did you review all of Dr. Buschmann's trial testimony?

25     A.   I skimmed over most of that, but I looked at some in

1    particular.

2        Q.   And did you find any testimony at trial from Dr.

3    Buschmann to be meaningful in connection with your written

4    description analysis?

5        A.   Yes, I think so.   I think it's on the next slide, a

6    discussion with regard to the '364 patent, I believe.

7             MS. SOBOLSKI:   Mr. Haw, if we could pull up day 2,

8    please, at page 157 of the trial transcript.   And page 157,

9    lines 8 to 15, please.   If we could also please pull up

10   DTX-304, which should be the '364 patent.   Together, please.

11   BY MR. SOBOLSKI:

12       Q.   Dr. Wolf, is this the testimony at trial from Dr.

13   Buschmann that you were referring to?

14       A.   Yes, I think it is.

15       Q.   And at page 157, lines 8 to 15 of day 2, Dr. Buschmann

16   was asked about line 46 of the '364 patent, which is DTX-304.

17   And can you please read into the record lines 46 through the

18   remainder of 55 of the '364 patent?

19       A.   U.S. patent numbers '737 and '558 as well as European

20   patent EP 475 B1 disclosed the substance and synthesis of minus

21   1R,2R, (3-dimethylamino-1-ethyl-2-methylpropyl) phenol

22   hydrochloride in Example 25.   As proven by x-ray diffraction

23   the 1R,2R configuration as shown in the drawing of the

24   structure in Example 25 is correct, although the configuration

25   is reported as minus 1R,2S in U.S. patent number '737 and minus

1     1S,2S in U.S. patent number '558 as well as in EP 475 B1.

2         Q.   And let's take a look at what Dr. Buschmann testified

3     in connection with this portion of the '364 patent.

4              MR. SOBOLSKI:   Mr. Haw, if you could pull up page

5     159 of Dr. Buschmann's testimony, and if we can cull out,

6     please, lines 13 forward.

7     BY MR. SOBOLSKI:

8         Q.   Is this the testimony from Dr. Buschmann at this trial

9     that you had in mind, Dr. Wolf?

10        A.   Yes, it is.

11        Q.   And what is meaningful to you about Dr. Buschmann's

12    trial testimony in this case in connection with your written

13    description analysis?

14        A.   I think he -- so, I take his testimony as an

15    acknowledgment that one needs to provide structural data to

16    show the exact and correct stereochemistry of the formula.  And

17    so, I believe that Grunenthal actually did that a few years

18    later, so they determined the structure by x-ray

19    crystallography.  And so a person of ordinary skill in the art

20    would have expected this to be done in the first place.  So, it

21    should have been in the '593 patent.  But I agree with Dr.

22    Buschmann that this is a way to do it.

23        Q.   Thank you, Dr. Wolf.

24             MR. SOBOLSKI:   If we can return to the

25    demonstratives, please, Mr. Haw.

1    BY MR. SOBOLSKI:

2        Q.   Dr. Wolf, let's turn to demonstrative 56 in which you

3    have introduced your analysis of the failure to satisfy the

4    original patent rule of those same claims, 61, 117 and 147.

5    Starting with demonstrative 57, what legal standard were you

6    asked to apply in connection with your original patent rule?

7        A.   It's my understanding that what is playing in the final

8    patent needs to be supported within the specification of the

9    previous patents, and this needs to be a clearly and un -- it

10   needs to be a clear and unequivocal disclosure.

11       Q.   Let's turn to demonstrative 58.  In light of the

12   specification of the parent '737 patent, would a person of

13   ordinary skill in the art find that that specification clearly

14   and unequivocally discloses the subject matter of claims 61,

15   117 and 147?

16       A.   No, because in the '737 patent, what is in Example 25

17   is the 1R,2S.  That's clearly not the 1R,2R which is the

18   stereoisomer in claims 61, 117 and 147.  So, a person of

19   ordinary skill in the art looking at this would not find a

20   clear and unequivocal disclosure of the claim subject matter.

21       Q.   Thank you, Dr. Wolf.  Let's turn now to demonstrative

22   59 in which you introduce your opinions related to the

23   non-enablement of claim 8 of the '593 patent.

24            First, starting with demonstrative 60, what was the

25   legal standard you were asked to apply in connection with your

1    non-enablement analysis?

2    A.   A person of ordinary skill in the art would have to be

3    able to practice the full scope of the invention without undue

4    experimentation, without excessive work.

5    Q.   And what standard were you asked to apply in connection

6    with whether the nature of the work is excessive or undue?

7    A.   These are actually the factors that I considered for my

8    analysis.

9    Q.   And this is demonstrative 61 listing various factors.

10   Did you consider each of these factors on demonstrative 61 in

11   connection with your non-enablement analysis, Dr. Wolf?

12   A.   Yes, and I have a few slides prepared for this.

13   Q.   Well, let's turn to those, Dr. Wolf.  At demonstrative

14   62, let's begin with how a person of ordinary skill in the art

15   would understand the breadth of claim 8.  Did you calculate the

16   breadth of claim 8, Dr. Wolf?

17   A.   Yes, the breadth of claim 8 is very broad.

18   Q.   How did you calculate that breadth of claim 8, Dr.

19   Wolf?

20   A.   I basically looked at the parent structure shown in

21   claim 8, and the first analysis I did is we have two stereo

22   centers in this which gives rise, because of the different

23   spatial orientation of the groups that can be on these stereo

24   centers, to the total of four stereoisomers.  And then I looked

25   at what is group X, what can group X be.  I show here in the

1    red block -- excuse me, in the green block.  And so this gives

2    rise to another nine possibilities.  And then I continue with

3    that analysis.  I look at R1, which I have shown here, these

4    are the possibilities for R1, and it gives rise to another 16

5    possibilities.  I then did this for R2 and R3, which adds

6    another multiplier of 71, and then finally R5 and R4 together

7    is another 286.  So, all the possible combinations that are

8    covered by this claim are more than 11 million.

9        Q.   For the record, Dr. Wolf has been testifying about

10   demonstrative 62 through 68 about claim 8 of the '593 patent.

11        Now, let's turn to demonstrative 69, Dr. Wolf.  What

12   would a person of ordinary skill in the art conclude in

13   relation to the quantity of experimentation necessary to

14   practice the breadth of claim 8?

15       A.   This is a very large number.  It is certainly

16   excessive.  So, Dr. Mogil's opinion is one would have to have

17   these compounds in order to test their activity, but I am

18   saying as a chemist, we would have to make them.  And this

19   would be a very large number to make.

20       Q.   When you refer to Dr. Mogil's opinion, are you

21   referring to Dr. Mogil's trial testimony in this case in

22   connection with non-enablement of claim 8?

23       A.   Yes.

24       Q.   And what is your understanding of Dr. Mogil's trial

25   testimony in connection with non-enablement, Dr. Wolf?

1          A.   My understanding is that according to Dr. Mogil, one

2     would have to test every individual compound in order to

3     determine its activity.

4          Q.   And what would that in turn entail from the perspective

5     of an organic chemist?

6          A.   Well, as I said, if you want to test those, you've got

7     to make them first, and to make such a large number of

8     compounds would be undue experimentation.

9          Q.   What would the experimentation entail to make those

10    compounds from the perspective of an organic chemist, Dr. Wolf?

11         A.   I did a very conservative analysis of how much work

12    would have to go into making these compounds, and so I came to

13    a conclusion that in the average it would take about two days

14    to make one compound.  I kept in mind that one could also run a

15    lot of reactions in parallel to make things faster, but even if

16    one considered -- even if one would say it takes only one day,

17    that would be still an excessive amount of work.  In this

18    analysis, I considered the chemistry that was described in the

19    '593 patent, the number of steps, possibility of common

20    precursors, and the reactions that I discussed in the '593.

21         Q.   And that is in connection with synthesizing the 11,

22    over 11 million compounds you've discussed, but did you also

23    consider the salts thereof or the physiologically acceptable

24    acid recited in claim 8 of the '593 patent?

