```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2                 CIVIL NO. 13-CV-4507(CCC)

 3

 4    IN RE: DEPOMED PATENT LITIGATION
                                            TRANSCRIPT OF
 5                                           PROCEEDINGS
                                             (Public)
 6

 7

 8     - - - - - - - - - - - - - - - - -

 9                                   Newark, New Jersey
                                     March 21, 2016
10
      B E F O R E:
11
              THE HONORABLE CLAIRE C. CECCHI,
12            United States District Judge

13

14

15

16

17

18    _____
              Pursuant to Section 753 Title 28 United States Code,
19    the following transcript is certified to be an accurate record
      as taken stenographically in the above-entitled proceedings.
20

21
               S/Yvonne Davion
22            Yvonne Davion, CCR
              Official Court Reporter
23

24

25
```



```
1                   A P P E A R A N C E S

2

3        KEITH MILLER, ESQ.
         (Robinson Miller)

4        MICHAEL SITZMAN, ESQ
         CHRISTINE RANNEY, ESQ.
5        FRANK P. COLE, ESQ.
         JAYSEN S. CHUNG, ESQ.
6        DAVID GLANDORF, ESQ.
         (Gibson, Dunn & Crutcher, LLP)
7        For Depomed and Janssen

8

9        MELISSA CHUDEREWICZ, ESQ.
         (Pepper Hamilton, LLP)

10       LINDA A. WADLER, ESQ.
         BASIL J. LEWRIS, ESQ.
11       (Finnegan, Henderson, Farabow, Garrett & Dunner, LLP)
         For Grunenthal
12
         JAMES RICHTER, ESQ.
13       (Winston & Strawn, LLP)

14       SAL PATEL, ESQ.
         IMRON ALY, ESQ.
15       AHMED RIAZ, ESQ.
         JOEL WALLACE, ESQ.
16       (Schiff Hardin, LLP)
         For Alkem
17
         KENNETH G. SCHULER, ESQ.
18       TERRENCE CONNOLLY, ESQ.
         (Latham & Watkins, LLP)
19
         AMY M. HANDLER, ESQ.
20       (Sills Cummis & Gross)
         For Roxane Laboratories
21
         SHEILA RAFTERY WIGGINS, ESQ.
22       VINCENT CAPUANO, PHD ESQ.
         ANTHONY FITZPATRICK, ESQ.
23       (Duane Morris, LLP)
         For Actavis Elizabeth, LLC and
24       Watson Laboratories, Inc

25
```

W I T N E S S E S

Asokumar Buvanendran

Direct examination by Mr. Connolly

Cross examination by Mr. Capuano

Cross examination by Mr. Sitzman

Redirect examination by Mr. Connolly

Recross examination by Mr. Capuano


JOEL BERNSTEIN

Direct Examination by Ms. Ranney          114

Cross examination by Mr. Aly              181

```
 1                    THE COURT:   Let's talk about your agenda for
 2         today.  What do we have going on?  I know that we've had the
 3         weekend.  In case there's any changes in plan.
 4                    MR. CONNOLLY:   Your Honor, the first witness
 5         today will be Dr. Buvanendran.  He is going to testify about
 6         non infringement and invalidity of the '130.  We expect him to
 7         go about an hour and 15 on direct and obviously the cross.  At
 8         that point Dr. Buvanendran will be the last witness on behalf
 9         of the defendants.
10                    THE COURT:   Okay.
11                    MR. SITZMAN:   The cross is probably be an hour
12         plus.  I would think that we would probably end up at lunchtime
13         by the time we're done with Dr. Buvanendran.
14                    THE COURT:   That sounds fine.
15                    MR. SITZMAN:   After lunch we will have Dr.
16         Bernstein who is the polymorph expert who will be with us.
17                    THE COURT:   All right.  Sounds good.  Anyone else
18         for today or that's it?  That should fill out the day, I'm
19         assuming.
20                    MR. SITZMAN:   Yes.
21                    THE COURT:   What are we planning for tomorrow?
22         Any thoughts yet?  And if you don't have them, that's fine.  We
23         will check in with you at the end of the day.
24                    MR. SITZMAN:   No, I think we've disclosed it.
25         Dr. Roush is coming.  He is a medicinal chemist, synthetic
```

1    chemist, organic chemist.  He will be testifying.  I feel like

2    he is going to last the majority if not all of the day.

3              THE COURT:  All right.  So he will be with us

4    for awhile.  Sounds good.  All right.  Let's start with the

5    first witness.  Actually you know what before we do that,

6    let's get the appearances.

7              (Whereupon the attorneys entered their

8    appearances)

9              MR. CONNOLLY:  Before we get started, I believe

10   that defendants counsel have an objection to one portion of one

11   slide and a full slide of the other.  The discussion of the

12   objection and the response thereto, I think we will raise

13   issues that are confidential.  It relates to testimony that was

14   given earlier in the case which was sealed so --

15             THE COURT:  Understood.

16   A S O K U M A R  B U V A N E N D R A N, sworn and testifies as

17   follows:

18   DIRECT EXAMINATION BY MR. CONNOLLY:

19             MR. CONNOLLY:  The defendants would ask that the

20   courtroom be sealed for this discussion and ultimately, your

21   Honor, the beginning of Dr. Buvanendran's testimony.  After a

22   very short introduction he is going to go directly into the non

23   infringement.  So we would ask that the courtroom be sealed for

24   the same reasons that we sealed it before.

25             THE COURT:  That's fine.  Let's seal the

1    courtroom so we can address the issue.

2                    THE COURT:    All right.  Let's just make sure

3    who's in the room.    Let's have the plaintiffs rise.  Is that

4    your group? Grunenthal and Depomed.    Yes.

5                    MR. SITZMAN:    Yes.

6                    THE COURT:    Let's do the defendants.  Actavis.

7    All right.    Roxane and Alkem.    All right.    Thank you.    The

8    courtroom is sealed.    The transcript is sealed too.

9                    (Whereupon the hearing was sealed).

10                    MR. CONNOLLY:    Your Honor, I think we are done

11    with the infringement portion.  I will turn to the invalidity

12    portion.  So, if your Honor would like to unseal the court, now

13    is the time to do that.

14                    THE COURT:    Let's do that.  This portion of the

15    transcript will be unsealed from this point forward.    We will

16    physically unseal the courtroom now.

17                    (Whereupon the following was heard in open court)*

18                    THE COURT:    Thank you.  We may begin.

19                    MR.  CONNOLLY:  Thank you, your Honor.

20    Q.  Let's turn to the next slide if we could, slide 22.

21    Now, doctor, have you considered the validity of the '130

22    patent claims 1, 2, 3 and 6?

23    A.    Yes,  I have.

24    Q.    Okay and what does demonstrative 22 referencing in DTX

25    75 refer to?

1      A.   So in the left-hand column it has all the defendants

2   Alkem,  Actavis and Roxane talking about claims 1 and 2 where

3   the claims 1 and 2 talks about polyneuropathic pain and claims

4   two is the salt of the Tapentadol.   And Alkem has claims 3 and

5   6.   And claims 3 and 6 specifically talk about patients with

6   polyneuropathic pain and diabetic polyneuropathic pain.   And

7   claim 6 talks again about diabetic polyneuropathic pain.

8      Q.   Did you consider the legal standards that were

9   applicable in connection with your -- withdrawn.

10         You were going to talk about two different versions of

11   invalidity today correct, right?

12      A.   Yes.

13      Q.   And the first is the first version, obviousness type

14   double patenting?

15      A.   Yes, sir.

16      Q.   Did you consider the legal standard applicable to an

17   obviousness type double patenting standard?

18      A.   Yes,  I did.

19      Q.   Okay.   Let's turn to slide 23.   And could you please

20   inform the Court as to what is it you intend to describe to the

21   Court about the legal standard obviousness type double

22   patenting?

23      A.   As I said, I'm not a lawyer here, but, I want to talk

24   about the two issues, the latter issued patent and the earlier

25   issued patent is commonly owned.

1        And the second issue I am going to be talking about is

2   claims of the latter patent are obvious over the claim of the

3   earlier issued patent in this matter.  I'm talking about '130

4   patent, claims 1, 2, 3 and 6 which is in 2007.  While the '593

5   patent claim 117 is in 1994.

6        Q.   Okay.  And let's turn to slide 24.  Did you also

7   consider legal standards that were applicable in connection

8   with the question of whether the later claims of the '130

9   patent were obvious in light of the earlier claim 117 of the

10  '593 patent?

11       A.   Yes.

12       Q.   And what were the standards that you applied?

13       A.   So, the subject matter of the claims as a whole would

14  have been obvious for a person of ordinary skill in the art at

15  the time of invention and they would consider some relevant

16  factors.

17       Q.   Were you asked to take in account other considerations

18  for obviousness?

19       A.   Yes.  The scope and content of the prior art.  The

20  differences between the prior art and the claim at issue.  And

21  the level of ordinary skill in the art and secondary

22  considerations.

23       Q.   Okay.  Any other legal considerations that you took

24  into account in forming your opinion?

25       A.   Yeah, a person of ordinary skill of art must be

1    motivated and have a reasonable expectation of success in

2    achieving the claimed subject matter.

3         Q.   Let's turn to slide 25.

4              In your consideration of the obviousness type double

5    patenting issue, did you look at whether the patents were

6    commonly owned?

7         A.   Yes,  I did.  If I may have the next slide.

8         Q.   What did you conclude in that regard?  We are looking

9    at slide 26 which references DTX 1346 and DTX 75.

10        A.   So on the left-hand column of that slide it has the

11   '593 patent.  It is again assigned to Grunenthal.  On the right

12   side it has a patent '130 which is assigned to Grunenthal

13   again.  So it's assigned to the same company.

14        Q.   Okay.  So let's turn to slide 27.   So, are you

15   indicating there that one of the two elements of the

16   obviousness type double patenting test has been met?

17        A.   Yes.

18        Q.   Please turn to the next slide, slide 28.   Slide 28 is

19   a reference to the '593 patent and it references DTX 1346,

20   right?

21        A.   Yes.  In this slide I just wanted to show that the '593

22   patent was issued and the priority date for that was July 23,

23   1994 and the patent was '593.

24        Q.   And what is your understanding of the stated priority

25   date of the '130 patent claims?

1      A.   The '130 patent is 2007.

2      Q.   Okay.   Let's turn to slide 29 if we could.   Slide 29

3 references DTX 1346.

4           What do you have up on slide 29?

5      A.   This is a Claim eight of that '593 patent where a

6 method of treating aq mammal suffering from pain, said method

7 comprising administering to said mammal an effective analgesic

8 of a 1-phenyl-3-dimethyl-aminopropane compound.

9           And if you go down the patent it's contained in the 117

10 claim which this compound is Tapentadol.

11     Q.   Let's turn to slide 30.

12          What have you prepared in slide 30?

13     A.   Well, I decided to put the two patents side by side.

14 On the left-hand column you have '593 and on the right-hand

15 side you have patent '130 with claim one.

16     Q.   Okay.   And you've prepared some highlighting on there.

17          Are there any differences between the scope of claim

18 117 of the '593 patent and claim one of the '130 patent?

19     A.   Yeah, I just wanted to put the differences in yellow.

20 You can see the words are mammal on the '593 and in '130 it's

21 called the subject.   And there's practically no differences.

22 And I also understand there's no dispute among the parties

23 between the two words.

24     Q.   Okay.   And you noted some differences that were

25 highlighted in light blue.

1          Could you please tell the Court about those?

2          A.   Yes, the difference in '593 is highlighted as pain.

And in '130 it talks about polyneuropathic pain.

4          Q.   Okay.   And we will come back to that in a second.

5    There's also you've highlighted on the left analgesic amount

6    and pain inhibiting amount.

7          Are those differences that are material in your

8    opinion?

9          A.   They are not.   They are the same.

10         Q.   Okay.   All right.   Now, I want to come back to the

11   word "pain" that's contained in the '593 patent and turn to

12   slide, to the next slide,  slide 31.

13         What did the word "pain" mean in claim 117 of the '593

14   patent as of 1994?

15         A.   The umbrella of pain back in 1994 included the concepts

16   of nociceptive pain and neuropathic pain which is essentially

17   the mechanisms or the pathophysiology, where the pain is

18   originating from.

19         In 1994 it was believed that it was considered

20   neuropathic and nociceptive and it is considered so even to

21   date.

22         Q.   And I think you answered this.   In your answer, you

23   referenced the mechanism of pain.   What did you mean by that?

24         A.   The mechanism and pathophysiology tells the practicing,

25   the healthcare provider on the origin of the type of pain and

1    how the pain is being transmitted and being perceived.  And so

2    you can formulate appropriate treatments for these patients.

3        Q.   And, Dr. Buvanendran,  what is your understanding of

4    whether the meaning of the word "pain" in 1994 is different

5    from the meaning of the word "pain" in 2007 as persons of skill

6    in the art understood those terms?

7        A.   There's no difference in definition wise.

8        Q.   You've testified so far about nociceptive pain and the

9    mechanism of pain and neuropathic pain.

10        With regard to the two types of pain you've identified

11    on demonstrative 31, would a person of ordinary skill in the

12    art understand any additional classifications of pain?

13        A.   Yes.  As I've said before, you could -- the neuropathic

14    pain, patients with neuropathic pain could be mononeuropathy or

15    polyneuropathy.  And again that will mean one nerve or multiple

16    nerves in the polyneuropathy.

17        On the other hand, nociceptive pain which has an

18    example of surgical pain or you hit your hand and you have

19    specific pain around the effected part, could also be somatic

20    or visceral.   Somatic meaning an extremity or visceral meaning

21    inside the abdomen or interabdominal contents.

22        Q.   Let's turn if we could turn to demonstrative 32.

23        Now, what did you intend to illustrate on slide 32?

24        A.   So, a person of ordinary skill in the art when they

25    utilize the term "pain" it meant both nociceptive and

 1          neuropathic pain back in 1994 and it is true even now.    In

 2          addition, the '593 patent, the summary of the invention talks

 3          about here which are suitable for the treatment of severe pain

 4          without giving rise to the side effects which are typical of

 5          opioids.

 6          Q.   All right.  Let's turn to slide 33, sir.

 7               Now, you've put up there the '130 patent, DTX 75 claims

 8          1 and 2.   Are they different?

 9          A.   The claim one talks about the method of treating

10          polyneuropathic pain in a subject suffering from therefrom.

11          And the said method comprising administering to said subject an

12          effective polyneuropathic pain inhibiting amount.  And it talks

13          about the hydrochloride salt in claim two.

14          Q.   And let's turn to slide 34 that you prepared.  I'm

15          going to ask you what you were intending to illustrate in slide

16          34?

17          A.   I was just trying to make an illustration here talking

18          about the umbrella term of pain and the '593 claim, '593, claim

19          117, 1994 talks about this umbrella of pain.  And in that

20          umbrella there's a small subpopulation of patients.  The '130

21          patent claims 1 and 2 which talks about polyneuropathic pain.

22          Q.   And does the description of the various pain conditions

23          that you've described in demonstrative slide 34,  inform your

24          or illustrate your opinion with respect to obviousness?

25          A.   Yes.

1      Q.   And as of March 2007, would a person of ordinary skill

2   in the art have found the subject matter of claims 1 and 2 of

3   the '130 patent obvious in light of claim 117 of the '593?

4      A.   Yes.  I just want to say this is all talking about

5   severe pain.

6      Q.   Okay.  Let's turn to demonstrative 35.  What

7   additional limitation does claim three of the '130 patent

8   contain as compared to claim one?

9      A.   So,  the claims 3 and 6,  they both talk about diabetic

10   polyneuropathic pain where claims one and two talks about

11   polyneuropathic pain.

12      Q.   Let's turn to slide 36 if we could.  I'm going to ask

13   you to describe for the Court what you were attempting to

14   illustrate in slide 36?

15      A.   So,  similar to what I said before, there is a big

16   umbrella of term for pain or severe pain, the '593 claim 117.

17   And in this there is a small subpopulation which is the claim

18   '130, claims 3 and 6, which is diabetic peripheral neuropathy

19   patients.

20      Q.   Is there any distinction in your mind between claims 3

21   and 6 of the '130 patent that reference diabetic

22   polyneuropathic pain?

23      A.   No.

24      Q.   As a person -- withdrawn.  As of March of 2000 how

25   would a person of ordinary skill in the art compare the scope

1      of claims 117 of the '593 versus claims 3 and 6 of the '130

2      patent?

3           A.   A person would assume it to be obvious.

4           Q.   Okay.  And what proportion of patients that you see in

5      your clinical practice who suffer from polyneuropathic pain are

6      suffering from diabetic polyneuropathic pain?

7           A.   So, among the patients who have polyneuropathic pain,

8      probably diabetes is probably one of the common reasons for

9      polyneuropathy.

10          Q.   Let's turn to slide 37.  Slide 37 has the second column

11     saying a later-issued claim would have been obvious in view of

12     the earlier-issued claim, with a check box there.

13               What is your ultimate opinion with respect to

14     obviousness type double patenting with respect to the '130

15     patent?

16          A.   Obvious for a person of ordinary skill in art back in

17     in 2007 to look at the '593 claim and see it's obvious.

18          Q.   Let's, I'm going to ask you to turn to slide 38.  And

19     Dr. Buvanendran, what is your understanding of how the

20     plaintiffs in this case contend a person of ordinary skill in

21     the art would understand the term pain as of 1994 as it appears

22     in claim 117 of the '593 patent?

23          A.   So, it is my understanding that the plaintiffs allege

24     that in the '593 when they meant the word "pain", they meant

25     nociceptive pain.

1          Q.   And only nociceptive pain?

2          A.   That was what the plaintiffs allege.

3          Q.   Do you recall what evidence of plaintiffs relied upon

4     in support of that position?

5          A.   I believe it was Dr. Ossipof who wrote in his report

6     that when they talk about pain in 1994, he meant nociceptive

7     pain.

8          Q.   And do you recall what evidence Dr. Ossipof cited in

9     support of his opinion.

10         A.   Yes, I did look up the reference.  I believe it's the

11    Hammond reference where he talks about pain as only nociceptive

12    pain.

13         Q.   Mr. Haw, can you put up DTX 1576, please?

14              And Dr. Buvanendran,  can you identify what this is?

15         A.   So, this is a book chapter that was in Issues in Pain

16    Measurement that I believe was published in I believe 1989.

17         Q.   And Mr. Haw, could you put up plaintiffs, turn to

18    Page 70 of DTX 1576 and call out the section entitled

19    Nomenclature.

20              Dr. Buvanendran, is this the portion of Dr. Hammond's

21    book chapter that Dr. Ossipof relied upon in his expert report?

22         A.   Actually he just relied on the first statement which

23    reads "the terms, pain and nociception, are frequently used

24    interchangeably".

25         Q.   Do you agree that Dr. Hammond's chapter of DTX 1576

1    supports or concludes that as of 1994 the ordinary meaning of

2    pain referred only to nociceptive pain?

3        A.   No, I do not agree.

4        Q.   Does Dr. Hammond provide a definition of pain in 1576?

5        A.   Yes.  If you go further down in the same paragraph of

6    the nomenclature, he talks about pain refers to both affective

7    and a sensory sequellae of a noxious stimulus.

8        Q.   Does that definition of pain include or exclude

9    neuropathic pain?

10        A.   That includes neuropathic pain as well.

11        Q.   And why is that?

12        A.   Because if you go down further, he talks about, she

13    talks about the word hyperalgesia.

14        Q.   Where is that?

15        A.   It is highlighted there, the "hyperalgesia denotes

16    increased sensitivity and reactivity to a noxious stimulus".

17        Q.   And what does the next sentence say?

18        A.   "It may also denote increased sensitivity to

19    non-noxious stimulus".

20        Q.   What is hyperalgesia?

21        A.   So, hyperalgesia is when there is noxious stimulus, the

22    response is normal.  And when the response is higher than

23    expected, then it is called hyperalgesia.  So, a simple example

24    would be a neuropathic pain patient would have hyperalgesia as

25    a hallmark.

1      Q.   Okay.  And for what type of pain does hyperalgesia

2  appear?

3      A.   Neuropathic pain.

4      Q.   And why therefore does the definition of pain in the

5  Hammond reference DTX 1576 at Page 70 include neuropathic pain?

6      A.   Because back in 1989 it was well-known that

7  hyperalgesia existed and neuropathic pain and nociceptive pain

8  existed.

9      Q.   Okay.  Now, thank you, Dr. Buvanendran.

10          Let's go back to slide 38 if we could please, Ted.

11  Let's put aside for a moment your testimony that the chapter at

12  DTX 1576 supports your position that the ordinary usage of pain

13  in 1994 included both nociceptive and neuropathic pain.

14          If pain, the word "pain" as it appears in claim 117 of

15  the '593 patent were restricted to nociceptive pain,  would

16  that affect your opinions regarding the obviousness of claims

17  1,  2,  3 and 6th of the '130 patent?

18      A.   No, because there is in the literature that says that

19  opiate and opioid like medications can be utilized for the

20  treatment of neuropathic pain.

21      Q.   You referenced literature.  Were you referencing

22  literature with respect to a particular time frame?

23      A.   Yes,  the time frame I picked up is 2007.

24      Q.   Okay.  And so is it your testimony that there was

25  substantial literature prior to 2007 which talked about the

1        efficacy of opioid and opioid like compounds?

2        A.   Yes.

3        Q.   For polyneuropathic and neuropathic pain?

4        A.   Yes.  In addition to my clinical practice, I use opioid

5        and opioid like medications for the treatment of neuropathic

6        and polyneuropathic pain patients.

7        Q.   Why did you consider literature about opioid and opioid

8        like drugs as of March 2007?

9        A.   That was the time the patent was filed.

10       Q.   Okay.  And what was relevant to the specifics of opioid

11       and opioid like drugs with respect to the patent, the '130

12       patent?

13       A.   The '130 patent was talking about Tapentadol which is

14       an opioid and opioid like mechanism of action.  And therefore I

15       considered all the opioids in this concern analysis.

16       Q.   Let's if we could turn to slide 39, Ted.

17            Okay.  Now is slide 39 one of the references that you,

18       pre-2007 references that you considered and testified about?

19       A.   Yes.  This is a reference from June of 1998 published

20       in Neurology, the Harati article, DTX 1605.

21       Q.   What did the Harati article say, if anything, that

22       informed your opinion in this case?

23       A.   So, this is a study of diabetic peripheral neuropathy

24       painful patients.  And this is a randomized controlled trial

25       where they gave either Tramadol for the treatment of pain or

 1  they gave a placebo for the patients, about 131 patients

 2  randomized into the two groups.  And they followed these

 3  patients for a 42-day period.

 4    Q.   And what conclusions, if any, did they reach?

 5    A.   The conclusion of the study of the randomized

 6  controlled trial was that the results of the placebo controlled

 7  trial showed that Tramadol was effective and safe in the

 8  treatment of pain of diabetic neuropathy.

 9    Q.   Why did this conclusion with respect to Tramadol, why

10  was that important to you?

11    A.   Because Tramadol and Tapentadol, as we just mentioned

12  in the '130 patent, have very similar mechanisms of action in

13  terms of its work in the neuroceptor, the opioid receptor and

14  also the norepinephrine reuptake inhibition.

15    Q.   Let's turn to slide 40 if we could, Ted.

16    Slide 40 references Hollingshead.  Could you please

17  explain to the Court what's significant about the Hollingshead

18  reference in slide 40 which is DTX 916?

19    A.   So Hollingshead is a Cochrane review.  And a Cochrane

20  review is essentially looking at all studies published between

21  1980 and 2005 on.  And this examined the effect of Tramadol and

22  neuropathic pain.

23    Q.   And what is the Cochrane review?

24    A.   So, Cochrane review looks at all the published studies.

25  And from that body of literature they select, with a highly

1    selective grading system, the randomized controlled trials.

2    And then do further analysis like lumps the randomized

3    controlled trials together to come up with a conclusion as to

4    what they think the analysis will be.

5        Q.   Is Cochrane review a well-regarded journal in the field

6    of medicine?

7        A.   Yes.

8        Q.   What was the conclusion presented in the Cochrane

9    review DTX 916?

10       A.   So, as of 2006 they concluded that Tramadol is an

11   effective treatment for the neuropathic pain.

12       Q.   Let's turn to slide 41.

13            Slide 41 references DTX 1141.  What is illustrated in

14   slide 41?

15       A.   This is a study by Gilron, PTX 1141, published in 2005.

16   It is a study where they compared patients with diabetic

17   peripheral neuropathy and post herpetic neuralgia and they

18   studied the effect in a randomized controlled treatment

19   fashion.

20       Q.   And what drugs were studied in PTX 1141?

21       A.   They studied morphine which is an opioid.  And also

22   studied Gabapentin which is typically utilized as an

23   anti-seizure drug and the combination of those.  And the

24   results were published in the New England Journal of Medicine

25   which is considered to be one of the highly impactful journals

1    in the medical profession.

2        Q.   What statements were made in PTX 1141 that informed

3    your opinion in this case?

4        A.   In the discussion they talk about, in addition to

5    evaluating combination therapy, which is why the study was

6    made, this trial replicates the evidence from previous studies

7    of the efficacy of opioids in neuropathic pain.

8        Q.   Let's turn, if we could, to slide 42.  Slide 42

9    references DTX 1609.

10       Dr. Buvanendran, what is significant about the

11   information contained in slide 42 which informed your opinion

12   in this case?

13       A.   So, this is algorithm treatment for this May of 2004.

14   This is DTX 1609 by Namaka where they looked at what is the

15   appropriate treatment that could be provided for patients with

16   neuropathic pain.

17       Q.   And what is a treatment algorithm?

18       A.   You generally want to have a step like a three step

19   wise treatment for the treatment of neuropathic pain.  And this

20   algorithm goes over the treatment modalities for the treatment

21   of neuropathic pain.

22       Q.   And why is that significant to your analysis?

23       A.   Because we just, as we mentioned about you can see in

24   this Table 3 of this excerpt talks about the opioids such as

25   morphine,  Methadone and Tramadol as utilized for the treatment

1    of neuropathic pain again in 2004.

2    Q.   Okay.   And did you look at other prior art references

3    in connection with your understanding of the definition of this

4    issue prior to 2007?

5    A.   If I may just have the next slide because I put here a

6    summary slide of the various literature that's available for

7    the utilization of opioids for the treatment of neuropathic

8    pain predating March 12, 2007.

9    Q.   Okay.   And on slide 43 there's a column that's headed

10    Tramadol and the listing of articles.

11    What was significant about those articles that caused

12    you to list them under the heading Tramadol?

13    A.   So, these were all Tramadol, as I said, opioid or

14    opioid like drugs.   And it has, this is from June of 1998, the

15    Harati article, DTX 1605; the July 2005 Freeman article talks

16    about DTX 1603, December 2005; the Finnerup article, PTX 1131

17    and February 2006, the Baron article, DTX 1599, and July 2006

18    the Hollingshead article on DTX 916.

19    These all utilized Tramadol to demonstrate its efficacy

20    for the treatment of neuropathic pain.

21    Q.   Okay.   And there's a column headed Oxycodone in

22    references there.   What do those references teach?

23    A.   Oxycodone again is an opioid.   And here again I put

24    some literature that supports the evidence that Oxycodone is

25    used for treatment of neuropathic pain in the July of 2005

1    Freeman article, DTX 1603; the Finnerup article in 2005, PTX

2    1131, and Baron's article in February of 2006 in DTX 1599.

3       Q.   Okay.   And there's a third column there listed as

4    Methadone.

5            Why did you call that out to the Court?

6       A.   Methadone is an opioid as well for the treatment of

7    neuropathic pain.   And I have two references now Namaka in

8    2004, DTX 1609, and in February of 2005, the Hays article, DTX

9    1606 talks about Methadone for the treatment of neuropathic

10   pain.

11      Q.   Okay.   And pardon me, the last column is listed as

12   morphine.

13           What do these articles say about morphine and

14   polyneuropathic pain?

15      A.   Morphine is an opioid as well for the treatment of

16   neuropathic pain in November of 2003, the Dworkin article, DTX

17   1601; the Namaka article, DTX 1609 and the March article by

18   Gilron that we just talked about, PTX 1141; the December 2005

19   the Finnerup article, PTX 1131 and the Baron article, DTX 1599.

20      Q.   In conclusion, Dr. Buvanendran, all of those references

21   predate March 12, 2007, the effective date of the '130 patent?

22      A.   Yes.

23      Q.   And do all of those references indicate that opioids

24   were known to be effective to treat neuropathic pain?

25      A.   Yes.

1     Q.   Okay.   Does the prior art literature about which

2    you've testified also reflect your personal clinical practices

3    in the 1990s and the 2000s?

4    A.   Yes.

5    Q.   How so?

6    A.   I use opioids for the treatment of severe pain for the

7    treatment of neuropathic and polyneuropathic pain.

8    Q.   And, Dr. Buvanendran, did you hear Dr. Christoph, one

9    of the named inventors of the '130 patent, testify in this

10    trial?

11    A.   I did listen to some of the cross-examination.   I read

12    the trial testimony.

13    Q.   Okay.   Did he testify about Grunenthal's internal

14    documents that discussed some literature published prior to

15    2007 regarding the use of opioids to treat neuropathic pain?

16    A.   I looked at some of the excerpts from the Grunenthal

17    document and they also say that opioids are utilized for the

18    treatment of neuropathic pain.

19    Q.   Okay.   As of 2007, do you believe that there was any

20    debate as to whether opioid or opioid like drugs were effective

21    in treating neuropathic pain, including polyneuropathic pain?

22    A.   There was no debate as to the effectiveness of opioids

23    and opioid like drugs for the treatment of neuropathic and

24    polyneuropathic pain.

25    Q.   Was there some debate or controversy about using

1    opioids for the treatment even though it was effective?

2        A.   So as I said there is no debate as to the effectiveness

3    of these opioids for the treatment of neuropathic and

4    polyneuropathic pain.   But, there was debate or controversy

5    surrounding the side effect profile of these drugs.

6            This controversy continues to date, whether it is

7    neuropathic pain or nociceptive pain, the adverse effects of

8    opioids namely typically opioid abuse, tolerance development

9    and other side effects.

10           So the debate still continues as to the side effect

11   profile of this class of drugs.

12       Q.   But is there any debate about whether the drugs

13   actually are effective in alleviating pain?

14       A.   There is no debate as to the effectiveness of the

15   drugs.

16       Q.   Now, let's turn to demonstrative 44.   In summary, Dr.

17   Buvanendran, as of March 2007, would a person of ordinary

18   skill in the art conclude that the asserted claims of the '130

19   patent would have been obvious in view of claim 117 of the '593

20   patent based upon your understanding of the definition of the

21   term "pain"?

22       A.   Yes.

23       Q.   And what if pain in claim 117 of the '593 patent were

24   restricted to only nociceptive pain?   Would a person of

25   ordinary skill in the art be motivated to treat polyneuropathic

1    pain using Tapentadol hydrochloride?

2        A.   Yes, because it was, there was a lot of abandoned

3    literature demonstrating opioid utilization prior to 2007 for

4    neuropathic pain.

5        Q.   And under this circumstance, would a person of ordinary

6    skill in the art have a reasonable expectation of success in

7    alleviating polyneuropathic pain by administering Tapentadol

8    hydrochloride?

9        A.   Yes.

10       Q.   So, if pain in claim 117 of the '593 patent were

11   restricted only to nociceptive pain, would a person of ordinary

12   skill in the art be motivated to treat polyneuropathic pain

13   using Tapentadol hydrochloride?

14       A.   Yes.

15       Q.   And why is that?

16       A.   Because I have demonstrated not only from all the

17   clinical studies that their opioids were utilized for the

18   treatment of polyneuropathic pain prior to 2007 with

19   effectiveness, and again in my clinical practice I use opioids

20   for the treatment of polyneuropathic pain and neuropathic pain.

21       Q.   Would the same be true in connection with treating

22   diabetic polyneuropathic pain and diabetic polyneuropathy by

23   administering Tapentadol hydrochloride?

24       A.   Yes.

25       Q.   And as of March 2007 would a person of ordinary skill

 1     have been motivated to test the efficacy of the Tapentadol used

 2     in an animal model of polyneuropathic pain?

 3          A.   Yes.

 4          Q.   And would the same be true for an animal model of

 5     diabetic polyneuropathic pain?

 6          A.   Yes.

 7          Q.    What would the results have been expected to be?

 8          A.   I would have expected it to be effective.

 9          Q.   Okay.  Let's turn to a different topic, slide 45.

10          Dr. Buvanendran, did you consider secondary, a couple

11     of secondary considerations as part of your obviousness

12     analysis?

13          A.   Yes, I have put up some legal standards.

14          Q.   Before you go there, what secondary considerations did

15     you consider?

16          A.   I considered the unexpected results and the long felt

17     needs.

