1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 2                  CIVIL NO. 13-CV-4507(CCC)

 3

 4      IN RE: DEPOMED PATENT LITIGATION
                                              TRANSCRIPT OF
 5                                             PROCEEDINGS
                                                (Public)
 6

 7

 8      - - - - - - - - - - - - - - - -

                                         Newark, New Jersey
 9                                       March 9, 2016

10      B E F O R E:

11            THE HONORABLE CLAIRE C. CECCHI,
              United States District Judge
12

13

14

15

16

17

        _____
18            Pursuant to Section 753 Title 28 United States Code,
        the following transcript is certified to be an accurate record
19      as taken stenographically in the above-entitled proceedings.

20

21                  S/Yvonne Davion
                    _____
                    Yvonne Davion, CCR
22                  Official Court Reporter

23

24

25
```

1

2                    A P P E A R A N C E S

3

4        KEITH MILLER, ESQ.
         (Robinson Miller)

5        MICHAEL SITZMAN, ESQ
         CHRISTINE RANNEY, ESQ.

6        (Gibson, Dunn & Crutcher, LLP)
         For Depomed and Janssen

7

8        MELISSA CHUDEREWICZ, ESQ.
         (Pepper Hamilton, LLP)

9

10       LINDA A. WADLER, ESQ.
         BASIL J. LEWRIS, ESQ.
         (Finnegan, Henderson, Farabow, Garrett & Dunner, LLP)

11       For Grunenthal

12       JAMES RICHTER, ESQ.
         (Winston & Strawn, LLP)

13

14       SAL PATEL, ESQ.
         IMRON ALY, ESQ.
         (Schiff Hardin, LLP)

15       For Alkem

16       KENNETH G. SCHULER, ESQ.
         TERRENCE CONNOLLY, ESQ.

17       (Latham & Watkins, LLP)

18       AMY M. HANDLER, ESQ.
         (Sills Cummis & Gross)

19       For Roxane Laboratories

20       SHEILA RAFTERY WIGGINS, ESQ.
         VINCENT CAPUANO, PHD ESQ.

21       ANTHONY FITZPATRICK, ESQ.
         (Duane Morris, LLP)

22       For Actavis Elizabeth, LLC and
         Watson Laboratories, Inc

23

24

25

W I T N E S S E S

JACK ANDERS

Direct examination by Mr. Sitzman          156

 1                    THE COURT:  We are here on In Re:  Depomed.  It is

 2          case Number 13-4507.  I will take your appearances in a moment.

 3          I want to explain what's been going on in the background

 4          because we were supposed to start at 9:30 and of course I'm a

 5          little delayed out here.

 6                    But, we did receive a consent order with respect

 7          to the use codes which we dealt with this morning.  And we also

 8          incorporated it into the final pretrial order which we wanted

 9          to get online before you begin today so it's clear to everyone

10          how we are going to proceed with respect to that.  So, we had

11          that done.

12                    In addition, I have canceled my schedule for

13          tomorrow and taken care of that as well.  So you will have the

14          full day tomorrow.  I understand you have a difficult schedule

15          involving certain witnesses so I wanted to make myself

16          available.

17                    You can probably figure that if you need to sit

18          tomorrow until about 6:30, that should be fine.  Will that help

19          at all with these witnesses?

20                    MR. SITZMAN:  Your Honor, I think it will.  I

21          think we will be able to get everybody in.  And we talked about

22          it.  I think Friday we'll be able to get all three of the

23          witnesses in without having to go into extra innings.

24                    THE COURT:  Perfect.  I figure if we stay a

25          little later tomorrow, that should alleviate some of the

1    pressure for Friday in the late afternoon early evening.  That

2    should probably help out a little bit.

3              So, anyway, that is what I have been tending to.

4    I just wanted to let you all know that we had certain things

5    resolved.  But tomorrow the schedule will be, as I said, 9:30

6    we should be starting at that point.

7              So let's start with your appearances.  We are here

8    today for the first day of trial.  Let's start with the

9    plaintiffs.

10             MR. MILLER:   Good morning, your Honor, Keith

11   Miller from the firm of Robinson Miller, Newark, New Jersey on

12   behalf of plaintiff Depomed.   With me are my co-counsel from

13   the Gibson Dunn firm Michael Sitzman, Timothy Best and

14   Christine Ranney.

15             MR. SITZMAN:   Good morning, your Honor.

16             THE COURT:   Thanks so much.

17             THE COURT:   Thank you.  Good morning.

18             MR. SITZMAN:   Good morning.

19             MS. CHUDEREWICZ:   Good morning, your Honor.

20   Melissa Chuderewicz from Pepper Hamilton on behalf of plaintiff

21   Grunenthal.  With me today are co-counsel from the Finnegan law

22   firm Linda Wadler, Bill Lewris and Krista Bianco.

23             THE COURT:   Good morning.  Thanks so much.

24             MS. WIGGINS:  Good morning.  On behalf of

25   defendants Actavis Elizabeth LLC I'm Sheila Wiggins from Duane

1    Morris, Newark, New Jersey.  With me are co-counsel colleagues

2    Vince Capuano and Anthony Fitzpatrick.

3                    MS. HANDLER:  Good morning, your Honor, Amy

4    Handler from Sill Cummis & Gross on behalf of defendant Roxane

5    Labs.  With me are my co-counsel from Latham & Watkins, Kenneth

6    Schuler, Terrence Connolly, Lauren Sharkey and Gregory

7    Sobolski.

8                    MR. RICHTER:  Good morning, your Honor James

9    Richter; Winston & Strawn on behalf of defendant Alkem

10   Laboratories.  And my co-counsel are going to introduce

11   themselves.

12                   THE COURT:   Thank you.

13                   MR. ALY:  Good morning, Imron Aly from Schiff

14   Hardin.

15                   MR. PATEL:   Good morning, your Honor, Sal Patel.

16                   THE COURT:   Thank you so much.   All right. So,

17   we will begin with openings today.  And again I just want to

18   remind all counsel that to the extent any portion of what

19   you're going to discuss is sealed, you are going to let me know

20   so I can take appropriate steps.

21                   But, at this point as we resolved the matter

22   yesterday, the proceeding will remain open unless I hear that

23   something is about to be said that is going to be subject to

24   sealing.  And we're all in agreement with that procedure.   So

25   just be mindful of it.  Thank you.

1          All right.  So we are beginning with the plaintiff

2     and the plaintiff's opening.

3          MR. SITZMAN:    Thank you, your Honor.    The reason

4     I approach is do want to be heard on issue first before we

5     begin.

6          THE COURT:    All right.

7          MR. SITZMAN:    Yesterday the Court will recall

8     after what has been a very difficult month of accusations being

9     flown at my firm,  myself and my client,  that the late a.m.

10    and Watkins firm of Terry Connolly,  Ken Schuler and the other

11    attorneys here,  had additional evidence to prove that we had

12    committed perjury,  contempt and fraud on the Court.

13         Last night they submitted a letter again accusing

14    us of all of those things.  I don't know if the Court has had

15    an opportunity to look at it.

16         THE COURT:  I have not.

17         MR. SITZMAN:  But, what it comes down to is what

18    they accused us of in their papers on Friday which was that

19    attached to my letter, attached to my declaration that was

20    submitted under penalty of perjury that the letter that I

21    attached from their former colleague Alex Long had never been

22    sent to me.

23         THE COURT:  I'm sorry.  So the letter that you

24    attached to your submission.

25         MR. SITZMAN:    Correct.

1          THE COURT:   Go ahead.

2          MR. SITZMAN:   That it had never been sent to me.

3   That I had committed perjury, fraud on the Court.   And

4   remember my declaration was being submitted in response to

5   their first contention which is we had committed contempt, we

6   were in contempt of the protective order.

7              The law firm of Latham & Watkins, top rated firm,

8   thousands of lawyers, they say in their letter last night their

9   firm, firmly believes I never received it.   They searched

10  their archives, they searched their e-mails.

11             THE COURT:   What is the basis that they received

12  it and what is or what is the basis that you received it?   What

13  is their basis that you did not receive it?

14             MR. SITZMAN:   Well, I'm going to show you your

15  Honor.   May I approach?

16             THE COURT:   Certainly.   Thank you.

17             MR. SITZMAN:   Actually while I'm doing that, your

18  Honor, what I've handed you is two different documents.   The

19  first is the e-mail that Alex Long sent to me on Wednesday

20  July 22, 2015 at 8:50 p.m.   It says Counsel see below and the

21  attached was the letter dated the same date and attached to my

22  declaration.

23             Not only did Mr. Long send it to me, but he also

24  sent it to Mr. Chung, Mr. Best and Miss Ranney, all of whom

25  are in the courtroom today.   And all of whom would be happy to

1       come in front of the court and explain that each one of them

2       received this e-mail.

3                    The second document I sent you is the metadata

4       which is and accompanies the e-mail I gave you.  And the Court

5       will see filtering through all of that metadata.

6                    THE COURT:   There's a lot.

7                    MR. SITZMAN:   That every time it hit a server, it

8       went out on the Latham & Watkins server.  It came in on the

9       Gibson Dunn server.  It went back and forth.  There's a

10      handshake that takes place.  The dating is consistent all the

11      way through July 22, 2015.

12                   What is their basis for claiming that we committed

13      perjury,  fraud,  very similar to their allegation that we are

14      also in contempt of court.  Very similar to the allegations

15      that Actavis has made.  This is about smearing Depomed and us

16      while we enter trial.

17                   For a month now I have been responding to all of

18      these allegations which are baseless.  They don't have any

19      basis.  They say well we looked at the server and we just

20      don't see you know how Mr. Sitzman got this letter.  It was

21      addressed to Bill Baumgartner and Alex Long is no longer here

22      so we are going to submit a letter to the court and tell the

23      Court that what's attached to Mr. Sitzman's declaration is

24      false.

25                   THE COURT:   All right.   So let me just turn now,

 1    because I do have their submission here which says as to the

 2    former let's see Latham has continued its expedited review of

 3    its file, can find no evidence that Mr. Long ever sent Mr.

 4    Sitzman the July 22, 2015 letter discussed in Paragraph 13 of

 5    Mr. Sitzman's declaration and attached as Exhibit 132.

 6              So let's hear a response to that because counsel

 7    has presented an e-mail chain and in fact the metadata

 8    regarding this particular document.

 9              MR. CONNOLLY:   Sure, your Honor.

10              THE COURT:   Thank you.

11              MR. CONNOLLY:   Terrence Connolly for Latham and

12    for Roxane, your Honor.

13              THE COURT:   Thank you.

14              MR. CONNOLLY:   Your Honor, first off if you look

15    at my letter, there is no allegation of perjury, fraud on the

16    Court or anything like that.   The allegations that we are

17    engaged in the smear campaign, your Honor, I really hope that

18    you read the letter because it doesn't say that.

19              THE COURT:   Although I'm focusing on very quickly

20    on the correct paragraph that references the fact that you can

21    find no evidence that it was ever actually sent.

22              Is that the paragraph that we are talking about.

23              MR. CONNOLLY:   In fact we could not find any

24    evidence and this is the first time your Honor you may recall

25    that Mr. Sitzman did attach a copy of a letter, did not attach

 1         this cover note.   The letter that was addressed has other

 2         counsel.   He was not shown as a recipient of the letter.

 3         There was nobody from Gibson Dunn shown as recipient of the

 4         letter, nor were there any CCs and that's all we had.

 5                   I mention Mr. Long has left the firm.   So,  in

 6         the 48 hours that we had to respond,  we tried to locate on Mr.

 7         Long's e-mail, that were part of Mr. Long's email, any copy of

 8         the letter that had indicated that it had gone to the Gibson

 9         Dunn firm.  Because the accusation here is that by sending the

10         letter to someone who had not yet been admitted pro hoc vice in

11         the case, Mr. Long had waived the confidentiality.

12                   Mr. Schuler was just reminding me that the issue

13         itself about which is contained in the cover letter is

14         confidential.  So, your Honor, I will try to avoid getting into

15         the substance of that.

16                   We pointed out in our opposition brief that there

17         was no -- that although Mr. Sitzman had attached a copy of the

18         letter, there was no cover note.

19                   THE COURT:   So bringing us up to this point is

20         Mr. Sitzman correct that he was, in fact, sent this letter?

21                   MR. CONNOLLY:   Your Honor,  I'm not going to

22         contest this.  We did not find this.  We looked.  And to the

23         extent that he has now established, to my satisfaction, that he

24         has, I will withdraw the letter from yesterday, the second part

25         of the letter from yesterday, and I will apologize to Mr.

 1    Sitzman to the extent that he suggested that I accused him of

 2    those things.

 3              I don't believe I did, your Honor.  I think any

 4    fair reading of the letter just pointed out it was an update of

 5    our research.   We said in a footnote in our brief that we

 6    hadn't had the time to complete our search.

 7              We then continued the search in due diligence and

 8    then we found, we found and I submitted to the Court this

 9    bottom e-mail and that was the attachment that I submitted

10    yesterday which just points out not only was Mr. Sitzman not on

11    the document that he submitted to the Court, we had actually

12    found the cover e-mail transmitting the e-mail which was from

13    Mr. Long's secretary and which listed a host of people but

14    again nobody from Gibson Dunn.

15              So, as of 11 o'clock the night before last your

16    Honor the only evidence that we had was that there was an

17    absence of documentary evidence that Mr. Sitzman had received

18    it.  He had not provided it to you in his opening.  So that's

19    why we were digging.  We were trying to find out what the basis

20    was.

21              And at 11 o'clock on the night before last we

22    found the cover note, the lower cover note.  We did not see

23    this.  I did not know it existed.  I felt it important to point

24    out to the Court that we had found it in the subsequent search

25    since I had undertaken to do it in the footnote.  And as I

```
 1        said, I will reiterate, your Honor, I do not contest now based
 2        upon this that Mr. Sitzman has received the letter.  That is a
 3        fact.
 4                  To the extent that my letter, I believe, be
 5        misconstrued as accusations of perjury and fraud on the Court,
 6        etc, I apologize.  I don't believe that those accusations are
 7        in there, your Honor.  I really don't.
 8                  THE COURT:   I understand where Mr. Sitzman is
 9        coming from because it's a sensitive issue with respect to what
10        was actually seen.  And obviously the issue, you know, the
11        overarching issue is what was seen and by whom.  So I
12        understand how it's been taken.
13                  But obviously at this point we do understand and
14        in fact you do agree that the document was sent, it was sent to
15        Mr. Sitzman, he was accurate with respect to how he referenced
16        the document.  And I understand there's a short period of time
17        which to look at these issues.  But again they are sensitive
18        issues which is why we are discussing them right now.
19                  MR. CONNOLLY:  I agree, your Honor, which is why I
20        apologized.  I just don't think that --
21                  THE COURT:   Understand.
22                  MR. CONNOLLY:  I don't want the record to suggest
23        that I am admitting that did in fact accuse Mr. Sitzman of
24        those things.  I don't believe I did.  But, to the extent he
25        took it that way, I, for the third time, am apologizing.
```

1           THE COURT:   I understand, counsel.

2           MR. SITZMAN:   I appreciate the apology and I

3    appreciate that I don't want to beat a dead horse.  That's not

4    fair.  But, I do want to point out that what has been going on

5    for the last week could have been completely avoided.  In fact,

6    all of this should have been avoided and it shouldn't have

7    taken the Court's time.  And we shouldn't have been submitting

8    declarations and doing interviews and searching servers and all

9    of these extraneous activities while preparing for trial.

10          It's time for the merits.  We are ready.   I

11   shouldn't have to have teams of people looking for e-mails when

12   they could pick up the phone and they could say, in a

13   professional manner, hey, by the way, did you get this e-mail?

14   If you've got the e-mail, could you send it over.

15          I talked to Ken Schuler twice yesterday,  twice

16   yesterday before they submitted this letter.   Hey, Mike, we're

17   about to send a letter to the court and we're going to tell

18   them that the letter that you attached to your declaration

19   under penalty of perjury was not in fact delivered to you.

20          THE COURT:   Again I fully respect where you're

21   coming from and I understand the issue is a little bit heated.

22   And I am sure everyone is trying to put their strongest

23   position forward if they believed that you hadn't received the

24   letter, I think that was the impetus for sending that in.   Was

25   it correct?  No.  It wasn't correct.  And I think at this point

1          counsel has indicated you've fully established that you

2          received the letter.

3                         And to the extent there was any implication he was

4          saying anything beyond that in his letter, he hopes you

5          understand that he wasn't.

6                         Is that an accurate recitation.

7                         MR. CONNOLLY:   Yes, your Honor.  I think that was

8          pretty clear.

9                         MR. SITZMAN:   And I accept the apology.  I really

10         appreciate that.  I would like to see this sort of come to an

11         end.   We've got a long trial ahead of us.

12                        THE COURT:   I agree.

13                        MR. SITZMAN:   We have a lot of work to do.

14                        THE COURT:   And we do still have some issues out

15         there.  And perhaps if we are able to work together, they might

16         be more quickly dealt with.  I understand that as far as the

17         issue that's pending with respect to these letters I'm not

18         going to go into them in detail right now.  Obviously because

19         we are hoping to do our openings right now.

20                        But, when we get together to discuss those I'm

21         going to set a specific date and time at the end of the day

22         when we can do that, not today, but for another day.  I'm

23         hoping that we will be able to address that in a spirit of

24         cooperation as well and get beyond this.   All right.

25                        Anything else on this particular issue?  Counsel.

1          MR. CONNOLLY:   Not from me your Honor.

2          THE COURT:   Anything else?

3          MR. SITZMAN:   The only thing I would like those

4    two documents I guess entered or if the Court wants me to

5    separately since the letter has come in and it has been put on

6    the docket,  I would like those two documents put on the docket

7    as well.

8          THE COURT:   Do you want to do a cover letter or

9    we could certainly just put them on the docket but then they

10   have no reference point.

11         During the break if someone wants to do a cover

12   letter you can show it to counsel, e-mail it to us, then we

13   would be happy to assist to put it on the docket today.

14         Is there any issue?

15         MR. CONNOLLY:   I'm going to ask Mr. Sitzman to

16   check whether his declaration, the original declaration is on

17   the docket because I believe some of those original papers were

18   not actually filed on the docket.   So if it's on the docket,

19   then you can cure it.  But, if it's not on the docket, I don't

20   think there's anything --

21         MR. SITZMAN:   The redacted version is filed under

22   seal on the docket.

23         MR. CONNOLLY:   By the way, these papers were also

24   filed under seal.

25         MR. SITZMAN:   Right.

```
1              THE COURT:   But these documents you are not
2    looking to have them filed under seal?  Do you want to consider
3    that?
4              MR. SITZMAN:   I don't think they have any
5    confidential information.
6              THE COURT:   I'm not certain.  You can look at
7    your metadata and see if there is.  Do you want to take a look
8    at the docket?
9              MR. CONNOLLY:   As long as the attachment isn't.
10             MR. SITZMAN:   The letter is not attached.  It's
11   just those two documents.
12             MR. CONNOLLY:   These two documents do not contain
13   any confidential information.
14             THE COURT:   I'm sorry, what was the last --
15             MR. CONNOLLY:   These two documents that Mr.
16   Sitzman just handed me do not contain any confidential
17   information.
18             THE COURT:   During the break if you want to have
19   someone on your team draft a letter or during lunch, that's
20   fine, a cover letter.  You can send it to us and we would be
21   happy then to assist by putting it on to the docket.   All
22   right.
23             Okay.  Any other matters before we start today?
24   Anything else?  Is everyone's computer equipment working
25   properly? Any issues? We are closing the skylight.  Hopefully
```

 1          that should aid with viewing the screen.

 2                    MR. SITZMAN:   Your Honor, may I approach?

 3                    THE COURT:   Yes, certainly.

 4                    MR. SITZMAN:   Your Honor, what I handed up is a

 5          set of demonstrative exhibits that I'm going to use during the

 6          course of my opening.

 7                    The other quick question before I begin,  would

 8          the Court mind if I approached the screen from time to time to

 9          point a few things out?

10                    THE COURT:   That is totally fine.   And with

11          respect to the slides,  has everyone on the defense side taken

12          a look and has a copy?  Yes.

13                    MR. ALY:   We just received a copy.

14                    THE COURT:   I gather at this point no issues.

15          Any issues so far?  If you want to take a moment.  Any issues?

16                    MR. SCHULER:   I think it comes to about 49.

17                    MR. SITZMAN:   There's going to be a need to

18          change the configuration.

19                    THE COURT:  Page 49.

20                    MR. SCHULER:  Slide 49.

21                    THE COURT:   I flag it at Page 49 but if you would

22          like to give me a reminder before you get to that point.

23                    Are we in agreement it's Page 49 where we start?

24                    MR. SITZMAN:   We will stop at 48, pause.

25                    THE COURT:   Fine.  Because just what I indicated,

1     if you would like to give me some lead notice even though I

2     have stickered it so we can take care of that.  All right.

3             Any other issues?  Anything else?  No? Okay.  So

4     let's begin with the opening on behalf of plaintiff.

5             MR. SITZMAN:  Thank you, your Honor.

6             THE COURT:   Thank you.

7             MR. SITZMAN:  Thank you and I thank the Court

8     staff, by the way, for persevering with us.  You have met most

9     of the team here and we are happy to be here.  Let me also

10    introduce Mr. Paul Simboli (ph) who is in the courtroom from

11    Depomed.

12            THE COURT:   Hello, sir, how are you?

13            MR. SIMBOLI:  Very well.  Thank you.

14            MR. SITZMAN:  Vice-president assistant general

15    counsel.  And also in the courtroom who will be testifying

16    later is the vice-president of finance from Depomed Jack

17    Anders.

18            THE COURT:   And Mr. Anders.  Hello Mr. Anders.

19    How are you?

20            MR. ANDERS:  Good.

21            THE COURT:   Good.

22            MR. SITZMAN:   Let me begin by giving the Court

23    just a brief roadmap as to where I'm going on my opening.

24    First I want to talk about, give the Court some background on

25    the science and treatment of pain that's relevant to this case,

1    some of which we've touched on.  But, I want to go into a

2    little bit more detail today.

3              Next I want to talk about the inventions,  then

4    the patents and then the issues that will be the subject matter

5    of the trial, defendant's infringement, and then the validity

6    of the patents.

7              So let's start with treatment and pain.   As I

8    told the Court in December,  there are two types of pain that

9    are relevant to this case, nociceptive pain and neuropathic

10   pain.   Nociceptive pain are what everybody calls a noxious

11   stimulus.   This the type of pain where you stub your toe,  you

12   twist your ankle,  you unfortunately hit your thumb with the

13   hammer as depicted there.  That's the type of nociceptive pain

14   we are talking about.

15             THE COURT:   Would you also refer to it as

16   external or could it be internal but caused by an injury?

17             MR. SITZMAN:   It could be internal as long as it

18   was caused by some --

19             THE COURT:   Pressure?

20             MR. SITZMAN:   Pressure.  Well, pressure or some

21   single point that when removed, that's the key,  when removed,

22   the signal goes away.

23             THE COURT:   Okay.

24             MR. SITZMAN:   Let me contrast that with

25   nociceptive pain.  What happen is the nerves become damaged,

1      they become not functional and are not operating correctly.

2      They are constantly sending signals, wrong signals of pain

3      through the body, different parts of the body and different

4      control centers.

5                   And as you can see in terms of the contrast,

6      there's no stimulus or isolated or identifiable stimulus that's

7      causing it.  It's the actual nerves themselves that are

8      suffering from that pain.

9                   Now, in order to feel pain, pain signals have to

10     make their way to the brain.   And they do that through the

11     ascending pathways.  The brain has to perceive the actual pain.

12                  The descending pathways, the ones coming down from

13     the brain, that's what's implicated in the neuropathic pain

14     aspect.  It's the descending.  And that's shown here, the

15     descending pathways.  That's what's implicated on the

16     neuropathic side of the chart.

17                  The neuropathic pain communication is dependent,

18     in part, on what we call neurotransmitters.   And

19     neurotransmitters are those chemicals that transmit a signal

20     from one nerve or neuron to another.   And examples of

21     neurotransmitters that you're going to hear in this case and

22     you will hear also there are things like Dopamine serotonin 5

23     HT Epinephrine, neuro epinephrine, those are all the

24     chemicals that are in that what we call that synaptic space

25     that delivered the signal from one nerve to the next.

```
 1              Now, opioids which you've heard a lot about

 2    already --

 3              THE COURT:    I have.

 4              MR. SITZMAN:   -- they play a very important role,

 5    as you can imagine, in reducing pain signals.  And they do that

 6    by interacting with the opioid receptors on individual nerves.

 7              Now there's a host of different types of opioid

 8    receptors.   Each one has its own characteristic.   Each one

 9    also relates to a different source of communication.

10              There are three primary sources of opioid

11    receptors, MU, Kappa, delta.  And then you can see from that

12    chart, which you don't have to memorize, that they are, within

13    each class, there's multiple sub types.  So you have MU 1, 2,

14    Kappa one.  And it's the targeting of these specific receptors

15    with particular opioids that can bring about certain pain

16    relief.

17              THE COURT:    I know in your brief you talk a lot

18    about the MU opioid.  You are going to focus on that today?

19              MR. SITZMAN:   Exactly.  Exactly.

20              THE COURT:    Okay.

21              MR. SITZMAN:   So it's the selective binding of

22    the opioids to these receptors, the MU opoid with regard to

23    this particular medication that reduces that pain signal that's

24    headed to the brain.

