

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2               CIVIL NO. 13-CV-4507(CCC)

 3

 4    IN RE: DEPOMED PATENT LITIGATION
                                            TRANSCRIPT OF
 5                                           PROCEEDINGS
                                             (Public)
 6

 7

 8    - - - - - - - - - - - - - - - -

 9                              Newark, New Jersey
                                March 15, 2016
10
      B E F O R E:
11
                  THE HONORABLE CLAIRE C. CECCHI,
12                United States District Judge

13

14

15

16

17

18    _____
              Pursuant to Section 753 Title 28 United States Code,
19    the following transcript is certified to be an accurate record
      as taken stenographically in the above-entitled proceedings.
20

21
                    S/Yvonne Davion
22                Yvonne Davion, CCR
                  Official Court Reporter
23

24

25
```

```
 1

 2                       A P P E A R A N C E S

 3

          KEITH MILLER, ESQ.
 4        (Robinson Miller)

 5        MICHAEL SITZMAN, ESQ
          CHRISTINE RANNEY, ESQ.
 6        FRANK P. COLE, ESQ.
          JAYSEN S. CHUNG, ESQ.
 7        DAVID GLANDORF, ESQ.
          (Gibson, Dunn & Crutcher, LLP)
 8        For Depomed and Janssen

 9

          MELISSA CHUDEREWICZ, ESQ.
10        (Pepper Hamilton, LLP)

11        LINDA A. WADLER, ESQ.
          BASIL J. LEWRIS, ESQ.
12        (Finnegan, Henderson, Farabow, Garrett & Dunner, LLP)
          For Grunenthal
13
          JAMES RICHTER, ESQ.
14        (Winston & Strawn, LLP)

15        SAL PATEL, ESQ.
          IMRON ALY, ESQ.
16        AHMED RIAZ, ESQ.
          (Schiff Hardin, LLP)
17        For Alkem

18        KENNETH G. SCHULER, ESQ.
          TERRENCE CONNOLLY, ESQ.
19        (Latham & Watkins, LLP)

20        AMY M. HANDLER, ESQ.
          (Sills Cummis & Gross)
21        For Roxane Laboratories

22        SHEILA RAFTERY WIGGINS, ESQ.
          VINCENT CAPUANO, PHD ESQ.
23        ANTHONY FITZPATRICK, ESQ.
          (Duane Morris, LLP)
24        For Actavis Elizabeth, LLC and
          Watson Laboratories, Inc

25
```

W I T N E S S E S

<u>Michelle Brown</u>

Cross examination by Mr. Connolly

Cross examination by Mr. Aly

Redirect examination by Mr. Sitzman

Recross examination by Mr. Capuano

Further Redirect examination by Mr. Sitzman

<u>Jonathan Steed</u>

Direct examination by Mr. Harp

1          THE COURT:   Good morning.

2          We have everyone on the record.  Before we start,

3     this is sealed, is it not?

4          MR. CONNOLLY:   Your Honor, this first portion

5     will be unsealed I'm guessing for about ten minutes.

6          THE COURT:   That sounds fine.

7          MR. CONNOLLY:   I will inform the Court when I

8     believe there's a need to seal.

9          THE COURT:   Very well.

10    M I C H E L L E   B R O W N, previously sworn, resumes.

11         THE COURT:   I remind you, Dr. Brown, that you

12    remain under oath.  Thank you.

13    CROSS EXAMINATION BY MR. CONNOLLY:

14       Q.   Good morning, Dr. Brown.

15       A.   Good morning.

16       Q.   Nice to see you again.  I don't know if you remember

17    but my name is Terry Connolly and I represent the Roxane

18    defendant in this action.

19       A.   Yes.

20       Q.   You've testified as an expert witness on behalf of

21    Depomed before, right?

22       A.   Yes.

23       Q.   And the drug that was introduced in that trial was a

24    drug called Gralise, right?

25       A.   Yes.

1   Q.   That was a long lasting version of the drug known as

2   Gabapentin, right?

3   A.   Yes.

4   Q.   And Gralise is indicated for the management of

5   postherpetic neuralgia, right?

6   A.   Yes.

7   Q.   And is postherpetic neuralgia sometimes referred as

8   PHN?

9   A.   Yes, it is.

10   Q.   I'm going to use the acronym because I am going to

11   stumble over the longer version.   Is that fair?

12   A.   Yes.

13   Q.   Is PHN sometime, I'm sorry.  Strike that.

14        Is PHN a neuropathic pain?

15   A.   Primarily,  yes.

16   Q.   And you testified yesterday I believe that some forms

17   of PHN can be monopathic, right?

18   A.   Yes, it's usually polyneuropathic but it can be

19   mononeuropathic.

20   Q.   So, the answer to my question is it can sometimes be

21   monopathic is yes?  Is that correct?

22   A.   It can sometimes be mononeuropathic.

23   Q.   Thank you.  In the Gralise trial you testified on

24   behalf of Depomed that there was a long felt need for Depomed's

25   Gralise product,  right?

1    A.   Yes.

2    Q.   Now you were also a member of Depomed's speakers

3    bureau, correct?

4    A.   Yes.

5    Q.   And the Depomed's speakers bureau is a group of

6    clinicians who educate other practitioners about a particular

7    drug that Depomed markets, right?

8    A.   Yes.

9    Q.   And one of your, I'm sorry, one of your

10   responsibilities as a member of Depomed's speakers bureau is to

11   teach other physicians about Depomed's Nucynta products and

12   Gralise,  right?

13   A.   Including Gralise,  yes.

14   Q.   Okay.   And when you meet with physicians --  let me

15   strike that.

16       When you talk about your responsibilities as teaching

17   physicians about Nucynta products, that would include both

18   Nucynta IR and Nucynta ER, correct?

19   A.   Yes.

20   Q.   Now, when you meet with physicians as part of your work

21   for Depomed's speakers bureau, you generally meet with doctors

22   one at a time often in a physician or practitioner's office,

23   correct?

24   A.   That is correct.   And sometimes it's in a lecture

25   situation at a conference, for example.

1      Q.   Okay.  And you set up these meetings together with one

2    or more of Depomed's sales representatives, right?

3      A.   The sales representative set it up and I attend.

4      Q.   Okay.   And those sales representatives are Depomed

5    employees whose job it is to sell Depomed's Nucynta, Gralise

6    products, right?

7      A.   In a simplified manner,  yes.

8      Q.   And when you meet with doctors as part of Depomed's

9    speakers bureau,  Depomed's sales representatives are there

10   with you 90 percent of the time or more,  right?

11     A.   At least 90 percent,  if not always.

12     Q.   During those meetings that you have with the doctors to

13   talk about Depomed's product, the sales representatives usually

14   put out Depomed promotional materials, right?

15     A.   They can, yes.  I'm not involved with that part of it.

16     Q.   Okay.  Do you have before you a binder, a spiral bound?

17   Would you pick that up, please?  That's a copy of your

18   deposition transcript?

19     A.   Yes.

20     Q.   Okay.

21          THE COURT:   You know what, I'm sorry, when did

22   this off the record but just so we can do it on the record, any

23   issues with respect to the exhibits or the demonstratives?

24          MR. SITZMAN:   No, your Honor.

25          THE COURT:    Thank you.

1    Q.   I'm going to ask you to turn to Page 242.   Tell me

2    when you're there.

3    A.   Yes.

4    Q.   And Lines 6 through 9.

5    A.   Yes.

6    Q.   You were asked the question, Well, what does the sales

7    representatives do at meetings.   And you answered They may put

8    out any promotional materials that they have, right?

9    A.   Yes.

10   Q.   Now, during these meetings that you have as part of

11   Depomed's speakers bureau, you present what is in the Nucynta

12   or Nucynta ER labels, right?

13   A.   When I'm speaking about Nucynta,  yes.

14   Q.   Right.   So every time you speak about Nucynta IR, you

15   present what is in the Nucynta IR label,  right?

16   A.   I'm obligated to speak about what's in the label,  yes.

17   Q.   And the same is true with respect to Nucynta ER.   When

18   you're presenting in these sales meetings, you refer to the

19   label, right, for Nucynta ER?

20   A.   I do.

21   Q.   Right.   Now you get paid by Depomed for your work as

22   part of Depomed's speakers bureau.

23   A.   I do because I take time from my practice to do that.

24   Q.   Is the answer to my question yes, ma'am,  doctor?

25   A.   I said yes, I do.

Q.   And your current rate for that work is between $1,000
and $3,000 per day, right?

A.   Yes.

Q.   And you also get reimbursed for your travel and any out
of pocket expense,  right?

A.   Yes,  I do.

Q.   And you became a member of Depomed's speakers bureau in
2012 to the best of your recollection, right?

A.   To the best of my recollection,  yes.

Q.   You estimate that you got paid about $50,000 last year
by Depomed for your work on the Depomed speakers bureau,
right?

A.   I think I said that on average I think I get paid
around $50,000 but I don't keep track of it very well.

Q.   Okay.  And you estimate that you got paid by Depomed
about $50,000 per year for your work on Depomed's speakers
bureau in each of the years of 2012,  2013,  2014 and 2015,
right?

A.   On average.

Q.   So,  your best estimate of the total amount of the
compensation that you received from Depomed for meeting with
doctors over the years 2012,  2013,  2014 and 2015 to tell them
about Depomed's products was about $200,000.   Was that
correct?

A.   About that based on that average,  yes.

 1          Q.   Not just based on my average.  I want your best

 2     recollection,  doctor.

 3               Is your best recollection that you've been paid

 4     approximately $200,000 in those four years for your work on the

 5     speakers bureau?

 6          A.   Yes.

 7          Q.   And that $200,000 that you got paid by Depomed does hot

 8     take into account the money that Depomed reimbursed you for the

 9     expenses that you incurred,  right?

10          A.   I can't really say.   It may or may not.

11          Q.   Okay.  I'm going to ask you to turn to your deposition,

12     ma'am, doctor.  Please turn to Page 245.

13          A.   Excuse me.  Someone was coughing.  240 what?

14          Q.   245.  Please tell me when you're there.

15          A.   I am.

16               THE COURT:   Hold off one second.  We're just

17     going to shut the ski lights so we can see this much better.

18          Q.   So,  do you have Page 245 before you, Dr. Brown?

19          A.   Yes.

20          Q.   Okay.  I'm going to ask you to focus on the line

21     starting on line four, okay?  Going down to about 18.  Okay?

22               So, there's a question which says "So, what are your

23     estimates for 2012 and 2013?

24               "Answer:  Probably similar, although they may be less

25     for the earlier years.

1          "Question:   Okay.   But, sitting here today, your best

2     estimate in terms of the compensation that you received from

3     Depomed in connection with being a participant in their

4     speakers bureau is roughly in the order of $200,000.

5          Is that correct?

6          "Answer:   For four years.

7          "Question:   That's correct.

8          "Answer:   And I'm not including any reimbursement

9     because that's money that I put out myself".

10         Do you see that?

11    A.   Yes.

12    Q.   Did I read that accurately?

13    A.   You did.

14    Q.   Now, you're still a member of Depomed's speakers

15    bureau, right?

16    A.   Yes.

17    Q.   So, you've continued to work for Depomed as part of its

18    speakers bureau and attend meetings with physicians and Depomed

19    sales representatives to talk about Nucynta products during the

20    course of your acting as an expert witness for Depomed in this

21    case,  right?

22    A.   Yes,  I have.

23    Q.   And you continue to tell doctors at these meetings

24    about Nucynta IR and Nucynta ER,  right?

25    A.   Yes,  I do.

1    Q.   And during your deposition in the beginning of February

2    you told me that you had a meeting with doctors just the month

3    before in January 2016 as part of your work on Depomed's

4    speakers bureau, right?

5    A.   Yes.

6    Q.   Have you had any further meetings as part of Depomed's

7    speakers bureau since January of this year?

8    A.   Yes.

9    Q.   How many?

10   A.   I think one because I did one about a week or two ago.

11   Q.   Okay.  And were you paid approximately one -- how much

12   were you paid for that?

13   A.   $2,000.

14   Q.   And do you plan to continue to work as part of

15   Depomed's speakers bureau for the rest of this year?

16   A.   Yes.  It's something I enjoy quite a bit because I can

17   educate people, which I'm no longer in academics, so, it gives

18   me the opportunity to do it and I can engage with my

19   colleagues.

20   Q.   So, the answer to my question is yes, doctor?

21   A.   The answer is yes.

22   Q.   Doctor, if your lawyer wants to ask you to expound on

23   any of the answers, he will be given that opportunity.  I'm

24   just going to ask you to try to answer my question so we can

25   get through this as promptly as possible.  Okay?