25         A.   Yes, I did.  And this is actually the table that I was

1    referring to earlier from the Berge paper, and so in 19 -- I

2    think this is from 1977, there were 53 pharmaceutical salts

3    known.  So, these would be physiologically acceptable salts

4    that are covered by claim 8.

5        Q.   And this is demonstrative 71 containing an excerpt from

6    DTX-176 at page 2.  What would a person of ordinary skill in

7    the art understand, Dr. Wolf, about whether there is any

8    additional organic chemistry involved in making these salts

9    thereof?

10       A.   Well, you would have to make them.  So, you would have

11   to run the reactions to make these salts.

12       Q.   And turning to demonstrative 72, what would a person of

13   ordinary skill in the art understand about the breadth of claim

14   8 in light of the further limitation "or salt thereof with a

15   physiologically acceptable acid?"

16       A.   Well, this then would have to be considered, that we

17   would have suddenly 53 pharmaceutically acceptable salts of

18   these more than 11 combination, and that gets us to over 619

19   million salts.

20       Q.   Let's turn to demonstrative 73.  What would a person of

21   ordinary skill in the art conclude with respect to what the

22   specification teaches and the state-of-the-art?

23       A.   So, there is -- in the specification there are 28

24   examples.  That's a relatively small number compared to what we

25   just discussed, millions of covered compounds.  And, of course,

1    a POSITA would understand, chemistry is not predictable, and

2    some synthesis might be complicated, might not work, especially

3    with such a large number of target compounds.  So, one would

4    have to remodify chemistry.  That would make it even more

5    difficult, more excessive to make these compounds.

6         Q.   Let's turn to demonstrative 74.  What would a person of

7    ordinary skill in the art conclude with respect to the relative

8    unpredictability or predictability of the art and the nature of

9    the '593 patent's purported invention?

10        A.   As I already said, chemistry is an empirical art, and

11   it is difficult to make some of these compounds, and chemistry

12   is not predictable.  So, some of the precursors might not be

13   available.  In my conservative analysis, I actually did not go

14   that far.  But some would not be just available.  So, you would

15   have to make those, also.  There might be problems with

16   stability, unexpected problems, problems with separating

17   enantiomers for sure, and, of course, one would have to not

18   just make them, not just run reaction, but also identify the

19   structure.

20        Q.   Thank you, Dr. Wolf.  And finally, what would a person

21   of ordinary skill in the art conclude when in light of the

22   relative skill of that individual?

23        A.   The relative skill of a person of ordinary skill in the

24   art is relatively high and means that a POSITA would insist on

25   developing sound synthetic schemes, determine the identity of

1    each compound that is potentially made, precursors and the

2    final compounds as well, and so that would require sound

3    empirical data.  And then, according to Dr. Mogil, each of

4    these would have to be then tested for an activity.

5        Q.   And is that according to the testimony at this trial

6    that Dr. Mogil gave which you reviewed?

7        A.   Yes, that's necessary according to Dr. Mogil.

8              MR. SOBOLSKI:  Thank you, Dr. Wolf.

9              THE COURT:  Thank you.

10             Anyone on this side?  Do you want to start the

11   cross now?  Do you want to take a five-minute break?  It's up

12   to you.

13             MR. GLANDORF:  Let's take a five-minute break.

14             THE COURT:  Okay.  That sounds fine.

15             THE DEPUTY COURT CLERK:  All rise.

16             THE COURT:  The witness is still sworn in and you

17   are not to talk with counsel regarding your testimony, but you

18   can step down and have the break with everyone else.  Thank

19   you.

20             (Recess at.2:43 p.m.)

21             (P.M. SESSION)

22   CROSS EXAMINATION BY MR. GLANDORF:

23             THE COURT:  All right.  Let's begin with the

24   cross, please.

25             Have you exchanged your exhibit binder or no?

```
 1                    MR. GLANDORF:   We only have a couple of
 2       documents.
 3                    THE COURT:   Any issue on the documents?
 4                    MR. SOBOLSKI:   None, your Honor.
 5       Q.   Good afternoon, doctor.
 6       A.   Good afternoon.
 7       Q.   I'm here representing Depomed.  My name is David
 8       Glandorf.
 9            If we could start with your written description
10       opinion.  Could we bring up slide 32 from Dr. Wolf's
11       presentation?
12       Q.   Dr. Wolf, do you recall this slide?
13       A.   Yes, I do.
14       Q.   And these are the three claims that you were
15       challenging as failing under the written description doctrine.
16       Is that right?
17       A.   That's correct.
18       Q.   These are the three asserted species claims.   Is that
19       correct?
20       A.   That's correct.
21       Q.   As opposed to the genus claim that's being asserted
22       from this patent, which is the claim 8.  Are we on the same
23       page?
24       A.   That's correct.
25       Q.   Now, your written description argument is directed to
```

1     the Tapentadol hydrochloride term.  Is that correct?  And I'll

2     read it out here.  It's the 1R 2R 3 3 dimethylamino 1 ethyl 2

3     methylpropyl phenol hydrochloride.

4          Is it okay if we refer to the Tapentadol hydrochloride

5     term?

6          A.   That's fair.

7          Q.   Okay.  And so your written description challenge to

8     these claims is based on that term.  Is that correct?

9          A.   No.  I don't think so.  My challenge is that a person

10     of ordinary skill in the art looking at the '593 patent would

11     find that discrepancy in the melting points and therefore

12     conclude --

13          Q.   I understand that's your basis.  I'm sorry.  I have a

14     much more narrow request than that in terms of which part of

15     that claim you are challenging as not being adequately

16     described.

17          You are focused on the Tapentadol hydrochloride term as

18     opposed to let's say the term "pharmaceutically acceptable

19     salt".  Is that fair?

20          You aren't arguing that there's anything that's

21     inadequate about the description of the words "pharmaceutically

22     acceptable salt".  Is that right?

23          A.   You are talking about claim 147?

24          Q.   Yes.

25          A.   Well, my point, I guess, is that if the formula that's

1    after this phrase starting with minus 1R 2R, it was not

2    possessed by the named inventor and of force the

3    pharmaceutically acceptable salt would not have been possessed

4    either.

5        Q.   That's exactly my question.  I just wanted to clarify

6    here though that your focus, the basis, the term that you are

7    saying is not adequately disclosed is the chemical term.  And I

8    understand then if that's not there, then you're right, the

9    claim as a whole fails.

10        But, I just want to make sure you're not saying that

11   there's anything inadequately described by the pharmaceutically

12   acceptable salt on its own.

13        A.   I think that's fair.

14        Q.   And in claim 117, the same thing.  Your challenge is to

15   the Tapentadol hydrochloride term, not to anything in the

16   preamble of Claim 8.  Let's go to Claim 8.  Actually if we

17   could, it's on slide 14.

18        You haven't offered an opinion today, for example, that

19   there's anything inadequate about the description of treating a

20   mammal suffering from pain.  Is that correct?

21        A.   I haven't provided an opinion about the written

22   description of Claim 8 if that is your question.

23        Q.   Okay.  That's right.  Okay.

24        A.   Well, let's go now to, I understand.  I'm sorry.  Let

25   me just make sure I clarify.  I realize you haven't offered a

1      written description in challenge to Claim 8.  In particular

2      your challenge is claim 117, is that right, under the written

3      description, doctor?

4           A.   Claims 61, 117 and 147.

5           Q.   Focusing on claim 117 again I just want to confirm that

6      you're not offering -- your challenge to the written

7      description there is not based on any of the, what we call here

8      the preamble, the start of a claim up here, the fact that this

9      is a method of treating a mammal for pain.

10               Is that correct?

11          A.   I think that's correct.

12          Q.   Okay.  Thank you.  Let's go to your legal slide if we

13     could which I believe is 31.  This is your law on written

14     description.  And I see your third quote here.  Could you read

15     the third quote for us?

16          A.   Sure.  "Nor do we set out any bright-line rules

17     governing, for example, the number of species that must be

18     disclosed to describe a genus claim, as this number necessarily

19     changes with each invention, and it changes with progress in a

20     field".