18          Q.   Now, turning to slide 45, is that your understanding of

19     the legal standards or the legal tests for unexpected results

20     and long felt need?

21          A.   Yes.  As I say, I'm not a lawyer.  But, this is what I

22     was informed the claim invention must achieve, a superior

23     property or advantage, and over the closest prior art, and that

24     a person of ordinary skill would not have expected it.

25          Q.   Okay.  And what is your understanding of the legal

1    standards governing long felt need?

2        A.   At the time of the patent somebody must have a

3    persistent and recognized need for, need by the person of

4    ordinary skill in the art, must not be satisfied by any other

5    solution, and the claimed invention must satisfy the long felt

6    need.

7        Q.   Now, let's go back and look at unexpected results.

8             In your opinion, did the evidence presented that you've

9    seen so far presented by plaintiffs show that the claims of the

10   '130 patent demonstrated an unexpected result?

11       A.   As I said before, I have a demonstrative of the various

12   opioids that have been utilized for the treatment of a

13   neuropathic pain.

14       Q.   Okay.  I think I might have missed the answer.

15            Did you consider the question?

16       A.   Yes, I did.

17       Q.   And what is your opinion as to whether the evidence

18   demonstrates that the claims of the '130 patent demonstrated an

19   unexpected result?

20       A.   We did not -- it did not provide an unexpected result.

21       Q.   Okay.   Let's, if we could, please turn to the slide.

22            What was the superior property that plaintiffs claim is

23   present in the claims of the '130 patent?

24       A.   The superior property that the plaintiffs claim is that

25   it is an opioid treatment for the neuropathic pain.  And the

1      second point they made was that it has decreased adverse

2      effects of the side effects.

3          Q.   What is the closest prior art to Tapentadol, in your

4      opinion?

5          A.   The closest prior art I would consider would be

6      Tramadol.

7          Q.   Why is that?

8          A.   Well, Tramadol, like Tapentadol, has similar mechanisms

9      of action.  Both drugs work as the MU receptor or the opioid

10     like receptor.  And they are, both of the drugs also have

11     inhibition of the descending pathway, the norepinephrine

12     inhibition.

13          So when the pain signals come down from the brain down,

14     it inhibits the norepinephrine reuptake mechanism and they,

15     both drugs, provide this method of action to provide pain

16     relief.

17          Q.   And did plaintiffs produce any evidence that Tapentadol

18     is superior to Tramadol for the treatment of polyneuropathic

19     pain?

20          A.   No.

21          Q.   Did plaintiffs present evidence that Tapentadol is

22     superior to Tramadol as it relates to side effects?

23          A.   No.

24          Q.   And was it unexpected in 2007 that an opioid like

25     Tapentadol would be effective in treating polyneuropathic pain?

1       A.   It was expected that a drug of this nature would

2  provide pain relief.

3       Q.   And what is the basis for your opinion in that regard?

4       A.   As I said before, the Tramadol has a very similar

5  mechanism of action and Tapentadol -- Tramadol does provide

6  pain relief for the neuropathic and polyneuropathic pain

7  patients and I would expect Tapentadol to do the same.

8       Q.   And let's turn to slide 46.

9            Is slide 46 a list of references that you've already

10  been through and told the Court that indicate that those would

11  be expected to be effective, that these particular opioids were

12  effective in treating polyneuropathic pain?

13      A.   I list in this slide all the opioid and opioid like

14  drugs for the treatment that has been available back in 2000,

15  prior to 2007, March.

16      Q.   Now, let's turn to the topic of long felt need.  Put up

17  slide 47, please.

18           Now, in your opinion, doctor, was there a long felt

19  need for Tapentadol in 2007?

20      A.   In 2007 there is no long felt need.

21      Q.   What is the basis for your opinion?

22      A.   So, in this slide I put up here the various categories

23  of drugs that have been available in 2007 for the treatment of

24  neuropathic pain.

25           In the left-hand column you will see the

1      antidepressants which are the tricyclic antidepressants that

2      are typically utilized such as amitriptyline and nortriptyline,

3      and some of the other classes of drugs such as SSNRIs and the

4      antiepileptics such as gabapentinoids and the pregabalins and

5      the other sodium antiepileptics which have always been utilized

6      for treatment of neuropathic and polyneuropathic pain.

7          Q.   What is the source for the information that you've

8      listed on slide 47?

9          A.   So, this excerpt is from the Baron article, DTX 1599.

10         Q.   And what were considered first line treatments,

11     treatment options in 2007 for the treatment of polyneuropathic

12     pain?

13         A.   Pretty much all the drugs that I have just talked

14     about, the antidepressants, the antiepileptics, both the sodium

15     and calcium channel blockers were all considered first line

16     treatment for the treatment of neuropathic pain.

17         Q.   Were opioids the first line treatment for

18     polyneuropathic pain in 2007?

19         A.   No, they were not first line treatment then in 2007.

20         Q.   What line treatment were they?

21         A.   They were the second line treatment and they are second

22     line treatment as of now currently as well.

23         Q.   Okay.  So were the first line treatments back in 2007

24     are still first line treatments today?

25         A.   Yes.

1      Q.   And were the second line treatments back in 2007 still

2      second line treatments today?

3      A.   Yes.

4      Q.   So,  how is Tapentadol used today for the treatment of

5      polyneuropathic pain?

6      A.   Tapentadol is a second line treatment for the treatment

7      of neuropathic pain.

8      Q.   So, in your opinion has Tapentadol met a need for a new

9      treatment for polyneuropathic pain?

10     A.   No.

11     Q.   Did plaintiffs identify any other need that Tapentadol

12     allegedly filled?

13     A.   As I said before, the plaintiffs allege that maybe

14     Tapentadol could have decreased side effects or adverse effects

15     of abuse potential.

16     Q.   And did Tapentadol meet that need?

17     A.   No.

18     Q.   And why do you say that?

19     A.   Well, because I have a demonstrative for that, if I may

20     have the next slide, please.

21          Essentially the DEA classifies opioids into the various

22     schedule drugs depending on their abuse potential.  It goes

23     from a Schedule 1 to Schedule 4.  The Schedule 1 being the most

24     abused.  And you have in this class heroin and cocaine as

25     Schedule 1 drugs.

1 Q. Okay.  Where does Tramadol fit on that schedule?

2 A. Tramadol was, in 2007, an unscheduled drug.

3 Q. And where does Tapentadol fit on that schedule?

4 A. Tapentadol was categorized as Schedule 2 in 2007.

5 Q. By the way, Dr. Buvanendran, what data are considered

6 when DEA places drugs into the schedule?

7 A. They examine their abuse potential from clinical

8 studies.

9 Q. And what does it mean for two drugs to be in the same

10 schedule for the DEA schedule?

11 A. So,  essentially it would be that they are the same

12 abuse potential.  And in this case Tapentadol is a Schedule 2,

13 it would be in the same category as morphine,  Oxycodone,

14 Fentanyl.

15 Q. And I think you testified that in 2007 Tramadol was an

16 unscheduled drug?

17 A. That is correct.

18 Q. And what did that say about its perception of abuse

19 potential in 2007?

20 A. In 2007 it was believed that it was of low potential

21 for abuse.

22 Q. Now, Dr. Buvanendran, in summary,  do you believe that

23 a person of skill in the art in March 2007 would have

24 considered claims 1, 2, 3 and 6, obvious in view of claim 117

25 of the '593 patent?

1    A.   Yes.

2    Q.   Okay.

3              MR. CONNOLLY:   Your Honor, I need to consult with

4    my colleagues for one second.   And I believe I will either have

5    another few seconds or other options.   Dr. Capuano has a short

6    examination.

7              THE COURT:   That's fine.   Do you want to take a

8    moment?

9              MR. CONNOLLY:   Thank you very much, Dr.

10   Buvanendran.   At this time I have no further questions.   I

11   turn the floor over to Dr. Capuano for Actavis.

12             THE COURT:   Thank you very much.

13   CROSS EXAMINATION BY MR. CAPUANO:

14             MR. CAPUANO:   Your Honor, I just have a few

15   slides.   Maybe ten minutes on that issue.

16             THE COURT:   That's fine.   Go ahead.

17             MR. CAPUANO:   Separate from the issues we heard

18   about before.

19   Q.   Good morning, Dr. Buvanendran.

20   A.   Good morning.

21   Q.   Dr. Buvanendran, do you have an opinion regarding

22   whether claims 1 and 2 of the '130 patent are invalid because

23   they are anticipated by the prior art?

24   A.   Yes.

25   Q.   And do your demonstrative exhibits include a section to

1    help you explain those opinions?

2        A.   Yes, I have a demonstrative on the legal standards of

3    anticipation.

4        Q.   And you testified you aren't a lawyer.  But,

5    nevertheless, do you have an understanding of what's required

6    to show that a patent is invalid as anticipated?

7        A.   Yes.

8        Q.   Okay.   And what is your understanding of that

9    requirement?

10        A.   So,  single prior art reference discloses each

11    limitation of the claim, either expressly or inherently.

12        Q.   Okay.  And you have the word "inherently" here.

13        Do you have an understanding of what it means for

14    something to be disclosed inherently?

15        A.   Yes, a claim limitation is inherent if the subject

16    matter described in the reference necessarily functions in

17    accordance with or includes the claimed limitations.

18        Q.   And in arriving at your opinions regarding

19    anticipation, did you apply these principles as you understand

20    them?

21        A.   Yes, I did.

22        Q.   Dr. Buvanendran, you recognize what's on the screen

23    here as defendant's Exhibit 752?

24        A.   Yes.

25        Q.   And what is defendant's Exhibit 752?

1      A.   This is DTX 752 is the patent, '737 claim patent.

2      Q.   Okay.  And do you have an understanding of the date on

3    which this patent was granted?

4      A.   I believe this was granted in 2011 sorry,  2001.

5      Q.   Thank you.   And does the '737 patent describe

6    Tapentadol hydrochloride?

7      A.   Yes.

8      Q.   And is that description here in the structure of

9    example 25 of the '737 patent?

10      A.   Yes.

11      Q.   And what are the uses for Tapentadol hydrochloride that

12    are described in the '737 patent?

13      A.   It talks about the underlying object of the present

14    invention was to provide substances with an analgesic effect,

15    which are suitable for the treatment of severe pain without

16    giving rise to the side effects.

17      Q.   So, at column one of 752, of defendant's Exhibit 752,

18    the '737 patent at lines 52 to 55, is that what you are

19    referencing here in demonstrative Exhibit 53?

20      A.   Yes.

21      Q.   And does the '737 patent describe a method of

22    administering Tapentadol hydrochloride as an analgesic to the

23    population suffering from severe pain?

24      A.   Yes, it does.

25      Q.   Okay.  And you've put together a demonstrative which is

1    demonstrative Number 54.

2         What are you showing here in this demonstrative, Dr.

3    Buvanendran?

4    A.   I'm showing here this large population of patients with

5    severe pain in the outer circle.  And in that outer circle

6    there's the smaller subpopulation of patients with patients

7    with polyneuropathic pain as stated in the claim, patent '130.

8    Q.   And is this relationship between the larger population

9    of severe pain, those suffering from severe pain, and the

10   subpopulation with polyneuropathic pain that you've indicated

11   here, is that consistent with your experience in diagnosing and

12   treating patients with severe pain?

13   A.   Yes.

14   Q.   Now, Dr. Buvanendran,  is this Venn diagram, is this

15   diagram that you included in slide 54, is this printed in the

16   '737 patent?

17   A.   No, it's not.

18   Q.   Is the word polyneuropathic pain or polyneuropathy, is

19   that word specifically used in the '737 patent?

20   A.   No, it's not.

21   Q.   Without those words being in the '737 patent, how is it

22   that this subpopulation that you've included here on

23   demonstrative Exhibit 54 is within the larger population of

24   severe pain sufferers?

25   A.   I know that because I mean this is a large population

1    of patients with severe pain.  And as I mentioned all this

2    time, this is a subpopulation of patients with severe pain who

3    have polyneuropathic pain.

4        Q.   Okay.   And if a physician were to practice the method

5    of administering Tapentadol as an analgesic to the population

6    of those suffering from severe pain as described in the '737

7    patent, would that method necessarily include treating that

8    subpopulation suffering from severe polyneuropathic pain?

9        A.   Yes.

10       Q.   Dr. Buvanendran, is the method of the '737 patent a

11   method of administering Tapentadol hydrochloride?

12       A.   Yes.

13       Q.   And is that the same as the method of administering

14   Tapentadol hydrochloride part of claims 1 and 2 of the '130

15   patent?

16       A.   Yes,  it is.

17       Q.   And as you have here on demonstrative Exhibit 56, is

18   the method of the '737 patent directed to treating a population

19   of patients with severe pain?

20       A.   Yes.

21       Q.   And is the population of the claims 1 and 2 of the '130

22   patent addressing that subpopulation with polyneuropathic pain?

23       A.   Yes.

24       Q.   And do you believe that claims 1 and 2 of the '130

25   patent are inherently anticipated by the method described in

```
1        the '737 patent?
2            A.  Yes, I do.
3                    MR. CAPUANO:   I have no further questions, your
4        Honor.
5                    THE COURT:  Thank you.  All right.  I think why
6        don't we take our break at this point.  Does that sound good?
7                    MR. SITZMAN:  Yes, your Honor, that sounds good.
8                    THE COURT:   Let's take about 5, 10 minutes for
9        our break.  I remind the witness that you are under oath.  You
10       are not to speak to Counsel about your testimony.
11                   We are going to take about a ten-minute break.  So
12       you can step down from the stand.
13                   THE WITNESS:  Thank you.
14                   THE COURT:   Thank you very much.
15                   (Whereupon a short recess was taken.)
16                   THE COURT:   All right.  Everyone, have a seat.
17       Let us start plaintiff's cross of the witness.
18                       Any issues on the exhibits?
19                   MR. CAPUANO:   Nothing so far, your Honor.
20                   MR. CONNOLLY:   No, your Honor.
21       CROSS EXAMINATION BY MR. SITZMAN:
22           Q.  Dr. Buvanendran, I would like to start by picking up
23       where I think you left off with the defendants.
24               It's your testimony that Tapentadol did not provide any
25       unexpected results,  correct?
```

1          A.   Yes.

2          Q.   And it's your testimony that it didn't satisfy the long

3     felt need,  right?

4          A.   Yes.

5          Q.   And it didn't, Tapentadol didn't provide any reduction

6     in side effects.

7               That's part of your long felt need analysis, correct?

8          A.   That is correct.

9          Q.   And it did not provide any synergistic results as part

10    of your unexpected results theory?

11         A.   Right.  I'm not sure what you mean by synergistic

12    results.

13         Q.   More than additive, right?  There's no synergy about

14    Tapentadol, right, according to you?

15         A.   I don't think I used the word "synergy" so I am not

16    sure.  If you can clarify that word for me.

17         Q.   Okay.  I'm going to use the word "synergy".

18              Do you believe that Tapentadol is synergistic in its

19    use?

20         A.   Sorry, I would happy to answer.  You say the

21    synergistic use with what?  I'm not sure in terms of what?

22         Q.   Do you know what the word "synergy" means?

23         A.   Yes.

24         Q.   What is your definition of synergy?

25         A.   Synergy means addition or additive.

1      Q.   Isn't it more than additive, doctor?  Isn't the word

2      "additive", additive and the word "synergy" more than additive?

3      A.   You could say that.

4      Q.   Do you believe Tapentadol is synergistic in its

5      behavior?

6      A.   I mean if you're talking about the mechanism of action

7      or are you talking about the disease conditions that it treats?

8      Q.   I'm talking about the way it behaves inside the human

9      body as you're treating patients.

10      A.   I'm sorry, I didn't really understand the question.

11           Yes, it does work in dual methods of action.  It has,

12      as I said, it has the MU receptor and it also inhibits the

13      norepinephrine reuptake inhibition.  So, it does have a dual

14      mode of action.

15      Q.   So, again do you consider Tapentadol to be synergistic

16      in its behavior?

17      A.   As a drug as it works, it does.

18      Q.   That's a yes?

19      A.   Yes.

20      Q.   Okay.  All right.  I'd like to look at a few of the

21      slides that your Counsel showed you.  And let's start with

22      slide 17 of the defendant's demonstratives.

23           MR. CONNOLLY:   Your Honor, I think we are

24      getting into confidential labeling information.  I ask that the

25      courtroom be closed.

1          THE COURT:   Yes.  Any issue?  Anyone have any

2     issue with sealing?  Counsel?

3               MR. SITZMAN:   Sorry, none from me.

4               THE COURT:   Let us seal the courtroom.

5               (Whereupon the hearing was sealed).

6               (Whereupon the following takes place in open

7     court)

8     Q.   Doctor, I was asking you about the '737 patent.

9          Can we agree that the treatment of polyneuropathic pain

10    is not disclosed in this patent either?

11    A.   That's correct.

12    Q.   And the treatment of polyneuropathic pain with

13    Tapentadol is not disclosed in this patent, correct?

14    A.   That's correct.

15    Q.   And you'll agree with me that severe pain is not

16    necessarily polyneuropathic pain, correct?

17    A.   I mean we talked about it before.  I mean patients with

18    severe pain may have polyneuropathy.

19    Q.   But, you just got done telling me on your list about

20    these patients who have obstructed ureters and kidneys and

21    either you treat them, I assume, those pains are severe, right?

22    A.   Yes.

23    Q.   And those are not polyneuropathic, correct?

24    A.   That's correct.

25    Q.    So my question to you is can you agree with me that

1          severe pain is not necessarily polyneuropathic?

2          A.   It's not all polyneuropathic.

3          Q.   Now, could we jump ahead to Page 17146?  And can you

4     bring up the pharmacological investigation?

5               Now,  doctor --

6          A.   Sorry. Okay.   I'm sorry.

7          Q.   Now, doctor, the patent includes a number of examples

8     of synthetic chemical methods,  right?

9          A.   Yes.

10         Q.   Okay.   And then it ends with this pharmacological

11    investigation,  correct?

12         A.   Yes.

13         Q.   Okay.   And this reports on the writhing test on mice?

14         A.   Yes, that's what it says.

15         Q.   Okay.  And the writhing test in mice, that's a

16    nociceptive pain test?

17         A.   I think I believe we talked about it at deposition as

18    well.  So, you know, even though I do a lot of animal models, a

19    writhing test is not one of the models that I have done in our

20    laboratory.  And so I do not want to comment on something that

21    I don't do in the laboratory in our practice.

22         Q.   But I thought you held yourself out, doctor, when Mr.

23    Connolly put up your definition of a POSA, a person of ordinary

24    skill in the art, you said that that person needed to have

25    animal study experience,  right?

1      A.   That's correct.

2      Q.   And do you have animal model experience?

3      A.   Yes, I do, because I normally have done animal models

4  in our lab that we have.  But I have created my own animal

5  models.

6      Q.   And you have no experience with the writhing test on

7  mice and you can't offer an opinion in this court as to whether

8  that's nociceptive?

9      A.   As I have said we have not done it.  In my last

10  15 years in the lab, I have not done writhing tests.  And I

11  have said that in the deposition as well when we met in

12  Chicago.

13      Q.   Have you ever read anything about the writhing test?

14      A.   I mean I have read about it but I have not done it.

15  And so the only thing I would say that it isn't all the tests

16  that is not commonly done nowadays.  And so, I really can't

17  comment too much about it.  But, it is considered probably more

18  nociceptive than neuropathic.

19      Q.   It is nociceptive, right?  Isn't that what's being

20  tested here in the phenylquinone mice?

21      A.   Again, as I said, I am not an expert on this specific

22  test, the writhing test, because I have not done it.   I can

23  only tell you what it would probably indicate.

24      Q.   Do you recognize this mouse model as a recognized

25  neuropathic model?

1      A.   I don't think so because I have reviewed the literature

2   on neuropathic pain and we are very much in the neuropathic

3   literature testing for rats at the time.

4      Q.   Now, I want to confirm your understanding of what's

5   required for anticipation.

6           You understand that for a reference to anticipate a

7   patent, the reference must explicitly or necessarily disclose

8   each element of the claims, correct?

9      A.   Correct.  I believe that's the legal standard.  But let

10  me pull up the slide.

11     Q.   Correct?

12     A.   Yes.  I think, can you just repeat the question?  I'm

13  sorry.  I was just trying to pull up the slide.

14     Q.   Sure.  You understand that for a reference to

15  anticipate the claims of a patent, the reference must

16  explicitly or necessarily disclose each element of the claim?

17     A.   That's true.

18     Q.   And in this case the essential elements of the '130

19  patent are claims for the treatment of polyneuropathic pain

20  with Tapentadol, correct?

21     A.   Correct.

22     Q.   So, the '737 patent does not explicitly or necessarily

23  disclose polyneuropathic pain or the treatment with

24  polyneuropathic pain including Tapentadol, correct?

25     A.   It does not.

1        Q.   Now,  for your obvious type double patenting opinion,

2   you're relying on claim 117,  correct?

3        A.   Correct.

4        Q.   Okay.   Can you show me where in the patent you have in

5   front of you where claim 117 is?

6        A.   It's on the '593 patent.  I'm not sure if it's DTX.

7        Q.   You have in front of you DTX 752.

8             And my question is, where in DTX 752 is the 117, claim

9   117?

10       A.   Sorry.  It's been awhile since I looked at it.

11       Q.   So, doctor --

12       A.   Yes.

13       Q.   -- the '737 patent does not have claim 117 in it,

14   correct?

15       A.   I cannot find it right here.

16       Q.   Can we go to the claims, Rob, at the back end of this

17   exhibit? Last page, sorry.

18            Doesn't this patent end with Claim 8, doctor?   Column

19   26, Claim 8?

20       A.   Yes.

21       Q.   Right.   This patent ends with Claim 8, correct?

22       A.   Correct.

23       Q.   All right.   Let's look at the '593 patent.

24            Can we have DTX 1346, please?

25       A.   Sorry.   Which DTX?

1      Q.   Oh,  sure, 1346.

2           If you look at the claims here, do you see claim 117

3      here?

4      A.   Yes, this is column 38.

5      Q.   Column 38.  Okay.  Can we stay here for a second,

6      though, Rob?

7      A.   Sorry.

8      Q.   What is the date of issuance of the '593 patent?

9      A.   The '593 patent I think was issued in the priority date

10     was July 23, 1994.

11     Q.   That's not what I asked.   I asked when did it issue.

12     A.   The date of reissue of the patent was April 24, 2007.

13     Q.   Okay.  Good.  Let's look at the '130 patent, the patent

14     you claimed as obvious in light of claim 117.

15          Can we pull up DTX 75? What's the priority date, the

16     provisional application date of this patent?

17     A.   The date of the patent was September 17, 2013 and the

18     the priority publication date was December 9, 2010.

19     Q.   Now,  you see the provisional application right below

20     that.

21          When was the provisional application filed?

22     A.   It was filed in March 12, 2007.

23     Q.   That's before the '593 patent issued, correct?

24     A.   Correct.

25     Q.   So, to confirm,  you're relying on a claim,  claim 117,

1      that did not exist when the '130 patent was filed, correct?

2          A.   I believe the '593 patent was the refile date that you

3      made me read on top.

4          Q.   Right.  And that reissue date when the 117 came into

5      existence was after the date that the '130 patent was filed,

6      correct?

7          A.   It's my understanding the '593 was back in 1994 and

8      that the '130 is in 2007.

9          Q.   Okay.  I'm going to ask again.

10              When the '593 issued for the first time with claim 117

11     in it, it was after the date, the priority date of the 130

12     patent, correct?

13         A.   That's correct.

14         Q.   You will agree with me, doctor, that Tapentadol was the

15     first opioid to be approved by the FDA to treat polyneuropathic

16     pain right?

17         A.   Yes.

18         Q.   And when was it first publicly disclosed or known that

19     Tapentadol had MU opioid activity?

20         A.   I can't tell you the exact date.  I was known that it

21     had MU activity.  But it was known that Tapentadol had activity

22     of the mu receptor and the norepinephrine reuptake inhibition.

23         Q.   So, when was it known, publicly known, that it had the

24     MU opioid receptor activity?  Or is it your testimony that both

25     mechanisms of action were publicly disclosed on the same day?

1      A.   I believe they were disclosed at the same time that it

2    had the MU activity and the norepinephrine reuptake inhibition.

3      Q.   And when was that?

4      A.   I want to say it's probably around 2006.

5      Q.   Okay.  Can you recall what reference it was that it

6    was disclosed in?

7      A.   I cannot recollect exactly the specific reference that

8    it was disclosed in.

9      Q.   Do you remember the author's name?  Tzchentke?  Can you

10   remember that?

11     A.   Yes.

12     Q.   Is that the reference you are referring to as the

13   disclosure of the MU opioid activity and the norepinephrine

14   reuptake inhibition?

15     A.   That's correct.

16     Q.   Okay.  Now, back when the '737 patent issued, without

17   the claim 117 then, practitioners were not using opioids as

18   first line treatment for the treatment of polyneuropathic pain,

19   correct?

20     A.   I believe in -- no, it was not used then and it is

21   still not used.

22     Q.   Okay.  And you'd agree with me at that time that the

23   effectiveness of opioids in treating polyneuropathic pain was

24   controversial, correct?

25     A.   No.  As I said before, the efficacy of the utilization

1    of opioids for the treatment of neuropathic pain was not the

2    area of controversy.   The area of controversy, as I said, was

3    the adverse advanced effects of the opioids in terms of

4    tolerance and abuse potential.

5    Q.   All right.  Let's take a look at some of those articles

6    then.   Let's start with Namaka.  It's DTX 1609.

7    A.   Is that in your binder or the previous binder?

8    Q.   You can use our binder.  I think it's in there.

9    This is one of the articles you relied on, correct?

10    A.   Yes.

11    Q.   This is one of the articles you relied on to say that

12    it was obvious to try Tapentadol to treat polyneuropathic pain,

13    correct?

14    A.   Yes.

15    Q.   Okay.  By the way, does Namaka refer specifically to

16    polyneuropathic pain?

17    A.   I believe he talks about neuropathic pain.

18    Q.   Not polyneuropathic pain?  It just talks about

19    neuropathic pain, correct?

20    A.   Correct.

21    Q.   And Namaka was published in 2004?

22    A.   That's correct.

23    Q.   Let me turn your attention to Page 13760 and let me

24    have you pull up right where you are, Rob.  Thanks.

25    It says at the top beginning with the usefulness of

 1      narcotics, which is where opioids would fall into,  correct,

 2      doctor?

 3          A.   Yes.

 4          Q.   The usefulness of narcotics in the treatment of chronic

 5      neuropathic pain is often debated and not very well studied.

 6               Do you see that?

 7          A.   Yes.

 8          Q.   Do you disagree with Namaka on this?

 9          A.   No,  I'm saying that it is what it says, the usefulness

10      of narcotics in the treatment of chronic neuropathic pain is

11      debated.   And there are some studies, but there are some

12      studies that are not showing efficacy.   There are some studies

13      to that effect.

14          Q.   All right.   And in fact Namaka says down starting with

15      as, it says As there is limited assessments of opioid

16      effectiveness in neuropathic pain, they should not be

17      considered as a first line treatment, right?

18          A.   Yes, it was then in 2004 it was not a first line

19      treatment and it is still not a first line treatment in 2016.

20          Q.   And here they are talking about the limited assessments

21      of opioid effectiveness, correct?

22          A.   Correct.

23          Q.   And despite what Namaka has to say now you are still of

24      the opinion that a physician would have been motivated to use

25      Tapentadol to treat polyneuropathic pain despite this

1    information?

2         A.   In the article as I stated before they had several

3    opioids, morphine,  Methadone,  Tramadol and opioid and opioid

4    like drugs listed in their table of contents demonstrating that

5    these drugs would be used for, and again it is not for first

6    line treatment, but again used as a second line treatment back

7    in 2004 and in 2016.

8         Q.   I think you may have missed my question.

9         Despite what Namaka has to say, is it your opinion that

10   a physician would have, nonetheless, been motivated to use

11   Tapentadol to treat polyneuropathic pain?

12        A.   Yes.

13        Q.   And would a person of ordinary skill in the art

14   reasonably predict that Tapentadol would be effective in

15   treating polyneuropathic pain?

16        A.   Yes.

17        Q.   Notwithstanding these statements?

18        A.   That's correct.

19        Q.   Okay.  Let's turn to Baron, DTX 1599.

20        This is another article that you rely on,  correct?

21        A.   Yes,  I did talk about it.

22        Q.   Okay.   Same question here, does Baron specifically

23   refer to polyneuropathic pain?

24        A.   I believe it's an article on neuropathic pain.

25        Q.   But not polyneuropathic,  correct?

1    A.   Correct.

2    Q.   Okay.  Let me have you turn to Page 13663.  And in the

3    paragraph on analgesics starting with the sentence that says

4    however, it's up here, Rob.

5         It says However, in contrast to widespread opinion,

6    neuropathic pain has been shown to be opioid sensitive.   Do

7    you see that?

8    A.   Yes.

9    Q.   And you see the widespread opinion,  correct?

10   A.   I do.

11   Q.   Okay.  You don't agree with the wide spread opinion,

12   do you?

13   A.   I am saying that when it says that it is useful for the

14   treatment of neuropathic pain and it was known and it is useful

15   and I was prescribing opioids back in 2004 for the treatment of

16   pure neuropathic pain.

17   Q.   All right.   And despite the wide spread opinion,  you

18   believe that a person of ordinary skill in the art back with

19   the Baron article in front of them, would nonetheless prescribe

20   Tapentadol for the treatment of polyneuropathic pain?

21   A.   Yes.

22   Q.   And it's also your testimony that despite widespread

23   opinion, that the person of ordinary skill in the art would

24   have predicted success with using Tapentadol for the treatment

25   of polyneuropathic pain?

1      A.   Yes.

2      Q.   Okay.  Let's look at another one.  Can I have DTX 1401?

3           There is an article by Dworkin.   Let me start by

4   asking you if you recognize this article.

5      A.   This is the 2007 article by Dworkin and I may have

6   skimmed it in my regular review of stuff.

7      Q.   Exactly.  So you relied on the Dworkin article from

8   2003,  right?

9      A.   I did review that before.  But again I reviewed so much

10  literature, I can't recollect exactly, but approximately,

11  correct.

12     Q.    And you know that Dworkin, between his 2003 article and

13  this article, changed his opinion as to whether opioids would

14  be effective in treating neuropathic pain, right?

15     A.   I haven't look at this article specifically but I would

16  be more than happy to look at it if you show it to me.

17     Q.   I will show you a couple of pages.  But generally do

18  you know that to be the case, that Dworkin changed his opinion

19  from 2003 to 2007?

20     A.   No.

21     Q.   Okay.  Let's look at what's been Bates stamped in the

22  corner as 764 in the introduction, second paragraph, the

23  management of patients.

24     A.   Sorry, so which page did you say?

25     Q.   It's the article, it's page,  it's the second page of

1        the article under introduction in the bottom corner.  It's

2        Bates stamped 764.  And the leadoff there says the management

3        of patients with chronic N.P., neuropathic pain, is complex

4        and responsive to existing treatments is often inadequate.

5                Even with well-established neuropathic medications,

6        effectiveness is unpredictable, dosing can be complicated,

7        analgesic onset is delayed and side effects are common.

8                Do you see that?

9        A.    Yes.

10       Q.    Do you disagree with Dworkin in 2007?

11       A.    It is true then, it is still true that even with well

12       established pain medications, neuropathic pain is a challenge

13       to treat.

14       Q.    Let's turn a little bit forward in the article to

15       Page 9 of the article, Bates stamped 771 in the bottom right.

16       Thanks Rob.

17               First column begins with the word "because".  Because

18       of these problematic aspects of opioid treatment and given the

19       efficacy of first line medications discussed above, treatment

20       of chronic, N.P., neuropathic pain, with opioid agonists should

21       generally be reserved for patients who have failed to respond

22       to or cannot tolerate the first line medications.

23               Do you see that?

24       A.    Yes.

25       Q.    Despite these statements in Dworkin which is a change

1    from 2003, you still believe that a person of ordinary skill in

2    the art would have prescribed Tapentadol for the treatment of

3    polyneuropathic pain, correct, doctor?

4         A.   I believe it says that it should not be used as a first

5    line treatment.  And I have said this several, several times,

6    that it is not a first line treatment prior.  It is not a first

7    line treatment now.  And it was not a first line treatment in

8    2007.

9         Q.   Doctor, in 2007 would a person of ordinary skill in the

10   art have prescribed Tapentadol for the treatment of

11   polyneuropathic pain?

12        A.   As a second line treatment.

13        Q.   So,  is that a no or is that a yes or you're now

14   changing kind of what your overall opinion is?

15        A.   I have not changed my opinion.  And I said exactly the

16   same thing since this morning and in my depositions.  It is a

17   treatment for neuropathic pain but it is not the first line

18   treatment for neuropathic pain.