25              Now, opioids are activated by opiates.  That's
```

 1      how they got their name.  The oldest known form of opioids is

 2      opium.  That's how this all comes together.

 3              Today in the modern world we've got the drugs we

 4      are going to talk about.  I tried to stay away from them on

 5      this slide.  Morphine is one of the big daddies of opioids.

 6      It has problems.  It has side effects.  Things that the Court,

 7      I'm sure, is aware of in public.  OxyContin is another one.

 8              All right.  Let's turn briefly now, well, or

 9      longly, to the inventions.  The inventions start out at

10      Grunenthal.  Grunenthal is a privately-owned pharmaceutical

11      company in Aachen, Germany.  Since the early 1960s, Grunenthal

12      has been investigating and developing analgesics compounds.

13      One of its first successful analgesics was Tramadol.

14              Tramadol was first synthesized in 1962.  Tramadol

15      is what we call a centrally acting opioid analgesic.

16      Centrally acting in that it acts on the nerves in the central

17      nervous system, the brain and spine, primarily the spine.

18              Now Tramadol is a fairly complex mixture.

19      Tramadol is administered as a racemic mixture.  Up above you

20      will see 1R, 2R, 1S, 2S Tramadol.  It exists in two

21      enantiomers.  When you take a pill, you are getting both

22      enantiomers.  When it hits the body, it then becomes

23      metabolized into two more molecules, 1R, 2R, 1S, 2S O

24      desmethyl.

25              Now each of these chemicals has its own complex,

1     I'm sorry, each form has its own pretrial.  It's the

2     combination.  In fact, you need the combination of all of these

3     molecules to bring about the analgesic activity of Tramadol.

4     That's what they indicated in the middle.  That's the new

5     opioid activity, the serotonin reuptake inhibition and NE is

6     shorthand for neuro Epinephrine uptake inhibition.   Tramadol

7     has some shortcuts.

8                    THE COURT:   So, back to that, though, you need

9     the full racemic mixture.  You need both the enantiomers in

10    that pill and then they breakdown into those two substances.

11                   MR. SITZMAN:   Exactly.   You cannot identify any

12    one of them as controlling one activity or one mechanism of

13    action.   In order to bring about the full analgesic effect of

14    Tramadol, you have to have the racemic mixture.  The racemic

15    mixture has to undergo metabolism.  The metabolites have to

16    work.

17                    I think I was talking about some of the

18    shortcomings of Tramadol.  It's relatively a weak opioid.  The

19    gold standard here is Morphium which is very strong.  And like

20    I said, has its own drawbacks in terms of side effects and in

21    terms of harm and danger.  But Tramadol is relatively a weak

22    opiod on the scale of opioids.

23                    THE COURT:  So in terms of what you would

24    prescribe it for, what would be the type of things you would

25    use Tramadol for?  It sounds like it's not really as strong as

1    some of the other drugs.  So what would you be using it for?

2              MR. SITZMAN:   You would use it for nociceptive

3    acute pain, for example.  By the way, just because it's

4    considered a weak opioid, doesn't mean that it doesn't have

5    utility or analgesic properties.

6              There's some people that cannot tolerate morphine

7    or some of the more potent opioid drugs.  So Tramadol is a good

8    substitute for that.

9              THE COURT:   So, what types of things would you --

10   I mean in terms of level of pain, would you be prescribing

11   this --

12             MR. SITZMAN:   I would like to reserve most of

13   that for the clinical experts that are going to be here.  But,

14   to give the --

15             THE COURT:   I am just trying to gauge its

16   relative strength.

17             MR. SITZMAN:   Relative to morphine?

18             THE COURT:   Yes.

19             MR. SITZMAN:   Again it would depend.  And I don't

20   think I have enough clinical experience to give you kind of

21   numbers of days and dosages that I would give a particular

22   patient.

23             THE COURT:   Fair enough.

24             MR. SITZMAN:   But, the way I look at Tramadol,

25   the way we view Tramadol is it is very helpful in treating that

1    short term acute pain that you get, that nociceptive type pain

2    where you don't need to treat other conditions,  other pains.

3    And you know that this is going to be perhaps a short lived

4    pain.  Again, I'm going to defer to the medical experts on

5    that.

6            It's also a complex molecule mixture, that it's

7    got the racemic mixture in those metabolites.  Given the

8    indication and the continued need to find pain treatments with

9    greater efficacy and less side effects.

10           THE COURT:   What were the side effects for

11   Tramadol?

12           MR. SITZMAN:   One of the biggest, for example, is

13   constipation.  And that's not uncommon with opioids.  But

14   that's one of the biggies.  Other gastrointestinal problems are

15   also associated with Tramadol.  That's not to say that

16   everything else is free of those.  But, these side effects are

17   in existence.  And there is this long felt need to find drugs

18   that can deliver an effective dose of opioid that's efficacious

19   and have less of these side effects.

20           So, against this backdrop, Grunenthal decided to

21   look for some new successor.   And while it could have started

22   anywhere in the field of pain treatment,  Grunenthal decided to

23   start and focus on systematically varying the control structure

24   of Tramadol in order to find some new successor compound.

25           Grunenthal identified three structural features

1   within Tramadol that it felt were very important.   First that

2   it had an aromatic ring.   Second,  that it had a tertiary

3   amino or nitrogen atom.   And by the way that's A B and C I

4   might come back and refer to them as A B C.

5          THE COURT:   That's fine.  A is an aromatic ring

6   and so on I'm with you.

7          MR. SITZMAN:   And C the cyclohexane ring.   This

8   ring structure here locks this molecule together.   It holds A

9   and B in just the right confirmational position in order to

10  bind to the MU opioid receptors and other receptors within the

11  body.  It holds it in that perfect space.

12         That's why this ring structure was important to

13  hold this all together and keep this molecule rigid because

14  they knew it worked.

15         So, in order to make sure you had an new drug that

16  would hit the same receptors, you gotta have the same

17  confirmation or at least try.

18         For ten years Grunenthal worked on trying to find

19  a successor to Tramadol, but to no avail.  Could not identify a

20  viable candidate.   They tested approximately 550 compounds,

21  the evidence will show . The desired profile for the new drug

22  that Grunenthal had set out was very demanding.  And many

23  people at Grunenthal, especially after ten years of working on

24  this, felt that there was no real prospect of success.

25         In scientific terms,  Grunenthal was stuck.   That

```
 1        is until May of 1992.   In May of 1992 Dr. Helmut Buschmann
 2        comes to Grunenthal.   The Court will hear from Dr. Buschmann
 3        later today.   Dr. Buschmann was skilled and trained in
 4        medicinal and synthetic chemistry.   And when he came to
 5        Grunenthal,  no surprise,  he was assigned to the successor
 6        project and brought up to speed as to what Grunenthal had been
 7        doing for the last ten years in terms of synthesizing new
 8        compounds.
 9              Dr. Buschmann, you will hear, started synthesizing
10        compounds just like the rest of the scientists at Grunenthal.
11        Nothing truly remarkable about any one compound until Dr.
12        Buschmann decided to take Grunenthal in a completely different
13        direction.
14              Remember the figure I just showed you.   Dr.
15        Buschmann proposed opening or breaking the cyclohexane ring.
16        That was a radical departure.   Dr. Buschmann felt that if they
17        lost some rigidity for some reason,  he believed he might be
18        able to come up with a new compound.
19              Now,  this flew in the face of everything that not
20        only Grunenthal knew, but that the scientific community knew.
21        Losing rigidity to obtain and try and keep that confirmational
22        configuration within the molecule didn't make sense.   All of a
23        sudden you are going to now make this floppy molecule that can
24        move and change into all kinds of shapes.
25              Additionally Dr. Buschmann wanted to do a few
```

1     other things.  He wanted to remove the C-1 hydroxyl group and

2     he also wanted to modify that aromatic ring that you see in A.

3                    THE COURT:   So you are saying it would be

4     counterintuitive at that time to have come up with a linear

5     structure?

6                    MR. SITZMAN:   It's as if you read my opening

7     statement.   Exactly.  That's exactly right.   And it wasn't

8     that easy, by the way.  It was counterintuitive not only to the

9     people at Grunenthal who had been working on this for ten years

10    but to the scientific community at large.

11                   The Court's going to hear from Dr. Bill Roush who

12    is an expert in synthetic chemistry and medicinal chemistry.

13    And he is going to talk about what was expected and known for a

14    person of ordinary skill in the art in 1994 and explain how far

15    outside the box this approach was.

16                   THE COURT:   Were any of the other analgesics at

17    the time in a linear structure?

18                   MR. SITZMAN:   No.

19                   THE COURT:   There were none?

20                   MR. SITZMAN:   Well, so, I'll keep moving forward.

21                   THE COURT:   I'm sure it's coming in somewhere.

22    Go ahead.

23                   MR. SITZMAN:   So, you can imagine, by the way,

24    how Grunenthal reacted to Dr. Buschmann wanting to do this.

25    And they resisted.   Dr. Buschmann's going to explain that they

1     resisted.   They he had to fight with his personnel in order to

2     make these linear compounds.  Ultimately Dr. Buschmann said

3     that he would continue and he agreed he would continue making

4     the cyclical compounds only if he could try some of his linear

5     compounds.

6           Grunenthal was not going to give up on its

7     teachings, its knowledge and the idea that cyclical compounds

8     were the way to go.

9           To make that situation, by the way, worse for Dr.

10    Buschmann, the chemical synthesis group, the group that he was

11    in, was receiving incredible pressure from the executives at

12    Grunenthal that the entire project was going to be scrapped.

13    If they could not find a rational candidate to move forward

14    with, they were going to scrap it.

15          Because at that point in time it was 12 years of

16    work.   They had spent millions of dollars and 12 years of time

17    and they didn't have -- they had lots of possibilities.   They

18    didn't have a rational candidate to really move forward with.

19          Dr. Strassberger, I was going to tell you about

20    Dr. Strassberger, he's the director of computational chemistry.

21    And he said at that moment in time that finding a candidate

22    with all of the required characteristics in a single compound,

23    could not be done.  Dr. Buschmann pushed forward.  And by 1994,

24    Dr. Buschmann's laboratory produced, synthesized more than 300

25    compounds, both cyclical, because as I was telling you he had

1     to continue that cyclical approach, and linear.   The linear

2     compounds were unlike anything that Grunenthal had ever seen or

3     any of its competitors.

4                Your Honor was asking about what the competition

5     was doing.  You are going to hear from Dr. Buschmann about what

6     the competitors were doing, and none of them were at this

7     point.

8                Many of the linear compounds Dr. Buschmann sent to

9     Dr. Elmar Friderichs who tested these linear compounds in a

10    nociceptive animal model.  They wanted to see whether any of

11    these linear compounds would work.   And lo and behold all of

12    the linear compounds that Dr. Friderichs had received showed

13    analgesic activity.

14                The data was very well received at Grunenthal.

15    But, they still weren't convinced and they moved forward in

16    drug development with several linear compounds but also a

17    couple of the cyclical compounds as well.

18                In December 1997,  three years after synthesizing

19    Tapentadol,  it was selected as the lead candidate that

20    Grunenthal would move forward with.

21                Dr.Buschmann and his co-inventors filed for patent

22    protection for this novel class of linear compounds.  That led

23    to the issuance of the '737 patent.   Let me just pause here

24    for a moment.   The court knows that the patent at issue is a

25    reissue patent that we refer to as the '593.   This is the

```
 1          original patent that gets reissued as the '593.
 2                    THE COURT:   Going back to Elmar Friderichs.
 3                    MR. SITZMAN:   Yes.
 4                    THE COURT:   When the substance was sent to him,
 5          tell me again what he did with it.
 6                    MR. SITZMAN:   He used --
 7                    THE COURT:   He tested it?
 8                    MR. SITZMAN:   He tested it in an animal model,
 9          that's an in vivo, to see if it had any analgesic activity.
10                    THE COURT:   Prior to that, had it been tested in
11          animal models?
12                    MR. SITZMAN:   The linear compounds?  No.
13                    THE COURT:   That was the first time?
14                    MR. SITZMAN:   That was kind of that first test.
15                    THE COURT:   Okay.
16                    MR. SITZMAN:   So, I don't want to lose this
17          point.  If the Court hears '737 or '593, we are talking about
18          either the reissue or the original patent, but it's that same
19          composition of matter invention.
20                    As a drug candidate, Tapentadol was a significant
21          departure, as you can imagine, for Grunenthal from what it was
22          used to.  Remember my discussion of Tramadol just a few
23          minutes ago which was racemic mixture, two enantiomers,
24          metabolites.  Tapentadol, on the other hand, is just the minus
25          enantiomer and a single molecule.
```

1          Tapentadol only had two methods of action.   It

2     had that MU opioid receptor activity.   It had the neuro

3     epinephrine reuptake inhibition but it didn't exhibit that

4     serotonin reuptake inhibition that Tramadol had.

5          So, by going with Tapentadol, Grunenthal went from

6     three methods of action to two mechanisms, sorry, mechanisms.

7     The bottom line and the take away here is that identifying

8     synthesizing and developing Tapentadol was a huge leap of faith

9     by Grunenthal.

10          While we're on Grunenthal, let me just talk

11     basically about the internal structure without much detail.

12     But it's an internal structure to keep in mind how things

13     worked at Grunenthal.

14          The process of going from synthetic chemistry to

15     production.   Here in synthetic chemistry this is where Dr.

16     Buschmann was, along with other scientists.   And the focus here

17     is identifying new novel compounds.   This is in that space.

18     What they're looking at is they're looking at generating new

19     compounds.   They are not working on quantities, they are

20     looking for new and novel compounds.   They are producing very

21     small amounts of these products in fact.

22          And this is where the synthesis of example 25, for

23     example, took place.   After synthetic chemistry, though, the

24     product, the project, the compound then makes its way through

25     chemical process and development.   Now here the focus changes

1    because we are no longer looking at developing new compounds.

2    Here what we're looking at is some efficiencies and savings on

3    some opportunities to start thinking about some scale up and

4    generating a little bit more for more testing, more in vivo

5    testing, more invitro testing, more analgesics to analyze the

6    compound certainly with much more quantities than they had in

7    synthetic chemistry.

8         When it eventually makes it way to production,

9    the focus again changes again.   Now we're looking at large

10   scale scale up.   Producing enough compound in the most

11   efficient way so that the dosage form can be made in an

12   economical way for delivery to the patient.

13        Each time this compound or the project or the

14   particular compound at issue moves along this process,  the

15   process changes, the focus changes, the process changes.   They

16   are still making Tapentadol or they are still making whatever

17   the drug is at issue.   But, the process changes for making it.

18        Now I'm going to come back to this in a few

19   minutes but I just wanted to layout that structure at this

20   point.

21        THE COURT:   Okay.

22        MR. SITZMAN:   We've been talking about Tapentadol

23   and the Tapentadol molecule.   Let's talk a little bit about

24   what happens when all the Tapentadol molecules are packed

25   together.   This brings up the concept of polymorphism.

1            Now, generally speaking, polymorph is the ability

2      of a solid material to exist in more than one form or crystal

3      structure.  This is a classic example of graphite and diamond.

4      Two different crystal structures.  Same chemicals, two

5      different crystal structures.

6            Now crystalline solids can exist in one of seven

7      different forms.  Here's the seven different crystal

8      structures.  Now each one has different properties.  But, by

9      and large all the crystals fit into one of these basic

10     structures.

11           Now, up until the late 1990s Grunenthal was not

12     focusing on polymorphism.  Dr. Buschmann tried to convince

13     Grunenthal that solid state analysis, analysis of these forms

14     of crystals of the actual solid form of the compound, that that

15     was important.  But Grunenthal did not have, at that time, a

16     solid state laboratory.

17           So, Dr. Buschmann convinced Grunenthal to go out

18     and hire its first inorganic chemist.  Normally in the

19     synthetic chemist group you've got all organic chemists.  Now

20     Grunenthal is going out and it's going to hire its first

21     inorganic chemist to study crystal structures.

22           And in 2000 Dr. Michael Gruss who the Court will

23     hear from in the next day or so was hired in 2000.  And he came

24     to Grunenthal as the first inorganic chemist to work on and

25     develop a solid state lab.

1          Shortly after Dr. Gruss arrived at Grunenthal he

2     started to collect various Tapentadol samples from all over

3     Grunenthal.   He was asked to take a look at what Tapentadol

4     is, what the structure is.   And he was studying Tapentadol as

5     well as other compounds that they were all interested in.

6          Since Grunenthal at that time didn't have the XRPD

7     type machinery, in fact they hadn't even bought one yet, Dr.

8     Gruss sent the samples out, that he had, out to outside labs

9     and asked for XRPD patterns of all of them to come back.

10          When they came back, Dr. Gruss reviewed all the

11     patterns and he concluded, after looking through and analyzing

12     all of this XRPD data, along with some other data, by the way,

13     it was on DSC data, there was some other data on the Tapentadol

14     molecule that was available to him, but from all of that data

15     he was able to conclude that there were two forms of

16     Tapentadol.   Form A, which is the monoclinic crystal and form

17     B which is the ortho rhombic crystal.

18          Now, many of the samples that Dr. Gruss received

19     back were form A or mixtures of form A and B. But, in 2002,  in

20     early 2002, Dr. Gruss saw the XRPD pattern of batch 0 which was

21     the original batch of Tapentadol that Dr. Buschmann synthesized

22     in his laboratory eight years earlier in 1994.

23          This is the XRPD pattern of batch 0 showing that

24     its form B and there is no form A present.   And again that was

25     done eight years after the fact.

```
 1                    After seeing this,  Grunenthal wanted to confirm
 2         this result.
 3                    THE COURT:   And what would it look like if there
 4         was form A present?
 5                    MR. SITZMAN:   You would see A peaks here at
 6         various different points.   Remember the patent, the '364
 7         patent identifies certain particular peaks in terms of claim
 8         one and claim two.  It identifies some of those two theta peaks
 9         that are specific to form A.  And Dr. Joel Bernstein is going
10         to be here in a week or so.
11                    THE COURT:   And explain what it would look like
12         and why this looks like a perfect form B?
13                    MR. SITZMAN:   Exactly.
14                    THE COURT:   And this one, this particular exhibit
15         is 1994?
16                    MR. SITZMAN:   No, it was done in 2002.
17                    THE COURT:   2002.
18                    MR. SITZMAN:   The results came back in 2002.
19                    THE COURT:   But this is the exact batch from 0.
20                    MR. SITZMAN:   Yep.   This is batch 0.   This is
21         what, this is the first manufacture and synthesis of
22         Tapentadol.  The very first.
23                    THE COURT:  Okay.
24                    MR. SITZMAN:   Now, seeing these results,
25         Grunenthal wanted to confirm what it was seeing.  So, it asked
```

```
 1        Marita Mueller, who you've heard a little bit about --

 2                 THE COURT:   I certainly have.

 3                 MR. SITZMAN:   -- to try and do and perform and

 4        resynthesize example 25, to go back and resynthesize and she

 5        did.  She did it twice.  And what she found when she did it was

 6        example 25 yielded form B.

 7                 So, what do we know of batch 0 form B carrying out

 8        example 25, form B?  But, we have other results from across the

 9        company that Dr. Gruss has received samples back in XRPD

10        patterns showing there's form A form B, even mixtures of form

11        A.

12                 THE COURT:   Going back to Marita Mueller for a

13        moment, I know we discussed this on some of the motions leading

14        up to trial in terms of her performing this analysis.  I think

15        she did it twice.  She got form B twice.  We had addressed at

16        the time what she had started with and how she got there.  If

17        you could go through that again.

18                 MR. SITZMAN:   I will.  Let me, I will preview

19        where I'm going to be.  She started at the beginning of example

20        25 and faithfully carried out example 25 from start to finish .

21        And she did it twice.

22                 THE COURT:   And you will go through that again as

23        we get to another point on this.

24                 MR. SITZMAN:   All right.  All right.  If you

25        want to jump ahead.  Here is the steps of example 25.  And
```

1    we've labeled them, we could go through all the chemical

2    synthesis, and several of the experts will do that for you.

3              THE COURT:   What is this, 62?

4              MR. SITZMAN:   This is 62 but it doesn't

5    disclose --

6              THE COURT:   We are okay with 62?

7              MR. SITZMAN:   I was just checking with them.

8              THE COURT:   Okay.

9              MR. SITZMAN:   Example 25 of the '737 patent.  And

10   what we've done here is broken it down as it's set forth in the

11   patents as four steps 1, 2, 3, 4.

12             THE COURT:   I think I have a different 62.

13             MR. ALY:   Your Honor, I have that as 59.  I don't

14   know if the number is any different.

15             THE COURT:   I'm going to follow what's on the

16   screen but I think have a different one.

17             MR. ALY:   It's 59 on my sheet, just to inform Mr.

18   Sitzman.

19             THE COURT:   Not a problem.

20             MR. SITZMAN:   Let's go with 59.

21             THE COURT:   I have it.  It's 59.  I'm good.  I

22   have it.

23             MR. SITZMAN:   Batch 0, the step order for batch 0

24   if you look back in the laboratory notebooks is not 1, 2, 3,

25   4, it's 1, 4, 2, 3.  There is an inversion of two steps.

1      It was a synthesis.  It wasn't intended to be an example 25 but

2      it was an early synthesis that Dr. Buschmann did.  And really

3      the only difference between example 25 and that is the switch.

4                THE COURT:   So you are saying in the original lab

5      notebooks it was actually 1, 4, 2, 3?

6                MR. SITZMAN:   Well, in the lab notebooks there's

7      a bunch of different synthetics.   And batch 0, the one that

8      corresponds with batch 0, if you try to compare it with example

9      25, what you see is it's 1, 4, 2, 3.

10               THE COURT:   Okay.

11               MR. SITZMAN:   Now you'll also see what ultimately

12     becomes example 25 as well.   But, if the court is interested

13     in knowing how batch 0 was made,  this is important.

14               THE COURT:   I am.

15               MR. SITZMAN:   The other thing that the Court's

16     going to hear from the experts is this particular switch, 1,4,

17     2, 3, is akin to having coffee with cream and sugar, one adding

18     cream and then sugar and the other one adding sugar and then

19     cream.   And the experts will explain that to you.

20               That was form B.  That's what Dr. Gruss originally

21     saw in form A .  The resynthesis by Miss Mueller are

22     represented here in the next two lines.   And she carries out

23     example 25, 1, 2, 3, 4 and she gets exhibit -- she gets form B.

24               THE COURT:   Form B.

25               MR. SITZMAN:   Now, these two in orange, since we

1    are jumping ahead, the two in orange represent the experiments

2    that were conducted by the defendants' experts.  The defendants

3    bear the burden in this case by clear and convincing evidence

4    to show that form A necessarily and inevitably forms when you

5    practice example 25.  That's their burden by clear and

6    convincing evidence.

7         The Court will not hear any evidence from the

8    defendants that the defendants ever performed example 25 from

9    start to finish.  Three defendants hired outside experts and

10   no one started from the first step.  No one.  Their burden is

11   clear and convincing evidence.

12        When they did buy the API and do Step 4,  they got

13   a mixture of A and B.  Actually a few samples actually had

14   more B than A.  That's just a preview of what's to come.

15        I think the Court I think where we were in the

16   invention story is Miss Mueller's resynthesis.  Let my just go

17   back to that real quickly.  This might help.

18        THE COURT:  I know what you're saying.  You are

19   saying we don't know what they started with so of course they

20   got something different.

21        MR. SITZMAN:  Correct, correct, correct.

22        THE COURT:  But again just to clarify again with

23   respect to the four steps, you say they were a bunch of lab

24   notebooks and so on regarding the steps involved.

25        Tell me again, just clarify one more time how we

1    had the steps in example 25 versus whatever was done originally

2    by Miss Mueller, 1,4,2,3, excuse me, she did 1,2,3,4 in

3    September 2002.

4              MR. SITZMAN:   Correct.  When Dr. Buschmann

5    originally started sketching out in his book, his lab notebook

6    and decided he wanted to see what this compound was and could

7    he do it,  he sketched it out and he sketched out a synthesis

8    and he sketched it out.  And it's only in sort of a hindsight

9    comparison here we are just comparing it so that you have a

10   foundation for understanding the steps that are laid out for

11   batch 0.

12             So when he originally sketched it out, he sketched

13   it out for what would be 1,  4,  2,  3.  Within the next few

14   syntheses thereafter, he then sketches out 1,  2,  3,  4.

15   That ultimately is what becomes example 25 in the patent.

16             THE COURT:   Okay.  So he starts with a different

17   set of steps in terms of a different order.  Not a different

18   set of steps, a different order.  He originally comes down to

19   1,2,3,4 and that's ultimately what's in example 25.

20             MR. SITZMAN:   Correct,  correct.

21             THE COURT:   And that's what Miss Mueller does in

22   2002.  She does 1,2,3,4 and she gets B.

23             MR. SITZMAN:   Correct.

24             THE COURT:   I'm with you.

25             MR. SITZMAN:   Correct,  correct.

1              THE COURT:   Just going back, and I know there's

2    some territory on this particular example that I'm not going to

3    go into now that I will maybe go into on the afternoon session,

4    but maybe we could talk about the Step 4 from the University of

5    Wisconsin and Organix because that looks like there's a

6    question mark here on this page.

7              MR. SITZMAN:   So, they get, they buy the API

8    Tapentadol and they then perform the final bromination step, I

9    believe it's bromination, Organix, and they perform the formal

10   purification step, the separation step, the crystallization

11   step.  It's all part of that last step process.  And then they

12   throw it through an XRPD machine so that they can analyze what

13   it is.

14              THE COURT:   Okay.

15              MR. SITZMAN:   It raises the question as to why

16   none of the defendants would have gone back and started at

17   Step 1.

18              All right.   Continuing on with the invention

19   story, 2002,  Miss Mueller confirms that example 25 yields form

20   B.  And it's at that point that Grunenthal realizes that form B

21   was the original form, the original polymorph that Dr.

22   Buschmann manufactured and sketched out here in synthetic

23   chemistry.  And that through the process of Grunenthal and

24   further development, they had come across the more stable novel

25   form, form A.

1          In June, 2004, Grunenthal filed for patent

2     protection --

3          THE COURT:    And more stable in terms of

4     temperature?

5          MR. SITZMAN:    Yes.  You're going to hear some

6     testimony about a few different, more terms, the terms are

7     metastable and thermodynamically stable.   Metastable means

8     that it's still stable, stable at room temperature, stable.

9     But it's not as stable as a different form.   The form A turns

10    out to be the more thermodynamically stable form of Tapentadol.

11          Since we are on that subject, it's my point of

12    emphasis before, form B, even though it's metastable, was

13    stable for eight years between the point in time Dr. Buschmann

14    originally synthesized it and when the XRPD pattern was taken.

15    So just because it's metastable, doesn't mean that there's

16    something wrong with it or that there's some problem with it.

17    Metastable just simply means that there is another crystal form

18    that is thermodynamically more stable.

19          Now interesting enough, you are going to hear from

20    Dr. Joel Bernstein who will tell you you can spend years

21    looking for more thermodynamically stable molecules and never

22    find it in which case the metastable form,  because that's the

23    only form you have, is considered the thermodynamically more

24    stable.

25          THE COURT:    Is considered what?  What was the end

1     of that?

2                    MR. SITZMAN:    The more thermodynamically stable.

3     If you only, if you keep looking and all you've got is one,

4     it's got to be the more thermodynamically stable until you find

5     something that's more thermodynamically stable.

6                    THE COURT:   Okay.

7                    MR. SITZMAN:    This is the patent, the '364 patent

8     that we've talked about before.   And that's the patent

9     protection on polymorph form A.

10                   Now, Grunenthal proceeded forward with its testing

11    of Tapentadol and was moving forward with those nociceptive

12    analgesic testings that I talked to you about earlier more

13    formally at this point in time.   But, in view of this, the

14    unique properties of Tapentadol, Grunenthal wanted to conduct

15    additional in vivo tests and they wanted to further

16    characterize what this molecule could do.

17                   Unfortunately Grunenthal had limited capabilities

18    in terms of its in vivo modeling and in vivo testing in its

19    facilities.

20                   In 1996, Grunenthal hired Dr. Thomas Christoph,

21    and the Court will hear from Dr. Christoph on Monday.   Dr.

22    Christoph was hired to build out a neuropathic department

23    within Grunenthal.

24                   The Court will hear from Dr. Christoph about a

25    host of experiments that he designed, that he made, that he

1    performed, that he had his staff do.   He started originally

2    with some mononeuropathic studies.   He's going to explain that.

3    The Bennett and Chung models and all of this will become much

4    clearer when you hear from him.

5            And then he moved on to polyneuropathic models and

6    modified polyneuropathic models.   The results and evidence from

7    all of these tests was overwhelming.   Tapentadol had a clear

8    and significant effect on the treatment of polyneuropathic

9    pain.   In fact, Tapentadol ultimately outperformed morphine,

10   the gold standard as I was telling you, in the treatment of

11   polyneuropathic pain itself.

12           Dr. Christoph was able to show this through all of

13   his tests.   But he was also able to show some surprising and

14   unexpected results beyond.   He showed, and he will explain that

15   Tapentadol had a higher potency, a higher potency for treating

16   polyneuropathic pain over mononeuropathic pain.

17           What does that mean? It more easily treats the

18   more complex pain syndrome than the easier and more simple

19   pain.

20           THE COURT:   So if you took it and you had

21   something internal, an internal stimuli that you needed this

22   for but you were injured, you would be able to feel the spot

23   where you were injured?

24           MR. SITZMAN:   That's excellent.   That's my second

25   point.   That's the other surprising result.   Because morphine

1    does not do that, by the way.  Morphine, one of the downsides

2    of morphine is that if you give enough of it you can treat your

3    polyneuropathic pain but it will eliminate your ability to

4    sense.

5              THE COURT:   To sense.

6              MR. SITZMAN:   Right.  And you have people who

7    will put their hands on a stove and they won't feel it or they

8    will do something else.   It's important to have that

9    nociceptive pain transmission and response in order to keep the

10   body together.

11             That's the second aspect of Tapentadol.  It keeps

12   that nociceptive pain transmission at its normal state while

13   treating polyneuropathic pain, just like you said.

14             THE COURT:   Okay.

15             MR. SITZMAN:   The first bullet point though is

16   you're looking at the models in terms of trying to treat one

17   bundle of nerves versus many bundles of nerves.  It has a

18   higher potency, a higher tendency to treat at a lower dose the

19   more complex nerve damage than the more simple nerve damage.

20             The other thing that Dr. Christoph discovered were

21   several different synergistic effects that Tapentadol had

22   within the animal models.  And it provides some further

23   explanation,  as he will explain,  to how Tapentadol functions

24   in this unexpected way.

25             All of these discoveries led to the filing of the

1    '130 patent in March 2007 covering the method of using

2    Tapentadol for the treatment of polyneuropathic pain and

3    polyneuropathic pain associated with diabetes.

4              Let's talk about the patents now.   The first

5    patent,  as I said,  claims a discreet class of compounds known

6    as 1-phenyl 3 Dimethylaminopropane compounds.   That's the

7    class of linear compounds that Dr. Buschmann identified and

8    synthesized.

9              The Court as I said is going to hear from Dr.

10   Buschmann about how he discovered these classic compounds, the

11   claim at issue in the '593 patent.   There's four remaining

12   claims.   Claim 8 is to a method of treatment using the class

13   of linear compounds that Dr. Buschmann described and

14   characterized.

15             Claim 61 is Tapentadol which was just one of the

16   compounds in this family, claim 117 which is a method of

17   treatment using Tapentadol and finally claim 147 which is a

18   pharmaceutically acceptable salt of Tapentadol.

19             THE COURT:   And the difference between 8 and 117

20   is what?

21             MR. SITZMAN:   Claim 8 is to a genus, the family

22   of compounds .   Claim 117 which is a dependent claim --

23             THE COURT:  Is specifically Tapentadol.

24             MR. SITZMAN:   Exactly.   The second patent and

25   second invention is the '364 patent.   This is the polymorph

1    patent.   The claims at issue here are claims 1,  2,  3 and 25.

2         Claim one is to the crystal form, the stable form,

3    crystal form A.  And this is where I was telling you crystal

4    form A that's characterized by eight specific peaks that are

5    unique to form A.  Claim two is also to form A with five

6    distinct peaks on the XRPD patterns.   And claim three is to

7    crystalline form A, the pattern itself, actually the overall

8    XRPD pattern being essentially the same as the XRPD pattern

9    that is attached as Figure 1 to the patent.  And 25 is a

10   pharmaceutical composition comprising form A.

11        The third patent and the third invention is the

12   '130 patent that I just spoke of.   And the claims at issue are

13   1 and 2 which is the treatment of polyneuropathic pain using

14   Tapentadol.  And claims 3 and 6,  which is the treatment of

15   diabetic polyneuropathic pain using Tapentadol.  I think I can

16   do one more segment before we have to make a change.

17             THE COURT:   Okay.

18             MR. SITZMAN:   Very briefly,  Depomed, in

19   May 2015, Depomed purchased the Nucynta franchise from Janssen

20   pharmaceuticals.  The Court will recall Janssen was one of the

21   original plaintiffs in the case, one of the plaintiffs.

22   Grunenthal has and has been and still today a plaintiff.

23        In May 2015 Depomed purchased the Nucynta

24   franchise for just over a billion dollars.   And the Court will

25   hear,  probably after lunch,  from Jack Anders the

```
 1          vice-president of finance about that purchase and certain

 2          circumstances around that purchase.