```
 1          A.   I will do the best I can.
 2          Q.   Thank you.  And I'll try to do the same.
 3               At that last meeting did you speak about Nucynta or
 4     Nucynta ER?
 5          A.   I spoke about Nucynta ER.
 6          Q.   Okay.  And in terms of your enjoyment of in working for
 7     the Nucynta speakers bureau, you have no intention of resigning
 8     from that work, sitting here today, right?
 9          A.   Not at this time.
10          Q.   So, you could be doing that for the next five years,
11     right?
12          A.   Conceivably, yes.
13          Q.   You could conceivably be doing it for the next ten
14     years, right?
15               MR. SITZMAN:   Objection, your Honor.  I'm trying
16     to see the relevance here.  We've gotten a little bit off
17     field.
18               MR. CONNOLLY:   Your Honor, she's being paid to
19     talk about the product at issue in this litigation.   It's
20     clearly relevant.
21               THE COURT:   How many questions along this line?
22               MR. CONNOLLY:   I have about -- I'll withdraw the
23     question about ten years.  Okay.
24               MR. SITZMAN:   Thank you.
25               THE COURT:   Okay.
```

1    Q.   You've also been a member of one of Depomed's drug

2    advisory boards,  right?

3    A.   Yes.

4    Q.   And your work on that drug advisory board involved

5    meeting with other physicians together with representatives of

6    Depomed to discuss Depomed's products,  right?

7    A.   Yes.

8    Q.   And at that time, I'm sorry, before you became a member

9    of Depomed's speakers bureau, you were also a member of

10   Janssen's speakers bureau, right?

11   A.   Yes and I did very little work with them.

12   Q.   And at that time Nucynta was a product that was

13   marketed in the United States by Janssen,  right?

14   A.   Yes.

15   Q.   And in that capacity you also talked to other doctors

16   about what was then Janssen's Nucynta product, right?

17   A.   A few times, yes.

18   Q.   And you understand that Janssen was once a plaintiff in

19   this case, right?

20   A.   Yes.

21   Q.   And your work on the Janssen speakers bureau was

22   similar to your work on the Depomed speakers bureau that you've

23   just testified about, right?

24   A.   Yes, although at the time I think Nucynta ER was not

25   introduced and on the cusp of being introduced.

1      Q.   When you're telling doctors about Nucynta ER,  you

2   discuss the clinical study section of the Nucynta ER label,

3   right?

4      A.   I do.

5      Q.   Okay.  And that label contains -- that label doesn't

6   contain the actual studies themselves, right?

7      A.   I don't agree with that because the label does include

8   the studies.

9      Q.   Okay.  Doesn't the label include a high level summary

10   of the study instead of the actual study itself?

11      A.   It includes a summary approved by the FDA.

12      Q.   Right.  So I'll ask the question again.

13          So, the label does not contain the actual studies, just

14   a summary, right?

15      A.   Yes.

16      Q.   Okay.  Now, you've actually read the underlying studies

17   that are summarized in the Nucynta ER label, right?

18      A.   I have.  As a clinician, I would have to.

19      Q.   You actually have read the underlying study and not

20   just the summary, correct?

21      A.   I have read the studies.

22      Q.   So, it's fair to say, Dr. Brown, that you are extremely

23   knowledgeable about Nucynta ER, right?

24      A.   I'm knowledgeable because I'm a good clinician and also

25   because of the speakers bureau, yes.

1    Q.   And you are not just knowledgeable, you are very

2    knowledgeable, right?

3    A.   I don't think I'm anymore knowledgeable than any

4    clinician that I would expect to be, other than the fact that I

5    have discussed it on a regular basis with other clinicians and

6    conferred with them about their knowledge base.

7    Q.   Now, you said that you don't think you're anymore

8    knowledgeable than any other clinician.   But, the whole

9    purpose of these meetings that you've described is to teach the

10   physicians about the product, right?

11   A.   Yes.   And part of that is based on my experience in

12   using it, yes.

13   Q.   Right.   And if they knew as much about Nucynta ER as

14   you did, there would be no need for you to meet them to teach

15   them about the product, right?

16   A.   I am also a specialist in pain management so in

17   comparison to a family practitioner, for example, I know quite

18   a bit more about pain management as well as the medications

19   that we use to treat chronic pain.

20   Q.   So, it's fair to say that you have greater knowledge

21   about the Nucynta ER than most of the healthcare providers that

22   you meet with as part of your work on Janssen's, strike that,

23   on Depomed's speakers bureau ?

24        Let me see if I can withdraw the question and actually

25   speak English this time.

1       Is it fair to say that you have greater knowledge about

2    Nucynta ER than most of the healthcare providers that you meet

3    with as part of the Depomed's speakers bureau, correct?

4    A.   Again I think that's fair, but it's also based on the

5    fact that I'm a specialist.

6          MR. CONNOLLY:   Your Honor, I think we have come

7    to the point in the proceedings where we are going to get to

8    confidential information.  And on behalf of Roxane, we request

9    that you seal the courtroom.

10         THE COURT:  I don't believe there's any objection

11    to that, is there?

12         MR. SITZMAN:   No objection, your Honor.

13         THE COURT:  Any objection?

14         MR.FITZPATRICK:   No.

15         THE COURT:   All right.  Let us seal the courtroom

16    now.

17         (Whereupon the following testimony is under seal).

18         THE COURT:   As I've been doing in the past, I'll

19    just do this very quickly.  Let's make sure whoever is in the

20    room is supposed to be in the room.

21         Let's see, Depomed, Grunenthal, Actavis, Roxane

22    Alkem.  All right.  Anyone who should not be here.  Does

23    anyone see anyone?  No.  All right.  Remain seated.  The

24    transcript is sealed and the courtroom is sealed.

25         You may proceed.

```
 1                    (Whereupon the hearing was sealed)*.

 2                    (Lunch recess).

 3                    (Whereupon the following takes place in open

 4     court)*

 5                    THE COURT:   All right.  We are back.  We are not

 6     under seal at this point.  Is that correct?

 7                    MR.FITZPATRICK:   That's correct, your Honor.

 8                    THE COURT:   And the courtroom is open then.  So,

 9     who is going to call the next witness? I know we have two

10     witnesses.

11                    MR. FITZPATRICK:  I think our understanding is the

12     plaintiffs are now resting on their case.

13                    MR. GLANDORF:  That is correct.

14                    THE COURT:   And that is on infringement.  And

15     when Dr. Brown comes back, it will be on a separate issue?

16                    MR. GLANDORF:  On validity, that's correct.

17                    THE COURT:   Very well.  Thank you.

18                    MR.FITZPATRICK:   That being so, Actavis now

19     wishes to move for judgment on partial findings under

20     Rule 52(c) as to the plaintiff's claim of infringement of the

21     '130 patent.  In making argument on that, your Honor, I am

22     afraid to ask that the courtroom be closed.

23                    THE COURT:  Fair enough.  Let us close the

24     courtroom again.

25                    (Whereupon the hearing is under seal). *
```

```
 1              (Whereupon the following takes place in open

 2    court).

 3              THE COURT:   I will be speaking to you in the next

 4    few days as to how to handle this, whether we want to take

 5    additional briefing and include it within our trial briefs,

 6    whether you want to do something before that time and have it

 7    done separately.  Let me think about it a little bit.  And I

 8    know the issues unfold every day obviously.  And I appreciate

 9    the presentations today.

10              MR. FITZPATRICK:  May I make one suggestion to

11    think about in that regard, your Honor?  I think and I assume

12    that the post trial submissions will be findings of fact and

13    conclusions of law.

14              THE COURT:   We also require a trial brief as

15    well.

16              MR.FITZPATRICK:   Fair enough.  Okay.

17              THE COURT:   We might want to think about

18    including that within the issue or there are many ways to deal

19    with it.  But, no, I definitely need a trial brief and findings

20    of facts and conclusions of law proposed obviously.

21              Thanks so much.  Thank you.

22              MR. SITZMAN:  Thank you, your Honor.

23              MR.FITZPATRICK:  Thank you, your Honor.

24              (Whereupon a short recess was taken.)

25              THE COURT:  So, let me just reiterate where we
```

```
 1        were.  I heard application from all three defendants and

 2        applications from the plaintiffs pursuant to Rule 52 seeking

 3        judgment at this time.

 4                    As I've indicated, I am reserving on those

 5        applications.  And I'll talk to the parties later about how to

 6        proceed on them.  All right.

 7                    So, at this point is there anything further before

 8        we go to the next witness? Anything? Any other issues? All

 9        right.

10        J O N A T H A N   S T E E D, sworn and testifies as follows:

11        DIRECT EXAMINATION BY MR. HARP:

12                    THE COURT:  Let's have counsel take a look at the

13        exhibits unless you've done that during the break.

14                    MS. RANNEY:  Yes, we have.  Christine Ranney for

15        plaintiff Depomed.

16                    Your Honor, we've previously lodged a foundation

17        objection to defendant's Exhibit 1097 that was in the context

18        of another witness.  A foundation was not established at the

19        deposition.

20                    THE COURT:   Which one is that?

21                    MS. RANNEY:  Defendant's exhibit, it's document

22        title BN 200 hydrochloride.

23                    THE COURT:   All right.  That was in the context

24        of which witness?

25                    MS. RANNEY:  Dr. Michael Gruss.   So the document
```

```
 1    wasn't ultimately used.  So plaintiffs would just like to renew

 2    our objection.

 3                THE COURT:   With respect to this document at this

 4    point we have another witness here.  To the extent a proper

 5    foundation can be laid, I think we can proceed.  But, otherwise

 6    we can deal with the issue as an issue arises.

 7                How does that sound?

 8                MS. RANNEY:   Sure.  That's fine, your Honor.

 9                THE COURT:  Any other issues with respect to any

10    of the other documents?

11                MS. RANNEY:  No.  Thank you.

12                THE COURT:   You may begin.

13                MR. HARP:   Thank you, your Honor.

14       Q.   Good afternoon, Professor Steed.  Would you please

15    state your name for the record?

16       A.   It's Jonathan Steed.

17       Q.   And what is the area in which you are offering opinions

18    today, Professor Steed?

19       A.   It's the invalidity of the '364 patent from the point

20    of view of polymorphism.

21       Q.   And were you with us here in the courtroom last week?

22       A.   Yes, I was.

23       Q.   And what portions of the trial did you observe?

24       A.   I observed the testimony of Dr. Buschmann and Dr.

25    Gruss.
```

1     Q.  Were you here for opening statements as well?

2     A.  Yes, I was.

3     Q.  What is your current occupation?

4     A.  I'm Professor of Chemistry at Durham University in the

5  United Kingdom.

6     Q.  What can you tell us about the chemistry department at

7  Durham University?

8     A.  We are very proud of Durham in terms of the complete

9  university guide.  We rank second after Cambridge and before

10  Oxford.

11     We were number one for impact for our research in the

12  U.K. and in the last research assessment exercise within

13  Germany we do a good job.

14     Q.  Is there a particular area of chemistry on which you

15  have focused?

16     A.  My research is generally on chemical synthesis, on

17  crystallization, development of new crystallization

18  technologies.  So I have interest in studying of

19  crystallization, other crystallization methods using gels, for

20  example, solid form of organic and for that matter coordination

21  of inorganic compounds and the technique used to study solid

22  states in organic and inorganic compounds.

23     Q.  You mentioned solid state compounds in your answer.

24     What do you mean by solid state chemistry and solid

25  state compounds?

1    A.   Yes, solid state as in crystals and crystalline forms

2    as opposed to liquids and gases, for example.

3    Q.   And you also have -- what is your experience with

4    synthetic chemistry?

5    A.   Yes, we make the compounds that we study in my lab.

6    Our primary focus is on the solid state form and then

7    crystallization.  But, we have to make them first before we can

8    study them.

9    Q.   For the '364 patent, what is the area of technology to

10   which that patent is directed?

11   A.   That's a patent that is directed to a particular

12   crystalline form of Tapentadol hydrochloride in this case.

13   Q.    Where did you attend college?

14   A.   I got my undergraduate and doctoral degrees from

15   University College, London.

16   Q.   I'm sorry, and your Ph.D. was also from?

17   A.   University College, London, yeah.

18   Q.   What was the subject of your Ph.D. research?

19   A.   It was synthesis of methyl organic compounds and they

20   are studied by techniques which is crystallography which I

21   actually used to study that crystalline form.

22   Q.   What did you do after completing your Ph.D. research?

23   A.   Then I went on to do a NATO post doctoral fellowship at

24   the Universities of Alabama and Missouri.

25        Then I was interested in again x-ray crystallography

1    and specifically the area of super molecular chemistry which is

2    the area in which one molecule interacts with another one such

3    as in crystals.

4        Q.   And what did you do after your NATO fellowship ended?

5        A.   Then I was appointed to a permanent position as an

6    academic.  We call that lecturer.  It's equivalent to assistant

7    Professor in the U.S.  That was at Kings College, London.  And

8    I was there from 1995 through to the end of 2003.

9        Q.   And what happened in 2003?  Where did you go?

10       A.   Then I moved to Durham University as a reader initially

11   and now full Professor of Chemistry.

12       Q.    What has been the nature of your work at Durham?

13       A.   Yes, it's predominantly been, as I've described, the

14   synthesis and crystallization of organic and molecular

15   compounds and the study of their solid state form.  And also

16   the study of solids that are related to crystals such as gels.

17       Q.   You mentioned determining the solid state structure of

18   compounds.

19            Is that referred to as crystallography?

20       A.   Yes, crystallography is a main technique but also a

21   related range of other techniques that they use to study

22   organic solids, thing likes differential scaling calorimetry,

23   x-rays of single crystalline powder, x-ray crystallography,

24   infrared spectroscopy and a whole range of other techniques.

25       Q.   Do you publish papers as part of your research?

1      A.    Absolutely.

2      Q.    How many papers have you published?

3      A.    Well over 300 now.

4      Q.    How about books or book chapters?

5      A.    Yes, a large range of book chapters.  I'm also the

6  author of a book in 2000 called Super Molecular Chemistry which

7  talks about the way in which one molecule interacts with

8  another in a variety of contexts, especially solid state

9  chemistry.   That was translated into Russian and Chinese and

10 the second edition came out in 2009.

11      I'm editor of an 8-volume series entitled Super

12 Molecular Chemistry from Molecules and other materials, again

13 focusing upon the interactions of one molecule with another.

14 There's a couple of other books that I have done in the early

15 years as well that are on similar sorts of subjects.

16      Q.    How often are your papers cited by other academic

17 scientists?

18      A.    Academics love to count these things.  My work has been

19 cited about 10,000 times or so.

20      Q.    How does that compare to others in your field?

21      A.    I guess that would put me in the top one percent or so.

22      Q.    Do you also teach, as part of your job at Durham?

23      A.    Most certainly.

24      Q.    What courses do you teach?

25      A.    At the moment I teach a core subject which is actually

1    Inorganic Chemistry.  And I also teach Super Molecular

2    Chemistry for advanced students.  And over the years I've

3    taught a very wide variety of subjects including

4    crystallography of course, things like green chemistry,

5    foundational chemistry.  A variety of other techniques.

6         Q.  And do you have a research lab at Durham?

7         A.  Yes, I do.

8         Q.  How many researchers do you have in your lab?

9         A.  It varies according to the funding, of course.  But,

10   typically between 5 and 15.

11        Q.  Have you been selected for any awards during your

12   career as a chemist?

13        A.  Yes, I have been quite lucky.  I was awarded the 2010

14   called a Morgan Prize for my work in super molecular chemistry.

15   That's a national award in the U.K.

16             Much earlier I won the 1998 Meldola (ph) medal, an

17   international award for my work in the super molecular

18   chemistry area.  I was also particularly pleased to win the

19   2008 I think the vice chancellor award for excellence in

20   doctoral supervision.  So actually I am teaching my doctoral

21   students how to do research which is perhaps the most important

22   thing we do.

23        Q.  Any awards related to your Ph.D. research?

24        A.  Yes.  I also won the Ramsey Medal for my Ph.D. which

25   was the best Ph.D. in chemistry from the University College

1          London in my year.

2          Q.   Does your research relate at all to the area of

3     pharmaceuticals?

4          A.   Yes, it does. One of the main thrusts of our research

5     is to try and develop new ways to crystallize pharmaceuticals.

6     This is the gel phase work that I mentioned.

7          Q.   Could you describe a little bit this gel phase

8     technology?

9          A.   Yes.  Within this context of pharmaceuticals, polymorph

10    screening that the pharmaceutical companies do routinely, I am

11    trying to develop new techniques for them to use within the

12    screening methodology, perhaps things they may not have thought

13    of before.

14         Q.   And these gel techniques are new?

15         A.   Yes, they are developed in my lab.

16         Q.   When did you develop them?

17         A.   The first publication in the pharmaceutical gel

18    crystallization area was 2010 in the nature of chemistry.

19         Q.    How did these gel methods compare to more routine

20    crystallization techniques?

21         A.    They are still very experimental.  But what we hope is

22    that they will offer a way of discovering new polymorphs that

23    aren't easily found otherwise.

24         Q.    And do you consult directly with the pharmaceutical

25    industry?

1      A.   Yes, I consult and collaborate with a variety of

2   different companies within the pharmaceutical industry either

3   through their sponsorship of students or through direct

4   consultancy or of course expert witness work.

5      Q.   And do you have experience related to crystal

6   structures in pharmaceuticals as part of your work with the

7   pharmaceutical industry?

8      A.   Yes, absolutely.  Crystal structures are like bread and

9   butter if you like.  We get crystal structures all the time.

10     Q.   Have you consulted with brand name companies?

11     A.   Yes, I have had students sponsored by JSK in the past.

12  At the moment I am signing a deal with Astra Zeneca to sponsor

13  a student as well to carry out research in pharmaceutical

14  crystallization.  I have done some consulting work with smaller

15  brand name companies as well.

16          MR. HARP:  Your Honor, at this point I would like

17  to offer Professor Steed as an expert in chemistry and

18  crystallography.

19          THE COURT:   Any issue?  Any objection?

20          MS. RANNEY:  No issue, your Honor.

21          THE COURT:   All right.  He is so admitted as an

22  expert in that field.

23     Q.   Professor Steed, can I ask you to turn to DTX 304

24  please in your book?  And we have it up on the screen as well.

25          What is this document?

1      A.   So, this is the '364 patent which is directed to

2    particular crystalline form, form A of Tapentadol

3    hydrochloride.

4      Q.   Does the '364 patent cover the Tapentadol molecule

5    itself?

6      A.   No, no, it's not directed to the synthesis or the

7    molecule itself just one particular crystal form.

8      Q.   Are you aware of any other patents that cover the

9    molecule?

10     A.   Yes, I believe the molecule is covered by the '737

11   patent.

12     Q.   And does the '737 patent identify the crystal structure

13   of Tapentadol?

14     A.   No, it merely states that it crystallizes out and gives

15   a melting point.  But, otherwise doesn't specify any crystal

16   structure.

17     Q.   Does the '364 patent disclose information related to

18   the crystal structure of Tapentadol?

19     A.   Yes, it does.

20     Q.   What does it disclose?

21     A.   So, it has a full single crystal x-ray structure

22   determination which gives the, if you like, the entire crystal

23   structure, for want of a better term, the position of the

24   molecules and the way they are packed in the solid.  It also

25   discloses the x-ray powder diffraction pattern of form A of

1    Tapentadol hydrochloride.

2    Q.   Is more than one crystal form -- is there more than one

3    crystal form of Tapentadol?

4    A.   Yes.  The disclosure also gives the same kind of

5    information, single crystal structure and powder, as well as

6    other bits of information on the form B of Tapentadol

7    hydrochloride.

8    Q.   And is that referred to as polymorphism when there's

9    more than one crystal form?

10    A.   Yes, that's right.  So, these two crystals are

11    polymorphs of one another so the system can be said to be

12    polymorphic.

13    Q.   And what is a polymorph?

14    A.   So, when you have a situation like this in which there

15    are two ways of packing a particular given molecule within

16    three dimensional space, that's polymorphism.  It results in

17    the same molecule in two different crystal structures.

18    Perhaps the better way to think of it is if you think

19    of the molecule as a brick like a house brick, then you can

20    build a wall in more than one different way.  You could

21    interleave the bricks together, perhaps get a stronger wall or

22    you can just pile them up in a line and that might be perhaps a

23    weaker wall in terms of the way in which it's built.

24    Then I suppose if you were to knock the wall down and

25    the bricks all fell into a pile, then that would be analogous

1    to an amorphous solid.

2        Q.   How does one distinguish one polymorph from another?

3        A.   A wide range of solid state techniques, the ones that I

4    mentioned, the patent of course, the single crystal and powder

5    x-ray crystallography.   Other spectroscopic techniques such as

6    infrared and raman spectroscopy.   Sometimes even more simple

7    things such as melting points in some cases can distinguish

8    polymorphs.

9            As I mentioned before, differential scanning

10   calorimetry can be another way to observe a polymorphic phase

11   transition.   So know that there's one polymorph transforming

12   into another for example and perhaps measuring melting points

13   through a variety of techniques.

14       Q.   Can you focus on x-ray powder diffraction for a moment?

15   Could you explain briefly how x-ray powder diffraction works?

16       A.   Yes, to put it crudely it's a little bit like a medical

17   x-ray.   The x-rays are shone on the crystal.   They interact

18   with the internal structure of the crystal and then they are

19   diffracted.   They pass through the crystal and they diffracted

20   in a particular way that gives rise to an x-ray powder

21   diffraction pattern which has the appearance of a series of

22   peaks of particular intensities on a horizontal scale which is

23   labeled two theta the diffraction angle.

24       Q.   And are those powder patterns able to identify one

25   polymorph compared to another?

1  A.   Yes, the x-ray powder diffraction pattern is

2  characteristic of the particular crystal packing arrangement.

3  It depends directly on the crystal packing arrangement.  And so

4  it's a direct probe of what the internal structure is.  And so

5  each polymorph should have a unique x-ray powder diffraction

6  pattern.

7  Q.   Professor Steed, were you in court last week to hear

8  some discussions regarding example 25 of the '737 patent?

9  A.   Yes, I was.

10  Q.   Could I ask you to turn to that patent?  It's

11  defendant's trial Exhibit 752.  I'd like to direct your

12  attention to example 25.

13  A.   Okay.

14  Q.   Which is up there on the screen.

15  The procedure for, to make the molecule in example 25,

16  is that actually listed in example 25?

17  A.   Not as specifically.  It actually says it's made in the

18  same way as example 24 using the opposite handedness of

19  starting material minus 21.

20  Q.   Example 24 as well, take a look at that.  Read all the

21  text of the three steps.

22  Could you explain just generally what is disclosed in

23  example 24?

24  A.   Yes.  So example 24 is a kind of umbrella heading for

25  three separate chemical reactions in which one molecule is

1      transformed into another molecule and then to another molecule.

2      And ultimately the final product of the third step is a

3      chemical reaction in which Tapentadol the molecule is formed

4      and then it's added to hydrochloride to give Tapentadol

5      hydrochloride which then crystallizes out and at that point the

6      crystal form is determined.

7          Q.   Okay.  It's a little hard to see.  It goes over several

8      columns.

9          Have you prepared a demonstrative that sort of

10     summarizes the steps laid out in example 24?

11         A.   Yes.  So, I've helped to prepare a demonstrative that

12     lays out the three steps in terms of the chemical

13     transformation also that did occur.

14         Q.   I will put that on the screen now, slide Number 4.

15         So maybe, could you explain using this demonstrative

16     what exactly, what exactly is shown in these three steps?

17         A.   Yes.  So, we've got three quite distinct chemical

18     reaction steps with purification at the end of each one of

19     them.

20         In the first step, the initial precursor which is the

21     molecule that's shown the top left there which has an OME at

22     the top, ME stands for methyl group and an OH group in the

23     middle, that's transformed into a compound.  It's very similar,

24     but in which the OH in the middle has changed into a CL.

25              THE WITNESS:  Perhaps, your Honor, would it be