21          Q.   And that's addressing the written description challenge

22     to a genus claim.

23               But, just so we're clear, you're not offering a written

24     description challenge to the genus claim in this case.  Is that

25     right?

1          A.  As I said, it's not about Claim eight.

2          Q.  Okay.  Let's go back then.  Let's go back to slide 32,

3     Rob.  And then could we go alongside it.  Put that on the left

4     and put alongside it, slide 15.

5          You recall testifying about slide 15, Dr. Wolf?

6          A.  Yes, I do.

7          Q.  And you, I believe, told the Court that this is the

8     claim construction that you applied while doing your analysis

9     today?

10         A.  That's correct.

11         Q.  And you applied this term, in fact, during the, for

12    example, during the claims construction.  I'm sorry, during the

13    written description challenge.  Is that right?

14         A.  Yes.

15         Q.  Okay.  And to look, let's look at what we have here.

16    We see the term that's being construed here on the left.

17         Do you recognize that as the, on the left side of the

18    claim construction, you recognize that as what you and I

19    defined as the Tapentadol hydrochloride term?

20         A.  I think that's correct.

21         Q.  Okay.  And so if we go back, your challenge is, for

22    example, of claim 61, the entirety of claim 61 is that term

23    which is being construed by the Court.  Isn't that right?

24         A.  I think that's correct.

25         Q.  Okay.  And so if we look now back to the claim

1    construction, could you go ahead and read for us the Court's

2    claim construction of that term, the Court's construction?

3        A.   The chemical compound 1R 2R 3 3 dimethylamino 1 ethyl 2

4    methylpropyl phenol hydrochloride depicted by the structural

5    formula identified by the number minus 21 in example 25 of the

6    RE '593 patent.

7        Q.   And so the language here is that the Tapentadol

8    hydrochloride term refers to the, what is depicted by the

9    structural formula in example 25.  Is that correct?

10       A.   That's correct.

11       Q.   Okay.  So, let's go ahead and take that down, Rob.  But

12   let's leave 32 up there on the left and then on the right let's

13   go ahead and put slide 33.

14            Now, here on 33 we have example 25, correct, doctor?

15       A.   Yes.

16       Q.   And, in fact, we have a structural depiction here.  Do

17   you see that?

18       A.   Yes.

19       Q.   And so what the Court has decided is that the

20   Tapentadol hydrochloride term refers to the structure as

21   depicted here in example 25.  Is that correct?

22       A.   I think that's true.

23       Q.   Okay .  And so when you're challenging claim 61 as

24   being inadequately described, a failure of written description,

25   is it your testimony that this structure here is inadequately

1    described?

2        A.   My testimony is that a person of ordinary skill in the

3    art would look at the whole information that is provided in the

4    specification.  And so as a POSITA, one would look into the

5    physical data that clearly don't show possession of the claim

6    subject matter.  There is no enantiomeric relationship between

7    24 and 25.

8        Q.   And I understand that's your testimony and we will

9    unpack that a little bit.

10       I just want to make sure we're clear here.  The meaning

11   of claim 61, according to the Court, is this particular, this

12   single structure here in example 25.  Is that correct?

13       We can go back to the claim construction.

14       A.   Yes, if you can go back to that.

15       Q.   Sure.  Let's go back, I think it was 15, Rob, if you

16   want to put slide 15.  The Court's construction is that the

17   chemical compound Tapentadol hydrochloride depicted by the

18   structural formula identified by that number minus 21 in the

19   example 25 of the reissue patent, the '593.  So let's go back

20   now, Rob, to 33.  There is just one structural formula depicted

21   here.

22       And, doctor, is that correct?  And it's identified as

23   minus 21, correct?

24       A.   That's correct.

25       Q.   And so claim 61 refers to a specific chemical structure

1      depicted here in full.

2             And is it your testimony today that that structure

3      fails the written description requirement?

4         A.   I haven't testified about just the structure.  To me

5      what is important is a person of ordinary skill in the art

6      would look at the whole information and would come to the

7      conclusion that the inventors were not in possession of this

8      example 25.

9         Q.   So, is it your testimony that a person of skill in the

10     art would, when looking at claim 61, for example, would

11     understand it to be that they would need to look at the melting

12     point data and the specific rotation data.

13            Is that your position?

14        A.   My position is they would look at all the data

15     provided.

16        Q.   And were you involved in the claim construction

17     proceeding in this case?

18        A.   Yes, I was.

19        Q.    And you understand that in this case defendants argued

20     for a claim construction of the Tapentadol hydrochloride term

21     that included the melting point and specific rotation, did they

22     not?

23        A.   I think that's correct.

24        Q.   But the Court ruled in fact that the Tapentadol

25     hydrochloride term refers to this structural depiction.  Isn't

1          that correct?

2               A.   I understand that.

3               Q.   Okay.  Now, you would agree that a chemical compound, a

4          structure alone, could satisfy the written description

5          requirement.  In general.  Not referring to our patent here.

6               In general is it possible for a chemical structure

7          alone to satisfy the written description requirement?

8               A.   I'm not a lawyer so I don't know what the requirement

9          is.

10              Q.   Well, you testified earlier as to your understanding of

11         what is required under the written description requirement.

12         You don't feel you can answer this question that that structure

13         alone would be sufficient to satisfy the written description

14         requirement?

15              A.   My understanding is that a person of ordinary skill in

16         the art looking into the specification of a patent would have

17         to find evidence that the inventors did invent what they

18         claimed they invented.

19              So maybe in some cases that could be just a structure.

20         But, I think in this case a person of ordinary skill in the art

21         looking into the specification would see the structure but

22         would see some striking difference between the melting point,

23         between 24 and 25, and the data that are provided clearly tell

24         a POSITA that the inventors were not in possession of example

25         25.

1     Q.   So,  your answer though to the general question, I

2    believe, and you can correct me if I'm wrong, was yes, that in

3    some cases a structural drawing alone would be sufficient to

4    satisfy the written description requirement.   Yes?

5    A.   I'm not aware of such a case.   What I'm saying is

6    maybe, maybe it could be.   I don't think it would work in this

7    case.

8     Q.   Rob, let's go ahead and put up slide 40 if we could.

9    You can take these other two down.   So, here we have example 24

10   and 25.

11     So just to make our hypothetical a little more exact,

12   if the melting point and optical rotation data was not

13   provided, would you still find a lack of adequate written

14   description here?

15    A.   I think with regard to this patent, yes.

16    Q.   And why is that?

17    A.   So, in this case a person of ordinary skill in the art

18   would still be aware of the prosecution history which shows to

19   a person of skill in the art that the inventors apparently

20   didn't even know what they might have possessed.

21    Q.   Are you referring to there the corrected

22   stereochemistry labels, the ones that the original labels were

23   1S 2S?   Is that what you are referring to?

24    A.   And the fact that there were no agreements with the

25   physical data.

 1      Q.   Which physical data?

 2      A.   The melting point range and the specific rotations,

 3  examples 24 and 25.

 4      Q.   You got me there.  Let's take the melting point and the

 5  optical rotation data out, as well as the specification out of

 6  the picture.

 7           Let's ask my question, without that data, would you

 8  still hold that these, that the Tapentadol hydrochloride, fails

 9  for lack of written description?

10      A.   I think in this case a person of ordinary skill in the

11  art would still see a problem with that.  But, there aren't any

12  structural data throughout the '593 patent.

13      Q.   But, I believe you just agreed that we can't have an

14  adequate written description even with the structural drawings

15  alone.  Is that right?

16      A.   Again I'm not a lawyer.  I think this wouldn't work in

17  this case.  I don't know if there are cases where that was --

18      Q.   So, it's the addition here of the melting points of the

19  optical rotational data that for now tips this over to a case

20  where there's no adequate written description.  Is that fair?

21      A.   I think I stated that even without those data present,

22  a person of ordinary skill in the art would not conclude that

23  the inventors were in possession of the subject matter.

24      Q.   I see.   And is that based on the, again, on the

25  stereochemistry labels?