19        Q.   So, it's not the first drug.  It's not even in the

20   first category of drugs that a person of ordinary skill in the

21   art would have considered,  correct?

22        A.   Correct.  It's not the first line of therapy for the

23   treatment of neuropathic pain.

24        Q.   Okay.  Is there anything --  well, let me ask you this

25   same question as I asked before,  would a person of ordinary

1    skill in the art have had an expectation of success with

2    Tapentadol for the treatment of polyneuropathic pain?

3        A.   Yes, because opioids have been shown by the Gilron

4    article, which is very highly cited.  They are a respected

5    journal,  The New England Journal of Medicine, that

6    demonstrates opioid which in this case is morphine, to be

7    effective in two models of neuropathic pain.

8        Q.   Okay.  Let's keep looking.

9             Can I have the next exhibit PTX 3002?  Let me ask if

10   you recognize this article from 2011?

11       A.   I believe the first time I saw it was at the deposition

12   but --

13       Q.   You know Dr. Candiotti?

14       A.    I actually do.

15       Q.    What's that?

16       A.   I do.

17       Q.   Let's turn to Page 2 of the article.  The bottom.

18   Thank you.

19            It reads "Among the pharmacological or the

20   pharmacologic approaches, the use of opioids for the treatment

21   of noncancer pain is particularly controversial".

22            Doctor, is it still your opinion that there was no

23   controversy regarding the use of opioids to treat noncancer

24   pain or neuropathic pain?

25       A.   As I said in terms of efficacy, there has been efficacy

 1          data demonstrating it.  And we have all used it as clinicians

 2          for the treatment of pain.

 3               The controversy still surrounds the utilization of

 4          opioids and the adverse effects that these drugs do cause.

 5          Q.   So, this controversy here, you're redefining this

 6          controversy as not about effectiveness, despite all the

 7          articles we saw, you're redefining this controversy in terms of

 8          side effects.

 9               Is that what I'm understanding?

10          A.   So, when you treat a patient with a drug, with any

11          compound for any disease condition, you outweigh the risk and

12          the benefits.  And so when there is risk and benefits, it's an

13          area of controversy if a drug does not cause any side effects

14          and it's obviously beneficial.

15               But when you have a risk/benefit ratio, it is important

16          as a clinician to weigh the risk and benefits and therefore

17          there will be areas of controversy.

18          Q.   Okay.  So we can at least agree, even though we may

19          have a different characterization of what the controversy is,

20          we can agree that the use of opioids for the treatment of

21          neuropathic pain was controversial just like Dr. Candiotti

22          said?

23          A.   So, what I would agree is that the effectiveness of

24          opioids for treatment is not the area of controversy but more

25          on the risk/benefit risk is an area of controversy before and

1    it still continues in 2016.

2        Q.   All right.  Let's move on to a paper that I think you

3    will recognize, Exhibit 3003.

4        Doctor, this is your paper, right?  This is your name

5    on the back here?

6        A.   Yes.  So, this was a paper written by one of the people

7    I trained, Dalia Elmofty is one of the students that I taught.

8        Q.   So you wrote this paper in 2013,  correct?

9        A.   Well, she wrote it,  yeah.

10        Q.   I'm sorry, so do you disavow what's in the article?  Is

11    that what I'm hearing?

12        A.   No, my name is there.

13        Q.   Let's look at Page 479 under opioids.  And doctor, the

14    first sentence, "the use of opioids for the treatment of

15    neuropathic pain remains controversial".

16        We're now up to 2013.   We've seen articles that go all

17    the way back to the '90s, 2004, this controversy this dispute

18    has continued, correct?

19        A.   As I said before, the controversy still continues.  It

20    is not about the effectiveness, it's about the adverse effects

21    that opioids do.  And it's a risk I take everyday when I

22    prescribe opioids to patients.  Actually now it is nociceptive

23    or neuropathic pain, except cancer patients.

24        Q.   So, if I understand what you're saying, there is no

25    dispute in your mind that the long term benefit for using

1      opioids for the treatment of neuropathic pain was clear and

2      undisputed?

3          A.   I do not believe that's what I said.  I said the

4      effectiveness of the use of opioids for neuropathic pain is not

5      disputed.  However, I said when you give drugs to a patient,

6      there are side effects and we need to weigh the side effects

7      and the benefit of that to that particular individual to this

8      disease condition.

9          Q.   Despite the controversy, despite the statements we've

10     seen so far, you still believe a person of ordinary skill in

11     the art would have prescribed Tapentadol for the treatment of

12     polyneuropathic pain?

13         A.   Yes.

14         Q.   And you would have expected the person of ordinary, or

15     you would have, your opinion is that the person of ordinary

16     skill in the art would have expected success with Tapentadol

17     for the treatment of polyneuropathic pain?

18         A.   Yes.  I would have expected it to work like any other

19     opioid.

20         Q.   Okay.  All right.  Doctor, let's look at something

21     that just came out last week.  It's in your book at PTX 3004.

22              Do you recognize this document?

23         A.   I recognize the document but I have reviewed it awhile

24     ago.  I mean I've reviewed it.

25         Q.    I'm sorry, this just came out March 18th.  And I

1    thought you testified on direct that you were part of the CDC

2    group that provided the information and guidelines that are set

3    forth in this document.  Isn't that true?

4        A.   What I testified to the fact was that the CDC formatted

5    its guidelines.  And various societies, including patient

6    groups were invited to make a comment.  I was the

7    representative from the 55,000 members of the American Society

8    of Anesthesiologists to review and to comment, solely provide

9    comments to the CDC.  Finally the ultimate product was the

10   CDC's output.

11       Q.   So you had some involvement in what ultimately we're

12   seeing here as the final output, correct?

13       A.   Let me correct that again.  I did provide input but I

14   had no control over the output of the product.

15       Q.   Were you the only one who provided input or were there

16   professionals from around the world in all sorts of disciplines

17   that provided input?

18       A.   So, I'm not sure the world.  I think it was restricted

19   to the U.S.  I believe they invited a lot of pain societies.

20   Probably they invited some pain societies and some patient

21   groups, the American Medical Association and the American

22   Society of Anesthesiologists who were invited to provide

23   comments including the H.S.S., the Human Health circuitry.

24       Q.   Let's take a look at a few of the things inside here.

25   Page 3, the bottom of the first column.  Thanks Rob.  And then

 1     continuing up on the next column.

 2          The article reads, "Although the transition from use of

 3     opioid therapy for acute pain to use for chronic pain is hard

 4     to predict and identify, the guideline is intended to inform

 5     clinicians who are considering prescribing opioid pain

 6     medication for painful conditions that can or have become

 7     chronic".

 8          Do you see that?

 9     A.   I'm really sorry.  I was reading.  Is this Page 3?  I'm

10     sorry.

11     Q.   That's okay.  It's at the bottom of the first column

12     and the top of the second column.

13     A.   Is that the column starting with The recommendation?

14     Q.   It says Scope and audience.

15     A.   Okay.  I'm sorry.

16     Q.   This is consistent with what you understood these

17     guidelines to be when they were soliciting information,

18     correct?

19     A.   Yes, that's what it says as you read.  I'm not sure

20     what the question is.  Sorry.

21     Q.   I just asked if that was consistent with your knowledge

22     as to what the scope and audience was in terms of the purpose

23     for this guideline.

24               THE COURT:   Hold on.

25               MR. CONNOLLY:   Your Honor, I just want to note

```
1    this is a new document.  It wasn't put on anybody's exhibit

2    list.  It's supposed to be shown to him for impeachment.  It's

3    a 2016 document.

4              THE COURT:   Although I think Mr. Sitzman

5    exchanged the documents to begin the examination.  No?

6              MR. SITZMAN:   Yes.

7              MR. CONNOLLY:   We got it now but it's not on any

8    exhibit list.  It's 2016.  It's a document that's three days

9    old.  It has nothing to do with a person of ordinary skill's

10   knowledge in 2007.  He can't be -- he's not being impeached.

11   He hasn't seen it.  There's really no purpose for the

12   examination other than to talk about a document that apparently

13   came out three days ago.  It's utterly irrelevant.  It wasn't

14   gone into on direct.  And he talked about a person of skill's

15   state of mind in March of 2007.

16             What the CDC is saying to doctors today has

17   absolutely no connection to that whatsoever.  We are talking

18   about a document that was issued three days ago, your Honor.

19   This is colossal waste of time.

20             THE COURT:   He can let me know but I think he is

21   using it for impeachment because of his connection with the

22   CDC, is he not?

23             MR. SITZMAN:   Correct.  And also the fact that

24   the doctor testified on direct that there is no question and no

25   doubt through all of these articles that people, people of
```

1    ordinary skill in the art, would be prescribing opioids for the

2    treatment of polyneuropathic pain.

3            MR. CONNOLLY:   Your Honor, his testimony on

4    direct was that at the critical date with respect to the '130

5    patent the state of literature before March of 2007 was that a

6    person of ordinary skill in the art would have an expectation

7    that an opioid product would work.   That was his testimony.

8            He didn't give testimony about the relevance of a

9    person of ordinary skill's knowledge today.   This is all about

10   a legal issue that is irrelevant.   And the fact that he happens

11   to have participated in the input and not the output of a

12   document that is 7, 8, 9 years after the relevant period at

13   issue, doesn't connect it up.   It's utterly irrelevant to the

14   topic.

15           THE COURT:   Is there a response?

16           MR. SITZMAN:   It is relevant.   It goes to the

17   heart of his opinions here.   He louted this participation

18   during his direct examination as to his participation, I am

19   entitled to go into this.   If they think it's irrelevant, then

20   they will either brief it or on redirect they will do --

21           THE COURT:   You can certainly respond to it.

22   This has been the line of testimony.   And this is the most

23   recent document that we are discussing.   And again in addition

24   to there is the relationship with the CDC.   I think based upon

25   the entirety of that, you can go forward with the questioning.

```
 1                    MR. SITZMAN:  Thank you, your Honor.

 2                    THE COURT:  Thank you.

 3          Q.   Can we turn to Page 15 of the article?

 4          A.   I thought it would appear in the scope and audience of

 5     this.

 6          Q.   We were just going to move ahead now.

 7          A.   Okay.  Sorry.  Which page?

 8          Q.   Page 15, bottom corner.

 9               Doctor, it says in summary --

10          A.   Sorry, before you go, is it on the right hand or the

11     left-hand column?

12          Q.   The right hand.

13          A.   The right hand column.

14          Q.   In summary, the categorization of recommendations was

15     based on the following assessment:  Number 1, no evidence shows

16     a long term benefit of opioids in pain and function versus no

17     opioids for chronic pain with outcomes examined at least one

18     year later.

19               Do you see that?

20          A.   I see it on your slide but I still can't find the

21     document here because I think I'm lost.

22          Q.   It's at the bottom of Page 15 in the far right corner.

23          A.   Oh, I'm sorry.  I see it.  Okay.

24          Q.   Doctor, just this last week the CDC issued this

25     opinion, for which you provided input, concluding there was no
```

1    evidence of long term benefit of opioids.

2         And yet you've testified in this case that as far back

3    as 2007 or even earlier, according to some of the prior art

4    that Mr. Connolly elicited, that there was no doubt in

5    anybody's mind that opioids can be and should be used for

6    chronic pain.  How do you reconcile that?

7    A.   Okay.  I can tell you because essentially opioids were

8    used in the '90s, 2000s and it continues to be used in terms

9    for patients with severe pain.

10        There were several literatures that emerged with

11   respect to adverse effects.  We talked about it in terms of

12   side effects.  And when they started looking at the outcome in

13   terms of one year or 6 months and now they moved it to one

14   year, it demonstrated that the risk was more than the benefit

15   that there was with this opioid treatment.  And therefore that

16   is what the guidelines say.

17        Now, let me finish because the guidelines also go on to

18   say what should be prescribed for these patients with noncancer

19   pain patients severe in nature and there were 12

20   recommendations set forth in this guidelines .   The analysis

21   was about risk/benefit ratio of the opioid treatment for these

22   patients.

23   Q.   Doctor, wouldn't a person of ordinary skill in the art

24   consider all of the references that we've talked about,

25   consider all of the controversy, consider all of the evidence,

1    consider everything that has been said and have some reasonable

2    expectation that Tapentadol would work to cure or to treat

3    polyneuropathic pain?

4        A.   As I said before, it will be effective in the treatment

5    of polyneuropathic pain.  But, again, it will be associated

6    with the risk.  And these guidelines point to the risk.  And in

7    fact the guidelines go further on to talk about what dosage it

8    should be started on and what should be considered low risk,

9    medium risk and high risk.

10        And it very clearly states what should be done when

11   you're prescribing opioids for these patients.  It further

12   elicit what the states, individual states should do when you

13   are prescribing opioids with patients with chronic pain.

14       Q.   Let's pick up with the second bullet.  Extensive

15   evidence shows the possible harms of opioids including opioid

16   use disorder, overdose, motor vehicle injury.  More risks

17   doctor?

18       A.   That is talking about opioid use disorders, overdose

19   and motor vehicle accidents.  These are all risks associated

20   with the utilization of opioids.

21       Q.   And is there any doubt that all of those risks, all of

22   that evidence and all of the controversy that has existed

23   throughout this timeframe, including the 2007 timeframe for

24   which you are opining that Tapentadol, that there was an

25   expectation that Tapentadol could be used to treat

1        polyneuropathic pain?

2            A.   Yes.

3            Q.   Okay.  Now, in 2007, Tapentadol wasn't approved,

4        right?

5            A.   Tapentadol ER was not.

6            Q.   The IR was not approved either, was it?

7            A.   I can't recollect exactly but probably around -- I

8        can't remember the exact date of the approval of the IR.

9            Q.   And so your opinion is again that a person of ordinary

10       skill in the art would use an unapproved drug with all this

11       evidence, with all the controversy, all of the statements we've

12       looked at, for the use of treatment of polyneuropathic pain,

13       correct?

14           A.   I'm saying opioids and opioid like drugs were utilized

15       for neuropathic, polyneuropathic pain.

16           Q.   You yourself, doctor, you remember in deposition you

17       told me that you would use any drug to treat polyneuropathic

18       pain, right?

19           A.   I would not, if I ever did say any drug, I would use

20       drugs that I think would function in the area of

21       polyneuropathic pain.  If I said it, I probably meant pain

22       drugs.  I mean I would not use a drug for the treatment of, you

23       know, cancer for polyneuropathic pain.  I would specifically

24       pick the drugs in the category of analgesics.

25           Q.   You said at deposition when I asked you about

1    anticonvulsants and I said Would any anticonvulsant,  would you

2    use any anticonvulsant for the treatment of polyneuropathic

3    pain? Do you remember what you said?

4        A.  I can't recollect but I can tell you the same answer

5    that I said in the deposition probably is that it is useful for

6    the treatment of polyneuropathic pain.  And we had slide

7    demonstration in the Namaka article.  I was talking about

8    Gabapentin and pregabalin which are the calcium, they are

9    blockers in the calcium channel.

10          They are the drugs that he's talking about used for

11    seizure.   It is used for seizures, but it is also used for

12    neuropathic pain.

13        Q.  And remember I asked you about Nsaids?

14        A.  Yes.

15        Q.  And you would use any Nsaid for the treatment of

16    polyneuropathic pain too, correct?

17        A.  Nsaids, I would use it as an adjuvant, as a first line

18    drug.  Nsaid is like Motrin.  And I would prescribe it because

19    it is, if it is severe pain, I would want to give an adjuvant

20    drug so the patients can feel pain relief.

21        Q.  And you would use any antidepressant or tricyclic

22    antidepressants TCAs we talked about?

23        A.  Yes.

24        Q.  And we already heard your opinions on opioids.

25          What about SSRI?  Do you remember we talked about

1      those?

2          A.   Yes.

3          Q.   You would use those for polyneuropathic pain too,

4      right?

5          A.    Correct.

6          Q.   And SNRA, those too?

7          A.   Some of them are older drugs.  So, you know, you

8      obviously try to weigh the risk and benefits.  And some other

9      drugs are not as commonly prescribed.  But, I have seen

10     patients come to me with all kinds of different drugs being in

11     their universe of practice.

12         Q.   And Gabapentinoids, you would use those, as you just

13     stated?

14         A.   I used Gabapentinoid and pregabalin, both of them for

15     the treatment of neuropathic pain.

16         Q.   And NMDA receptor agonists, you would use that for the

17     treatment of polyneuropathic pain, correct?

18         A.   NMDA drugs are an interesting class of drugs.  And,

19     yes, if it is possible to be used, I would utilize them for

20     polyneuropathic pain.  But, it generally does not come in an

21     oral formulation.  And therefore it is a bit challenging, even

22     though there's some drugs that may have some NMDA activity.

23         Q.   And then I asked you would you use muscle relaxants and

24     neuroleptics.  You would use those too for the treatment of

25     polyneuropathic pain,  correct?

     1          A.   I generally don't use muscle relaxants but --

     2          Q.   You told me at your deposition it was not a single pain

     3     medication that you would not try for polyneuropathic pain.

     4     And then you identified one transdermal patch.  Isn't that

     5     correct?

     6          A.   Transdermal patch in terms of treatment?

     7          Q.   Yeah.  That was the only one you identified.  You would

     8     use everything else except for a transdermal patch for

     9     treatment.

    10          A.   Transdermal patch.  Are you still talking about topical

    11     agents?  If I could get it for polyneuropathic pain if it is

    12     possible to utilize, if it is localized to a specific area, I

    13     would try a patch, if it's possible.

    14               MR. SITZMAN:  Your Honor, do you want to break

    15     now?  I'm at a breaking point here.

    16               THE COURT:   I think so.  It's 1 o'clock.  So

    17     let's break for 45 minutes.  We will continue with this.

    18               How much do we think we have on the redirect?

    19               MR. CONNOLLY:   I don't think he's done yet, your

    20     Honor.

    21               THE COURT:   When he's done.

    22               MR. CONNOLLY:   As of now I think it's probably

    23     ten minutes, your Honor.

    24               THE COURT:  Okay.

    25               MR. CONNOLLY:   I don't know how much longer he's

1        got.

2                     THE COURT:   I wasn't implying that he had

3        concluded but that's okay.

4                     MR. CAPUANO:   I got about a minute or two.

5                     THE COURT:   Not a problem.  Just trying to get an

6        idea.  That sounds fine.  Let's meet back in 45 minutes.  Let

7        me remind the witness you remain under oath.  You are not to

8        talk to your Counsel about the testimony.

9                     Thank you very much.  Have a good lunch, everyone.

10                    MR. SITZMAN:   Thank you, your Honor.

11                    THE COURT:   Thank you.

12                    (Lunch recess)

13                    THE COURT:   Everyone have a seat.  Let us

14       continue with the cross-examination.

15       Q.   Good afternoon, doctor.

16       A.    Good afternoon.

17       Q.   I just want to continue my cross examination and talk a

18       little bit about the prosecution history in this case.

19               Isn't it true that all of your invalidity opinions on

20       anticipation and obviousness were made by the examiner and

21       rejected by the examiner who saw and/or oversaw the '130

22       patent?

23       A.   I believe it is to be true.  I believe she looked at

24       it.

25       Q.   But, specifically that she looked at the arguments that

1    you're now raising were arguments that she identified and that

2    she ultimately rejected when she granted the '130 patent?

3        A.   I cannot tell you what he or she did.  But, it is

4    ultimately, it was granted.

5        Q.   Okay.  Let's take a look at some of the prosecution

6    history.

7             Can I have PTX 1600, tab A?

8             You should have that in front of you.

9        A.   Is that tab one, tab A?

10       Q.   Tab A, exactly.  Let's take a look at this.  This is

11   the first office action rejection dated April 2, 2009.

12            Do you see that under the mail date there?

13       A.   Yes.

14       Q.   Okay.  Let me have you turn to Page 4 of the office

15   action.   And the paragraph that starts with Buschmann there.

16   Do you see that?

17            It says "Buschmann discloses substances with an

18   analgesic effect, which are suitable of the treatment of

19   severe pain without giving rise to the side effects which are

20   typical of opioids ".

21            Do you see that?

22       A.   Yes, I do.

23       Q.   And this is, if you can see the top, this is a

24   rejection under 102(b) which is the anticipation section of the

25   patent statute.  This is the same argument you're raising,

1    right, that Buschmann, the '737 patent, the earlier patent

2    disclosed substances with an analgesic effect which are

3    suitable for the treatment of severe pain without giving rise

4    to the side effects.

5          Isn't that your argument, doctor?

6    A.   Yes.

7    Q.   Okay.  Let's turn over to Page 5.  And she rejects the

8    claims.  She says, Accordingly, the last sentence, no at the

9    top there, "Accordingly, claims 1-4, 9, 14-16 and 18 are

10   anticipated by Buschmann", right?  That's your argument?

11   A.   Correct.

12   Q.   Okay.  All right.  Let's flip over a little bit,

13   Page 7.  And the top paragraph and then a little bit into the

14   next.

15         And then she says that the claims are being rejected

16   under 103, you understand that's the obviousness section, as

17   being unpatentable over Buschmann in view of Dworkin.   That

18   was one of the articles that you discussed and that we

19   discussed earlier, right?

20   A.   Correct.  We discussed the Dworkin 2003 article.  I

21   should say I can't remember this 103 number but --

22   Q.   I will represent to you that that's the obviousness

23   section.

24   A.   Okay.

25   Q.   Okay.  And then it says "Buschmann teaches substances

1      with an analgesic effect" -- the same as we saw before --

2      "which are suitable of the treatment of severe pain", right?

3          A.   Yes.

4          Q.   And then turn over to Page 8, Rob and the top

5      paragraph, and down.   Take it all the way down there to the

6      second paragraph.

7               And then she says, Buschmann does not teach the use of

8      the compound, where she's giving the chemical formula for

9      Tapentadol, Buschmann does not teach the use of Tapentadol

10     hydrochloride specifically for treating neuropathic pain,

11     especially diabetic neuropathic pain.

12               Do you see that?

13          A.   Yes.

14          Q.   However, Dworkin, the article we were talking about,

15     Dworkin teaches treatment recommendations of neuropathic pain,

16     right?

17          A.   Yes.

18          Q.   I mean isn't this the argument that you're making here

19     today?

20          A.   I mean, I'm not sure.   If you ask me a specific

21     question, I would be more than happy to answer that.

22          Q.   Okay.   All right.   Dworkin is one of the references

23     that you -- well, here just I wish I had a pointer.

24               Down at the bottom it says Dworkin details treatment.

25     Isn't that what you said and testified to on direct

1     examination, that Dworkin and other references, obviously

2     Dworkin details treatment of neuropathic pain with opioid

3     analgesics and treatment of neuropathic pain with Tramadol,

4     right?  That was one of the things you said?

5          A.   That's correct.

6          Q.   Where he provides the clinical trial information,

7     adverse effect profile and recommended dosages of the drug.

8          A.   That is true.

9          Q.   Okay.  And then the next paragraph down, Rob, the

10    examiner says, In view of the foregoing references, the method

11    of using the instantly elected compound Tapentadol

12    hydrochloride for treatment of neuropathic pain would have been

13    prima facie obvious to one of ordinary skill in the art.

14         That's exactly your conclusion, right?

15         A.   It said opioids and opioid like drugs can be used for

16    the treatment of neuropathic pain.

17         Q.   Okay.  And she came to the conclusion that it was prima

18    facie obvious, right?

19         A.   I read it before several months ago and so I can only

20    tell you what I testified to the fact.

21         Q.   Okay.  Well, let's go a little bit farther then in the

22    prosecution history.  Let's look at tab E in the history there.

23         This is the next office action dated February 4, 2010.

24    Do you see that?

25         A.   Yes, I do.

1      Q.   If we turn to Page 5 and we picked up with claims,

2   yeah, that middle paragraph plus a little bit of the -- there

3   you go.

4           Again, she is rejecting the claims under '130 as being

5   unpatentable over Buschmann, right, '737 in view of Dworkin?

6   Do you see that?

7      A.   Yeah the claims 1-4, 9, 14-16.

8      Q.   Right?

9      A.   Yes.

10     Q.   And she is saying the same thing you are which is that

11  the earlier patent to Buschmann '737, right, the earlier patent

12  discloses, teaches substances with analgesic effects for the

13  treatment of severe pain.  And then in response to Mr.

14  Connolly's questions you said, and then there's this law

15  references out there, Dworkin being one of them, that say you

16  can use opioids for the treatment of neuropathic pain?

17     A.   That's correct.

18     Q.   And so your conclusion, just like the examiner, was

19  well this must be obvious then?

20     A.   Yes.

21     Q.   Okay.  Turn to Page 6 of the office action there.  The

22  little paragraph on the bottom there.  Again she says

23  "Buschmann does not teach the use of the compound Tapentadol

24  hydrochloride specifically for treating neuropathic pain,

25  especially diabetic neuropathic pain," right?  That was not in

1          the '737 patent.  You agreed with my questions on that?

2          A.   Correct.

3          Q.   Okay.  And then the next paragraph down she talks about

4     Dworkin again.  However, Dworkin teaches recommendations of

5     neuropathic pain, right?

6          A.   Yes.

7          Q.   Okay.  And then let's skip ahead a little bit farther.

8     Let's go to tab G.  It's Page 4 of the office action there.

9     Bates stamped 980 in the back.  GRTNUC 43980.  The bottom two

10    paragraphs, Rob.  Thanks.

11              This is the third time, right, this is now May 2011 and

12    the examiner again is saying the claims are rejected under 103

13    as being unpatentable over Buschmann in view of Dworkin.

14              Do you see that?

15         A.   Yes.

16         Q.   So she continues to make your argument for you.  Okay.

17    And we turn the page, can we go to the top of Page 6? Take that

18    top paragraph.

19              Although Buschmann, which is misspelled, although

20    Buschmann does not teach the pain to be treated by his

21    inventive compounds to be polyneuropathic pain, in the absence

22    of evidence to the contrary,  treatment of pain taught by

23    Buschmann is inclusive of the neuropathic pain such as

24    polyneuropathic pain and as such a skilled artisan would have

25    been motivated to utilize the inventive compounds of Buschmann

1     which includes the instantly elected compound in the treatment

2     of polyneuropathic pain.

3          Do you see that?

4     A.   Yes.

5     Q.   Isn't that the argument you made today in terms of why

6     you believe the patent claims are invalid as being obvious?

7     A.   I believe, I'm not sure, the compounds, but he keeps

8     talking about instantly elected.  So I am not sure what that

9     means.

10         I'm just saying that when you are using it for chronic

11    severe pain, for neuropathic pain, you can utilize opioids and

12    opioid like compounds.

13    Q.   Okay.  In fact, in the next paragraph there's something

14    there that's halfway down, middle of the sentence starts

15    towards the end of the right it says Dworkin, et al, details

16    treatment of neuropathic pain with opioid analgesics which

17    include clinical trial, I bet that means data, demonstrating

18    the treatment of diabetic polyneuropathy.

19         You agree with that, right?

20    A.   Yes.

21    Q.   Okay.  And then turn over to Page 7 Rob, top paragraph.

22    In view of the foregoing references, the method of using the

23    instantly elected compound which is Tapentadol for the

24    treatment of polyneuropathic pain would have been prima facie

25    obvious to one of ordinary skill in the art.  Right?  That's

1    your opinion?

2        A.   Well, I keep saying that this is, I believe it's

3    talking about the IR version, correct?  You are talking about

4    the whole paragraph in the document.  I'm not sure.  It keeps

5    saying the instantly elected.

6        Q.   Do you recognize the chemical compound as Tapentadol?

7        A.   Yes.

8        Q.   Okay.   And it's for the treatment of polyneuropathic

9    pain?

10       A.   Correct.

11       Q.   Now, do you know what the patentee, what Grunenthal did

12   in response to this third rejection in the patent prosecution

13   history? Do you recall?

14       A.   No, it should say -- I forgot.  I read all of this well

15   more than a month or two ago.

16       Q.   Okay.  Well, let's take a look.

17           Rob, can you turn to tab I?  It's 44045 in the bottom

18   right.  It's earlier in the tab.

19           Do you remember looking at the Christoph declaration

20   that was submitted to the Patent Office?

21       A.   Yes, I do remember reviewing it.  But, it's been

22   awhile.  But I can skim through it.

23       Q.   Let me draw your attention to just a couple of things.

24   Can you turn to Page 4048 at the bottom right.  Actually can

25   you bring up Page 5, right next door, side by side? Thanks.

1          Do you remember the data and the information that Dr.

2    Christoph submitted to the Patent Office regarding a redesigned

3    Chung model and a redesigned STZ model of polyneuropathic pain?

4          A.   I do vaguely remember talking about it or looking at

5    it.

6          Q.   Did you look at the data in these results?

7          A.   Again to be quite honest I looked at it like really

8    long time ago.  I want to say maybe 2, 3 months ago.  I

9    haven't looked at it in the recent.

10         Q.   I think you said earlier, I could be wrong, but I

11   thought you said earlier that you were here for the testimony

12   of Dr. Christoph?

13         A.   No.  I said I was here for the cross-examination of Dr.

14   Christoph.

15         Q.   All right.  Thanks.

16         When you look at the data here, well, let's look at at

17   polyneuropathic pain .316.

18         Did you analyze at all the information that Dr.

19   Christoph put forward here and whether or not Tapentadol had

20   delivered unexpected results?

21         A.   Are you talking about Table 2?

22         Q.   Yes.

23         A.   Okay.  I believe, again it's without reviewing it

24   recently it's a bit hard for me to go from recollection.  But,

25   I believe it's summated to the fact that at .316 dose compared

1    to the in diabetic SGC model, the .316 dose of Tapentadol was

2    compared to the .316 dose of morphine as the opioid and it was

3    found to be more effective or believed that was the conclusion

4    of the Christoph article.

5         Q.   And we're going to get to the comparison of morphine in

6    just a second.  But, I apologize, I don't have a pointer on me.

7              But, did you look at selective inhibition here of the

8    ability of Tapentadol to treat the diabetic rats while

9    maintaining the nociceptive pathway here in the vehicle, the

10   selective treatment of Tapentadol?

11        A.   I apologize but I don't think I understand your

12   specific question.

13        Q.   Well, I guess the bigger question is, did you consider

14   this data and these results in coming to the conclusion that

15   there were no unexpected results with Tapentadol?

16        A.   I looked at several information, not just this one.  So

17   that was my conclusion after looking at all the available

18   literature.

19        Q.   Okay.  I'd like you to explain to the Court and me

20   how you can reach that conclusion when Tapentadol demonstrated

21   a three-fold production in the treatment of polyneuropathic

22   pain and the maintenance of the nociceptive pathway as

23   demonstrated in these two models.

24        A.   So, I'm not clear.  I'm not sure how you come up with

25   the conclusion of the nociceptive pathway.  I see in this rat

1    model, I believe in this Christoph model, they were all STZ

2    models which it is the diabetic rats.  And they gave Tapentadol

3    or vehicle, which is like saline water, and another group of

4    rats with morphine.

5        So I'm not sure they are piecing out between

6    nociceptive and neuropathic pain.  It's my recollection of

7    reading this.  Again, I would be more than happy to review

8    them.  But, this is my recollection of review of this matter

9    several months ago.

10       Q.   Is it your testimony here today that table one and

11   table two do not show a selective treatment for mononeuropathic

12   and polyneuropathic pain over nociceptive pain?

13       A.   That is generally drugs.  Some drugs work at different

14   doses.

15       Q.   I'm sorry, let me just make that clearer.

16       Is it your testimony here today that Tapentadol does

17   not selectively treat neuropathic pain while preserving the

18   nociceptive pathway as demonstrated in Table 1 and 2?

19       A.   I disagree with your statement.

20       Q.   And did you, you considered, you considered the

21   evidence that you see here, correct?

22       A.   I considered this evidence and this evidence does not

23   point to your question.

24       Q.   Okay .  Can you please show me and the Court what it is

25   that you're looking at that does not substantiate the statement

1      that I made?

2          A.   Because there is no direct comparison between, in the

3      same models with the utilization of in a nociceptive model and

4      a polyneuropathic pain model in this document.  I mean the

5      mononeuropathy was looked at and the polyneuropathy, and if you

6      show me -- sorry, I'm not trying to be argumentative.  I would

7      be more than happy to look at it.

8              I just want you to show me.  That's all.  Because what

9      I look at polyneuropathic pain in this document, I am sorry if

10     I forgot about it, but, I would be more than happy to look at

11     it.

12         Q.   Let's look at table 2.  It's polyneuropathic pain?

13         A.   That's correct.

14         Q.   We have a dose here of .316 in the diabetic animal.  Do

15     you see that?

16         A.   Yes, I do.

17         Q.   Do you see its significance, the stars, the

18     significance there, it's 15, 30 and 45 minutes?

19         A.   Yes, I do.

20         Q.   Okay.  And the same dose .316 in the naive rats.  You

21     see there's no significance there?