 3                    Today Depomed and Grunenthal make and market

 4          Nucynta around the world, Depomed focusing here in the U.S.

 5          The generics, as the Court knows, would like to do the same.

 6          And with that I want to move on to infringement but I think we

 7          have an issue.

 8                    THE COURT:   All right.   Why don't we do this,

 9          we are going to take a break at this point and we are going to

10          make arrangements.  So we are going to go off the record at

11          this point.

12                    (Whereupon a short recess was taken.).

13                    (Whereupon the hearing was under seal)

14                    (Whereupon the following takes place in open

15          court)

16                    THE COURT:   Anything else?  No?  We're all good.

17          If we want to unseal it this portion, everyone is nodding yes.

18          Anyone who opposes that.  No one.   All right.  Let us unseal

19          the courtroom.

20                    The transcript is unsealed at this point as well

21          it will be reflected on the record.   So if there's anyone else

22          that needed to come in, we can unseal the courtroom formally.

23                    Let's continue.

24                    MR. SITZMAN:   Thank you, your Honor.

25                    THE COURT:   Thank you.
```

1           MR. SITZMAN:   We now shift over to validity where

2     the defendant's burdens are clear and convincing evidence.

3     Defendants have challenged the validity of all three patents.

4     Now, despite this burden, the primary art that the defendants

5     are going to rely on, the primary pieces of so called prior art

6     that they are going to rely on during the course of this case,

7     is all art that was already before the examiner during the

8     prosecution of all three of these patents.

9           The primary art that the Court's going to hear

10    about from defendants is not new.  In fact, as the court knows

11    from the pretrial motions, the art that they are relying on

12    for the invalidation of the '130 patent happens to be our own

13    publications which also were before the examiner.

14           THE COURT:   I do recall.

15           MR. SITZMAN:   All right.  Let's move on to the

16    '593 patent.  First, and primarily I think is their argument

17    on obviousness.  To establish obviousness of the '593 patent,

18    the defendants must establish by clear and convincing evidence

19    that there was a known compound in the prior art that would be

20    the natural choice for further development.  By the way, that's

21    a known compound and motivation to modify that compound with

22    reasonable expectation of success.  That's called the lead

23    compound analysis.

24           The Federal Circuit has coined that term and

25    that's what they will use in terms of the law that applies to

```
 1        this case.   It is not the lead compounds analysis but the lead
 2        compound analysis.
 3                    Facing a virtual sea of endless possibilities, the
 4        defendants claim here that it would have been obvious to make
 5        Tapentadol.  In 1994 there were thousands,  thousands of
 6        starting places that a person of ordinary skill in the art
 7        looking to make a new analgesic compound could possibly start
 8        from, thousands.
 9                    By way of the thousands, defendants don't choose
10        any one.   Again it's a lead compound analysis.  They must show
11        you by clear and convincing evidence that there is a lead
12        compound.
13                    So,  what do they talk about the most in their
14        briefs and otherwise?  They talk about Tramadol.   Tramadol
15        remember is a mixture of compounds.   It's got the plus or 1R
16        2R and 1S,2S enantiomers and the metabolites.   When asked
17        which one of those is your lead compound, the experts all say
18        um, all of them.   They have to do that because you need all of
19        them to get all of that activity.
20                    Taking one of these molecules,  though,  and
21        looking at it and trying to get from anyone of those four
22        corners to Tapentadol without using any hindsight analysis is
23        impossible.   It was not obvious to make the necessary choices
24        that one would have to make to get to Tapentadol.
25                    The most important, which you've heard already
```

1    about this morning is it would not have been obvious to open

2    that cyclohexane ring.   The contrarian arbitrary choices that

3    you would have to make in order to go from anyone of these let

4    alone all of them to Tapentadol goes against the scientific

5    principles and there's absolutely no motivation or even

6    suggestion that you would do that.

7            The Court,  as I mentioned, will hear from Dr.

8    Bill Roush, Professor of chemistry and director of medicinal

9    chemistry at Scripps.  And he will testify that none of the

10   choices were obvious, let alone all of the choices that would

11   have to have been made to get to Tapentadol.  No one would have

12   made those choices for good reason.

13           Enablement.  Defendants assert that the genus,

14   that's the claim 8 that has the family of compounds,  they

15   argue that that claim 8 is not enabled.   The patent discloses

16   multiple synthetic methods of making the various compounds that

17   are in the genus of claim 8, one of which as you know is

18   example 25 to make Tapentadol.   But there are other synthetic

19   rounds and other syntheses that are disclosed in the patent.

20           Defendants admit that making the compounds that

21   would fall into claim 8 would be routine.   It would be routine

22   for a synthetic chemist to make those.   What do they argue?

23   The defendants argue it would be routine to make a compound

24   that falls within.   It would be undue to make all of those

25   compounds.  And you are going to hear testimony from the

1      defendants' expert talking about oh, there's tons of compounds

2      that are claimed and that are part of this genus.  And it would

3      take undue amounts of time to make them all and test them all.

4              That's not the law.  The law is that you don't

5      have to make all the compounds of the genus and test all the

6      compounds.   It has to be something that routine

7      experimentation by a person of ordinary skill in the art can do

8      and test for themselves compounds within that genus.

9              Written description.  You will hear the

10     defendants experts testify that a person of ordinary skill

11     reading the patent would not have had any belief that the

12     patentees actually possessed the invention.

13             Defendants continue to argue, notwithstanding the

14     claim construction order, that the wrong name for Tapentadol

15     and the melting point, that is erroneously recorded in the

16     patent, somehow destroys this patent and it establishes a lack

17     of written description.

18             Defendants are grasping at straws here.   There's

19     little doubt that the patentees possessed this invention

20     there's.  Little doubt that the patentees knew what they had

21     made and ultimately commercialized one of those products.

22             Utility --

23             THE COURT:  You know what, can we go back to

24     Tramadol for a second?  We discussed how it's a mixture of the

25     compounds and that it metabolizes in a certain way.

1          Why would defendants not be permitted to look at

2     that in terms of a lead compound?  I know you had used the word

3     very specifically "compound" as opposed to "compounds".  But is

4     there any history in terms of you know the caselaw on this that

5     discusses this particular issue, meaning a substance versus a

6     compound?

7               MR. SITZMAN:   I'm not aware of any.   The Federal

8     Circuit has said that you need to identify some --  because

9     that's how the analysis has to start, some individual lead

10    compound so that one can analyze the modifications that would

11    be necessary in order to get to the compound.

12               THE COURT:   Right.  And I understand the lead

13    compound analysis.  But the distinction between a compound and

14    this particular, I'm going to call it a mixture.

15               MR. SITZMAN:   Exactly.

16               THE COURT:   If you would focus in a little bit

17    about again how you see the distinction there.  And based upon

18    whatever exists in terms of legal authority, how you would see

19    that.  I know you are doing your opening but I'm just curious

20    if there's anything that you would like to discuss with respect

21    to that.

22               MR. SITZMAN:   I think the best way to do it is to

23    suggest how you might approach it but why that would be wrong.

24               Each one requires some modification to get to

25    Tapentadol.   There has to be choices that need to be made

1          along the way and they have to be motivated and lead to some

2          reasonable success.

3                    But in order to take this mixture and get to

4          Tapentadol,  then you'd have to modify all four,  you would

5          have to explain why or how all four would either independently

6          get to Tapentadol or how collectively they would get to

7          Tapentadol. And then what you've done is you've again now made

8          this lead compound into a multi-tiered analysis of multiple

9          molecules all leading someplace and with an explanation that

10         would have to support each one.

11                   THE COURT:   When you ingest this what are you

12         ingesting?  The left and the right on the top?

13                   MR. SITZMAN:   The enantiomers.

14                   THE COURT:   Okay.

15                   MR. SITZMAN:   You are ingesting those.  You know,

16         you are making the metabolites and you want, presumably, the

17         analgesic activity and need all four.

18                   Utility.   Defendants claim here that the

19         invention is not useful to the public.   The patent discloses

20         in vivo animal data for 24 of the claimed compounds.   That is

21         not enough, defendants say.   They contend that the patentee

22         here needed to demonstrate pronounced analgesic activity which

23         was discussed in the summary section of the patent.

24                   But this is nowhere to be found in any of the

25         claims.   This is just defendants grafting in new limitations

```
 1          to patent claims and asking the patentee to demonstrate

 2          something that's not there.  This is a useful compound to the

 3          public.

 4                    All right.  Let's move on to the '364, unless you

 5          have questions.

 6                    THE COURT:  No, I'm good.  Thank you.

 7                    MR. SITZMAN:  Okay.  The '364 patent, there are

 8          three points of attack here, inherent anticipation,

 9          obviousness and unclean hands.  Let's take them in order.  In

10          inherent anticipation that the prior art necessarily, I think I

11          alluded to this earlier, necessarily and inevitably produces

12          polymorph form A.  This is the seminal case Schering Plough.

13                    To succeed, the defendants have to show by clear

14          and convincing evidence that the prior art necessarily and

15          inevitably produces form A.  They were relying on example 25.

16          And not any one of the defendants and not any one of the

17          defendants' experts ever went back to the beginning.

18                    The evidence that we've demonstrated, even though

19          it's not our burden, is that example 25 yields form B and we

20          have evidence and we will put on that evidence that they will

21          not be able to overcome.

22                    You know what, I didn't get a chance to talk about

23          this in case the Court was asking me --

24                    THE COURT:  The pressure study.

25                    MR. SITZMAN:  Yes.
```

```
1                    THE COURT:   Go ahead.

2                    MR. SITZMAN:   Well, you heard a little bit about

3       it.

4                    THE COURT:   I did.

5                    MR. SITZMAN:   But admittedly that is not a full

6       and faithful performance of all five steps.  However, Miss

7       Mueller, when she did do that experiment, did what the

8       defendants did, and she got form B.

9                    All right.  Let's turn to obviousness.

10                   THE COURT:   So, wait a minute, in terms of what

11      Miss Mueller did --

12                   MR. SITZMAN:   In 2009.

13                   THE COURT:   We have question marks for her steps.

14      What are those steps?  Are you are saying they are the same

15      steps the defendants engaged in?

16                   MR. SITZMAN:   We don't know for sure but it's

17      roughly the same approach, which is to get the API from

18      someplace else.   Someplace else that we don't know how the API

19      was made and then do the last step.   And then everybody is

20      going to say the API I got was the right thing.   It was

21      Tapentadol.  But nobody can tell you that the API they got

22      performed steps 1,  2 and 3.  And there's no evidence or

23      suggestion that it did follow.   In fact, there's evidence that

24      it didn't follow 1,  2 and 3.

25                   THE COURT:   And she only received a result of B
```

1          on that?

2                    MR. SITZMAN:    Correct, with no A.

3                    THE COURT:    I'm good.  Go ahead.

4                    MR. SITZMAN:    All right.   We're moving on to

5          obviousness.   In one of the most unpredictable fields in the

6          pharmaceutical industry the defendants claim that it would have

7          been obvious to make form A.   That's the obviousness claim.

8                    The Court will hear testimony from one of the

9          foremost authorities in polymorphism, Dr. Joel Bernstein.   He

10         will be here in a week or so to testify about how a person of

11         ordinary skill would have had no way of reasonably knowing or

12         predicting that form A of Tapentadol existed or how to get it.

13                   Let's look at this step wise.   This will show

14         you, starting with the family of compounds that are disclosed

15         in the '737 patent,  the first step in this obviousness

16         analysis would be to find and pluck out Tapentadol out of this

17         family.   There's nothing that suggests in the '737 patent,

18         that somebody should take Tapentadol out.   So, that's the

19         first step.

20                   Then there's no way to predict at that point in

21         time what will result in terms of solid state analysis whether

22         there's going to be hydrates,  solvates,  polymorphs or none at

23         all.

24                   So, we are just going from this step,  assuming

25         somebody had actually picked out Tapentadol, they would have to

1    try to predict reasonable predictions, at least as to what

2    would come out in solid state.   Assuming then that they

3    reasonably were able to predict polymorphs, then the question

4    is how many.   How many polymorphs are there going to be 1,  2,

5    3,  4,  5,  6.

6             Dr. Bernstein is going to tell you about

7    situations where we have 13 polymorphs.   He is going to tell

8    you a case that off with Retonavir where they started down the

9    road where the polymorph changed over to another and another

10   and another and could never get back to the original polymorph.

11   This is a very unpredictable field.

12            But, let's say, let's just say the person was able

13   to pluck out Tapentadol, was able to predict that polymorphs

14   would result and was able to predict that two polymorphs would

15   result, then you have to then go to a structures of properties

16   analysis that this person, this person of ordinary skill in the

17   art would also have to predict.   Because it's only from that

18   stage that you would get to the analysis of what's the most

19   stable form.   And then, assuming you've made all of these

20   predictions perfectly,  you will get to form A.

21            This is defendants' claim that form A was obvious

22   in light of the '737 patent.

23            Now, instead of dealing with all of this and

24   explaining how you could possibly get through this tree, the

25   defendants' position is very simple, it would have been obvious

1    to do, all the tests would have been necessary, and you would

2    simply test and test and test and test and then at some point

3    in time you would get form A.

4           Obvious to do a test is not the law.  It's never

5    been the law.  Not under KSR.  Not in the past.  Not in the

6    present.  There is no way to reasonably predict form A of

7    Tapentadol from starting with the '737 patent.

8           Now the third ground --

9           THE COURT:   I'm sorry, the Buschmann family that

10   we are talking about, how many compounds were contained

11   therein?

12          MR. SITZMAN:   Well, if you listen to defendant's

13   experts, I think Dr. Wolf, he will testify that there is

14   hundreds of thousands, millions that would fall within that

15   genus of compounds.  Actually that's just claim 8.

16          Within the entirety of the patent, there's

17   probably millions of potential linear compounds.

18          THE COURT:   I'm sorry, millions in the entirety

19   of the patent?

20          MR. SITZMAN:   Yes.  Dr. Wolf I think tried to

21   analyze that by just looking at claim 8 as opposed to looking

22   at the entirety of the patent.   But, under this analysis when

23   you are looking at trial to figure out how you go from the '737

24   patent to a polymorph,  you don't have that luxury of knowing

25   that claim 8 will at least reduce some of that.   Unless of

1    course I guess someone could predict that claim 8 was relevant

2    out of the 140 something claims.   Sorry, that's wrong.   At the

3    time of the '737 patent there was only 8 claims.

4              THE COURT:   Okay.   And the defendants' testimony

5    of Dr. Wolf is regarding claim 8?

6              MR. SITZMAN:   Yeah, I think so.   I don't think he

7    is offering an opinion as to the entire patent.   But, I don't

8    think it will make much of a difference.   I think you will hear

9    there are millions of compounds.

10              THE COURT:   Okay.

11              MR. SITZMAN:   The last argument that they are

12    making here for invalidity is the one that Roxane is advancing

13    and that is unclean hands.   This is an enforceability argument

14    claiming that the '364 patent is unenforceable.

15              The Court's already heard and seen a preview of

16    this argument so I'm not going to go through it.   The evidence

17    through the course of the trial though will show that

18    plaintiffs did not engage in the egregious misconduct that is

19    required for unclean hands.   And there will be no evidence,

20    during the course of this trial, that Grunenthal, of

21    Grunenthal's intent to mislead the Patent Office.   There will

22    be a complete failure on intent.

23              All right.   Let's move on to the '130 patent.

24    Defendants claim that the '130 patent is both anticipated and

25    obvious.   Again the art that they are relying on is not

1    independent art that was not already considered by the

2    examiner.   No.   In this instance they are actually relying on

3    Grunenthal's own work, the Tzchentke references, to invalidate

4    the patent.

5              Now as the court knows from our pretrial motion

6    papers on these references to Tzchentke down here you can see

7    at the bottom right, those are not prior art.  They constitute

8    the work of the Grunenthal inventors?  And that work, sorry --

9    can you go back one more.

10             That work was done well after the invention was

11   conceived and the invention was reduced to practice.   So

12   whether you analyze this on a concept reduction to practice or

13   because these pieces of prior art that they are relying on are

14   that of the inventors, either way these references are not

15   prior art for purposes of anticipation and obviousness.

16             What's defendants' argument?  The defendants'

17   argument is well, the Tzchentke references are authored by

18   people and there are authors that are not inventors.   That

19   fact alone, by the way, doesn't convert the Tzchentke

20   references into prior art because, for among other reasons,

21   defendants have not and cannot identify anything in the

22   Tzchentke references that comes from a non inventor that is

23   part of or related to the '130 patent.

24             Let me say that again.   '130 that last and that

25   piece of analysis is important.  They cannot identify something

1    in the Tzchentke references that come from a non inventor that

2    is either in the '130 patent or that relates materially to

3    something in the '130 patent.

4         THE COURT:   So everything in the Tzchentke

5    references are to Tzchentke himself on the '130 patent or they

6    are not material.  Is that it?

7         MR. SITZMAN:   Of sort.  There is some other

8    disclosure and either they are not in the '130 patent or they

9    are not relevant to the '130 patent.   There are other authors

10   on the papers other than Tzchentke.  We keep using Tzchentke as

11   a shorthand because he is the first author.  And Dr. Tzchentke

12   who you will have testimony from by deposition, is a Grunenthal

13   employee.

14        That last step of the analysis that I said was so

15   important is because otherwise if you can't tie something from

16   the Tzchentke references, if that's what you are relying on, to

17   something in the '130 patent from a non inventor that happens

18   to be a co-author, if you can't do that, you can't use it in

19   any way to try and invalidate.

20        And we asked defendants' experts did you do that

21   last step of the analysis.  Can you identify something in the

22   Tzchentke references from a non inventor that has shown up or

23   appeared in or related to the '130 patent.  And Dr. Buvanendran

24   said I didn't do that analysis.

25        Last one.   Obvious double patenting.   Defendants

1     will claim that a person of ordinary skill would have

2     understood the '737 patent, that original Buschmann patent, to

3     cover the use of Tapentadol for the treatment of

4     polyneuropathic pain.  There's nothing in the '737 patent that

5     remotely points to or suggests that Tapentadol can be used to

6     treat polyneuropathic pain.

7             There is data, I think I told you there is data in

8     one '737 patent.  It's the mouse writhing data.  It's the

9     nociceptive model that was used to see in these linear

10    compounds that had analgesic activity.

11            That doesn't tell you anything about whether

12    neuropathic pain or polyneuropathic pain can be treated using

13    any of these compounds.  In fact, if that were the case then

14    Dr. Christoph wouldn't have had to spend 12 years doing all

15    kinds of tests to try and characterize this and see whether or

16    not did it treat polyneuropathic pain.

17            There's nothing obvious about the Tapentadol

18    ability to treat polyneuropathic pain.  And there was nothing

19    predictable about the results and the unexpected results that

20    Dr. Christoph found.

21            Again,  I think the Court will recall the

22    unexpected results that were discovered, the higher potency for

23    polyneuropathic pain to treat polyneuropathic pain over

24    mononeuropathic.   The ability to treat polyneuropathic pain

25    and keep the nociceptive pain transmission at its normal state

1          and the synergistic effects within the compound.

2                    Now, your Honor, at the end of the trial, we're

3          going to be asking your Honor to find that defendants' ANDAs

4          infringed all three patents and that all three patents are

5          valid and enforceable.   And in view of all the evidence that's

6          going to be presented, we're going to ask the Court to order

7          that the effective date for the approval of any and all of the

8          defendants ANDAs be no earlier than the date of the original

9          patent expiration as extended through various extensions that

10         have been granted by the PTO and FDA.

11                   And if the Court doesn't have any further

12         questions, I am through.

13                   THE COURT:   I'm fine.   No further questions on

14         this end.   I do appreciate your presentation.   Thank you very

15         much.

16                   MR. SITZMAN:   Thank you.

17                   THE COURT:   I listened very carefully.   So that

18         concludes on behalf of, is it just with respect to Depomed or

19         is it with respect to the entirety of the plaintiffs at this

20         point?

21                   MR. LEWRIS:   Entirety of the plaintiffs.

22                   THE COURT:   Much appreciated.   I think we should

23         take our break at this time and then we can hear from the

24         defendants.   I think you probably have three presentations

25         about a half hour apiece.   Is that right?   Everyone is nodding

1    yes.  And I look forward to those as well.  Thank you in

2    advance.

3              Why don't we do that, we will take a break for

4    about 45 minutes.  I think the lunch has already arrived.

5    Whoever has ordered lunch, I think it's already here.  You know

6    which rooms you are going to.  So that should work out just

7    fine.  And we will see you back here in 45 minutes.  1:30

8    sounds good.

9              (Lunch recess)

10             THE COURT:   My deputy just informed me that it

11   sounds like we might have to engage in a clearing of the

12   courtroom.   Is that correct?

13             MR.FITZPATRICK:   About a third of the way into my

14   opening.

15             THE COURT:   Oh, all right.  So you'll let me know

16   then.

17             MR.FITZPATRICK:   I will, your Honor.

18             THE COURT:   Very well.  Okay.  And before we

19   turn to defendants, I just have one quick question for the

20   plaintiffs and it's right at the end of the slides.   It's

21   page, it's on my slide book it's a little bit off, I think,

22   from the ones that were on the screen 66, the critical data.

23   Did you define --

24             MR. SITZMAN:  It's the latest data that we reduced

25   to practice the polyneuropathic pain model and demonstrated

```
 1         that it worked.  You will hear all of about this, but the STZ
 2         model rat --
 3                    THE COURT:   STZ model.
 4                    MR. SITZMAN:   Rat.  You will hear from Dr.
 5         Christoph that is a model of polyneuropathic pain.  And that we
 6         completed it no later than that and demonstrated that it worked
 7         in the polyneuropathic model.
 8                    THE COURT:   So that's the latest date then that
 9         you're referencing?
10                    MR. SITZMAN:   Exactly.   Exactly.
11                    THE COURT:   All right.  Thanks for that.
12                    MR. SITZMAN:   Thank you.
13                    THE COURT:   Let us begin.  Let's turn to the
14         defendants.   How are you going to divide the argument?
15                    MR.FITZPATRICK:   Your Honor, Anthony Fitzpatrick
16         for Actavis.
17                    THE COURT:   Yes.  Thank you.
18                    MR.FITZPATRICK:   I'm going to proceed first.
19                    THE COURT:   Okay.
20                    MR.FITZPATRICK:   Then Mr. Schuler for Roxane and
21         then Mr. Aly for Alkem.
22                    THE COURT:   Very well.  Thank you.  You may
23         proceed.
24                    MR.FITZPATRICK:   Thank you, your Honor.
25                    THE COURT:   Thank you.
```