```
 1          okay if I point with the laser?
 2                    THE COURT:   Go right ahead.
 3                    Did we get the demonstratives handed out?
 4                    MR. HARP:  I think so, your Honor.
 5                    THE COURT:  Did we get them?
 6                    MR. HARP:  It's rather thin.
 7                    THE COURT:   Is it in the notebook or is it
 8     separate?
 9                    MR. HARP:  It's separate.
10                    THE COURT:   I have it.  Thank you.
11                    MR. HARP:  We have another one.
12                    THE COURT:   No, I'm good.  Yes, you may
13     definitely go forward if you'd like to.  Would you like to do
14     that?
15                    THE WITNESS:   Thank you.
16       Q.   If you'd like to, Professor, that's fine.
17       A.   Yes.  So in step one we got the chemical reaction in
18     which this OH here is transformed into a CL.  That's using this
19     reagent thionyl chloride.   And then we got a second chemical
20     reaction step.  So we haven't formed Tapentadol yet.
21            Step 2 entirely separate step in the reaction in which
22     this chloro that we formed in the first step is then
23     transformed again.  It's transformed into hydrogen.  So, when
24     chemists write the structure, we don't especially put the
25     hydrogen on.  That's something implicit.  It's a shorthand way
```

1     of drawing it.

2          And these reagents, sodium borohydride and zinc

3     chloride followed by phosphene, triphenyl phosphene, do that

4     transformation.  That gives us this molecule at the end of

5     Step 2 which is the immediate precursor.

6          And then in Step 3 we finally synthesize the Tapentadol

7     molecule.  And all that involves is removing this methyl group,

8     the ME here, using concentrated hydrobromic acid, very strong

9     acid.  And then that's neutralized by base, that gives us OH

10    here, and that gives us Tapentadol free base, which is

11    Tapentadol without the hydrochloride.

12         And then in the final step we add a source of

13    hydrochloric acid, a Tapentadol hydrochloride crystallizes out.

14    And that's the end of Step 3.

15    Q.   At what point in these steps do we actually get the

16    Tapentadol hydrochloride product?

17    A.    It's the very, very last step where we add the hydrogen

18    chloride, the hydrochloric acid, to the Tapentadol that's

19    formed by removing the ME group from the precursor.  At that

20    point the Tapentadol hydrochloride crystallizes out.

21    Q.   And what steps are important for making the polymorphic

22    Tapentadol hydrochloride?

23    A.   The polymorph isn't formed until that very, very last

24    step in which there's a crystallization from solution.  So

25    until the hydrochloric acid's added right in the very last

1    step, the Tapentadol molecule is this solution and there's no

2    solid form there.

3          So that very last step is the only one that's relevant

4    in terms of defining the polymorphic form and of course the

5    conditions under which it occurs.

6          Q.   And what polymorph should result from the synthesis

7    described in example 25?

8          A.   The only polymorph that's stable at room temperature

9    which is form A.

10         Q.   Why is that?

11         A.   Well, there are only two known polymorphs of course.

12   Form A is the one that's stable at room temperature.  And

13   unless it's impure, form B transforms into form A at room

14   temperature.

15         So, we would fully expect to get form A from this

16   reaction unless impurities are somehow stopping the form B from

17   doing that.

18                THE COURT:   You know what, just go back to step 2

19   for a moment.  If we are looking at the ring on the left versus

20   the right, in terms of the stereochemistry, we have a dotted

21   line on the left coming off of the ring and a straight line

22   from the right.  If you could explain that to me.

23                THE WITNESS:   Yes, because we are removing this

24   chloro group, the chloro has the highest atomic weight there.

25   And the stereochemistry is assigned based on atomic weight.

1        And so the chlorides takes priority.

2                But, when we change the chloro into a hydrogen,

3    obviously a hydrogen has an atomic weight of one so the

4    hydrogen is lowest priority.  So the molecule is switched

5    around from chloro having highest priority coming forward to we

6    now put in this diagram this part here which has the highest

7    priority coming forward and the hydrogen is going backwards.

8                So, in terms of the formalisms of the rules, as

9    Dr. Buschmann alluded to, although he didn't mention atomic

10   weight, the form configuration is inverted, R becomes S, S

11   becomes R, depending upon what terms we are talking about.

12               THE COURT:    Thank you.

13   Q.   Professor Steed, have you reviewed the work of

14   scientists at the University of Wisconsin who reproduced the

15   synthesis described in example 25?

16   A.   Yes, I have.

17   Q.   What was the result of that synthesis?

18   A.   They carried through the Step 3 of example 25.  So they

19   carried out the chemical synthesis from the precursor to

20   produce Tapentadol free base.  And then they carried out the

21   hydrochloric acid crystallization step to produce Tapentadol in

22   crystalline form.  And they actually got a mixture of form A

23   and form B.

24   Q.   Have you reached an opinion as to which form of

25   Tapentadol will result if one follows example 25?

1          A.   In the absence of impurities it will be the form A.

2     The impurities can't stabilize form B.

3          Q.   Let's look a little more closely at what the work that

4     was done at Wisconsin.  If you could look to defendant's trial

5     Exhibit 299, please.

6          A.   Okay.

7          Q.   What is this document, defendant's trial Exhibit 299?

8          A.   Yes.  So, this is a document produced by the scientists

9     at the University of Wisconsin describing the compound that

10    they began their work with.  So, the immediate chemical

11    precursor to Tapentadol.  It's the one with the ME group on the

12    ring oxygen.

13          And so this is the chemical starting material which

14    would produce Tapentadol.

15          Q.   What exactly did the scientists at Wisconsin do to

16    determine the nature of the starting material they were using?

17          A.   Yes, they didn't make this.  This was made by other

18    scientists who had carried out a chemical synthesis to get to

19    this point.  And then in order to make certain that it was the

20    right compound and it was pure, they carried out a variety of

21    tests, tests that they list here.  And I can go through those

22    if you'd like.

23          Q.   Please do.

24          A.   So amongst many tests, for example, they looked at the

25    melting point of the compound.  They observed the melting point

1    of 164 to 165.  That's consistent with the compound that they

2    knew about in the literature.  And they cite the '593 patent

3    which has the same specification as the '737.

4          So, 163 to 164 is the literature value.  The 164 to 165

5    is the same within experimental, theh are very close indeed.

6          Q.  Did they conduct any other types of tests to determine

7    the identity of the molecule?

8          A.  Yes, they did.  So, they checked the actual molecular

9    structure using hydrogen and carbon NMR, nuclear magnetic

10   resonance spectroscopy.

11         Q.  That up there on that line?

12         A.  Yes.  So that's a spectroscopic technique which is done

13   in solution.  It doesn't say anything about crystal form.  And

14   its job is to check the molecular structure, make certain it's

15   the right number of atoms and they are in the right

16   relationship to one another.

17         And they can also tell you about organic impurities.

18   And by organic I mean impurities that might contain carbon and

19   hydrogen.  The NMR technique looks at specifically hydrogen and

20   carbon.  So, any impurity that has hydrogen and carbon in it

21   will show up by NMR.  Of course if the impurity doesn't have

22   hydrogen and carbon in it it won't show up.

23              THE COURT:  Could you just explain that a little

24   bit more in terms of it's done in solution.  What does that

25   mean?