1        A.   I think that certainly is a strong argument, yes.

2        Q.   And of course when we look at the actual reissue

3    patent, the '593, those stereochemistry labels have been

4    corrected.  Is that right?

5        A.   At the end, yes, they have been changed to 1R 2R.

6        Q.   Now, if we look at the two structures drawn here, a

7    person of skill in the art would recognize those as

8    enantiomers, correct?

9        A.   You're just referring to the two pictures, yes.

10        Q.   And if a person of skill in the art were to follow,

11    for example -- you reviewed the whole specification.  Is that

12    right?

13        A.   That's correct.

14        Q.   So, if a person of skill in the art was to follow the

15    reaction schemes described that's leading to these two, they

16    would expect those reaction schemes to lead to enantiomers.

17    Isn't that true?

18        A.   I think a person of skill in the art would expect to

19    see structural data for the intermediates that have been

20    formed.  This is a reaction scheme that goes through several

21    reactions.  As I explained earlier, chemistry is not

22    predictable.  And so one would expect structural data for all

23    the intermediates that finally lead to examples 24 and 25.

24    None of that is there.

25        Q.   But, these are routine experiments as of the date of

1    the patent, as of 1994, isn't that true, these synthetic steps

2    that are described in the examples here?

3        A.   What I explained earlier also with my demonstratives is

4    --

5        Q.   I'm sorry, were you going to answer that question?

6    These are routine steps that are involved in the synthesis

7    leading to example 24?

8        A.   If your question is if these were reactions that were

9    known at the time, then that's correct.

10       Q.   Okay.

11       A.   I would like if I --

12       Q.   Sure.  I'm sorry.  Go ahead.

13       A.    I would like to add though even with known reactions,

14   as chemistry is not a predictable art, the outcome sometimes is

15   not expected or hypothesized even if it's a known reaction.

16       Q.   And that's exactly my point.  I understand that you're

17   right, something could happen and you may not get what was

18   expected as you used the word.

19            But, just so we're clear, what was expected was the two

20   structures drawn here, correct?  That is the expectation?

21       A.   I don't know what the inventors had in terms of

22   expectation.

23       Q.   I'm talking about the steps leading to example 24 and

24   25 which we just decided were routine.   The expectations of

25   the products of those steps are the two enantiomers shown here

1   in example 24 and 25.  Is that true?

2       A.   That could have been the hypothesis but you need to

3   verify those were structural data.

4       Q.   That would be the hypothesis, correct?  The person of

5   skill in the art reading those reactions would expect example

6   24 and 25 to be the rule?

7       A.   There would be a very high chance of other compounds

8   being formed too.  So, if you don't have structural

9   elucidation, then you don't know for sure what you have and

10  sometimes the unexpected is happening.

11          So, if it's a routine reaction that has been known for

12  a long, long time, it's possible and it happens that expected

13  results -- that the results are not as expected.  So one would

14  need to get structural data to confirm that, otherwise, you

15  don't know.

16      Q.   Just to be clear, you haven't offered up any side

17  products that someone with skill in the art would end up with

18  instead of these products, correct?  You haven't identified any

19  products, side products that someone might get instead of

20  these?                                          A.   I haven't

21  run any tests, if that's what you are referring to.

22      Q.   You haven't predicted any products other than what are

23  shown here in example 24 and 25.  Is that right?

24      A.   That's correct.  I don't think it's necessary because

25  one would know that the unexpected can happen.

1    Q.   And so your testimony is that as of 1994, there was a

2    variety of routine analytical techniques to check to see if

3    your reaction was proceeding as expected.  Is that right?

4    A.   That's correct.

5    Q.   And you have a slide, I think, to that.  Can we put up

6    slide 34?

7         These are some of the techniques that a person with

8    skill in the art, in your testimony, would have used in 1994 to

9    see if they were progressing toward the reaction product they

10   expected.  Is that fair?

11   A.   These are.  I just list here a few possibilities.

12   Q.   There's others as well?

13   A.   One could also think of others.

14   Q.   What about melting point?

15   A.   The melting point does not tell you anything about the

16   structure.

17   Q.   Now, so, if a person of skill in the art in 1994 was

18   given a structure drawn on a paper and asked to synthesize it,

19   first of all, that person of skill in the art could design a

20   synthetic root.  Isn't that correct?

21   A.   That's correct.  We call it retro synthesis.

22   Q.   Retro synthesis?

23   A.   Yes.

24   Q.   And if they were to check their synthesis, they can

25   check their proposed synthesis, they would perform these

1    well-known structural data techniques.  Is that right?

2        A.   They would verify structures with some of these,

3    typically a combination.  But, that depends on what you're

4    making.

5        Q.   So, for example, if they were making a new compound,

6    attempting to achieve a new compound that they had seen drawn

7    on a paper, they could check that with protein or carbon NMR.

8    Is that right?

9        A.   They can apply protein and common NMR spectroscopy to

10   verify the structure.

11       Q.   And possibly something like FD IR as well?

12       A.   That's correct.

13       Q.   And so if a person that's skilled in the art in 1994,

14   for example, had the structure, the Tapentadol hydrochloride,

15   the structure shown on example 25, they would, they could

16   attempt to synthesize that and they would be able to verify

17   that by using the techniques like we have here.   Is that

18   right?

19       A.   It's so if you have a retro synthetic analysis and you

20   start with a certain compound to make, for instance,

21   Tapentadol, you could verify those steps through some, using

22   some of the techniques that I have listed here.

23       Q.   Even if you had no reference, even if you had reference

24   to NMR, IR relation to compare it to, you could still use those

25   techniques to determine whether you had successfully prepared

1    that structure.  Isn't that right?

2         A.   You can use the techniques to verify the structure of a

3    new compound so in that case you don't have a reference point.

4         Q.   Thank you.

5         A.   It's fair to say these are well-known techniques at the

6    time.

7         Q.   As of 1994 these are well-known techniques.  Is that

8    it?

9         A.   That could have been used but they weren't in the '593

10   patent.

11        Q.   Let's go to slide 25 if we could.  I apologize.  Let's

12   try 35.

13             You testified, for example, about this slide 35 in

14   terms of the importance of structural data.  Is that right?

15        A.   That was one of those that I referred to, yes.

16        Q.   But just to be clear, this isn't a guideline for patent

17   drafting, correct?

18        A.   This is a guideline for publication in a journal.

19        Q.   In this specific journal, The Journal of Organic

20   Chemistry.  Is that right?

21        A.   This is for The Journal of Organic Chemistry but these

22   are routine techniques.  There's nothing stringent about these

23   requirements.

24        Q.   Let's go to the next slide then as well.

25             And again this guide to materials characterization and

1      chemical analysis, this isn't written to patent drafters.

2              Is that correct?

3      A.   No, but I've chosen it because it shows that, it shows

4      that at the time these kind of techniques were used by chemists

5      to identify the structure of new compounds or known compounds.

6      Q.   I understand.

7      A.   But, this is not for a patent.  That's correct.

8      Q.   The next slide then I think you have one more in this

9      series.  This is a chapter in an undergraduate book.  Is that

10     correct?

11     A.   I believe it's from an under grad textbook.

12     Q.   It's written for under grad chemistry students.  Is

13     that right?

14     A.   Yes.

15     Q.   Not written for, not directed to patent drafters.  Is

16     that right?

17     A.   It's not written for patent drawers.  The point is I'm

18     making here is these are basic tests that one would apply to

19     verify the structure of a compound.  Even under grads would do

20     that.  So, we are not even talking at the level of a POSITA.

21     And one would need to verify the structure of a new compound.

22     Q.   Let's go back to slide 40 if we could.  I just want to

23     confirm we had talked about this before.  I just want to

24     confirm here you are not challenging that the steps of the

25     patent, you're not challenging that the steps in the patent

1    would lead to these compounds, right, example 24 and 25?

2        A.   I don't have evidence that they would.  What I'm saying

3    is a POSITA would expect structural verification to be

4    convinced that these steps would lead to these structures.

5    Without it, one doesn't know.

6        Q.   You read Dr. Buschmann's testimony, for example,

7    correct?