22         A.   Yes, I mean it doesn't -- yes.

23         Q.   The next one, let's go down to the maximal dose of the

24     one for diabetes and the mean effective dose is 54 and it has

25     significance at every time point.

1 A. That is true.

2 Q. And for the very first time at one mg per kg we are

3 seeing an effect finally in the naive rats.   Do you see that?

4 A. Yes.

5 Q. And those are the first significant results in naive

6 rats, correct?

7 A. Correct.

8 Q. Is it your testimony that this data does not show a

9 selective ability to treat diabetic polyneuropathy while

10 keeping the nociceptive pathway intact without any decrease at

11 a .316 level?

12 A. Yes.

13 Q. That's your testimony?

14 A. Yes.

15 Q. So, you don't see anything unexpected here at all?

16 A. As I said before, it is useful for the treatment,

17 whether they are demonstrating that it is useful for the

18 treatment of an STZ pain model and it is compared to a vehicle

19 which is, in this case, saline administered compared to the

20 drug Tapentadol.

21 It does not talk about nociceptive and neuropathic pain

22 pathways.

23 Q. Doctor, how is this test designed?  In order to render

24 that opinion you must know how this test was designed by Dr.

25 Christoph, right?

1       A.   As I said, I would be more than happy to review more.

2    I reviewed this awhile ago.  And I can only tell you as we use

3    STZ model in our lab and I can tell you what we do.   And

4    without looking at the exact methodology of what he did in his

5    laboratory, I can tell you that we induce diabetes --

6       Q.   Well, I'm not asking about what you did, doctor.  I'm

7    asking about what Dr. Christoph did.

8            Because you're telling us something completely contrary

9    to what Dr. Christoph testified to.  And I want to know whether

10   or not you really have knowledge of how Dr. Christoph

11   distinguished this model from the normal STZ model and what he

12   did in order to make this demonstration?

13      A.   I'm not clear on the question but I can tell you that

14   what he demonstrated was that it is useful for the treatment of

15   polyneuropathic pain in the STZ model.

16      Q.   All right.   But I want to know do you know how, what

17   his methodology was?

18           You're here to testify in front of this Court.  I want

19   to know do you know the methodology he used to show the

20   significance of treating polyneuropathic pain while maintaining

21   the nociceptive pain pathway.

22      A.   As I can tell you, if you're asking me what he did.

23      Q.   Yes.

24      A.   I cannot tell you what he did because I was not there

25   to see what he did.  So I cannot tell you what he did.

1    Q.   You can't tell us what he did either on the STZ side or

2    on the mononeuropathic side, correct?

3    A.   I was not there for either of them.

4    Q.   You can't testify or provide us with any evidence about

5    the subsequent tests that he ran on cite cite synergy, correct?

6    A.   With all due respect, I can tell you that I was not

7    there.

8    Q.   You didn't review any of the evidence that he submitted

9    with regard to the spinal and super spinal tests that he did on

10    polyneuropathic rats, correct?

11    A.   I don't recollect seeing that.  But, if you provide it,

12    I would be more than happy to look at it.

13    Q.   You haven't seen and reviewed Dr. Christoph's detailed

14    analysis of all the tests that he ran to make a conclusion that

15    he demonstrated a selective treatment of polyneuropathic pain.

16    Isn't that correct, doctor?

17    A.   I just want to clarify that you specifically asked me

18    before about nociceptive or neuropathic over nociceptive.  And

19    what I was saying was in this Table 2 it talks about --

20    Q.   Sorry, doctor, have you reviewed that evidence?

21    A.   Sorry, which evidence?

22    Q.   All of the evidence from Dr. Christoph that

23    demonstrates how Tapentadol works in a polyneuropathic model

24    while maintaining the nociceptive pathway?  Have you reviewed

25    that evidence?

1    A.   I cannot recollect if I reviewed all of it.  It's

2    impossible for me to know or recollect that.

3    Q.   But, you're offering an opinion that there's no

4    unexpected results here?

5    A.   For clarification purposes, you said look at this

6    Table 2 and tell me if this is selectively inhibiting

7    neuropathic pain or with a nociceptive pathways.

8    I said looking at that Table 2 I cannot come to that

9    conclusion because this table is only about neuropathic pain.

10    Q.   Except you have absolutely no idea how he set up the

11    model and what he used as the vehicle,  correct?

12    A.   You asked me to look at the table.  I can only respond

13    to that.

14    Q.   Doctor, correct, you do not know how this test was

15    redesigned and what he used as his vehicle, correct?

16    A.   Correct.

17    Q.   Thank you.  Can we have Page 8, please, of the

18    declaration.

19    This is the third test that Dr. Christoph ran.  This is

20    the one you wanted to jump to right away.  This is the

21    comparison of morphine and Tapentadol,  correct?

22    A.   This is a graph demonstrating the comparison of

23    Tapentadol and morphine.

24    Q.   Right .  And do you see where Tapentadol is relative to

25    morphine?

1   A.  Yes, I do.

2   Q.  Is it your testimony that Tapentadol did not outperform

3   morphine in this experiment?

4   A.  In this experiment it demonstrates that Tapentadol is

5   better than morphine at this dose.

6   Q.  So, we're turning now to the prosecution history,

7   doctor.

8   Can we look at tab H and can we look at Page 5, the

9   paragraph that starts with the present inventors.  Bring up the

10  paragraph, the present inventors.

11  Doctor, Grunenthal told the Patent Office based on the

12  Christoph declaration and the data, that the present inventors

13  have unexpectedly and surprisingly discovered that Tapentadol

14  is extremely and selectively effective for treating

15  polyneuropathic pain and polyneuropathy.

16  Do you see that?

17  A.  Yes, I do.

18  Q.  I'm sorry.

19  A.  Yes, I do.

20  Q.  I assume, based on your testimony, you think that's a

21  lie?

22  A.  I'm saying that I didn't say that.  I said what it

23  demonstrates is that Tapentadol works for polyneuropathic pain

24  in rats.

25  Q.  Do you disagree with that sentence that I just read?

1        A.   I would agree that Tapentadol is effective in the

2    treatment of polyneuropathic pain and that it is generally,

3    again, my understanding from clinical practice that different

4    doses of drugs would need to be utilized for different

5    conditions.  So, it is in the fact that Tapentadol does work

6    for polyneuropathic pain.

7        Q.   Okay.  Let's look further.  Page 6 of the office action

8    at the bottom, one of ordinary skill.

9        One of ordinary skill in the art reading Buschmann,

10   Buschmann's disclosure that its compounds are useful for the

11   treatment of pain and are effective in the phenylquinone

12   writhing test -- that was the writhing test we looked at in the

13   '593, correct?

14       A.   Correct.

15       Q.   And writhing test would not reasonably expect that

16   Buschmann's compounds would be useful for the treatment of

17   polyneuropathic pain.

18       Do you see that statement?

19       A.   Yes.

20       Q.   Let's turn over to Page 7, Rob and pick up in contrast

21   in the middle of that big paragraph.

22       It says In contrast, Tapentadol has a dual mode of

23   action MU opioid receptor agonism and noradrenaline reuptake

24   inhibition.  Thus, Tapentadol has a different mode of action

25   than opioids.

1          Do you see that?

2      A.   Absolutely.

3      Q.   And then the last sentence of that paragraph, Due to

4  these differences in action between opioids and Tapentadol and

5  Tramadol and Tapentadol, one of ordinary skill in the art would

6  not have had a reasonable expectation that Tapentadol could be

7  successfully substituted for the opioids and Tramadol disclosed

8  in what is probably meant to say Dworkin.

9          You see that, right?

10      A.   Yes.

11      Q.   And turning, actually at the bottom of that page,

12  Furthermore, even assuming the combination of Buschmann and

13  Dworkin rendered the presently claimed methods prima facie

14  obvious, the unexpected and surprising extreme and selective

15  effectiveness of Tapentadol for treating polyneuropathic pain

16  and polyneuropathy effectively rebuts such prima facie

17  obviousness.

18          The data described in the Christoph declaration

19  demonstrate these unexpected results associated with the

20  presently claimed methods.

21          Do you see that?

22      A.   Yes, I do.

23      Q.   And you see the description of all those results on

24  Page 8, 9 and 10?

25      A.   I was following you up to that point, but --

1      Q.   Do you see how Grunenthal disclosed what was

2      highlighted in the Christoph declaration at pages 8, 9 and 10

3      of the office -- of the response to the office action?

4      A.   Yes, I see the results from 8, 9 and 8, 9, yes.

5      Q.   After Grunenthal submitted the Christoph declaration

6      with the data that we just looked at and after it presented

7      this response, what did the Patent Office do?

8      A.   I believe this was in 2011.  I don't have that document

9      in front of me.

10      Q.   Well, let's look at tab K.  That might help.

11           Didn't the Patent Office allow the claims of the '130

12      patent at that time?

13      A.   I believe so.

14      Q.   So, over all of the objections that you identified

15      during your testimony, the patent examiner raised them three

16      separate times.  Grunenthal submitted data and the Christoph

17      declaration, some of which you don't remember or don't know

18      about, and that response.  And then the Patent Office granted

19      the patent, correct?

20      A.   Yes.

21      Q.   Do you know what Grunenthal did next?  Let's take a

22      look at tab L.

23      A.   I'm here.

24      Q.   Do you know what a request for continued examination is

25      A.   Again, I'm not an expert in this field so I'm not going

1    to comment on that.

2         Q.   You're not an expert in patents, are you?

3         A.   I'm not an expert on the laws surrounding this

4    application process.

5         Q.   You've never participated in the patent prosecution

6    process at all, have you?

7         A.   No, I have not.

8         Q.   And you're not listed as an inventor on any patents?

9         A.   No.

10        Q.   And a request for continued examination is where the

11   applicant, the patentee, sends back to the Patent Office the

12   notice of allowance and asks the Patent Office to look at the

13   claims one more time.  And that's what's filed here, I will

14   make that representation to you, the extraordinary step of

15   requesting continued examination.

16             And do you know what the Patent Office did in response

17   to this?

18        A.   Yes.

19        Q.   Okay.  What was that?

20        A.   They granted the application.

21        Q.   It granted the application one more time.

22             And if we can look at Page 2 of tab M, I will take the

23   bottom and then the top of the neck page, Rob.

24             At the bottom of the Page 2, the examiner says she has

25   reviewed the submitted IDS and its contents and has determined

1          that the cited references do not teach nor provide adequate

2          motivation to arrive at the instantly claimed methods.

3                    Do you see that?

4          A.   Yes, I do.

5          Q.   And then at the top of the next page, Page 3, the

6          instant claims are seen to be novel and nonobvious over the

7          teachings of the prior art.

8                    Do you see that?

9          A.   Yes.

10         Q.   As between you and the Patent Office, who has more

11         expertise in evaluating patents?

12         A.   In evaluating patents, I would say the Patent Office.

13         Q.   Now, this last statement that the examiner made that

14         the instant claims are seen to be novel and nonobvious over the

15         teachings of the prior art,  you actually agree with that

16         statement, don't you?

17         A.   No.  I just said that the treatment of neuropathic

18         pain, polyneuropathic pain with opioids is not new.

19         Q.   So, you disagree with that?  You do not believe that

20         the instant claims are seen to be novel and nonobvious,

21         correct?

22         A.   Yes.

23         Q.   Let's take a look at one of your articles.

24                    THE COURT:   Let me just ask, any issue with this?

25                    MR. CONNOLLY:   No, your Honor.

```
 1                   THE COURT:    Thank you.
 2        Q.   Doctor, I have just introduced and had marked
 3   plaintiff's trial Exhibit 3005 which is an article written by
 4   you entitled Multimodal Analgesia for Perioperative Pain
 5   Management.   Do you see that?
 6        A.   This is for the perioperative is acute pain management.
 7        Q.   Okay.   Let's take a look at Page 61.
 8             Are you there?
 9        A.   Yes.
10        Q.   Do you see the dual acting agent Tapentadol? Do you see
11   that?
12        A.   Yes.
13        Q.   Let me read the first sentence that you wrote.
14   "Tapentadol is a novel centrally acting analgesic with dual
15   mode of action".
16             Do you see that?
17        A.   Yes.
18        Q.   But, you disagreed a minute ago with the examiner who
19   called this novel but yet you wrote in your paper that
20   Tapentadol was novel, correct?
21        A.   That's not what I wrote in the paper.
22        Q.   Correct?
23        A.   Let me finish.   What I wrote in the paper was a novel
24   method of treating acute pain.   It is a dual method in terms of
25   dual mode of action for opioids and norepinephrine reuptake
```

1    inhibition for the treatment of pain.

2        Q.   I'm sorry, doctor, I didn't see the word "acute" there,

3    did you, in that sentence?

4        A.   You are taking the entire topic.  If you look at the

5    first page is on multimodal analgesia for perioperative pain

6    management.  Perioperative pain management means the first 24

7    to 48 hours after surgery.  It is not talking about chronic

8    pain defined as long months of duration.

9            Second of all, this is actually an excerpt.  This is

10   not a publication.  This was an excerpt from a supplement of a

11   review article.

12       Q.   It's funny you say that because you didn't list this on

13   your C.V. as a publication and yet it does seem like a

14   publication to me.

15       A.   It is true.  As I said, it is not a publication because

16   this is a review article.  This is a lecture among all the

17   lectures I give that you say I am not an acute pain expert, but

18   actually I'm an acute pain expert and a chronic pain expert.

19           This is one of the international lectures I gave that

20   they decided to print.  So, I don't consider that as one of my

21   publications because it didn't go through the peer review

22   process which my publications all, I believe, should go through

23   before it gets published.

24       Q.   All right.  Legally let's look at what else you had to

25   say about Tapentadol when you were not having to go through a

1    peer review process.

2         You said, the next sentence, combining both effects in

3    a single molecule eliminates the potential for drug drug

4    interactions inherent in multiple drug therapy.

5         Doctor, Tapentadol eliminates that drug drug

6    interaction, right?  Or do you not agree with that sentence?

7    A.   That's correct.

8    Q.   The analgesic effects of Tapentadol are independent of

9    metabolic activation with minimal metabolites,  correct?

10   A.   This is true.

11   Q.   And what are you comparing there Tramadol, right?

12   Tramadol has metabolites, correct?

13   A.   Correct.

14   Q.   All right.  Let's skip down a few more sentences.

15        The dual mode of analgesia --

16   A.   I'm sorry, I think I lost you.  Okay.  I'm sorry.

17   Q.   Sure.  The dual mode of analgesia is synergistic as

18   demonstrated by preclinical work.

19        Do you see that?

20   A.   Yes.

21   Q.   The preclinical work that you're relying on, that's Dr.

22   Christoph's work, isn't it?

23   A.   Probably.  I don't see the reference and it is not

24   cited.

25   Q.   Did you do any preclinical work on Tapentadol?

1       A.   No.

2       Q.   Let's go to the top of the next column.   This compound

3   though has opioid activity, also has activity at the descending

4   pathway.

5       Do you see that?

6       A.   Yes.

7       Q.   And is the descending pathway implicated in neuropathic

8   pain?

9       A.   Yes.

10      Q.   Okay.   It then says this will be a very useful

11  analgesic as more clinical experience is obtained in the

12  postoperative setting.

13      Do you see that?

14      A.   Yes.   As I said before, this is about acute pain and

15  you are saying that very clearly that it's in the postoperative

16  setting.   After surgery it will be beneficial.

17      Q.   Okay.   Next sentence, Tapentadol has decreased

18  incidence of nausea and vomiting compared to Oxycodone.

19      Do you see that?

20      A.   Yes.

21      Q.   That to me reads as in the decrease of side effects.

22  Doesn't that read that same way to you?

23      A.   It decreases in terms of nausea and vomiting.   It

24  decreases in side effects.

25      Q.   So, those are side effects that are not as great with

1      Tapentadol as with Oxycodone, correct?

2      A.   Correct.

3      Q.   Last question, doctor.  Can I have DTX 75?

4      A.   Is that in your binder?  I'm sorry.

5      Q.   DTX 75.

6      A.   Is that in yours?

7      Q.   Can I have Table 3, Rob?  It's column 12.  Can you blow

8  that table up, please ?

9      Doctor, are you there?

10     A.   One second.  Sorry.

11     Q.   Okay.

12     A.   Just give me one minute.  Yes, I am.

13     Q.   Okay.

14     A.   I'm there at the table.

15     Q.   Have you read this particular example, the in vivo

16  experiments that are here in Table 3 of the patent?

17     A.   Again, I have reviewed this but it has been awhile.  So

18  bear with me if I have to read it.

19     Q.   Four compounds were compared, here, right?  Morphine,

20  Gabapentin, Tramadol, and what's the last compound?

21     A.   I believe it's compound nine.  I believe it's, from my

22  recollection, it's Tapentadol.

23     Q.   So, Tapentadol was compared to Tramadol wasn't it,

24  doctor?

25     A.   I believe so in this animal model.

1      Q.   And Grunenthal provided this information to the Patent

2      Office when it granted the patent, correct?

3      A.   It must have.

4      Q.   Thank you.

5                MR. SITZMAN:   No further questions at this time.

6                THE COURT:   Thank you very much.   All right.

7      Are you going to do a further examination?

8                MR. CONNOLLY:   Hopefully very brief, your Honor.

9                THE COURT:   All right.

10     REDIRECT EXAMINATION BY MR. CONNOLLY:

11     Q.   Dr. Buvanendran, do you happen to have the testimony

12     from your testimony from the Cadence versus Exela trial that

13     you were asked questions about today?

14     A.   Yes, I do.

15     Q.   Okay.   I'm going to ask you to turn to page, in the

16     upper right-hand corner it says 1449.

17           Tell me when you're there, okay?

18     A.   1449.   I'm there.

19     Q.   Okay.   And would you turn to the question, do you see

20     there's a question on Page 5?

21     A.   You mean Line 5?

22     Q.   I'm sorry, Line 5.   And the answer that goes through

23     Line 12?

24     A.   Yes.

25     Q.   Could you just read that out loud into the record

1      noting where there's a question and when there's the answer?

2          A.   So, the question was, Can you provide the Court with

3      some details regarding your medical practice?

4          Response:  Yes.  My common practice is I do

5      anesthesiology and I practice anesthesiology with routine care

6      of patients with acute postoperative pain and also chronic pain

7      management.  In addition I also do clinical development

8      research in the area of active in pain management.

9          Q.   Okay.  And can you put up Dr. Haeussler's trial

10     testimony?

11         Do you recall you were being asked some questions this

12     morning or this afternoon, I kind of lost track of it, about

13     your review of Dr. Haeussler trial testimony?

14         A.   Yes.

15         Q.   You recall that plaintiffs Counsel asked you a series

16     of questions about a certain portion of Dr. Haeussler's

17     testimony?

18         A.   Yes.

19         Q.   Okay.  Now, I'm going to ask Ted if you wouldn't mind

20     putting up Page 47, I'm sorry, Page 48, 49.  I'll get it right.

21     Yesterday.

22         So, on Page 49 could you highlight from Line 8 on

23     Page 49 through Line 8 on Page 50?

24         Now those lines read as follows:  "Question:  So,

25     there's no question" -- this is inquiry to Dr. Haeussler.  "So

1    there's no question, I would like you to turn to one other page

2    or two pages, the review of Dr. Brodsky.  It's about two-thirds

3    of the way through.  And we will put it on the screen for you

4    and we will start at Page 4 of 129.  And if we could go to the

5    third paragraph Results.

6         And, again, do you see the reference to the two trials

7    11 and 15?

8         "Answer:  Yes.

9         "Question:  Okay.  Let's turn two pages forward to

10   Page 6 of the 129 summary.

11        And Dr. Brodsky says in summary, the efficacy of

12   Tapentadol ER in the chronic treatment of pain was from two

13   positive adequate and well-controlled trial studies, 11 and 15.

14   Do you see that answer?

15        "Yes.

16        "Question:  And then he says, the next sentence, the

17   heterogenous design populations of the two positive trials

18   supports the efficacy of Tapentadol.  The two positive trials

19   had different designs, different populations and different

20   types of pain, nociceptive and neuropathic pain.  Do you see

21   that?

22        "Answer:  Yes.

23        "And that's the characterization of the FDA's medical

24   doctor that reviewed these clinical studies, correct?

25        "Answer:  It seems so".

 1          Doctor, is that the testimony that you read of Dr.

 2   Haeussler in this trial?

 3     A.   Yes.

 4     Q.   And what was the significance of that testimony to your

 5   opinions stated here today?

 6     A.   He talks about the chronic low back pain being more

 7   nociceptive.

 8          MR. CONNOLLY:   I have no further questions.   I

 9   believe Actavis' Counsel has some.

10          THE COURT:   That will be fine.   Thank you.

11   RECROSS EXAMINATION BY MR. CAPUANO:

12          MR. CAPUANO:   Can I borrow demonstrative 54?   This

13   will be very brief, your Honor.

14          THE COURT:   All right.

15     Q.   Dr. Buvanendran, do you remember Counsel asking you

16   about the legal standard for anticipation and he asked whether

17   the '737 patent explicitly or necessarily disclosed the use of

18   Tapentadol hydrochloride for treating polyneuropathic pain? Do

19   you remember him asking you that?

20     A.   Yes.

21     Q.   Okay.  And looking at this demonstrative exhibit number

22   54, did you think he was asking you whether the subpopulation

23   with severe polyneuropathic pain is necessarily part of the

24   larger population with severe pain?

25     A.   You've got to rephrase.  I am not very clear of your

1    question.

2        Q.   He asked you about the '737 patent and what it was

3    explicitly and necessarily describes.  Do you remember that?

4        A.   Yes.

5        Q.   Did you understand he was asking you about what the

6    words were in the patent?

7        A.   He was asking me about the words, yes.

8        Q.   Was he asking you about this Venn diagram?

9        A.   No.

10            MR. SITZMAN:   I object to the form of the

11   question.  He is asking the question to, I guess, speculate as

12   to what I was asking or thinking.

13            THE COURT:   I am not sure I understand the

14   question, so you can start again.

15            MR. CAPUANO:   Okay.

16       Q.   When you were asked the question by Counsel about

17   whether the '737 patent explicitly or necessarily disclosed the

18   use of Tapentadol to treat polyneuropathic pain, did you

19   understand that question to be asking you about the words in

20   the patent?

21       A.   Yes.

22       Q.   Okay.  In your Venn diagram on slide 54, is the large

23   population, the severe pain, does that necessarily include the

24   smaller population with severe polyneuropathic pain?

25       A.   Yes.

1    Q.   Okay.  Let's turn to slide 52.

2         Do you remember Counsel asking you whether there was

3    any doubt in your mind that example 25 describes Tapentadol?

4    A.   Yes.

5    Q.   And I think you told him you weren't a chemist.

6         In reaching your opinion that example 25 describes

7    Tapentadol, did you rely on any opinions of other chemistry

8    experts in this case?

9    A.   Yes.  I can't recollect their names, but I do rely on

10   them.

11              MR. CAPUANO:  No further questions, your Honor.

12              THE COURT:  Thank you.  Anything else?  Anything

13   else from the defendants?

14              MR. CONNOLLY:  No, your Honor.

15              THE COURT:  Anything else from the plaintiffs?

16              MR. SITZMAN:  Nothing, your Honor.

17              THE COURT:  All right.  Thank you very much.

18   Your testimony is concluded today.  The Court thanks you for

19   coming in and assisting.  I do appreciate it.  You may go.

20   Thank you.

21              THE WITNESS:  Thank you.

22              THE COURT:  Where does that leave us, Counsel?

23              MR. SITZMAN:  I think it's the defendants' move to

24   rest at this point.

25              MR. CONNOLLY:  We so rest.

1            MR. ALY:  Before we rest, we want to make sure the

2      Exhibits -- two things, just for the record purposes.  I will

3      use the microphone.

4            THE COURT:   Speak right into it.  See if you can

5      pull it a little closer.

6            MR. ALY:  One thing is the exhibits.  As your

7      Honor knows, we have been exchanging lists of exhibits.  So,

8      when we close, it will be subject to the exhibits being made

9      part of the record officially, which they haven't been done.

10     And the second thing --

11           THE COURT:   Did you agree upon another list?  The

12     initial list that you gave us, we put on the record.  Is there

13     a second list now?

14           MR. SITZMAN:  There will be a second and a third.

15     There is not an issue.  We are kind of lagging behind making

16     sure we get through the transcripts, making sure we have all

17     the exhibits.

18           THE COURT:  I completely understand.

19           MR. SITZMAN:   And there's no objection to Mr.

20     Aly's preservation.

21           THE COURT:   Excellent.

22           MR. ALY:   The two points.  The second point, your

23     Honor, has to do with deposition transcripts which the Court

24     order procedure is to just submit those separately.  So, when

25     we close, they will also be subject to those deposition

```
 1        transcripts which will be of record.  Of course the two in mind
 2        are Marita Mueller and Dr. Tzchentke that were relevant and
 3        referred to in the case.
 4                    THE COURT:   Any issue?
 5                    MR. SITZMAN:   No objection here, your Honor.   In
 6        fact, I think we are going to start discussing how those should
 7        be submitted to the Court.
 8                    THE COURT:   That's fair enough.
 9                    MR. FITZPATRICK:   I will just note for the record,
10        your Honor, that Mr. Aly is speaking on behalf of all
11        defendants on these issues.
12                    THE COURT:  That sounds fine.  Thank you.
13                    MR. ALY:  Those are the only two.
14                    THE COURT:   So, the two issues I think we have
15        dealt with is the first one is the exhibit list.  It sounds
16        like you're still going through it, catching up with the record
17        and you're going to be submitting something formal.  I will
18        treat it in the same way that I dealt with the first exhibit
19        list.  So, once you're in agreement, you can let me know and
20        then I will put it onto the docket.
21                    And the second issue with respect to the
22        depositions, you're still talking to one another with respect
23        to how you're going to be, I guess the process for submitting
24        them.  Or what is it exactly that you're still discussing?
25                    MR. SITZMAN:   I was going to make a proposal that
```

1    we handle the plaintiff witnesses, the color coding for the

2    designations, their designations and ours, have the defendants

3    handle all their witnesses, then we can hand them over and then

4    hand them to you.

5                THE COURT:   How does that sound?

6                MR. ALY:   That sounds fine.

7                THE COURT:   Mr. Aly is speaking for all the

8    defendants?

9                MR.FITZPATRICK:   Yes, your Honor.

10               MR. CONNOLLY:   Yes, your Honor.

11               THE COURT:   Are we good with that? Yes.   Thank

12    you.   That sounds fine.   That seems pretty straightforward.

13               MR. SITZMAN:   I guess on that topic, your Honor,

14    as long as we get them to you in the next few days, is that all

15    right, by Thursday maybe?

16               THE COURT:   That's fine.   I know you folks have

17    your hands full.

18               MR. SITZMAN:   Thanks.

19               THE COURT:   Where do we stand now?

20               MR. ALY:   I think we do rest at that point.

21               THE COURT:   All right.

22               MR. SITZMAN:   Your Honor, I just want to preserve

23    and sort of make the 52(c) motion as to Roxane and Alkem on the

24    infringement issue.

25               The Court's already heard argument on that.   I

1    don't think there's any need to do that.  The Court's already

2    indicated that it will reserve.  But, I just wanted to formally

3    make sure, now that they've closed, to request that.

4                    THE COURT:   That makes sense to reserve your

5    rights with respect to that.  But, as I indicated with the

6    other application, I will be reserving on this as well because

7    it is a complex matter and I would like time to reflect on the

8    issues.

9                    So, at this point I will be reserving on that as

10   well.  Thank you.

11                   MR. SITZMAN:  One more thing.

12                   THE COURT:   Yes.  Go ahead.

13                   MR. SITZMAN:   I just need to get clarity on

14   something.

15                   THE COURT:   One more thing with respect to that

16   in terms of doing our closings.  I know we have set aside a

17   separate date for doing our closings.  I am anticipating also

18   doing essentially what is a motion argument at that point in

19   time as well.

20                   So, we can talk about it as we get closer to the

21   date.  But, I'm sure you folks want to put together your own

22   presentation.  But I want, I do want to allow time for my own

23   questions and an argument regarding the issues that we've had

24   here.

25                   MR.FITZPATRICK:  Of course.

1              THE COURT:   As opposed to a sterile argument

2    which I appreciate and certainly I'm looking forward to

3    hearing.  But, I also have some issues that I would like to get

4    further development of.  And I think it would be productive if

5    we all discuss it together.

6              MR. FITZPATRICK:  Certainly.

7              THE COURT:   Thank you.

8              MR. SITZMAN:  We will talk hopefully later this

9    week about timing and schedules and things like that.

10             THE COURT:   That sounds good.  Do we think we are

11   going to be done this week or not?

12             MR. SITZMAN:   I haven't heard about the rebuttal

13   case but we're hoping to be done by Thursday.

14             MR.FITZPATRICK:   I think that's the defendants'

15   consensus also, your Honor.

16             MR. SCHULER:  Based on our understanding of how

17   much time is left.

18             THE COURT:   How much time is left on either side?

19             MR. SCHULER:  My understanding is we are up to

20   25 hours before today, which is --

21             MR. CONNOLLY:  And seven hours after that, today,

22   your Honor.

23             THE COURT:  Is that it?  No, I'm joking.

24             MR. SCHULER:  It depends on how you accelerate

25   time.  So, our understanding, based on we have been getting six

1     hours a day, we may ask the Court if we can go late.  I don't

2     know which day we need to do it.  I hate to do it Thursday.

3     But even a little bit, half hour here or there, I think we will

4     finish.

5               MR. SCHULER:  Or run out of time.

6               MR. SITZMAN:  As long as they stay within their

7     allotted time, I'm sure that's going to work out fine.

8               THE COURT:  And obviously if you don't complete

9     what you need to do by Thursday, I would anticipate that you'd

10    have whatever witnesses you actually need for the following

11    Monday.  Would we be prepared to do that?  I'm pushing to do, I

12    think it would be great if we finish on Thursday.

13              MR. SCHULER:  Based upon who they already

14    proposed for Wednesday, that is their final two rebuttal

15    witnesses, and then there are simply two secondary additional

16    witnesses that are fairly short.

17              THE COURT:  I'm sorry, again, the numbers count

18    between the hourly count for the defendants and the hourly

19    count for the plaintiffs is what, roughly?

20              MR. SCHULER:  Aggregate 25.

21              MR. FITZPATRICK:  I think we would have to redo

22    the count at the end of the day.

23              THE COURT:  It's 25 plus seven on your side?

24              MR. SCHULER:  No, combined the two sides have

25    about 25.

```
 1              MR. SITZMAN:   I've got 25 hours for the
 2   defendants and 19 hours for us.
 3              MR. MILLER:   As of last night, or last week.
 4              MR. CAPUANO:   Our numbers are close to that.
 5              THE COURT:   Okay.  So, not counting today.
 6              MR. SITZMAN:   Not counting today.
 7              MR.FITZPATRICK:   So, that would leave about 26
 8   before today.
 9              THE COURT:   All right.  So, we'll see how it
10   goes.
11              MR. SITZMAN:   Your Honor, with the defendants
12   resting, we sure would like to get our next witness on quickly.
13   Is that okay?  Don't take a break yet and go ahead and move on.
14              THE COURT:   Are you good?  Would you like to just
15   start?  All right.  Five minutes, the short, short break.
16   Short, short break.
17              MR.FITZPATRICK:   Thank you, your Honor.
18              (Whereupon a short recess was taken.)
19              THE COURT:   Let's call the next witness, please.
20              MS. RANNEY:   Plaintiffs would call Dr. Joel
21   Bernstein.  But, I believe we have binders to hand out first.
22              THE COURT:   Good afternoon.  Let us have the
23   witness sworn in.
24
25   J O E L  B E R N S T E I N, sworn and testifies as follows:
```

```
 1              THE COURT:   How are we doing on the exhibit
 2    binders?  Did we get an opportunity to take a look?
 3              MR. ALY:   Yes, your Honor.  No objection to the
 4    exhibits.   As to demonstratives, there's new material not in
 5    Dr. Bernstein's report, particularly with slide ten.  However,
 6    given that this is a bench trial, what we'd suggest is that we
 7    just cross-examine on that slide which has to do with the
 8    timing of various techniques.
 9              THE COURT:   That sounds fine.  I'm sure there's
10    no problem with that.
11              MS. RANNEY:   That's fine.  And, your Honor, we
12    believe that these slides are also supported in Dr. Bernstein's
13    report and we are happy to go through that.
14              THE COURT:   Thank you.   All right.
15    DIRECT EXAMINATION BY MS. RANNEY:
16              THE WITNESS:  I didn't state my name yet.
17              THE COURT:   You can state it.
18    A.   My name is Joel Bernstein.
19    Q.   I'm Christine Ranney of Gibson Dunn for Depomed.
20              THE COURT:  Thank you.
21    Q.   Good afternoon, Dr. Bernstein.
22    A.   Good afternoon.
23    Q.   Let's put up plaintiff's Exhibit 1034.
24         What's this exhibit, Dr. Bernstein?
25    A.   That's my C.V.
```

 1        Q.   And is this C.V. accurate as of the date in the top

 2   right corner?