```
 1                    MR.FITZPATRICK:    Your Honor, I have copies of my
 2         slides.
 3                    THE COURT:    Thanks so much.  You can send them
 4         up.
 5                    MR.FITZPATRICK:    May I proceed, your Honor?
 6                    THE COURT:    Yes.  Thank you.
 7                    MR.FITZPATRICK:    Thank you, your Honor.
 8                    MR. SITZMAN:    Sorry, your Honor, if we can, we
 9         are just getting the demonstratives.   If we can just flip
10         through.
11                    THE COURT:  Absolutely.  Take a moment.  Let me
12         know if there's any issue with respect to them.
13                    MR.FITZPATRICK:    Your Honor, the confidential
14         portion will begin, I think, at slide 19.
15                    THE COURT:   So, just as we approach that, I ask
16         you to be mindful of it and you let us know and we will engage
17         in the same process as we did this morning.
18                    MR.FITZPATRICK:    Certainly.
19                    THE COURT:    Thank you.
20                    How are you doing with that?
21                    MR. SITZMAN:    It doesn't look like anything is
22         problematic.
23                    THE COURT:    Excellent.   Let's begin.
24                    MR.FITZPATRICK:    As I said, Anthony Fitzpatrick
25         from Duane Morris on behalf of Actavis Elizabeth.
```

1          I want to briefly introduce our team.  You know

2     Mr. Capuano and Miss Wiggins who are our local counsel.  And

3     Carolyn Alenci from our team is here in the back of the

4     courtroom.   And we do have one other person on our team who is

5     not here today but who will be here next week Patrick

6     Gallagher.

7                    THE COURT:   Thank you.

8                    MR.FITZPATRICK:   We represent Actavis Elizabeth

9     LLC.  Actavis is a global leader in genetic pharmaceuticals.

10    And its U.S. headquarters are located near here in Parsippany,

11    New Jersey.

12         This case relates to,  as your Honor knows,

13    Tapentadol hydrochloride.  And in particular there are three

14    approved products with that active pharmaceutical ingredients.

15    There are immediate release Tapentadol hydrochloride tablets

16    which are marketed by the plaintiff Depomed under the trade

17    name Nucynta.   There's an oral solution of Tapentadol.  And

18    then there are extended release Tapentadol hydrochloride

19    tablets which are sold by Depomed under the trade name Nucynta

20    ER.

21         And there are, as your Honor has heard many times,

22    three patents-in-suit.   What we all refer to as the '593

23    patent which is a reissue patent which claims Tapentadol

24    hydrochloride itself.  The '364 patent which claims a specific

25    crystal form of Tapentadol hydrochloride which we all refer to

1   as form A.   And then the '130 patent which claims methods of

2   using Tapentadol hydrochloride to treat polyneuropathic pain.

3   These patents are owned by the plaintiff Grunenthal and

4   licensed to the plaintiff Depomed.

5           This slide shows the expiration dates for the

6   three patents and also what their respective listings are in

7   the FDA's orange book.   The '593 patent will expire in 2022.

8   It has been listed in the FDA orange book for immediate release

9   tablets, extended release tablets.   And the oral solution.

10          That's also true for the '364 patent which will

11  expire in 2025.   And then the '130 patent which will expire in

12  2028 is only listed in the orange book for extended release

13  tablets.

14          So, how did we get here?   How did we get to this

15  point where we have three patents asserted against these

16  defendants? Well, the history starts as Mr. Sitzman indicated

17  this morning, back in the 1960s when Grunenthal developed

18  Tramadol.   And in 1972,  Tramadol was patented in the United

19  States, the United States patent Number 3652589 claiming the

20  compound Tapentadol.   And that patent expired in 1989.

21          And this is that original patent the 1972 patent

22  for Tapentadol, I'm sorry, for Tramadol which issued from an

23  application that had been filed in 1964.   In 1977 Tramadol was

24  approved in Germany.   And in 1978, the inventors of Tramadol

25  published prior art . And this is prior art that I'm going to

1    come back to later in my presentation, but it's important prior

2    art because they disclosed a great deal of information

3    regarding the structure activity relationship for Tramadol.

4            So, chemists talk about structure activity

5    relationships and that means if you've got a certain structure

6    of a chemical molecule, what's the activity of that molecule.

7    What does it do?  And if you change the structure in some way

8    or ways, what does that do to its activity?  And these

9    inventors published the paper that I will come back to later,

10   the Flick paper in which they talked about that.

11           And as the '589 patent, the patent that had issued

12   in 1972 neared its expiration, Grunenthal undertook what it

13   itself called the Tramadol successor project.   And they

14   initiated this project because they had good sales success as

15   they said themselves in the introduction, in the very first

16   sentence.  Only the good sales success of Tramadol in the last

17   few years has underlined the desire for a Tramadol successor.

18           They also had a good understanding,  as I say,  of

19   the structure activity relationship of Tramadol because their

20   inventors had studied that.   And they pointed that out right

21   here.  They said the chemistry has synthesized a variety of

22   compounds based on the Tramadol molecule.

23           And they were also concerned about not having a

24   patent protected product.   And so they decided to start with

25   the activity profile of Tramadol as a starting point for the

1    successor.    And Tramadol was known, at that time,  to have a

2    special place among analgesics because it has this dual method,

3    this dual mode of action having both opioid activity and non

4    opioid activity.

5            And in their successor project Grunenthal

6    developed a desired profile for this successor product and they

7    in fact formulated what they themselves refer to as the ten

8    commandments for this project.    And they laid out the

9    particular profile and the particular criteria that we're

10   looking for.  And Number 9 was, the substance should be

11   patentable.  They wanted something that would be patentable.

12           And in order to obtain such a substance they set

13   out to systematically vary, in their words,  systematically

14   vary the control structure of Tramadol.    And the outcome of

15   that project was Tapentadol.    The '737 patent application was

16   filed for Tapentadol in 1995 and then that issued in 2001.

17   Subsequently in 2003 they sought a reissue of that '737 patent

18   and that reissue is the '593 patent which is one of the patents

19   here in suit.

20           Then four years after that,  in 2011,  they

21   obtained the '364 patent and then again in 2013 they obtained

22   the '130 patent.

23           Now,  one point that's important here to notice

24   that the '737 patent is prior art to both the '364 patent and

25   the '130 patent because of the timeline and because of when

1          those later applications for those later patents were filed.

2     The '737 patent which was later reissued as the '593 is prior

3     art to the '364 and the '130.

4               THE COURT:   Okay.  And the reason for the

5     reissuance?

6               MR. FITZPATRICK:  I think some of my colleagues

7     are going to get into what happened in the course of the

8     reissuance later on.

9               THE COURT:   Okay.

10              MR.FITZPATRICK:   But, one thing that this shows

11    is the lengths to which Grunenthal has gone and would go over

12    the course now of more than five decades to maintain patent

13    rights for its analgesic portfolio.   So let's talk about these

14    three patents.  Let's begin with the '130 patent.

15              The '130 patent has only method claims.   It

16    claims methods of treating polyneuropathic pain comprising

17    administering Tapentadol.   I have up here on this slide 14

18    claims 1,  2 and 4 of this patent.  Claims 1,  2 and 4 have

19    been asserted against Actavis.

20              Mr. Sitzman didn't talk about claim four so I will

21    focus on 1 and 2.   But, I think the analysis will be the same

22    regardless.   These are first and foremost method claims.

23    There's no allegation that Actavis would or could directly

24    infringe these claims because Actavis is never going to

25    administer this drug to a patient.   Actavis makes and sells

1        the drug.

2                    And so the claim against Actavis and against the

3        other defendants is a claim of indirect infringement which is

4        either inducement of infringement under 35 USC section,  271(b)

5        or contributory infringement under section 271(c).

6                    So let's talk a little bit about those statutes

7        and the law relating to inducement and contributory

8        infringement.

9                    First of all the federal circuit tells us that in

10       order to prevail on an inducement claim the patentee must first

11       establish that there has been direct infringement.   So they

12       have to show direct infringement first.   And then secondly they

13       have to show that the alleged infringer knowingly induced

14       infringement and possessed specific intent to encourage

15       another's infringement.

16                    And we have some guidance from the Federal Circuit

17       on what that means in the Hatch-Waxman context.   And this is

18       the Takeda pharmaceuticals versus West-Ward case from just last

19       year.   Because in Hatch-Waxman cases where there are method of

20       use claims, the whole issue of does the label induce is

21       frequently an issue.

22                    And in the Takeda case, the Federal Circuit says

23       the label must encourage, recommend or promote infringement.

24       And they held that merely describing an infringing mode is not

25       the same as recommending,  encouraging or promoting an

1        infringing use or suggesting that it should be performed.

2               And the federal circuit went on in Takeda to say,

3        as we have stated in Warner Lambert in the ANDA context, it is

4        well established that mere knowledge of possible inducement by

5        others, infringement by others does not amount to inducement,

6        specific intent.  And action to induce infringement must be

7        proven.

8               And then from the Warner Lambert case itself the

9        Court tells us that where a product has substantial non

10       infringing uses, intent to induce infringement cannot be

11       inferred even when the defendant has actual knowledge that some

12       users may be infringing.

13              So, a lot of focus and a lot of emphasis from the

14       Federal Circuit on the intent requirement and teaching from the

15       Federal Circuit in the context of inducement that if you have

16       substantial non infringing uses, you can't infer intent.

17              Moving now to contributory infringement under 35

18       U.S.C section,  271C, I've got the statute itself on this

19       slide.   This statute, this section to me is always kind of a

20       mouthful.   But, there are really, I think, two important

21       requirements that have to be established by the patentee in

22       order to prove contributory infringement.

23              First of all, they have to show that the alleged

24       infringer knew that the accused product was especially made or

25       especially adapted for use in an infringement of such patent.

1          So there's a knowledge requirement that it is

2     especially made and especially adapted to be used in

3     infringement.  Secondly,  they have to show that it's not a

4     staple, article or commodity of commercial suitable for non

5     infringing use.  So, if it is suitable for non infringing use

6     or substantial non infringing use, then there cannot be

7     contributory infringement.

8          And the Supreme Court has told us that 271 C

9     requires a showing that the alleged contributory infringer knew

10    that the combination for which his component was especially

11    designed was both patented and infringing.  You have to know

12    that not just that there's a patent out there, but the product,

13    if used, would infringe.

14          So, now, your Honor, I am approaching the point of

15    confidential material.

16          THE COURT:  Very well.  Let us pause for a

17    moment on the record.  We will go off the record.  Actually we

18    will stay on for one moment.  Does everyone agree at this

19    portion we should seal the courtroom? If you'd like to take a

20    look at the slide that we are up to.  We are up to 18 .  So

21    you can take a look and let me know.

22          MR. SITZMAN:  We don't have any objection if

23    Actavis wants to do that.

24          THE COURT:  All right.

25          MR. SCHULER:  Same for Roxane.

1          MR. ALY:   Same here.

2          THE COURT:   Very well.  We are going to seal the

3    courtroom at this point.   So, what I would ask that our

4    counsel take a look to see whose remaining in the courtroom,

5    identify their representatives who may remain and everyone else

6    will remain outside until the record becomes open again.

7          How should we handle it?  Do you want to do the

8    same thing I did before?  Let's see, who's from Depomed, stand

9    up please.   We will just do this really fast.   From

10   Grunenthal, stand up.   Who do we have from Actavis?  Please

11   stand.   Okay.   Roxane, please stand.  And Alkem, please

12   stand.  All right.

13         Everyone is standing.  No one is seated.  You

14   recognize everyone in the room.  Everyone knows who their

15   people are.  All right.  Very well.  The courtroom is sealed.

16   Thank you.

17          MR.FITZPATRICK:   Thank you, your Honor.

18          THE COURT:   Thank you.

19          (Whereupon the hearing is under seal)

20          (Whereupon the following takes place in open

21   court).

22          THE COURT:   I think you can go ahead.

23          MR.FITZPATRICK:   Thank you.  I will move now to

24   the '593 patent.   We will call to testify regarding the '593

25   patent Professor Stephen Martin.   Professor Martin is a

1    professor in the department of Chemistry at the University of

2    Texas at Austin.   And he will testify and explain to the court

3    that in his view the '593 patent claims are structurally

4    obvious in view of the lead compound Tramadol.

5        So let's go back and talk more about Tramadol.

6    Tramadol was clinically proven to be safe and effective as an

7    opioid based analgesic to treat moderate to severe pain.   I

8    will also just note that to address a question that you had of

9    Mr. Sitzman this morning,  that my recollection is that

10    Tramadol has also been used to treat polyneuropathic pain.

11        As I explained earlier, Tramadol was patented in

12    1972, approved for use in Germany in 1977.  And in 1978, as I

13    will explain further in a moment, the structure activity

14    relationships of Tramadol were extensively studied and that

15    work was published.   And as I say the structure activity

16    relationship is what's the relationship between the structure

17    and any changes you make to the structure and the activity and

18    any changes in the activity.

19        And among the Mr. Sitzman's huge field of

20    analgesics, Tramadol was really unique.   Tramadol was at the

21    time the first and only analgesic to combine these opioid and

22    non opioid mechanisms of action.

23        And accordingly, a person of ordinary skill in the

24    art knowing that and knowing the prior art that had been

25    published about it, would be motivated to, would want to

1    maintain what was unique about Tramadol but search for new and

2    improved analgesics.

3         Now, Tramadol was known to have these two

4    enantiomers.  The RR Tramadol enantiomers and the SS Tramadol

5    enantiomer.  And then when administered to a human, those two

6    enantiomers would metabolize to RR O desmethyl Tramadol and SS

7    O desmethyl Tramadol.  And that just means in the liver this

8    OCH-3 up at the top gets knocked off and replaced with a

9    hydrogen.

10        These molecules, these four molecules were studied

11   extensively in the prior art individually and collectively.

12   They were studied so that it could be understood how they work,

13   which components of the molecules contribute to their analgesic

14   effect, and which components contribute to which effect the

15   opioid and the non opioid.

16        And the prior art describes the interactions

17   between the enantiomers of Tramadol including potency activity

18   and side effects.

19        So again a person of ordinary skill in the art

20   would be interested in developing Tramadol analogs that would

21   maintain its analgesic potency but reduce the side effects.

22        THE COURT:  In the course of your discussion if

23   you could distinguish and present your position with respect to

24   compound versus compounds in terms of examining prior art.  We

25   touched upon that earlier this morning.

```
 1              MR.FITZPATRICK:    I was just going to approach

 2      that, your Honor.

 3              THE COURT:    Very well.   Thank you.

 4              MR.FITZPATRICK:    Because the law is what would a

 5      person of ordinary skill in the art do.   And Professor Martin

 6      will explain that a person of ordinary skill in the art,

 7      knowing what was known,  would look at the mixture, all four

 8      together, and would look at the individuals and he will testify

 9      about that.  And specifically --

10              THE COURT:    And in terms of any caselaw that

11      you'd like to cite to in materials of what is the best way for

12      the Court to approach the issue of a lead compound, whether

13      it's singular, whether it's plural, whether it's one molecule,

14      whether it's more than that, do you have anything that you'd

15      like to point to as being particularly apt in this

16      circumstance?

17              MR.FITZPATRICK:    Nothing comes immediately to

18      mind, your Honor, but, we can certainly take a look at that.

19              MR. SCHULER:   I can briefly address that.

20              THE COURT:  Yes.  Go ahead.

21              MR. SCHULER:  From Roxane's perspective it would

22      be M.S. versus Teva case.  We will happily give you the cite

23      to that, cited by the Federal Circuit last year.  And hate to

24      do it from memory because if I'm wrong, I will be called out

25      about it.
```

1        THE COURT:    That's okay.  We can clarify

2   tomorrow.  But, go ahead.

3        MR. SCHULER:    Two of the attributes the Federal

4   Circuit looked for were A, structural similarity between the

5   potential lead compound and the subject matter of the claim and

6   whether there would have been a reason to modify the prior art

7   compound such that it would be a promising lead compound.

8        And I think there's some generalized language

9   about a lead compound versus the lead compound.  And I believe

10  counsel for the plaintiffs suggested that the answer is the

11  lead compound.  But I believe the Federal Circuit at least on

12  one occasion in that case used the phrase a lead compound.

13       THE COURT:    Okay.

14       MR. SCHULER:    I will let Mr. Fitzpatrick address

15  the indications of that.

16       THE COURT:    Okay.  Thank you.

17       MR.FITZPATRICK:    So, in particular, of those

18  four, so just going back to the four for a moment, of those

19  four, a person of ordinary skill in the art would have known a

20  lot about and focused on the RR Tramadol and the SS O desmethyl

21  Tramadol because those were known to have these combined two

22  effects, the opioid and the non opioid mechanisms of action.

23       And in particular --

24       THE COURT:    So you're saying that someone would

25  focus on the metabolite as well?

 1              MR. FITZPATRICK:  Yes, your Honor.

 2              THE COURT:   That would be the primary choice to

 3     start with, those two?

 4              MR.FITZPATRICK:   It's certainly, yes.

 5              THE COURT:   Okay.

 6              MR.FITZPATRICK:   And so the metabolite would be

 7     of particular interest because it would avoid some

 8     complications that were known.  And it would also, it was known

 9     that the metabolite had a three fold, it was three times more

10     active than its parent.

11              So, again this was known since the 1970s and it

12     was known from the prior art that there were certain components

13     of the molecule that were what Professor Martin will describe

14     as the Tramadol pharmacophore.  These are the components of the

15     molecule that are essential to its properties.

16              A person of ordinary skill in the art would know

17     that he or she could do something,  could modify the molecule

18     by doing something with this hydroxy group right here or this

19     ring down here.  And so this shows the movement from the SS O

20     desmethyl Tramadol to what is in Tapentadol.

21              And again the highlighting here shows the changes

22     that a person of ordinary skill in the art would make from

23     Tramadol to Tapentadol and note that throughout the

24     pharmacophore the essential components of the molecule remain

25     intact.

1          Now, Mr. Sitzman talked about a move to a linear

2     structure.   Professor Martin will explain that a linear

3     structure is a common theme in compounds that act on the neuro

4     epinephrine receptor.   So that was something that was known.

5     And if you were trying to design a compound to act on the

6     opioid receptor and the neuro epinephrine receptor, you would

7     want flexibility in the linear compound.

8          But again notwithstanding this talk about linear,

9     what's important is that the pharmacophore remains intact.

10    The core, the key parts of the molecule remain intact.

11         THE COURT:   When you say the linear structures,

12    the common theme, if you could be more specific on that.

13         MR.FITZPATRICK:   Just that that was something

14    that was known in the field in the prior art.   It was known

15    that if you wanted to act on the neuro epinephrine receptor,

16    having a linear structure would be desirable.   That was

17    something that was known in the art.

18         So the critical prior art here comes from the

19    inventors of Tramadol themselves.   This paper from 1978, by

20    Flick, Frankus and Friderichs reports on structure activity

21    study for Tramadol and related compounds.   This is the single

22    most important piece of prior art as to the '593 patent from

23    the inventors of Tramadol.   And it defines, again, the

24    pharmacophore of Tramadol.

25         It defines the components of the molecule that is

1    essential to its activity.  This is not prior art that relates

2    just to the thousands of analgesics generally.  This is prior

3    art that relates to these types of compounds specifically.  It

4    shows the importance of specific components of the compound and

5    it is the most relevant structure activity study for that class

6    of compounds.

7          Professor Martin will also talk about another

8    paper from 1978, the Frankus paper again from an inventor of

9    the '593 patent.  And Professor Martin will testify that this

10   prior art describes the importance of the relative

11   stereochemistry of Tramadol.  So a person of ordinary skill in

12   the art would know that they couldn't change the relative

13   stereochemistry of the enantiomers.  You would still want an RR

14   and an SS.  You wouldn't want an RS and an SR or something

15   like that.

16         So, this slide, there's a lot going on here.  But,

17   this really is a summary of the changes that a person of

18   ordinary skill in the art could make to improve the analgesic

19   properties of Tramadol.  A person of ordinary skill in the

20   art, as we see in red, would not change the amine nitrogen

21   region, which is the phenyl region which is up here, or the

22   stereochemistry region.  But, they could change the bridge

23   carbon region or the cyclohexane region.

24         And a person of ordinary skill in the art would be

25   motivated to make these changes and would have a reasonable

1    expectation of success, as Professor Martin will explain, and

2    the result would be Tapentadol.

3              And so he will explain that the claims of the

4    patent are obvious in view of that Tramadol prior art.  None of

5    this is hindsight.  Professor Martin's analysis was not

6    conducted with the benefit of any information relating to the

7    Tramadol successor project.

8              THE COURT:   I'm sorry, which witness is

9    testifying about what you believe a POSA would or would not

10   change?

11             MR.FITZPATRICK:   Professor Martin.

12             THE COURT:  It is Professor Martin.

13             MR.FITZPATRICK:   Yes.  So finally, your Honor,

14   the '364 patent which is as we refer is directed to a

15   crystalline form, form A of Tapentadol hydrochloride.

16             We will call to testify regarding the '364 patent

17   Professor Mark Hollingsworth who is a professor of chemistry at

18   Kansas state university.  And he will testify that the '364

19   patent is anticipated and obvious in view of Grunenthal's '737

20   patent.

21             So, again, the '737 patent that we've talked

22   about, you've heard about here, it was issued in 2001.   So

23   it's prior art as of 2001.   And it claims Tapentadol and it

24   includes in its examples various methods of making Tapentadol.

25   And one of those is example 25 which is right here and you've

1    heard a lot about example 25.   You will hear a lot about

2    example 25.

3              THE COURT:    I suppose.

4              MR.FITZPATRICK:    One thing that's important to

5    bear in mind in approaching and thinking about the '364 patent

6    is that the claims cover any amount of form A.   There's no

7    requirement of any specific amount.   There's no threshold.

8    There's no concentration requirement.   Nothing like that.

9    It's any amount of form A.

10             The defendants will present evidence of two

11   recreations of sample 25.   And we'll show that those

12   recreations produced some form A.   Professor Hollingsworth

13   will testify about recreation that was done by a company called

14   Organix and Chemic and he analyzed the results of that and this

15   is from his report.   This is the result of an x-ray powder

16   diffraction analysis of the sample prepared according to

17   example 25.

18             And Professor Hollingsworth will explain that the

19   peaks that are shown here demonstrate that the result included

20   form A.  We will also hear testimony from, and I leave it to my

21   co-counsel on the defense side to talk about another recreation

22   by the University of Wisconsin.

23             THE COURT:   But, in terms of the starting

24   substance that was used to recreate, was that a purchased

25   substance?

1          MR.FITZPATRICK:    I'm sorry.

2          THE COURT:    The starting substance that was used

3     to recreate.

4          MR.FITZPATRICK:    The starting substance was a

5     purchased substance.   You know, I'm sure your Honor has

6     already heard a lot and will hear more about steps 1, 2 and 3.

7     It's, oh my gosh, they didn't faithfully do 1, 2 and 3.   There

8     are two important points to keep in mind here, your Honor.

9     First of all, Step 4 is the critical step here.   Step 4 is the

10    step that involved demethylation and salt formation.    And that

11    that's the step that determines what the polymorph is.    That's

12    the critical step.

13          Saying that we didn't faithfully, properly

14    implement example 25 because we didn't do 1,  2 and 3 is akin,

15    I would submit, your Honor, to saying you didn't properly bake

16    your cake because you didn't grow the wheat and you didn't mill

17    the flour from that wheat.

18          It's those steps are not significant compared with

19    Step 4.  Step 4 is the significant step.   And there is no

20    allegation,  no contention,  no argument that Step 4,  as

21    performed by Organix did not faithfully follow what's set forth

22    in example 25 .

23          And so we will demonstrate that the natural

24    inherent inevitable consequence of following that process is

25    the production of form A.  And hence that example 25 inherently

1    anticipates the claims of the '364 patent.

2          It's also important, your Honor, to note and Mr.

3    Sitzman spoke to this this morning, form A is the more

4    thermodynamically stable form of Tapentadol.   It's the form

5    that is stable at room temperature.   Form B in a chemically

6    pure form only exists at temperatures well above.

7          THE COURT:   Go back to the source substance

8    again.   In terms of that, do you do any examination on it once

9    you get it before you do this further, you know, the further

10   analysis through the rest of the steps up through Step 4, to

11   determine what it is you've obtained and if it is in fact the

12   desired substance?

13         MR. FITZPATRICK:   Sure.

14         THE COURT:   So how would you determine how that

15   has form A in it or form B in it or something that might

16   produce that ultimately at the conclusion of your process.

17         MR.FITZPATRICK:   Well, I may ask for some help

18   from Mr. Capuano on this one.

19         THE COURT:   Okay.

20         MR. CAPUANO:   Your Honor, thank you.   The

21   material that was purchased and used by Organix is not

22   Tapentadol.   It's the precursor --

23         THE COURT:   I understand.

24         MR. CAPUANO:   -- to Tapentadol.   It's fully

25   characterized.   It comes with a certificate of analysis.

1      Plaintiffs took discovery of the company that provided that

2      material to Organix.  And so that material is understood, fully

3      characterized and consistent with the product of Step 3 in the

4      example 25 in the '737 patent.  In the prior art patent --

5                  THE COURT:   Okay.  When it comes with a

6      certificate, what was the certificate saying?

7                  MR. CAPUANO:   It gives the identity of the

8      material, its molecular formula.  Dr. Hollingsworth knows,

9      plaintiffs know how that material was made, what it is.  And

10     it's the same thing you get --

11                 THE COURT: Does it recite the steps that were

12     taken to generate it?

13                 MR. CAPUANO:   Not the certificate of analysis.

14     It's just what it is.  Plaintiffs took discovery on how it was

15     made.  We know how it was made.  It's from -- we are still

16     sealed in here?  No.

17                 THE COURT:   No.

18                 MR. CAPUANO:   We know how it was made.

19                 THE COURT:   You can come back to it later, which

20     is fine.

21                 MR. CAPUANO:   Thank you, your Honor.

22                 THE COURT:   Thank you.

23                 MR.FITZPATRICK:   So, just coming back to form A

24     and form B and the fact that the form A is the more

25     thermodynamically stable form, there are, in terms of looking

1          at this from an obviousness perspective, so, we contend that

2          example 25, in practice, inherently anticipates the '364

3          patent.  But, we also contend that it would have been obvious,

4          the claims of the '364 would have been obvious and in view of a

5          '737 patent.

6                    And in terms of how a person of ordinary skill in

7          the art would have approached that,  a person of ordinary skill

8          in the art would have looked at the '737 patent, and Professor

9          Hollingsworth will explain, and would have seen that there are

10         20 some examples of specific molecules that were synthesized by

11         the inventors of the '737 patent.

12                    And so the person of ordinary skill in the art

13         would have been focused on those, would have been motivated to

14         look at those.  They would not have started with the huge

15         number of theoretical compounds but instead would have looked

16         at what's the practical stuff.  What did the inventors

17         actually do?  They would have focused on those.  They would

18         have been motivated to screen for different polymorphs of the

19         substance.

20                    So there's any number of motivations.  But one

21         motivation comes from the FDA itself.  But in 1987, the FDA

22         published guidelines where it says appropriate analytical

23         procedures should be used to determine whether or not

24         polymorphism occurs.

25                    And so the FDA was saying find out if there are

1     polymorphs of your drug substance.   Find out what they are.

2     Figure it out.   This is all routine stuff in this field.

3              And there are commercial reasons beyond the

4     regulatory motivation.   There are commercial reasons why this

5     would be done.   The techniques were well-known.   They are

6     routine.   They are effective.   Generally the most

7     thermodynamically stable form is going to be preferred, for

8     obvious reasons, because it insures that the drug substance

9     won't convert to another form with different physical

10    properties.

11             So, a person of ordinary skill in the art would

12    have been motivated to look for different polymorphs,  to

13    screen for them and to identify the most stable one.   And in

14    doing that, given that this is a routine process in the field,

15    they would have understood that they would have had a

16    reasonable expectation of success in view of example 25 of the

17    '737 patent.   And so your Honor our evidence will show that

18    the '364 patent also is invalid.

19             So your Honor at the conclusion of the trial,  we

20    will ask that your Honor determine that the asserted claims of

21    the three patents are all invalid and that Actavis' product

22    will not infringe the claims, asserted claims of the '130

23    patent.

24             THE COURT:   Thank you very much.   Much

25    appreciated.   Thank you.

```
 1                    Who do we have up next?  Mr. Schuler, is a second
 2       set of slides?  If you could just exchange those and take a
 3       moment.
 4                    MR. SCHULER:   If I can approach, your Honor.
 5                    THE COURT:   Yes.  Thank you.
 6                    MR. SCHULER:   And then while people take a
 7       minute, maybe a housekeeping matter.  I plan to start with the
 8       '130 issue.
 9                    THE COURT:   So do you want to --
10                    MR. SCHULER:   It might be easier to do it now.
11                    THE COURT:   That's fine.  Mr. Schuler is going to
12       start with the 130.  He said perhaps this might a good time to
13       clear the courtroom once again.  So he can begin with that and
14       then move on.  But why don't you take a look at the slides
15       first and we will determine that.
16                    MR. SCHULER:   More housekeeping, I will give you
17       the best citation we have --
18                    THE COURT:   Go ahead.  Hold on.  Let me find my
19       page.  All right.  Here it is B M. Vs. Teva.  What's the
20       cite?
21                    MR. SCHULER:   I don't have the cite yet but
22       Federal Circuit Number 2013-1306.  It was decided on June 12,
23       2014 by Judge Chen.
24                    THE COURT:   Thank you.
25                    MR. SCHULER:   And we will provide the actual
```

```
1          cite.
2                         THE COURT:    Thank you.
3                         All right.    My deputy is at the end of the
4          courtroom.   Let's see is everyone wants to turn around and see
5          if they identify their folks and if there's anyone extraneous.
6          Do you want me to do it informally or do you want to stand
7          still? I will do it again just to make sure.    Okay.
8                         Let's have the folks from Depomed, please.
9          Grunenthal.   Actavis.    Roxane, Alkem.   All right.   Counsel
10         are all good with the folks who have stood up, I am assuming.
11         Yes?
12                        MR. SCHULER:  Yes, your Honor.
13                        THE COURT:    No one has an issue.   Okay.   Let's
14         seal the courtroom again.    Thank you.
15                        MR. SCHULER:   Thank you, your Honor.
16                        THE COURT:    Everyone is getting a little
17         exercise.  It's late in the afternoon.  It's fine.  It's hot in
18         the room.
19                        MR. SCHULER:   I may walk around a little.
20                        THE COURT:   We're trying to deal with the fact
21         that it is super warm in this room.  But it's unseasonably warm
22         outside today so we are having a little bit of an issue.
23                        (Whereupon the hearing is under seal)
24                        (Whereupon the following takes place in open
25         court)
```

```
 1                    MR. SITZMAN:    Your Honor would it be possible to

 2          take a quick break at this point in time.

 3                    THE COURT:    Certainly.  Is this a good time?

 4          Let's take 5, 10 minutes.  Is that good?

 5                    (Whereupon a short recess was taken.)

 6                    THE COURT:    Let's continue.

 7                    MR. SCHULER:    Your Honor, now I'm going to turn

 8          to the additional and independent invalidity defenses on the

 9          '593 reissue patent.  You may hear it referred to in the course

10          of the trial as the compound patent.

11                    Those defenses are as follows:  Lack of utility,

12          self anticipation and obviousness, which is kind of an offshoot

13          of utility that I will explain, lack of written description.

14          With regard to three of the claims, those are the claims that

15          are directed only to Tapentadol and then finally non enablement

16          with regard to Claim 8 which is the broader claim that the

17          Court inquired about earlier.

18                    I now want to introduce the witnesses that will

19          testify for the defense on these issues.  You will hear from

20          Dr. Jeffrey Mogil on Friday.  Dr. Mogil is currently the E.P.

21          Taylor Professor of Pain Studies at McGill university in

22          Canada.  He has an expertise in animal modeling associated with

23          analgesia and pain.  He also will testify as to the lack of

24          utility and he will also testify about non enablement.