```
 1              THE WITNESS:  Yes, so they would take the
 2    molecule -- it's on the screen.  And the precursor molecule in
 3    this case but any molecule and literally dissolve in the
 4    solvent.
 5              THE COURT:   Do you know what the solvent is?
 6              THE WITNESS:  It's a bit like dissolving sugar in
 7    coffee.
 8              THE COURT:  Do you know what the solvent is?
 9              THE WITNESS:  Oh, it's the NMR experiment.  It's
10    usually something like dimethyl sulfoxide.  I'm not sure if
11    they state it here.
12       Q.  You can go back to the other page too.
13              THE COURT:  Is it in the document?
14              THE WITNESS:  I don't see it here.
15       Q.  Professor Steed, if you could go forward to the fifth
16    page of the exhibit, I believe there is --
17              THE COURT:  What page in the exhibit?
18              MR. HARP:  The fifth page in the exhibit.
19       A.  It is here, your Honor.  It's a solvent CD3OD that's
20    NMR spectroscopy, the solvent has to be deuterated.  So that's
21    actually methanol with the hydrogen atoms in methanol exchange
22    and you have to do that to get a signal in NMR spectroscopy.
23              THE COURT:   Thank you.
24       Q.  If you can go back to the second page of the exhibit.
25       A.  Yes.  So, broadly speaking, that's a check for the
```

1    identity of the molecule and a check for whether there's any

2    impurities observed.

3        Q.   Why would a chemist want to run these kinds of tests

4    before starting a synthesis, doctor?

5        A.   All chemists like to start with pure starting material

6    so the impurities don't interfere with the final product.

7            THE COURT:   If there were impurities other than

8    hydrogen and carbon, how would they be detected?

9            THE WITNESS:   They wouldn't show up by NMR

10   spectroscopy.  They might show up in the melting point.  If the

11   melting point was depressed below the literature value, that be

12   a sign of impurities as well.

13           In terms of impurities of the left and right

14   handed molecules, what I would call enantiomeric impurities,

15   they also measured the optical rotation.  And that's this alpha

16   D25 number.  They observed a number of minus 25.7 and compared

17   that to the reported number of minus 23.8.

18           Those numbers are sufficiently similar to reassure

19   me that they have the correct enantiomers.  It's another plus

20   number for example.

21           THE COURT:   Now, would that just show the right

22   enantiomers or would it show any type of impurity as well, the

23   optical rotation?

24           THE WITNESS:   It would only show the optical

25   rotation of impurities.  So if it was 0, for example, it would

1    be a 50/50 mixture of the enantiomers.

2              THE COURT:  So, in terms of any other impurities

3    aside from testing for hydrogen and carbon, it would just be

4    the melting point that would demonstrate that?  It is usually a

5    low melting point?

6              THE WITNESS:  That's right in terms of the test

7    that they did.  But we also have a certificate of analysis on

8    the material, which is an additional test which I could get for

9    you.

10    Q.   Professor Steed, could you maybe scoot a little closer

11   to the microphone?

12   A.   Surely.

13   Q.   Move your chair a little forward if you have room.

14   Thank you.

15   A.   Is that better?

16   Q.   Yes.  Thank you.

17   A.   Confounding.

18   Q.   You just mentioned a certificate of analysis.

19   A.   Yes.  So, they did their own tests to satisfy

20   themselves first did they have the right stuff and that it was

21   pure.  And also they compared their tests to the certificate of

22   analysis that they received with the material which they also

23   include in this document.

24   Q.   Is that at Page 8 of defendant's trial Exhibit 299?

25   A.   Yes.  So this is an analytical report which came to

1    them with the material that they received.  And this reports

2    some additional tests further establishing, I think to their

3    satisfaction and to mine, that the material was pure to begin

4    with.

5         So, for example, and the way to read these analytical

6    reports is there's a column that says test, which is the

7    identity of the test.  There's a specification which says what

8    the compliant material should look like under that test.  And

9    then the results are given in the right hand column.

10        So, for example, under the description we find that

11    this was a white powder.  That's good evidence that it's free

12    of at least colored impurities, none visible to the naked eye.

13             THE COURT:  So, I'm sorry, so, the certificate

14    itself states that they did which tests?  This is when the

15    substance actually came?

16             THE WITNESS:  Yes.  So these tests would have been

17    done by analytical scientists producing the material who then

18    sent it to them.

19             THE COURT:  So, outside of the University of

20    Wisconsin?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay.  And what test is this

23    reflective of?

24             THE WITNESS:  A whole variety of tests as listed

25    in the test column there.  The first one I was referring to

1    was simply the physical description of the material.

2    Tapentadol hydrochloride is well, Tapentadol hydrochloride but

3    also this compound as well, the white material, and this is

4    indeed says that it is a white powder.  So, it's free of at

5    least visual impurities.

6        Q.   What other types of tests were done on this certificate

7    of analysis?

8        A.   Yes, they also checked of solubility, soluble in

9    methanol.  We saw that in the NMR spectrum that that's indeed

10   the case.  So it complies.  The material was identified by IR,

11   that's infrared spectroscopy.  That's another technique, looks,

12   it happens to look at vibrations in molecules.  But again it

13   gives us a fingerprint of the molecular structure.  And also to

14   some extent the solid form, although that's not relevant for

15   this compound because we haven't, it's not even Tapentadol yet.

16        But, it has a compliant under infrared spectrum.  So it

17   has the right kind of bond in it.  The analytical report

18   reports the loss on drying.  So that's where in this case you

19   heat the material at a high temperature, 105 centigrade for

20   three hours and see whether it loses any mass.  So that's a

21   test for volatile impurities.

22        And we find that it loses very little mass at all.  And

23   it loses .35 percent of its mass so that's a very small amount.

24        There's a residue on emission test.  That basically

25   means you burn the stuff.  And because it's an organic

1    molecule, it should all burn away and you shouldn't be left

2    with anything behind, of course, any ash.

3        If there was that would be a sign of some inorganic

4    impurities.  The specification says not more than .2 percent so

5    really quite low.  In fact they found 0.03 percent.  So, tiny,

6    tiny, minuscule amounts.

7        Similarly, there's a heavy metals test.  Of course this

8    is an organic compound.  It shouldn't have any heavy metals in

9    it.  The specification says that it shouldn't have more than

10   ten parts per million to be a complaint material.  And the

11   results are that it complies.  So, it doesn't have more than

12   ten parts per million.  So, again, a small amount.

13       Rather like the Wisconsin scientists themselves, the

14   analytical report also reports optical rotation excess of

15   around enantiomeric impurity.  The material complies if it's a

16   negative value between 23 and 27.  The specification reports

17   23.7ish so again it's compliant.

18       It details a series of tests.  I will keep going

19   through them.  So, in test eight the analytical report looks

20   at the purity as measured by a number of particular identified

21   impurities using the technique called high performance liquid

22   chromatography, HPLC.  That's a technique with its own

23   solution.  And it looks at how fast particular molecules and

24   their impurities, for that matter, travel down a chromatography

25   column. So you can identify by how long they spent on it, what

1    the particular impurity is.

2          So, that identified two particular impurities what they

3    call the diastereoisomer impurity.  And that's present in tiny

4    amounts.  And it's within specification.

5          Similarly, hydroxy impurity should be there and not

6    more than two percent.  Actually they're in .05 percent so

7    again as a compliant material.  They look at the total unknown

8    impurities.  You can't always identify every tiny impurity

9    that's there.  Unknown impurities should be not more than

10   .2 percent.  Again, we have .09.  So very, very low amounts

11   indeed.

12         There's a specification for total impurities shouldn't

13   be more than three percent, if fact it's .149 percent.  So very

14   low total impurities as well.

15         Q.   What are the last two tests that are shown there?

16         A.   More of the same kind of idea.  The assay by HPLC based

17   on dry basis involves calculating how much should be there,

18   taking away how much the loss in drying is there.  So, the

19   .35 percent.  So we had a slightly anomalous result.  The assay

20   is 100.3 percent and that's because there is a little bit of

21   loss on drying.   But, again, it's within specification.

22   Specification is less than 97 percent.

23         And the final test is a test for various residual

24   solvents that might be left over from the synthesis.  The

25   specification allows certain amounts of each of these solvents.

1     And in fact the material's well within specification on the two

2     where any solvents were detected and the end is not detected

3     for this.

4         Q.   What did you conclude based on all this analysis of the

5     starting material that was used at Wisconsin?

6         A.   Wisconsin scientists concluded that it was a compliant

7     material suitable for further use and I agree with them.  It's

8     very pure material.

9         Q.   At which step in example 25 did the Wisconsin

10    scientists begin their reproduction?

11        A.   So, that matches somewhat what the patent describes as

12    Step 3.  It's the last synthesis step followed by the

13    crystallization step.

14        Q.   Is step 3 an appropriate step at which to begin the

15    reproduction of the synthesis described in example 25?

16        A.   Yes.  As I said, example 25 consists of three separate

17    syntheses and Step 3 is the last of those syntheses.  It's the

18    one that actually makes the Tapentadol molecule and then

19    subsequently crystallizes it as Tapentadol hydrochloride.

20            So, that's absolutely the place to begin if you are

21    interested in the crystal form of Tapentadol hydrochloride.

22        Q.   I would like to direct you to a defendant's trial

23    Exhibit 298 which is another document from the University of

24    Wisconsin.

25            Have you seen this document before?

1     A.   Yes, I have.

2     Q.   What is this document?

3     A.   So, similar format.  This is then their electronic lab

4     book detailing the actual chemistry that they did on that

5     compound we've been talking about, the precursor compound.  So,

6     this is the Step 3 of example 25 of their reproducing.

7     Q.   And have you helped to prepare a demonstrative to show

8     how the work done at the University of Wisconsin prepares for

9     the procedure set forth in example 25?

10    A.   Yes, I have.

11    Q.   Is this that demonstrative?

12    A.   Yes, I have compared step by step all the individual

13    steps, the unit operations, I would call them, within step

14    three of example 25 within that recipe and gone through and

15    made certain that that was done to my satisfaction at the

16    University of Wisconsin work.

17    Q.   Let's start with row Number 1.  What's happening in the

18    first step there?

19    A.   So, the diagram there shows us it's the same diagram as

20    was on my previous slide and it shows us the actual chemistry

21    that's occurring.  So the OME group is being replaced by an OH

22    group.  And along the way we're going from a hydrochloride salt

23    as a precursor minus 23, the reaction of hydrobromic acid and

24    then we end up with a hydrochloride salt of the product

25    Tapentadol hydrochloride.

1    Q.  If we could flip back to DTX 298 and take a look at the

2    description, what they actually did, can you point out for us

3    where they carried out that step?

4    A.  Yes. So, this first step is to dissolve 4.3 grams of

5    that precursor molecule we were talking about in 100

6    milliliters of concentrated hydrobromic acid.   And so they

7    give the chemical name of that precursor we've been talking

8    about.  I won't read it out because I don't think even I can do

9    that.

10        They take that compound.  It's the one with the

11   structural formula in the previous exhibit.  And they take

12   4.3 grams of it, as the patent teaches, and they add

13   hydrobromic acid, 48 percent is concentrated and it's a hundred

14   mil.  That's what the patent teaches.

15   Q.  So, if you go back to the demonstrative, the Wisconsin

16   scientists faithfully carry out that step?

17   A.  Yes.

18   Q.  What's the next step in the process?

19   A.  So, then it needs to be brought to boiling.  The

20   mixture is heated under reflux for two hours.  That means

21   boiling that water solution of hydrobromic acid with the

22   precursor in it.

23   Q.  So, if you would flip back to the notebook page,

24   please, do we see that they carried out that step?

25   A.  Yes, mixture was heated to 83 degrees for two hours.

1     Q.   Was that step carried out faithfully?

2     A.   Yep.

3     Q.   So, go back to the demonstrative.  How about step

4  Number 3?  What's happening in that step?

5     A.   So once that reaction is complete, the reaction mixture

6  is cooled to room temperature and it's concentrated under

7  vacuum.

8     Q.   And go back to the notebook page.

9          Did they follow that portion of the procedure

10  correctly?

11    A.   Yes,  exactly what it says.  So the reaction is cooled

12  to RT, that's room temperature, and concentrated in a vacuum.

13    Q.   If we go back to the demonstrative, that was faithfully

14  carried out, step Number 3?

15    A.   Yes.

16    Q.   What's happening with step Number 4?

17    A.   Then at this stage we've got this vast excessive, this

18  very aggressive concentrated hydrobromic acid.  So we need to

19  get rid of that, neutralize it.  So that's done with a base,

20  concentrated hydrogen carbonate solution.  And that's done

21  until an alkaline reaction is obtained.

22    Q.   Was that faithfully, was that step carried out by the

23  scientists at the University of Wisconsin?

24    A.   Yes.  So what they say is the residue is neutralized

25  with such with anhydrous sodium hydrogen carbonate in aqueous.

```
 1        It's in water.  And then they give the ph that they got at the
 2   end of that process which is a ph of 8.  So exactly neutral
 3   would be a ph seven.  And they have gone beyond ph 7 to 8 which
 4   is alkaline as the patent teaches.
 5        Q.   We go back to the demonstrative.  Okay to put the
 6   checkmark in that box?
 7        A.   Absolutely
 8        Q.   And what about step Number 5?
 9        A.   Yes.  Then the patent teaches that the resulting
10   mixture which is crude Tapentadol should be extracted twice
11   with 50-milliliters, 2 lots of 50 milliliters of
12   dichloromethane which is an organic solvent.
13        Q.   Was that carried out at Wisconsin?
14        A.   Yes.  So, the mixture was extracted with DCM, that's
15   dichloromethane, 50-milliliters times two.
16        Q.   And so check off step number five?
17        A.   You can check that one.
18        Q.   Let's go to the next page.
19             What happens next in the process, step Number 6.
20        A.   Yes, so then the combined two lots of 50-milliliters of
21   dichloromethane have to be dried and there's a drying agent
22   used to do that, that's sodium sulfate.
23        Q.   And was that done at the University of Wisconsin?
24        A.   Yes.  Just as I said, the combined organic phases were
25   dried with anhydrous sodium sulfate.
```

1    Q.   Okay to check the box on that one as well?

2    A.   Yep.

3    Q.   What's happening in step Number 7?

4    A.   They want to get rid of the solvent dichloromethane so

5    we use a vacuum for that.  We distill it off in the vacuum.

6    Q.   Let's go back.  Do you see them carrying out that step

7    in their notebook?

8    A.   Yes, they give this lovely phrase concentrated to

9    afford a crude tedious oil.  I'm sure it was a tedious

10   procedure.  And then it was dried in a vacuum to remove the

11   dichloromethane just as the patent teaches.

12   Q.   Very good.  Go back to the demonstrative and check the

13   box.  You agree it's appropriate to check the box for step

14   number 7?

15   A.   Yes.

16   Q.   And what about step Number 8?

17   A.   We are left with crude Tapentadol.  It's dissolved, the

18   patent uses the words taken up, that means dissolved in another

19   organic solvent to butanone.

20   Q.   Was that carried out at Wisconsin as well?

21   A.   Yes, the crude residue from the evaporation is taken up

22   in butanone and that gives the amount.

23   Q.   Go back to the demonstrative.  Step Number 8 faithfully

24   carried out by Wisconsin?

25   A.   Yes.

1     Q.   What's the next step in the process?

2     A.   Then we come to the final step which is where we go

3    from the butanone solution of Tapentadol free base to

4    Tapentadol hydrochloride.  So we have to add the source of

5    hydrochloric acid.

6        In this case it's done by premixing a source of

7    hydrochloric acid, so trimethyl chlorosilane with water.  And

8    mixing those two together generates hydrochloric acid which can

9    then react with the Tapentadol to give Tapentadol

10    hydrochloride.

11       And the idea is that the Tapentadol hydrochloride is

12    not soluble in the butanone and so it crystallizes out and then

13    we get crystal product.

14     Q.   Is it important that the trimethyl chlorosilane and

15    water are premixed?

16     A.   Yes, the chemical reaction between the trimethyl

17    chlorosilane and the water generates the hydrochloric acid.  So

18    that reaction needs to occur to give you the hydrochloric acid

19    before you can add it to the Tapentadol.  Otherwise you could

20    get side reactions occurring.

21     Q.   Let's look at what the scientists at the University of

22    Wisconsin did.

23       Can you explain how they carried out that step?

24     A.   Yes, so they took a premixed mixture which they

25    describe as a biphase mixture of TMSCL that trimethylsilyl

1    chloride, a different name for the same thing.  They give the

2    amounts and water in a 1 to 1 ratio in terms of numbers of

3    molecules or mini mols as they put there.

4          It was added and they say a white solid precipitated

5    immediately so they got the crystal occurring as the patent

6    teaches.

7          Q.   If we go back to the demonstrative, please.

8          A.   Yes.  So you can put the tick there.

9          Q.   Was it significant to you that the scientists reported

10   that they saw white powder as soon as they added the TMCS and

11   water mixture?

12         A.   That's certainly what I expect because Tapentadol

13   hydrochloride is insoluble in butanone.  And more importantly

14   it's what the patent teaches.  So at that point the patent says

15   that the product crystallizes out and that's the end of the

16   procedure.

17         So, the fact that that worked for them means that the

18   chemistry worked for them, that they carried out a successful

19   reproduction.

20         Q.   What was the final product that the scientists at the

21   University of Wisconsin obtained?

22         A.   Yes, they report it as a white powder which of course

23   it should be.

24         Q.   How did the scientists at Wisconsin know what they had

25   actually made?

1       A.   Yes, so then rather like they did on the starting

2   material they then carried out the similar kinds of tests in

3   order to characterize their product.   So they carried out

4   hydrogen and carbon NMR spectroscopy, for example, to the

5   melting point.

6               THE COURT:   I just have a follow-up question with

7   respect to the starting material but I'm going to address this

8   to counsel because it may actually be something that's

9   protected.

10               Do we know where the starting material is obtained

11   from?  And if it is something that needs to be protected, we

12   will seal the courtroom later just to get that answered.

13               MR. HARP:   I don't think it needs to be sealed.

14               THE COURT:   All right.

15               MR. HARP:   If we go back to the notebook page,

16   it's from Norac.  It's a company called Norac.

17               THE COURT:   You know what, let's ask, should we

18   ask the witness?  That's okay.

19               Do you know where the starting material came from?

20               THE WITNESS:   Yes, your Honor.

21               THE COURT:   All right.  Where did it come from?

22               THE WITNESS:   As Counsel said the Wisconsin

23   scientists actually note in their lab book that it comes from

24   Norac Pharma.

25               MR. HARP:   I think that's in defendant's trial

```
1          Exhibit 299.