8        A.   Yes.

9        Q.   And Dr. Buschmann testified that he believed that he

10   had synthesized Tapentadol hydrochloride.  Isn't that correct?

11       A.   But, believing is not knowing.  We are scientists.  We

12   need to know.  We might have a hypothesis.  We might think it

13   is.  But that doesn't mean that's really the compound that we

14   thought we would make.

15           So, in theory it's possible.  But, chemistry is an

16   empirical art.  You run the experiment.  You must determine the

17   structure of the compound that you thought you might make or

18   might have made.  Dr. Buschmann also testified that one can

19   use proof of the structure with crystallography.

20       Q.   Are you aware Dr. Buschmann had performed an NMR to

21   determine whether he had the structure?

22       A.   It's not in the '593 patent.

23       Q.   And you have not, just to be clear, you have not

24   attempted any of the steps that are described in the '593

25   patent.  Is that right?

1      A.   I have not run any of these reactions to make the

2  compound that I described in the '593 patent.

3      Q.   Thank you.  Now, you mentioned that it's the addition

4  of a melting point, right, that's part of your basis for

5  claiming that this example 25 fails the written description

6  requirement.  Is that right?

7      A.   I think it's fair to say that the large difference in

8  the melting point range that are provided in the patent for

9  example 24 and 25 convinces a POSITA that the inventors did not

10  possess.

11      Q.   Because in your mind it's not possible for those

12  numbers to have been an error.  You seem to have eliminated

13  that possibility.

14         Is it possible that these melting points here could

15  have been an error?

16      A.   So, in general there can be an error if you determine

17  melting points.  That's well-known in the art.  It was

18  well-known as of the '90s as well.

19      Q.   You said there cannot, I'm sorry, you said cannot be an

20  error in the melting point?

21      A.   There can be error.

22      Q.   There can be.

23      A.   Like with every experiment you are running, you can

24  have an error.

25      Q.   And you understand Dr. Buschmann's testimony to be that

1      this was an error.  This was a listing error here in example

2      25.  You saw that testimony in Court, correct?

3          A.   I think what he said I think that's not convincing to a

4      POSITA that this was an error.

5          Q.   And why is that?

6          A.   I think if I can I would have two things to say to that

7      regard.   The first thing is, as I said earlier, a POSITA would

8      look at everything that's in the specification.   And so we see

9      here, as I said earlier today, that the enantiomer minus 21 is

10     related to example 24 which is the purported enantiomer plus

11     21.

12         Q.   Those are enantiomers, that's right?

13         A.   That remains to be discussed.  But, this is information

14     that a POSITA sees.  So a POSITA would look, for instance, at

15     more information.  And so if you look in the '593 patent,

16     there's a description of how these were made.   And this is

17     what this is referring to.  At the very end the material

18     supposed to go through two purification steps, if I remember

19     that off the top of my head correctly.  One is an extraction

20     and one is a crystallization.

21          These are, as I mentioned earlier, what once you run a

22     reaction, you purify the compound before you determine the

23     structure.

24          So, a POSITA would look at this and see that these two

25     examples would have been through the same double purification

1    processes.  They should have the same purity.  They should have

2    the same purity profile.  They should have the same melting

3    points.

4         So, that is certainly striking.  The difference in the

5    melting points is absolutely striking.   These cannot be

6    enantiomers.

7         If I may, my second point is, if you just assume that a

8    POSITA, if you just assume for a moment that they had

9    considered that they could be enantiomers, which I don't think

10   they did, it's even an under grad would realize they cannot be

11   enantiomers.  The melting points are totally off.

12        So, if you look at this and you say the melting points

13   are totally different, you just take five minutes to get to

14   double check the melting point or you do some structure

15   elucidation then you know it's really screaming at a POSITA and

16   an under grad student that the melting points are absolutely

17   off.  They are not even close.  These cannot be enantiomers.

18   Q.   I think we are on the same page here, doctor.  I think

19   you've talked now you gave two examples, walked through two

20   reasons why these were these melting points.  But, both your

21   reasons were they should be the same.  They should be the same

22   because they are enantiomers.

23        What I'm asking is isn't one explanation then that this

24   is an error, it's a listing error or a measure error, either

25   one, but it's an error.  This melting point is simply an error.

1    And in fact isn't that what Dr. Buschmann testified?

2        A.   A person of ordinary skill in the art would not see

3    that in the specification.  So, a person of ordinary skill in

4    the art would look at what's provided in the specification and

5    it's hypothetical what the reason is.

6            But, a person of ordinary skill in the art would expect

7    that the inventors, if they had thought even of these being

8    enantiomers, would have seen that right away.  As I said, it's

9    screaming.  Even an under grad, not even a POSITA, knows they

10   cannot be enantiomers.  So, you wouldn't provide this data and

11   throughout the whole prosecution history.

12       Q.   They could be enantiomers or they could be an error.

13   Is that fair?

14       A.   I think that's hypothetical.  I think that could be

15   just the melting points of what --

16       Q.   It could be the melting point.  It could also be an

17   error.  Are you disagreeing with that?

18       A.   I think in theory.  But, practically speaking, I don't

19   think that's convincing to a POSITA looking into the

20   specification.

21       Q.   And you talked about the whole specification.  Let's

22   talk about the specification as a whole here.

23           We have two structures shown, correct?

24       A.   That's correct.

25       Q.   Those structures are enantiomers as shown, correct?

1          A.   Just the structures alone.

2          Q.   And we talked about the reaction scheme.  We mentioned

3     the reaction schemes are routine steps and that these are the

4     expected results, correct?

5          A.   As I said --

6          Q.   I understand it's not guaranteed, but the expected

7     results are that it would react, it would result in the

8     enantiomers listed here, correct?

9          A.   I don't know what the expected results were.

10         Q.   You can't follow those synthetic reactions and see what

11    the expected results are?

12         A.   I don't know what the inventors had in their minds.

13    That's not in the specification.   I can see that the steps

14    that were applied could make this possibly in theory.  But,

15    one would have to test it and it would be just using one of the

16    techniques that we've discussed to verify the structure.

17              It's not therefore the final product.  It's not even

18    therefore the precursors.

19         Q.   Let's go ahead and look at '593.  Let's go to example

20    two on column seven.  Let's go to 668.  I think we have a

21    better copy.   Do you have that there?

22         A.   This is in the handouts.

23         Q.   Yes, it's in one of the two handouts.

24         A.   All right.

25              MR. SOBOLSKI:   Your Honor, just to clarify the

1      record, PTX 668 is not the '593 patent, it's the '737 patent.

2                MR. GLANDORF:   So we are switching now to the

3      312.  We are going to 668 which is the original.

4          Q.  Do you have example two, doctor.

5          A.   I'm there.

6          Q.  Could you explain what is happening in example two

7      here?

8          A.  So, at example two it says enantiomers of 1-2S 3S 1

9      dimethylamino methyl 1-3-methyoxphenyl cyclohexanol

10     hydrochloric plus 1.

11         Q.  So you've reviewed these steps previously?

12         A.  I have looked at the reaction awhile ago, yes.

13         Q.  Can you explain at a high level what's happening in

14     example two?

15         A.  So, what happened here with compounds, compound one was

16     that the base was released with basically an extraction

17     procedure.  And the resume was then separated on the chiral

18     edge POC column.  So that is a procedure to separate

19     enantiomers.

20         Q.  And the enantiomers that had been separated, how are

21     they designated?  Not their chemical names.

22         A.  That would be the minus one and the plus one.

23         Q.  Okay.  So, now if we go ahead to example 25, so the

24     example 25 is using the minus one enantiomers from example two.

25     Is that right?

1      A.   That's correct.

2      Q.   Taking then the minus one enantiomer, what it says is

3  you use the minus one enantiomer from example two and then you

4  put it through the reactions that are listed in example 24.