 3        A.   Yes, the upper right-hand corner of this is July of

 4   last year.  It's accurate as of that.

 5        Q.   Any material changes since then?

 6        A.   There may have been a few additional publications or

 7   talks that I've given, papers we've submitted.  But that's

 8   essentially it.

 9        Q.   I'd like to walk you through your employment and

10   educational background.

11        Did you help prepare any slides to aid your testimony

12   today?

13        A.   Yeah.  We have a demonstrative I think that summarizes

14   some of that.

15        Q.   All right.  Let's put up the first slide.

16        Could you tell the Court about your educational

17   background, Dr. Bernstein?

18        A.   Yes.  Actually there should be another line below where

19   I went to school.  I'm sort of on a homecoming trip here.  I

20   went to high school up the hill here in West Orange, New

21   Jersey.  So I'm a little bit of a local boy.

22        And then I went to, I was an undergraduate at Cornell

23   where I did a Bachelors degree in chemistry.  And following

24   that I did my Masters and Ph.D. at Yale in physical chemistry

25   and mainly on spectroscopy.  And the title of my thesis is

1    given there.

2        Q.   What is your current professional affiliation?

3        A.   My current affiliation is I'm global distinguished

4    Professor of Chemistry at NYU.  And I split my time between one

5    semester at NYU in Abu Dhabi and another semester in Shanghai.

6    I'm currently actually in Shanghai.

7        Q.   How long have you been a faculty member?

8        A.   I took my first faculty job in October of 1971 so it's

9    been about 45 years.

10       Q.   Let's go to the next slide.

11            What does this slide show?

12       A.   This slide summarizes a number of the positions I have

13   held over the years.  Most of my career, my academic career was

14   at Ben-Gurion University of the Negev in Israel.  And that was

15   punctuated by visiting Professorships and sabbaticals at a

16   number of other institutions which are shown here.

17       Q.   And in the 45 years that you've been a faculty member,

18   has there been a common thread throughout your research?

19       A.   Yes.  Most of my work has been on the solid state

20   chemistry of molecular crystals e have been interested in the

21   structure and properties of molecular crystals with a

22   particular emphasis and my greater interest in polymorphism.

23       Q.   And how did you first become interested in

24   polymorphism?

25       A.   Well, back in 1965 or '66 when I was in the late stages

1    doing my Ph.D., I was working with another graduate student on

2    trying to work out some of the geometry of a particular

3    crystal.  And we were having a difficult time.

4         So, he said, you know, maybe this is, this material is

5    polymorphic.  And I said what's that.  He said well, it could

6    have more than one crystal structure.  And I was fascinated by

7    the idea that a particular substance could crystallize or a

8    particular molecule would crystallize in more than one crystal

9    structure.

10        And that was sort of a milestone in my entire career

11   and I've been interested and fascinated by this ever since.

12   Q.   Are you still active in research on polymorphism?

13   A.   Yes, I am.

14   Q.   Let's put back the C.V. and go to Page 5.  Memberships

15   and professional societies.

16        Now, one of the items listed here is Fellow, American

17   Association for the Advancement of Sciences.

18        What's that one, doctor?

19   A.   Yeah, the American Association for the Advancement of

20   Science of course is an important professional organization

21   which publishes the Journal of Science.  And every year they

22   elect a few hundred Fellows for special recognition on

23   accomplishments, career accomplishments.  And among those are a

24   few foreign Fellows.

25        And since I was in Israel when I was elected a Fellow,

1          that was as a foreign Fellow back in 1999.

2               Q.   Is this a fellowship you still hold today?

3               A.   Yep.

4               Q.   Let's go to Page 6, the next page.  The scientific

5          publication section.

6                    Does this section reflect your publications related to

7          polymorphism?

8               A.   Yes, it does.  Most of the publishings in there deal

9          with polymorphism.

10              Q.   And how many books or chapters have you written on

11         polymorphism?

12              A.   Well, the first entry there is a book I wrote which

13         came out what, about 14 years ago, and was translated into

14         Russian in 2008.  And then there are 17 or 18 chapters and

15         another 170 or 80 papers.  So, the total list of publications

16         is approaching about 200.

17              Q.   Okay.  And is this the book you are referring --

18                   MS. RANNEY:   May I approach?

19                   THE COURT:  Yes?

20              Q.   -- the book you are referring to?

21              A.   Yes, it is.

22                   MS. RANNEY:  I am going to hand this to the

23         witness.  For the record, this is plaintiff's Exhibit 1041.

24              Q.   How did this book come about, Dr. Bernstein?

25              A.   Well, about in the early '90s when I had been working

1        in this field for quite a few years,  I realized that there

2        was, there had been a lot of activity.  And polymorphism was

3        actually discovered about 1821.  And many more people were

4        starting to work in the field.  But, there was no, there was no

5        texts in the field.

6                And I decided to write this book in order to accomplish

7        really two purposes, one was to set out the fundamentals of

8        polymorphism and molecular crystals.  And so the first four or

9        five chapters do that.  And then summarize a lot of the work

10       that had been done until then.

11               So that the book could serve as a starting point for

12       people who want to get into the field, and then serve as a

13       point for further work as more and more work was published.

14           Q.   And do you know roughly how many times your book has

15       been cited?

16           A.   Yes.  It's been cited, I think, a little bit over 1400

17       times already.

18           Q.   And have defendants' experts relied on your book before

19       in their books?

20           A.   Yeah, I think Dr. Metzger cited it 12 times and Dr.

21       Steed 9 times, last time I checked.

22           Q.   Let's go to Page 9 at the top.  What's listed on this

23       page?

24           A.   These are, this is the beginning of the list of peer

25       reviewed publications and scientific journals.

Q.   You mentioned earlier that your total publications were approaching the number 200.

Do you know about how many times your publications have been cited?

A.   I think somewhere over 16,000.

Q.   I would also like to ask you about one of the articles listed on your C.V., if we could go to plaintiff's Exhibit 680.

What's this article?

A.   Well the article's entitled Polymorphism, a perspective.  And it was published in Crystal Growth and Design which is an American Chemical Society Journal.  It was founded in 2001.

Now, as the journal approached its tenth anniversary, the editor decided to invite key people in the field to write what they call perspective articles, sort of reviews on the main topics in the field.  And I was invited to write that one on polymorphism.  And so that's how this particular paper was generated.

Q.   How does the scientific content of this article compare to that of your textbook?

A.   Well, since I had published my book in 2002 and this was going to be published in 2011, what I decided to do was try to cover some of the progress that had been made in that decade and as well as layout a number of the remaining problems and challenges that we're still faced in research on polymorphism.

1       Q.   Now,  did you help prepare a slide summarizing the

2       expertise that you've just described that's relevant to the

3       subject matter you will be discussing today?

4       A.   Yes, there is a slide of that nature.

5               THE COURT:   You know what, before we get to the

6       slides, Mr. Aly, I didn't get from you which is the slide that

7       you have an issue, I know you are going to talk about it on

8       cross-examination.  But just so I understand, which slide was

9       it?

10              MR. ALY:   Number 10.

11              THE COURT:   Number 10.   And the response to that

12      is the subject of it was in fact contained in the expert

13      report?

14              MS. RANNEY:   That's correct.

15              THE COURT:   Okay.  Briefly what is the slide on?

16              MR. ALY:  On timing of various things.  So there's

17      a difference between, in the report, discussions of finding

18      polymorphs versus the time it takes to do different tests and

19      techniques for the polymorph discovery process.

20              THE COURT:   Okay.  I know you mentioned timing

21      but that's a little more specific.

22              MR. ALY:   That's what I meant.

23              THE COURT:   And the response was that -- was this

24      fact part of the expert report?

25              MS. RANNEY:   Yes.  Dr. Bernstein discusses how,

1      you know, experiments can take different amount of time,

2      sometimes many months.  And he discusses some of the techniques

3      on the slide in his report.

4                    THE COURT:    Okay.  Thank you.

5         A.    Yes, this is a summary of my research interests

6      throughout most of my career and today as well.

7                    MS. RANNEY:    Your Honor, plaintiffs offer Dr.

8      Joel Bernstein as an expert in the field of solid state

9      chemistry and polymorphism.

10                   THE COURT:    Any issue with that?

11                   MR. ALY:    No, your Honor.

12                   THE COURT:    Thank you.  He is so deemed an expert

13     in those areas.

14                   MS. RANNEY:    Thank you.

15                   THE WITNESS:    Thank you.

16        Q.    Doctor, were you asked by plaintiffs to provide any

17     expert opinions in this case with respect to U.S. patent

18     Number 7994364?

19        A.    Yes, I was.

20        Q.    What opinions were you asked to provide?

21        A.    I think my opinions are summarized on the next

22     demonstrative.  I was asked to opine on validity of the '364

23     patent, including utility, obviousness and anticipation with

24     respect to that patent.  And the issue of enforceability which

25     involved defendants' claim of unclean hands on the part of

1     Grunenthal.

2          Q.   And did you reach any conclusions with respect to the

3     validity and enforceability of the '364 patents?

4          A.   Yes,  I did.

5          Q.   What were those conclusions?

6          A.   I think the patent demonstrates utility, it's

7     nonobvious and the material in the patent was not anticipated.

8          Q.   And did you reach conclusions on enforceability and

9     and --

10         A.   And Grunenthal did not demonstrate unclean hands in

11    applying for the patent.

12         Q.   Okay.  Let's put up plaintiff's Exhibit 1458.

13              If you can sort of highlight the top.

14              Do you recognize this document, doctor?

15         A.   Yes, that's the '364 patent.

16         Q.   And if we go back to the whole patent, what is the

17    invention of this patent?

18         A.   The invention I think is pretty well summarized both in

19    the title and the abstract.  So if we could see the title.  No,

20    the title.  The abstract does it as well.

21         Q.   The title is fine.

22         A.   The title says this is crystalline form so the patent

23    deals with crystalline forms of Tapentadol.  And the abstract

24    again, a hitherto unknown crystalline form.

25              So the patent deals with that and how to make it.  And

1    then the patent also describes the use of that as an analgesic

2    to treat pain and/or urinary incontinence.

3        Q.   Is the invention of the '364 patent useful?

4        A.   Yes, it's useful essentially for two reasons, one, it

5    provides the method of preparation and the characteristics for

6    form A which is a stable form, stable crystalline form of the

7    material at room temperature.  And it also describes its use as

8    an analgesic.

9        Q.   And does the '364 patent provide data showing that this

10   form A is the stable crystalline form at room temperature?

11       A.   Yes, it does.  And I think that's, if we go towards the

12   end of that specification, just before the claim, I believe

13   it's example 16, if I remember, if I recall correctly.

14       Q.   Yes, that would be Bates 57606, PDF Page 18.

15            So what does example 16 show us, doctor?

16       A.   Example 16 is titled Variable Temperature X-ray Powder

17   Diffraction Experiment.  And then as is written, a variable

18   temperature x-ray powder diffraction experiment was run thereby

19   producing form B from form A.   Form A converted to form B from

20   40 to 50 degrees during the experiment.  The result is

21   reversible with form B changing over into form A at lower

22   temperature.

23            So, that means that the experiment was begun at room

24   temperature and the material was heated up.  And in the course

25   of heating the material up, it was monitored using x-ray powder

1    diffraction and a transition or phase change, as we say, from

2    form A to form B occurred at the higher temperatures, namely

3    from 40 to 50 degrees.

4        The last sentence in that paragraph says, The result is

5    reversible with form B changing over into form A, indicates

6    that form A is the stable form at room temperature.

7    Q.   Thank you.   Let's move on to a different topic.

8        Were you in court for Dr. Steed's testimony regarding

9    obviousness?

10   A.   Yes, I was.

11   Q.   And do you agree with Dr. Steed that the claims of the

12   '364 patent are obvious?

13   A.   Not at all.

14   Q.   Could you give us one reason you disagree?

15   A.   Well, no crystal form is predictable.   And

16   predictability is essentially, from a scientific point of view,

17   a synonym of obviousness.   Nobody could look at the '737 patent

18   and have any idea what crystal forms would be possible from

19   Tapentadol.

20   Q.   Do you address the predictability of crystal forms in

21   your book?

22   A.   Yes, I do.   And that's on --

23   Q.   If we could go to plaintiff's Exhibit 681.

24   A.   That would be on Page 241.

25   Q.   All right.

1      A.   Which is the chapter on polymorphism and

2   pharmaceuticals.  And in the middle of the first paragraph on

3   Page 241 where it says while, that's the part, and I'll read

4   that.

5           While it may not be surprising that many

6   pharmaceutically important materials have been found to be

7   polymorphic or that any particular compound may turn out to be

8   polymorphic, every compound is essentially a new situation.

9   And the state of our knowledge and understanding of the

10   phenomenon of polymorphism is still such that we cannot

11   predict, with any degree of confidence, if a compound will be

12   polymorphic, prescribe how to make possible unknown polymorphs,

13   or predict what their properties might be.

14           And that, of course, was written in 2002.

15      Q.   And what do you mean when you say "every compound is

16   essentially a new situation"?

17      A.   Well, there are a lot.  Scientists naturally would like

18   to be able to predict when polymorphs might appear.  So people

19   have done a lot of statistics and say there are certain factors

20   which might influence the presence or the formation of

21   polymorphs.  And even with those statistics, which we will talk

22   about in a few more minutes, when you have a specific compound,

23   nothing is known about it and nothing can be predicted.

24           And so the meaning of every compound is essentially a

25   new situation.  When we started with a new compound, we have no

1     idea what the possibilities are.  And so that involves a

2     considerable amount of research.

3          Q.   And you wrote this opinion quite awhile ago.  Is it

4     still true today?

5          A.   Pardon me.

6          Q.   Sorry.  Is this still true today what you wrote?

7          A.   Absolutely.  It hasn't changed at all.

8          Q.   Do others in the field agree with you?

9          A.   Yes, they do.

10         Q.   Let's put up plaintiff's Exhibit 691.  Call out the

11    title and authors.

12              Are you familiar with this article, doctor?

13         A.   Yes, I am.

14         Q.   Does this article address whether polymorphism was

15    predictable in 2004?

16         A.   It does.

17         Q.   What's the general thrust of what it says?

18         A.   The general thrust is it was not predictable.  And we

19    can go on and read I think the relevant passage.

20         Q.   Sure.  Let's go to PDF Page 22, Page 296 of the

21    article.

22              I direct your attention to the first full paragraph on

23    the right column.  And there's a sentence in the middle of the

24    paragraph beginning Unlike salts.  The first paragraph on the

25    right beginning For many years.  And the sentence beginning

1      Unlike salts.

2          A.   In the middle.

3          Q.   There we go.   If you can just read this sentence for

4      the record.

5          A.   Unlike salts, which for the most part can be

6      prophetically claimed based on an understanding of the chemical

7      structure of the compound and its ionization constants, the

8      existence and identity of hydrates, solvates, co-crystals and

9      polymorphs have defied prediction.

10         Therefore, in order to obtain patent protection on

11     these forms, some of which may have significantly different

12     properties and relevance as development candidates, it is

13     essential to prepare them, identify conditions for making them,

14     and evaluate their properties as valuable new pharmaceutical

15     materials.

16         Q.   All right.   And do you agree that the identity of

17     hydrates, solvates, co-crystals and polymorphs have defied

18     prediction?

19         A.   Yes.   That's just affirming what I said earlier.

20         Q.   Is it possible to predict whether a compound will be

21     polymorphic based on molecular structure?

22         A.   Not at all.

23         Q.   Have you investigated the inability to predict

24     polymorphism in your own work?

25         A.   Yes.   And we're still doing that.   In fact, very

1    recently last summer we published a paper which addressed that

2    specific question.

3        Q.   Could you tell us a little bit about what you found?

4        A.   The paper's actually called Facts and Fictions about

5    polymorphism.  It was published in Chemical Society Reviews

6    which is the review journal of the Royal Society of Chemistry

7    in London.

8        And we were curious about really whether there could be

9    any molecular predictor.  If you can look at a molecule and

10   find any feature in the molecule which could be a predictor of

11   polymorphism.

12       And so we based our research on the data what's called

13   the Cambridge crystal graphic, the Cambridge structural

14   database which is a depository for all the crystal structures

15   that have been done in Cambridge at the University of

16   Cambridge.  And there are probably about 800,000 over there

17   now.  And this has been going on since 1965.

18       And I actually had two colleagues who worked with me,

19   both of them, one is from Eli Lily and the other is from Roche.

20   And we investigated what possible factors could be important on

21   a molecular basis.  If you look at a molecule, it's got certain

22   features to be a predictor of polymorphism.  And we found that

23   there is no, no molecular feature which can be used as a

24   predictor of polymorphism.

25       Q.   Did you hear Dr. Steed testify that about 50 percent of

1        compounds exhibit polymorphism?

2            A.   I heard him say that.

3            Q.   Do you agree with him?

4            A.   Well, the statistics, I don't agree with that.   I mean

5        I do, well, in a way I do agree.  And I should probably explain

6        it.

7            The statistics on polymorphism are very difficult to

8        obtain.  So, for instance at one extreme if you look in the

9        Mercks index which contains about 10,000 compounds of

10       pharmaceutical importance, and look up how many of those are

11       polymorphic, it's about one or one and a half percent.  So that

12       you might say that's the low end and that obviously is

13       contrary, completely, to what Dr. Steed said.

14           On the other hand, it was a study by Pat Staley who was

15       a scientist who worked at SSCI, you've heard about SSCI, for a

16       number of years.  And SSCI's business, they were in the

17       business of contracting, they were asked by pharmaceutical

18       companies under contract to search for polymorphs.  So, that

19       was how they were making their money.   And Pat Staley

20       summarized many years of their work, looked at about 250

21       compounds or so.

22           So,  here was a concerted effort to look for and find

23       polymorphs.  And in that instance they found about 48 percent

24       of the compounds that they looked at exhibited polymorphism.

25       So, that would be, that would be the high end.  Our numbers

1    that we found last, we published last summer, are considerably

2    lower.

3        Q.   Could you tell us about those numbers or a little bit

4    about them?

5        A.   Those numbers are somewhere in the range of about 30 to

6    35 percent.

7        Q.   Have others in your field written about the inability

8    to predict polymorphism based on molecular structure?

9        A.   Yes,  they have.

10       Q.   Could we go to plaintiff's Exhibit 684?  Let me just go

11   back to the title of the article which is Crystal Gazing:

12   Structure Prediction and Polymorphism.

13       A.   Yeah, this is a paper in science from 1997, as I

14   recall, from the author Gautam Desiraju.  And Gautam Desiraju

15   is a colleague, you can call him a friend, who established a

16   very active group in India for many years in Hyderabad.  He

17   recently moved to the Indian Institute of Technology in

18   Bangalore.  And he was, until recently, president of the

19   International Union of Crystallography which is a worldwide

20   organization of crystallographers.

21           So, he is a real authority in the field.  And he wrote

22   this paper commenting on the prediction, our ability to predict

23   polymorphism back in '97.  And if you can go to the appropriate

24   section.

25       Q.   Let's call out the bottom of the middle columns or

```
 1        about five lines down.
 2              Could you read this last sentence beginning All this
 3        means?
 4        A.   Sure.  "All this means that the crystal structures of
 5        many 'simple' organic compounds need not be simple at all.
 6        What is surprising, however, and this is what provides the
 7        vital impetus to molecular chemistry.
 8        Q.   Sorry.  That's not quite right.
 9        A.   No, that's not it.
10        Q.   Go to sort of the paragraph begins --
11        A.   It goes down to the subject.  It's under the caption on
12        the right-hand side.  "Vital impetus to the subject, is that
13        although the energy differences between the plethora of
14        putative crystal structures for a given molecule can be quite
15        small, many organic compounds are not polymorphic.
16              Molecules seem to know exactly how to crystallize, even
17        as chemists seem unable to accurately foresee such events".
18              So, this just again shows how little we know about the
19        possibility of polymorphism and the lack of our ability to
20        predict it.
21        Q.   And would this have been the case in 2004 as well?
22        A.   Absolutely.  It's still the case.  It hasn't changed at
23        all.
24        Q.   Okay.  Let's go to plaintiff's Exhibit 693.  If you can
25        call out the title and authors.
```

1    A.   Yeah.

2    Q.   What's this about?

3    A.   You don't have the reference up there.  If you get the,

4    stop, the reference is actually from chemical reviews.  So

5    which I point out is the most highly, it's the chemistry

6    journal with the highest impact factor.  So, this was from

7    2001.

8         The second author, the Professor Zaworotko also had a

9    distinguished career here in Canada and Florida.  And he has

10   now been put in charge of the pharmaceutical research unit at

11   the University of Limerick which is part of a consortium of

12   seven Irish universities developing pharmaceutical research and

13   development techniques.

14   Q.   If we can go to the second page, that's Bates

15   Number 64169, and call out the two sentences are From molecules

16   to Crystal Engineering, could you read the first two sentences

17   into the record there?

18   A.   Sure.  You will note, this is a quotation and so they

19   are quoting "One of the continuing scandals in the physical

20   sciences is that it remains in general impossible to predict

21   the structure of even the simplest crystalline solids from a

22   knowledge of their chemical composition".

23        And then Mike Zaworotko notes this provocative comment

24   by Maddox illuminates an issue that continues to represent a

25   challenge of the highest level of scientific and technological

1      importance.

2            Just to note that Maddox was, at the time, the editor

3      of nature this is a quotation which perhaps has haunted people

4      in our field because we haven't made a whole lot of progress

5      since then and been able to do that.

6      Q.   Let's talk more specifically about Tapentadol

7      hydrochloride.

8            Would a person of ordinary skill in 2004 be able to

9      look at the molecular structural of Tapentadol and predict

10     whether it would be polymorphic?

11     A.   As I pointed out, they couldn't do it then and they

12     can't to it now.  So there's no way that could have been done.

13     Q.   And how many forms of Tapentadol do we know about

14     today?

15     A.   We know about two crystalline forms and there's an

16     amorphous form.

17     Q.   And is it possible that there would be other

18     crystalline forms?

19     A.   Absolutely.  We just, there may be, but we haven't

20     discovered them yet.

21     Q.   Is it possible that these other forms may be more

22     stable than form A?

23     A.   If we, if other forms appeared, it would be likely that

24     they would be more stable.  The person who first really looked

25     at this whole situation of stability was sort of the father of

1   physical chemistry, a man named Oswald, a great German physical

2   chemist in the 1890s.  And he pointed out that if a material is

3   polymorphic, then as more, as new forms appears, the later

4   appearing ones will be in general more stable than the ones

5   that appeared before that.

6        This is called Oswald's rule, not Oswald's law.  So

7   there are exceptions.  Like every rule there are exceptions.

8   There are exceptions to that as well.  So that's on the basis

9   of Oswald's observation.  That's what we would expect if and

10   when we find any new forms.

11   Q.  Could you provide the Court with a well-known example

12   of a more stable crystal form appearing late in the game?

13   A.  Sure.  One of the first that I encountered was

14   ranitidine hydrochloride which is the active ingredient in

15   Zantac.  And the hydrochloride, ranitidine hydrochloride was

16   first prepared in 1977.  And then Allen & Hanburys which was

17   the predecessor of Glaxo at the time where the material was

18   being studied, worked for four years on that compound before

19   anything new was discovered.

20        And then one day one batch in a pilot plant appeared in

21   a new form, and that was the second polymorph.  And in fact

22   that was the polymorph that then Glaxo started marketing as

23   Zantac in 1984.  So, that was a serendipitously beneficial

24   incident.

25        But later, later on back in 1998 Abbott Laboratories

1    was marketing a drug called ritonavir and which was used, it's

2    an antiviral compound which was part of the AIDS cocktail.

3         And in 1998, two years after they had launched and that

4    was on the market, they had made 240 batches.  And there were

5    something on the order of 50,000 AIDS patients taking this

6    material.  And I think the market was somewhere in the order of

7    $200 million.  A new form appeared.  And in concert with

8    Oswald's rule, that new form was more stable.  And the more

9    stable forms are less soluble.  And so that new form had

10   essentially no therapeutic value.

11        And Abbott, which was at the time I remember the fifth

12   or sixth largest drug company in the world, couldn't find a

13   solution to go, they wanted to go back to the earlier form, and

14   they couldn't really figure out how to do it.  And the drug

15   went off the market for a year while they searched.

16        And there was the story of their search is a fantastic

17   story.  But, they finally, after a year, didn't solve the

18   problem by being able to go back to the original form.  But,

19   they developed a gel capsule.  A gel capsule is essentially a

20   solution in a pill.  So that's, and that's how they solved the

21   problem.

22        So, new forms can come along at anytime.  Sometimes the

23   pharmaceutical companies continue to look for them.  And

24   sometimes they come along, whether they are desired or not.

25   And there's the two cases I gave, one where it was a good thing

1      and the other one where it was at least a public relations

2      disaster.

3          Q.   So, with Ritonavir, you said they launched the drug and

4      they had 200 batches and they only then dissolve the more

5      stable form?

6          A.   They had no idea if that form could exist.  And, as I

7      said, they were on the market, 240 plant batches that they had

8      made before this appeared.  And it took them a few years to

9      figure out how that happened.

10         Q.   Let's go to plaintiff's Exhibit 668 and call out the

11     heading title.

12              Are you familiar with this document, Dr. Bernstein?

13         A.   Yes.  That's the '737 patent we've heard a lot about.

14         Q.   And did you hear Dr. Steed testify that the '364 patent

15     is obvious in view of the '737 patent and other references?

16         A.   Yes, I heard him say that.

17         Q.   Do you agree with him?

18         A.   Not at all.

19         Q.    Does the '737 patent include Tapentadol hydrochloride?

20         A.   Yes, it's one of the many compounds that are mentioned

21     in the patent.

22         Q.   And what other compounds does the '737 patent include?

23         A.   Well, there's a huge number which I actually haven't

24     calculated.  I think somebody has.  But, I am not familiar with

25     it.  But, there are, I think, 28, if I recall correctly, named

1     compounds which are included there.

2         Q.   Does the '737 patent disclose specific crystalline

3     forms of any of these compounds?

4         A.   No, the whole concept of crystalline forms is not

5     mentioned in that patent.

6         Q.   So, it doesn't disclose any of the compounds as

7     polymorphic?

8         A.   No.  The word "polymorph" doesn't appear in the patent.

9         Q.   Did you hear Dr. Steed testify that the '364 patent is

10    obvious in light of the '737 patent and references discussing

11    polymorph screens?

12        A.   Yes, I did.

13        Q.   And what is a polymorph screen?

14        A.   Well, a polymorph screen probably should be more

15    properly called a crystal form screen.  And the idea is that

16    when a pharmaceutical company has an active compound -- I

17    should mention it's not only pharmaceutical companies,

18    industries that work in pigments and in explosives and anything

19    that deals with solids, they would like to know what is a whole

20    variety of solids that might be possible for a particular

21    material.  So, that would be a crystal form screen.

22             And what it means is doing, trying to set up a whole

23    set of almost an infinite variety of experiments in order to

24    discover and characterize all the crystal forms that are

25    possible for the particular compound of interest and then

1    choose the one or ones, in some cases, that might be best

2    suitable for the purposes that the company is interested in.

3        Q.   Have you prepared any slides to help demonstrate what

4    one might be looking for in a crystal form screen?

5        A.   Yes, I have.

6        Q.   If we can go to slide 7.

7        A.   This is sort of a brief tutorial to demonstrate what we

8    are talking about with polymorph and the screen.

9             So, I apologize if it's a little bit too simple because

10   the idea is in solution, which we have all these molecules

11   which are representatives as human stick figures, and in

12   solution the molecules tumble around in a random way.  And what

13   we want is a solid.  And solids are characterized, crystals are

14   characterized by a regular order.

15            So, when these molecules come together to form a

16   crystal, then we can get a crystal structure which is up in the

17   upper right-hand corner.  And you can see all the molecules

18   there are well organized in a regular fashion.  Of course this

19   is a two-dimensional demonstration.  It could be crystals that

20   are three dimensional.

21            And the whole idea is that well, as I said when I was

22   fascinated in 1965 about polymorphs, it doesn't have to be just

23   that way.  The molecules can arrange themselves in another way.

24   Let's see like that.  See then these would be two different

25   molecules and you can easily see that the same molecules are

1     arranged in different ways.

2          And then the idea is if they are different structures,

3     since the properties depend on the structure, then different

4     polymorphs can have different properties.

5          The example that we often use is diamond and graphite

6     which are both crystal structures of carbon, although not

7     strictly polymorphs in this sense because the bonding is a

8     little bit different.  But, they are both carbon and of course

9     they have very different properties.  So, this is a polymorph.

10    And as I said, this isn't the only limitation.

11        Q.   For the record, we have moved to slide 8.

12        A.   Again, I'm showing the molecules here.  I should point

13    out I am showing the molecules up on the left and these are in

14    a solution and so which the molecules crystallize.  You see on

15    the right there's the regular order that we saw before.  But,

16    the molecules of the solvent can be incorporated in a regular

17    fashion.

18         If it's water, it's called a hydrate.  And if it's a

19    solvent, then we call it a solvate.  So, the crystal form

20    landscape as we say can have polymorphs,  they can have

21    polymorphs, solvates, hydrates and polymorphs of solvates and

22    hydrates.  And you will see in a minute what we mean by that.

23        Q.   It looks like this is actually slide 7.  So let's go to

24    slide 8 now.

25        A.   Okay.  So this demonstrates the variety of

1       possibilities when you start out with a particular compound and

2       what can happen.

3              So, let's say if a pharmaceutical company is

4       investigating a molecule decides to pursue the development of

5       that molecule, then what we have is a free molecule.  We have

6       identified a molecule which is active.  And we want it as a

7       solid.  And that can be polymorphic which is what I showed two

8       slides back.

9              But then you can have a salt and we're talking here

10      again this Tapentadol is a salt because it's Tapentadol

11      hydrochloride.  So that can be polymorphic.  But, that's not

12      all.  Because, as you saw, we could have the hydrates of the

13      salt and that can be polymorphic.

14             And we can have a solvate which is in which the solvent

15      is included.  It's not water, but some other solid.  So it

16      could be a methanol, ethanol or something like that, and that

17      can be polymorphic.

18             So that's what we are talking about with the salts.

19      But, again, the free molecules can also have a hydrate and that

20      can be polymorphic.  And if the included solvent is not water

21      but some other solvent, that's a free molecule.  So these are

22      many, essentially all the possibilities when you start out with

23      a compound that you're looking at exploring the crystal form

24      landscape, in answer to the question what are you looking for.

25             Q.  If a crystal form screen was to be conducted on a

1    particular compound in 2004, does the prior art point a person

2    of ordinary skill in any particular narrow direction?

3        A.   It doesn't say anything about how to begin or what to

4    do.

5        Q.   Could you expand on that a little why it doesn't say

6    anything about what to do?

7        A.   You see you have here either the salt or the free

8    molecule.  And you start out and you have a solid.  And now

9    you'd like to start investigating this landscape.  So you have

10   to start doing experiments to try to prepare as many of these

11   unknown crystal forms.

12       You don't know how many they are going to be and/or

13   what conditions you need to prepare them.  So, there's a huge

14   variety, almost an infinite variety of conditions that are

15   possible to do that and I think we have.

16       Q.   Yes.  Can we go to slide nine?

17       A.   So, these are just some of the techniques that are

18   possible for exploring this crystal form landscape, as I call

19   it.  And I said sometimes they use, sometimes it's a polymorph

20   screen or polymorph landscape is used as a synonym.  But, the

21   method that Dr. Steed and Dr. Metzgar talked about essentially

22   concentrated in the first line here where they talk about

23   solution crystallization.

24       And even in that there's a huge variety of solvents

25   with temperatures, whether you stir or not, and when the

 1    solution, the crystallization is generally carried out by

 2    cooling.   So the cooling rate can be a major factor in

 3    determining what you get.

 4         Seeding is a procedure by which you add a material,

 5    usually of the same compound, in order to try to induce

 6    crystallization.   An anti-solvent if you add another solvent

 7    to a solution in which the anti-solvent is a solvent in which

 8    the material does not dissolve and that induces

 9    crystallization.   And all of these methods, all the changes in

10    these methods can lead to different crystal forms.

11         But, that's only part of the story because all these

12    other techniques are used to explore the crystal form

13    landscape.

14    Q.   What is the timeframe needed for these experiments?

15    A.   Well, some of these experiments can be done in a matter

16    of minutes or hours, or some of them, especially if you'd like

17    to see what happened over a period of time, it can take months.