25                    The Court will also hear from the defense through
```

1    Christian Wolf.   Dr. Wolf is a professor of chemistry at

2    Georgetown university.   He is an expert in organic chemistry

3    generally but he also has expertise in stereochemistry which is

4    a subject the Court may recall from our claim construction

5    process.

6                   THE COURT:  I do.

7                   MR. SCHULER:   Dr. Wolf will testify for the

8    defense as to lack of written description, self anticipation

9    and obviousness and lack of enablement.

10                  I want to turn to what I think is the most

11    straightforward defense which is lack of utility, which is

12    under sections 101 and 112.   And here are some of the precepts

13    to kind of frame the issue for the court.

14                  Initially there has to be some disclosure of

15    substantial and practical utility for the invention.   In

16    addition, given the nature of the chemical arts,  testing is

17    often required to establish practical utility.

18                  And the Federal Circuit has emphasized that to the

19    extent that there are tests that are invoked they have to be

20    reasonably indicative of the desired pharmacological response.

21    I am going to come back in a minute to the reasonably

22    indicative part of that.  But for now I want to focus on the

23    desired pharmacological response.

24                  And again if we look at the legal backdrop

25    juxtaposed against what is in the specification,  Dr. Mogil

1    will explain that the desired pharmacological response here is

2    the very first thing that the named inventor said about their

3    invention in the summary of the invention.

4            What they said was that the underlying object of

5    the present invention was to provide substances with an

6    analgesic effect which are suitable for the treatment of severe

7    pain without giving rise to the side effects which are typical

8    of opioids.

9            And Dr. Mogil will explain that a person of

10   ordinary skill in the art at the time would have understood

11   this reference to the underlying object of the invention to

12   constitute the desired pharmacological response.   And you

13   heard Mr. Sitzman echo that during his opening when he talked

14   about the desire to have a compound free of these opioid side

15   effects that he explained to you.

16           Dr. Mogil will also explain that with regard to

17   the side effect aspect of the desired pharmacological response,

18   there were in fact animal models that were in use as of the

19   early 1990s to look for and evaluate whether an opioid compound

20   was exhibiting these side effects.

21           But the evidence will show that the '593 patent

22   specification contains no data from any such animal model

23   relating to opioid side effects.

24           The only data comes from what is called the

25   writhing assay which the evidence will show it has nothing

1   whatsoever to say about side effects.  So, again, when we

2   juxtapose the standard against the underlying object described

3   in the specification and the limited data in the specification,

4   there has to be data from testing that is reasonably indicative

5   of the desired pharmacological response.  But there simply is

6   not with regard to opioid side effects.

7          So given the foregoing, we believe the evidence

8   establishing lack of utility for this particular reason is both

9   straightforward and clear and convincing.

10         Now the defense recognizes, your Honor that the

11  plaintiffs assert that they believe that the relevant

12  pharmacological activity is mere analgesia without the

13  necessity of showing the absence of side effects.  We

14  disagree.  But in any event the evidence will show that the

15  specification does not demonstrate utility even examined under

16  that lower standard and that is for two fundamental reasons.

17  As.

18         Dr. Mogil will explain the first is that when we

19  look at the specification, it contains data from only a single

20  assay, the mouse writhing model.  Here is part of the legal

21  framework.  Again there has to be a sufficient correlation

22  between that test and the asserted pharmacological activity

23  which is analgesia so as to convince those skilled in the art

24  to a reasonable probability that the novel compound or

25  compounds will exhibit that asserted pharmacological activity.

1           The question,  your Honor is posed as a matter of

2    science.   It's posed to those who are people of skill in the

3    art at the time of the invention.   And so the question is was

4    the mouse model on its own sufficient to convince those people

5    in the field as of 1994 that the compounds tested in the

6    specification had analgesia, which is the specified activity,

7    or some other pharmacological potential activity.   And as Dr.

8    Mogil will explain, your Honor, the answer to that is a

9    resounding no.

10          Let me step back and explain the mouse model a

11   little bit.   The mouse model works as follows:   The mouse is

12   given either like a saline control or it is given what is being

13   tested for analgesic effect.   A period of time elapses and

14   then the mouse is administered something called phenyl quinone

15   which is supposed to be a noxious stimulus that should make the

16   mouse writhe.   The technician compares the number of writhes

17   that the mouse that got the test compound has versus the number

18   of writhes exhibited in the group that was given the saline and

19   there's a comparison.

20          Now, as the court will learn in the course of

21   trial the patentees in the specification cited to a paper by

22   some authors Hendershot and Forsaith regarding their use of a

23   mouse model.  Now the writhing assay is fairly old, your Honor.

24   It's been around since the Fifties or even earlier.  And this

25   particular paper, as you can see, is dated from 1959.

1           This article itself which we have excerpted below

2      notes that the model is subject to what is called a serious

3      confounding effect, confounding means there can be an effect

4      other than the one you're looking for that's causing the mouse

5      not to writhe.  Among other things, that might be sedation,

6      the mice were simply getting tired or sleepy.  It could be

7      interference with the central nervous system which is called an

8      anti colinergic (ph) effect or it could be interference with

9      the Dopamine system which helps the neurotransmitters, that Mr.

10     Sitzman mentioned, that helps regulation movement.

11          That wide spread knowledge among those in the

12     field along with those deficiencies in the model led to

13     significant criticism of the model well before the critical

14     date of patent.

15          The Court will hear evidence that the criticisms

16     were both far ranging, excuse me, wide ranging and consistent.

17     The evidence will show the Court that there were a number of

18     different criticisms like the lack of specificity, the

19     confounding effects, but also the fact that the model may not

20     actually be an innocuous stimulus at all that would mimic pain

21     in a human being.

22          Here is excerpts from some of the literature that

23     the Court will hear about, including literature, your Honor,

24     that Dr. Mogil offered well outside the context and well before

25     this litigation ever came to be.

1          Now the evidence will show your Honor that those

2     in the field actually knew, and this is on the second quote

3     here from a paper by Dr. Hammond at the university of Chicago

4     dated from 1995, years before the prior art date that there was

5     no model that predictable.   No model that was used that would

6     be widely predictive of analgesia.

7          And part of that, your Honor, is that unlike other

8     pharmacological responses which might be reflected in a simple

9     invitro assay where you have a receptor that there is some

10    binding activity to, the evidence will show that pain is a

11    multi-faceted experience.   That goes beyond mere simplistic

12    binding to a particular receptor.

13          So, as Dr. Hammond wrote here, people in the field

14    at the time understood that the only way that you could have

15    what she says is an inference of pain and its modulation in

16    animals was only through what she determined as judicious use

17    of complementary models plural of nociception and assessment of

18    motor function.   And by that means is the mouse actually simply

19    not being able to move or is there true pain relief.

20          Notably plaintiff's expert on this issue Dr.

21    Ossipof (ph) conducted his research in the field consistent

22    with these precepts and with Dr. Mogil's opinions on that

23    subject.   And as we've all heard throughout the course of our

24    lives, your Honor, actions speak louder than words.

25          Now, the second fundamental attribute of lack of

1    utility is that there are three claims, as the Court heard

2    earlier from Mr. Sitzman, they directed to Tapentadol molecule.

3    But,  when we look at the data in the patent,  there is no data

4    for example 25 which the Court has now repeatedly heard is the

5    one that supposedly refers to Tapentadol.

6                So when we go back to the legal framework, there's

7    supposed to be test data to convince somebody in the field to a

8    reasonable probability that the novel compound has the asserted

9    activity here.  The sole novel compound ostensibly of these

10   three claims is Tapentadol but there's no data for Tapentadol.

11               Now the evidence will show that the plaintiffs

12   eventually did attempt to submit data for Tapentadol on two

13   separate occasions.  But the evidence will show several things,

14   the first is the test data for Tapentadol was submitted after

15   the filing date.  Plaintiffs contend that one such submission

16   occurred when Dr. Buschmann submitted a declaration to the

17   patent office.  But the evidence revealed some ambiguity on

18   that score.

19               In the text of his declaration he mentions example

20   24 but that's not Tapentadol.  And then in the table there is a

21   mention of example 25 but there's some confusion there.  The

22   evidence will also show that there's no indicia submitted by

23   Dr. Buschmann that the data that he was submitting was

24   available as to the priority date.  The other data was

25   submitted in the year 2005, your Honor, in connection with the

1    reissue application.  But that was 11 years after the asserted

2    priority date.

3                Given the foregoing, the evidence will show that

4    the plaintiffs' invocation of the data submitted during

5    prosecution is not legally pertinent for two independent

6    reasons, initially as Judge Coe (ph) who has been handling the

7    high profile Apple v. Samsung matters, recently emphasized,

8    courts cannot look at post filing test results as evidence to

9    substantiate utility which is frozen in time as of the asserted

10   priority date.

11               Here there was no, again no evidence submitted to

12   the Patent Office that any of the information concerning

13   Tapentadol as a molecule was available as of the filing date.

14   In fact,  the evidence shows that a number of the data sheets

15   that were submitted in the reissue process bear dates that are

16   well after the priority date, some as late as 1999.

17               The second problem for the plaintiffs is that we

18   challenge priority.   And the limited exception for looking at

19   post filing data doesn't apply but only applies when priority

20   is not at issue.  And here are our excerpts from the caselaw in

21   that regard.

22               Now,  you may hear a suggestion during the course

23   of trial from one or more of the plaintiffs' witnesses that one

24   could infer the activity of Tapentadol because there's no data

25   for Tapentadol  from the activity of other compounds that are

1    in the table.   But, that theory suffers both legally and

2    factually.

3              Legally, the caselaw talking about looking to the

4    activity of other compounds is in the context of prior art

5    compounds.   And it's limited to those for which there is

6    structural similarity between the prior art compounds and the

7    compound of the count.

8              Now, Mr. Sitzman just got through explaining that

9    plaintiffs do not believe there are structural similarities

10   between Tapentadol and any of the prior art compounds.  But, to

11   the extent that the plaintiffs produce any evidence of that,

12   that has obvious invocations for other invalidity defenses.

13             But, more importantly, perhaps is that factually

14   the evidence will show that people in the field, the scientists

15   would not presume that a different enantiomer would be active

16   for a variety of reasons which include the fact that the

17   receptors we are talking about have a particularized three

18   dimensional shape for accepting the molecule.  And the evidence

19   will show that when they are tested in the same assay,

20   enantiomers typically have markedly different activities.

21             Now, I want to turn to the other aspect of the

22   utility which is the self anticipation and obviousness.   And

23   that defense invalidates the asserted claims even in the

24   scenario the Court accepts and evaluates the evidence submitted

25   during the prosecution regarding additional data or potential

1        activity.

2                    In essence the evidence will show, as I just

3        previewed from Dr. Mogil, that the claims, the specification

4        does not support the claims, the priority date.  And that again

5        is for the two fundamental reasons we don't have any data for

6        Tapentadol which is the sole subject of three of the four

7        claims.  And the only other claim, claim 8 is supported only by

8        the writhing model, which is what we saw, no model was deemed

9        itself reliably predictive as of 1994.

10                   Now,  the evidence will show that the applicants

11       implicitly acknowledge the shortcomings in the specification by

12       submitting about 80 some pages of data sheets from animal

13       testing models during the reissue process.

14                   The evidence will show that that did not occur,

15       however, until 2005.   In the interim there was a public

16       disclosure of Tapentadol and its efficacy as an analgesic

17       agent.   So before the patentees could establish utility in

18       2005, there had been a sufficient public disclosure of

19       Tapentadol, its structure and its analgesic activity that would

20       invalidate the claims for lack of novelty.

21                   That's precisely what happened.  I'm sorry, this

22       is actually played out before your Honor.   This is a scenario

23       that's happened in the course of events where a patentee had

24       filed a patent application but lacks sufficient information to

25       support utility.

1          They subsequently try and put in information that

2     would support utility, but, in the meantime there has been

3     public disclosure of information that is sufficient to

4     invalidate it.   And that's precisely what happened here.

5          Dr. Mogil will explain that the specification

6     lacks data for Tapentadol or for any other compound that will

7     be sufficient to show analgesic activity.   And so Dr. Mogil

8     will testify that the first time that the patentee submitted

9     data that may have been, that was sufficient from multiple

10    animal models to show some activity for Tapentadol and the

11    other compound was in 2005.

12          And of course your Honor just to stop here for a

13    second, again you will see dates on some of these pages from

14    1995, 1996, 1999.   So, those axiomatically cannot go back

15    and retroactively support utility as of 1994.   Because as you

16    can see on the face of them, they didn't exist.

17          But what happened is also, your Honor, a

18    paradigmatic example of actions speaking louder than words.   We

19    believe that you will hear at least once in the course of trial

20    from a witness for the plaintiff who will say that the data in

21    the specification actually is sufficient to support utility.

22    But if that's the case then why submit this data at all.

23          You will not hear any explanation for that action

24    during the trial because that is, that submission came from Dr.

25    Strassberger and Dr. Strassberger is not being called by the

1       plaintiffs to explain his actions.

2               The evidence will show that Grunenthal's action

3       logically is consistent with the conclusion that they

4       acknowledge that a person of skill in the art would not regard

5       it, would not have regarded the data in the specification as

6       sufficient.

7               So again what happened in the interim 11 years

8       between 1994 and 2005 well, one reference that had published on

9       Tapentadol is from the WHO, the world health organization's

10      drug information guide from 2002.  And you can see we have the

11      popular name Tapentadol.  We have the chemical formal name for

12      Tapentadol.   We have it's same structure and it's a

13      description that's it's analgesic.

14              Dr. Wolf will testify that a person of ordinary

15      skill in the art could have used the information to readily

16      synthesize Tapentadol.  And Dr. Mogil corroborates that you

17      quickly verify that it had analgesic activity.  That disclosure

18      then invalidates or renders obvious all of the asserted claims.

19              Your Honor may have asked a question or there may

20      have been a suggestion by Mr. Sitzman how would you ever go

21      through and select Tapentadol out of those thousands.

22              THE COURT:   I did.

23              MR. SCHULER:   Here's the reason.   The priority

24      date for the polymorph patent I believe is 2004.  But as of

25      2002, it was known that this is the one that's an analgesic and

```
 1          has enough activity to place it in the World Health

 2          Organization's drug information guide.

 3                    Now written description, this is limit --

 4                    THE COURT:   In terms of the family of those using

 5          it, this is the only one that showed up in the World Health

 6          Organization's document?

 7                    MR. SCHULER:   To our knowledge this is the only

 8          compound out of those I will say.

 9                    THE COURT:   And I refer to it as the family.

10                    MR. SCHULER:   I will admit that it's a family and

11          I will admit that it's millions.

12                    THE COURT:   Okay.

13                    MR. SCHULER:   We will come to that in a minute.

14                    THE COURT:   Okay.

15                    MR. SCHULER:   Lack of written description is

16          confined to those three claims that are limited to Tapentadol.

17          The evidence will show that the underlying patent application

18          specification fails to adequately describe those claims.  And

19          Dr. Wolf will testify for the defense on this issue.

20                    Briefly the standard, the burden we bear.  We have

21          to show that the specification does not reasonably convey to

22          those skilled in the art as of the filing date that they

23          possess Tapentadol.  We note however your Honor it's an

24          objective inquiry.  You have to look at all four corners of the

25          specification and you have to do so from the perspective of the
```

 1        person with skill in the art.

 2                    And those precepts are important for two reasons,

 3        initially their claim for written description, I believe you

 4        will hear, is effectively well we had a structure and we had a

 5        synthetic route.  That's enough.  But remember you have to look

 6        at all of the four corners, not just a self-serving subset of

 7        that information.

 8                    In addition,  the evidence will show your Honor

 9        that the chemical name in the original application is

10        indisputably not Tapentadol.   And of course you have to look

11        at all four corners of that information in the specification.

12                    Now the evidence will also show your Honor that

13        when the patentees attempted to correct the name, they still

14        corrected it to a 1R 2S configuration.  That is not Tapentadol.

15        And more significantly when they submitted that correction they

16        said that the supports for the amendment was found in the

17        original formula, which Dr. Wolf will explain would mean they

18        are conveying to a person of ordinary skill in the art that

19        they convey the new corrected name now conforms to the

20        structure that the plaintiffs are pointing to as evidence of

21        written description.

22                    And Dr. Wolf will explain when you have

23        contradictory information like that, a person of ordinary skill

24        in the art would expect to see something more than just a

25        structure.   A person of ordinary skill in the art in chemistry

1    would have expected to see information confirming testing that

2    had shown the actual structure.

3             The evidence will corroborate Dr. Wolf's testimony

4    in several ways including evidence showing that the applicants

5    themselves, your Honor, did not know at the time of the

6    claimed priority date, whether or not they had synthesized the

7    compound having the requisite 1R 2R confirmation that is

8    associated with what we know today as Tapentadol.

9             There's some additional legal guidance we think is

10   pertinent and that is that the adequacy of the written

11   description varies with the context. And it depends on the

12   complexity and the predictability of the relevant technology.

13   And you will hear from the plaintiffs themselves that chemical

14   arts are unpredictable and you can't predict necessarily the

15   activity of compounds.

16             But the evidence will show that it's also

17   unpredictable from the synthetic side. That you don't

18   necessarily synthesize what you set out to synthesize. And

19   the final precept is that it changes with progress in the

20   field. It may have been the case in the 1960s that publishing

21   a structure might have been sufficient to show somebody that

22   you had thought of a compound. But, by the mid-1990, Dr. Wolf

23   will explain, a scientist would expect to see data, analytical

24   data of the sort that would confirm the structure.

25             The evidence will show that the little data that

1    is in the patent specification which is melting point and

2    optical rotation, there is no data from the structural

3    technique like nuclear magnetic resonance or N.M.R.

4              The evidence will further show that the only data

5    that's here, the melting point, the optical rotation says

6    nothing about the structure.  The evidence will show that the

7    compounds examples 24 and 25 are supposed to be enantiomeric.

8    As the court may recall, enantiomers are non superimposable

9    mirror images like my left hand and my right hand.  And they

10   are supposed to have an enantiomeric relationship.

11             But the data, Dr. Wolf will tell you, does not

12   show an enantiomeric relationship.  They should have the same

13   melting point and they do not.  They should rotate plain

14   polarized light in equal but opposite directions and they do

15   not.

16             Dr. Wolf will explain why that data has a bearing

17   upon whether the applicants actually possessed Tapentadol at

18   the time.

19             Now, I'll move to the final issue which is non

20   enablement of claim 8 and this will be brief because the facts,

21   your Honor, are effectively undisputed.   Dr. Wolf and Dr.

22   Mogil will each offer testimony on the non enablement defense.

23             The legal precepts are very straightforward.   We

24   bear the burden of showing that one could not practice the full

25   scope of Claim 8 without undue experimentation.  But the

1       Federal Circuit has offered some additional guidance which is

2       that even where the experiment is routine,  if there is a whole

3       lot of routine experimentation, that can still be undue.  And

4       that's from the Wyeth versus Abbott case.

5               And here we have Claim 8 your Honor.  And Mr.

6       Sitzman got it absolutely right, Dr. Wolf did calculate the

7       number of compounds that could be used in this method and he

8       calculated a huge number.  It's numbers in the millions.  And

9       that's accounting for actually all of the potential

10      physiologically acceptable salts that one could make.

11              But let's call, just call it one million

12      compounds.  Dr. Wolf will testify that practicing the full

13      scope or both Dr. Wolf and Dr. Mogil combined will testify that

14      practicing the full scope of that claim will take many,  many

15      years of experimentation.  Given the unpredictability of the

16      chemical arts, Dr. Wolf, I'm sorry, evidence will show that the

17      only way that you could determine which of the compounds would

18      be suitable to treat a mammal suffering from pain, which is the

19      subject of the method, is to first synthesize that compound and

20      then test it in one or more animal models or multiple animal

21      models to see if it had analgesic effect.

22              The evidence, in fact, will show your Honor that

23      in the course of the Tramadol project that Mr. Sitzman talked,

24      about nearly half of the compounds that they had tested were

25      found to have no efficacy at all.  Dr. Wolf will explain that

 1        while the chemistry is fairly straightforward, it would still

 2        take on average about one day to synthesize each of the

 3        compounds.  And we don't anticipate any material dispute

 4        between the experts on that issue.   And so right there we have

 5        a million days.

 6               And Dr. Mogil will testify that completing a

 7        couple of animal assays to see whether the compound has that

 8        activity would take about another day.  So right now we are

 9        looking at 2 million days, which is about 5,000 years.

10               Now, final slide.  In that sense Claim 8 is eerily

11        reminiscent of the claims that were invalidated by the Federal

12        Circuit in the Wyeth case.  There the representative claims

13        likewise recited a method of treatment using a class of

14        compounds.  There they were called Rapamycin compounds.

15               The Federal Circuit explained that practicing the

16        full scope of the claims would require synthesizing and

17        screening each of at least tens of thousands of compounds.

18               And they said given that circumstance, the

19        resulting need to engage in such systematic screening for each

20        of the many Rapamycin candidate compounds is excessive

21        experimentation.

22               Now you heard Mr. Sitzman say the exact opposite

23        during his direct, that it doesn't matter, that you wouldn't

24        have to synthesize each of the compounds as a matter of law.

25        We beg to differ.  We think the federal circuit has

```
 1          specifically ruled that to practice the full scope of claims

 2          like this would require synthesizing and screening each of

 3          them.

 4                      And there's no dispute your Honor that when you do

 5          so with regard to Claim 8, you are talking thousands of years.

 6          That concludes my presentation.

 7                      THE COURT:   Thank you very much.   Much

 8          appreciated.  I think we are on our last leg of the defendants'

 9          presentation.

10                      MR. ALY:   Yes, we are.

11                      THE COURT:   All right.   You can exchange the

12          slides.   Take a look.   Let me know if there's any difficulty

13          with them.

14                      MR. ALY:  WE did at the last break.   I am advised

15          there are no difficulties and I can approach with the

16          presentation.

17                      THE COURT:   Yes.   Thank you.

18                      MR. ALY:   May it please the Court.

19                      THE COURT:   Yes, please begin.   Thank you.

20                      MR. ALY:  I'm Imron Aly and I have the honor of

21          representing Alkem laboratories, the third and final defendant

22          today.   And representing Alkem their managing director came

23          from India and I'd like to introduce Mr. Sindeep Singh (ph) who

24          is here in the audience with us today.

25                      THE COURT:   Thank you.   Welcome.
```

 1            MR. SINGH:   Thank you, your Honor.

 2            MR. ALY:   Your Honor, we have a different backdrop

 3    and then we are going to address the same patents but focus on

 4    different issues than the other defendants, not because we

 5    disagreed with what they said, but obviously because we want to

 6    focus on issues that we will be presenting until your Honor

 7    gets a complete picture of the different issues without hearing

 8    the same thing.

 9            THE COURT:   That would be fine.   Go ahead.

10            MR. ALY:   Slide two is explaining our backdrop

11    and the story starts where Mr. Sitzman's story started with

12    Tramadol.   Tramadol is actually something that was inventive.

13    It was something that helped people and it is something that

14    had a patent on it.

15            But what happens at these pharmaceutical companies

16    your Honor is delay.   Why they have an incentive your Honor to

17    keep generics off the market as long as possible, some people

18    call that evergreening in publications, other people call it

19    life cycle management.

20            But the business strategy remains the same.   You

21    come up with something, keep trying to tweak it to do something

22    else.   So the patent life cycle can continue indefinitely .

23    That's what happened here.   Look at the timeline.   We got the

24    compound application filed in 1994 which included not just

25    Tapentadol but millions of other compounds as we just heard.

1    Why?  Because it was a place holder.

2              Several years later after they finally found out

3    that Tapentadol is the one they want to focus upon, then they

4    do an activity test in 1997 and submit that to the Patent

5    Office, that's the late data about example 25 in Tapentadol

6    that they are focusing upon.

7              * and then in 2003 they do a reissue application

8    changing the claims and saying let's not have just the eight

9    claims that we originally submitted,  let's add over a hundred

10   brand new claims some of which focus on Tapentadol.

11             That's the timeline for how Tapentadol came to be

12   in your Honor asked what happened with the reissue application

13   I intend to address that when I show those slides.  But what

14   happened in a nutshell is Grunenthal did not have Tapentadol at

15   first in the patent and later in the reissue put Tapentadol in

16   it.   That's what happened.

17             While these patents were being processed,  what

18   about the other two patents.   The other two patents support

19   this theme of delay.   In 199.

20             THE COURT:   When you say it wasn't in the reissue

21   and then it was the issue.

22             MR. ALY:  It wasn't this the original patent.

23             THE COURT:   In 1994 though if we are looking at

24   Tapentadol and other compounds correct.

25             MR. ALY:   That's what the patent says but it's

1    not Tapentadol included that's what the plaintiff says pardon

2    me but Tapentadol is not included but of some typos that were

3    in there is what plaintiffs call them we call them the wrong

4    stereochemistry and the reasoning here is remember the four

5    compounds that Mr. Sitzman identified there is an example 25

6    that's the example we've all been talking a lot about and will

7    continue to do so and on that example stereochemistry is

8    admitted wrong.

9           So somebody reading that application in 1994 until

10   the reissue application 2003 only really know for sure what

11   compound that wasn't.

12          Now plaintiffs want to have it both ways and say

13   yes they would know what it was at that time but also no one

14   else could be able to replicate it during the polymorph test

15   because they wouldn't know what compound they are make g and

16   I'm going on be addressing all of to e patents and about but

17   plaintiff can't have the both ways is another key part of our

18   presentation.

19          In that compound and then we they submitted

20   reissue in 2003 they told the Patent Office don't worry we have

21   the figure here so the figure supports the change to the

22   supposed typo.

23          The problem from a legal point of view is there's

24   two things that are inconsistent the figure and the

25   nomenclature the numbers or the letters assigned to it so which