2                    THE COURT:   299?

3                    MR. HARP:  Yes, under preparation.

4                    THE COURT:   What's document number on that?

5                    MR. HARP:  DTX 299, Page 2.

6                    THE COURT:   All right.  And the company, I'm

7          sorry, that performed the certificate of analysis prior to

8          doing the work at Wisconsin, what was the name of that company?

9                    THE WITNESS:  The name that's actually on the

10         analysis, I understand, is a supplier to Norac.  But, I don't

11         know the details of how these companies are related.  It's

12         exhibit D, I believe.

13                   THE COURT:   I'm sorry, exhibit D to which

14         document?

15                   THE WITNESS:  Exhibit D to, I'm sorry, to my

16         report.

17                   MR. HARP:  It's defendant's trial Exhibit 299.

18                   THE COURT:   299.  So, it's the same document.  Do

19         you know the page on that?

20                   MR. HARP:  Eight.

21                   THE COURT:  Thank you.

22         Q.  So, if we could go back to Exhibit 298, please.

23              So what did the scientists at the University of

24         Wisconsin determine when they tested their product using NMR?

25         A.  Yes.  So, they give the spectrum but they also give --
```

1      yes, so they performed proton and hydrocarbon NMR spectra.

2      Actually the solvent mixture, methanol and dimethyl sulfoxide.

3      They give the NMR spectrum there and it corresponds to the

4      right product as far as I am concerned.

5           Q.   So, when you say the right product, what is that they

6      made?

7           A.   Tapentadol.

8           Q.   They made Tapentadol.  Did they characterize the

9      polymorph of the material that they made?

10          A.   Yes.  So they also sent the sample to an x-ray powder

11     diffraction laboratory.

12          Q.   If we go to defendant's trial Exhibit 297, please, have

13     you seen this document before?

14          A.   Yes, I have.

15          Q.   And what is this document?

16          A.   Yes.  So, this is the experimental details of the x-ray

17     powder diffraction measurements.  And Page 3 of this document

18     actually has the powder pattern on it.

19          Q.   Let's take a look at that pattern on Page 3.  Are we

20     looking at it here on the screen?

21          A.   So, this is an x-ray powder diffraction pattern

22     measured on the sample that they made and it shows that the

23     sample is a mixture of form A and form B Tapentadol

24     hydrochloride.

25          Q.   How have you been able to determine that the sample

1    contains form A?

2         A.   It has all the peaks that are identified as being form

3    A peaks within the '364 patent.

4         Q.   And what peaks are those specifically that you're

5    looking at?

6         A.   So, the ones that are most obvious to me are the peaks

7    at 18.9 and 22.5 which are quite unique peaks for form A.  But

8    I've checked into that and it actually has all the peaks listed

9    in claims 1 and 2 of the '364 patent.

10        Q.   Let's take a look at those claims.  Defendant's trial

11   Exhibit 304.  If we take a look at claims 1 and 2.  Are those

12   the peaks that you identified in the powder pattern for the

13   Wisconsin project?

14        A.   Yes, they are both listed, both claims 1 and 2

15        Q.   Are all those peaks present in the pattern for the

16   Wisconsin project?

17        A.   Yes,  they are.

18        Q.   Did you consider the intensities of the peaks when you

19   compared the Wisconsin pattern to the peaks listed in the

20   claims.

21        A.   Only insofar that they were consistent with what I

22   would expect given this is a mixed sample.  But, in comparing

23   the two claims, I looked at the peak positions with the area

24   that the patent gives which is plus or minus two in two theta.

25        Q.   Is there a figure in the '364 patent that contains the

1  powder pattern for form A?

2    A. Yes, that's Figure 1.

3    Q. Take a look at that.  Did you compare Figure 1 in the

4  '364 patent to the pattern obtained by the University of

5  Wisconsin?

6    A. Yes I did, and the University of Wisconsin data is

7  consistent with Figure 1 albeit also with the presence of form

8  B as well.

9    Q. So, how does the pattern for the Wisconsin product

10  compare to Figure 1?

11    A.  It's essentially the same thing.

12    Q. Has it been disputed that the Wisconsin product

13  contains form A of Tapentadol hydrochloride?

14    A. No, it hasn't.  Dr. Bernstein in his report also said

15  that form A Tapentadol hydrochloride is present.

16    Q. Professor Steed, were you in court last week to hear

17  Grunenthal's witnesses discuss samples they said resulted in

18  form B at room temperature?

19    A. Yes, I was.

20    Q. Do recall what those samples were?

21    A. What they were.  You mean in terms of their code

22  numbers?  I believe it's the charge 0 you are referring to.

23  And also Miss Mueller's reproductions of this procedure?

24    Q. Right, right.  There was also some discussion of Dr.

25  Buschmann's batch one.  Do you remember that?

1    A.   Yes.

2    Q.   You didn't list that one in your answer.  Why didn't

3    you list that one?

4    A.   No powder diffraction data had been provided on that

5    sample to me.

6    Q.   So, let's talk first about Miss Mueller's attempt to

7    reproduce example 25.

8         Have you reviewed the notebooks documenting her work?

9    A.   Yes, I have.

10   Q.   Having reviewed those notebooks do you have an opinion

11   about whether her work was a faithful reproduction of example

12   25?

13   A.   No.  I don't think it was a faithful reproduction quite

14   simply the procedure just didn't work in her hands.  She didn't

15   get a product where the patent says she should, in any of her

16   reproductions.

17   Q.   Can you say it in a little more detail what do you mean

18   she didn't get what the patent describes?

19   A.   Yes, so that very last step of the patent, the point

20   which the Tapentadol hydrochloride crystallizes out, in her

21   hands, when following the teachings of the patent, nothing

22   crystallized out.  The procedure just quite simply didn't work.

23   Q.   Was there anything else about the product that she

24   eventually did obtain that indicated to you that the

25   reproduction hadn't worked properly?

1      A.   Yes, well, when she finally did get a product out by

2      cooling it in an icebox for 90 minutes then she got what she

3      described as a mustard yellow compound which, as all chemists

4      will tell you, is a pretty bad sign in terms of purity.

5      Q.   Do you know who Miss Mueller is?

6      A.   I am not acquainted with her personally.

7      Q.   Do you know what her job was at Grunenthal or is at

8      Grunenthal?

9      A.   Yes.  I have reviewed her background from her

10     deposition transcript.  It's my understanding she was a

11     technician working in the process development labs with

12     expertise in analysis.

13     Q.   Do you know how much experience Miss Mueller had with

14     the synthesis of Tapentadol at the time she did her

15     reproductions of example 25?

16     A.   She stated it was the first time she was ever doing the

17     reaction, ever handling Tapentadol.

18     Q.   How many times did Miss Mueller attempt to follow

19     example 25?

20     A.   I think initially she did three reactions and then a

21     rather later one, I think much later around 2009.

22     Q.   Let's take a look at some of her notebook documenting

23     her attempts.  If you could turn to defendant's trial

24     Exhibit 1003.

25          Have you seen this document before?

1     A.   Yes, I have.

2     Q.   What is this document?

3     A.   So, this is an English translation of Miss Mueller's

4  notebooks from her attempt to reproduce the example 25.

5     Q.   If I could direct your attention to pages 14 and 15 of

6  DTX 1003.

7     A.   Okay.

8     Q.   Have you seen those pages before?

9     A.   Yes, I have.

10    Q.   What was documented on those pages?

11    A.   So, these two pages are, on the left, Page 14 is her

12  first attempt to reproduce example 25.  And the Page 15 is her

13  third attempt to reproduce example 25.

14    Q.   Okay.  And have you reviewed the work that's documented

15  on these pages?

16    A.   Yes, I have.

17    Q.   How does the work that Miss Mueller performed here

18  correspond to example 25 in the '737 patent?

19    A.   It deviates from it in a number of quite significant

20  ways.  And as I alluded to the fact that at the end the patent

21  just didn't work, the point she should have gotten crystals,

22  she didn't get anything, so clearly it didn't work for her.

23    Q.   What were the mistakes that she made?

24    A.   There's several of them.  I have prepared a

25  demonstrative which might make it a little bit more helpful.

1       Q.   Why don't we take a look at that.  I think it's slide

2   Number 9.

3       A.   So, this demonstrative compares the areas where she

4   made mistakes compared to the same steps that I went through

5   with the University of Wisconsin work.

6            So, in looking at this the first thing I noticed was

7   that she said that she had never actually characterized the

8   starting material that she used, that precursor molecule with

9   the OME group on it, she said in her deposition that she didn't

10  characterize it.  I don't know why.

11           I also noted she didn't start with the amount that the

12  patent teaches.  She used 4.55 grams instead of 4.3 for some

13  reason.

14      Q.   Let's take a look at her deposition testimony.  It's

15  DTX 285.  It's Page 60, lines 15 through 19.  Is that also

16  testimony that you were referring to in your answer?

17      A.   Yes.

18      Q.   So, what didn't she do here?

19      A.   So, she was asked if she examined the purity of the

20  35111 chemical product.  The 351 is the immediate chemical

21  precursor.  It's her code for the immediate chemical precursor

22  of Tapentadol.  It's the compound that we were talking about in

23  the Wisconsin context.

24           She was asked if she examined the purity of that

25  starting compound and she said no.

1      Q.   Thank you.  Let's go back to the demonstrative please.

2           So what conclusions did you reach about whether Miss

3      Mueller faithfully carried out the first step in example 25?

4      A.   So, in terms of the starting material that she was

5      working with, we don't know whether it was pure or not.  She

6      didn't carry out those tests and she didn't start with the

7      amount that the patent recommends.

8      Q.   Are there any other mistakes that she made in the

9      process of attempting the reproduce example 25?

10     A.   Yes, then she carried out a similar process to the

11     Wisconsin scientists until we get to Step 4.  This is the step

12     in which that very, very strong hydrobromic acid needs to be

13     neutralized.

14          If it isn't properly neutralized then it can carry

15     through into the final product.  This is the step where we can

16     kill it off.  The patent teaches that it should be neutralized

17     until an alkaline reaction was obtained.

18     Q.   If we look back to her notebook page in DTX 1003 at

19     Page 14, if you could blow up starting there.  Actually it's

20     above the paragraph above that.

21          Can you point out here where she is describing work

22     that she did related to that step?

23     A.   Yes. So, she does say she rendered the residue

24     alkaline, rendered the residue alkaline.  It's concentrated

25     sodium hydrogen carbonate solution, but she doesn't say what ph

1    that went to.  So that just creates a little doubt in my mind.

2    If she just went to just alkaline ph 7.01 it may not be enough

3    to properly kill off the hydrobromic acid.

4        Q.   Why would that matter?

5        A.   Well, this is our chance to destroy the hydrobromic

6    acid and make it back into sodium bromide in this case but

7    remove it from the reaction.

8            And so if it isn't destroyed at this point, then it can

9    carry through to the final product.  This is the stage at which

10   it gets neutralized.

11       Q.   What other mistakes did Miss Mueller make?

12       A.   Yes.  If we go back to the demonstrative.

13       Q.   Sure.

14       A.   Yes.  So, I just want to focus on Step 5 there.  Can we

15   just get up to --  so, Step 5 is the extraction with two lots

16   of 50 milliliters of dichloromethane.  I wanted to show you

17   what that looks like.

18           So if you go to the next demonstrative, the way in

19   which is that's done is a manual process.  It's done with this

20   piece of apparatus, a separating funnel.   The dichloromethane

21   layer and the crude alkaline layer that contains all the

22   impurities, as well as the Tapentadol free base at this stage

23   are mixed together and they form two layers like this within

24   our funnel.

25           It's the operator's job basically to open the tap,  run

1    the two layers through, and close the tap at the point where

2    they decide, in this case the water will be on the bottom

3    because it's full of salt.  When the water is finished going

4    through and the organic solvent is entering the tap, then they

5    have to quickly shut the tap off, switch the flask over and

6    then collect the organic layer and do that twice.

7         What happens then, what always happens is that there's

8    lots and lots of droplets of water in the dichloromethane.  So

9    you always get a very wet solution there.  So that's why it's

10   important to dry it.  And that's Step 6.

11   Q.    Why does it matter that there could be water left in

12   the aqueous phase?

13   A.    Remember we need concentrated hydrobromic acid and we

14   neutralized it with sodium carbonate.  So the water is full of

15   sodium bromide.  It's a very, very concentrated solution of

16   sodium bromide.  And so this is our chance to get rid of it in

17   the water layer.  And if don't remove all the droplets of

18   water, the sodium bromide in the droplets of water will carry

19   through.

20   Q.    How is the water removed?

21   A.    That's through use of the drying agent.  What the

22   patent teaches is that the combined organic phases, that's the

23   two lots of 50 milliliters of dichloromethane, were dried over

24   sodium sulfate.

25   Q.    And if we go back to Miss Mueller's notebook pages and

DTX 1003, Page 14.

1

2     A.   Yes, so she does something that's actually slightly

3     different and significant.  So, she says that she filtered the

4     extract over sodium sulfate.  There's a big difference between

5     filter over and dry over.

6          So, when you dry something over a drying agent, what

7     you do is you place the drying agent into the flask, you swirl

8     it around a bit then let it sit for 5 or 10 minutes to absorb

9     all the moisture.

10         If you filter over it, what you're doing is you're

11    pouring the dichloromethane over the drying agent and it

12    filters straight through.  So, the contact time is far, far

13    less.  That means it's not going to be dried properly.

14    Q.   And what could be the result of the failure to dry the

15    aqueous phases properly?

16    A.   Droplets of water passing through into the final

17    product which are laced with impurities, particularly sodium

18    bromide.  But also any other trace impurities that have been

19    generated in this very aggressive reaction.  It's very

20    concentrated acid.

21    Q.   Did she make any other mistakes in the process?  If we

22    go back to demonstrative.

23    A.   Yes.  The final one I identified was right at the very

24    last step, that's the step at which the polymorphic form was

25    identified, the Tapentadol hydrochloride.

1          The patent teaches to add this premixed mixture of

2     trimethyl chloro silane and water at which point the product

3     crystallizes out.  That's not what she did, however.

4          Q.  Can we go to the notebook.  What did Miss Mueller

5     actually do?

6          A.  So,  first of all she added the water directly to the

7     butanone solution of the Tapentadol free base.   And then she

8     added separately the trimethyl chloro silane again directly to

9     that butanone solution.

10         Q.  So she didn't premix those two reagents.  Is that

11    right?

12         A.  No, she didn't give them a chance to react together to

13    produce hydrochloric acid.  So instead the trimethyl chloro

14    silane can react with the Tapentadol.  There's a risk of at the

15    point of addition you suddenly get generation of HCL which

16    causes degradation byproducts and so on.  It's just generally

17    not what the patent teaches in this prior practice.

18         Q.  Just to be clear, what effect would it have on the

19    reaction to not have done the premixing?

20         A.  It's another way in which it would generate impurities.

21         Q.  What happened in Miss Mueller's experiment after she

22    added the, sequentially added the TCMS and water?

23         A.  Nothing.  No crystals came out.

24         Q.  Is that significant to you?