5  Is that right?

6      A.   That's correct.

7      Q.   Okay.  And again I'm asking you, a synthetic chemist,

8  if you were to put it through the reactions in example 24, if

9  you start with minus one, put it through the reactions of 24,

10  the expectation is, you are going to say we have to prove it, I

11  know.  But, the expectation would be to achieve the structure

12  shown here in example 25.

13       Isn't that correct?

14      A.   So, that can't be the expectation that putting these

15  enantiomers through the several reactions, we skipped over a

16  few, that in theory they could make the examples 25 or 24.

17      Q.   In theory they would make that, correct?  In theory?

18      A.   They could.

19      Q.   They could.   You wouldn't say that they would?

20      A.   Well, so, in theory if everything goes as expected, if

21  you start with enantiomeric study materials, so that you can

22  make enantiomeric products, that is the theory.  The melting

23  points show us that this apparently didn't happen.

24      Q.   But, just so we're clear, the reaction scheme is

25  consistent with the structural drawing, correct?

1      A.   I would say it's fair to say that one would have to

2    have structural data to say the drawing is right.

3      Q.   All right.  Let's talk a little bit but utility.  Maybe

4    we can come back to this example here in a minute. Let's go to

5    slide 20 from Dr. Wolf's presentation.

6            Now, you talked about some of the utility shown here

7    for some of the compounds.   Do you recall that?

8      A.   Yes,  I do.

9      Q.   And each and every compound in this example shows

10   analgesic activity.   Is that correct?

11     A.   Based on Dr. Mogil's opinion, I don't think that this

12   table shows any analgesic activity.

13     Q.   You have your own opinion whether there's analgesic

14   activity here?

15     A.   I am relying on Dr. Mogil's opinion.

16     Q.   You have no opinion of your own on that point apart

17   from Dr. Mogil?

18     A.   I have looked at that table and I can tell you from the

19   perspective of an organic chemist there is a lot missing that

20   makes me, that's not convincing me that these are adequate data

21   that show analgesic activity.

22     Q.   Now, a person of skill in the art would expect that a

23   new compound that is structurally similar to a known compound

24   with an established utility and expect that the new

25   structurally similar compound would also have that utility,

1    correct?

2         A.   I don't think so.   I think that there could be the hope

3    it does.

4         Q.   That would be the expectation, correct?

5         A.   As I explained earlier with the example of the

6    Thalidomide, that could certainly not be the expectation.

7         Q.   I understand that it may not be reality.   But, the

8    expectation would be that a new compound that is structurally

9    similar to an existing compound with utility would also have

10   that utility, right?

11        A.   I think one would have to get the data to prove it.

12        Q.   Let's look at your deposition testimony if we could.

13   If we could pull up his deposition testimony.   This is the 2015

14   deposition.   Let's go to Page 173-23 and we are going to

15   continue to the next Page 174-12.

16        Q.   Now, at your deposition, Dr. Wolf, you were asked how

17   did you or what did you mean by structurally similar in the

18   context of this assertion.   And I'm going to go ahead and read

19   your answer here.

20             You said, So, in some cases we know that a class of

21   compounds generally has a certain activity, for example,

22   biological activity.   And in some cases there is a good

23   understanding of the structure activity relationships.

24             So it's a reasonable expectation that a small change in

25   the structure of a proven biologically active compound will

 1    yield another biologically active compound.  It may not be

 2    clear if that will be a better or not so effective compound.

 3    But, there's a reasonable expectation that it will have

 4    biological activity.

 5              THE COURT:   You're standing.  I think we have an

 6    issue.

 7              MR. SOBOLSKI:   We would ask that the previous

 8    question be read because this clearly refers to a designation

 9    which begins at Page 173, Line 12.  In fact, this is a question

10    about something that was in Dr. Wolf's reports.

11              THE COURT:   Go ahead.

12              MR. GLANDORF:  I would suggest if Counsel wants to

13    explore that, he can do that.

14              THE COURT:   I think that's apt.  That sounds

15    fine.  Thank you.

16       Q.   Did I read your answer correctly here, Dr. Wolf?

17       A.   I think that's, yeah, you read this correctly.

18       Q.   And so there can be a reasonable expectation for a

19    structurally similar compound that if one has a certain

20    biological activity, the structurally similar compound would

21    have that activity as well.  Is that right?

22       A.   So, if you have a good understanding of structure

23    activity relationship that can certainly guide a POSITA and

24    suggest some structural modifications with an expectation that

25    one could potentially even make a better drug.

1       Q.   Let's go to slide 63 then which is to be Claim eight.

2            You would agree, Dr. Wolf, that there is a structural

3       similarity here among the compounds covered by Claim eight,

4       correct?

5       A.   Could you be more specific?  There are so many

6       compounds claimed here.  Indeed the functional groups that are

7       here are not necessarily similar.  One has to define what is

8       similar.

9       Q.   Well, we can get to that.  I think we'll dig into that.

10      Let's start at the highest level.

11           This is the backbone of the molecule here, correct?

12      A.   That's correct.

13      Q.   R1 and referring to the substituent that can be placed

14      on the backbone, correct?

15      A.   That's correct.

16      Q.   So, this is a structural similarity here.  We can talk

17      about the extent of it.  But, let's start at the beginning.

18      There is a structural similarity here, correct?

19      A.   Not to the extent that all these compounds that are

20      encompassed by Claim eight would necessarily be considered

21      structurally similar.

22      Q.   So you're not even willing to say there is some level

23      of structural similarity here?

24      A.   Well, some might be very similar but some might not be

25      similar at all.

1    Q.   Your testimony is there is not a level of structural

2    similarity that goes across this entire genus. You have a

3    backbone there.  I think, as you said, that's common.

4         So, the question here is is there a sufficient

5    structural similarity in this class such that a person of skill

6    in the art would expect that if utility was shown for some

7    compounds, it could be expected of other compounds?

8    A.   I haven't opined on that.  But, I think I wouldn't say

9    that.

10   Q.   I'm sorry, you haven't opined on that but you wouldn't

11   say that?

12   A.   Do you mind asking your question again?

13   Q.   Yes.  Is there a sufficient structural similarity among

14   the compounds in this class so that if some were shown to have

15   certain biological activity, you would expect others in the

16   class to have that activity?

17        And your answer was that you haven't opined on that,

18   correct?

19   A.   So, what I'm saying is out of millions of compounds

20   there could be, you expect that you might find one or some that

21   have activity in the table to begin with.  My understanding is

22   activity isn't even shown.

23   Q.   And I understand that.  And that's a separate question.

24        My question is if activity is shown to some of the

25   compounds, is there sufficient structural similarity here that

1      you can then expect others in this class will also have a

2      similar activity?

3          A.   I don't know of structure activity relationships that

4      have been developed for these that I could show you.  If you

5      gave me one compound that has analgesic activity that I could

6      tell you and a specific other one that would also have that

7      activity.

8              As I said earlier, even if you look at mirror images

9      that look so much alike, it's known some have activity in a

10     certain way and others don't.

11         Q.   My question, doctor, is have you analyzed, have you

12     analyzed the genus here to see if there is a structural

13     similarity to the extent that you could apply, that you would

14     have expectation of biological activity if some were shown to

15     be active.

16             Have you done that analysis?  Have you presented an

17     analysis as to the degree of structural similarity here?

18         A.   I don't think I have.

19         Q.   You rely on Dr. Mogil for the idea that each and every

20     compound needs to be tested.  Is that right?

21         A.   I think that's correct.

22         Q.   And let's, we can come to the salts in a minute.  But,

23     in terms of actual compounds, you listed the number as 11

24     million.  Is that right?

25         A.   Whatever I had on my demonstratives.

1      Q.   I believe it was 11 million.

2      A.   Yes.

3      Q.   So, you haven't offered an analysis, for example, of

4  what percentage of that category would have to be tested for

5  utility before you could have an expectation across the genus.

6  Is that right?

7      A.   My understanding is you would have to test each orb.

8      Q.   You would have to test each orb.  If you tested the

9  first ten million you would have to test the last million.   Is

10 that right? That's your opinion?

11     A.   So I'm relying my opinion on what Dr. Mogil has opined

12 and that is you have to test each one to know if that

13 particular compound has that particular activity.