18    And that's demonstrated on the next slide, I think.

19    Q.   Slide ten?

20    A.   So, some on the upper, on the upper part, you see we

21    have some of the techniques for generating crystals from

22    solution which I just talked about.   And the ones in yellow are

23    just some of the others that were on the previous slide.

24         And the time scale at the bottom goes from the

25    relationship between the time necessary to reach one of these

1    techniques on an approximate level, of course, and it goes

2    anywhere from seconds to months.

3         And sometimes if we're interested in investigating

4    metastable polymorphs or trying to find metastable polymorphs

5    where you generally try to do those rapidly, and the more

6    stable ones we try to get more slowly.

7         These are just general guidelines.  That says nothing

8    about any particular compound that we might be looking, we

9    might be investigating.

10   Q.   You mentioned that defendants' experts had focused on

11   solution crystallization techniques.  You mentioned that

12   there's a huge variety of conditions that can be varied.  You

13   talked about some of them.

14        Are there more examples of conditions that can be

15   varied in the literature?

16   A.   Yes.  That same paper we saw by Morrissette a few

17   minutes ago has a table.  That's the same paper.

18   Q.   I believe it's at page 3.

19   A.   And this table demonstrates a very busy table because

20   there's a lot more information.  There are a lot of ways to do

21   it.  It's hard for me to point, but, I will try to describe it.

22        See the heading in this table is Crystallization

23   composition and processing variabilities.  So, this

24   delineates in a very general way some of the possibilities and

25   some of the variety of techniques that might be used in trying

1    to prepare crystal forms.

2         If you concentrate on the left-hand column, the one

3    right there, so that's, we are talking about polymorphs and

4    solvates for the moment.  And so if you go down, you see

5    solvent combinations, degree of super stauration.  Super

6    saturation is a concept where you're actually dissolving more

7    material in the solvent than the solubility.  And that's done

8    by heating it up.

9         And then you can add materials that says anti-solvent.

10   And you can add the additives that you can also put in other

11   materials into the solution.  And so those are, those are just

12   the kind of things you can do in solution crystallizations.

13        And then if you go over to process variables, so then

14   for each one of those there are different possibilities whether

15   methods are whether thermal, they are heating or you add an

16   anti-solvent or you evaporate it or do a slurry conversion or

17   other variables.

18        And you see the table, there's an entry in every box,

19   so to speak.  And each one of these entries then has a huge

20   variety of possibilities for changing the conditions.

21   Q.   Did you hear Dr. Steed testify that the Byrn reference

22   provides a systematic well-defined approach to carry out an

23   investigation to determine polymorphism?

24   A.   Yes, I did.

25   Q.   Do you agree with Dr. Steed?

1        A.   No, I don't.

2        Q.   Why not?

3        A.   Well, what Steve Byrn tried to do was to summarize, in

4   a very exact way, sort of a root decision tree it's called, for

5   how one might look at it.  And he has one entry on the upper

6   left-hand corner of this decision tree which says polymorphs

7   found.  And then there are 3 or 4 lines of the kind of

8   conditions that you might try.

9            And that 3 or 4 lines actually summarizes everything

10  we've been talking about on the last couple of slides.

11       Q.   Are there any shortcuts involved in the crystal form

12  screen?

13       A.   Nope.  You just have to do the experiments.   There's

14  no other way to determine what the crystal form landscape looks

15  like.  You just have to do the experiments.

16       Q.   And in 2004 was there a standard set of screening

17  experiments that Tapentadol could have been plugged into?

18       A.   No.  There wasn't then and there is no standard recipe

19  now.

20       Q.   If a crystal form screen had been conducted on

21  Tapentadol, would a person of ordinary skill have any

22  reasonable expectation of discovering the monoclinic form?

23       A.   No, they wouldn't.  The whole point of doing the

24  experiment is you don't know what the result's going to be.

25       Q.   In our case form A was discovered relatively quickly,

1        right?

2             A.   Yeah, but that's hindsight.  That's the only way.  We

3        only know that because that's what happened.  But, there was no

4        way of knowing that before the experiments were done.

5             Q.   And here there's only polymorphs A and B,  right?

6             A.   Right.  That's also hindsight.  There could be more.

7        But nobody could tell, prior to carrying out the appropriate

8        experimentation, what the crystal form landscape would look

9        like.

10            Q.   Is there any guarantee of obtaining the absolute most

11       stable form of a given compound if you do a crystal form

12       screen?

13            A.   No, there's no guarantee.  As I pointed out from

14       mentioning Oswald's rule and Glaxo didn't discover the second

15       form of hydrochloride and Abbott didn't discover the second

16       form of ratonivir until rather late in the game.

17                 And there's no reason to believe that other crystal

18       forms and therefore more stable crystal forms aren't out there

19       lurking and waiting to be discovered.

20            Q.   So, if you were to spend a lot of time and do a

21       polymorph screen, would there be any guarantee of finding all

22       the polymorphs for a given compound?

23            A.   No.  You could do a thousand experiments and not find

24       anything.  And then a thousand and first might be the one that

25       gives you, you hit pay dirt.  There's just no way of knowing.

1     Q.   Did you prepare a slide summarizing your opinion

2     regarding the nonobviousness of Tapentadol hydrochloride?

3     A.   Yes, I did.

4     Q.   Let's go to slide 11.

5     A.   This slide sort of shows how these principles apply to

6     form A of Tapentadol hydrochloride.   So, what's in the '737

7     patent?  The '737 patent has a very, very large array of

8     molecules.  And that's what is shown.  Each one of these dots

9     or colored dots is a compound.

10         And as I said, some of those have been marked.  And

11    actually, actually there's a table that describes the potential

12    therapeutic use of those.  So, those are marked with numbers.

13    I don't know if you can see them on the screen there.

14         So, that's what's in the '737 patent.  There's no more

15    than that.  Nothing about the crystal forms.  And then from

16    that set of compounds, Tapentadol hydrochloride was chosen.

17    And again this still has nothing to do with the crystal forms.

18    And then what happened, we just talked about the polymorph

19    screen.

20         So, we have to carry out the polymorph screen.  You

21    don't know anything beforehand.  And you have the

22    possibilities, as I pointed out, of hydrates, solvates,

23    polymorphs and even amorphous forms.  Amorphous forms don't

24    have that same three dimensional arrangement, regular

25    arrangement, sort of like chewing gum.  That's what the

1      polymorph screen involves.  And again you don't know any of

2      that before you start out.

3           And then the question is how many.  That's not known

4      before you start out.  And there are six arrows here.  But,

5      that's still a big question mark.  And out of that possibility,

6      you get a certain number.  And then you have to determine their

7      structures and their properties.  And out of that number, there

8      were two here.

9           So that's why the arrow leads, the arrow from two leads

10     to structure and properties and then from that we want to know

11     which is the most stable.  And it turns out form A is the most

12     stable.

13          So that's sort of a summary of the kind of

14     experimentation that you have to carry out in order to get the

15     form A starting with the '737 patent.  And there's nothing,

16     there's nothing known.  All those steps are experimental.

17     Q.   What does all of this lead you to conclude about the

18     obviousness of form A of Tapentadol?

19     A.   Well, clearly there's nothing on the left-hand side in

20     the Buschmann family, there's nothing obvious about the

21     eventual result of obtaining form A.

22     Q.   I will move on to another topic.

23          Doctor, have you testified about inherent anticipation

24     of crystal forms before?

25     A.   Yes, I have.

1    Q.   And what is your understanding of the standard for

2    inherent anticipation?

3    A.   My understanding is summarized on the next slide.

4    Q.   Okay.  This is slide 12.  Would you just give us a

5    summary of your understanding?

6    A.   Sure.  It says in order for something to be anticipated

7    then whatever we're talking about must necessarily and

8    inevitably flow from the practice of the prior art.  If you

9    carry out the, if you carry out the prior art, you have to get

10   it all the time without exception.

11        And the second reference there involved the same

12   compound I was talking about before, the ranitidine

13   hydrochloride and Zantac.

14   Q.   Were you in Court for Dr. Steed's argument that form A

15   is anticipated by the '737 patent?

16   A.   Yes, I was.

17   Q.   And do you agree with Dr. Steed's conclusion that the

18   '364 patent is inherently anticipated?

19   A.   No.

20   Q.   Let's see where the point of disagreement is.

21   Defendants' experts argue that example 25 will always yield

22   form A.  Do you agree with that?

23   A.   No.

24   Q.   Okay.  Why not?

25   A.   Well, because Marita Mueller did at least faithful

         reproductions of example 25 to prove that what you get when you

         carry out example 25 is form B.

              Q.   And were the samples from Marita Mueller's experiments

         analyzed by x-ray powder diffraction or XRPD?

              A.   That's how the proof that they were form B was

         established.

              Q.   Did you review the XRPD patterns associated with those

         samples?

              A.   I did.

              Q.   Let's go to slide 13.

                   Doctor, can you tell us what the two patterns are shown

         here?

              A.   Sure.   There are two, the XRPDs.   XRPD is a

         fingerprint.   Just like human beings have fingerprints, solids

         have fingerprints.   And the way we determine the fingerprints

         is by measuring the x-ray powder diffraction.   And the lower,

         the lower trace in this graph is the fingerprint of form B.

         And it says calc.   It's calculated.   And that can actually be

         calculated from the single crystal structure which is described

         also in the '364 patent.   So that's sort of a gold standard.

                   And then we want to compare the product of Marita

         Mueller's reproduction of example 25.   And that's the upper

         curve.   And you can see there's a precise 1 to 1

         correspondence, that is to say the fingerprints match.   The two

         points here where the arrows are just have to do with a little

1    bit of aluminum is added in here to make sure that this whole

2    trace is calibrated.  So they have nothing to do with the

3    sample that was in there.

4        Q.   Did you see any form A in this sample?

5        A.   No, there is no form A here.  And we can, we can

6    determine that and what we do when we start to measure these

7    things and look at them and become familiar with them, like I

8    said, we determine that there are a lot of peaks here and a lot

9    of lines that can be very confusing.

10        But, those of us who work in this field very quickly

11   recognize that there can be certain markers that we can use to

12   determine it.  And sometimes these markers appear sometimes in

13   the patent descriptions.

14        So, form A we learned if we look at form A in a moment

15   we will see a little bit of form A.  Form A has these two peaks

16   here.  And you can see that they come at what we call windows.

17   They come at places where form B doesn't exhibit any intensity.

18        And so there's an easy marker for us to determine.   If

19   we look at those particular places, which is actually if you

20   look at the X scale, the X scale is a two theta value the way

21   the experiment is carried out.  And so the two theta values

22   form A which are representative, there are others, but these

23   are the two that we would normally look at to see if any form A

24   is there.  Then the two peaks are 18.9 and 22.5.  And there's

25   no trace in them at all.

1     So this form is pure.  This material that Marita

2     Mueller prepared is pure form B with no trace of form A.

3     Q.  All right.

4          MS. RANNEY:   And for the record, Dr. Bernstein is

5     pointing to two arrows indicating form A at X value 18.9 and

6     22.5.

7     Q.  All right.  Could we keep slide 13 and put below it

8     Figure 4 of plaintiff's Exhibit 1458?  If we can zoom in on

9     figure 4 a tiny bit so the scales are more similar.

10         Doctor, do these two patterns appear as essentially the

11    same to you?

12    A.  Yeah.  Figure 4 from the patent, and this is the same

13    form, this was the same pattern on the lower figure that

14    appears in the upper figure, both calculated and experimental.

15    Q.  Okay.  Let's go to slide 14.  Maybe we will call out

16    the key at the top there.

17         What are the two pattern shown here, doctor?

18    A.  Well, it's difficult to see it with the blue on it.

19    But there's a sort of purple line and a black line.  The black

20    line, as it says, is form A.  And the purple line is form B as

21    you'll see.  We can look at the arrows.

22    Q.  Let's take the key off so we can see a little better.

23    A.  Okay.  So now you can easily see that, where in the

24    previous where we had windows here, there's form A and there's

25    a peak there.  And there's a peak there.  So that's how we

1       usually recognize it.

2               Whereas the two characteristic form B peaks are here

3       and here where their windows then inform -- I'm having a hard

4       time pointing, but, this one points down.  There's nothing in

5       form A there.  And there's nothing in form A there.

6               So that's how we can easily determine if any solid

7       contains all A, all B or a mixture of the two, if we see the

8       peaks for both of them.

9               MS. RANNEY:  For the record, Dr. Bernstein was

10      pointing to 2 arrows indicating form A peaks and pointing to

11      the purple line and also pointing to 2 arrows indicating form B

12      peaks.

13      Q.   Doctor, just to clarify, this purple pattern is the

14      XRPD pattern for the first of Miss Mueller reproductions in

15      example 25?

16      A.   The purple one, yeah.

17      Q.   Yes?

18      A.   Okay.

19      Q.   Is that a yes?

20      A.   I didn't say that.

21      Q.   Yes.  I just wanted to clarify.

22      A.   Okay.  Yeah.  Right.  I mean you can see it's B.  It's

23      marked as B.  But the caption is a little difficult to read.

24      Q.   Let's go to the next slide, slide 16.

25              Have you reviewed this pattern, doctor?

1        A.   Yes, I have.  And this one is GBBU 322-1-3 which is

2   Marita Mueller's third reproduction, example 25.  And so

3   there's -- and the x-ray powder diffraction pattern is on the

4   purple line here.  And the lower curve is again form A.

5        And now if we put in the arrows, you can see it's a

6   little bit difficult to see.  But, I will try.  I'll try.

7        Q.   Feel free to come up here if that's easier.

8        A.   I will try to point out.  May I, your Honor?

9             THE COURT:   Yes, please do.

10       A.   So, as I said, this is Marita Mueller's, the trace of

11  the x-ray powder diffraction pattern from Marita Mueller.  And

12  the lower form, the lower trace is form A.  And here's the one

13  characteristic peak of form A and it comes through right to

14  here.  So you can see it.

15       And the other characteristic peak that we use sort

16  of as a marker comes through right here, okay.  And you can see

17  on form, on the trace from Marita Mueller's material, there's

18  no, there's nothing here and there's nothing here.  But, the

19  form B peaks are very strongly represented both here and here.

20            MS. RANNEY:  For the record, Dr. Bernstein was

21  pointing to peaks form A in the bottom blue pattern.  Then

22  pointing to the absence of those peaks in the top purple

23  pattern.

24       Q.   Did you hear Dr. Metzger testify that this XRPD pattern

25  is too noisy to determine whether form A is present?

1        A.   Well, it is noisy.  And I mean it is what it is.  And

2    that's what sometimes when we do an experiment like this,

3    sometimes the traces are noisy.

4        But, it's, I think a person of skill in the art or

5    anybody even actually in this room can see that there's no,

6    that they, even so, there's no A here and that the trace is a

7    trace of B in the x-ray powder diffraction pattern of Marita

8    Mueller's example.

9        Q.   If there were form A in this sample, would you expect

10   to see predominant peaks at the indications you've indicated?

11       A.   Yeah.  I would expect to see peaks.  I would expect to

12   see peaks in the purple trace where the arrows are indicated

13   because those are two of the strongest peaks.  So they would

14   come up first if there's a small amount of impurities of A in

15   there.

16       Q.   Okay.  Have you reviewed Dr. Roush's opinion regarding

17   Miss Mueller's reproduction of example 25?

18       A.   Yes, I have.

19       Q.   Do you agree with Dr. Roush that Miss Mueller's

20   experiments were faithful reproductions of example 25?

21       A.   Yes, I do.

22       Q.   Do you recall Dr. Metzger and Dr. Steed's criticism

23   that Miss Mueller's reproductions produced Tapentadol that was

24   the wrong color?

25       A.   Yes, I do.

1      Q.   And do you agree with defendants' experts that this

2   suggests that Miss Mueller did not faithfully reproduce example

3   25?

4      A.   No, I don't think the color indicates a level of

5   impurities that could effect this.  And there are actually two

6   pieces of experimental evidence that indicate that.  One is

7   that the NMR, the nuclear magnetic resonance spectra of the

8   material didn't show any impurities at a level that was

9   detectable, at least by NMR.  So, a very high level of purity.

10  And the x-ray powder diffraction pattern doesn't show any

11  evidence of any impurity.

12       I would like to add, I mean, a color, I have dealt with

13  color since the days of my Ph.D. thesis.  As I said my Ph.D.

14  thesis was in spectroscopy.  And we learned very early that

15  color is a very interesting phenomenon.  And these organic

16  materials at very, very low concentrations can be colored.

17       So, even one part in 10,000 might add a slight yellow

18  or orangeish tint to the sample and not be considered an

19  important chemical or solid state impurity.

20     Q.   Does the '737 patent specify specific color

21  requirements for example 25?

22     A.   No, it doesn't.

23     Q.   On similar lines, do you recall Drs. Steed and Metzger

24  testifying that Miss Mueller's reproduction of example 25 led

25  to examples that were impure?

1        A.   I heard them say that.

2        Q.   Did this criticism effect your opinion that Miss

3   Mueller faithfully reproduced example 25?

4        A.   No.   The x-ray powder diffraction patterns clearly show

5   that for 1-1 and 1-3, that she got form B.

6        Q.   Does the '737 patent specify a particular purity

7   requirement for example 25?

8        A.   No.

9        Q.   Did you hear Dr. Metzger and Dr. Steed testify that the

10  only way that form B can exist at room temperature is through

11  impurities?

12       A.   I heard them say that.

13       Q.   Do you agree with them?

14       A.   No.

15       Q.   Why not?

16       A.   Well, I think, I don't think there was any proof.  I

17  think that was all speculation on their part.  The idea of

18  showing -- this is not a totally new idea.  The idea of

19  demonstrating that impurities can effect which crystal form you

20  get is not particularly new.  It's been looked at quite a bit.

21       For instance, back to the ritonavir example, Abbott

22  really wanted to find out what was it that caused the new form.

23  So they did a very thorough investigation of all the impurities

24  that resulted in the synthesis of the material.   It took them

25  about 3 or 4 years to do that.   And in the end they did

1    isolate one impurity which led to the formation of the more

2    stable form which caused them all the problems.

3         But that hasn't -- Dr. Steed and Dr. Metzger didn't do

4    anything of that sort here and form B was prepared.

5    Q.  Did you review any documents discussing samples of

6    Tapentadol hydrochloride at Grunenthal and impurities?

7    A.  Yeah, there are a couple of tables that I think we have

8    here.

9    Q.  Let's put up plaintiff's Exhibits 1579.

10             MS. RANNEY:  For the record, this is a translation

11   of plaintiff's Exhibit 507.

12   Q.  Is this one of the documents you reviewed, doctor?

13   A.  Yes, it is.

14   Q.  And what's shown in this table?

15   A.  Again, this is maybe --

16             THE WITNESS:  May I, your Honor?

17             THE COURT:   Yes, definitely.

18   A.   There's a lot of information here.   Okay.  So, there

19   are different batches here where these are crystallization

20   attempts.  And there's a whole lot of data here.  This is what

21   was obtained.

22             But the important point is what, well, what's in

23   the left-hand column and the right hand column.  And you can

24   see for instance all the entries on the left, form B was

25   obtained and that the impurity levels vary quite a bit.

```
 1              The one I'd like to point out is this one is quite

 2      low .35 percent and it's .2 percent.  And the point is that

 3      BN300 and BU351 are impurities.  I'm not actually quite sure of

 4      their identity.  But it's just to show the level of these two

 5      impurities that were identified by Grunenthal.

 6              So, as you can see here, so, these are low, some

 7      of them are higher.  But, there's no, there's no difference in

 8      all these cases form B was obtained.

 9      Q.   Okay.  Let's look at the second page of this document.

10      A.   So, in this case in most of the cases form A was

11      obtained, form A and a little B.  And there are some of these

12      which have higher impurities than those which were shown on the

13      previous slide for form B.

14          This just says it's quite a range of variation here for

15      these two impurities.  And there's nothing really to draw any

16      conclusion about distinguishing between form A and form B and

17      the level of impurities here.  That's the object of these two

18      slides.

19      Q.   Thank you.

20              THE COURT:   I do have a quick question about the

21      color that we were talking about before.

22              THE WITNESS:  Sure.

23              THE COURT:  Is there anything in the field that

24      someone would use to analyze and determine what to call a

25      specific color? If they observed something after an experiment
```

1    and they had to make a determination as to whether it was

2    yellow, beige, white, cream, is there some sort of ranking

3    system to determine how you address that color?

4              THE WITNESS:  Not really.  If you go through

5    the -- you're saying to actually make a quantitative

6    description of the color?

7              THE COURT:   Or a qualitative assessment as to

8    what color is.  How would someone actually approach the issue

9    and determine what to write down as its color.  Is there any

10   benchmarks for doing that?

11             THE WITNESS:  No.  There are really no standards.

12   If you go through the chemical literature from the earliest

13   possible days, you think back a hundred, I'm actually looking

14   at these, if you go back a hundred years, 120 years ago for

15   organic chemists there was almost, there were no, there's very

16   few instrumental methods to do to make measurements like this.

17             And so how did they, when they got a new material,

18   how did they characterize it? Well, they measured the melting

19   point.  And melting point was one of the few quantitative

20   measures you could get.

21             But then they did things, they recorded, I don't

22   have it with me, but I actually, I just recently looked at an

23   organic chemistry textbook from 1893.   So then what do they

24   do?  They say record the color, record the smell, record the

25   shape of the crystals because crystals can take on different

1    shapes and believe it or not they say record the taste.

2               And so for many years until about a hundred years

3    ago they tasted them.  Even there's one instance of oxalic acid

4    which it says record the taste and in parenthesis it says

5    poison.  Even though they viewed it as poison, they wanted to

6    experiment it.

7               But the color is a qualitative measure and it's

8    difficult, isn't quantified.  It's not quantified classically.

9    And I am not aware of anywhere in the chemistry literature that

10   it's --

11              THE COURT:   That has some sort of rubric for

12   color?

13              THE WITNESS:  No, not at all.  I mean there are

14   colors and somebody might describe it as, you know, bright

15   yellow or pale yellow, orange yellow, reddish yellow.  And

16   that's just the way it is.  It doesn't --

17              THE COURT:  Thank you.

18              THE WITNESS:  It doesn't get any better than that.

19              THE COURT:   Thank you.

20   Q.   All right.  Just to sum up our discussion of the table

21   we were just looking at, plaintiff's Exhibit 1579,  Dr.

22   Bernstein, did you hear defendants' expert's suggestion that

23   the form B samples tend to have higher impurity levels than

24   form A samples?

25   A.   I did.

1      Q.   Do you agree with them?

2      A.   No, I don't.  I don't think they provided any evidence

3   to prove that.

4      Q.   Do you recall Dr. Steed testifying regarding a

5   synthesis of Tapentadol hydrochloride conducted at the

6   University of Wisconsin?

7      A.   Yes, I do.

8      Q.   Do you agree with Dr. Steed that the University of

9   Wisconsin faithfully reproduced example 25?

10      A.   No, I don't.

11      Q.   Why do you disagree?

12      A.   It's my understanding that a faithful reproduction --

13           MR. ALY:  Your Honor, we object.  It's beyond the

14   scope of the report.  This expert didn't opine on the

15   reproduction steps and relied on another expert, Dr. Roush, who

16   plaintiffs will be calling.

17           THE COURT:   Counsel.

18           MS. RANNEY:   That's true he did rely on Roush and

19   he will be relying on Dr. Roush for his testimony.  He did

20   opine in his reports, I am happy to point you to those

21   sections, on certain aspects of those reproductions.  And those

22   were independent conclusions he drew based on Dr. Roush's

23   testimonial.

24           MR. ALY:  Again, the reliance is on Dr. Roush for

25   the testimony.  So I think it would be inappropriate because we

 1    wouldn't be able to question the basis with this expert for the

 2    expert to introduce that opinion.

 3              THE COURT:   Although you still could do the cross

 4    on that as to the extent of what the defendant did himself or

 5    knows himself versus what he relied upon.

 6              MR. ALY:   That might depends on the scope of the

 7    opinions.  But, going back to the scope of the report in terms

 8    of the Rule 27, it just refers back to Dr. Roush and it doesn't

 9    say here is any independent analysis that had been done.  And

10    Dr. Roush is a witness they are calling tomorrow.  So it's not

11    like they won't have the opportunity --

12              THE COURT:   Is there any independent analysis of

13    this issue in the report?

14              MS. RANNEY:  He explains what Dr. Roush has opined

15    in his report.  And then he explains why in his opinion that

16    would not be a faithful reproduction.

17              MR. ALY:   Maybe if Counsel could direct us to

18    where that is and we will take a look.

19              MS. RANNEY:   Absolutely.  I believe he discusses

20    reproductions by Organix in paragraphs 84 to 88 and Wisconsin

21    starts at 97.  It sort of refers partially back to the Organix

22    analysis.

23              Your Honor, would you like a copy of his report?

24              THE COURT:   Thank you.  If you have a copy, I

25    will take a look at it.  Although maybe after looking at it Mr.

```
 1            Aly might be satisfied.

 2                       Mr. Aly, do you have a copy in front of you?

 3                       MR. ALY:   We are looking at an electronic copy.

 4            It looks like maybe it depends on the question, your Honor,

 5            because it looks like it's not about the procedure as a whole,

 6            but some certain aspects of the results.  And that would be

 7            fine, just as Dr. Steed had done.

 8                       But, that question the way it was phrased was

 9            asking about a broader scope of it.

10                       THE COURT:   I will take the report just in case

11            we head into difficult territory ahead.  But, I think we could

12            probably agree that if the question is rephrased, depending

13            upon where this is in here, let me just take a look, then I

14            think Counsel can go forward and you can do cross on the issue.

15                       MS. RANNEY:   Just to clarify, he will just be

16            talking about this at a very high level based upon what he

17            understands from Dr. Roush.

18                       THE COURT:   What is the page you are referring

19            to?

20                       MS. RANNEY:   I'm not sure of the page.  Number 1

21            starting in Paragraph 97.

22                       MR. ALY:  Page 49,  your Honor.

23                       MS. RANNEY:   I believe those paragraphs refer

24            back to earlier paragraphs.

25                       THE COURT:   It's an imbedded analysis.  Yes, you
```

1    have to go back throughout the whole document.   I think why

2    don't we do this, because it does seem that there is some

3    support for moving forward.  Why don't you rephrase the

4    question.  Go ahead.  To the extent there's any issue, you can

5    go into it on cross.  Mr. Aly?

6                MR. ALY:   Okay.  Thank you.

7                THE COURT:  Thank you.  Go ahead.

8        Q.   Dr. Bernstein, did you review Dr. Roush's opinion

9    regarding Miss Mueller's -- sorry, the University of

10   Wisconsin's synthesis of Tapentadol hydrochloride?

11       A.   Yes, I did.

12       Q.   And based on Dr. Roush's opinion, do you agree with

13   defendant's experts that the University of Wisconsin faithfully

14   reproduced example 25?

15       A.   No, I don't.

16       Q.   Okay.  Why not?  And if you could just point out where

17   you are relying on Dr. Roush's opinion, that would be great.

18       A.   Dr. Roush, I assume, will opine on the synthetic

19   details.  He's a synthetic organic chemist.  I am not a

20   synthetic organic chemist.  But, it's my understanding that a

21   faithful reproduction of a patent means going back to the

22   beginning of the patent and starting from where the inventor

23   started in order and describe the synthesis.

24            And Wisconsin did not do that.  And that's why I don't

25   believe that that's a faithful reproduction.  And that's

1          essentially why I don't believe it was.

2              Q.   Thank you.  Did you hear Dr. Steed testify that the

3          University of Wisconsin performed the last step of example 25

4          and the last step is the only one that's relevant?

5              A.   I heard him say that.

6              Q.   Does that change your opinion that the University of

7          Wisconsin did not faithfully reproduce example 25?

8              A.   Not at all, for the same reason I just said.  The last

9          step is not going back to the beginning of the procedure as the

10         inventors did.

11             Q.   Why might it matter if one doesn't go back to the

12         beginning of the procedure?

13             A.   Well, if you go back to the beginning, then you have,

14         you use the same starting materials and you carry those all the

15         way through the synthesis and that can seriously effect the

16         nature of the final product.  And that's the principle.  And as

17         I said, Dr. Roush can describe the intricacies and the details

18         of those procedures.  But, that's the principle that I

19         understand.

20             Q.   Can you think of a real world example that shows why

21         it's important to go back to the beginning of a procedure?

22             A.   Yeah.  Well, I mentioned the ranitidine and

23         hydrochloride case.  It's a bit of a story, but I will be happy

24         to tell it.

25                  Ranitidine hydrochloride was prepared first in 1977.

1    And as I mentioned, 1981 the second form appeared.  And the

2    second form was the one that Glaxo was using in Zantac and in

3    which became the largest selling drug in the world in 1991.

4    And so the patent on the first form was going to expire in

5    1995.  And the patent on the second form was going to expire in

6    2002.

7         So,  many generic companies wanted to try to get on the

8    market in 1995 with form one, the first form.  And they tried

9    to prepare, they tried to prepare form one by actually taking

10   Zantac from the market, which was form two, and then using some

11   appropriate chemistry on it.  And they always got, they always

12   got form two back.

13        So, there was, if you go back to the -- I don't know if

14   you want to go back to the slide, but I mentioned that Glaxo

15   Novopharm case that I mentioned, okay.  And so what they

16   did --

17        Q.   Slide 12.

18        A.   They took the generics, they wanted to take it off the

19   market.  They went to actually six organic chemists and they

20   said carry out example 32.  That's this case on the bottom, the

21   lower one, okay.  This involved also inherent anticipation.

22        And what they tried to do, they said well, we want to

23   make form one.  And they tried to make form one according to

24   the recipe in the form one patent and got form two.  They got

25   form two all the time.

1    They said well, if you get form two all the time, form

2    two is inherently anticipated.  So, therefore, the form two

3    patent which was due to expire in 2002, should not be valid.

4    And I mentioned I was involved in that case as a

5    witness, the first case.  So I'm sort of intimately familiar

6    with it.  And in order to prove that the lack of inherent, that

7    there was no inherent anticipation, there were two

8    possibilities, one was to go back to the notebooks of the

9    original inventor of form one from 1976 and 1977 and compare

10   those with the patent.  And that was done.  And so there were

11   three cases there.

12   But, at the same time the witness for Glaxo was Sir

13   Jack Baldwin, the Professor of Organic Chemistry at Oxford.

14   And what he did was he took the patent and he gave it to two of

15   his post doctoral Fellows, his most senior post doctoral

16   Fellows and he says you see this, take this patent and go back

17   to the beginning.  Don't go to example 32.  Go back to the

18   beginning.  Start from the beginning and make it just the way

19   the inventors did.  And they did.  And in June of 1993 they

20   actually made it and they got exactly what was described in the

21   form one patent.

22   So, this, so the whole idea was that they went back to

23   the beginning of the procedure and proved that if you carry out

24   the procedures from the beginning,  you get form one.  And that

25   to me was the lesson I have carried with me ever since.  So,

1          this is why I'm claiming that's what has to be done in this

2          instance as well.

3                Q.    And, doctor, have you seen any evidence in this case

4          that a faithful reproduction of example 25 necessarily and

5          inevitably yields form A?

6                A.    No.

7                Q.    Did you hear Dr. Steed's testimony that form B does not

8          persist at room temperature?

9                A.    Does not persist at room temperature?

10               Q.    Does not persist.

11               A.    Yeah, I heard the testimony.

12               Q.    Do you agree with him?

13               A.    No.

14               Q.    Why not?

15               A.    Well, there are a number of examples of form B

16         persisting at room temperature.  And batch 0 is a perfectly

17         good example.  But, Grunenthal has prepared others which still

18         exist at this point.  So, there's no, there isn't an absolute

19         necessary transformation to form A of form B at room

20         temperature.

21               Q.    And, similarly, did you hear Dr. Steed testify that

22         form B is unstable?

23               A.    I did.

24               Q.    Do you agree with him?

25               A.    No, form B is not unstable.   Form B at room

1          temperature is metastable with respect to form A.

2               Q.   What does it mean to be metastable?

3               A.   Well, metastable, I think we have a slide.

4               Q.   We do.

5               A.   So I can illustrate this.

6               Q.   If you go to, I think it's slide 18.

7               A.   Right.   So, this slide demonstrates the idea of

8          relative stability.  So, we have these two lakes and

9          representatives of form A and form B.  And form B is at a

10         higher elevation.

11              So, when we talk about energy, that's at a higher

12         energy than form A.  But this situation will be maintained as

13         long as none of the water can get out of this high lake and

14         drop down.

15              So, in terms of that we are discussing now form B is

16         metastable or the lake is metastable with respect to form A.

17         But, in order for form B to get out then we somehow we have to

18         get the water over this.  We have to get the water over this

19         peak or this block or this dam or whatever it is and that would

20         be required in order for the water to go downhill.