```
 1          do you pick.   That's why there wasn't support in the compounds
 2          application and they had to do the reissue and then they added
 3          over a hundred other claims.
 4                    While that was going on internally they were doing
 5          polymorph tests on say what polymorph do we have here.   In
 6          1998 this is an internal test which he will eye show you where
 7          Tapentadol was tested for a polymorph and by 1998 they had
 8          Tapentadol in its form A low and bow hold it's form A because
 9          it stable formulated method you get if you make Tapentadol you
10          get form A and they just did nothing with that information
11          until 2004 when they filed an application for the Tapentadol
12          polymorph patent at issue here:
13                    Why would a company sit on its hands for six years
14          if they had invented something it's because they didn't invent
15          anything.   They had form A in their pockets.   They waited six
16          years and then filed a patent application for it.
17                    And your Honor Mr. Sitzman said well at that time
18          we didn't have our own lab.   We didn't have an ability to test
19          the polymorph.   That's not the standard of obviousness that
20          you didn't have a device to do the test in your lab and in fact
21          the 1998 test before they had the lab,  they sourced it out.
22          They sent it to a lab.   Just like we would for an a blood test
23          sends it to lab see was e there and what do you get back form
24          A.
25                    The third and final patent the '130 is the
```

1    Tramadol history applies here as well.   In 1998 or the oh Mack

2    kneel working with Janssen the former plaintiff in this case

3    the one who sold the product to Depomed,  in 1998,  published

4    that Tramadol works for polyneuropathic pain and particularly

5    the diabetic polyneuropathy.

6         What happened there Tapentadol existed but

7    plaintiffs just decided let's not bother trying it out for the

8    neuropathic pain for years because what happened if you do that

9    you get a longer patent term at the end of the day 2007 is when

10   they finally applied for polyneuropathic pain indication and

11   Mr. Sitzman identifies that the submission included some FDA

12   data that they later obtained some Phase 3 testing.

13        This is going to be a key issue that Phase 3

14   testing is for what somebody can put on their label.   You

15   can't market something on the label without at least the

16   Phase 3 testing Mr. Sitzman said that we agree.   But that's

17   different than a patent standard for were whether somebody

18   invent a patent and say I take credit for invention for using

19   social security they basically the same drug as Tramadol with

20   some tweaks to it and then saying it work for the same thing.

21        It's not that it works for a new indication it

22   didn't solve any new problem that's why when we are looking the

23   he can approximation part at issue on you slide 3 which

24   everybody has used it but I tweak, I want to add to is

25   following that we e having been evergreening problems what

1    naturally happens by definition is the later patents at you

2    later they get weaker and we're there's just have there's not

3    much left to tweak or not much left to refine social security

4    that's what happened here.

5              What happened in 2022 the compound transition

6    patent where e changed some things on the patent and say here

7    is brand new compound the 2025 that's patent that expired but

8    for the polymorph and 2028 that's the compound expires are to

9    method what I'm showing you an example hire that if plaintiffs

10   were to succeed in showing that the first patent is not invalid

11   but we succeed on showing that the second two patents are

12   invalid then there's product launch in 2022.

13             If defendants can show that all three patents are

14   invalid then we can launch the day that the decision is

15   rendered because it would be all invalid.

16             Next slide four to talk about what Alkem is going

17   to do about that it's I a company from an India but also has an

18   office in Montvale, New Jersey.  They have done their

19   research and development oncoming up with this formulation they

20   have purchased and have plants manufacturing facility in the

21   U.S. and really working towards developing this product so that

22   there's generic version of Tapentadol available to the public.

23             Here are the claims representative claims that are

24   being asserted for the '593 patent, '364 patent and '130

25   patent.  You've seen these representative claims but I will go

1    into this in a little more detail for right now I want to

2    explain that the standard of invalidity is because we are

3    contending all three patens are invalid.

4           The standard for invalidity is would it be obvious

5    to a person of ordinary skill in the art.   And what is that

6    person in ordinary skill in the art it's not just an average

7    lay person it's actually somebody who knows what they are

8    talking about in that field and the parties have agreed upon

9    generally the definition is and so when we're looking at eat

10   from from perspective there's another very unique attribute to

11   an ordinary person of skill in the art hypothetical person that

12   is doesn't apply to any real human being and that is they are

13   deemed to know every prior art reference in their field.

14   Deemed to know it.

15         So it's hypothetical test for the following

16   reasons the question presented is not did an inventor

17   subjectively believe they were doing something new because they

18   couldn't possibly have known all of the prior art.

19         The question is would a hypothetical question of

20   ordinary skill in the art have believed that it obvious in view

21   of what is was available the all of the prior art and that's

22   important because what patents are awarded for is advances on

23   the technology and not just baby steps not just regurgitating

24   what the art had already taught even if the inventors

25   themselves didn't realize that.

1          For the compound patent therefore we are having

2     Dr. Prisinzano addressed what is specialty is making drugs

3     synthesizing drugs specifically for pain and he will explain to

4     you why the modifications from Tramadol to Tapentadol were

5     obvious.

6          For the method claims Dr. Buvanendran all three

7     defendants have talked about him will explain to you why that's

8     obvious and the polymorph especially in view of the Tramadol

9     and other patents that exist on Tapentadol and polymorph wise

10    we have Dr. Steed who will take a look at and explain the prior

11    art and why the prior art when you follow the recipe of the

12    prior art you get form A which is the same thing that

13    Grunenthal evidence shows.

14         Most of my time your Honor will be spent on that

15    polymorph patent but I do want to address the other two the

16    Alkem perspective.

17              THE COURT:  Go ahead.

18              MR. ALY:   On slide eight I wanted to point out

19    what literally hand in the reissue this is original patent so

20    we doctrine the original patent law where if there's something

21    in the original patent that specifically and distinctly set out

22    as a separate inventions' that's what you can claim in reissue

23    reissue are by law something where you can say you know what

24    oops I forgot to claim something but you can see it's right

25    therein the patent that's legal.

1        What's not legal is saying take this particular

2   place holder with millions of combinations and then now go and

3   cherry pick or change those compounds themselves and then say I

4   want to pick one of those going forward that's the original

5   patent rule.

6        What happened here is this reissue that occurred

7   of the original patent that's '737 then we come reissued as

8   '593 and as Mr. Sitzman said we look at the same specification

9   but the difference is the difference is now we have some claims

10  that are going to be in Italics.   As I'm going to slide ten.

11       And slide ten is showing the italics any

12  italicized claim in a reissue is a brand new claim.  It didn't

13  exist before so all of these e new claims including 117 which

14  is specifically about Tapentadol with all the numbers and the

15  letters correct in claim 117.

16       Now when I ask explain what was disclosed in the

17  patent in example 25 as far as the errors are concerned we

18  don't have to look very far.  The 539 patent one the things

19  with the reissue is you have to change in brackets what was

20  changed basically to put in Italics was removed adds what

21  changed and you get the 1R 2R.  Or the 1S 2S or particular

22  examples here that changed overtime and these the change from

23  the original patent over to the reissued patent but that's the

24  change that shows if steer chemistry is so important as Mr.

25  Sitzman has explained and argued in that case then we have to

1    hold them to their own standard and say you have to have gotten

2    that right and you can't cherry pick those later.

3              I think my colleagues addressed example 25 wasn't

4    tested so let me conclude the '593 portion by saying that there

5    are core and none core elements that were known in Prisinzano

6    will explain that there's a pharmacophore word which basically

7    means the core the guts of the compound the thing that does the

8    work and then there's other parts of it that we can tweak and

9    we can see what happens if those are changed.

10             The analogy and I'm not going to go into all the

11   details of '593 as Mr. Fitzpatrick has covered the changes but

12   analogy that I wanted to make sure to explain there's got to be

13   some rational basis to do what you're doing.

14             What would person of ordinary skill the art change

15   are or not change and why that's the discussion or obviousness

16   and just like as an airplane some of the things you're not

17   going to change.  And other of the things you might depending

18   on the application.

19             Here's an example you can't really change the fact

20   of having an engine or a wing.  You can change the windows

21   maybe you don't need them maybe you need a bigger one maybe you

22   need a smaller one the tips of the swings maybe you need speed

23   maybe you need fuel efficiency.  These are the things, I am not

24   a person who designs airplanes, but a person who designs

25   airplanes would know these things you don't change.  These

1      things you can change.

2              If it's within that field, it's obvious they are

3      doing something completely different than expected and never

4      before taught in the literature that's different story but here

5      the defendants will show with literature why we're doing each

6      of these change to the compound and why that would be obvious.

7              That's my portion of the '593.   The '130 patent

8      the method claim here the issue is the following on claim 15

9      I'm sorry slide 15 claim one the '130 patent has this method of

10     treat polyneuropathic pain and the question is is

11     polyneuropathic pain covered within the word pain.   And we

12     originally thought that no it's not.

13             And I'm going to slide 17 to say we originally

14     thought well we don't know if it is or isn't than a that was

15     disputed because the plaintiffs attorneys and the plaintiff's

16     experts had originally said when you are looking at pain if

17     it's in the prior art because we had the invalidity argument

18     and if the prior art just says pain.   That isn't enough.   It

19     doesn't have what I'm now going to call the magic words

20     analysis the magic words analysis is does eat say neuropathic

21     pain in particular or does it say pain in general.

22             And the argument plaintiffs had before there were

23     some changes in the case and just before the evolution of the

24     case let me put it that way is a the case evolved the

25     plaintiffs have changed their position to the prior art to

1    invalidate too specifically use the magic words and now at

2    trial it's pain includes neuropathic pain.

3            It's change and reacting to that change if you

4    look at Alkem label on slide 18 there are two indications, the

5    first moderate to severe chronic pain in adult and the second

6    is neuropathic pain associated with diabetic peripheral in

7    your.   And the question from an infringement and invalidity

8    points of view is actually the same.   If I may approach the

9    screen your Honor.

10           THE COURT:   Yes go ahead.

11           MR. ALY:   If the two indications the seconds one

12   is the one that plaintiffs have accused of infringement.   But

13   if the first one here its also infringing which we ask their

14   experts about if that's also covered by the claim just having

15   severe chronic pain then includes the neuropathic pain,  then

16   that's the invalidity or infringement choice.

17           Plaintiffs can't have the both ways.   Either

18   there's infringement or there's invalidity and they can't have

19   the both ways.   Why is that?  Because the prior art taught

20   using Tapentadol in particular foresee veer pain.   Here's an

21   example of prior art and it's Dr. Buschmann should be Dr.

22   Buschmann himself 558 patent but already published that you can

23   use and if that fore severe pain it's already out there.

24           So if that general reference to pain without the

25   magic words polyneuropathic pain includes polyneuropathic pain

1    then this disclosure of severe pain is invalidating as

2    anticipatory it anticipates it anticipates.

3                There's other anticipation as well and your Honor

4    asked about the Tzchentke references and we are waiting to see

5    what plaintiffs have to say about Dr. Tzchentke the following

6    reason Mr. Sitzman satisfied two things,  Dr. Tzchentke is

7    employed by Grunenthal Janssen and that he was part of the team

8    that helped develop or worked on this compound what Mr. Sitzman

9    left off Tzchentke is not on the patent he is not an inventor

10   so we hat Tzchentke one Tzchentke one Tzchentke two Tzchentke

11   three why is he writing all of these articles where they file

12   author that are patent application did he not think it was an

13   invention did he not know what was being done internally, why

14   is he doing these publications.

15               Now the standard for the critical data and this is

16   issue that really is remaining,  by the way Mr. Sitzman used a

17   brand new divide initial of critical is he not the one I'm

18   familiar the one I'm familiar you take the application 2007

19   here, you subtract one year March 2006 and it basically means

20   anything before March 2006 is automatically prior art and if

21   it's within the window of 2006 and 2007 which it is here then

22   you have to figure out if it's prior art or not based on the

23   testimony of the plaintiffs.

24               The burden actually shifts to the plaintiff to say

25   I see it's before March 2007 when we applied for our patent on

```
 1          this method claim but maybe we have evidence to show that we
 2          published parts of it or we published something that is already
 3          including of the invention.
 4                  And it's only because of the inventors work
 5          instead of somebody else's guess what Dr. Tzchentke is one of
 6          the witnesses they only wanted to have by deposition and in
 7          that deposition which we will again submit after trial he says
 8          he did offer additional materials in that article that were not
 9          provided to him by the inventors and that makes sense he wrote
10          the articles.
11                  Also on this method claim we have obviousness type
12          double patenting which is that going back to our famous '593
13          patent event which is asserted or the '737 from which with
14          derives again it's the same thing.  Originally they had pain in
15          there pain was already in there and so if pain is enough to
16          automatically include neuropathic pain which is plaintiff's
17          position,  then by that definition they've already got a patent
18          on eat and they don't deserve two patents on the same thing
19          with differ rent expiration dates.
20                  Obviousness also in that Tramadol did do the same
21          thing and Mr. Fitzpatrick hints had on this it was well-known
22          in 1998 Tramadol was tested for diabetic in your operate I in
23          particular and the conclusion was yes it works.  So the
24          invention here is take the derivative of Tramadol waits nine
25          years patent it on the same exact thing.  We don't believe
```

1      that deserves a patent either.

2                Slide two summarizes why because the known

3      characteristics between the two drugs and the conclusion that

4      it can also be doctored.   DPN therefore we believe is the

5      obvious one.

6                Now I'm at '364 patent slide 25 which I would like

7      to spends the fall balance of the time.   '364 patent has

8      claims to a new crystalline form and claim 26 or slide 26 claim

9      one I should say has where the claim is recited.

10               I just want to take a little bit of time here

11     because I am building up to a slide where I'm going to spend a

12     lot of time.   Little bit of time here is when we talking about

13     polymorphs what are they and how do you know you have one what

14     are they is crystal patterns within a solid structure and so if

15     you have a chemical and you put it in solution you stir it

16     around.   There's no, there's no crystals yet.

17               You've got it in solution for example if you

18     dissolve salt our you can dissolve sugar you've got a solution

19     then you do certain steps to see if you can extract out the

20     solids and make crystal out of that you get sugar crystal or

21     salt crystals that just as a general analogy when you get out

22     those crystals at the end of day threes what you measuring to

23     see okay are these crystals that was their shape and Mr.

24     Sitzman put up a slide with 7 or 8 known shapes and just a

25     beauty of nature is these shapes can be triangles,  rectangles,

1    squares,   rhombuses from Geometry.

2              And it doesn't really matter all of the time it

3    doesn't much of the time is it doesn't matter here how do you

4    it's a got one of the particular forms you do an xray

5    defractogram.  You put it through a machine and it gives you

6    peak numbers about where you see little peaks that's the

7    technology it's not a new technology it's not one that

8    Grunenthal had invented.

9              And when you look at slide 27 then this is showing

10   you the result of the two forms that exist for Tapentadol.

11   There are only two forms that exist for Tapentadol only two.

12   Form A and form B and looking at the peaks I can't make much of

13   this but the experts can look at an eyeball and it says yeah it

14   looks like a lot of over loop its look likes there's a very

15   similar structure but here's what structures actually look like

16   when you put them together and it's slide 28 which is these are

17   given different names monoclinic or orthorhombic.

18             But all it really means is you got a rectangle and

19   a slightly leaning rectangle that's essentially what you have

20   here the two forms form A and form B the claims just say form A

21   the claims.  Do not have purity requirements much there is no

22   purity requirement this the claims.   So as a result it's not a

23   claim that says 99 percent pure form A or more.   This is just

24   form A.  Do you see it yes or no.

25             And for that reason even combinations of form A

```
 1    and B are included within the claim and would anticipate if
 2    found in the prior art and that won't be disputed.
 3              Internally at Grunenthal they had done the test
 4    themselves slide 29 shows the form A and form B the rectangle
 5    and the slightly leaning rectangle that's what they found.
 6              '364 patent then says and this was again filed in
 7    2000.
 8              THE COURT:   I am sorry go back to slide 29 what
 9    are you saying that shows.
10              MR. ALY:   Slide 29 is showing this is Grunenthal
11    internal assessment conclusion about what are the forms of
12    Tapentadol and they are saying form A and form B and it's
13    rectangle and the slightly leaning rectangle and form A is the
14    one that's in the patent.
15              THE COURT:   Conclusions from which substance.
16              MR. ALY:   Tapentadol.
17              THE COURT:   I understood but do we know what
18    batch or what I what is this from.
19              MR. ALY:   This is a synthesis of a lot of
20    different testing I'm going to show you the test report in a
21    moment it's lot of different testing that was done by an
22    outside vents or and synthesize of in an update that's provided
23    here here ear the two forms and what I know about them so in
24    the particular analysis it's not a matter of saying here you
25    have to use this particular method to get A or this particular
```

1       method to bet.

2               The issue that was presented here was if I sent it

3       to a lab and they do whatever they want with it what the the

4       different forms that they get and the answer was here's your

5       two choices.

6               THE COURT:   Do you know what they sent.

7               MR. ALY:   To that lab.

8               THE COURT:   Yes.

9               MR. ALY:   That lab they sent originally form A

10      Tapentadol and that's actually going to be part of the unclean

11      hands issue that's coming up which is they sent form A

12      Tapentadol and the company messed around with it and said the

13      different tests sometimes they got form A and sometimes they

14      got mixtures of form A and B and then they put a patent

15      application after that saying to the patent office hey we gave

16      the a lab form B which which was incorrect which gave the lab

17      form B and we got back form A look we should get a patent on

18      this.

19              But in reality they gave the lab form A and got

20      back form A and said we should get a patent on this.  That's

21      what the evidence will show.

22              THE COURT:   What is the evidence you're going to

23      use to show that they actually gave form A as opposed to form B

24      which you are saying they said they gave.

25              MR. ALY:   The Grunenthal reports.  They have

1    internal SSCI reports the SSCI by the way is the company in

2    Indiana that did the testing they document what they received

3    and what they did  with form  A was so unstable it was really

4    hard to work with.

5                    It's very difficult to keep it stable at room

6    temperature and for that reason form A.

7                    THE COURT:   I know we are going to hear from the

8    witness but are you saying that the report itself represents

9    what form was actually sent to be tested.

10                   MR. ALY:   It does.

11                   THE COURT:   And you're saying it rents that its

12   sent form A to be tested.

13                   MR. ALY:   It does.

14                   THE COURT:   Form A resulted in an analysis which

15   showed form A and form B present.

16                   MR. ALY:   After they did different tests in

17   between so the test that was given to S SC A was task.   Here

18   is form A Tapentadol and you should do different

19   recrystallization with and see what form you get out if I may

20   here take short time out to explain something.

21                   THE COURT:   I am not sure what recrystallization

22   is.

23                   MR. ALY:   That is what I was going to explain.

24   You've got something that starting material that's crystal and

25   then but all that matters is that you know what you started

```
 1        with when you are doing the crystallization procedure so if you

 2        have something you say here I got in something.  I know it's

 3        this compounds recrystallization now put it in liquid mix it

 4        up.  So now it's in a solution.  It doesn't have a crystal

 5        anymore.

 6                     It's like know flakes stirring them into the pot

 7        you lose all the crystal then you do techniques to put it back

 8        in on crystal form which the in snow make might be freezing it

 9        or putting it through a tube.  I am not sure but there are

10        techniques too be used to get a crystal back out that's

11        recrystallization if the middle step you to take the pot and

12        you add different ingredients or add different conditions.  The

13        goal is to see do I get anything in a different shape a rhombus

14        were this, do I get a square at the time that's test that we

15        are talking about.

16                     Recrystallization is important because the

17        Step 1 2 3 4 analysis that we need to address.

18                     THE COURT:   I'm sorry, did you say this was done

19        solely pursuant with the recrystallization or some of the tests

20        were crystallization.

21                     MR. ALY:  All SSCI tests for recrystallization.

22        Other tests that Grunenthal did internally that were not all

23        recrystallization so they were making different types of

24        products internally to see what formed the synthetic process.

25                     THE COURT:   I'm sorry with respect to slide 29 is
```

1    the only through recrystallization or is this the one that's

2    both.

3                MR. ALY:   You know I would think it's only

4    recrystallization because SSCI got a solid product to start

5    with but then internal work that they did Grunenthal had the

6    same results that these are the only two forms that they could

7    ever find as well A and B.

8                THE COURT:   I'm sure we will hear more on it

9    thank you.

10               MR. ALY:   When that's what we are interested in

11   talking about.   I said that the two forms don't make a

12   difference and I wanted to point to the admission in the '364

13   patent itself that says that so we don't have to go very far

14   the polymorph patent is telling us crystalline form A is the

15   same pharmacological activity as form B but is more stable

16   under ambient conditions.

17               So the important thing here is you too take either

18   form A or B give it to somebody it would have the same effect

19   and that's what the FDA is really concerned about and that's

20   were e polymorphs if they ever matter matter when you get form

21   A to somebody that helps their pain you give forms B to

22   somebody and that doesn't make a difference but you better be

23   pretty sure what you're given if that's the situation.   This is

24   not that situation.

25               This situation is you could give form A you could

1       give form about it really doesn't matter why would you pick

2       form A.  It's because it more stable under ambient conditions.

3                   All the reports that Grunenthal got /TPWR third

4       parties said you knee I'm having a tough time making form B but

5       if I cook it to above 50 C which is about '130 degrees

6       Farenheit if I took it to that number or higher I'm starting to

7       see form B yeah.

8                   But guess what that doesn't matter who is going to

9       be '130 C for manufacturing conditions they are not that's why

10      from Alkem's points of view we infringe because everybody

11      should be using form A that's the room temperature Table 1

12      that's the one you get when you just sitting there making it in

13      a lab.

14                  As to the question as well on utility defendants

15      have expert Dr. Metzgar who will address the point and say when

16      I'm looking the a statement in '364 patent even as to the claim

17      that B is more stable,  even that there's no data in the patent

18      so they are making the claim but where's the data for it that's

19      a question that will be addressed by Dr. Metzgar.

20                  Now we get to the prior art or polymorphs and so

21      that if u follow the rest pie of the '593 patent which was the

22      one that that they applied for in 94 you get to the form  A or

23      mixtures of the form A and B which is good enough in the '364

24      patent.

25                  How do I explain this.  This is the slide 33

1    where I will slow down for a minute and then take sometime to

2    talk about.   The reason is as follows:   Mr. Sitzman talked

3    about steps 1,2, 3,4 because example 24 which is in this prior

4    art '593 or '737 has what they are calling first step and

5    second step a third step and then example 25 is where

6    Tapentadol comes into the picture with the right steer

7    chemistry with a fourth step.

8             I don't know if these are the four steps that the

9    plaintiffs are now tracking because this is the first time I

10   saw the 1,  2,  3,  4 numbering.   But here's what I do know.

11   That the example 24 third step, that's where the

12   crystallization happens.

13            Here I'm reading from column 18 line 64.4. 3 grams

14   of plus 23 from Step 2 were added to one milliliter of

15   concentrated hydrobromic acid why is that important why am I

16   reading that it's because the third step starts with a solid

17   then they put it into a solution and then they do the steps in

18   the example to see what crystals form.

19            So when Mr. Sitzman said well what about the first

20   step the seek step where things were happening to the chemical

21   structures and the chemistry was being developed  overtime,

22   doesn't matter.   Doesn't matter.   And your Honor when we had

23   the call about ma Rita Mueller' work the reason there's so

24   important is this is the critical question.

25            Do I have 4.3 milligrams of plus 23 from Step 2

```
1        that's the starting point of this crystallization project
2        there's other starting points we agree to get to that point.
3        But you better end up at that points and that's when you need
4        to check and stop and say do I have this.   That's what the
5        defendant's expert did, we hired them.
6                    The University of Wisconsin is who we hired.   They
7        got something that they purchased and they said is the this
8        plus 23.   They did a test do it NMR and says yes that's what
9        it is for sure.   So that's where they start with.
10                    Now contrast that with the evidence that
11        plaintiffs will put on where they don't have that evidence
12        because they are saying don't worry about it we made the
13        chemistry the right way from the whole step earlier from making
14        the right compounds so we don't have to check our work and show
15        you that the N. M. R shows that for the Line 63 compound which
16        is the plus 23 that's the compound that has the structure to
17        it.
18                    We don't have to show you that there's what
19        plaintiffs are saying and these why Marita Mueller we think is
20        not here because we asked her about these things we are going
21        to talk about the particular evidence and testimony she
22        presented in the next slides for rights now we're saying one
23        key step to make sure are you doing the crystallization
24        properly or not is you start right there is my starting
25        material correct.
```

```
 1              You take that starting material,  and that put it

 2      into the solution and then you put it into this crystallization

 3      thing then you finally do the X R D to see if did you really

 4      get the right form A what form did you get that's why I want to

 5      spend a lot of time on.

 6              THE COURT:   Go back to the starting material

 7      because I asked a couple of folks about the starting material

 8      let's go back to this.

 9              MR. ALY:   Yes.

10              THE COURT:   So you're saying it's done by a lab

11      was it the done by the university or was it done by a separate

12      lab how is what?

13              MR. ALY:   Defendant Alkem retained a lab at

14      University of Wisconsin with professors at the University of

15      Wisconsin and those professors run what they call z laboratory

16      z e been h they are going on be buying that plus 23 because at

17      that point the crystals aren't defined it doesn't really matter

18      these just starting material you need to make sure this is

19      pure.

20              Are you starting with the right starting material

21      but this was the University of Wisconsin did the following

22      steps in this patents.