25         A.  Yes.  The patent teaches that after addition of TMCS

1    water mixture, the Tapentadol crystallizes out.  If it doesn't

2    crystallize out, then the patent hasn't worked.  The procedure

3    hasn't been followed properly.

4        Q.  Let's go back to the notebook.  What did she do when

5    she didn't obtain crystals?

6        A.  Then she tried to get the crystals to come out by

7    improvising.  And so she immersed the rest of the entire

8    reaction mixture, the butanone reaction mixture in an ice bath,

9    set it for 90 minutes, and then she did get a solid coming out.

10       Q.  What was the net results of all these mistakes?

11       A.  She did ultimately isolate a low yield of product.  And

12   unfortunately it was a yellow product.  She described it as

13   mustard yellow.  So a really unpleasant, discolored looking

14   impure product.

15       Q.  And Professor Steed, just to backup a little bit, this

16   experiment we've been talking about is, if we go to the top of

17   the page, does she have a label for this product?  For the

18   final product that was given a code labeling, a number.  Do you

19   know what that was?

20       A.  Yes.  And I think you are highlighting it.  The 351 is

21   the starting compound and the product label is 322.  So BU 322.

22   Now, having heard Dr. Buschmann's testimony, I understand what

23   the 11 means, reaction method one and sample one.

24       Q.  If you go to Page 15 of this document, DTX 1003, what's

25   on this next page?

1        A.   So, this is her third attempt to reproduce it.  I think

2    she abandoned her second attempt.  And this is the same

3    procedure except that now she used just a one third scale so

4    instead of starting with 4.3 grams of starting material, she

5    began with 1.23 grams and she scaled the amount of hydrobromic

6    acid down as well.

7        Q.   And did she, did Miss Mueller make mistakes in her

8    third attempt here for GBBU 322-1-3?

9        A.   Yes, she made exactly the same mistake she made the

10   first time around.  I think she obviously got something out the

11   first time so she did it again exactly the same way because

12   that's the way it worked for her.  The procedure is essentially

13   identical to repetition one.

14       Q.   What in the end was the net result of the product that

15   she got on this page?

16       A.   Again a discolored product she described it as beige.

17       Q.   If we could flip back one page as well.  I would just

18   like to -- where on the Page 14 of DTX 1003 does she report the

19   color of her product?

20       A.   This is not her page.  This is repetition one.  That's

21   mustard colored.

22       Q.   I'm sorry.  I've gone back to repetition one.

23       A.   I'm sorry.

24       Q.   I'm backing up.  Sorry to be confusion.

25       A.   Yes.  So it's right at the bottom there under the

1    heeding appearance on repetition one.

2         Q.   And what was the appearance of the final product?

3         A.   It was mustard colored in repetition one.

4         Q.   Do you recall a later attempt by Miss Mueller to

5    reproduce example 25?

6         A.   Yes, I believe she did a third attempt at reproduction

7    in 2009.

8         Q.   Could I ask you to turn to defendant's trial

9    Exhibit 1034, please?

10             Have you seen this document before?

11        A.   Yes.

12        Q.   What is this document?

13        A.   This is again an English translation of her lab book

14   from that fourth reproduction.

15        Q.   And does this attempt faithfully follow example 25?

16        A.   No.  This is a completely different reaction because

17   she's not starting with the right starting material.  So under

18   reactions, she starts with BU 351 hydrobromide salt.  So, the

19   patent teaches start with hydrochloride salt.  So this is a

20   different chemical substance.

21        Q.   What were the -- did she make any other mistakes in

22   this process as well?

23        A.   She did this process in much the same way she had done

24   repetitions 1 and 3.  So, for example, with the sequential

25   addition of the trimethyl chloro silane and the water.

1          Q.   And what was the product, if we go to the next page,

2    what was, actually two pages to Page 3 of the exhibit, what was

3    the result of all those mistakes?

4          A.   Yes.   So, in this case she obtained a cream colored

5    solid.

6          Q.   What does that indicate?

7          A.   So again it should be white.   So again this colored

8    impurities, there it's a discolored product.

9          Q.   Professor Steed, are you also aware of some work done

10   at Grunenthal, some other work -- sorry, strike that.

11         Professor Steed, are you aware of any other work done

12   at Grunenthal that plaintiffs allege results in form B at room

13   temperature?

14         A.   The only other work that I'm aware of is Dr.

15   Buschmann's charge 0.

16         Q.   Have you reviewed the lab notebook describing the

17   synthesis for charge 0?

18         A.   I have, yes.

19         Q.   Could we ask you to turn to defendant's trial

20   Exhibit 974, please?

21         Have you reviewed the document?

22         A.   Yes.

23         Q.   What is this document?

24         A.   This is the English translation of Dr. Buschmann's lab

25   book from that charge 0 reaction.

1      Q.   Is the synthesis described in exhibit 974 the same as

2    example 25?

3      A.   No, it's completely different.  So, he never does that

4    Step 3 we've been talking about.  He carries out a chemical

5    reaction from a different molecule.  It's a chloro molecule.

6    If perhaps if I point with a laser pointer, is that okay, your

7    Honor?

8              THE COURT:   That's fine.

9              THE WITNESS:   Thanks.

10      Q.   So, it starts with the chloro molecule CL here.  That's

11    not the starting material for Step 3.  He carries out this step

12    with a triphenylphosphine reaction to give the Tapentadol

13    molecule it's hydrochloride.

14      So this isn't the hydrobromide reaction at all.  It's

15    completely a different chemical reaction with a completely

16    different starting material.

17      Q.   Were you in the courtroom during Dr. Buschmann's

18    testimony?

19      A.   Yes.

20      Q.   And did his testimony confirm that batch 0 did not

21    follow example 25?

22      A.   Yes, it did.

23      Q.   What's the chemical purity on the batch 0 product?

24      A.   Dr. Buschmann, I believe, carried out some tests.  I

25    believe he carried out an NMR spectroscopy and he looked at the

1   melting point.

2           The melting point is quite strange.  It's what's

3   labeled as F.P. here.  And he says that it sinters at

4   123 degrees C with decomposition.  And the melting point of

5   Tapentadol hydrochloride is 200 degrees C.  So way, way

6   different from 123.

7       Q.   So, is there an actual melting point reported in DTX

8   974?

9       A.   No,  no melting point.  The sintering process, the

10  compound remains a solid during sintering.  It's a kind of

11  merging together of particles.

12      Q.   So what's the difference between the sintering point

13  and the melting point?

14      A.    So there's no actual melting.  No liquid is formed

15  here.  And as I said, he noted the decomposition and it's a

16  very, very different temperature. So, this indicates to me,

17  well, it's hard to know what to make of it.  It certainly isn't

18  a good melting point indicating a high purity product.  It

19  seems to be indicating something that's very impure indeed.

20      Q.    Have you reviewed the synthesis of Dr. Buschmann's

21  batch one?

22      A.   Yes.

23      Q.   Let's look, if I can ask you to turn to DTX 977.   Do

24  you recognize this document?

25      A.   Yes, I do.

1    Q.   What's described on this notebook page?

2    A.   So, this is his notebook page in English translation

3    for so called charge one, his second, his second synthesis of

4    Tapentadol.

5    Q.   Is this method the same as the method that was used to

6    make batch 0?

7    A.   No.   This method much more closely parallels example

8    25.   So this is a reaction of the example 25 precursor, the

9    methoxy compound with hydrobromic acid to get Tapentadol

10   hydrochloride.

11   Q.   Have you seen any x-ray theta for batch one?

12   A.   No.

13   Q.   Even if they didn't follow example 25, how do you

14   explain the results of Miss Mueller and Dr. Buschmann seeing

15   some form B that persisted at room temperature?

16   A.   These are both highly impure samples.   Those impurities

17   can prevent the normally unstable form B transforming to form

18   A.   So these are not Tapentadol hydrochloride but actually

19   mixtures of Tapentadol hydrochloride with other impurities

20   sufficient to stop it from transforming to the normally, the

21   only stable form of -- the only form of Tapentadol that's

22   stable at room temperature.

23   Q.   What evidence have you seen that form A is the stable

24   form at room temperature and that form B converts to form A at

25   that temperature?

1    A.   The evidence is abundant.   So, in particular I can

2    point to a single crystal x-ray crystallography in which form B

3    transforms to form A above room temperature.   Powder x-ray

4    diffraction was looked at and showed that form A is the only

5    form stable at room temperature.   And differential scanning

6    calorimetry also shows that form A is the only form stable at

7    room temperature.

8    Q.   Let's talk about the powder x-ray diffraction studies

9    you mentioned.   If we look at the '364 patent which is

10    defendant's Exhibit 304, column 18.

11    A.   Okay.

12    Q.   Is this the variable temperature x-ray diffraction data

13    that you were talking about?

14    A.   Yes.   This is the description of the experiment.

15    Q.   What are they doing in these experiments?

16    A.   Yes, so very simple.   All they are doing is recording

17    the x-ray powder diffraction pattern.   I think they started at

18    around 30 actually in the actual data but at a lowish

19    temperature.   They recorded as form A.

20    Then they are heating the sample and recording the

21    x-ray powder diffraction pattern.   Every time they heat it, I

22    don't know what steps they are going through but probably just

23    a few degrees.

24    And what they say is that form A converts to Form B

25    between about 40 and 50 degrees centigrade.

1    Q.   And what happens next after they've done the heating

2    step?

3    A.   So, then the x-ray powder pattern for form A changes to

4    the Form B powder pattern above the transition temperature.

5    And then they cool the sample down, they get the same sample.

6    Monitor the x-ray powder diffraction again and B transforms

7    back into A again.

8    Q.   And what does that -- what conclusion do you draw from

9    that experiment?

10   A.   It's what we scientists call an enantiotropic pair.  So

11   one form is stable at room temperature; one form is stable at

12   high temperature.  And there's a very fast conversion between

13   them such as you see that conversion happening on the time

14   scale of the experiment.  So a matter of a few minutes.

15   So,  In other words, form B simply doesn't persist at

16   room temperature.  It's unstable.

17   Q.   You also mentioned some single crystal x-ray studies

18   that showed this behavior.

19   Could we take a look at defendant's trial Exhibit 993,

20   please.  Can you go to the next page?

21   What is this document?

22   A.   Yes, this is a report sent to Grunenthal Dr. Gruss by

23   Professor Englert at the University of Aachen detailing his

24   single x-ray diffraction studies on Tapentadol.  What Dr.

25   Englert found was that if he took just one single crystal of

1    form A and determined its structure, he was able to find the

2    crystal packing arrangement, the shape of the molecule and of

3    course a single crystal experiment allows you to directly

4    calculate the powder pattern.  The two are related to each

5    other.

6         He unambiguously identified form A at room temperature.

7    And what he did was to warm it up to the transition point and I

8    believe he found in his crystal it was 48 centigrade.  And he

9    watched that one single crystal transform into form B.  And

10   then he did a full single crystal x-ray structure examination

11   on form B.

12        And then what he found was that when he cooled it down

13   again, that one form B crystal transformed into form A again.

14        Q.   So what did Dr. Englert conclude about the behavior of

15   form  A and form B?

16        A.   He was actually able to realize that the only

17   difference between form A and form B, they are very closely

18   related.  The only difference is a very small rotation of one

19   of the organic groups.  And perhaps we could put up the picture

20   that he has on Page 2 of his document.  Right. That picture

21   there.  Thank you.

22        So, the form A molecule, if I may point again, is this

23   one on the left.  And if you look at this little organic group,

24   just here it's and ether group, that's the form A shape.  And

25   when he did the x-ray structure of Form B, having warmed it up,

1    that little organic group just laid over on its side right

2    back.

3           So, that small twist is the only difference forms A and

4    B.  And what Professor Englert was able to do was to calculate

5    that these two different shapes were essentially the same as

6    each other.  And he calculated the barrier interconversion

7    between them which he found was five kilocalories per mol,

8    which is a very low energy barrier indeed.  The kind of energy

9    that is just around in the atmosphere, the transition

10   temperature of 30 to 40 in this case.

11          So, he was able to show that it was a very small

12   transition between the two crystal structures.  It was a very

13   easy transition.  It didn't involve breaking or making any

14   bonds.  And so it wasn't surprising that it would happen so

15   readily and so form B would transform back to A as soon as you

16   cool it.

17       Q.  Is it fair to say that the transition between A and B

18   is reversible?

19       A.  Absolutely.

20       Q.  And what is the third piece of evidence you mentioned

21   showing that forms A and B interconvert?

22       A.  Yes, that's a differential scanning calorimetry.  So,

23   I think this is a technique that Dr. Gruss talked about.  It's

24   a technique in which the heat taken in by a sample or given out

25   by a sample relative to a reference is measured as a function

1    of temperature.

2          So you warm the sample up.  See if it takes or gives

3    out any heat which might indicate a phase change.  And then

4    cool it down again, see if it takes or gives out heat again

5    that might indicate it transforming from one form to another.

6          Perhaps the simplest analogy is something like melting.

7    So if you take ice which is a stable form at low temperature

8    and put heat in, it will transform to water which is the stable

9    form at the higher temperature above the melting point.

10         THE COURT:   Sorry, what is the third figure did

11   you say on this?

12         THE WITNESS:  It's the third figure.  I didn't

13   mention a third figure.  Oh, sorry, it's the superposition of

14   the two.

15         THE COURT:   Of one over the other?

16         THE WITNESS:  Yes.

17         THE COURT:   Go ahead.  I'm sorry.

18   A.    So the DS experiment basically allows you to look at

19   phase changes like one polymorph to another or like melting.

20   It allows you to look by virtue of heat that goes in or comes

21   out during the transformation.

22   Q.    If I could ask you to take a look at defendant's trial

23   Exhibit 1243, Page 9 of that document.

24         Have you seen this document before?

25   A.    Yes, I have.

1      Q.   What is it?

2      A.   So, these are a series of slides produced by

3   Grunenthal's Dr. Andreas Fischer who is inventor of the '364

4   patent in 2005 which summarizes Grunenthal's understanding of

5   polymorphism of CG 5503 Tapentadol hydrochloride.

6      Q.   And on Page 9 of this document, what are we going to

7   see on this slide?

8      A.   Yes.  So, these are two DSC scans, differential

9   scanning calorimetry scans showing the transformation of form A

10   into Form B.

11      Q.   Can you briefly walk us through the experiment and tell

12   us what's happening with the data on this page?

13      A.   Yeah, I would be happy to.  So, and if I may point

14   again, so if you look at the horizontal scale, it's pretty hard

15   to make out, but this is temperature and degree centigrade with

16   room temperature on the left here going up to a little over 200

17   on the right here which is beyond the melting point.

18           And probably the best place to start is on the upper

19   trace.  I'm just on the horizontal section here.  So, once the

20   sample in reference to underneath the equilibrium, get rid of

21   this here, this horizontal line means that no heat is going

22   into or leaving the sample as we raise the temperature going on

23   the line until we get to the beginning of this peak just here.

24           And this peak is pointing upwards.  It's what we call