14     Q.   You wouldn't be able to say, if you tested a thousand,

15 that that would provide an expectation across the class?  You

16 are relying on Dr. Mogil.  Is that right?

17     A.   I think if you have tested a thousand and if these have

18 proven biological activity, that might give you an actual

19 understanding of structural relationships.  And then you might

20 have a way to expect that certain structures that are covered

21 by Claim 8 might also have that activity.

22     Q.   And in your opinion must utility be shown by a

23 scientifically rigorous method?

24     A.   Again I'm not a lawyer.  But, as a scientist, I would

25 expect that a rigorous method would be applied to show the

1    utility.

2         Q.   Well, as you applied your opinion here today, does your

3    opinion call for each -- require that each compound be examined

4    for utility by scientifically rigorous method?

5         A.   That's my understanding of what Dr. Mogil opined.

6         Q.   Is it your understanding in offering this opinion today

7    that each compound must be shown to be advantageous over

8    Tramadol?

9         A.   I haven't opined about that.

10        Q.   You did talk about the time it takes to make all the

11   compounds.   Do you recall that?

12        A.   That's correct.

13        Q.   And in your opinion it would take roughly two days for

14   a compound.   Is that your opinion?

15        A.   That's what I've said, yes.

16        Q.   And you are not arguing that taking two days to prepare

17   a compound could be undue experimentation?

18        A.   That's an average for other compounds that would have

19   been required.

20        Q.   I understand.   But if we were looking at one compound

21   and it took roughly two days, you wouldn't argue that that's

22   undo experimentation, correct?

23        A.   For one particular, for one, just one compound, no.

24        Q.   Let's look at slide seven here, Rob, if we could.

25   Actually let's go, Rob, to 74.

1          You mentioned some potential problems here with

2     producing these compounds.  Is that what's shown here on slide

3     74?

4          A.  Yes, that's correct.

5          Q.  But, you haven't identified a problem with any

6     particular compound in Claim eight? You haven't identified any

7     particular precursor that would be missing, have you?

8          A.  I have not done that.  But, my understanding is that

9     based on the large number of compounds that are covered by

10    Claim eight, you would certainly run into these issues.

11         Q.  But you haven't identified any final compound, for

12    example, that might have a lack of stability, have you?

13         A.  No, I have not identified those details.

14         Q.  You haven't identified any particular compound that is

15    likely to be difficult to manufacture, to synthesize, correct,

16    no particular compound?

17         A.  I haven't provided that information.

18         Q.  And if a person of skill in the art tried a synthetic

19    path and reached a dead end, they would find a way to redesign

20    that synthesis, correct?

21         A.  That's not necessarily the case.  But, that person

22    would make a try.

23         Q.  Let's look at your deposition testimony.  Rob, same

24    deposition.  Go to 159-11 to 160-10.  So you are being asked

25    here a priori is also known which if any synthesis of compounds

1          covered by asserted genus claims, a person of ordinary skill

2          would have been expected to fail due to lack of facility.  A

3          priori is it also unknown.

4               You asked to repeat the question.  Read back.  You

5          said, This chemistry is not fully predictable so one would have

6          to find out by experiment.

7               The next question was, Now, you'd agree in 1994, you

8          would agree in 1994 a person of ordinary skill would have been

9          able to revise a synthetic round that it is a dead end for one

10         of the claimed compounds of the asserted genus claims without

11         undue experimentation.

12              And your answer was, I think a person of ordinary skill

13         in the art as of 1994 would be able to realize that he or she

14         hit a dead end and would then come up with another retro

15         synthetic scheme or at least route to the product that could

16         include the development of reactions that were not known at the

17         time.

18              Did I read that correctly?

19         A.   I think so.   So, one would try to come up with another

20         idea of making the compound.   If that would be successful again

21         one would have to, of course, determine by the experiment

22         structural elucidation.

23         Q.   Let's go back to, I think it's slide 60.   How about

24         slide 14.

25              And so the structure shown here in Claim eight, these

1          could be prepared with relatively routine synthetic routes

2          known to a person of skill at the time with some reasonable

3          expectation of success, correct?

4              A.   This encompasses a very large number of structures.

5          And because of that, I would not think it would be a reasonable

6          expectation of success that all of these would be successfully

7          synthesized.

8              Q.   But if we were to pick just any one particular

9          compound, you haven't identified any compound for which there

10         would not be a reasonable expectation of success in this genus,

11         correct?

12             A.   I haven't identified any particular but I think it would

13         be clear to a POSITA that out of so many and with some of the

14         groups attached to this backbone, there would be complications.

15         And there would be compounds very difficult to be made and some

16         probably would not be made.

17             Q.   And that's your general statement.  But, again, you

18         haven't identified any particular group or compound in your

19         opinion that you presented today that would be difficult to

20         make. Is that right?

21             A.   I have not shown any particular structure,  yes.

22             Q.   Okay.

23                  Let's go to slide 58, if we could.  Let's put back up

24         our claims construction slide next to it.  That's 15.

25                  Now, I believe your testimony on the original patent

1    rule was that any claim in the reissue needed to be disclosed

2    in the original application.  Is that correct?  Is that a fair

3    statement of the standards?

4        A.   I think that's correct.

5        Q.   If we look at claim 61, for example, the question is is

6    this disclosed in the original patent.  Is that right?

7        A.   That's correct.

8        Q.    And again if we look at the claim construction, we see

9    that the entire claim here is construed by the Court to refer

10   to this structure here in example 25.  Is that right?

11       A.   I understand that claim construction.

12       Q.   And this structure shown here in example 25, that

13   structure, this structure was shown in the original patent,

14   correct?

15       A.   That is correct together with the melting points.

16       Q.   Okay.  Again, the claim construction doesn't refer to

17   the melting point?

18       A.   But, this is something that a POSITA would certainly

19   see in the specification.  And so it shows the POSITA that

20   there cannot be an enantiomeric relationship.

21       Q.   In your reading of it when a POSITA reads this claim,

22   they would include the melting point in that understanding.

23   Is that your testimony?

24       A.   I don't think that's my understanding of the claim

25   construction that we have, no.  But, I'm saying that a POSITA

1          would understand that claim construction and look what's in the

2          specification and there is that claim construction.  And then

3          there is this vast discrepancy between the melting points

4          between example 24 and 25.

5               Q.   Okay.  And if we look here at claim 117 again it has

6          that Tapentadol hydrochloride term.  And you understand that,

7          according to the Court, to be a reference to this structure

8          that was in the original patent.   Is that right?

9               A.   Yes, I think we are looking at the same claim

10         construction.

11              Q.   And if we look at claim 147 again, it has that same

12         Tapentadol hydrochloride term.  And it's referring to,

13         according to the Court, again, the structure that has been

14         there since the original patent,  correct?

15              A.   Claim 147 actually is not having the hydrochloride term

16         in it.

17              Q.   I see.   So it's referring, is it fair, though, to

18         understand that to be referring to the structure depicted here

19         minus the hydrochloride?

20              A.   And then plus a pharmaceutical salt.

21              Q.   Plus other salts as well.  Okay.  I understand that.

22                   Now, you testified that this entry in the World Health

23         Organization drug information would make Tapentadol

24         hydrochloride obvious.  Is that correct?

25              A.   That's correct.

1     Q.  Because what's shown here on this page, the name and

2    the structure, is enough to disclose to a person in the art and

3    to give them an understanding of what Tapentadol hydrochloride

4    is.  Is that right?

5     A.  Yes.  We have a name and a structure and that's

6    referred to as Tapentadol.

7     Q.  And so your opinion here, if we, let's go back a slide

8    here, let's go back one more.  So your standard here on

9    obviousness, I'm sorry, your opinion here on obviousness is

10    based on the patent has a priority date in 2005.  Is that

11    correct?

12     A.  That's correct.

13     Q.  And did you do an analysis to determine that the

14    priority date should be 2005?

15     A.  I was basically working with Dr. Mogil's opinion that

16    this would be the earliest time that utility could have shown.