21              So, form B again is metastable with respect to form A.

22         And that's the analogy that we use now for these two forms of

23         the compound.

24              MS. RANNEY:  For the record, Dr. Bernstein is

25         pointing to slide 18 and indicating that in order to convert

1       from form B to form A, it would have to go over a little peak

2       mountain that's indicated on the slide.

3           Q.   Can you think of examples of other compounds where a

4       number of forms exist in ambient conditions and they don't

5       convert to the more stable form?

6           A.   There are many but perhaps the classic one was a

7       compound called ROY which -- ROY, R-O-Y.   They are usually

8       written with capitals letters in red, orange and yellow.   And

9       there are about 7 or 8 polymorphs known.

10              And they all essentially exist at room temperature,

11      even though one of them, only one of them can be the most

12      stable form at room temperature.   And that's, and the rest of

13      them are metastable, but they don't convert.

14              Ranitidine and hydrochloride and the same as I

15      mentioned are two forms and they are actually very close in

16      energy.   But, they can exist, co-exist next to each other

17      essentially forever.   There's no transformation from one to

18      the other.

19          Q.   You've testified that you've seen samples of form B

20      that existed at room temperature.   And you mentioned a sample

21      called batch 0.

22              Have you reviewed any XRPD patterns for batch 0?

23          A.   Yes, I have.

24          Q.   If we can go to slide 20.   This is plaintiff's

25      Exhibit 599.

1              Do you recognize this XRPD pattern?

2      A.   This is an XRPD pattern of batch 0.

3      Q.   How did this XRPD pattern come back?

4      A.   As I said, Grunenthal had raw data of this XRPD

5    pattern, which draw data means that what we have is a number of

6    values measured along the X fact.   This is the variable,  the

7    instrumental variable.   And then you measure the amount of

8    x-rays that come out of the sample which is the intensity here

9    which is essentially the number of counts of x-rays that

10   reached the detector.

11        And so those data can be plotted using Excel and I had

12   those data plotted and this is what comes out.

13     Q.   All right.

14          MS. RANNEY:   And for the record the data from

15   which this plot came from is plaintiff's Exhibit 574 and

16   plaintiff's Exhibit 601.   And those were two of the data files

17   that Dr. Gruss reviewed last week.

18     Q.   Okay.  Dr. Bernstein,  what was your conclusion in

19   reviewing this pattern for batch 0?

20     A.   Just so we have to do the same kind of analysis we had

21   done previously.   We have to look for the representative peaks.

22   So, if we look for the peaks, if we want to show it's form A,

23   form B, then there shouldn't be pure form A.   There shouldn't

24   be any peaks of form B.   And there's a reference where we would

25   expect peaks of form A if there's any impurities of form A in

 1      here and there are none.

 2              Again, for form B peaks appear very strongly.  And in

 3      order to demonstrate this even more clearly, there's an

 4      expansion of this so you can see it I think on the next slide.

 5              MS. RANNEY:  For the record, Dr. Bernstein was

 6      pointing to areas of the pattern where there's arrows

 7      indicating where form A should be.

 8      A.   So now simply the X scale has been expanded on for this

 9      batch 0.  So, we're going for over a much narrower range just

10      to show the detail and the places where you expect to see peaks

11      of form A if there is any there.  They don't show any of that.

12      And again the form B peaks, characteristic peaks are there.

13              So, this shows that batch 0 doesn't contain, is pure

14      form B and doesn't contain any form A.

15      Q.   And we're on slide 20 which is plaintiff's Exhibit 600.

16      And this is just a blow up of plaintiff's Exhibit 599.  So it

17      comes from the same data files.

18              What do these XRPD patterns show you about the

19      stability of batch 0?

20      A.   What do XRPD patterns?

21      Q.   Show you about the stability of batch 0 at ambient

22      conditions?

23      A.   If you measure the XRPD patterns and you see only form

24      B, then it's stable at least until the time you measured it.

25      Q.   Do you recall when batch 0 was synthesized?

1        A.   I believe batch 0 was synthesized in 1994.

2        Q.   Do you recall when the XRPD pattern was measured,

3    roughly?

4        A.   I think this one was somewhere around 1998 or 2000,

5    2002.  I don't remember exactly.  But at least four years

6    later, maybe 6 or 7 years later.

7        Q.   Okay.  Do you recall a 2009 synthesis of Tapentadol

8    hydrochloride conducted by Marita Mueller?

9        A.   Yes, I do.

10       Q.   Did you review an XRPD pattern for this synthesis?

11       A.   Yes, I did.

12       Q.   Let's go to slide 22.  This is plaintiff's

13   Exhibit 486C, Page 12.  Is this the XRPD pattern you reviewed

14   regarding the 2009 synthesis?

15       A.   Yes, it is.

16       Q.   What are the two patterns shown here?

17       A.   The red is a reference for the form B pattern.  So

18   that's the upper one in this case as opposed to earlier ones

19   where it was the lower one.  And the lower, the lower one is

20   the x-ray powder diffraction pattern of the 2009 synthesis by

21   Marita Mueller of form B.  And you see that it's an excellent

22   match with no form A peaks there.

23       Q.   Have you indicated where the form A peaks would be on

24   this?

25       A.   Yeah.  I think we have the arrows to show where we

1    would expect the form A peaks if there was any form A.  So

2    there they are and that's again clean.

3         Q.   Thank you.  Have you seen other examples of form B that

4    existed at room temperature besides batch 0 and PG 1026 that

5    are shown here?

6         A.   Yes, there are others.

7         Q.   Having reviewed these XRPD patterns and those other

8    samples you mentioned at Grunenthal, what did you ultimately

9    conclude as to whether the claims of the '364 patent are

10   anticipated?

11        A.   That the claims of the '364 patent are valid.

12        Q.   Let's move to defendants unclean hands allegations.

13             Did you hear Dr. Metzgar testify that Grunenthal acted

14   with unclean hands indicating the '364 patent?

15        A.   Yes, I heard him testify to that.

16        Q.   Do you agree with him?

17        A.   No, not at all.

18        Q.   Let's walk through these allegations.

19             Did you hear Dr. Metzgar testify that Grunenthal acted

20   with unclean hands because it's not preserved relevant samples

21   of Tapentadol hydrochloride?

22        A.   I heard him say that.

23        Q.    Do you agree?

24        A.   Not at all.

25        Q.   Why not?

```
 1        A.   First of all, there's no, there's no necessity to keep
 2    samples around for many, many years.  We don't necessarily do
 3    that or we didn't do that in my laboratory.  My laboratory
 4    doesn't and Beer Sheva doesn't exist anymore.  But, we didn't
 5    keep them around and they didn't either.
 6        And even more so they didn't have to.  But, even more
 7    so when this was declared a controlled substance, they had to
 8    clean the lab out.  So, they couldn't keep them around.  And I
 9    don't see any intention to misrepresent anything to the patent
10    office.
11        Q.   Could we put up plaintiff's Exhibit 1458 patent.
12    Let's go to Bates Number 57600 and go to example two.
13        Did you hear Dr. Metzger testify that Grunenthal misled
14    the PTO about the starting materials used in example two and
15    other examples in the '364 patent?
16        A.   Yes, I did.
17        Q.   Do you agree with Dr. Metzger?
18        A.   No.
19        Q.    Why not?
20        A.   Well, this is, if you go, actually, well, the example
21    two is preparation of form A(1).  And if you look at the
22    procedure here, this is, it starts out by saying the compound
23    was synthesized, was prepared according to example 25.  But,
24    this is a recrystallization experiment.
25        And in order to carry out a recrystallization, you have
```

1    to dissolve the material.  So, it doesn't matter where it came

2    from.  And, moreover, it refers to European example 25, the

3    European patent.  And somebody reading this patent, if the

4    material wasn't on the market for sale by some commercial

5    company, they would have no other way of knowing how to get the

6    material.

7         So, they would have to go and prepare it.  And that's

8    what's described here.  But no more than that.  Just how to get

9    some of this compound so you could dissolve it and do the

10   recrystallization.

11        Q.   All right.  And do you recall Dr. Metzger testifying

12   that Grunenthal believed that example 25 will always produce at

13   least some form A?

14        A.   I heard him say that.

15        Q.   Do you agree with him?

16        A.   No.

17        Q.   Why not?

18        A.   I haven't seen any proof that that's the case.   You

19   get form B.  You get the batch 0.  And others you get they are

20   pure.

21        Q.   Okay.  Let's go back to slide 14.

22        Do you recall discussing this sample earlier?

23        A.   Yeah.

24        Q.   And is it your testimony or was it your testimony that

25   this is a pattern from Marita Mueller's first reproduction of

```
1          example 25?

2              A.  First reproduction, that's the 1-1 right in the upper

3          left-hand corner.

4              Q.  What form does this XRPD indicate that that sample was?

5              A.  I didn't hear.

6              Q.  I'm sorry.  What form of Tapentadol was Miss Mueller's

7          sample from this reproduction?

8              A.  Form B.

9              Q.  And is there any form A present?

10             A.  None whatsoever.

11                 MS. RANNEY:   Thank you, Dr. Bernstein.   That's

12         all my questions.

13                 THE COURT:   Thank you.  Mr. Aly.

14                 MR. ALY:  Yes.

15                 THE COURT:   Do we have an estimate as to time?

16                 MR. ALY:   Over an hour.   Shall I start today?

17                 THE COURT:   Would you like to take a break and

18         then maybe we'll try some of it?

19                 MR. ALY:   It's up to your Honor.  I'm good either

20         way.  We are handing out binders.  That will take a couple of

21         minutes.

22                 THE WITNESS:  I could use a break.

23                 THE COURT:  That's fine.  Why don't we take a

24         five-minute break and then we will start at least some of it to

25         cover some ground.
```

```
 1                    Does that sound good or would you folks like to
 2          break for the day?
 3                    MR. GLANDORF:  Our preference is to take a break
 4          and continue.  We have Dr. Roush.
 5                    THE COURT:   I'm trying to get the schedule moving
 6          forward.   All right.  Let's take a five minute, ten minutes.
 7          We will come back and we will see how much we can actually get
 8          done.   Thank you.
 9                    (Whereupon a short recess was taken.)
10                    THE COURT:   Have you had an opportunity to take a
11          look at the exhibits?
12                    MS. RANNEY:   Yes, we have.  We have a translation
13          issue with defendant's Exhibit 1332 and we're just locating
14          plaintiff's competing translation.   And also defendant's
15          Exhibit 1106, we have a competing, another translation.   There
16          are a few things in this exhibit that have been obscured.   And
17          I believe we have already spoken with the defendants and think
18          they are going to use our version.
19                    THE COURT:  You said --
20                    MS. RANNEY:   They are going to use our version
21          which is plaintiff's Exhibit 511.
22                    THE COURT:   For both exhibits or just the one?
23                    MS. RANNEY:   We're still locating our translation
24          of defendant's Exhibit 1332.  Hopefully we will get that done
25          soon.
```

```
1              THE COURT:   Okay.  Mr. Aly, are you using the
2       exhibit on the translation on one.  Is that it?
3              MR. ALY:  Well, it looks like they are saying one
4       of our exhibits, DTX 1106, we should use 511_T instead.  That's
5       fine.  And for the other one 1332, they are identifying an
6       issue with another document.
7              But, whatever that other document is, we can have
8       both available.  I don't think it comes down to a translation
9       issue.
10             THE COURT:   How does that sound?
11             MS. RANNEY:  That sounds fine.  Thank you.
12             THE COURT:  That's fine.  Any demonstratives?
13             MR. ALY:  Only the one.
14             THE COURT:   I think we're good to start.  Let's
15      begin, please.
16             MR. ALY:   Thank you, your Honor.
17             THE COURT:   Thank you.
18      CROSS EXAMINATION BY MR. ALY:
19        Q.   Dr. Bernstein, thank you for your help with this case.
20      You have been an expert in many other cases before this one.
21      Is that right?
22        A.   That's correct.
23        Q.   In fact, over 25 cases you have been an expert, right?
24        A.   It depends how you define how many cases.  I've been,
25      as you know, at various levels.  I haven't testified in court
```

1    in 25 cases.  And I am not sure I've been deposed in 25 cases.

2    But, I just don't know the number.  The number of 25 sounds a

3    little bit strange to me.

4         I may have been retained on that number of cases, but I

5    don't, I don't, not all, certainly not all of them went to

6    Court.

7    Q.    In terms of the number of expert reports you've

8    submitted on polymorph patent issues, it's been in over

9    25 cases.  Is that fair?

10   A.    I have never counted it.  I really, it could be, but I

11   have never really counted it.

12   Q.    And let me make clear on this, regardless of the

13   number, each and every time that you've submitted an expert

14   report it's been on behalf of the patent owner.

15        Is that correct?

16   A.    That's correct.

17   Q.    And each and every time you've provided an opinion, an

18   opinion submitted in a case or in court or in a deposition,

19   it's always been that the patent is valid.  Is that true?

20   A.    If the question was validity, that's true, yeah.

21   Q.    Now, you did talk about a book that you had authored,

22   right, on direct examination?

23   A.    One book.  It's a book, yes.

24   Q.    I think you have a copy of that book as well?

25   A.    I have it here.

1    Q.   I'd like to go through some of those pages to sort of

2    set the themes that I would like to discuss with you over the

3    course of the examination.   So that's PTX 1041?

4    A.   Sure.

5    Q.   Let's start at Page 252.   And Page 252 appears, does

6    it not, Dr. Bernstein, in a section you have discussing

7    metastable polymorphs?

8    A.   Okay.

9    Q.   Is that right?

10   A.   That's the section.   That's Section 7.6.

11   Q.   On Page 252 in the bottom paragraph, we can zoom into

12   that.   The first sentence you write is that one traditional

13   strategy for screening a compound for polymorphic behavior

14   involves the trial of a variety of solvents and solvent

15   mixtures.

16        Do you see that?

17   A.   Yeah.   One traditional strategy.   That's correct.

18   Q.   You agree that doing a polymorph screen is a

19   traditional strategy as of the time you wrote the book in 2002,

20   right?

21   A.   No.   I agree with that.   But, the sentence says One

22   traditional strategy involves, one strategy involves a trial of

23   a variety of solvents and solvent mixture.

24   Q.   And the idea that you were discussing during direct

25   examination is the result of the screen, one may not be able to

1      predict ahead of time.  Is that right?

2         A.   That's correct.

3         Q.   But the screen itself, you're not saying that in this

4      case Grunenthal was the first person or first entity to do a

5      polymorph screen, right?

6         A.   No.

7         Q.   And in fact when you wrote the book, you went on to

8      describe, in the second sentence, that our understanding of the

9      role and choice of solvent has improved considerably because of

10     the state of the art by that time, correct?

11        A.   At that time it had improved considerably over the

12     previous hundred years or so, yeah.

13        Q.   And on the next page, shifting to another of the topics

14     that you talked about on direct, you mentioned that you didn't

15     think that impurities could stabilize a metastable form.  Do I

16     understand that correctly?

17        A.   No, I didn't, I didn't say that.  What I said in this

18     case it had not been proven that impurities stabilized.  I

19     didn't say impurities -- there's no way that impurities could

20     stabilize a particular form.

21             And I think I have written in many places that

22     sometimes impurities can lead to a different crystal form.

23     And that's certainly a possibility.  But, what I certainly said

24     here is I haven't seen any proof that impurities play a role in

25     determining which form you get.

1    Q.   Do you agree with me though, Dr. Bernstein, that

2    impurities can make stable an otherwise metastable form at room

3    temperature?

4    A.   I'm not sure I agree it can make stable.  The point of

5    impurities is they can direct a crystallization to a particular

6    form.  I'm not sure I'd say the impurities stabilize a form.

7    What might be is impurities can influence the result of a

8    crystallization.  But, I really haven't seen very many.

9         And, for instance, in the ritonavir case, it was the

10   presence of an impurity which led to the crystallization.  But,

11   it wasn't that the impurities was incorporated within the

12   crystal and stabilized it.  I'm not sure I'd say -- the whole

13   idea of an impurity stabilizing a form is contrary to the idea

14   of crystallization.  It doesn't go together.

15        I'm not saying it's impossible.  But, my understanding

16   of it is that impurities can influence the result of a

17   crystallization.  But, I wouldn't necessarily say that

18   impurities stabilize it.  I haven't actually seen anybody prove

19   such a thesis.

20   Q.   Do we agree then, Dr. Bernstein, that an impurity could

21   help influence which polymorph results from A?

22   A.   Yes.  Impurities definitely can influence which

23   direction a crystallization goes.

24   Q.    In fact, in the book, this is on page 253 now of your

25   book, you write that in some cases additives are actually

1      purposely put into formulations to help influence which

2      polymorph results, correct?

3          A.   These are called tailor made additives and they are

4      exquisite experiments that some of my colleagues in Israel

5      carried out.  Really exquisite.  Sometimes the additives, well,

6      most of the cases where additives are used, they are designed

7      specifically to prove a point.  And I can cite, I cite papers

8      here.  But, there have been more recent ones.

9            So, it's generally you don't just throw in an additive,

10     although some people do to see what happens.  But additives

11     certainly can influence it.  And that's very similar to the

12     influence of impurities where you don't know what you're

13     adding.   Here the case is tailor made additives.

14         Q.   Then shifting to a third subject that will be one of

15     the ones we discuss in more detail, in your book you also write

16     about the ranitidine example.  That's one of the things you

17     talked about on direct, correct?

18         A.   Yes.

19         Q.   And that was the caselaw discussion that you had where

20     it involved Glaxo?

21            Is that right?

22         A.   That's correct.

23         Q.    Were you personally involved in that case as an expert?

24         A.   I was.

25         Q.   So, you've got information from your involvement in the

```
 1        case that really isn't public information or even case

 2        information, right?

 3            A.   Not true.

 4            Q.   So you --

 5            A.   Not true.  I don't agree with that.  I don't agree with

 6        you.

 7            Q.    In fact, it's also correct that you put the materials

 8        about that case that you were aware of in this book, didn't

 9        you?

10            A.   I describe some of it and I described it elsewhere.

11        And there's a lecture I give about that case all the time.

12        Everything I wrote about and everything I talked about is

13        public information and it was at the trial.

14            Q.   But, today in court, to be clear, you said that what

15        was wrong with the replication of the prior art in that case

16        was that the people replicating it, started it later in the

17        process rather than in the beginning of the process?

18                 Isn't that what you said?

19            A.   That's what I said.

20            Q.    And in your book, let's see, you describe it here.

21        Let's go to Page 298.  We are still on PTX 1041.  And you see

22        on the bottom left Section 10.2 is the ranitidine hydrochloride

23        case.

24            A.   I'm sorry, you are on page 298?

25            Q.   That's correct.
```

1      A.   Okay.

2      Q.   You sees the ranitidine hydrochloride case that you

3  were talking about?

4      A.   Correct.

5      Q.   Now, let's go to Page 300 right where your cursor is,

6  the bottom half of that paragraph, please.

7           And now here when you were discussing it, Glaxo argued

8  not that there was a wrong starting point information, but

9  actually that the people replicating the work were contaminated

10  with seed crystals of the wrong form, correct?

11     A.   You got my testimony wrong.

12     Q.   I'm just asking what you wrote in your book.

13     A.   That's what I wrote in my book.  But, you're saying

14  that contradicted what I said today.  That's not.

15     Q.   Let's focus on this some more.  When you were talking

16  in your book about the replication of example 32, the reason it

17  was not a faithful replication in that case from your

18  experience is because the experiments were contaminated with

19  seed crystals of one polymorph instead of the other, right?

20  That's what you wrote?

21     A.   That's the reason they didn't get it.  But, as I

22  pointed out in my direct testimony, the reason Glaxo did get it

23  was because they went back to the beginning, they went back to

24  the beginning of the patent.

25     Q.   And in particular you were focusing not, in this book

1      chapter when you were describing the case, on anything that had

2      to do with the sequence of events, but, actually the seed

3      crystals which are put in during the crystallization process.

4      Isn't that true?

5           A.   No.

6           Q.   And therefore --

7           A.   No.   The answer is no.

8           Q.   And I'm continuing with the next question, sir.

9                And putting in the seed crystals, that directs or also

10     can influence the polymorphs that one gets.   Isn't that right?

11          A.   Yes.   In this case, though, the seed crystals that were

12     involved were non intentional.   They weren't put in as, to use

13     your words, they weren't put into the crystallization.   But

14     they were ambient seeds.   But I want to distinguish between the

15     two.

16          Q.   I think you've answered the question.

17          A.   Okay.   I've answered the question.

18          Q.   My next question, sir, is in that particular case with

19     the seed crystal, that's different than the example 25 that

20     we've been talking about here for a couple of weeks because

21     there's no issue or discussion that anybody's made about seed

22     crystals, right?

23          A.   No.   But my point was completely different.

24          Q.   Let me ask you about the example 25, if I may.

25     Example 25 has three steps.   First step, second step, third

1  step.  You are familiar with those, right?

2      A.  Yeah.

3      Q.  And the third step has a starting material, we called

4  that the minus 23 compound.  And then it's put in solution and

5  then steps are taken after that to get to the minus 21

6  Tapentadol hydrochloride, correct?

7      A.  Okay.

8      Q.  Do you understand that?

9      A.  I haven't gone into that in detail.  As I testified, I

10  haven't gone into it.  I haven't looked at all those steps in

11  any detail.

12      Q.  But, in terms of crystallization, making a crystal that

13  could be one polymorph or the other, you know that happens in

14  the third step because it goes from solution to crystal,

15  correct?

16      A.  But that's different from a faithful reproduction of a

17  patent.  A faithful reproduction of a patent, as I testified,

18  is going back to the beginning of the patent, starting from

19  where the inventors started and going to the end.  And the

20  crystallization step is one.  But, you have to have the right

21  stuff in there in order to get the right material.

22      Q.  And I understand your testimony on that, Dr. Bernstein.

23  But, my question is just more focused on when do crystals form

24  in the third step of example 25.

25          Is it in the beginning, middle or end of that process?

1      A.   The material is formed at the end, but, it's formed

2   from a solution that contains everything that's been carried

3   along since the beginning of the synthesis.

4      Q.   So, you believe, and let me get this right because it's

5   an important point, you believe that when Marita Mueller did

6   the work, she did the first step and second step and didn't

7   have any other solids that came from that, but, it was still in

8   solution into the third step.

9          Is that your testimony?

10     A.   That's not my testimony.  I think Dr. Roush is going to

11  testify about what Marita Mueller did.  What I understand is

12  Marita Mueller in gross simodo (sic) went back to the beginning

13  and started from the beginning and carried out example 25.

14         Beyond that, I said I'm not, I'm not a synthetic

15  chemist.  And I'm sure you're going to hear tomorrow Dr. Roush

16  talk about all the details.  But, that is my understanding

17  again she went back to the beginning and she got, she got form

18  B.

19         Beyond that, I haven't really examined it in any more

20  detail because Dr. Roush is a first class organic chemist and

21  can do it a lot better than I can.

22     Q.   But, sir, you did offer an opinion and I wanted to find

23  out from you if you knew one way or the other whether the minus

24  23, this is the starting compound for the third step in example

25  25, whether Marita Mueller tested that for any amount of

1      impurities.

2          A.   I don't know.

3                  MS. RANNEY:   Objection, your Honor.  These

4      questions are going into a great deal of detail about the

5      example 25 synthesis.  And Dr. Bernstein has already stated

6      that he relies on, you know, Dr. Roush is going to be the one

7      to go into the details of the synthesis.

8                  THE COURT:   And he did plainly state that.

9                  Are we going to go into much more of the

10     particulars on that?

11                 MR. ALY:   No, but that was related to my

12     objection that because of the opinions offered, I want to make

13     sure that we understand the scope of those opinions, your

14     Honor.

15                 THE COURT:   That's fine.  Thank you.

16         Q.   And I do understand that you're not a synthetic organic

17     chemist, Dr. Bernstein.  But, just to make sure I understand

18     the replication steps that you were talking about, the minus 23

19     compound that the University of Wisconsin used to start the

20     process of the third step, do you know if they checked it for

21     purity?

22         A.   I don't know.

23         Q.   And you don't offer an opinion as to whether or not the

24     starting material, this minus 23 for the third step, was

25     appropriate to start because it was checked for impurities or

1 not?

2  A. If they started, they started with something else.

3 They didn't go back to the beginning of the patent.  I don't

4 know what they had.  I don't know what they, whether they

5 checked it or not.  And even if they checked it, I don't know

6 what they got.

7  But, I do know that they didn't go at that time to the

8 beginning of the patent.

9  Q. For Marita Mueller's work, do you know for sure whether

10 she went back to the beginning of the patent?

11  A. That's my understanding.  And I have read Dr. Roush's

12 declaration.  And I understand from that he says she did go

13 back.

14  Q. So that I understand what I should question you on or

15 not, are you saying, sir, that Marita Mueller did all of the

16 steps from the beginning of where the patent starts, all the

17 way through example 25?  Or are you just saying that's your

18 understanding based on what Dr. Roush said?

19  A. I have not spoken to Marita Mueller.  I did not read

20 her deposition testimony.

21  What I understand is I read Dr. Roush's declaration and

22 he said she did.  And that's the basis of my knowledge.

23  Q. Will you agree with me if Marita Mueller actually

24 didn't follow example 25, then we shouldn't rely on her work to

25 determine whether it's the right or the wrong polymorph?

1      A.   I mean you have to establish the facts.  I don't --

2   will I agree with you?  I don't know.  I mean I have to, that's

3   a hypothetical.  If you establish the facts and that's the

4   case, then I'd have to think about it a little bit more.

5          But, I haven't seen any, I mean, I haven't seen any

6   evidence to that effect at all.

7      Q.   And the particular case that you were discussing which

8   is on the slide here or on the screen here for ranitidine,

9   there was also a purity requirement that was in the claims in

10  that case.

11         Do you understand that?

12     A.   I don't know what you mean.

13     Q.   In other words, if there are different polymorphs that

14  are being distinguished, did that case have a purity

15  requirement that it had be a certain percentage of form one

16  versus another form?

17     A.   No, you are mixing up the cases.

18     Q.   Well I'm asking in that case.

19     A.   In this case, no.  There were two cases Glaxo

20  Novopharm.  In the first it had to do with the validity of the

21  form two patent.  And so that was the case of polymorph

22  identity.

23         In the second case Novopharm went on the market with

24  form one.  They learned how to make form one.  And Glaxo then

25  claimed that they couldn't make form one without a form two

1     impurity.  And that was the issue in that case.  And that went,

2     also went to trial.  And just for the record I was a witness in

3     that case as well.

4        Q.  And in this case the one we are talking about here with

5     the '364 patent, all the claims that are asserted, not one of

6     them has an impurity or purity requirement in the percentage of

7     form A's that must be present, right?

8        A.  There's no issue of purity here as far as I understand

9     it.

10        Q.  And you do not dispute, Dr. Bernstein, that the

11    University of Wisconsin test did show some form A in the

12    result, correct?

13       A.  They showed what they showed.  I haven't reviewed the

14    University of Wisconsin results.  And I don't recall ever doing

15    that right now.

16         But, if they had, if they had some form A, they had

17    some form A.  They didn't -- that was not a faithful

18    reproduction of example 25.

19       Q.  What I want to make sure is that do you have an opinion

20    or not whether University of Wisconsin got form A?

21       A.  I honestly don't remember the fact.  If they got form

22    A, they got form A.  I mean I can't say anything beyond that.

23       Q.  All right.  Now, we are also shifting to the batch 0.

24         You testified on direct examination that there was a

25    batch 0 that had been prepared at Grunenthal.  Is that right?

1        A.   Yes.

2        Q.   And apart from Dr. Roush's opinion, do you yourself

3   have an opinion whether batch 0 was made by the same basic

4   synthetic route as described in example 25 of the '737 patent?

5        A.   I don't recall ever seeing how batch 0 was made.

6        Q.   So, you don't have your own opinion?

7        A.   I don't have an opinion on how batch 0 was made.

8        Q.   And in terms of impurities, when we're looking at the

9   forms B and A, you agree that in fact form A is the stable form

10  at room temperature, correct?

11       A.   That's correct.

12       Q.   And I'd like to look at DTX 1001 to discuss the

13  temperature effect with you, sir.

14            You should have copies in the binder if you need them.

15  But right now we are looking at the cover page of the 2006

16  polymorph screen report that Grunenthal put together based upon

17  SSCI's study.

18       A.   Will I need to look at it in the folder or be able to

19  see it on the screen?

20       Q.   You should be able to see it on the screen.  I'm just

21  saying if you need it, it's there.

22            If we could turn now to Page 18 of the PDF which is the

23  one ending in 21107 and look at Table 10.  And Table 10 in the

24  SSCI study shows what they titled a variable temperature XRPD

25  study.  You're aware of that one, right?

1    A.   I'm not sure I understand what you mean by you're aware

2    of them.  I know that SSCI did a lot of work on this compound.

3    Q.   Dr. Bernstein, is this temperature study one of the

4    things that you reviewed?

5    A.   I've reviewed a lot.  I mean we've been going on, as

6    other witnesses have said, we have been going on for a long

7    time.  I have looked at this.  I'm sure I've seen it.  But, the

8    SSCI did a lot of work and I don't remember everything by

9    heart.  But, we can look at it.

10   Q.   Sure.  Thank you, Dr. Bernstein.

11       You see here where they've got the 32 degrees.  That's

12   the starting temperature of some material.  And they say that's

13   XRPD form A.

14       Do you see that?

15   A.   Yep.

16   Q.   And then they heat that from the 32 to 75 degrees

17   celsius.  And then that results in form B, that heating step,

18   correct?

19   A.   Yes.

20   Q.   Now, they continue heating it again and then cooling it

21   down, it remains as form B until you see this last step where

22   it says room temperature XPRD, take it to the next state.  Do

23   you see?

24   A.   Yes.

25   Q.    When the room temperature is taken the next day they

1        see A, correct?

2            A.    That's what it says.

3            Q.    So, what's happening here, do you agree with me, that

4        when you take A and you heat it up past a certain temperature,

5        it does convert to B?  But, then if you let it sit there, it

6        should normally return to form A?

7            A.    This is one experiment and that's what happened.  But

8        not every experiment, not every experiment when you cool, when

9        you cool B to room temperature or even a little bit below it

10       doesn't always convert back to A.

11           Q.    And there's something different then obviously, sir,

12       between the form A and B they were testing here and the form B

13       that Marita Mueller got according to the work that she did?

14           A.    What's different about it?

15           Q.    I think you yourself said, did you not, Dr. Bernstein,

16       that the one that Marita Mueller made was stable for more than

17       overnight still as form B, whereas this one changed to form A.

18       Do you agree there's a difference between those two?

19           A.    There's a lot of data here in this situation.   There

20       are cases -- this is a case where A, sorry, B converted back to

21       A at room temperature.  Fine, that's one.  There are cases

22       where B doesn't convert back and instances where it does

23       convert back.  It doesn't always convert back at the same

24       temperature, a phenomenon called hysteresis.

25               So, there are samples of B that have been stored at

1    room temperature for a long time.  Batch 0 is one of them.  And

2    they don't always convert back.  And that's part of the

3    instance of metastable.  There are factors which prevent the

4    conversion from B to A.

5    Q.   And in both cases though Dr. Bernstein, your opinion is

6    that it's still form B, whether it converts back to A at room

7    temperature or stays as B in room temperature, it's still the

8    same form B?

9    A.   B is B is B.  A is A is A.  There's only one B.

10   There's only one A.  And if you measure the x-ray powder

11   diffraction pattern of B, you get that fingerprint.  If you

12   measure the x-ray powder diffraction of A, you get that

13   fingerprint.  There's no variation in B or in A.  There's one B

14   and there's one A.

15   Q.   And, sometimes B, when SSCI did the work, for example,

16   reverts to A at room temperature without doing anything else,

17   just letting it cool.

18   A.   Yes.

19   Q.   So, with that, let's look at your demonstrative

20   number 18 to talk through that, please.  Here in your

21   demonstrative 18 you had basically two ponds, one as form B as

22   a higher pond and one as form A, a lower pond.  Is that

23   correct?

24   A.   Correct.

25   Q.   Form B, you were testifying, is the metastable form at

1     room temperature and the form A is the stable form?

2        A.   That's correct.

3        Q.  So, there's something in between the form B that is

4     preventing it from going to form A even though A is the more

5     stable, right?

6        A.  Sometimes it can go, sometimes it doesn't go, as we saw

7     on your previous slide.  Absolutely.

8        Q.  And you're aware that Grunenthal looked into this

9     question and found that impurities are likely to play a role in

10    preventing B from getting to A?

11       A.  Grunenthal looked into and suggested a possibility in a

12    presentation, an internal slide presentation in the company

13    that impurities were a possibility.  It has never been proven

14    that impurities actually do that and, if so, which impurities

15    might be the cause.  That's a possible suggestion and that

16    could be.