23              Your Honor asked if this is a clinical lab and

24      there was that another, co-defendants have hired is that

25      Organix, that's other name we keep hearing about and Chemic
```

1      those are the other labs independently had nothing to do with

2      the university of Wisconsin did their own testing using the

3      same starting material collected to see if it is pure did the

4      crystallization and got the same result which is a mixture of A

5      and B.

6                    THE COURT:   Okay.   How could the starting

7      material I'm just positing, this is an an open question how

8      would the starting material impact whether you would get A or B

9      okay you're saying you had it tested by a lab to determine it

10     was in fact this substance.

11                   But,  could there be variations in that substance

12     that was provided that could yield either A or B or some

13     combination therein and isn't that very important here.

14                   MR. ALY:   Very important your Honor and here's

15     what could happen.   If you don't know what the starting

16     material is then you actually don't know what you're

17     crystallizing so you might get a crystal of something and it

18     mate have all of the signals why you think form A should be.

19     It may not even be that compound at all.

20                   And an example that happens and we are talking in

21     chemistry here than this was an example that happens here

22     bromine and chlorine these are two atoms on the periodic Table,

23     2 elements that very very similar to one year and if the

24     starting material is more bromine than chlorine.

25                   Then you don't have the right compound to start

1    with and then as you go through the proper recipe then you are

2    ending up with something that looks similar to what a form A or

3    a form B but really isn't.

4              And if you start with impure compound it is an

5    issue and if you start with pure compound you don't know you

6    didn't carryover impurities from the other steps but the way

7    they did it the plaintiffs test if you start with something

8    that you don't know if it's pure or not it could be carrying

9    through these impurities through the process then you would end

10   up with something like look likes a particular form but may not

11   be the right compound if it is right compound it mate be the

12   impurities that are causing it to look in a particular form and

13   this is where impurities basically can come found the results

14   of a particular form A or form B signal.

15             This isn't just our theory defendants plaintiffs

16   themselves had puts in their internal reports and presentations

17   we are looking at form B it's little weird because form A is

18   the one stable at room temperature so what explains it

19   impurities the problem is probably the explanation and you will

20   see that in their own presentation goes the.

21             THE COURT:   And would doing the process to

22   generate the substance in a certain way following certain steps

23   in a certain order or different steps would it impact also

24   would whether you get form A or form B or some combination.

25             MR. ALY:  No, not if it's above that and you

1      check what you have right there.   The key is right there

2      before you are doing crystallization.   What's your starting

3      material before you are doing crystallization if you have this

4      material right here, it doesn't matter how it was made or how

5      it got there.

6              And in fact that's something that Dr. Buschmann is

7      going to talk about there's different ways to manipulate

8      compounds and solutions and you can there are tricks basically

9      if you have O in a particular position you can put in reagent

10     it will take the O. Off if you have H. Over here and you want

11     to add something to it there's solutions and that's chemistry

12     and some might call will Alkem.

13             But that's basically what they do make the

14     compounds by adding and subtracting pieces and and subtracting

15     reagents that's what's happening in the first and second steps

16     and they are defined in the patents but the key is the third

17     step when you have and you haven't crystallized anything.   This

18     is where the crystallization happens.   It has very,  very pure

19     material the input crystallization if you trying to get a

20     patents on crystallizing that's the step that matters.   Is the

21     crystallization step you got start with right material do the

22     right recipe and end with the right form.

23             THE COURT:  When you buy the substance do you know

24     how it was made?

25             MR. ALY:  When you buy the substance, you don't

1    always know how it's made.  Here for example we can't go back

2    and ask all the people in the labs making the material but

3    because Wisconsin did it in connection with the litigation.

4              They did have the opportunity to ask all the

5    people how it's made and get additional documentation from

6    anywhere in the chain and they can find out information in but

7    your Honor that's not what matters we don't have to prove that

8    it was made up to that point in the same way and there's not

9    really any science that would show why anything in the earlier

10    steps would really effect if you've got the starting material

11    here.

12              This is kind of where Mr. Fitzpatrick's analogy

13    works for us which is this flour in the cake.  If you're

14    trying to make flour from grain and then sowing and then doing

15    processing you have to do, you don't really know what your

16    starting material is could it could be flour, it could have

17    flour with husks in it.

18              I don't know what the right terminology is but if

19    you buy flour off the shelf and scientifically test it to say

20    this is an NMR test.  It's 99 percent flour then you doing the

21    step properly.  So in way we're saying it's a lot better to get

22    it commercially made and done because then you don't have this

23    risk to having carried down impurities or the not knowing what

24    it is you're actually crystallizing so that is the starting

25    point.

1          THE COURT:   Although if you did it yourself you

2     would have full authority and there's no question as to what

3     was contained in the substance by doing it yourself.  So you

4     have full authority over verifying exactly what process you

5     used, what was put into it in terms of the contituents and you

6     would have you know a full understanding of what was created

7     and how it was created.

8          MR. ALY:   Yes, your Honor but to be honest that

9     question is to a chemist the same as saying you should have

10    started with the field to make sure why that you used flour at

11    the right step because frankly speaking even the plaintiffs

12    test that the work that he did in making this up.

13         It didn't start with carbon by itself and hydrogen

14    by itself and then making those bond and then having those form

15    rings and then having those be added into bigger complexes and

16    then hang that two plus two compounds they starting with start

17    material there are rings that already exist with components on

18    them it's not like plaintiffs can say I can show you where

19    those rings were made and how these pieces were attached to.

20         At the very beginning of even their first step

21    that's chemistry where they take the material put it together

22    and see what it makes.  But the key is you got a check it to

23    see that you really got what you made and not just something

24    else that happened to be part of the process.

25         THE COURT:   Okay.   Thank you.

 1                MR. ALY:   Thank you, your Honor.  The University

 2       of Wisconsin did all of the tests that were were required to be

 3       done on the purity starting material and then they ran through

 4       the example 25 procedure and that's what they found at the end

 5       of the day was you get a mixture of form A and B.

 6                The next slide 35 I want on show why they didn't

 7       follow the recipe and here your Honor was asking Mr. Sitzman

 8       for batch 0 is it really the same as example 25 and he conceded

 9       it isn't.

10                Now that's because this his analogy he used 1423

11       but it really isn't that simple because the material in batch 0

12       and we'll see that with Dr. Buschmann really wasn't following

13       example 25 even for that third step.   The only important step

14       is the third step what they title third step in exam will 24

15       and Dr. Buschmann didn't use that third step he used something

16       different.

17                So if I'm saying the crystallization step has to

18       be done correctly I'm saying batch 0 he wasn't done in the

19       crystallization it didn't have to do the precursor up above he

20       didn't have the right starting material and Marita Mueller the

21       other person who did the replication later in 2002 also didn't

22       follow the recipe.

23                And what I mean by that is there is a step in the

24       example and I'll go back just to show us here in example 33

25       where we are taking this trimethylchlorine/water reading from

1    column 18 about Line 72.  It's an examination of those two

2    things that u why make and then add it to the solution that is

3    really close to the crystallization you see that after you add

4    those things in example 243.8 grams of hydrochloride

5    crystallized out.

6              So that's the crystallization component that's

7    very key at the end of the crystallization.

8              Reading that recipe the University of Wisconsin

9    and Organix put the two together the trimethylchlorine and

10   water together and that's what they dropped and got white

11   powder example 25 shows that they don't report the color the

12   testimony shows it should be white powder and then at Organix

13   they also did it and got white powder.

14             Interestingly when Marita Mueller did the

15   replication she added the water first and then this other

16   ingredients.  What happened is the yellow powder.  She called

17   it mustard colored that was the translation the mustard colored

18   powder.  This already shows you there's impurities present in

19   what work occurred there's impurities because why it would be

20   yellow.

21             They haven't provided an explanation the the

22   plaintiffs have not about why anytime else they are make can it

23   it's white when Marita Mueller does it it's yellow this could

24   be one explanation there are several others but you're having

25   either impurities carried through or you're not doing the

1    recipe in the correct say either way the result we know is

2    going to be mustard yellow.

3                Marita Mueller asked about that deposition to make

4    sure that her starting material this is again that plus 23

5    compound on slide 26 the question was presented.   If she

6    examined the purity of the 351-1 chemical product which is what

7    we are talking about here at any point in your experiments the

8    answer was no.   She didn't check to make sure he had the right

9    ingredients.

10               Slide 37 says that Mueller when doing the internal

11   work didn't even match up the amounts properly.   So so slide

12   37 the recipe says use 4 points 3 grams of plus three and down

13   here this is the compound that's there we don't know if it's

14   pure or not but the many amount that's use is different 4.55

15   you're supposed to use a hundred milliliters of hydrobromic

16   acid, she used 11.47, the explanation is using math to scale up

17   things because she wanted to use a little more, didn't want to

18   be so precise on measure but the fact of the matter is she

19   didn't follow the recipe.

20               Starting with the wrong materials she did the

21   wrong sequence.   We explained how the sequence was different

22   the patent says trimethyl chlorine/water do it together.   Her

23   procedure says mix first with water and then with the MCS.   So

24   it's the two steps rather than doing it in one it's the wrong

25   sequence now I know that Mr. Sitzman said cream and sugar to

1    your coffee it is only in the following way if you add cream

2    and sugar first and stir it it's lot easier to make sure the

3    sugar is dissolved and you put it in there because you can

4    check that.

5          If you put them both separately in there you sugar

6    the a bottom cream on top that's what I do every morning if

7    that's what Sitzman is saying not the same thing or it

8    shouldn't be considered the same thing.

9          It's not unfortunately chemistry that we are

10   talking about here, it's a little bit more complicated than

11   cream and sugar anyway.

12         That may explain it though because Miss Mueller

13   did these materials differently.  Slide 29 the record says

14   mustard colored solid.  That's the translation and that's our

15   picture of it because we don't have importantly your Honor we

16   do not have any of the samples that plaintiffs say they tested.

17   The batch 0 doesn't exist anymore.   The Mueller doesn't exist

18   anymore as contrasted with the defendants who had the material.

19   I don't think plaintiffs asked for it because had they asked

20   for it in the course of discovery we made the material during

21   litigation we had it available for testing have it available

22   for testing still.

23         The point of the matter is we don't have sample to

24   see what went wrong we do have our example that plaintiffs

25   could confirm if they wanted to what went right.

1              This idea about stability your Honor I just want

2      to give an explanation for why stability matters.   The form A

3      is like a spring with position A it's coiled in because that's

4      the natural position it wants to stay in somebody can't put

5      force or energy or do something to put it into another position

6      the spring that would be form B position B here.

7              But if you let go of that or just let it rest back

8      to room temperature, for example, with Tapentadol it's going to

9      go back to form A.  That's what their internal report shows and

10     that's what I am trying to show with slide 40.  I'm trying to

11     show with slide 41 to answer your Honor's questions about

12     impurities and what could be changing these forms and what you

13     get if you put something in that holds it in place these are

14     impurities like pencils in a spring came to mind that's when

15     you're going to stabilize and see from B when you otherwise

16     wouldn't.  So you have to make sure the impurities aren't

17     there.

18              Now we are getting to slide 42 as we wrap up and

19     that slide is showing the fact of the what I told your Honor

20     about in the beginning they are saying they have material that

21     was prepared according to example 25.  European patent which is

22     the same as the '737 example which is the same as example 25.

23              If you fix the stereo chemistry and they are

24     saying that there was starting material which their internal

25     material says A and then they they are saying as result of that

1   they got form A but that's what we going to show is this is

2   unclean hands issue which is is if you had form A to start with

3   but you toll the Patent Office something different,  clearly

4   they are going to have a different interpretation of what it is

5   that you invented and they are going to say all right you took

6   something over here that was different and you made it into

7   something else.   But in reality they had something that was

8   form A and they turned it into form A.

9          Next slide 43 shows that this wasn't new because

10  because on slide 44 I told your Honor I would stay in the

11  timeline where they did the tests to show Grunenthal what the

12  form was and in 1998 they did it themselves and farmed it out I

13  think FNE is the name of lab.   I think I heard where they go

14  this place and they get report of crystal structure in 1998 and

15  they get back form they don't call it form A yet but they get

16  back what I call monoclinic cell parameters.   Monoclinic we now

17  know is form A and it provides dimensions for what shape should

18  be is it rectangular or not.

19          And is that's where that exact number surprisingly

20  are the same ones that they put in the '364 patent event in

21  2005 as the dimensions for what they are claiming is brand new

22  form A  which is for example.   A is 7.11 and '364 and in this

23  98 report it says 7.110.   B in the '364 the patent 11.62 B

24  says 11.615.   I'm not reading all the numbers but the point is

25  they are the same.

1        My co-counsel explained the obviousness issue that

2    it's essentially the FDA was asking for in 1987 and slide 46 I

3    explained I I'd showed your Honor that what happened here is

4    that eat was formed out by Grunenthal to two lasts SSCI is one

5    crystallics is another one.

6        Crystallics they asked also to test it use the

7    usual procedures to test it.   And crystallics sent back a

8    report and says we tried 97 experiments we've got two forms

9    thats what we got form A and form B and they are also reporting

10   that form A is thermodynamically stable one meaning that's the

11   one that would be there at room temperature so the question

12   presented is from an obviousness points of view now and these

13   what I'm shifting to putting the test aside from an obviousness

14   points of view if there are two choices A and B and you're

15   doing routine testing is it fair to claim one of those

16   polymorphs and say that's an invention.

17       It's not part of what counts as an inventive

18   looking at slide 46 I want to make it clear that here the test

19   is not absolute predictability now Mr. Sitzman had a very nice

20   slide with all kinds of options that were there and the analogy

21   that came to my mind if I'm flipping a coin and I get heads or

22   tails, I didn't tell where in the world the coin came from.   I

23   didn't tell you the denomination of coin.   I didn't tell you

24   what I am going to use the coin for.   But I knew I was going to

25   get A and B. That's not inventive.

1          Another way to look at it using legal tests

2     instead of analogy is what would a person of ordinary skill in

3     the art do given the FDA's instruction to test something for

4     polymorphs.  And the new drug Tapentadol at the time what would

5     they do, the person of ordinary skill in the art would do a

6     screen.  Maybe they would hire a lab.

7          Crystallics is one of those labs.   They would run

8     their screens and say here's what you get form  A and form B.

9     It's no different than taking a blood test and that is not

10    patentable.

11         Under Mr. Sitzman's view showing that flow chart

12    with the different options and ping pong balls on one side

13    importantly his view is every time I see a polymorph no matter

14    what, I can patent it.  Because they would always be true that

15    you would have to test it to figure out what shape it's taking

16    is it a square, is it a rectangle, a rhombus.  You have to test

17    to main find that out that doesn't mean its inventive that

18    you've done the same thing that was done for 30,  40,  50 years

19    and you say here I have got a result that's a square because I

20    have a  new compound and somebody else does the test and says I

21    got a square too, but they get an invention on that, they get a

22    patent on that?

23         This is the problem with the timeline that I

24    started with your Honor that what Grunenthal has patented here

25    and what now Depomed is asserting a patent on two polymorphs

1      that exist they picked one of them and then I think in no else

2      can use even though they did nothing special to get it they

3      don't show anything different that form A does versus B in the

4      body it doesn't make a difference and A is actually the easier

5      one to get because you get it at room temperature as opposed to

6      having to cook it to '130 degrees Farenheit or more.  So

7      predictability is not the test obviousness is.

8                  And that's where we're going to conclude by saying

9      that because of the timeline and notwithstanding that

10     Grunenthal did what it did and notwithstanding that Janssen

11     brought these claims and these patents slide 47 is showing what

12     our expert Mr. Hoffman will explain in more detail as the

13     secondary considerations expert but summarizing these numbers

14     in the right hand column.

15                  It's cumulative losses see the lines here were

16     supposed to show how much are we getting on net basis because

17     Nucynta and Nucynta IR ER and immediate release and the answer

18     is negative numbers every year negative numbers and in 2014

19     finally they have accumulated the losses now it's over

20     $400 million in losses that they have e an accumulated.

21                  So,  when Depomed says hey we're willing to pay

22     money for that this is not a situation where Grunenthal or

23     Janssen are saying no please don't we're e making tons of money

24     on this they are saying we've lost $400 million and if you're

25     going to give us money on that sounds like a great deal it

1    doesn't mean that there's anything inventive here about it.

2         It just means these are the numbers or the

3    financial situation is the parties happen to find them also and

4    that's what the secondary considerations will say is that none

5    of these numbers even if they were positive sales weren't

6    because of the polymorph certainly weren't because of the new

7    method because the method is about one percent of the usage

8    they were because if anything the Tramadol development that

9    happened in 70s.

10        And for that reason we believe that all three

11   patents should be found invalid because they it didn't really

12   add anything to the prior art.   Thank you very much your

13   Honor.

14        THE COURT:   Thank you so much.   All right.

15   Much appreciated.   Thank you that was quite helpful,

16   everyone's opening statement to the Court.   I do appreciate

17   them.   And again I have listened very carefully so I think it

18   sets the stage for us moving forward quite nicely.

19        At this point do we intend to introduce our next

20   our first witness, rather I know it's 4:30.   It's basically how

21   you folks would like to handle this at this point.

22        MR. SITZMAN:   I think if it's okay with the court

23   we would like to at least call our first witness.

24        THE COURT:   That would fine.

25        MR. SITZMAN:   Who is fairly short.   But that

```
 1          does mean that tomorrow could be a long day.   Dr. Buschmann

 2     and Dr. Gruss are both here from Germany and they will have to

 3     testify tomorrow.

 4               THE COURT:   Do you anticipate they will both be

 5     done tomorrow?

 6               MR. SITZMAN:   That's what my hope is and I think

 7     that if the Court will indulge us and we do get through that

 8     then I think we can continue to accommodate the defendants on

 9     Friday.

10               THE COURT:   All right.   And again who do we have

11     schedule for Friday.

12               MR. SITZMAN:   Friday we have Dr. Haussler from

13     Janssen in the morning.

14               MR. CAPUANO  Dr. Weinberger for Actavis.

15               MR. SCHULER:   And then Dr. Mogil.   On behalf of

16     the entire defense group, we will call Dr. Mogil.

17               THE COURT:   Do you think you will be done with

18     all three of those on Friday?

19               MR. SCHULER:   Counsel indicated that Dr. Haussler

20     is relatively short and I am fairly confident we can get all of

21     those in.

22               THE COURT:   Then let's take a break then we will

23     start our first witness here today.   It sounds like you may be

24     able to conclude that today.

25               MR. SITZMAN:   Yes.
```

1          THE COURT:   That sounds fine.   Thank you.

2              (Whereupon a short recess was taken.)

3          THE COURT:   Let's have the plaintiff call their

4     first witness.

5          MR. SITZMAN:   Thank you, your Honor.   Jack

6     Anders.

7     J A C K  L.  A N D E R S, sworn and testifies as follows:

8          MR. SITZMAN:   Your Honor, we've got witness

9     binders for the Court.

10    DIRECT EXAMINATION BY MR. SITZMAN:

11         THE COURT:   The witness has been sworn.

12    Q.   And where do you work?

13    A.   I currently work at Depomed.

14    Q.   And in what business is Depomed engaged?

15    A.   So we are a pharmaceutical company focused on pain and

16    treatment of the central nervous system.

17    Q.   And how big a company is Depomed?

18    A.   So we are approximately 500 employees.   From a market

19    cap perspective at about 900 hundred million to a billion.

20    Q.   Okay.   And how long have you worked at Depomed?

21    A.   I've worked at Depomed approximately ten years.

22    Q.   And what is your current position at Depomed?

23    A.   Vice-president of finance.

24    Q.   And could you describe for the court your, generally

25    describe your duties as vice-president of finance?

1      A.   As part of my duties I am in charge of the FNPA finance

2      which is financing planning and analysis.  So budgeting,

3      tracking performance versus budget, doing ad hoc financial

4      analyses including financial modeling, product acquisitions,

5      company acquisitions.

6          Another part of my team is focused on commercial

7      finance.  So revenue recognition, you know, invoicing,

8      collection with regard to our product sales.  As well as part

9      of my job includes drafting pieces of ICC reports and reviewing

10     some of those respective filings.

11     Q.   Okay.  And speaking of your products and your product

12     portfolio, can you generally describe or specifically describe

13     for the Court what the Depomed current product portfolio is?

14     A.   Sure.  We currently have six products, two of which are

15     in question here.  So, Nucynta and Nucynta ER.   Our four

16     products Gralise, for post tympanic neuralgia?

17               THE COURT:  What was it?

18               THE WITNESS:   Gralise, for post tympanic --

19               THE COURT:   Could you spell it?

20               THE WITNESS:  G-r-a-l-i-s-e.

21               THE COURT:   That is for.

22               THE WITNESS:  It's PTN, which is post tempanic

23     neuropathy.  It's a nerve pain.

24               THE COURT:  Thank you.

25     Q.   I don't know if you've recited all of the products?

1      A.   No.   So we also have Cambia, C-a-m-b-i-a,  which is

2  indicated for acute migraines.   And we also have Zipsor,

3  which is indicated for mild to moderate acute pain.   And lastly

4  we have Losonda, which is indicated for pain associated with

5  late stage cancer.

6      Q.   Are these on the demonstrative up here which looks like

7  it's got a picture of Depomed, are those the labels or all or

8  the actual names of all the products that are currently in the

9  portfolio?

10      A.   That is correct.

11      Q.   Okay.

12            MR. PATEL:   Your Honor,  I don't know how many

13  demonstratives they have, but we did not receive any copies of

14  the demonstratives.

15            THE COURT:  Do you want to just take a quick look?

16  I don't know if we will cover all of them today.

17            MR. PATEL:   This is the only demonstrative.

18            MR. SITZMAN:   This is the only one.

19            THE COURT:   Okay.

20            MR. SITZMAN:   Are there any objections?

21            MR. PATEL:   No objection.

22            THE COURT:   No objection.   Good.

23            MR. SITZMAN:   Sorry about that.

24      Q.   Which of these products generates the most revenue for

25  Depomed?

1     A.   It's the Nucynta franchise which is about 60 percent of

2   our total revenues.

3     Q.   And that's Nucynta and Nucynta ER?

4     A.   Correct.

5     Q.   Now what is Tapentadol?

6     A.   Tapentadol is the active pharmaceutical ingredient in

7   both Nucynta and Nucynta ER.

8     Q.   Okay.   And the ER on Nucynta ER what does that stand

9   for?

10    A.   Extended release.

11    Q.   And the other one that doesn't say anything is the

12  immediate release?

13    A.   Correct.

14    Q.   Now,  did Depomed develop the Nucynta franchise

15  internally?

16    A.   We did not.

17    Q.   Did Depomed purchase the Nucynta franchise from

18  somebody?

19    A.   Yes,  we did.

20    Q.   And who was that?

21    A.   We purchased the rights to the Nucynta franchise from

22  Janssen pharmaceutical.

23    Q.   And when was that?

24    A.   We announced the acquisition in January of 2015 but we

25  completed the acquisition in April of 2015.

1      Q.   And were you involved in that acquisition process?

2      A.   Yes, I was.

3      Q.   And can you tell us just a little bit about your

4    involvement or role in that acquisition?

5      A.   Sure.   My team did the financial modeling with respect

6    to the acquisition. My team was also involved in, you know,

7    finance, due diligence, looking at the data room, looking at

8    their, you know, internal P & Ls,some of their contracts for

9    certain financial obligations.

10     Q.   When did you first become involved in the efforts to

11   acquire the Nucynta franchise?

12     A.   I believe it was approximately December 13th, I'm

13   sorry, December 2013.

14     Q.   And can you recall how you first became involved in

15   that process?

16     A.   Our senior vice-president of business develop Fad

17   Vargas (ph) approached individuals with, you know, in the team

18   at Depomed of potentially acquiring Nucynta from Janssen.

19     Q.   And did Depomed make a bid to Janssen for the

20   acquisition of the Nucynta franchise?

21     A.   We did eventually make a bid.   At the time Janssen was

22   actually looking for a co-promote partner and not actually a

23   company to acquire the products.   But, we actually wanted the

24   products for ourselves.   We did not want to go through the

25   co-promotion route.   And if you'd like me to explain

1          co-promotion --

2                      THE COURT:   Yes, go ahead.

3                      THE WITNESS:   So, co-promotion would be that

4     Janssen would retain the license and the rights to the product.

5     We at Depomed having a sales force, we would promote the

6     product on their behalf to physicians and detail the product

7     and we would get a cut of the profits.

8                      And so that was, you know, we knew Janssen was

9     looking for a co-promote partner.   We actually wanted to

10    acquire the products for ourselves because we felt that we

11    could do a better job with the products.

12         Q.   Okay.   And at that time --  well, strike that.

13         Why was Depomed interested in the Nucynta franchise?

14         A.   We really liked the product itself.   And so that was

15    obviously part of the interest.   It was a, you know, a novel

16    compound.   It had certain characteristics that we liked.   And

17    also we are, you know, Depomed is in the pain CNS business.   We

18    had, we thought there would be certain synergies, you know,

19    with Depomed acquiring the product which included our expertise

20    in pain and our actual you know sales force that has been

21    focused on pain and CNS.

22         So, you know, we were at that time our sales force was

23    calling on, calling on and visiting physicians who also

24    prescribe Nucynta and Nucynta ER.

25         Q.   At the time that Janssen was looking for that

1      co-promote, did Depomed make a bid for the acquisition of the

2      Nucynta franchise?

3          A.   So we did put in an unsolicited bid to acquire the

4      franchise.

5          Q.   And how much was that?

6          A.   The first number that I believe we sent over was

7      approximately 400 to $500 million.

8          Q.   And you said million?

9          A.   Correct.

10         Q.   At your deposition did you say something different?

11         A.   I did.   I made a mistake.   I said 400 to 500,000.

12     The correct number was 400 to 500 million.  And you know for a

13     product that was selling 150 to 160 million annually at the

14     time 400 to 500,000 doesn't make any sense.  So I did, I

15     misspoke during the deposition which we hopefully corrected

16     with the errata that we submitted.

17         Q.   At the time of the bid, the unsolicited bid, did you

18     have access to any confidential information belonging to

19     Janssen?

20         A.   Not that I'm aware of.

21         Q.   Other than the Nucynta acquisition had you already been

22     involved in other bids by Depomed to acquire other drugs?

23         A.   Yes.

24         Q.   How did Janssen respond to Depomed's unsolicited bid?

25         A.   They eventually decided to go through a formal process

1       to find additional bidders to sell the rights to the entire

2       franchise.  So they shifted it from the co-promote model to an

3       actual bidding process on the sale of the rights to those

4       products?

5           Q.  And I assume Depomed then participated in that bidding

6       process.

7           A.  Yes, we did.

8           Q.  Okay.  And do you know how many other companies

9       participated in that bidding process?

10          A.  I don't know the totality of other companies but

11      Janssen did notify us that there were at least four other

12      bidders.

13          Q.  And at that time, at that point in time, did you get

14      access to confidential information belonging to Janssen?

15          A.  Eventually we had had access to the diligence room that

16      they set up.

17          Q.  And you had meetings with Janssen set?

18          A.  Yes,  we had, we did have a face-to-face meeting with

19      them in September of 2014, as well as phone calls.

20          Q.  Okay.  Let's look at one of those.  Can I have PTX

21      829?

22                  THE COURT:  Just before we go through the

23      exhibits, is there any issue with these exhibits?  They have

24      seen these exhibits?  And you have exchanged the list and these

25      are the list?

1              MR. SITZMAN:   Correct, these were the list.

2              MR. PATEL:   Correct.

3              THE COURT:   No issues, correct?

4              MR. SITZMAN:   Correct.

5              MR. PATEL:   Correct.

6              THE COURT:   Good.

7       Q.   Do you recognize -- Mr. Anders, do you recognize 829?

8       A.   Yes.

9       Q.   What is this?

10      A.   So this is the presentation that Janssen gave to us in

11   person.  So we went out to New Jersey to visit them with regard

12   to acquiring Nucynta.   We brought a large team out there.

13   They had a large team out there to present the Nucynta

14   products.   And so they gave us this presentation live in person

15   and then they eventually gave us a soft copy.

16      Q.   They actually then gave you a soft copy of the slides

17   that we are seeing here?

18      A.   Yes.

19      Q.   Let me just look at a couple of pages here.   If we can

20   pull up page Bates stamped Jan Nucynta 1634430.  So, it's 4430

21   in the bottom right corner.

22      A.   Okay.

23      Q.   Executive summary.   And the second bullet point is

24   Nucynta is ideally positioned with a broad, robust molecule

25   portfolio.

1        Do you see that?

2        A.   Yes.

3        Q.   Under that bullet, first sub bullet reads both

4   immediate and extended release products.

5        Do you see that?

6        A.   Yes.

7        Q.   Was the existence of both IR and ER products and

8   versions of Nucynta a factor that Depomed considered as part of

9   the due diligence process?

10       A.   Yes.  We were aware that Nucynta IR competes in a short

11  acting opioid market.  And we were, you know, and Nucynta ER

12  was competing in a long acting opioid market.  And so you know

13  the presence of both of these was a factor that played into our

14  decision.

15       Q.   Okay.  And then the second sub bullet point, sorry,

16  maybe all the way down at the end it says composition of matter

17  patent through 2022.

18       Do you see that?

19       A.   Yes.

20       Q.   And did you understand that, aside from this

21  composition of matter patent, that there were other patents as

22  well?

23       A.   Yes.  I mean it is later in this presentation that

24  there were patents that go out to 2025 and 2028.

25       Q.   Was the existence of these patents and the patent

1    protection for Nucynta something that Depomed considered an

2    important part of the bidding process?

3         A.   Yes.

4         Q.   And why is that?

5         A.   So as a company we were prepared to make a significant

6    investment into acquiring this franchise and you know including

7    a very large acquisition fee.   We needed to really make sure

8    that there were lengthy patents in order for us to essentially

9    have the future revenue stream to you know essentially make

10   back the investment that we would be putting forth to acquire

11   the products, as well as any interest that we would incur in

12   order to make the actual upfront payment.   And the patents were

13   a key piece of those future revenues.

14        Q.   Now, under the third bullet point there it says that it

15   is the only CII or CIII opioid with a dual MOA that works

16   through two pain pathways.

17             Do you see that?

18        A.   Yes.

19        Q.   Do you have an understanding of what that means or what

20   that refers to?

21        A.   So, the dual MOA being the dual mechanism of action was

22   something that we were aware of.   We understood that as it

23   says there it works through two pain pathways.   The first pain

24   pathway is typical with an opioid.   And I'm not a scientist but

25   as we understood it from a deal perspective, you know, the

1    first,  the first pain pathway being the MU opioid receptor

2    agonist, something you know opioids typically work on the

3    opioid receptors.  We thought you know that's pretty common

4    with other opioids.

5          What was different about Nucynta is that it worked on

6    you know through a second pathway which you know it worked as

7    neuro epinephrine reuptake inhibitor.  But which was more, as

8    our internal medical team focused on, was more specific towards

9    treating neuropathic pain.

10         So, it had differentiating features comparative to some

11   of its competitors on the market.  And so we thought that this

12   was a very, very novel distinction in order for us to take the

13   product and really think about you know as we tell the story of

14   Nucynta and try to grow the franchise, that this is a piece of

15   that story.

16       Q.   Let's look at just a few more pages.

17            Can I have page Number 4445 in the bottom right.  The

18   title of this slide is Tapentadol has better G.I. tolerability

19   than Oxycodone in all studies.

20            Do you see that?

21       A.   Yes.

22       Q.   Was the tolerability of Tapentadol something that

23   Depomed considered as part of the due diligence process?

24       A.   Yes, it was.

25       Q.   And was that an important consideration as part of the

1      bidding process for Depomed?

2          A.   It was an important consideration.  Opioids do have a

3      lot of side effects.   We felt that having lower side effects

4      than some of its competitors was part of the differentiation of

5      the product.  Particularly that in G.I. disorders, opioids, you

6      know, do cause a lot of constipation.

7               I mean there are drugs out there for OIC, opioid

8      induced constipation.  And so we thought that less side effects

9      you know made more, added to the compelling argument on why a

10     physician should be prescribing Nucynta versus some of its

11     competitors and so having less side effects, having essentially

12     a very similar pain profile in terms of efficacy was an

13     advantage for the product relative to some of its competitors.

14         Q.   All right.  Let's look a little bit further ahead.

15     Can I have Page 4449?

16              The title of this slide says Tapentadol has lower rates

17     of abuse versus category.

18              Do you see that?

19         A.   Yes.

20         Q.   Was the abuse rate of Tapentadol something that Depomed

21     considered during the due diligence process of the Nucynta

22     acquisition?

23         A.   Yes, it was.

24         Q.   And why was the abuse rate of Tapentadol an important

25     consideration?

1        A.   So, we were aware that you know in this category

2    opioids have high rates of abuse, addiction and diversion as

3    well.   You know we felt that given the low abuse rates, it is

4    part of the whole you know differentiation story in terms of

5    mechanism of action, lower side effects, lower abuse potential.

6             So, it really just makes this, you know, this compound

7    that more attractive that it was, it had differentiating

8    features that would allow it to compete in a very competitive

9    market.

10        Q.   And I apologize but I'm going to make you go back to

11   Page 4434.   And the title of this slide is Pain market is

12   large, fragmented and evolving.

13            Do you see that?

14        A.   Yes.

15        Q.   And do you remember this slide from the presentation?

16        A.   Yes,  yes.

17        Q.   Where does, in this slide,  where does the Nucynta IR

18   product fall?

19        A.   So the Nucynta IR product falls under the middle one

20   Class II SAO category.

21        Q.   The third one from the left, CII SAO?

22        A.   Yes, CII being Class 2.

23        Q.   SAO?

24        A.   Short acting opioid.

25        Q.   The ER product falls where?

1      A.   The one to the right of it CII LAO.

2      Q.   And the CII refers to the controlled II substance?

3      A.   Yep.

4      Q.   And am I reading that correctly in terms of what's

5   being said here, that all of these are almost a hundred percent

6   genericized except for the CII LAO market?

7      A.   Correct.  It says the CII LAO market is 66 percent

8   generic.

9      Q.   Is that consistent with what you believe Depomed

10  believed the market looked like at the time of its acquisition

11  or the bid?

12     A.   Yes, it's consistent.

13     Q.   Let me have you look at 4470.  And this is entitled

14  Nucynta commercial model has evolved to a specialty model.

15          Do you see that?

16     A.   Yes.

17     Q.   I just want to ask you a little bit about that fourth

18  area on the bottom there.  It says business model.  Can you

19  tell me what's being represented there or explained?

20     A.   So, this is the, as Janssen explained to us, the

21  quantity of reps that they had promoting Nucynta IR and ER

22  overtime and how that changed from 2009 to 2014.

23     Q.   If I'm reading that correctly, it looks like that at

24  one point in time they had in excess of a thousand reps and

25  then they went to 89?

1    A.   That's correct.

2    Q.   And did they have any explanation as to why they did

3    that?

4    A.   I don't know specifically their reasons behind that.

5    They did, you know, they did decide to go to this dedicated

6    specialty rep where they had a contract sales organization.  So

7    they went away from actually having their own Janssen employed

8    reps to an outsource model.  And those, so these were contract

9    sales reps when they switched over to the dedicated specialty

10   89 reps.

11   Q.   Did that effect Depomed's decision to move forward or

12   effect in any way the bid that Depomed ultimately made for the

13   franchise?

14   A.   It did.   We saw this as an opportunity.   You know we

15   felt that they were not resourcing this and giving it the

16   attention that it probably needed.

17          And so we thought that this would be a product with our

18   existing sales force structure that we could take the message

19   of Nucynta and characteristics of Nucynta and really continue

20   to educate docs and target more physicians and really drive

21   growth.

22          So we saw this as really interesting that they really

23   slimmed the sales force down in 2013 and 2014.  And so it

24   really reinforced our ability that we could really grow this

25   product from where it was in 2013 and 2014.

1      Q.   Let me ask you about one more slide in this here, it's

2   Page 4471.  It's just the next page up.

3           Do you remember this part of the presentation?

4      A.   Yes.

5      Q.   And if I'm reading this correctly it looks like there's

6   56 percent growth in the Nucynta sales?

7      A.   Sure.  It's 56 CAGR growth which is the cumulative

8   annual growth rate.  So it's increasing 56 percent each year

9   starting from 2009.

10      Q.   It looks like there's 188 million?

11      A.   188 million in net sales.

12      Q.   In net sales.

13           Were you here during Alkem's opening statement where

14   Mr. Aly showed some information, some financial information

15   from Janssen?

16      A.   Yes,  I was.

17      Q.   And do you recall him showing that it was a

18   $400 million loss to Janssen?

19      A.   Yes.

20      Q.   Did you understand that that was, at the time that

21   Depomed was looking at this product, that that was a

22   $400 million loss to Janssen?

23      A.   So,  I don't know specifically.  I didn't add that to

24   get to the 400.  But, there is information in this management

25   presentation that does show their internal P & L where they

 1      were at losses in the first three to four years.

 2              It's typical in a commercial launch.  You don't, as

 3      you see here, you don't have the revenues to generate to offset

 4      of the expenses.  And typically with some of our products we

 5      haven't been profitable on launch and it took awhile, it took a

 6      few years in order to get profitable.

 7              But, we also you know, I can't really speak to the

 8      expense structure that Janssen had in place and how they

 9      allocated those expenses.  The way we viewed this product, and

10      you know we obviously knew it was at a loss in those first few

11      years, and you know we take that with a grain of salt.

12              But, in our hands it's, you know, it's a different

13      story.  Depomed has a different cost structure.  This is a

14      product that at that time was doing $188 million in 2013.  It

15      made a lot of financial sense for us to take on this product.

16      Q.   Let's talk about the actual acquisition.

17              Can I have Exhibit 1563?  And let me know when you're

18      there.

19      A.   Got it.

20      Q.   Do you recognize 1563?

21      A.   Yes, this is our annual report on form 10K for the year

22      ended December 31, 2004 that we filed with the SEC.

23      Q.   You said 2004?

24      A.   I'm sorry, 2014.

25      Q.   It's okay.  Sometimes numbers don't come out right.

1            Were you involved in the preparation of this document?

2       A.   Yes, I do draft certain portions of the document and I

3   did review the entire document.

4       Q.   Okay.  Let's look briefly at page DM.0020.

5            How much did Depomed ultimately bid for the Nucynta

6   franchise?

7       A.   So the final and winning bid was at 1.05 billion with a

8   B.

9       Q.   With a B.  Do you know what the other bids were for

10  Nucynta?

11      A.   I do not know the other bids.

12      Q.   Where did Depomed get the $1.05 billion that it needed

13  for the Nucynta acquisition?

14      A.   We didn't have it and we ended up borrowing 920 million

15  in order to do the acquisition.  And we funded the remaining

16  130 million with our existing cash.

17      Q.   If you look forward in the document I think it's

18  Page 118, there's a note 8 in the disclosure.   It's labeled

19  debt.  Do you see that?

20      A.   Yes.

21      Q.   And what's the subject matter there that's being

22  reported?

23      A.   So this is the, so we took data out in two large

24  tranches.  This is the first tranches debt which is convertible

25  debt.  So it converts into our actual shares of Depomed common

1  stock.   But,  with this we borrowed 345 million in convertible

2  debt.

3       Q.   Let's jump ahead.  Let's look at Exhibit 1568.

4            Do you see that document?

5       A.   Yes.

6       Q.   Can you tell us what that is?

7       A.   So this is our quarterly report on form 10Q that we

8  filed with the SEC and it relates to the period ending

9  September 30, 2015.

10      Q.   And again this is a document that you helped to prepare

11 and file?

12      A.   Yes.

13      Q.   Okay.   Let's pull up Page 406, DM 00406.  And there

14 I'd like to look at note nine that also says debt.

15      A.   Okay.

16      Q.   And what's the subject matter there of this particular

17 debt?

18      A.   So this is the second tranche that I referred to.  So

19 this is 575 million in senior notes that is not convertible.

20      Q.   Is Depomed paying interest on this loan?

21      A.   Yes,  we are.

22      Q.   And what is the interest rate that Depomed's paying?

23      A.   It's pretty high.  It's a floating interest rate.  But

24 as we sit here today it's 10.75 percent interest.

25      Q.   Is Depomed also required to make principle payments on

1       that loan?

2           A.   Yes.  So starting on the third anniversary we start to

3       make annual principle payments or we are required to make

4       principle annual payments.

5           Q.   And I think there may be a chart on the following page,

6       Page 407.

7               Does that set forth some of the principle payment

8       obligations?

9           A.   Correct.

10          Q.   Is this loan secured or unsecured?

11          A.   It's secured by all of our assets.

12          Q.   All of Depomed's assets?

13          A.   Correct.

14          Q.   What happens if Depomed can't make its loan payments?

15          A.   There's a lot of possibilities that could happen.  The

16      holders of the debt could seize the assets.  They could make

17      us liquidate the respective assets.  So it could be us having

18      to sell some of our existing products.  And so,  you know they

19      you know they would have control of our assets and could

20      dictate what we do with them.

21          Q.   Let me have you turn to Page 437 in the same document.

22      There's a section called risk factors?

23          A.   I'm there.

24          Q.   You're there.  Okay.

25              Did you help prepare portions of this disclosure here?

1        A.   This is an area that I reviewed.

2        Q.   And at the top of Page 438 it discusses generic

3    manufacturers and litigation?

4        A.   Yes.

5        Q.   Okay.   And what's the risk that's being disclosed

6    there?

7        A.   So, the risk is essentially that, as I mentioned, if

8    generic manufacturers use litigation in regulatory means to

9    obtain approval for generic versions of our products, our

10   business will suffer.

11       Q.   And based on your analysis and work, would Depomed be

12   able to make its payments on the $920 million in loans if

13   generic versions of Nucynta were to enter the market this year?

14            MR. PATEL:   Objection, your Honor.   I just want

15   to object to this line of questioning on relevance grounds.

16            THE COURT:   Well, you know what, it is a bench

17   trial and I am obviously dealing with all of the issues here

18   since we do not have a jury.   So I'm going to let counsel

19   continue.

20            And obviously I'm going to weigh it myself and

21   determine how much to value it.   All right.   Thank you.

22            MR. SITZMAN:   Thank you, your Honor.

23       Q.   You can go ahead.

24       A.   As I mentioned, Nucynta, the Nucynta franchise

25   represents 60 percent of our revenues.   We you know internally

1     we always look at and we run our own case studies and analyses
2     in terms of what happens when a generic entrant comes onto the
3     market.
4          What we have seen is you know within a year,
5     prescriptions of the brand product typically you know drop 75
6     to 95 percent.  So this being a product that's 60 percent of
7     our revenues, you know, our expectations would be that we would
8     lose a lot of prescription demand and lose a lot of associated
9     revenues.  We just, we wouldn't have the cash flows to make
10    those respective debt principle payments.
11         Q.   The ones that are secured by all the assets?
12         A.   Correct.  And as well as the convertible debt, which is
13    it is due in seven years.
14         Q.   Okay.  Now since Depomed acquired the Nucynta
15    franchise, have any companies expressed an interest in
16    obtaining Depomed or Depomed's rights to Nucynta?
17         A.   So, we did have an unsolicited proposal from Horizon
18    Pharma to acquire the company.
19         Q.   And approximately when did that come relative to the
20    Nucynta transaction?
21         A.   So we closed the Nucynta acquisition in April of 2015.
22    Their CEO actually reached out to our CEO prior to then.   Our
23    CEO said wait, we're in the middle of closing the transaction.
24    You know, talk to us afterwards.
25         They immediately made an offer in May of 2015 and we

1    rejected that offer.  We eventually, you know, we launched the

2    product with our own you know revamped commercial team in June

3    of 2015.  And then I believe it's in July of 2015 they made the

4    acquisition attempt public and it turned into a hostile bid.

5        Q.   Horizon, did you subsequently learn that Horizon was

6    one of the bidders for the Nucynta franchise from Janssen?

7        A.   Yes, we were aware they were one of the bidders.

8        Q.   And obviously they were not the successful bidder?

9        A.   Correct.

10       Q.   And now they were making a hostile takeover for

11   Depomed?

12       A.   Yes.

13       Q.   Ultimately did those efforts succeed?

14       A.   No, they withdrew their bid in November of 2015.

15       Q.   All right.  Let's just turn briefly to Nucynta's

16   performance at Depomed.

17            Let me have you look at exhibit PTX 1559.

18       A.   Okay.

19       Q.   And do you recognize this document?

20       A.   Yes, this is our third quarter 2015 earnings release.

21       Q.   Okay.  It's dated November 9, 2015?

22       A.   Yes.

23       Q.   Were you involved in putting together the information

24   that's contained in this press release?

25       A.   Yes, I helped draft this.   My team provides all the

1   numbers in this document.

2        Q.   In the third quarter of 2015,  how did Depomed's net

3   sales for the Nucynta franchise products compare to those

4   realized by Janssen?

5        A.   So, if you look down on that second bullet, so

6   Nucynta's net sales for the third quarter of 2015 were 65

7   million.   So the corresponding period a year ago Janssen

8   reported in the low 40 million range.

9        So this is an increase of about 50 percent over what

10  Janssen recorded as net sales for the Nucynta franchise in the

11  same quarter in 2014.

12       Q.   And I just want to make sure I got the number right,

13  50 percent, five zero?

14       A.   Over 50.

15       Q.   Let me have you look at Exhibit 1566 and ask if you

16  have seen this document before?

17       A.   Yes.  This is our, the investor presentation that our

18  CEO and CFO typically give to investors and analysts.  And this

19  was presented in January of 2016.

20       Q.   Were you involved in putting together the information

21  that's contained in this presentation?

22       A.   Yes, I do review it and I do provide the numbers within

23  this document.

24       Q.   Let's look at page DN 356 titled Promotion progress:

25  Accelerating demand RX growth of 20.5 percent over prior year.

 1        Do you see that?

 2        A.   Yes.

 3        Q.   How well has Nucynta ER performed in terms of market

 4   share since Depomed acquired the Nucynta franchise?

 5        A.   So the market, since we acquired the franchise market

 6   shares are up about 19 percent.  What this graph shows is

 7   really the, you know, the year over year prescription growth.

 8            I think what's important to point out is you know

 9   Nucynta ER was growing when we acquired it.  So if you look at

10   the May 2015 time frame on the left, it was growing in the

11   single digits.

12            In June of 2015 is what we called the Depomed launch.

13   So that's what -- the Depomed launch is us going out hiring

14   additional sales reps, training them on the product, training

15   our existing sales force on the product.  We came out with a

16   new campaign for the franchise and we started you know

17   promoting, promoting to physicians ourselves as Depomed.  And

18   so that occurred in June 2015.

19            What you do see is it took a little bit of time but you

20   do start to see we started to accelerate the prescription

21   growth.  So it went from single digit year over year growth

22   prior to our launch to, you know, approximately 20 percent

23   growth over the prior year in November,  December.

24        Q.   Okay.   And this is prescription growth, right?  I

25   misspoke, I said market share or something like that.