25   an endotherm.  It means that the heat is taken in by the sample

1    and that heat is required to drive this transformation of form

2    A to form B.

3         So, as we increase the temperature through this peak,

4    the sample takes in heat.  That allows form A to transform to

5    form B and eventually on the other side of the peak the sample

6    is now all form B so the peak dies away again.

7         We then carry on with essentially a horizontal line all

8    the way up in temperature until this enormous great peak which

9    is around 200 centigrade and that's the melting of Tapentadol.

10   You can see how much bigger a peak melting is in the phase

11   transformation.  The phase transformation is a very small heat

12   indeed because it's a very easy transformation.

13        Q.  What's happening on the lower trace that we see on the

14   page?

15        A.  Then we have the reverse experiment, the cooling down

16   experiment.  So, if we start around 40 degrees, see here at the

17   transition point, this is where the sample is form B.  And then

18   as we go horizontally from right to left cooling down, we see a

19   downward pointing peak, opposite direction of the other peak.

20   That's where the heat that went in to make form A into form B

21   is now coming out again as form B transforms back into form A.

22        And the beginning of this peak is around 24 and a half

23   degrees centigrade.  And so by the time we've gotten to room

24   temperature, the sample is transformed all the way back to form

25   A.  And that's the end of the experiment.

1      Q.   Does the DSC provide information about how quickly this

2    transformation happens between A and B?

3      A.   Yes.  So, a typical heating arrangement of DSC will be

4    around ten degrees C per minute.  And so if we just look at the

5    width of that cooling peak for example there, the width of that

6    peak is around ten degrees C ballpark.  So, this process is

7    occurring in under a minute.

8      Q.   Based on the data that we've just been talking about,

9    how do you know that the Grunenthal reproductions must have

10    impurities?

11      A.   Well, we see it here that if you've got a sample of

12    Tapentadol, then it will transform from form B to Form A by the

13    time you get to room temperature.  And so if that doesn't

14    happen, there must be something stopping it.

15      We can see the behavior of Tapentadol.  It's form A

16    stable at room temperature thermodynamically.  Form B is only

17    stable at high temperature, not just thermodynamically, but

18    also form B is kinetically unstable.

19      What that means is the rate of transformation, B back

20    to A, is fast.  When you cool down.  And we can see that

21    directly from the DSC here.  It occurs within a minute.

22      So if that's happening with this sample of Tapentadol

23    hydrochloride, then if you see a sample that's persisting at

24    room temperature, we know that Tapentadol hydrochloride is both

25    thermodynamically and kinetically unstable at room temperature.

1   So there must be an impurity stopping it from transforming.

2   There has to be.

3       Q.   Did you help prepare some demonstratives that

4   illustrate the behavior you're talking about?

5       A.   Yes, I did, just cartoon fashion.  So, the best way to

6   think it about it as an analogy is that in position A, form A

7   if you think of Tapentadol hydrochloride as being like a

8   spring, then when it's coiled up it's stable.  That's the room

9   temperature stable form.

10      When you warm it up to position B, heat goes in that

11  allows the spring to stretch out into an unstable state.  And

12  then it would naturally spring back again which is the reverse

13  peak going backwards in the DSC.

14      The only thing that would stop it from doing that is if

15  some impurity gets in the way and literally physically prevents

16  that transition from occurring.  And I've represented that in

17  cartoon fashion just with the pencils getting in the way.  I

18  don't know if you've got that slide.

19      So the stretch spring represents form B.  And as you

20  cool it down, it becomes unstable.  We know it should transform

21  back to Form A fast.  But if something gets in the way, the

22  impurities, that can stop it and make it metastable.  In other

23  words, make it long lived at room temperature even though it's

24  not thermodynically stable.

25      Q.   Was Grunenthal aware of the role impurities play in

1          stabilizing form B at room temperature?

2               A.   Yes, they were.   They discussed it extensively.

3               Q.   Can we look at DTX 1243 at Page 18.

4               How do you know that Grunenthal was aware of the role

5          of impurities?

6               A.   Yes.   So, just looking at this slide on Page 18, this

7          is a slide in which they recognize that in some special cases

8          polymorph B was obtained and does seem to be stable at room

9          temperature, flying in the face of their own DSC data.

10              And they recognize that this was a special case and an

11         anomaly and they tried to explain it.   And they came up with

12         four possible explanations.

13              One is impurity profile.   They recognize that

14         impurities might simply stop the form B transforming if it

15         wasn't pure enough.   They also considered the possibility of

16         particle size.   But there's another slide in this document in

17         which they rule that out by systematic study of particle size

18         and transition temperature and conclude that there is no

19         effect.

20              They also consider the possibility of mixed crystal

21         formation which is also impurities, specifically where the

22         impurities are actually getting into the intimate crystal

23         structure of the crystal and preventing it from transforming.

24         So 1 and 3 are both impurities.

25              And they also wondered whether they might even have a

1    new polymorph.  But, there's only forms A and B of Tapentadol

2    known up until now at least anyway.

3        Q.   Does this document include any studies of a particular

4    impurity profile?

5        A.   Yes, it does.

6        Q.   Where do you see that, sir?

7        A.   On the very next page.  Page 19.

8        Q.   Page 19 of defendant's trial Exhibit 1243?

9        A.   Yes, so this refers to a series of batches of

10   Tapentadol hydrochloride with the label CEPM which Grunenthal

11   prepared by recrystallization in order to try and eliminate

12   impurities.

13        And so batch CEPM one is a recrystallization batch in

14   which the Tapentadol hydrochloride is dissolved in a solvent.

15   It's cooled and crystallizes.  I forget what the solvent was.

16   I am not sure about that.  It crystallizes out to form A and

17   the form A crystals are filtered off and removed.

18        And yes, in fact, we can see from the table that it's

19   modification A that comes out in batch CPM one because it's

20   been recrystallized and the impurities have been removed.

21        What they then did was with the liquid that's left over

22   from filtering off those form A crystals, they then evaporated

23   that liquid.  They got rid of the organic solvent and looked at

24   what solid was left behind.

25        Now of course this is a crystallization.  The idea is

1    that the form A crystallizes out and leaves behind the

2    impurities and solution.   And so if you then evaporate that

3    solution, of course what you've got left behind is remaining

4    Tapentadol hydrochloride and all the impurities.

5         That's what we are seeing here.   So batch CEPM 1 A is

6    the impurities, is impurities that were left behind from the

7    CEPM 1 crystallization.   They analyze specifically three

8    different impurities.   They've given the code name shown there.

9    And you can see that there's almost three percent of impurity

10   300, .32 of impurity 210, and 351 at 1.88 percent and that

11   comes out as modification B.

12        So, you can compare those two numbers.   CPM one has

13   very, very low levels of impurities of those three particular

14   impurities.   CPM 1 A has much higher levels.   CPM 1 B, CPM 1A

15   as B impurities are stabilizing to form B.

16     Q.   Were new conclusions reached regarding the role of

17   impurities according to this document?

18     A.   Yes.   It was the same exercise for CPM 2 and 2A.   Again

19   the impure one was B.   The pure one was A.   And even CPM 3 and

20   3A, CPM 3A a  little bit less impure and it was a mixture .

21        And what Grunenthal scientists said was as it says that

22   impurities effect the formation of the unfavored modification,

23   form B.

24     Q.   Does this document address any other types of

25   impurities?

1    A.   This particular document doesn't address any other

2    kinds of impurities.  But normally impurities tend to flock

3    together.  So while this document only analyzes specifically

4    for three particular impurities, generally impurities in a

5    recrystallization like this, all the impurities left behind in

6    the mother liquor as it's called.  So even if they weren't

7    analyzed for them, there may be other impurities present as

8    well.

9    Q.   Is there any study of an inorganic impurity that's

10   represented in another slide in this document?

11   A.   Yes, Grunenthal scientists were worried particularly

12   about bromide.

13   Q.   If you could turn to Page 21 of DTX 1243.

14   A.   Yes.  So they specifically considered the possibility

15   that bromide, which is chemically very, very similar to

16   chloride as in Tapentadol hydrochloride, could substitute for

17   chloride within the hydrochloride lattice.

18        Because Bromide is only very slightly bigger than

19   chloride.  It's right adjacent to it on the periodic table and

20   has very similar chemistry and of course is involved in the

21   synthesis reaction, they were worried that bromide might get

22   into the crystals and cause this retardation effect.

23        They likened the effect to the doping the semi

24   conductors where an impurity gets into the semi conductor

25   structure and actually changes it's properties.

1     Q.   What is meant by in the second bullet point here?

2     A.   Yes.  Well they noticed that, I only have this bullet

3     point to go on, but they must have actually characterized the

4     bromide salt of Tapentadol hydrochloride.  And what they say is

5     that the corresponding bromide salt has an isotypic structure,

6     in other words has the same crystal structure as form B.

7     So it's not surprising that bromide could substitute

8     for chloride within the form B crystal structure.

9     Q.   Are you aware of any other documents that discussed the

10    role of impurities in stabilizing form B.

11    A.   Yes, there are a number of other documents that

12    Grunenthal talks about impurities stabilizing form B.

13    Q.   If I could ask you to turn to defendant's trial exhibit

14    995.  Have you seen this document before?

15    A.   Yes, I have.

16    Q.   Does the document address the role of impurities in

17    stabilizing form B?

18    A.   Yes.  So this is a document, it's a report on

19    crystallization studies undertaken by a company Crystallics and

20    it's addressed to Dr. Gruss from Grunenthal.   They have a

21    specific section on impurities within the document.  I believe

22    it's on page Bates number ending in ten at Page 10 of the

23    document.

24    Q.   It's defendant's trial Exhibit 995 Page 10.

25    A.   Yes.  So, in the first paragraph there.

1      Q.   What's described in this section of the document?

2      A.   So, Crystallics says that Grunenthal has previously

3  indicated that the polymorphic form of CG 5503, Tapentadol

4  hydrochloride, is affected by the amount of the impurities.

5  That was the instruction that got particularly with regard to

6  two impurities which they've identified by code names here,

7  present in the mixture upon crystallization.

8          And what Crystallics did was then to try and decide

9  what the effects of those two impurities were on whether form B

10 persists or was formed at all.  So they did a particular design

11 of experiments in which, in which they carried out systematic

12 experiments to try and see whether those two particular

13 impurities would influence the polymorphic form.

14     Q.   What conclusions did they reach?  I think it's on the

15 next paragraph down.

16     A.   Thank you.

17     Q.   Blow that up.

18     A.   Yes.  And so it's the second sentence.  The second

19 paragraph.  Yes.  So, they concluded after that systematic

20 study that higher amounts of GRT 0912Y, which is an impurity,

21 were observed to have a larger influence of the formation of

22 polymorph B than GRT4045Y gather impurities that they were

23 asked to look at.

24         Q.   Are you aware of any other Grunenthal documents

25 that discuss the role of impurities in stabilizing form B.

1          A.   Yes, I am.

2          Q.   Could I ask you to turn to DTX 1008 in your book? Have

3     you seen this document before?

4          A.   Yes, I have.

5          Q.   What is this document?

6          A.   So this is another Grunenthal internal report and

7     discussing their for polymorph investigations on Tapentadol

8     hydrochloride.

9          Q.   Does this document address the role of impurities in

10    stabilizing form B?

11         A.   Yes, it does.   It's on the third page of the document.

12         Q.   What does this document say about impurities?

13         A.   So, this is within the context of these anomalous room

14    temperature long lived form Bs.   They say that in a bullet

15    point, in three bullet points they make three different

16    attempts to explain the behavior.

17              One, do they have contamination with bromide in the

18    sample to give a co-crystallization that occurs to decrease the

19    DSC transition point?   In other words make the B to A

20    transition occur below room temperature.   Do they have other

21    impurities like byproducts of degradation products that effect

22    the transition temperature.   Or is there a third polymorph

23    modification present and that doesn't seem to be the case.

24              So, the first two again refer to either bromide is an

25    impurity or degradation product impurities.

1    Q.   What do you conclude based on these Grunenthal

2    documents about the discussion in all these Grunenthal

3    documents about impurities?

4    A.   It's quite clear that if form B persists at room

5    temperature, it's impure.  Impurities are stabilizing the form

6    B otherwise it would transform to form A at room temperature.

7    It seems Grunenthal was well aware of this problem and I agree

8    with their speculations.

9    Q.   Based on all the information you have reviewed in this

10   case, does example 25 inherently anticipate the asserted claims

11   of the '364 patent?

12   A.   Yes, it does.

13   Q.   Professor Steed, I'm going to move ahead a little bit

14   to streamline some of the questions.  And I want to direct your

15   attention to PTX, plaintiff's trial Exhibit 1547.

16        Were you in the Court last week for testimony related

17   to the XRPD pattern for Dr. Buschmann's batch 0?

18   A.   Yes.

19   Q.   Do you recognize this document PTX 1547?

20   A.   I do.

21   Q.   What is this document?

22   A.   Yes.  So, I believe the blue trace is Dr. Buschmann's,

23   said by plaintiffs to be Dr. Buschmann's batch 0.  And the red

24   trace is what they used as a reference material which is a

25   powder diffraction pattern, I hasten to add.

1           And the red trace is the powder diffraction pattern of

2      the reference material CEPM 1A that's the compound I was

3      talking about which results from evaporating the mother liquor

4      from the form A crystallization which is CPM 1.  And so this is

5      a very impure batch indeed which is form B.

6           Q.  So, what is the impurity content of CEPM1A?

7           A.  That was the impurities that we looked at on the table

8      a few minutes ago and analyzed the three specific impurities

9      identified by code name which were present in amounts of around

10     2.8ish percent, point 3 percent and 1 and a halfish percent I

11     think.

12          Q.  What is the red trace on  PTX 1547?

13          A.  So the red trace is what we are talking about, that's

14     CPM1A.  That's the impure reference material.

15          Q.  What's the blue trace?

16          A.  The blue trace is said by Grunenthal to be the powder

17     diffraction pattern of Dr. Buscmann's  batch 0.

18          Q.  What's the impurity content of Dr. Buschmann's batch 0?

19          A.  We know from its lack of melting point it's sintering

20     point, that it must be very impure.

21          Q.  Professor Steed, do you have an opinion as to whether

22     or not the '364 patent is obvious?

23          A.  Yes I believe it is obvious.

24          Q.  And how do you come to that determination?

25          A.  All it reports is the only form of Tapentadol

1    hydrochloride which is stable at room temperature.  So, any

2    crystallization experiments on tapentadol hydrochloride would

3    straightaway reveal form A with all of its characteristics.