17     Q.  Dr. Mogil provided you with that, with the standard?

18    It was Dr. Mogil's opinion that the priority date should be

19    2005?

20     A.  I think that's true.

21     Q.  You didn't do an analysis to determine that the date

22    should be 2005, correct?

23     A.  I've worked with his analysis of that priority date.

24     Q.  And so your opinions on obviousness here in this

25    section, those are only relevant if there is a priority date of

1    2005, correct?

2        A.   I think it's fair to say that the World Health

3    Organization document is from 2002.  So it probably would be

4    effective earlier than 2005.

5        Q.   Let's ask it this way, if the Court decided that a

6    priority date of 1994 is appropriate for this patent, your

7    obviousness opinion is irrelevant, correct?

8        A.   I think my obviousness opinion is only for the later

9    time.

10       Q.   And again if the Court grants a priority date or

11   determined that a priority date of 1998 should apply, again

12   your obviousness opinion is not relevant.   Is that right?

13       A.   I think that's true.

14       Q.   And so let's go forward a couple of slides back to our

15   W.H.O. document here.

16            Just so I understand, it is true that this structure

17   shown here is Tapentadol hydrochloride.  Is that right?

18       A.   That is the structure of Tapentadol.

19       Q.   That is the structure of Tapentadol.  If it was

20   associated with the hydrochloride, it would be Tapentadol

21   hydrochloride?

22       A.   That's correct.

23       Q.   And this is the same structure again minus the

24   hydrochloride that's shown in example 25 of the patent?

25       A.   Just the structure alone?

 1          Q.   Yes.

 2          A.   I think they are the same.

 3                    MR. GLANDORF:   Can I confer with my colleagues

 4     for a moment?

 5                    THE COURT:  Yes.

 6                    (Off the record discussion).

 7                    MR. GLANDORF:   No further questions.

 8                    THE COURT:  All right.  Thank you.  Counsel.

 9                    MR. SOBOLSKI:   Briefly, your Honor.

10                    THE COURT:   Redirect.  Yes, please go ahead

11     REDIRECT EXAMINATION BY MR. SOBOLSKI:

12          Q.   Mr. Haw, if I can ask you to please recreate the split

13     between Dr. Wolf's demonstratives 15 and 33.

14                    Dr. Wolf, do you recall what Counsel for Depomed put

15     up, this split screen with your demonstrative 15 and your

16     demonstrative 33?

17          A.   I think so.

18          Q.   And on the left side of the demonstrative 15 that

19     presents the claim construction that the Court has issued in

20     this case in connection with a term that appears in claim 61,

21     117 and you read that into the record.

22                    Do you recall that?

23          A.   Yes, I do.

24          Q.   Mr. Haw, if I can ask you to emphasize under the

25     chemical compound, please.

1          Now, Dr. Wolf, in light of this claim construction and

2    the information about which you testified earlier this

3    afternoon, is it your opinion, is it your testimony that a

4    person of ordinary skill in the art would conclude that the

5    inventors possessed the chemical compound minus 1R 2R 3 3

6    dimethylamino 1 ethyl 2 methylpropyl phenol hydrochloride

7    depicted by the structural formula identified by the number

8    minus 21 in example 25 of the RE '593 patent?

9    A.    No, as I said earlier, a POSITA would not conclude that

10   they possessed this.

11   Q.    Thank you, Dr. Wolf.

12         You can take that down, Mr. Haw.  And if you please put

13   up Page 173 of Dr. Wolf's November 2015 deposition transcript.

14         Dr. Wolf, do you recall when Counsel for Depomed asked

15   you some questions about your deposition testimony on Page 173

16   here?

17   A.    Yes, I do.

18   Q.    Mr. Haw, can we please call out lines 12 through 25.

19         And do you recall that Counsel for Depomed asked you

20   about a question below the question that appears here at 12,

21   Dr. Wolf, at Line 12?

22   A.    I think that's true.

23   Q.    I am going to ask you please for the record to read the

24   question you were asked preceding that question.  Please read,

25   for the record, the question that you were asked at Page 173

1       starting at Line 12.  And please also read your answer at line

2       22 into the record.

3           A.    Okay.  Now going back to your opening report at

4       Paragraph 88, the sentence following what we've looked at

5       before starts at the top of Page 29, "a POSITA might reasonably

6       expect that a supposedly new compound that is structurally

7       similar to a known compound with established utility might also

8       have that utility.  But, a POSITA would require empirical

9       demonstration of that assertion on a compound by compound

10      basis".

11          Q.    Do you see that?

12          A.    Yes.

13              MR. SOBOLSKI:   No further questions, your Honor.

14              THE COURT:  Thank you very much.  Anything

15      further?

16              MR. GLANDORF:   One moment.

17              THE COURT:   Yes, take a few minutes.

18              MR. GLANDORF:   No further questions.

19              THE COURT:   All right.  Thank you very much.  We

20      are concluded with this witness.  Thank you very much.

21              THE WITNESS:  Thank you, your Honor.

22              THE COURT:   You may step down.  You are released

23      now.  Your testimony is concluded.  We appreciate your time

24      with us today.  Thank you so much.

25              THE COURT:   Counsel, is there anything else for

1     today?

2              MR. SCHULER:   That's it for today.   We advised, I

3     think we presented the Court with the proposed schedule for

4     Monday.

5              THE COURT:   Which sounds fine.   As I indicated, if

6     there is any wrinkle with respect to the weather, we will get

7     in touch with you.   Can we confirm, we have no testimony

8     tomorrow, correct?

9              MR. SCHULER:   Correct.

10             THE COURT:   Just so we don't have stray folks

11    coming in, we will say it again.

12            What time are you folks thinking for Monday? Is

13    nine good?

14            MR.FITZPATRICK:   Yes.

15            MR. GLANDORF:   Your Honor, I have one matter.   I

16    have a list of exhibits from just a couple of --

17            THE COURT:   Are you going to be handing them in?

18            MR. GLANDORF:   We conferred and I believe we have

19    agreement.

20            THE COURT:   Are you going to be exchanging them?

21            MR. GLANDORF:   It's testimony from Dr. Buschmann

22    and Dr. Gruss.

23            THE COURT:   How should we handle it?   We can have

24    it read into the record.

25            MR. SCHULER:   It's long.

```
 1                    THE COURT:   How many exhibits?
 2                    MR. GLANDORF:    We have 68.
 3                    MR. FITZPATRICK:  We can just put it on the
 4       docket, your Honor.
 5                    THE COURT:   We need a copy so we can keep track
 6       of it.
 7                    MR. FITZPATRICK:  Can we just put the document on
 8       the docket?
 9                    THE COURT:   Yes, let's do that.   I know we will
10       be adding to it.  We're just at a point where you've got up a
11       little bit.
12                    Any other issues before we disband?
13                    MR. SITZMAN:   One quick thing.  I just want to
14       get one quick item, your Honor.   Your Honor, we've got one
15       small item.
16                    THE COURT:  Okay.
17                    MR. SITZMAN:  And it's not in evidence, but, it's
18       in your book.  And it's a demonstrative from Dr. Martin and
19       it's slide 54.   We'd like to remove that from everybody's
20       books since there was no testimony on that.   And there's not
21       going to be any evidence offered on the information that's
22       contained in that page.
23                    THE COURT:   Okay.  So, do you want mine back or
24       do you want to just give me the additional one and I will swap
25       it out?
```

1          MR. SITZMAN:   We can just rip it out.

2          MR. FITZPATRICK:  Just take the page out.   Actavis

3     has no objection, your Honor.

4          THE COURT:   Okay.  Good.

5          MR. FITZPATRICK:  Just to clarify for the record,

6     your Honor, it's Number 54.

7          THE COURT:   Hold on one second.

8          Any additional business before we conclude for the

9     day and the weekend?  Anything else?  Last chance.  All right.

10    Thank you everyone.  Have a good weekend.  I will see you on

11    Monday.  Take care.  Thank you.

12          (Whereupon the matter was concluded)

13

14

15

16

17

18

19

20

21

22

23

24

25