17         The fact of the matter is B can exist and does exist at

18    room temperature for a long time.  And nobody has proven to me

19    what the reason for that is.

20       Q.  And to be clear, though, on the other direction,  Dr.

21    Bernstein,  no one has even put a hypothesis out there that

22    there are impurities that could stabilize form A at room

23    temperature .  Nobody's even said that, right?

24       A.  I haven't seen anybody, I don't see any reason why they

25    would do it.  If that's a stable form at room temperature, why

1    should it be?  Why should it be stabilized by anything? I mean

2    unless there's another form that we don't know about and

3    something is stabilizing with respect to that.  But A is A and

4    A is stable at room temperature.

5       Q.   So, let's look at some of the Grunenthal analysis here,

6    DTX 1060, please.

7       Do you see here, if we can get the date, Mr. Haw, this

8    is the September 2001 study of the status of polymorphism

9    research that SSCI had done,  correct?

10    A.   Yes.

11    Q.   And if we can go to the text of the letter underneath

12    this, this letter here.

13       MS. RANNEY:   Sorry, not interrupt, but, your

14    Honor, this is one of the exhibits for which plaintiffs have a

15    competing translation.  And I believe it's in defendant's

16    binder it's PTX 1486.

17       THE COURT:   1486 is the other translation?

18       MS. RANNEY:   Plaintiff's translation.

19       THE COURT:   For 1060, is that it?

20       MS. RANNEY:   Correct.

21       THE COURT:   You can direct the witness if you'd

22    like.

23       Sir, do you understand there's a translation at

24    1486?  If you'd like to look in your binder.

25       THE WITNESS:   A different translation?

```
 1                    THE COURT:    And the other is 1060, correct?

 2   That's the defendant's translation.

 3                    MR. ALY:    That's right.    This wasn't, your

 4   Honor, one of the things they had raised.    I think I could have

 5   probably used that if I knew.

 6                    THE WITNESS:   PTX?

 7                    MS. RANNEY:    Yes.

 8                    THE COURT:   I'm sorry.

 9                    THE WITNESS:   Okay.

10      Q.   All right.   Here we're looking at PTX 1486.   We will

11   use this.   Here, you've got that one in front of you?

12      A.   Yeah.

13      Q.   And here what I wanted to make sure we were looking at

14   together is there is a status report and it's talking about how

15   the polymorphism screening at SSCI will most likely be

16   completed by mid or late October.

17           Do you see that?

18      A.   That's what it says.

19      Q.   And at that point in time, this is again

20   September 2001, there were tests that had been done and they

21   found only two polymorphs A and B, correct?   It says this

22   resulted in the identification of at least two polymorphs?

23      A.   The result there resulted in the identification of at

24   least two polymorphs.   That's what they say.

25      Q.   When you see down below they've summarized the
```

1       temperature study that at temperatures below 40 degrees celsius

2       or after the cessation of the mechanical stress, form B

3       transforms back into form A.

4               Do you see that?

5       A.   Yes.

6       Q.    And it goes on the next sentence to say what you said,

7       However, this does not happen sometimes until some time has

8       elapsed, as little as six hours but possibly more than eight

9       months.

10              Do you see that?

11      A.   Correct.

12      Q.    And there's actually one and only one theory that's

13      provided for that at this time, the first theory that's

14      provided that The cause of this partly kinetically very

15      inhibited back transformation is not yet understood (it could

16      depend on the impurities profile).   Do you see that?

17      A.   Exactly, not understood.  And it could, it's

18      speculation about what could happen.   No further proof is

19      provided anywhere.

20      Q.    And it goes on at page, let's look at Page 12 of this

21      PDF, still on PTX 1486, there's a slide here that's been

22      presented and it has the title Two polymorphic modifications.

23      And the two forms are identified there as form A and form B,

24      right?

25      A.   Yes.  That's what it says.  And again, it says this

 1      behavior is not yet understood.

 2           Q.   And it says that underneath there the only reason given

 3      is that it might be due to impurities which inhibit the

 4      transformation from form B to form A, correct?

 5           A.   Right.  This is one slide.  This is part of an interim

 6      report in this kind of study where Grunenthal still didn't

 7      understand the polymorphic system, and neither did SSCI for

 8      that matter.  This is pure speculation.  It might be due to

 9      impurities.  It was never further proved beyond that.

10           Q.   This is the 2001 status at SSCI, right?

11           A.   Yes, that's the date of the report.

12           Q.   Let's look at the next status, DTX 1158.  We're looking

13      here at a research report?

14           A.   Wait.  This is now?

15           Q.   DTX 1158.

16           A.   Is now the translation of PTX?

17           Q.   I am not aware of a translation issue with this one.

18           A.   Okay.  I don't know.  So what number do I need?

19                     MS. RANNEY:   No translation issues here.

20           Q.   DTX 1158.

21           A.   I'm sorry, I don't have anything in my folder.  That's

22      empty.  DTX?

23           Q.   DTX.

24           A.   DTX 1158 is empty in my folder.

25           Q.   It looks like you got a special one.  Let me make sure

1      we got the right one.

2           A.   Wait, wait, let me look.  No, it's not there.  Hold on

3      a second.  Let me look back one.  No.

4           Q.   We've got an extra copy.

5                     MR. ALY:  May I approach?

6                     THE COURT:   Yes.

7           A.   I don't have anything.

8           Q.   All right.  Dr. Bernstein, we've got DTX 1158 and we

9      are looking at the cover page.  It's a summary of polymorphism

10     investigations now in 2003, right?

11          A.   The date is 2003, June, yeah.

12          Q.   One of the people on the prepared by list is Dr.

13     Andreas Fischer?  He is one of the co-inventors named on this

14     '364?

15          A.   Correct.

16          Q.   Let's look at page 2 of this report.  The second page

17     of the document.  We are going to look at this part right

18     here, this table.  There's a table on the bottom.  And in 2003

19     the observation is made again that polymorph A is the one

20     that's stable at room temperature, right?

21          A.   Where?  Okay.  Yeah, right.

22          Q.   And then on the right side of that stable polymorph B

23     is the one identified as metastable at room temperature but

24     stable at greater than 50 degrees celsius, right?

25          A.   That's what the table says.

1        Q.   And they discuss why this could be, at page 7.  So,

2   let's look at the text starting here, We determined, and you'll

3   see that they put --

4        A.   Wait, wait, let me go to page 7.

5        Q.   Sure.  It's the one ending in 571 as the production

6   numbers.

7        A.   Okay.

8        Q.   And that one has in the top that We determined a

9   cooling curve first to obtain the transition temperature form B

10   to form A.

11        Do you see that?

12        A.   I see it.

13        Q.   So, that's basically they are saying normally we've

14   seen other samples of B return to room temperature, return to

15   form A at room temperature.  So let's find out what that

16   transition temperature is for the different samples that they

17   were studying.

18        Do you agree with that?

19        A.   Could I hear the question again?

20        Q.   Sure.  It was little long but I will basically -- do I

21   understand the sentence correctly, we are reading it together

22   here, that what they were trying to test to figure out when you

23   take the B normally at room temperature converts to A.  So they

24   are trying to figure out what that transition temperature is

25   where different samples of B convert or don't convert to A?

1    A.   Well I don't agree with your introductory sentence that

2    normally B converts to A, I don't agree, at room temperature.

3    There are lots of instances where B doesn't convert to A.  I

4    will say there are instances where it does.  But, I'm not sure

5    I would use the term "normally".

6    Q.   But SSCI had never seen a sample of form B that didn't

7    convert to A at some point, right?

8    A.   I don't know about all the SSCI experiments, but there

9    are DSC, there are DSC traces that don't show the conversion

10   from B to A once you get to room temperature.  And I'm not sure

11   they are in here, but I certainly have seen those.

12   Q.   And then here?

13   A.   And B exists.  I mean B exists at room temperature.

14   My testimony was full of examples of that.

15   Q.   Let's look through the theories for what was discussed

16   internally and at SSCI about why that could be, Dr. Bernstein.

17   The describing of the protocol is On heating up we get the

18   transition from A to B.  And that's part of the process

19   sometimes if you heat up A, you get B, right?

20   A.   Right.

21   Q.   And this method they are describing is useful to

22   determine mixtures of form A and B and not just on the anyway

23   low decreased heat of transition, but also on the B to A

24   transition on cooling down.

25        Do you see that?

1        A.   True.   Yes, that's what it says.

2        Q.   And the decreased heat of transition, just so we are on

3    the same page, that is instead of transferring from B back to A

4    at room temperature, it might be at a lower temperature that

5    that transition occurs?

6        A.   Or not at all.

7        Q.   Or not at all.   What they were then asking right

8    underneath the box, Mr. Haw, we can go to the next section, we

9    have made different attempts to try to explain this behavior

10   for the decreased heat of transition.   Do you see that?

11       A.   Yes.

12       Q.   And they have three different theories that they talk

13   about.   And we will scroll down to each of those.

14            And the first of the three theories is that they might

15   have contamination with bromide in the sample.   Do you see

16   that?

17       A.   I see what they say.

18       Q.   Second is that there might be other impurities like by

19   or degradation products, correct?

20       A.   Yes.

21       Q.   And the third is they might have polymorphic

22   modification, that there's a third polymorph out there

23   somewhere, right?

24       A.   That's what it says.

25       Q.   Now, they take a look at and discuss each of these

1    three theories.  The first theory for crystallization of the

2    corresponding bromide salt, they look at that.  So this is,

3    instead of forming Tapentadol hydrochloride, actually sometimes

4    people might be forming Tapentadol hydrobromide, right?

5        A.   Okay.

6        Q.   Were you aware that this was an impurity theory that

7    Grunenthal had discussed?

8        A.   I think I've read it somewhere, yeah.

9        Q.   And it goes on to say that this is an isotypic

10   structure to the B modification of the chloride salt.

11        Do you see that?

12        A.   I see that but I haven't seen any proof of that.

13        Q.   Well, this is Grunenthal itself saying that in their

14   experience it's isotypic, right?

15        A.   Again, I've seen that in order for it to be isotypic,

16   it would have to have the same x-ray powder diffraction

17   pattern.  And I haven't seen any evidence of that.  That may be

18   true, it may not be true.  I can't confirm that for myself.

19        Q.   First let me make sure we understand together what

20   isotypic is.  It means that it has the same XRD signal,

21   correct?

22        A.   It's not precisely the same because bromine is larger

23   than chlorine and there will be some changes.  But, if it's

24   isotypic, one would expect a very similar pattern with some

25   variations and the variations depend on going from one system

1        to another.

2              But, I haven't seen any isotypic x-ray powder

3        diffraction pattern of the bromide instead of chloride.  I just

4        haven't seen it.  And that's what they say, but I haven't any

5        evidence.

6              And for me one of the things I always say to my

7        students is theory guides but experiment decides.  I haven't

8        seen an experiment.  I can't express an opinion on it until I

9        can see it.

10        Q.   Well, didn't they actually do the experiment?  In the

11        next sentence it says In the DSC data no thermal event could be

12        found up to the melting point and down to minus 60 C.

13              And it's for that test reason that they conclude

14        co-crystallization actually could be a reason for the decrease

15        in the transition temperature?

16        A.    No, they didn't prove anything.  In order to prove the

17        two systems are isotypic, you have to have the x-ray powder,

18        you have to show that the bromide, you make the bromide and you

19        measure the x-ray powder diffraction pattern and you put it

20        next to the x-ray powder diffraction pattern like hydrochloride

21        and you show that they are the same.

22              I haven't seen it.  Maybe there are data out there.  I

23        haven't seen it.  But, that's what has to be proved.   And

24        otherwise I can't say anything about this.

25        Q.   Right.  So, you don't have an opinion one way or the

1    other?  You just know Grunenthal, when they were saying this,

2    they hadn't shown it.  Is that what you are saying?

3    A.  I think we are in the process -- I think you have to

4    understand something.  We are in the process here of Grunenthal

5    right from the beginning when they started realizing that they

6    had more than one, they may have had more than one crystal

7    form, it was a very common, it's a very common situation.

8    They didn't know what was going on.

9    So, you can find a lot of information in the

10    documentation over even a number of years, as was the case

11    here, where there's speculation.  It might be this.  It might

12    be that.  We don't know.  And this is very, very common.

13    Not only does it happen in the cases I have been

14    involved in in industry as a consultant and also as an expert,

15    but, it's happened in my own laboratory.  We start with a

16    system.  We can't figure it out.  It takes us awhile.  So we

17    speculate a lot.  And this is what happened here.  But, I have

18    not seen proof that it's isotypic.

19    Q.  And, in fact, Dr. Bernstein, for that theory the report

20    goes on to say that The probability is not high, based on the

21    samples SSCI had seen, because of the low amounts of the

22    impurities that they found.  Do you see that?

23    A.  Right.

24    Q.  But, you didn't look at the XRD to figure out what they

25    would look like side by side, correct?

1      A.   I am not aware there were any XRDs of these

2    co-crystallization experiments or of the hydrobromide.   I am

3    not aware of them.   Maybe there are, but, I haven't looked at

4    them.   No.

5    Q.   So, nobody showed you the co-crystallization experiments

6    that Grunenthal had, right?

7      A.   No, I haven't seen it.

8      Q.   All right.   Let's look at the next page for this

9    particular document on the second theory of impurities to

10   Number 2.   It goes down there.

11        The report goes on to say, There is a small number of

12   impurities present in the batches that might affect the

13   transition of the two polymorphic forms.

14        Do you see that, sir?

15     A.   Yep.   And the emphasis, my emphasis would be on the

16   might, not proven.

17     Q.   But, they go on to do systematic analysis of the

18   different batches.   This is by 2003, years after the table that

19   you showed us on direct examination, and they give an analysis

20   of that.   Do you see that in Table 1?

21     A.   Right.   And as I've said before, if it's an impurity,

22   if it is due to impurities, you have to show which impurities

23   and what the level is.   Otherwise, it's not proven to me.

24     Q.   And on direct examination, so we're clear, you showed

25   us a chart and said there's impurities at different amounts

1    with different samples.  You didn't see a pattern between A and

2    B, right?

3         A.   That's correct.

4         Q.   But, in this report they actually do actually what you

5    said they should do, identify the impurities and show the

6    level, didn't they?

7         A.   But they had more data, which is what I discussed.

8         Q.   Let's look at the data.  It's right underneath that

9    Table 1.  If we can go back to the document.  This paragraph

10   here will show you the protocol that they had a special focus

11   on two impurities, BN300 and BU351.  Do you see that?

12        A.   I see it.

13        Q.   You testified on direct you weren't even sure what

14   those were, correct?

15        A.   I don't know the chemical identity of those two.

16        Q.   Let's look at the next page, Page 9 of the report.

17   And we are looking here at these two paragraphs, the first two

18   paragraphs.

19             And the first paragraph here says let's look at BN300

20   and that seems to be without an influence up to 1.28 percent.

21   Do you see that?

22        A.   I see that.

23        Q.   But then as soon as you go above that number, that

24   1.28 percent specific number with raising amount of this

25   impurity, the transition temperature decreases.

1        In other words, there's more stable form B, right?

2    A.   What is it this is based on?  How many samples?

3    Q.   Do you know how many samples were used here?

4    A.   I can't, I don't see it here.

5    Q.   And then they go on, do you agree with me the report

6    that they provide is that after 1.28 percent, with rising

7    amounts of that impurity, the transition temperature decreases?

8    In other words, the room temperature stable B can stay more

9    stable?

10   A.   It slows down the transition.  Okay.  That's what it

11   says.

12   Q.   And they also will look at another impurity BU351.  And

13   here it says that it affects both the temperature decrease as

14   well as the formation of a modification B that seems to be

15   stable at room temperature.

16       Do you see that?

17   A.   I see what it says, yeah.

18   Q.   And it gives specific numbers for exactly where that

19   occurs at more than .5 percent of BU351, that's where almost

20   each sample they report had a cooling curve showing

21   modification B, correct?

22   A.   I'm not sure I understand the sentence here Almost each

23   sample with a concentration of more than .5 percent BU351

24   reveals in the cooling curve of the DSC a rate of modification

25   B.  I don't know what that means, a rate of modification.

1    What is a rate of modification?

2        Q.   Could it mean, sir, that you are starting to see some

3    form B at room temperature that you wouldn't otherwise?

4        A.   That's a phrase which the English means absolutely

5    nothing to me.

6        Q.   Let's be clear --

7        A.   The DSC, a rate of modification B.  Modification B is a

8    structure.  A rate is a velocity.  A rate, so they are talking

9    about the velocity of a structure.  It doesn't say, maybe

10   there's a word missing or what, but what's stated there doesn't

11   make any sense.  The English doesn't make any sense.

12       Q.   Let's just, to round it out, look at the last sentence

13   which I don't think we will have a disagreement about.  It says

14   At higher impurity levels, now we are looking at greater than

15   1.8 percent in Table 1, the only product is form B and in

16   between mixtures of A and B are formed.

17            Do you see that?

18       A.   That's what it says.

19       Q.   So, the report that they found is that if you go above

20   1.8 percent of BU351, they only saw form B, correct?

21       A.   Okay.

22       Q.   Now, let's look at Page 10.  I said there were three

23   theories they considered and Page 10 has a third theory, this

24   part here.  And it says in Step 3, this was whether they really

25   had maybe found a third polymorph.  Do you remember that one?

1    A.   That was a possibility but it was never, I haven't seen

2    any evidence of a third form.

3    Q.   And in fact they ruled it out after some extensive

4    investigations, correct?

5    A.   Okay.

6    Q.   And the conclusion that they reached in 2003 is that

7    the existence of an intermediate polymorphic form is most

8    unlikely, concerning the current results.  Do you see that?

9    A.   I see that's the conclusion, yes.

10    Q.   And, by the way, while we're at this document, I want

11    to make sure that the differences between form A and B, they

12    are, biologically they don't make any difference, right?

13    A.    I understand the physiological absorption is the same.

14    Q.   And the solubility curves, they are what you call

15    identical here, right?

16    A.   I don't recall.  But, I don't recall this, the

17    solubility curve.  But, I wouldn't be surprised.  I think they

18    are quite similar.

19    Q.   Let's look at them together on Page 15 of this document

20    of Exhibit 1158.  And here we have the curves in figure 7.

21    These are the dissolution testing that they did and showed the

22    solubility over time.

23        Do you see that of polymorphs A and B?

24    A.   That's a dissolution curve, yes.

25    Q.   And the text under that analyses is right it says the

1 curves are identical, variation between the 5 and 10 minutes

2 values can lead back to the dissolution of the gelatine

3 capsules.

4   Do you see that?

5 A. That's what it says.

6 Q. As far as you are aware, because the solubility is the

7 same, that's what pharmacists or physicians or drug developers

8 look at to determine whether or not there would be any

9 importance to study from an FDA point of view.

10   Is that right?

11 A. That's one of the factors.

12 Q. And now let's look at PTX 507.  Well, sorry, PTX 379.

13 Let's look at that.

14   Now, we have the Crystallics report.  That's their

15 final report in May 2003.

16   Do you see that?

17 A. I see it.

18 Q. And if we look at Page 10.  In Page 10 they've got to

19 Step 3 Effect of Impurities.

20   Do you see that section?

21 A. I see it.

22 Q. This section has been discussed in other testimony but

23 I want to look at the data with you.  And that's at Page 23

24 referring to this Step 3.  And you see this table here is the

25 Step 3 table.

1          Do you see that?

2     A.   That's what it says.

3     Q.   And in terms of the experience that Crystallics had,

4  they also found that only with impurities can you get form B,

5  right?

6     A.   I don't see that conclusion.

7     Q.   All right.  Let's look through the data.  There's some

8  factors here that are called seeding.  We looked at seeding and

9  we talked about that earlier, correct?

10     A.   You're talking about factor C, the cut right?  The seed

11  amount?

12     Q.   The seed amount.  Putting aside seed amount, because

13  seeding is a separate issue for this case but for this case we

14  have impurity A which is factor A.  And we've got another

15  impurity which is called factor B.  And what they've done here

16  is they said let's add, on purpose, certain percentages of

17  those impurities.  Do you see that?

18     A.   Could you go through that again, please?

19     Q.   Sure.  What they've done in the study is they have put,

20  on purpose, certain percentages of these two impurities

21  identified as factors A and factors B,  correct?

22     A.   Yes.

23     Q.   You don't know what those impurities are, right?

24     A.   I have no idea.

25     Q.    And when they added in any percentage of either factor

1    A or factor B but didn't seed it with something, that resulted

2    in some form B, correct?

3        A.   What you're directing me to is the result in response

4    in five.

5             Is that right.

6        Q.   Response five.  That's where they got that polymorph?

7        A.   So, what you're saying is standard two has factor A and

8    resulted in a mixture of A and B.  And standard three has

9    factor B and that results in a mixture of A and B and standard

10   four has both factor A and factor B and results in a mixture of

11   A and B.

12            And then standard 9 has just factor B and that results

13   in a mixture of A and B.  Is that what you -- is that the

14   question you're asking?

15       Q.   Yes, sir.

16       A.   Okay.  That's what the table says.

17       Q.    All right.  Now, in terms of impurities, I know you

18   testified why but I just want to make clear that you agree if

19   we had the Marita Mueller sample to test today, we could test

20   it to see what impurities are there of the type that are being

21   referenced here?

22       A.   You could, but it doesn't make any difference because

23   she did a faithful reproduction of it.  And I show you the

24   evidence she got form B.  She got the x-ray powder diffraction

25   pattern of form B.  The fingerprint, it's form B.  It doesn't

1    matter.  It doesn't really matter why she got form B, she got

2    form B.

3         Q.   Well, Dr. Bernstein, if Marita Mueller agreed, if she

4    herself agreed she didn't follow example 25, then it wouldn't

5    be pertinent to the analysis of whether example 25 anticipated

6    even if she got form B, right?

7         A.   Well, to the best of my knowledge and according to Dr.

8    Roush's testimony, she did follow example 25.  So, I don't

9    think, for me, that's not an issue.

10        Q.   That's what I want to make sure.  This is not your

11   opinion.  You are relying on Dr. Roush for that?

12        A.   Absolutely.

13        Q.   Similarly for the batch 0 that existed at some point,

14   we can't, that doesn't exist anymore so we can't test it to

15   find out what impurities it had and how it might have been made

16   incorrectly?

17        A.   That's correct.

18        Q.   I do want to take a look at the examples in the '364

19   patent.  But, we don't need to put it up right now.

20             I just want to make sure when you were saying that the

21   patent said it started with example 25 from the other patents,

22   were you saying that it was form A, sir?

23        A.   No, I didn't.  I didn't say it started with example 25.

24   Put it up and we will see what it says.

25        Q.   All right.  Let's look at DTX 304.  That's the '364

1      patent.  And we want to look at example two.

2          A.  So, it was prepared according to example 25.  And I

3      explained that at the time this was written that if somebody

4      was reading this patent and wanted to go out and buy that

5      material, they couldn't find it.

6          So, the only, so the inventor had to explain, to teach

7      a person of skill in the art where can you get this stuff.  So

8      you go back to example 25 and you make it.

9          Q.  And what I want to make sure that you and I agree on

10     right now is do you agree or not that when it's referring in

11     the patent to some starting material that was made according to

12     example 25 actually was form A?

13         A.  I wouldn't say that.  From the best of my knowledge it

14     was no, example 25 gives you form B.  Why would it be form A?

15         Q.  Have you gone back, sir, to look at the tests, where

16     this came from, this example came from, and whether or not that

17     first sentence where it said it was example 25 was form A

18     Tapentadol or form B Tapentadol?

19         A.   I haven't gone back because it doesn't make any

20     difference.  What this is is a crystallization.  It doesn't

21     matter, really doesn't matter whether it's form A or it's form

22     B.  You are doing a recrystallization.  So, you are going to

23     dissolve the material.  Once it dissolves, it doesn't matter

24     which form it was to begin with.

25         Q.  Let me ask that question so I can have that as a

```
 1        response answer.

 2             Does it matter what you start with as a solid if you

 3        are doing it in solution and getting a recrystallization?

 4        A.   It doesn't matter which form you start with.

 5        Q.   So, now if we're looking at, in this example, to go

 6        back to the question I asked you, do you know whether or not

 7        that starting material that they said was according to example

 8        25, was form A or not?

 9        A.   Now you're talking about the notebook record of what

10        went into this example.

11        Q.   Notebook record or any other record, sir.

12        A.   I don't know.  But, it wouldn't make any difference to

13        me because whatever -- I assume it's form B because it was made

14        according to example 25 and it was dissolved.  If it happened

15        to be form A, it wouldn't make any difference about the nature

16        of this example.

17        Q.   I hear you saying that it wouldn't make any difference.

18        But, do you know whether or not the Patent Office would have

19        been interested to know whether the invention here was taking

20        form B and making it into form A or starting with form A and

21        making it into form A?

22             MS. RANNEY:   Objection, your Honor.  Dr.

23        Bernstein doesn't really have, doesn't have any knowledge of

24        what the Patent Office would have said.

25             THE COURT:   Sustained.
```

1      Q.   Dr. Bernstein, you're saying that they had -- you are

2    saying that it doesn't matter.  But, do you know what it was

3    that Grunenthal told the Patent Office about this particular

4    form?

5      A.   In this example 2, did Grunenthal tell the Patent

6    Office which form of the compound they used in performing this?

7      Q.   That's my question.

8      A.   I am not aware of that information.

9      Q.   And did Grunenthal say anywhere in the patent what form

10   you get when you make the recipe according to example 25?

11     A.   Could I hear that question again?

12     Q.   Sure.  Did Grunenthal tell the Patent Office anywhere

13   in the patent what form one should get when they follow example

14   25 from the prior art?

15     A.   I don't recall what Grunenthal told the Patent Office.

16   I haven't seen a file wrapper.  I don't know.  But, as a

17   chemist, to be honest with you, it doesn't make any difference

18   in this example.

19     Q.   Well, let's look at the top of column 3 of the '364

20   patent.  So, we are still at DTX 304, the first full paragraph.

21   It says, they write Grunenthal in the patent, The process

22   starts from crystalline form B prepared according to U.S.

23   patent number '737 patent or the '558 patent or the European

24   '475 patent, it's all the same specification.

25           Do you see that?

1      A.   I see it.

2      Q.   And then they are talking about how they are going to

3   take that starting material, which is form B as they report in

4   this part of the patent, and say they are going to turn it into

5   form A with the different examples that they discussed,

6   correct?

7      A.   That's what it says.

8      Q.   And so when they really did the experiment, did you

9   know, Dr. Bernstein, that example 2 and other examples actually

10   started with form A, even though they put in the patent that it

11   was made according to example 25?

12      A.   I didn't.  But frankly, I have no reason to doubt it

13   because example 25 makes form B.

14      Q.   Well, let me ask you this, if we look at the particular

15   report,  DTX 141, 144 is the interrogatory responses, and we

16   will look at Page 9.  And this is the interrogatory responses

17   from Grunenthal, plaintiffs in this case.  And when you look at

18   the box here and you see that for examples 2 and 3 the

19   reference is to a document with the production number starting

20   in 21090.  Do you see that?

21      A.   No, oh, okay.

22      Q.   It's the same document then that's for example 3,

23   right?

24      A.   Okay.

25      Q.   It's also for example 5, that same Document 21090?

1        A.   Okay.

2        Q.   Nine, example nine, the same Document 21090?

3        A.   I see it.

4        Q.   And example 11, that's the same Document 21090?

5        A.   Okay.

6        Q.   Let's look at that document with the 21090 that's going

7   to be --

8        A.   To be perfectly honest with you I don't know what

9   you're showing me here.  I have no idea what this is.

10       Q.   You haven't seen the interrogatory responses?

11       A.   No.

12       Q.   Let's go back a page then I will show you what we're

13  looking at.  Go back one more.

14            This is the response that plaintiffs gave when the

15  interrogatory was put to them in interrogatory Number 21 to

16  explain the basis for the examples that were in the '364

17  patent, the one that you've provided opinions on.

18       A.   Okay.  I don't think I recall ever having seen this

19  before.

20       Q.   They didn't show you where the examples came from?

21       A.   No, I haven't seen this document.

22       Q.   Oh, you haven't seen it?

23       A.   The interrogatories I haven't seen.

24       Q.   Okay.  Do you disagree with the response in the

25  interrogatories?

1        A.   Do I disagree about what?

2        Q.   About where the materials came from.   In other words,

3   do you have other information that's not here about where the

4   examples in the patent could have come from?

5        A.   I don't have any reason to agree with you or disagree

6   with you.   I mean I'm just not familiar with this document or

7   with the interrogatories.   And I don't know where the examples,

8   except for what's written in the patent that you just showed

9   me, I don't know where the samples came from.

10           I said I haven't seen a file wrapper so I don't know.

11   I'm not familiar with those details.

12       Q.   Let's look at those details.   DTX 1001, the document

13   we looked at, the 2006 polymorph screen.   This is DTX

14   polymorph screen with enclosures is the report from SSCI.   You

15   can look at the bottom half of this.   It just says it's an

16   enclosure of a report from SSCI.   Do you see that? Do you see

17   that?

18       A.   Yes.

19       Q.   And then on Page 3 of the document -- and by the way,

20   sorry, if we can go back to Page 1.   The production number on

21   Page 1 is 21090.   Do you see that?

22       A.   I see that.

23       Q.   And then if we go to Page 3, you will see that the

24   attachment is this polymorph screen from SSCI, right?

25       A.   I see that.

1      Q.   Now, if we go to Page 5, you will see that the starting

2   material, the samples here is the CG 5503 sample received from

3   Grunenthal as summarized in Table 1.

4          Do you see that?

5      A.   I see that.

6      Q.   And now if you go forward to Table 1 which is on

7   Page 13 of the document, the very top table, it says that the

8   sample received from Grunenthal was XRD result of form A.  Do

9   you see that?

10      A.   That's what it says.

11      Q.   When we are looking at the '364 patent and if we take

12   them at their word, what Grunenthal was telling the Patent

13   Office for example 2 when they said it was material according

14   to example 25 of the prior art, that was this form A material

15   that was used in those experiments, correct?

16      A.   You're going to have to go through the identification

17   for me again.  This says, this says this was lot CEHS98-99 and

18   CG5503.  That's the SSCI internal number.

19      Q.   That's right.

20      A.   Okay.  And then CEHS98-99 is what?

21      Q.   The material they labeled when they received it.  Did

22   you know that?

23      A.   I thought I just said no but then there's an SSCI

24   number.  You're going to have to track it for me.  I don't --

25      Q.   Let me just --

1      A.   I lost track of where the sample is.  I mean I can't

2   confirm anything because I've gotten lost to where this sample

3   started out and where we got to.

4      Q.   We can retrace the steps but let me ask you, Table 1,

5   in the interest of time, you see there is only one sample lot

6   that SSCI received from Grunenthal,  correct?

7      A.   This table shows one entry.   What else they received,

8   I don't know.  I mean I notice this report has 180 some odd

9   pages and I'm not familiar with the whole report.  So, you've

10  shown me one table with one entry and that's what it says.  It

11  says what it says.  I can't argue with that.

12     Q.   This is the same report that was referenced in those

13  interrogatory responses we looked at, right?

14     A.    I don't remember the number.  I'm not familiar with the

15  number in the interrogatory report.  But, I will assume that

16  that's correct.

17            MR. ALY:  Your Honor, I was handed a note about

18  the timing so I must be sensitive to the time.  I do still have

19  about 20 minutes of material on the obviousness opinions that

20  the expert offered.

21       So, maybe I could address those now if you'd like.

22  But, in the morning would also be fine.  It's like a breaking

23  point is what I'm saying.

24            THE COURT:  It's already, it's like it's almost

25  6:20 at this point.  Counsel, I'm thinking we should probably

```
 1          break.
 2                          MS. RANNEY:   I think it's time to break.
 3                          THE COURT:   I think so too actually.  All right.
 4          So, let us conclude for the evening.
 5                          Sir, you will remain under oath.  But, we will
 6          pick up your testimony tomorrow morning.
 7                          Let's decide on a time then.  With that also do
 8          not speak to your Counsel regarding your testimony.
 9                          Shall we do 9 o'clock tomorrow morning as well?
10                          MR. ALY:  That's fine with me, your Honor.
11                          THE COURT:  Is that good?
12                          MR. CONNOLLY:  That's fine with us, your Honor.
13                          MS. RANNEY:   And plaintiffs.
14                          THE COURT:   So, we will start 9 o'clock tomorrow
15          morning.  Any other issues before we disband for the evening?
16          Anything? No.
17                          MR. ALY:  That's a brave question, your Honor.
18                          THE COURT:   That concludes our testimony for the
19          evening.  We will see you tomorrow morning at 9 o'clock.
20          Thank you so much.  Thank you, everyone.  Take care.
21                          ATTORNEYS:  Thank you, your Honor.
22                          (Whereupon the matter was concluded)
23
24
25
```