```
 1        A.   Yes.

 2        Q.   But let's look at market share.

 3        A.   Sure.

 4        Q.   I think that may be on slide 358.

 5        A.   Okay.

 6        Q.   Did I get this one right now, market share?

 7        A.   Yeah.

 8        Q.   So how has the Nucynta ER performed in terms of market

 9   share?

10        A.   We've grown market share, we've grown market share by

11   19 percent in approximately seven months.

12        Q.   Did Depomed lower the price of Nucynta ER to make up

13   this gain in market size?

14        A.   We did not lower the price.   We did increase the price

15   on acquisition in April of 2015.

16        Q.   So you've made this growth despite the fact that the

17   price has increased?

18        A.   Correct.

19        Q.   Actually, let's just turn ahead, or back, sorry about

20   that, Page 348.

21             Does Depomed expect the revenue from Nucynta to grow

22   even more?

23        A.   Yes, we do.

24        Q.   And it looks like on the front line it says billion

25   dollar blockbuster opportunity?
```

1      A.   Yes.

2      Q.   Okay.  Does the length of time that Nucynta enjoys

3    patent protection bear upon this expectation?

4      A.   It does.  You know it will take sometime to get to a

5    billion dollars in net sales.  But, with the added patent, it's

6    something that our management team thinks we can get to.

7              MR. SCHULER:  Your Honor, I just want to make

8    sure that if the plaintiffs go any further, that Roxane's

9    position is they are awfully close to waiving the

10   attorney/client privilege.

11             MR. SITZMAN:  I don't see that but that was my

12   last question.

13             THE COURT:  I don't see it either at this point.

14             MR. SITZMAN:  Thank you.  I have no further

15   questions at this time.

16             THE COURT:  That makes that easy.  All right.

17   Who would like to do cross?

18             MR. PATEL:  I will be doing the cross.

19             THE COURT:  Will you be doing the entirety of the

20   cross or is everyone going to do part?

21             MR. PATEL:  We will see.  I will probably be

22   handling most of it but other defendants may have other

23   questions.

24             THE COURT:  Go right ahead.

25             MR. PATEL:  I think we have some binders too.

```
 1              THE COURT:   Hand them up.

 2   CROSS EXAMINATION BY MR. PATEL:

 3      Q.  Good evening, Mr. Anders.  I guess it's late enough to

 4   be evening.

 5      A.  Good evening.

 6      Q.  Mr. Anders,  earlier you were discussing the sales of

 7   Nucynta with Mr. Sitzman.   Do you recall that?

 8      A.  Yes.

 9      Q.  And the sales in particular at Depomed?

10      A.  Yes.

11      Q.  Now one of the things that Mr. Sitzman mentioned is

12   that Depomed instituted a price increase,  correct?

13      A.  Correct.

14      Q.  And would that price increase -- that price increase

15   would also increase the revenue that Depomed was obtaining for

16   Nucynta, right?

17      A.  That's correct.  We do retain some of that price

18   increase.  We do have to, there's certain governmental programs

19   where we don't get any benefit from the price increase and

20   certain managed care contracts out there where we don't get the

21   benefit.  But, largely we do in totality we do get part of the

22   price increase.

23      Q.  Okay.  And let's talk about the price increases that

24   Depomed instituted.

25              Is it correct that Depomed immediately increased the
```

1  price of Nucynta, upon acquisition, by 44 percent?

2    A. That is correct.

3    Q. And was that at the time of acquisition in April 2015

4  or the time of this joint launch in June 2015?

5    A. So, it was immediately when we acquired the product.

6    Q. So April 2015?

7    A. That's correct.

8    Q. Okay. And isn't it true -- and Nucynta comes in a

9  variety of doses, right?

10    A. Yes.

11    Q. And Mr. Sitzman, and I believe you testified about the

12  immediate release dose and the extended release dose, extended

13  release formulation, right?

14    A. Correct.

15    Q. Is it correct that Depomed increased the price of one

16  of the ER doses shortly after acquisition as well?

17    A. That's correct. So we did have the same price for the

18  200-milligram and the 250-milligram Nucynta ER products. So,

19  as the management team we did, they had the same price and in

20  June of 2015 we did increase the price of the Nucynta

21  250-milligram by 25 percent to make it a little more

22  promotional to the actual milligrams.

23    Q. So, that was increased by 25 percent.

24    And in December 2015 is it correct that Depomed added

25  another nine percent increase over the entire Nucynta

1    franchise?

2        A.   That's correct.

3        Q.   So, if we're just doing the math, that's about a

4    53 percent, over 50 percent increase on the Nucynta franchise

5    except for the 250-milligram dose?

6        A.   Yes.

7        Q.   And that's in the less than eight months that Depomed

8    was marketing the product?

9        A.   That's correct.

10       Q.   And if you're looking at the 250 milligram dose, we're

11   talking about almost an 80 percent increase in price?

12       A.   I think that's a fair assessment.

13       Q.   And so when you were discussing with Mr. Sitzman

14   earlier about the revenue growth that Depomed experienced, you

15   testified that you experienced about a 50 percent growth in the

16   third quarter compared to what Janssen was making, right?

17       A.   That's correct.

18       Q.   You would agree that these price increases that we just

19   talked about contributed to those increased sales numbers,

20   right?

21       A.   They did have an effect.   But, I do think I was

22   referring to Q3 net sales.   And I think what you just mentioned

23   that you were referring to is the December 2015 price increase.

24   So, that was done after Q3 of 2015 and those net sales numbers.

25            So, you know, the characterization that we increased

1       the price by over 50 percent as it relates to the testimony

2       then I mentioned in terms of the over 50 percent net sales

3       increases is incorrect.  So it does include the initial

4       44 percent price increase but it does not include that.

5           Q.   The subsequent nine percent?

6           A.   Yes.

7           Q.   So we're still at 44 percent increase still.  You would

8       agree it had a significant impact on the increased --

9           A.   It did.  To put it in perspective, we launched the

10      product in June and it takes time to, you know, get physicians

11      to write the product.   So our Q3 you know net sales isn't --

12      you know, we did increase Nucynta ER prescriptions and we

13      started to accelerate the growth.   But, we started to really

14      see the effects more so in Q4 versus Q3.

15          Q.   Okay.  And we'll get to those sales numbers.  But,

16      sticking with price increases, isn't it true that there are

17      more price increases planned for the future?

18          A.   So, in our financial models consistent with you know

19      the industry, we do have modeled in our long term forecast once

20      a year price increases in the high single digits.

21          Q.   About nine percent every year?

22          A.   Yes.

23          Q.   It's year over year?

24          A.    Every year one.

25          Q.   And isn't it true that as Depomed gets closer to

1    generic competition, those price increases will be even more

2    significant?

3    A.   In our model, that's correct.

4    Q.   Approximately 20 to 30 percent, right?

5    A.   But you know there's a lot of things that could happen

6    between now and then that would make us do things differently.

7    Q.   Exactly. Let me ask you about, you said that you've

8    done things differently.  One of the things is increase

9    marketing,  right?

10    A.   Yes.

11    Q.   And isn't it correct that Depomed increased its sales

12    force by over three times what was at Janssen?

13    A.   So yeah, if you look at the specialty sales force that

14    was put up on the screen earlier, that was, you know,

15    approximately 89 sales reps were currently out there with 275

16    sales reps promoting the product.

17    Q.   The increased sales and marketing certainly had an

18    impact on the increased revenue that Depomed experienced,

19    right?

20    A.   You need to tell the story.   So, really you know we

21    felt there was an opportunity to increase you know the

22    promotional efforts, including sales reps.   But,  you know

23    that was a portion of it.  But, you know, the key is getting

24    the message out and for us was getting the message of dual

25    mechanism of action, the lower side effects and I think it's

1    telling physicians about the product.  And increased sales reps

2    kind of helps us educate physicians about the product in that

3    manner.

4        Q.  Earlier you were talking about some of the benefits

5    that you believed that Nucynta has.  You called them novel.

6    You said that there was less side effects.

7            Sir, you're not a medical expert, right?

8        A.  That's correct.

9        Q.  Those are just statements that you saw in the Janssen

10   presentation that you were testifying about?

11       A.  So they were in the management presentation that

12   Janssen prepared for us.   You know I've had conversations with

13   our scientific folks that corroborate what was in those

14   respective presentations.   And so --

15       Q.  But you're not an expert?

16       A.  I'm not an expert, absolutely not.

17       Q.  Right.  Correct?

18       A.  Correct.

19       Q.  Now, isn't it true that Depomed's CEO attributed those

20   increased sales to the efforts of its sales force?

21       A.  I don't know that.  Can you --

22       Q.  Sure.  If we can turn to, I believe it was the

23   earnings, third quarter earnings report, exhibit PTX 1559.  If

24   you look at -- and Mr. Sitzman was asking you about this.  And

25   the revenue growth and the last, there's a quote from Jim

1    Schoeneck the president and CEO.  And right at the end of the

2    sentence there he says the increased revenue is reflecting the

3    outstanding work of our sales force across the entire product

4    line.

5         Does that refresh your recollection?

6    A.   Yeah, but, that doesn't specifically say that it's

7    because we increased the sales force.

8    Q.   Let's talk about what else happened at Depomed.

9         There were no additional indications that came out once

10   Depomed acquired the product, right?

11   A.   You're correct.

12   Q.   There were no new patents that came out after Depomed

13   acquired the patent, right?

14   A.   Correct.

15   Q.   And you testified that it was Depomed's promotional

16   efforts that led to the increased sales, right?

17   A.   Yes.  I could be specific in this sense.  It's us,

18   it's our sales reps getting the message out of the benefits of

19   the product.  And so part of our campaign, part of the

20   education of our sales reps was for them to really hone in on

21   the dual mechanism of action.

22        And so it's part of the educational efforts that our

23   sales reps went out --

24   Q.   Isn't it that Janssen was also marketing for dual

25   mechanism action?  You just increased the size of your sales

1    force, right.

2        A.   I don't specifically know specifically what Janssen,

3    what their marketing campaign was.

4        Q.   It was something that attracted you to this product,

5    right?

6        A.   Not their marketing campaign.

7        Q.   Not the marketing campaign.  But, the dual mechanism of

8    action is something that attracted you to this product, right?

9    That was something that Janssen had told Depomed about and was

10   marketing it through its sales force as well?

11       A.   I can't speak to how effective they were in getting

12   that message across.  But, we made that a priority point of our

13   marketing materials.

14       Q.   You say it was better in your hands, meaning you were

15   able to execute better on promotion and marketing compared to

16   Janssen.

17            Do you agree?

18       A.   Can you repeat that question again?

19       Q.   That you said that the product was better in your

20   hands, which means that you believed that Depomed was better at

21   promoting and marketing the product?

22       A.   Yeah.  We felt we could do a better job.

23       Q.   Again, there were no new indications, no new patents.

24   It's just through promotion and marketing?

25       A.   If you look at our new campaign, so we came out with

1    the new campaign and new promotional materials to educate docs.

2    It was really heavy on the dual mechanism of action that, you

3    know, this addresses two types of pain, nociceptive pain and

4    neuropathic pain.  And there's one product that can address it.

5    And so we emphasized that that was a key driver.

6         And I can't speak to exactly how Janssen's sales reps

7    were promoting the product, but, that was our strategy and it

8    seems to have grown prescriptions.

9         Q.   And that's a sales strategy,  right?

10        A.   It's a sales strategy.

11        Q.   Let's talk about the forecast.  You talked about how

12   Depomed has high hopes for the Nucynta franchise, right?

13        A.   That's correct.

14        Q.   And now you said that you participated in the due

15   diligence process.

16        Is that right?

17        A.   Yes.

18        Q.   And during that due diligence process you knew that

19   Janssen had a cumulative loss, right?

20        A.   I did receive, you know, their internal P & Ls.  But,

21   as I mentioned before, it's typical you know in the commercial

22   launch you typically lose money in your first few years.  It's

23   something that we have experienced with our products.  It's

24   something that we've experienced when we've acquired products.

25        Q.   I heard you about the losing money during the first few

1    years.  But, isn't it true that Janssen had a $400 million

2    cumulative loss?

3        A.   I don't have the numbers in front of me and it may have

4    been.

5        Q.   You saw the management presentation, right?

6        A.   Yes.  It could have added to 400, I just --

7        Q.   Okay.  Now, in terms of forecasts, did you ask during

8    the due diligence process whether Janssen met its forecasts?

9        A.   No.

10       Q.   So you weren't aware that Janssen fell well short of

11   its expectations or forecasts?

12       A.   We were not aware of that.

13       Q.   And isn't it true Depomed is a much smaller company

14   than Janssen?

15       A.   That's correct.

16       Q.   You would agree that Janssen is a sophisticated pain

17   company?

18       A.   I don't know a lot about Janssen and whether they're a

19   sophisticated --

20       Q.   You were deposed a few weeks ago and I can read your

21   testimony if you want.

22            Do you recall testifying that you believe Janssen was a

23   top five pain company?

24       A.   Sure.  But, this is different from a sophisticated pain

25   company.

1      Q.   And Janssen is one of the largest pharma companies in

2      the world?

3      A.   Right.   I said it's different from sophisticated.

4      Q.   Now, Depomed's forecast, they are based on assumptions,

5      right?   There's plenty of assumptions that are in those

6      forecasts?

7      A.   Yes.

8      Q.   And in fact isn't it true that any investor

9      presentation talking about future sales that Depomed may hope

10     happens, has a warning in there that says no assurance that

11     anticipated results will be achieved?

12     A.   That's correct.

13     Q.   And that's because there is a significant risk that

14     those forecasts may never be met?

15     A.   I disagree that there's a significant risk, but, there

16     is a risk.   And that's why we put that disclaimer in.

17     Q.   There's a whole laundry list of risks that you included

18     in your SEC statements?

19     A.   That's correct.

20     Q.   It's really just a hope and expectation.   It may or may

21     not happen?

22     A.   It's our current forecast but you're correct, it may

23     not happen.

24     Q.   And there's lots of unknowns.   For example, in the

25     pharmaceutical space there could be a new product that could

1        make Nucynta obsolete, right?

2            A.   It's possible.

3            Q.   Okay.  Let's talk about the sales of Nucynta currently

4        at Depomed.

5                You testified that Nucynta competes in the long acting

6        opioid market, correct, Nucynta ER?

7            A.   Correct, the CII long acting opioid market.

8            Q.   In that market isn't it true that Nucynta ER, the long

9        acting opioid, only has 1 to 2 percent of that share, of that

10       market?

11           A.   It's, yeah, it's, I think, in the material here.  It's

12       about 1.77 percent.

13           Q.   If you look at the IR product, that also has less than

14       two percent of the sales.  Is that correct?

15           A.    That's correct.  They are very large markets.

16           Q.   And you said one of the things that attracted you,

17       attracted Depomed to the product was the DPN indication or the

18       dual mechanism of action?

19           A.   Dual mechanism, yes.

20           Q.   Prior to your deposition, did you have a conversation

21       with Dr. Vellturo?

22           A.   Yes.

23           Q.   And he is one of the commercial success experts for

24       plaintiff?

25           A.    Correct.

1    Q.   And did you talk to him for a couple of hours?

2    A.   About a couple of hours.

3    Q.   And you described to him the financial forecast

4    calculations that you did?

5    A.   Yes.

6    Q.   And the net present value calculations that you did?

7    A.   Yes.

8    Q.   Now, during that conversation, is it true that you

9    didn't give him any information regarding the share of Nucynta

10   ER prescriptions that are attributable to DPN diabetic

11   peripheral neuropathy?

12   A.   I don't recall what we physically gave him if anything.

13   Q.   Okay.  In terms of --

14   A.   In terms of documents.

15   Q.   Is it true that at your deposition less than two weeks

16   ago, Depomed didn't have any knowledge regarding the percentage

17   of its portions of sales that are attributable to DPN?

18   A.   As far as I know I don't have that information.

19   Q.   Depomed doesn't have that information?

20   A.   I can't necessarily speak to everybody at Depomed but

21   I'm not familiar with that information.

22   Q.   Okay.

23        MR. PATEL:  I don't believe I have any further

24   questions but I leave it to defendants.

25        Thank you, Mr. Anders.

```
 1                        THE COURT:   Thank you.  Anyone else from the
 2        defendants?
 3                        MR. CAPUANO:  No questions.
 4                        THE COURT:   No? All right.
 5                        Any redirect from the plaintiff?
 6                        MR. SITZMAN:  Let me, real quickly.
 7                        THE COURT:   Do you want to take a minute?
 8                        MR. SITZMAN:  Could I take a minute?
 9                        THE COURT:   Yes, sure.
10                        MR. SITZMAN:  Your Honor, we don't have any
11        further questions at this time.
12                        THE COURT:   All right.  Very well.
13                        MR. SITZMAN:  Thanks.
14                        THE COURT:   You may step down.  Thank you very
15        much.
16                        (Whereupon the witness was excused)
17                        THE COURT:   Will that be it today for witnesses
18        or do you have someone else that you'd like?  You probably have
19        a half hour if you would like to do something with that.
20                        MR. SITZMAN:  I don't think that --
21                        THE COURT:   It's productive to start in on
22        someone.
23                        MR. SITZMAN:  I mean it's, we certainly can't get
24        through his direct.  It will be Dr. Buschmann.  And so I think
25        if we can start in the morning and everybody --
```

1        THE COURT:   We will start tomorrow morning and

2    hopefully there are no other issues and we will start at 9:30,

3    which is what I expect.  So, we will start with that witness,

4    Dr. Buschmann.  We will work, as I say, throughout the day

5    because I have canceled my other arrangements for the day.  So,

6    I will have the whole day here with you folks.

7             And I am happy to stay late, probably around 6:30,

8    if you need to.  It sounds like you may in fact need that.

9    And barring any unforeseen events, I mean that should be the

10   schedule that we take.

11            Does anyone anticipate anything else for tomorrow?

12   Anything?

13        MR. ALY:  Not for tomorrow.  I have a housekeeping

14   issue for today.  The parties had agreed to exchange objections

15   to exhibits disclosed by 6 p.m., assuming the Court would be

16   done at 4:30.  We just want to make it clear that we --

17        THE COURT:   You are going to do that now.

18        MR. ALY:   And we can talk about it now but

19   submit --

20        THE COURT:   That sounds fine.

21        MR. SITZMAN:   We will accept the objection but

22   there won't be any so --

23             (Laughter).

24        THE COURT:   That should conclude it for today.

25   Thanks so much for your time and attention today.  I will see

1          you tomorrow morning at 9:30.  We will try and get the air

2     conditioning to work in here anyway.  Enjoy the day.  Thank you

3     very much.

4                      (Whereupon the was concluded)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25