4         Q.   Could I ask you to take a look at the '364 patent

5    again?  Please.  It's defendant's trial Exhibit 304.   If you

6    could look at the first page?

7         A.   Okay.

8         Q.   What's the filing date of the '364 patent?

9         A.   It dates from June 28, 2004.

10        Q.   And what is the level of ordinary skill with respect to

11   the subject matter disclosed in the '364 patent as of that

12   filing date?

13        A.   Person of ordinary skill would be somebody with perhaps

14   a Ph.D. in chemistry or subject like crystallography and

15   crystallization science or perhaps somebody with a lower degree

16   but some years of industrial research or laboratory experience.

17        Q.   Can I direct you to the '737 patent which we were

18   talking about earlier today.  That's the one with example 25.

19   That's DTX 752.

20        A.   Okay.

21        Q.   Does the '737 patent disclose the synthesis of

22   Tapentadol?

23        A.   Yes, this is at example 25.

24        Q.   Do you have an understanding as to why Grunenthal was

25   making Tapentadol and the other molecules that are disclosed in

1      the '737 patent?

2          A.   Yes.   They wanted to use them as medicines for pain and

3      analgesics.

4          Q.   If I could direct you to column one of the '737 patent.

5      How do you know that this project was aimed at finding

6      analgesics?

7          A.   Yes,  I think that's under the heading summary of the

8      invention.   The patentee says the underlying object of the

9      present invention was to provide substances with an analgesic

10     effect which is suitable for the treatment of severe pain.

11         Q.   Thank you.

12         Q.   Does example 25 identify the crystal structure of the

13     Tapentadol product?

14         A.  No, it doesn't.   Just that it can be made in

15     crystalline form.

16         Q.   Would a person of skill be motivated to find out if

17     there was more than one crystal structure of Tapentadol?

18         A.   Yes, absolutely.   Screening for crystal forms is a

19     routine part of the business of pharmaceutical companies.

20         Q.   And why is it a routine part of the business?

21         A.   Well, amongst other things because the FDA requires

22     them to carry out a polymorphism screen and decide whether or

23     not polymorphism is relevant to the performance of a drug

24     substance and therefore whether they need to control for it.

25         Q.   Could I ask you to take a look at defendant's trial

1  Exhibit 290.   Have you seen this document before?

2  A.   Yes.

3  Q.   What is it?

4  A.   So these are the FDA guidelines with supporting

5 documentation in drug applications as of February 1987.

6  Q.   And are these the FDA guidelines you were mentioning in

7 your answer a moment ago?

8  A.   Yes, among a number of documents.

9  Q.   So,  where in this document is the FDA telling drug

10 developers about polymorphism?

11  A.   They have a specific section on polymorphism.  You may

12 have to help me with the page number.

13  Q.   Go to Page 37 of the document.

14  A.   Thank you.   Yes, they have a specific heading entitled

15 polymorphism.

16  Q.   Actually on Page 36.

17  A.   Yes.  The section starts on 36 and runs to 37.

18  Q.   Right.

19  A.   So,  perhaps the most appropriate place to look is the

20 middle of Page 37 where the FDA says approximate analytical

21 procedures should be used to determine whether or not

22 polymorphism occurs.

23  So, In other words, carry it out a screen for

24 polymorphism and determine if the drug substance is

25 polymorphic.  And then it gives examples of the analytical

1    procedures that can be used to analyze the results of that

2    screen for whether they have the same or different crystal

3    forms.

4    Q.   Would a person of skill in the art have understood as

5    of June 2004 how to conduct such a polymorph screen?

6    A.   Yes absolutely.

7    Q.   Are there publications that provide guidance on how to

8    do such a screen?

9    A.   There certainly are.

10    Q.   Could I ask you to turn to DTX 755 please.  Do you see

11    that document?

12    A.   Yes.

13    Q.   What is that?  What is DTX 755?

14    A.   This is a review article written Dr. Steven Byrn and

15    his colleagues which talks about the FDA's requirement to carry

16    out a polymorphism screen and then make a decision as to

17    whether the resulting polymorphs that have or haven't been

18    discovered are relevant to the formulation of the drug

19    substance in its long term stability and so.

20    Q.   Can you direct us to the portion of the document that

21    describes what you just talked about?

22    A.   Yes, so the very first paragraph after the abstract

23    discusses this issue.  So it says Interest in the subject of

24    pharmaceutical solids stems in part of the Food and Drug

25    Administration drug substance guideline that states appropriate

1       analytical procedures should be used to detect polymorphic

2       hydrated or amorphous forms of the drug substance.

3           Q.   Does this paper go on to describe how to carry out an

4       investigation to determine polymorphism?

5           A.   Yes.  This paper describes what it calls a strategic

6       approach.  So a systematic well defined approach to satisfy the

7       FDA's guidelines requirements.

8           Q.   Where do we find that in the paper?

9           A.   So, the best place to look is in Figure 1 which is a

10      decision tree covering how to screen for polymorphs and then

11      decide if they are relevant to the production of the drug

12      substance.

13          Q.   And how does one carry out such a screen?

14          A.   Yes.  So very simply the decision tree begins with the

15      question, have polymorphs been discovered.  So that's the

16      polymorph screen.  And it gives guidance as to how we can

17      answer that question, whether polymorphs have been discovered

18      or not.

19               So, the paper teaches that we can discover polymorphs

20      if they exist by carrying out a range of different

21      recrystallization experiments using different solvents with

22      different polarity.  The kind of standards that would be known

23      in the lab.  And systematically vary the temperature, the

24      concentration, whether or not there was agitation and the PH

25      and so on, simple routine trial and error experiments, changing

1      the conditions to see what crystallizes.

2      Q.   Does the Byrn paper identify particular solvents that

3      should be used?

4      A.   Yes, it gives an exemplary list of particular common

5      solvents that would be good starting points to try.  That's in

6      the second column on the same page under the heading  A

7      formation of polymorphs.  Have polymorphs been discovered?

8           So Dr. Byrn suggests that the suitable starting point

9      of solvents would include water, methanol, ethanol, propanol,

10     isopropanol  acetane, cetanol triethyl acetate, hexane and

11     mixtures.

12     Q.   Are you aware of the polymorphs screen that Grunenthal

13     conducted on Tapentadol?

14     A.   Yes, I am.

15     Q.   Who conducted that polymorph screen?

16     A.   They contacted an external research company SSCI to do

17     the polymorph screen.

18     Q.   Have you seen any documents describing that project?

19     A.   Yes, I have seen the final report from  SSCI describing

20     in detail the polymorph screen they conducted.

21     Q.   Turn to DTX 2001, sorry 1001.   What is DTX 1001?

22     A.   Yes.  So this is the final report from SSCI of the

23     polymorphism screen on Tapentadol hydrochloride that they

24     carried out in 2001 for Grunenthal.

25     Q.   How did SSCI carry out the screen?

1      A.   They did essentially what Dr. Byrn instructs.  So they

2  carried out a variety of different crystallization of

3  Tapentadol hydrochloride in a variety of different solvents

4  under a variety of conditions

5      Q.   Are those results gathered somewhere in this document?

6      A.   Yes, Table 3 of the document give the results of the

7  polymorph screen.

8      Q.   That's on Page 14 of DTX 1001?

9      A.   Yes.  And it goes onto Page 15 as well.

10     Q.   What were the results of these screening experiments?

11     A.   Yes.  So you see in the left hand column the different

12 solvents that they chose, the conditions, they varied the

13 conditions, fast evaporation, slow evaporation, slow cooling

14 and slurrying experiments.

15      They give a sample number and then they analyze the

16 results by x-ray powder diffraction.  And in every single case

17 where they got a solid material, they got form A.

18     Q.   Did SSCI use any of the solvents that Dr. Byrn

19 suggested in the paper we were looking at a moment ago?

20     A.   Yes, with the exemption of water they used every single

21 one of them.

22     Q.   What polymorph was found in those experiments?

23     A.    A every time.

24     Q.   Is it surprising to you that form A appears in all of

25 the results where crystals were obtained?

1         A.    Not at all.   Form A is the only form that's stable at

2    room temperature.   So I would have been surprised if they

3    hadn't found it.

4         Q.    If you could turn quickly to the claims of the '364

5    patent.   That's DTX 304.

6              Professor Steed, what do claims 1, 2 and 3 of the '364

7    patent cover?

8         A.    They cover crystalline form A Tapentadol hydrochloride,

9    the one that was discovered in all of these polymorphism

10   screens including the experiments and they identified by its

11   powder diffraction peaks and the overall appearance of its

12   powder diffraction pattern.

13        Q.    Would the polymorph screen described in Byrn have found

14   that Form A -- would have found the form A polymorph of

15   Tapentadol?

16        A.    Yes.   The powder diffraction pattern of a particular

17   organic substance is directly related to its internal

18   structure.   So, if you crystallize a particular organic

19   substance and do its powder x-ray diffractogram, then you'll

20   find its characteristic peak positions and it's overall peak

21   appearance.   And so for Form A Tapentadol this is what it would

22   look like.

23        Q.    Let me direct your attention to claim 25 of the '364

24   patent, please.   What does this claim cover?

25        A.    This claim is directed to a solid form as a

1    pharmaceutical composition comprised as an active ingredient

2    crystalline form A of Tapentadol hydrochloride.  Again

3    recognized by the same peaks that are listed in claim one.

4        Q.   Would it have been obvious to a person of skill to use

5    form A Tapentadol in a pharmaceutical dosage form?

6        A.   Yes absolutely.

7        Q.   Why?

8        A.   Form A is the only form that's stable at room

9    temperature.  So the commonsense reason is you wouldn't want to

10   use a form which might then transform into form A and therefore

11   mean your medicine is unstable.

12       Q.   Are you aware of any guidance in the literature that

13   would support your conclusion?

14       A.   Yes.

15       Q.   Turn to DTX 930.  What is DTX 930?

16       A.   This is an article by Sherry Morissette and her

17   co-workers talking about particular polymorphism screen

18   techniques published in 2004.

19       Q.   Does the Morissette paper discuss using

20   thermodynamically stable polymorphs in dosage forms?

21       A.   Yes, it does on Page 2 of the document, the first

22   column.   So, what she says is that the preferred solid form is

23   generally the thermodynamically most stable form of the

24   compound.

25       Q.   Do you agree with that statement?

1      A.   Yes, absolutely.  That's the obvious place to start for

2  commonsense reasons.  And it's the place where the

3  pharmaceutical industry starts as their first choice for

4  medicine.

5      Q.   How many polymorphs exist for Tapentadol?

6      A.   Just two.

7      Q.   And what kinds of techniques were used to determine the

8  polymorphic forms of Tapentadol?

9      A.   By crystallization for a variety of solvents and then a

10  characterization by a technique like x-ray crystallography.

11      Q.   And the crystallization techniques that were used, are

12  those standard and routine procedures?

13      A.   Yes absolutely.  The way we work in this field is by

14  empirical testing.  So we just take the substance crystallize

15  it for a variety of solvents in a variety of conditions quite

16  straightforward experiments and analyze the crystals to see

17  what's formed.

18      Q.   Does it matter whether one uses form A or form B

19  Tapentadol in a dosage form?

20      A.   Actually no.  As it turns out it doesn't.  They are the

21  bio equivalent.

22      Q.   Based on all the information you've reviewed in this

23  case, are the claims of the '364 patent obvious?

24      A.   Yes.

25      Q.   Thank you, Professor Steed.  That's all my question.

1          THE COURT:  Thank you.  Thank you.  All right.

2          Let's hear from the plaintiffs.  I'm assuming no

3   one else is going to be questioning on behalf of the defendants

4   of this witness, correct ?

5          MR.FITZPATRICK:   No, your Honor.

6          THE COURT:   Okay.  Let's hear from the plaintiffs

7   on cross.  Would you like to put this on for the morning?

8          MS. RANNEY:   That's what I was going to talk

9   about, tomorrow morning.  Plaintiffs have over an hour

10   15 minutes of cross-examination.  So, we are thinking it would

11   probably be better to just go tomorrow.

12          THE COURT:  Any issue?

13          MR. ALY:  Your Honor, if I may, we did truncate

14   the direct a bit so maybe we could, as a compromise, leave the

15   direct open if there is a maximum of 10 or 15 minutes of

16   information we need to build on here, obviously not consulting

17   with the expert.

18          MS. RANNEY:  That's fine, your Honor.

19          THE COURT:   You are saying just in case you have

20   a few follow-up questions, you have some opportunity to

21   continue with direct because you tried to really make it quite

22   compact at the end.

23          There's no issue with that, is there?  Any issue?

24   Anyone?

25          MS. RANNEY:   No issue.

1          THE COURT:   That's fine.   So you can determine

2     whether you need to do anything further on direct.   We will

3     address that first thing in the morning.   And then we will deal

4     with the cross in the morning as well thereafter.

5               Just so we have some idea as to what we have going

6     on, we will obviously be finishing with our witness tomorrow.

7     What else for tomorrow?

8          MR. SCHULER:   Then I believe the next witness is

9     Dr. Martin.

10          MR.FITZPATRICK:   Martin, Stephen Martin.

11          THE COURT:   He will be testifying in what area?

12          MR.FITZPATRICK:   He will be testifying regarding

13     invalidity, your Honor, of '593.

14          MR. SCHULER:  Dr. Metzger will be testifying about

15     the invalidity of the '364 and unenforceability of the '364

16     patent.

17          THE COURT:   Okay.   That sounds like it will

18     probably take care of the day.

19          MR. FITZPATRICK:   I think that will probably fill

20     the day tomorrow.

21          THE COURT:   I could be wrong.   You might be quick

22     with them.

23          MR.FITZPATRICK:   No, I think you're probably

24     right.

25          THE COURT:   So, we will have those two witnesses

1    tomorrow.  I think at this point let me release the doctor from

2    the stand.

3              Thank you very much.  You are released.  We will

4    see you tomorrow morning at, shall we do 8:30 tomorrow morning?

5              MS. RANNEY:  Your Honor, if you don't mind, could

6    you just give the witness the same instruction given to the

7    other witnesses about not speaking with Counsel?

8              THE COURT:  I will definitely do that.

9              I do remind you that you are under oath and you're

10   continuing your testimony.  So, do not speak with Counsel

11   regarding your testimony and you will be back tomorrow morning

12   to continue it.  All right.

13             What time are we planning?

14             MR.FITZPATRICK:   Can we start at 9 tomorrow, your

15   Honor?

16             THE COURT:   That's fine.  Do you want to do 9?

17             MR. ALY:   Yes.

18             THE COURT:  Everyone, 9 o'clock.  Nine o'clock

19   tomorrow morning we are beginning.

20             And so the witness is now excused for the evening.

21   Thank you very much.   We will see you tomorrow morning.

22             Any other cleanup issue that we have to tend to

23   before we depart tonight? Anything else?

24             MR.FITZPATRICK:   None for defense, your Honor.

25             THE COURT:   Nothing.  Anything from the

1        plaintiffs?

2                        MS. RANNEY:   No, your Honor.

3                        THE COURT:   All right.  Sounds good.  I think we

4        have our schedule set.  So, I will see you tomorrow morning at

5        9 o'clock.  Thank you.

6                        MS. RANNEY:   Thank you, your Honor.

7                        (Whereupon the matter was concluded)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25